1 | BRAD D. BRIAN (Cal. Bar No. 79001)
KRISTIN LINSLEY MYLES (Cal. Bar No. 154148)
2 | DANIEL P. COLLINS (Cal. Bar No. 139164)
MUNGER, TOLLES & OLSON LLP
3 | 355 South Grand Avenue, 35th Floor
Los Angeles, CA 90071
4 | Telephone: (213) 683-9100
Facsimile: (213) 687-3702
5
Attorneys for Defendant
6 | ARCHER-DANIELS-MIDLAND COMPANY

7 | O'MELVENY & MYERS LLP
DANIEL M. PETROCELLI (Cal. Bar No. 97802)
8 | WALLACE ALLAN (Cal. Bar No. 102054)
1999 Avenue of the Stars, Suite 700
9 | Los Angeles, CA 90067
Telephone: (310) 246-6850
10 | Facsimile: (310) 246-6779

Attorneys for Defendant
11 | NESTLE U.S.A.

12 | MAYER, BROWN, ROWE & MAW LLP
LEE H. RUBIN (Cal. Bar. No. 141331)
13 | Two Palo Alto Square, Suite 300
Palo Alto, California 94306
14 | Telephone: (650) 331-2000
Facsimile: (650) 331-2060
15
Attorneys for Defendant
16 | CARGILL, INCORPORATED

17 | UNITED STATES DISTRICT COURT

18 | CENTRAL DISTRICT OF CALIFORNIA

19 | JOHN DOE I, Individually and on behalf | CASE No. CV-05-5133-SVW
of Proposed Class Members; JOHN
20 | DOE II, Individually and on behalf of | **NOTICE OF MOTION AND**
Proposed Class members; JOHN DOE | **MOTION OF DEFENDANTS**
21 | III, Individually and on behalf of | **ARCHER-DANIELS-MIDLAND**
Proposed Class Members; and GLOBAL | **CO.; NESTLE, U.S.A.; AND**
22 | EXCHANGE, | **CARGILL, INC. TO DISMISS**
| **PLAINTIFFS' COMPLAINT**
23 | Plaintiffs, | **PURSUANT TO FED. R. CIV. P.**
| **12(b)(6) FOR FAILURE TO**
24 | vs. | **STATE A CLAIM UPON WHICH**
| **RELIEF CAN BE GRANTED;**
25 | NESTLE, S.A.; NESTLE U.S.A.; | **MEMORANDUM OF POINTS**
NESTLE Ivory Coast; ARCHER | **AND AUTHORITIES**
26 | DANIELS MIDLAND CO.; CARGILL,
Inc.; CARGILL COCOA; CARGILL | Time: Feb. 6, 2006, 1:30 P.M.
27 | WEST AFRICA, S.A.; and | Ctrm: #6, 312 N. Spring St.
CORPORATE DOES 1-10, | Honorable Stephen V. Wilson
28 | Defendants.

CERTAIN DEFTS.' MOTION TO DISMISS UNDER FED. R. CIV. P. 12(B)(6); MEMO. OF P.'S & A.'S

FILED
CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CA
LOS ANGELES
2005 DEC -5 PH 4: 35

19

FILED ON CM
DEC - 8 2005
BY

007

1    TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

2    PLEASE TAKE NOTICE that on February 6, 2006, at 1:30 p.m., or as soon

3    thereafter as counsel may be heard, in the courtroom of the Honorable Stephen V.

4    Wilson (Courtroom 6) of the above-entitled Court, located at 312 North Spring

5    Street, Los Angeles, California, Defendants Archer-Daniels-Midland Company

6    ("ADM"), Nestlé U.S.A. ("Nestlé"), and Cargill, Incorporated ("Cargill") will and

7    hereby do move the Court to dismiss the Complaint, pursuant to Rule 12(b)(6) of

8    the Federal Rules of Civil Procedure, for failure to state a claim upon which relief

9    may be granted.

10   This motion is made following the conference of counsel pursuant to Local

11   Rule 7-3, which took place on October 12, 2005, and in accordance with the

12   schedule set forth by order of this Court on October 17, 2005.

13   This Motion is based upon this Notice of Motion and Motion, the attached

14   Memorandum of Points and Authorities, the Declaration of Joseph S. Klapach filed

15   concurrently herewith, the pleadings and records on file in this action, such

16   additional authority and argument as may be presented in any Reply and at the

17   hearing on this Motion, and such other matters of which this Court may take

18   judicial notice.

19   DATED: December 5, 2005             MUNGER, TOLLES & OLSON LLP

20

21                                       By: _____

22                                           Brad D. Brian
                                             Attorneys for Defendant
23                                           ARCHER-DANIELS-MIDLAND CO.

24   MAYER, BROWN,                       O'MELVENY & MYERS LLP
     ROWE & MAW LLP
25

26   By: _____    By: _____

27         Lee H. Rubin              Daniel M. Petrocelli
     Attorneys for Defendant      Attorneys for Defendant
28   CARGILL, INCORPORATED        NESTLE U.S.A.

# TABLE OF CONTENTS

Page

I.   INTRODUCTION ..................................................................................1

II.  FACTUAL BACKGROUND.................................................................3

III. ARGUMENT ........................................................................................5

A.  Plaintiffs Fail to State a Federal Common Law Claim under the ATS......................................................................................................5

   1.  The Supreme Court's Decision in Sosa v. Alvarez-Machain .......................................................................................5

   2.  Plaintiffs' Claims that Defendants Should Be Liable for Alleged Forced Labor Committed by Others Does Not State a Claim Under the ATS.......................................................7

      a.  The ATS Does Not Impose Aiding and Abetting Liability..................................................................................7

      b.  Plaintiffs' Claims Based on Secondary Liability Do Not Allege a Norm with the "Definite Content and Acceptance" Required by Sosa.................................... 10

      c.  Under Any Standard, Plaintiffs' Allegations Based on Defendants' Alleged Purchases of Cocoa Beans and Alleged "Logistical Support" Fail To State an ATS Claim ...................................................................... 12

B.  Plaintiffs Fail to State a Claim Under the TVPA ............................... 19

   1.  The TVPA Applies Only to "Individuals," Not Corporations................................................................................. 19

   2.  Plaintiffs Do Not Adequately Allege the Requisite State Action ............................................................................................ 22

   3.  The TVPA Does Not Provide for Aiding and Abetting Liability .......................................................................................... 24

C.  Plaintiffs Fail to State a Claim Under the Thirteenth Amendment.... 27

D.  Plaintiffs Fail to State a Claim Under 18 U.S.C. §§ 1589, 1590, and 1595 ............................................................................................. 30

E.  Plaintiffs' California Law Claims Are Barred by the Federal Foreign Affairs Doctrine ..................................................................... 32

F.  Plaintiffs Fail To State a Claim Under the California Constitution ...................................................................................... 33

G.  Plaintiffs Fail To State a Valid Claim For Breach Of Contract ......... 34

H.  Plaintiffs' Negligence and Recklessness Claims Must be Dismissed........................................................................................... 35

I.  Plaintiffs Fail to State a Claim Under California's Business and Professions Code §17200 ..................................................................... 37

IV. CONCLUSION.................................................................................40

CERTAIN DEFTS.' MOTION TO DISMISS UNDER FED. R. CIV. P. 12(B)(6); MEMO. OF P.'S & A.'S

# TABLE OF AUTHORITIES

Page(s)

## FEDERAL CASES

*Aldabe v. Aldabe,*
   616 F.2d 1089 (9th Cir. 1980) ........................................................... 30

*Aldana v. Del Monte Fresh Produce, N.A.,*
   416 F.3d 1242 (11th Cir. 2005) ......................................................... 23

*Alexander v. Sandoval,*
   532 U.S. 275 (2001) ............................................................................ 30

*Allen v. Wright,*
   468 U.S. 737 (1984) .............................................................................. 5

*Alma Soc'y Inc. v. Mellon,*
   601 F.2d 1225 (2d Cir. 1979) ............................................................. 29

*Alvarez-Machain v. United States,*
   331 F.3d 604 (9th Cir. 2003) (en banc) ............................................. 31

*American Ins. Ass'n v. Garamendi,*
   539 U.S. 396 (2003) ............................................................................ 33

*Arizona Cartridge Remanufacturers Ass'n v. Lexmark Int'l Inc.,*
   421 F.3d 981 (9th Cir. 2005) ............................................................. 37

*Arndt v. UBS AG,*
   342 F. Supp. 2d 132 (E.D.N.Y. 2004) ................................................ 22

*Baker v. McDonald's Corp.,*
   686 F. Supp. 1474 (S.D. Fla. 1987) ................................................... 29

*Beanal v. Freeport-McMoRan, Inc.,*
   969 F. Supp. 362 (E.D. La. 1997), *aff'd on other grounds,* 197 F.3d
   161, 169 (5th Cir. 1999) ............................................................... 21, 22

*Bigio v. Coca-Cola Co.,*
   239 F.3d 440 (2d Cir. 2000) ............................................................... 24

*Bivens v. Six Unknown Named Agents of the Federal Bureau of
   Narcotics,* 403 U.S. 388 (1971) ........................................................ 29

*Bonneville Power Admin. v. FERC,*
   422 F.3d 908 (9th Cir. 2005) ............................................................. 26

*Bowen v. Georgetown Univ. Hosp.,*
   488 U.S. 204 (1988) ............................................................................ 31

*Brentwood Academy v. Tennessee Secondary Sch. Athletic Ass'n,*
   531 U.S. 288 (2001) ............................................................................ 23

*Cabello v. Fernandez-Larios,*
   402 F.3d 1148 (11th Cir. 2005) ......................................................... 25

*Cato v. United States,*
   70 F.3d 1103 (9th Cir. 1995) ............................................................. 29

1

# TABLE OF AUTHORITIES
(continued)

2

**Page(s)**

3

4
*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,*
511 U.S. 164 (1994)......................................................................... 7, 11, 24, 25

5
*Channer v. Hall,*
112 F.3d 214 (5th Cir. 1997) ............................................................... 29

6
*Churchill Village, L.L.C. v. Gen. Elec. Co.,*
7
169 F. Supp. 2d 1119 (N.D. Cal. 2000)................................................ 39

*City of Memphis v. Greene,*
8
451 U.S. 100 (1981)............................................................................. 29

*Civil Rights Cases,*
9
109 U.S. 3 (1883)................................................................................. 27

10
*Clinton v. City of New York,*
524 U.S. 417 (1998)....................................................................... 19, 20

11
*Collett v. Socialist Peoples' Libyan Arab Jamahiriya,*
12
362 F. Supp. 2d 230 (D.D.C. 2005).................................................... 22

*Correctional Service Corp. v. Malesko,*
13
534 U.S. 61 (2001)......................................................................... 29, 30

14
*Del Elmer v. Metzger,*
967 F. Supp. 398 (S.D. Cal. 1997)..................................................... 28

15
*Dellums v. U.S. Nuclear Regulatory Comm'n,*
863 F.2d 968 (D.C. Cir. 1988)........................................................... 39

16
*Deutsch v. Turner Corp.,*
17
324 F.3d 692 (9th Cir. 2003) ............................................................. 33

*Doe v. Broderick,*
18
225 F.3d 440 (4th Cir. 2000) ............................................................. 31

19
*Doe v. Gap, Inc.,*
2001 WL 1842389 (D.N. Mar. I. 2001)............................................. 29

20
*Doe v. Keane,*
658 F. Supp. 216 (W.D. Mich. 1987) ................................................ 29

21
*Doe v. Saravia,*
22
348 F. Supp. 2d 1112 (E.D. Cal. 2004) ............................................. 26

*Enahoro v. Abubakar,*
23
408 F.3d 877 (7th Cir. 2005) ............................................................. 15

24
*Estate of Cowart v. Nicklos Drilling Co.,*
505 U.S. 469 (1992)........................................................................... 21

25
*Estate of Rodriguez v. Drummond Co.,*
256 F. Supp. 2d 1250 (N.D. Ala. 2003).............................................. 22

26
*Exxon Mobil Corp. v. Allapattah Servs., Inc.,*
27
125 S. Ct. 2611 (2005)....................................................................... 26

*Flagg Bros., Inc. v. Brooks,*
28
436 U.S. 149 (1978)........................................................................... 23

1

**TABLE OF AUTHORITIES**
(continued)

2

**Page(s)**

3
*Flanigan v. General Electric Co.*,
93 F. Supp. 2d 236 (D. Conn. 2000)............................................................8

4
*Flood v. Kuhn*,
5       443 F.2d 264 (2d Cir. 1971)................................................................ 29

*Flores v. S. Peru Copper Corp.*,
6       343 F.3d 140 (2d Cir. 2003)................................................................ 19

7
*Gallagher v. Neil Young Freedom Concert*,
49 F.3d 1442 (10th Cir. 1995) ............................................................ 23

8
*Goodman v. Lukens Steel Co.*,
482 U.S. 656 (1987)............................................................................ 28

9
*Great Rivers Co-op. of Southeastern Iowa v. Farmland Indus., Inc.*,
10      120 F.3d 893 (8th Cir. 1997) .............................................................. 28

*Griffin v. Breckenridge*,
11      403 U.S. 88 (1971).............................................................................. 27

12
*Halberstam v. Welch*,
705 F.2d 472 (D.C. Cir. 1983) .............................................. 17, 18, 24

13
*Harley-Davidson Motor Co. v. Powersports, Inc.*,
319 F.3d 973 (7th Cir. 2003) .............................................................. 40

14
*Hayden v. Paul, Weiss, Rifkind, Wharton & Garrison*,
15      955 F. Supp. 248 (S.D.N.Y. 1997) ......................................................7

*Helvering v. Stockholms Enskilda Bank*,
16      293 U.S. 84 (1934).............................................................................. 21

17
*Holland v. Bd. of Trustees of Univ. of the Dist. of Columbia*,
794 F. Supp. 420 (D.D.C. 1992)......................................................... 28

18
*HUD v. Rucker*,
535 U.S. 125 (2002)............................................................................ 26

19
*In re African-American Slave Descendants Litig.*,
20      375 F. Supp. 721 (N.D. Ill. 2005)....................................................... 40

*In re Agent Orange Product Liability Litig.*,
21      373 F. Supp. 2d 7 (E.D.N.Y. 2005) .................................................... 21

22
*In re Currency Conversion Fee Antitrust Litig.*,
265 F. Supp. 2d 385 (S.D.N.Y. 2003) ..................................................7

23
*In re Estate of Marcos*,
25 F.3d 1467 (9th Cir. 1994) ....................................................... 5, 6, 7

24
*In re South Africa Apartheid Litig.*,
25      346 F. Supp. 2d 538 (S.D.N.Y. 2004) .......................................... passim

*In re Terrorist Attacks on Sept. 11, 2001*,
26      349 F. Supp. 2d 765 (S.D.N.Y. 2005) ................................................ 22

27
*In re Yamashita*,
327 U.S. 1 (1946)................................................................................ 26

28

- iv -

# TABLE OF AUTHORITIES
(continued)

Page(s)

*International Labor Rights Fund v. United States,*
391 F. Supp. 2d 1370 (C.I.T. 2005) ...................................................... 16, 33, 39

*J.S. Sweet Co., Inc. v. Sika Chemical Corp.,*
400 F.3d 1028 (7th Cir. 2005) ........................................................................ 36

*Jackson v. Metropolitan Edison Co.,*
419 U.S. 345 (1974) ...................................................................................... 23

*Jett v. Sunderman,*
840 F.2d 1487 (9th Cir. 1988) ....................................................................... 18

*John Doe I v. Exxon Mobil Corp.,*
393 F. Supp. 2d 20 (D.D.C. 2005) ............................................................... 9, 21

*John Doe I v. Unocal Corp.,*
Nos. 00-56603, 00-56628 (9th Cir. 2004) ......................................................... 9

*Johnson v. Duffy,*
588 F.2d 740 (9th Cir. 1978) ......................................................................... 25

*Johnson v. Eisentrager,*
339 U.S. 763 (1950) ...................................................................................... 28

*Kadic v. Karadzic,*
70 F.3d 232 (2d Cir. 1995) ............................................................................ 22

*Khulumani et al. v. Barclay Nat'l Bank Ltd et al.,*
No. 05-2141 (2nd Cir. 2005) .................................................................. 8, 9, 10

*King v. Massarweh,*
782 F.2d 825 (9th Cir. 1986) ......................................................................... 24

*Landgraf v. USI Film Prods.,*
511 U.S. 244 (1994) ...................................................................................... 31

*Lugar v. Edmondson Oil Co.,*
457 U.S. 922 (1982) ...................................................................................... 22

*Lujan v. Defenders of Wildlife,*
504 U.S. 555 (1992) ...................................................................................... 37

*Mann v. City of Tucson,*
782 F.2d 790 (9th Cir. 1986) ......................................................................... 24

*MCI Telecommunications Corp. v. Graphnet, Inc.,*
881 F. Supp. 126 (D.N.J. 1995) ....................................................................... 7

*Mujica v. Occidental Petroleum Corp.,*
381 F. Supp. 2d 1164 (C.D. Cal. 2005) ................................................... 21, 25, 33

*Piazza v. Ebsco Indus., Inc.,*
273 F.3d 1341 (11th Cir. 2001) ..................................................................... 28

*Pinter v. Dahl,*
486 U.S. 622 (1988) ...................................................................................... 17

*Ratzlaf v. United States,*
510 U.S. 135 (1994) ...................................................................................... 26

- v -

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Roe v. Unocal Corp.,*
70 F. Supp. 2d 1073 (C.D. Cal. 1999) ......................................................... 11, 16

*San Francisco Arts & Athletics, Inc. v. U.S. Olympic Committee,*
483 U.S. 522 (1987).................................................................................... 23

*Sanders v. A.J. Canfield Co.,*
635 F. Supp. 85 (N.D. Ill. 1986)................................................................. 29

*Seattle-First National Bank v. Carlstedt,*
678 F. Supp. 1543 (W.D. Okla. 1987)........................................................ 17

*SEC v. Rogers,*
790 F.2d 1450, 1460 & n.22 (9th Cir. 1986) ............................................. 17

*Sinaltrainal v. Coca-Cola Co.,*
256 F. Supp. 2d 1345 (S.D. Fla. 2003) ...................................................... 22

*Smith v. United States,*
507 U.S. 197 (1993).................................................................................... 31

*Soliman v. Philip Morris Inc.,*
311 F.3d 966 (9th Cir. 2002) ..................................................................... 34

*Sorenson v. Secretary of Treasury,*
475 U.S. 851 (1986).................................................................................... 21

*Sosa v. Alvarez-Machain,*
542 U.S. 692 (2004)............................................................................. passim

*Terry Props., Inc. v. Standard Oil Co.,*
799 F.2d 1523 (11th Cir. 1986) ................................................................. 29

*Turner v. Unification Church,*
473 F. Supp. 367 (D.R.I. 1978).............................................................. 28, 29

*United States v. Curtiss-Wright Export Corp.,*
299 U.S. 304 (1936).................................................................................... 28

*United States v. Gaskins,*
849 F.2d 454 (9th Cir. 1988) ..................................................................... 27

*United States v. Kozminski,*
487 U.S. 931 (1988).................................................................................... 30

*United States v. Middleton,*
231 F.3d 1207 (9th Cir. 2000) ................................................................... 20

*United States v. Verdugo-Urquidez,*
494 U.S. 259, 271 (1990)............................................................................ 28

*Van Strum v. Lawn,*
940 F.2d 406 (9th Cir. 1991) ..................................................................... 28

*Vietnamese Fishermen's Assoc. v. Knights of the Ku Klux Klan,*
518 F. Supp. 993 (S.D. Tex. 1981)............................................................. 29

*Westray v. Porthole, Inc.,*
586 F. Supp. 834 (D. Md. 1984) ................................................................ 29

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Wilson v. Garcia,*
471 U.S. 261 (1985) ...................................................................... 28

*Zivkovich v. Vatican Bank,*
242 F. Supp. 2d 659 (N.D. Cal. 2002) ........................................... 5

*Zschernig v. Miller,*
389 U.S. 429 (1968) ...................................................................... 32

## STATE CASES

*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.,*
20 Cal.4th 163 (1999) ................................................................... 39

*Davidson v. City of Westminster,*
32 Cal. 3d 197 (1982) ................................................................... 36

*Doyle v. Rice Ranch Oil Co.,*
28 Cal.App.2d 18 (1938) .............................................................. 34

*E.O.C. Ord, Inc. v. Kovakovich,*
200 Cal. App. 3d 1194 (1988) ...................................................... 35

*Gatto v. County of Sonoma,*
98 Cal. App. 4th 744 (2002) ......................................................... 34

*In re Marriage of Smith & Maescher,*
21 Cal. App. 4th 100 (1993) ......................................................... 35

*Lauriedale Assocs. Ltd. v. Wilson,*
7 Cal. App. 4th 1439 (1992) ......................................................... 34

*Melchior v. New Line Prods., Inc.,*
106 Cal. App. 4th 779 (2003) ....................................................... 34

*Morris v. De La Torre,*
36 Cal. 4th 260 (2005) .................................................................. 36

*Moss v. Superior Court,*
17 Cal. 4th 396 (1998) .................................................................. 33

*Murphy v. Allstate Ins. Co.,*
17 Cal. 3d 937 (1976) ................................................................... 35

*Niles v. Louis H. Rapoport & Sons,*
53 Cal. App. 2d 644 (1942) .......................................................... 35

*North Alaska Salmon Co. v. Pillsbury,*
174 Cal. 1 (1916) .......................................................................... 34

*Norwest Mortgage, Inc. v. Superior Court,*
72 Cal. App. 4th 214 (1999) .................................................... 34, 39

*Rubin v. Green,*
4 Cal.4th 1187 (1993) ................................................................... 39

*Schaefer v. Williams,*
15 Cal.App.4th 1243 (1993) ......................................................... 34

CERTAIN DEFTS.' MOTION TO DISMISS UNDER FED. R. CIV. P. 12(B)(6); MEMO. OF P.'S & A.'S

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Shell v. Schmidt,*
126 Cal. App. 2d 279 (1954) ........................................................ 35

*Thompson v. County of Alameda,*
27 Cal. 3d 741 (1980) ................................................................. 36

*Titus v. Canyon Lake Property Owners Assn,*
118 Cal. App. 4th 906 (2004) ..................................................... 36

**FEDERAL STATUTES**

1 U.S.C. § 1 ................................................................................. 20

18 U.S.C. § 1030(a)(5) ................................................................ 20

18 U.S.C. § 1589 ............................................................. 30, 31, 32

18 U.S.C. § 1590 ............................................................. 30, 31, 32

18 U.S.C. § 1591(a)(1) ................................................................ 32

18 U.S.C. § 1595 ................................................................... 30, 31

18 U.S.C. § 2 ............................................................................... 32

19 U.S.C. § 1307 ......................................................................... 16

28 U.S.C. § 1350 (Alien Tort Statute ............................... 2, 5, 6, 13

28 U.S.C. § 1350, *note* (Torture Victim Protection Act ....... passim

42 U.S.C. § 1983 ............................................... 22, 24, 25, 28

Trafficking Victims Protection Reauthorization Act of 2003, Pub. L.
No. 108-193, 117 Stat. 2875, 2878 (2003) .......................... 31

TVPA, Pub. L. No. 102-256, 106 Stat. 73 (1992) ..................... 19

**STATE STATUTES**

Cal. Bus. & Prof. Code § 17200 ........................................... 37, 39

Cal. Bus. & Prof. Code § 17204 ....................................... 37, 38, 39

Cal. Bus. & Prof. Code § 17208 ................................................. 39

Cal. Civ. Code § 52.1 ................................................................. 33

Cal. Civ. Proc. Code § 335.1 ................................................ 28, 36

Cal. Civ. Proc. Code § 337 ......................................................... 35

**CONSTITUTIONAL PROVISIONS**

U.S. Const. amend. XIII ........................................................ 2, 27

**OTHER AUTHORITIES**

1 Witkin, Summary of Cal. Law §§ 686, 696 (10th ed. 2005) ............. 35

2 D. B. Dobbs, THE LAW ON TORTS § 333 ................................. 17

BLACK'S LAW DICTIONARY 773 (6th ed. 1990) ......................... 20

CERTAIN DEFTS.' MOTION TO DISMISS UNDER FED. R. CIV. P. 12(B)(6); MEMO. OF P.'S & A.'S



**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

H.R. Conf. Rep. No. 939, 106th Cong., 2d Sess., 101-02 (2000)........................... 32

H.R. Rep. No. 367, 102d Cong. 1st Sess. 5 (1991), *reprinted in* 1991
    U.S.C.C.A.N. 84 ................................................................................... 20, 22

Prop. 64, 3 WEST'S CALIFORNIA SESSION LAWS A-70 (2004) ................................ 37

RESTATEMENT (SECOND) OF TORTS §§ 315-20 (1965)....................................... 17, 36

RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW § 702(b).............................. 16

RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW § 702, com. a...................... 15

S. Rep. No. 249, 102d Cong., 1st Sess. 10, at 7 (1991)............................... 20, 25, 26

WEBSTER'S THIRD NEW INT'L DICTIONARY 1152, 1686 (1986) ............................. 20

**TREATIES AND OTHER INTERNATIONAL AUTHORITIES**

Convention Against Torture and Other Cruel, Inhuman or Degrading
    Treatment or Punishment, G.A. res. 39/46, 39 U.N. Doc., GAOR
    Supp. (No. 51), U.N. Doc. A/39/51 (1984) ......................................................... 14

Declaration on the Protection of All Persons From Being Subjected to
    Torture and Other Cruel, Inhuman or Degrading Treatment or
    Punishment, G.A. Res. 3452, 30 U.N. Doc., GAOR Supp. (No. 34),
    U.N. Doc. A/10034 (1976) ............................................................................ 13, 14

ILO Convention No. 105 Concerning the Abolition of Forced Labour,
    Arts. 1, 2.......................................................................................................... 14

ILO Convention No. 138 on Minimum Age for Employment, 1015
    U.N.T.S. 297 (1973) ..................................................................................... 13, 14

ILO Convention No. 182 on the Worst Forms of Child Labour, 38
    I.L.M. 1207 (2000).............................................................................................. 14

ILO Convention No. 29 Concerning Forced or Compulsory Labor, 39
    U.N.T.S. 55 (1930)....................................................................................... 13, 14, 15

International Covenant on Civil and Political Rights, Art. 8, G.A. res.
    2200A (XXI), 21 U.N. GAOR Supp. (No. 16) at 52, U.N. Doc.
    A/6316 (1966), 999 U.N.T.S. 171 (1976).......................................................... 14

Office of the Legal Advisor, U.S. Dep't of State, Treaties in Force
    418-23 (2004)...................................................................................................... 13

Rome Statute of the International Criminal Court, 37 I.L.M. 1002,
    1016 (1998).............................................................................................. 11, 12, 18

Statute of the International Criminal Tribunal for Rwanda (1994), 33
    I.L.M. 1602, 1604 (1994)................................................................................. 11, 12

Statute of the International Criminal Tribunal for the Former
    Yugoslavia, 32 I.L.M. 1192, 1194 (1993, updated 2004) ........................... 11, 12

United Nations Charter, Art. 1, 59 Stat. 1031 (1945).............................................. 14

CERTAIN DEFTS.' MOTION TO DISMISS UNDER FED. R. CIV. P. 12(B)(6); MEMO. OF P.'S & A.'S

## MEMORANDUM OF POINTS AND AUTHORITIES
## I.  INTRODUCTION

The plaintiffs in this action — three individual citizens of Mali and a San-Francisco-based human rights organization — seek to hold defendants Archer-Daniels-Midland Company, Nestle U.S.A., and Cargill, Incorporated liable for alleged forced child labor and related acts by third party farmers or farming cooperatives in Cote D'Ivoire.[1]  Plaintiffs allege that these farmers or farming cooperatives forced them to work on the harvesting and cultivating of cocoa beans on the farms, trafficked one of the plaintiffs to Cote D'Ivoire from Mali to perform such work, held the plaintiffs against their will on the farms and did not permit them to leave, and subjected the plaintiffs to beatings and other mistreatment in the course of their confinement and labor on the farms.

Plaintiffs have not sued any of the individual Ivoirian farmers, farms, or farming cooperatives who allegedly committed these wrongs.  Rather, they have named as defendants United States companies that allegedly purchased for further processing cocoa beans produced in Cote D'Ivoire.[2]  Plaintiffs do not allege that any of these corporate defendants had actual knowledge of forced labor or other wrongful practices by any specific farm or farming cooperative, and certainly do not assert that Defendants themselves either committed such practices or even offered assistance in their commission.  Rather, their theory is that Defendants are liable to Plaintiffs because (1) the use of child labor — which Plaintiffs appear to equate with child *slave* labor — on cocoa farms in Cote D'Ivoire is "well-documented"; (2) Defendants nonetheless purchase their cocoa beans from Ivoirian

---

[1] Plaintiffs also named as defendants, but have not yet served, foreign affiliates of defendants Nestle U.S.A. and Cargill, Incorporated.  Only the domestic defendants are currently before the Court, and only these entities are joining in this motion.

[2] Defendants do not concede that the entities currently before the Court — *i.e.*, those corporate entities that have been named and served — in fact were actual purchasers of cocoa beans from Cote D'Ivoire.  Defendants simply assume the truth of Plaintiffs' allegations to that effect for purposes of the present motion.

1    cocoa farms and provide unidentified "logistical support" to such farms; and

2    (3) each of the named individual Plaintiffs allegedly worked on a plantation whose

3    cocoa "is supplied to any one and/or more of the Defendants herein."  Complaint,

4    ¶ 35-37, 44-46.  Plaintiffs purport to state federal common law claims under the

5    Alien Tort Statute, 28 U.S.C. § 1350 ("ATS"); the Torture Victim Protection Act

6    ("TVPA"), 28 U.S.C. § 1350, *note*; the Thirteenth Amendment to the U.S.

7    Constitution; as well as other federal and state laws.

8         Plaintiffs' theory of liability — under which a purchaser of a good, or any

9    entity that provides "logistical support" (such as financial support) for the

10   production of that good, is liable for any wrongful act allegedly committed in the

11   production of the good — has no basis in domestic law, nor does it fall within the

12   very narrow class of international-law norms cognizable under the ATS, as

13   construed in *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004).  Moreover, such a

14   theory would have breathtaking implications for the global economy (including, for

15   example, on the United States' ever-expanding economic relationship with China),

16   and would impose unreasonable requirements on purchasers to make upstream

17   investigations to ensure the human rights *bona fides* of each and every entity

18   involved in any aspect of production of the purchased goods.  No court has

19   endorsed such a theory, and this Court should not be the first to do so.[3]

20   _____

21   [3] The lack of a judicial remedy does not mean that labor problems within Cote
     d'Ivoire are going unaddressed.  To the contrary, the Executive Branch, with the

22   cooperation of the private sector, is actively engaged, although progress has been
     limited by the fact that Cote d'Ivoire has been in the midst of a civil war for the past

23   five years. *See, e.g.,* U.S. Dep't of State, Supporting Human Rights and
     Democracy: The U.S. Record 2004-2005 at 23 (available at http://www.state.gov/

24   g/drl/rls/shrd/2004/43108.htm); U.S. Dep't of State, Background Report: Cote
     d'Ivoire, http://www.state.gov/r/pa/ei/bgn/2846.htm.  As the federal government

25   observed in opposing the recognition of a judicial remedy in a similar situation, the
     United States "often promote[s] active economic engagement [by the U.S. private

26   sector] as a method of encouraging reform and gaining leverage" in working to
     change the labor and human rights policies of other nations.  U.S. *Amicus Curiae*

27   Br. at 13, *Khulumani et al. v. Barclay Nat'l Bank Ltd et al.,* No. 05-2141 (2d Cir.
     2005) (hereafter, "U.S. Apartheid Br."), Klapach Declaration, Ex. A, filed

28   concurrently herewith.

## II.  **FACTUAL BACKGROUND**

Plaintiffs allege that, beginning between 1994 and 1998 (at a time when each was no older than 14 years of age), they were forced to work "harvesting and cultivating cocoa beans" at three different plantations in Cote d'Ivoire.  Complaint, ¶¶ 44-46.  John Doe I further alleges that he was "trafficked into Cote d'Ivoire" for the purpose of performing such labor.  *Id.*, ¶ 44.[4]  In each case, the forced labor is alleged to have continued until 2000.  *Id.*, ¶¶ 44-46.  The Complaint alleges that none of the Plaintiffs was paid for his labor; that John Does I and II received only minimal nourishment; and that all three Plaintiffs were guarded and were kept at night in a locked room.  *Id.*  The Complaint alleges that John Doe I was beaten with tree branches, and that John Does II and III were whipped, when those guarding them "felt [they were] not performing adequately."  *Id.*

Plaintiffs' Complaint does not allege that Defendants themselves participated in any way in these acts of trafficking, forced labor, and mistreatment.  On the contrary, it repeatedly states that these actions were committed by "farm[s] and/or farmer cooperative[s]" in Cote d'Ivoire that are neither identified in the Complaint nor named as defendants.  *See, e.g.*, Complaint, ¶¶ 8-10, 31-32, 37-38, 44-46.  The Complaint's allegations with respect to Defendants fall into two categories.

First, with respect to each of the three plantations on which the Plaintiffs respectively worked, the Complaint contains an identically worded allegation that "[u]pon information and belief, the cocoa cultivated on this plantation is supplied to any one and/or more of the Defendants herein."  Complaint, ¶¶ 44-46.  Elsewhere, the Complaint alleges that, at the time Defendants made these alleged purchases, "they knew or should have known" that the "farms and/or farmer cooperatives" in question "relied on forced child labor in the cultivating and harvesting of cocoa

---

[4] Although the Complaint initially states that all three Plaintiffs are "of Malian origin who were trafficked and forced to work ... on farms in Cote d'Ivoire" (Complaint, ¶ 1), the Complaint contains no details about the alleged trafficking of John Does II and III.

1   beans." *Id.*, ¶ 37.

2       Second, the Complaint alleges that, even though Defendants "knew or should

3   have known" that these "farms and/or farmer cooperatives ... relied on forced child

4   labor in the cultivating and harvesting of cocoa beans," Defendants "provided such

5   farms with the logistical support to do so with little or no restrictions from the

6   government of Cote d'Ivoire." Complaint, ¶ 37. This allegedly knowing provision

7   of "financial support, supplies, training, and/or other substantial assistance ...

8   *contributed to the ability*" of, *inter alia*, the "farm[s] and/or farmer cooperative[s]"

9   to "use and/or facilitate the use of child slave labor," and therefore (according to the

10   Complaint) amounts to "aid[ing] and abett[ing]" the mistreatment of Plaintiffs. *Id.*,

11   ¶ 31, emphasis added. The Complaint also alleges that Defendants' entry into "any

12   agreement, contract, and/or memorandum of understanding, written or oral" with

13   the "farm[s] and/or farmer cooperative[s]" under which the latter would "supply

14   cocoa beans" is sufficient to render Defendants "vicariously liable" for the actions

15   of those farms and farmer cooperatives. *Id.*, ¶ 32.

16       Based on these allegations, the individual Plaintiffs seek to hold Defendants

17   liable under federal common law, the TVPA, and other laws. Plaintiff Global

18   Exchange asserts a single claim under the California unfair competition law.

### III.  ARGUMENT

20   **A.**    **Plaintiffs Fail to State a Federal Common Law Claim under the ATS**

21       Plaintiffs' federal common law claims under the Alien Tort Statute, 28 U.S.C.

22   § 1350 ("ATS") must be dismissed because they do not satisfy the rigorous

23   requirements of *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004).[5]

24     [5] Plaintiffs do not have standing to pursue any of their claims because the alleged

25   injuries are not fairly traceable to Defendants' conduct. Article III requires the
plaintiff to "show each link in the causal chain between the defendant and the

26   asserted injury." *Zivkovich v. Vatican Bank*, 242 F. Supp. 2d 659, 670 (N.D. Cal.
2002); *see Allen v. Wright*, 468 U.S. 737, 760 (1984). Here, Plaintiffs were not

27   subjected to forced labor by Defendants, and the sole allegations connecting
Defendants to the claimed injury – buying cocoa, providing unidentified "logistical

28   support," and having "economic leverage" — are too attenuated to establish a
causal chain between Defendants' conduct and the claimed injuries. Had

-4-

### 1. The Supreme Court's Decision in *Sosa v. Alvarez-Machain*

The ATS, enacted in 1789, states that "[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350. Before *Sosa*, the Ninth Circuit and other courts had held that, despite the statute's wording, it not only conferred jurisdiction but also created a statutory cause of action for violations of international law. *See, e.g., In re Estate of Marcos*, 25 F.3d 1467, 1475 (9th Cir. 1994). The Supreme Court in *Sosa* unanimously rejected this view as "'simply frivolous.'" 542 U.S. at 713 (citation omitted). Accordingly, it is now settled that "the ATS is a jurisdictional statute creating no new causes of action." *Id.* at 724.

The Court in *Sosa* went on to hold that the ATS was intended to confer jurisdiction for "a narrow set" of common law violations that were recognized at the time of its enactment in 1789. *See id.* at 715; *see also id.* at 720 (noting that "some, but few, torts in violation of the law of nations were understood to be within the common law"). By a divided vote, the Court further held that the courts continue to possess a "restrained" federal common law authority to "adapt[] the law of nations to private rights," but emphasized that courts must exercise "great caution" in employing a federal common law authority "with such obvious potential to affect foreign relations." *Id.* at 725, 728.

The Supreme Court established a "requirement of clear definition" that is a necessary, but not sufficient, condition for recognizing a proposed international-law norm as federal common law that is privately enforceable under the ATS. *Id.* at 733 n.21. This "clear definition" rule has two parts.

*First*, "federal courts should not recognize private claims under federal common law for violations of any international law norm with less definite content

---

Defendants ceased dealing with them, the Ivoirian farmers may have found other buyers or sold their cocoa beans through intermediaries. Because the causal chain asserted by Plaintiffs depends upon the "uncertain" and "independent decisions" of "numerous third parties," it cannot be said that the asserted injury is fairly traceable to Defendants' alleged conduct. *Allen*, 468 U.S. at 757, 759.

1   and acceptance among civilized nations than the historical paradigms familiar when

2   § 1350 was enacted" in 1789, *id.* at 732 — *i.e.*, the norm must have "the certainty

3   afforded by Blackstone's three common law offenses" against the law of nations

4   "addressed by the criminal law of England: violation of safe conducts, infringement

5   of the rights of ambassadors, and piracy." *Id.* at 737, 715, 724.  This "demanding

6   standard of definition" must be met "to raise even the possibility of a private cause

7   of action." *Id.* at 738 n.30.  Although the Court found this standard linguistically

8   consistent with an earlier statement of the Ninth Circuit that any international law

9   norm must be "'specific, universal, and obligatory,'" *id.* at 732 (quoting *Estate of*

10  *Marcos*, 25 F.3d at 1475), the Court made clear that its test is narrower than the

11  former Ninth Circuit standard, disapproving of the Ninth Circuit's application of

12  that standard in *Sosa* itself.  542 U.S. at 733-38.

13          *Second*, even if a plaintiff can show that a norm meets the strict *Sosa*

14  definitional standard, the court still must determine whether recognition of a private

15  right of action to enforce the norm is appropriate, and if so, under what

16  circumstances.  As the Court put it, "the determination whether a norm is

17  sufficiently definite to support a cause of action should (and, indeed, inevitably

18  must) involve an element of judgment about the practical consequences of making

19  that cause available to litigants in the federal courts." *Id.* at 732-33.  Because the

20  "creation of a private right of action raises issues beyond the mere consideration

21  whether the underlying primary conduct should be allowed or not," courts also

22  must consider "the possible collateral consequences of making international rules

23  privately actionable." *Id.* at 727.[6]

24

---

25  [6] This additional requirement followed logically from the Court's rejection of the
    cases holding that the ATS *itself* created a cause of action.  Before *Sosa*, the
26  presence of a "specific, universal, and obligatory" norm of international law was
    thought sufficient for a claim under the ATS, which had been construed as
27  expressly conferring a statutory private right of action.  *Estate of Marcos*, 25 F.3d
    at 1475.  But in light of the Court's holding that the ATS is jurisdictional only, the
28  presence of a binding norm does not itself give rise to a private right of action.

- 6 -

1  **2.**  **Plaintiffs' Claims that Defendants Should Be Liable for Alleged**

2  **Forced Labor Committed by Others Does Not State a Claim**

3  **Under the ATS**

4    Plaintiffs' principal theory – that Defendants can be held vicariously liable for

5  forced child labor allegedly committed by the cocoa farmers – fails to state a claim.

6  **a.**  **The ATS Does Not Impose Aiding and Abetting Liability**

7    The limited federal common law authority under the ATS does not carry with

8  it the authority to fashion principles of *secondary* liability such as aiding and

9  abetting. The Supreme Court has held that, in light of (*inter alia*) the uncertain

10  status of civil aiding and abetting liability under U.S. law, federal statutes cannot be

11  construed to authorize aiding and abetting liability unless a congressional intent to

12  do so appears on the face of the statute. *See Central Bank of Denver, N.A. v. First*

13  *Interstate Bank of Denver, N.A.*, 511 U.S. 164, 181-82 (1994) (recognition of a

14  private right of action under a statute, whether express or implied, does not carry

15  with it a "general presumption that the plaintiff may also sue aiders and abettors").[7]

16  Because a court thus is forbidden to infer civil aiding and abetting liability even

17  where Congress has *expressly* created a cause of action, it follows inexorably that a

18  court relying only upon federal common law authority likewise has no warrant to

19  create and impose such liability. *See Sosa*, 542 U.S. at 726-27 (stating that "the

20  general practice has been to look for legislative guidance before exercising

21  innovative authority over substantive law" and that the creation of private rights of

22  action "is one better left to legislative judgment in the great majority of cases"). As

23  explained above, the ATS does not even create a cause of action, but is merely

24  [7] The courts have applied the *Central Bank* analysis to other federal statutes outside
of the securities law context. *See, e.g., In re Currency Conversion Fee Antitrust*

25  *Litig.*, 265 F. Supp. 2d 385, 431-32 (S.D.N.Y. 2003) (no aiding and abetting
liability under Truth and Lending Act); *Hayden v. Paul, Weiss, Rifkind, Wharton &*

26  *Garrison*, 955 F. Supp. 248, 256 (S.D.N.Y. 1997) (no aiding and abetting liability
under RICO statute); *MCI Telecommunications Corp. v. Graphnet, Inc.*, 881

27  F. Supp. 126, 129 (D.N.J. 1995) (no aiding and abetting liability under Sherman
Act); *Flanigan v. General Electric Co.*, 93 F. Supp. 2d 236, 254 (D. Conn. 2000)

28  (no aiding and abetting liability under ERISA).

1    jurisdictional, and therefore obviously provides no textual warrant for imposing
2    aiding and abetting liability.

3        The courts that have addressed the issue within the post-*Sosa* framework have
4    applied just this analysis to conclude that, in light of *Central Bank*, there can be no
5    aiding and abetting liability under the ATS. Thus, in *In re South Africa Apartheid*
6    *Litig.*, 346 F. Supp. 2d 538 (S.D.N.Y. 2004), *appeal pending sub nom. Khulumani*
7    *et al. v. Barclay Nat'l Bank Ltd et al.*, No. 05-2141 (2nd Cir. 2005), the court
8    dismissed a complaint alleging, among other things, that the defendants had aided
9    and abetted the South African government in its "forced labor" practices and
10    "benefitted from ... [the] glut of cheap labor." *Id.* at 544, 548. Judge Sprizzo
11    explained that "*Central Bank* applies with special force" in the ATS context. *Id.* at
12    550. Because "the [ATS] presently does not provide for aider and abettor liability,"
13    the court refused to "write it into the statute." *Id.* "To allow for expanded liability,
14    without congressional mandate, in an area that is so ripe for non-meritorious and
15    blunderbuss suits would be an abdication of this Court's duty to engage in 'vigilant
16    doorkeeping.'" *Id.* (quoting *Sosa*, 542 U.S. at 729). The court also was "mindful
17    of the collateral consequences and possible foreign relations repercussions that
18    would result from allowing courts in this country to hear civil suits for the aiding
19    and abetting of violations of international norms across the globe." *Id.* at 551.

20        Similarly, in *John Doe I v. Exxon Mobil Corp.*, 393 F. Supp. 2d 20 (D.D.C.
21    2005), the court dismissed an ATS claim that the defendants aided and abetted a
22    group of Indonesian soldiers in numerous violations of international law by, among
23    other things, providing "logistical support" to the alleged tortfeasors. *Id.* at 22.
24    Noting that "courts must conduct a more searching merits-based inquiry than is
25    required in a less sensitive arena," the court held that "defendants cannot be held
26    liable for violations of international law on the theory that they aided and abetted
27    the Indonesian military in committing th[e alleged] acts." *Id.* at 24.[8]

28    _____
[8] In *Cabello v. Fernandez-Larios*, 402 F.3d 1148, 1157-58 (11th Cir. 2005), the

- 8 -

1    Strongly supporting this restrained interpretation of the ATS are two separate

2    *amicus curiae* briefs in which the United States Department of Justice ("United

3    States") urged the courts to reject claims for aiding and abetting under the ATS.

4    *See* U.S. *Amicus Curiae* Br. at 10-26, *John Doe I v. Unocal Corp.*, Nos. 00-56603,

5    00-56628 (9th Cir. 2004) (hereafter, "U.S. Unocal Br."); U.S. Apartheid Br.,

6    Klapach Declaration Ex. A, filed concurrently herewith.  Specifically, the United

7    States noted that the "caution mandated by *Sosa*" combined with the rule of *Central*

8    *Bank* "lead[s] to the unmistakable conclusion that aiding and abetting liability

9    should not be recognized under the ATS, absent further congressional action."  U.S.

10   Apartheid Br. at 9-12.

11       The United States also emphasized that allowing secondary liability under the

12   ATS would have grave foreign-policy implications.  Such liability would "interfere

13   with the ability of the U.S. government to employ the full range of foreign policy

14   options when interacting with regimes with oppressive human rights practices,"

15   including the use of "active economic engagement as a method of encouraging

16   reform and gaining leverage."  U.S. Apartheid Br. at 13.  It could "trigger foreign

17   government protests" and "lead to greater diplomatic friction" by allowing

18   "plaintiffs ... to challenge the conduct of foreign nations" indirectly through claims

19   against "those alleged to have aided and abetted the government."  *Id.* at 17.  And,

20   it would "have a deterrent effect on the free flow of trade and investment ... for

21   those operating in countries where abuses might occur," which would threaten the

22   "broader foreign policy interests in using trade and investment to promote

23   economic development in other countries as a way of promoting stability,

24   democracy and security."  *Id.* at 18-19.

---

25   court stated that the ATS "permits claims based on direct and indirect theories of
     liability," including "accomplice liability."  However, because *Cabello* does not
26   even mention, much less analyze, the impact of *Sosa*, the opinion effectively
     addresses only pre-*Sosa* law and is of no assistance in analyzing the *post-Sosa*
27   arguments asserted here.  *See, e.g., In re South African Apartheid Litig.*, 346
     F. Supp. 2d at 550 n.12 (rejecting, as inconsistent with *Sosa*, pre-*Sosa* case law that
28   had recognized secondary liability under the ATS).

1    Given *Sosa*'s admonition to consider the "practical consequences" of creating

2    rights under the ATS, including the foreign-affairs implications, this Court should

3    afford substantial deference to the United States' view on this issue.

4        **b.**    **Plaintiffs' Claims Based on Secondary Liability Do Not**

5                **Allege a Norm with the "Definite Content and Acceptance"**

6                **Required by *Sosa***

7    Plaintiffs' effort to read secondary liability into the ATS fails for the

8    additional reason that there is no theory of civil aiding and abetting that satisfies the

9    "demanding standard of definition" imposed by the *Sosa* Court for the enforcement

10   of international law norms under the ATS.  542 U.S. at 738 n.30.  As noted above,

11   *Sosa* requires the proposed norm to be "accepted by the civilized world and defined

12   with a specificity comparable to the features of the 18th-century paradigms" of

13   piracy, violation of safe conducts, and the infringement of the rights of

14   ambassadors. *Id.* at 725.  The Court made clear that courts must apply this standard

15   not only in evaluating the primary conduct involved, but also in considering a

16   proposed extension of liability "to the perpetrator being sued, if the defendant is a

17   private actor such as a corporation or individual." *Id.* at 733 n.20.

18   There is no standard for civil aiding and abetting liability that is "accepted by

19   the civilized world" and defined with the specificity required by *Sosa*.  While the

20   concept of *criminal* aiding and abetting liability finds some support in international

21   law,[9] that fact does not (and cannot) establish that there is any comparable

22   international-law concept of *civil* liability (much less one that is defined with the

23   universality and precision demanded by *Sosa*).  In discussing domestic law, the

24   Supreme Court has expressly cautioned against employing concepts of *criminal*

25   aiding and abetting in the civil context. *See Central Bank*, 511 U.S. at 181-82.

---

26   [9] *See, e.g.*, Statute of the International Criminal Tribunal for the Former Yugoslavia

27   ("ICTY Statute"), art. 7(1), 32 I.L.M. 1192, 1194 (1993, updated 2004); Statute of
    the International Criminal Tribunal for Rwanda (1994) ("ICTR Statute"), art. 6(1),

28   33 I.L.M. 1602, 1604 (1994); Rome Statute of the International Criminal Court
    ("Rome Statute"), art. 25(3)(c), 37 I.L.M. 1002, 1016 (1998) (not ratified by U.S.).

1    Indeed, it is this absence of consensus on whether, and to what extent, civil aiding

2    and abetting liability exists that contributed to the Court's conclusion in *Central*

3    *Bank* that such a theory of liability should not apply in the absence of statutory

4    guidance. *See Central Bank*, 511 U.S. at 181-82 (observing that "the doctrine [of

5    civil aiding and abetting] has been at best uncertain in application," and that "in

6    some States, it is still unclear whether there is aiding and abetting tort liability"); *cf.*

7    *Roe v. Unocal Corp.*, 70 F. Supp. 2d 1073, 1080-81 (C.D. Cal. 1999) (fact that a

8    proposed norm was not reflected in U.S. domestic law demonstrates that there is a

9    lack of the requisite consensus).

10        In any event, even if the scope of criminal aiding and abetting liability under

11    international law were a proper guide here, *Sosa*'s demanding standard of definition

12    would still not be met, because the relevant international statutes and tribunals do

13    not agree on the nature and extent of such criminal liability.  For example, the ad

14    hoc tribunals for Yugoslavia and Rwanda only require, as proof of scienter, that the

15    aider and abettor have "knowledge that the acts performed by the aider and abettor

16    assist the commission of a specific crime by the principal." *Prosecutor v.*

17    *Vasiljevic*, ICTY-98-32-A, ¶ 102 (Feb. 25, 2004), http://www.un.org/icty/vasiljevic/

18    appeal/judgement/index.htm.  By contrast, the scienter required under the Rome

19    Statute of the International Criminal Court is much higher.  Under art. 25(3)(c), it

20    must be shown that the aider and abettor acted "[f]or the purpose of facilitating the

21    commission of such crime." Rome Statute, art. 25(3)(c), 37 I.L.M. at 1016 (not

22    ratified by United States).  Notably, one thing all three tribunals *do* agree upon is

23    that their jurisdiction over criminal aiding and abetting claims extends only to

24    "natural persons" and does not include corporations; they thus reject the very type

25    of liability Plaintiffs seek to impose in this case. *See* ICTY, art. 6, 32 I.L.M. at

26    1194; ICTR, art. 5, 33 I.L.M. at 1604; Rome Statute, art. 25(1), 37 I.L.M. at 1016.

27        These international law authorities on aiding and abetting confirm beyond

28    doubt that there is no applicable norm, defined with the demanding specificity and

- 11 -

1    universality that *Sosa* requires, for imposing civil aiding and abetting liability on a

2    corporation in the context alleged here.[10]

3          c.    **Under Any Standard, Plaintiffs' Allegations Based on**

4                    **Defendants' Alleged Purchases of Cocoa Beans and Alleged**

5                    **"Logistical Support" Fail To State an ATS Claim**

6         Even if claims of aiding and abetting were somehow cognizable under the

7    ATS — or if Plaintiffs were to argue that they are asserting claims of direct liability

8    — Plaintiffs' claims based on Defendants' alleged purchases of cocoa beans and

9    "logistical support" nonetheless fail.[11]  Plaintiffs allege that Defendants violated

10   applicable norms of international law by "*purchas[ing]* cocoa from farms and/or

11   farmer cooperatives which [Defendants] knew or should have known relied on

12   forced child labor."  Compl. ¶ 37 (emphasis added).  The Complaint further alleges

13   that Defendants provided the farms or farming cooperatives with "logistical

14   support" in the nature of in the nature of "financial support, supplies, training,

15   and/or other substantial assistance" to farms that, in turn, allegedly used forced

16   child labor.  *Id.* ¶¶ 31, 37.  Whether these assertions are conceptualized as an

17   assertion of direct or secondary liability, they fall far short of satisfying the exacting

18   standard set forth in *Sosa*.

19        The Complaint wholly fails to identify any applicable norm of international

20   law that would prohibit either the purchase of goods allegedly produced through the

21   use of forced labor or other forms of "logistical" or financial support for entities

22   that may engage in such practices — much less that any such norm has achieved the

23   sort of "definite content and acceptance among civilized nations" as "the historical

---

10    The U.S. also rejected the argument that an aiding and abetting norm is
sufficiently established in international law to meet *Sosa*'s demanding standard of
definition.  U.S. Apartheid Br. at 19.

11    As Defendants read the Complaint, it purports to assert only theories of aiding
and abetting or secondary liability.  Each of the ATS-related causes of action, as
pleaded, relates to the forced labor and other alleged underlying wrongs perpetrated
by the farmers and cooperatives, and thus necessarily asserts only secondary
liability on the part of Defendants.

1  paradigms familiar when § 1350 was enacted" in 1789. *See* 542 U.S. at 732. The

2  various treaties and resolutions cited in ¶¶ 50(c)-(n) of the Complaint[12] contain no

3  such proscription, and, indeed, none of them even addresses the purchase of goods

4  produced using proscribed forms of labor.

5      To the extent these materials do address forced labor, they are directed toward

6  persons who actually engage in forced labor; they do not, in terms, prohibit the

7  purchase of goods from, or other forms of support for, such alleged violators. For

8  example, most of the cited materials specially define "forced labor" and other

9  proscribed conduct in a way that includes only those who actively engage in those

10  practices and therefore excludes those who merely purchase goods produced by

11  alleged violators. *See, e.g.,* ILO Convention No. 29 Concerning Forced or

12  Compulsory Labor, art. 5, 39 U.N.T.S. 55 (1932) (defining "forced or compulsory

13  labour" as "all work or service which is exacted from any person under the menace

14  of any penalty and for which the said person has not offered himself voluntarily"),

15  *available at* http://www.ilo.org/ilolex/english/convdisp2.htm.[13]  Another of the

16  ────────────

[12] *Sosa* explicitly holds that some of the cited treaties are *not* appropriate sources
17  for norms that may be enforced under the ATS. For example, *Sosa* explains that
treaties "ratified" by Congress "on the express understanding that [they will not be]
18  self-executing" do not "create obligations enforceable in the federal courts." *Sosa,*
542 U.S. at 735. Several of the cited authorities are not self-executing. *See id.*
19  (International Covenant on Civil and Political Rights not self-executing). Others
have not been ratified by the United States and are, therefore, not binding, much
20  less self-executing. *See* ILO Convention No. 29 Concerning Forced or Compulsory
Labor, 39 U.N.T.S. 55 (1930); ILO Convention No. 138 on Minimum Age for
21  Employment, 1015 U.N.T.S. 297 (1973); *see* Office of the Legal Advisor, U.S.
Dep't of State, Treaties in Force 418-23 (2004). Still others are hortatory
22  declarations that amount to mere "statement[s] of principles" and do not have force
to "impose obligations as a matter of international law." 542 U.S. at 735 (Universal
23  Declaration of Human Rights is of "little utility" under *Sosa* standard); *see*
Declaration on the Protection of All Persons From Being Subjected to Torture and
24  Other Cruel, Inhuman or Degrading Treatment or Punishment, G.A. Res. 3452, 30
U.N. Doc., GAOR Supp. (No. 34) at 91, U.N. Doc. A/10034 (1976).
25  [13] *See also* ILO Convention No. 182 on the Worst Forms of Child Labour, art. 8, 38
I.L.M. 1207 (2000), *available at* http://www.ilo.org/ilolex/english/convdisp2.htm
26  (defining "worst forms of child labor" as, among other things, the "use, procuring,
or offering" of a child for certain illicit purposes and "work which … is likely to
27  harm the health, safety or morals of children"); *cf.* Convention Against Torture and
Other Cruel, Inhuman or Degrading Treatment or Punishment, art. 1, G.A. res.
28  39/46, 39 U.N. Doc., GAOR Supp. (No. 51) at 197, U.N. Doc. A/39/51 (1984)

- 13 -

cited materials merely states a highly generalized aspiration — such as that all persons have a right to "free choice of employment" — without even remotely suggesting that such statements address the purchases of goods by third parties. *See* Universal Declaration of Human Rights, Arts. 4, 23, G.A. Res. 2220A(xxi), 21 U.N. Doc., GAOR Supp. (No. 16) at 52, U.N. Doc. A/6316 (1966) (right to "free choice of employment").[14]

Indeed, only one of the cited materials even mentions goods produced using illicit labor, and it provides only that a signatory State may not grant a "concession" to "private ... companies" that "involve[s] any form of forced or compulsory labour for the production ... of products which such private ... companies utilise or in which they trade." ILO Convention No. 29 Concerning Forced or Compulsory Labor, Art. 5, 39 U.N.T.S. 55 (1932), *available at* http://www.ilo.org/ilolex/ english/convdisp2.htm. The Convention does not address, much less purport to create liability on the part of, those third parties who purchase goods produced by, or provide other logistical support to, alleged violators.[15]

---

(defining "torture" as "any act by which severe pain or suffering ... is intentionally inflicted on a person" by or with the consent of a public official for various enumerated purposes); Declaration on the Protection of All Persons From Being Subjected to Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Art. 1, G.A. Res. 3452, 30 U.N. Doc., GAOR Supp. (No. 34) at 91, U.N. Doc. A/10034 (1976) (same).

[14] *See also* International Covenant on Civil and Political Rights, Art. 8, G.A. res. 2200A (XXI), 21 U.N. GAOR Supp. (No. 16) at 52, U.N. Doc. A/6316 (1966), 999 U.N.T.S. 171 (1976) (right to be free from "perform[ing] forced or compulsory labour"); *cf.* United Nations Charter, Art. 1, 59 Stat. 1031 (1945) (noting goal of "encouraging respect for human rights," without defining rights); ILO Convention No. 105 Concerning the Abolition of Forced Labour, Arts. 1, 2 (proscribing "forced or compulsory labour" without defining term); ILO Convention No. 138 on Minimum Age for Employment, Arts. 2, 3, 1015 U.N.T.S. 297 (1976) (setting minimum employment ages without addressing goods produced in violation), *available at* http://www.ilo.org/ilolex/english/convdisp2.htm.

[15] Plaintiffs also allege that Defendants aided and abetted the violation of international law norms against torture and cruel, inhuman, or degrading treatment. Compl. ¶¶ 57-65. But Plaintiffs cannot bring ATS claims based on these underlying norms because, in passing the TVPA, Congress "occup[ied] the field" and thereby precluded enforcement of these norms under the ATS. *Sosa*, 542 U.S. at 726; *see Enahoro v. Abubakar*, 408 F.3d 877, 886 (7th Cir. 2005). Indeed, in passing the TVPA, Congress chose to provide a remedy for torture only upon

- 14 -

Nor does "[c]ustomary international law" impose any such prohibition. Here, as in *Sosa*, Plaintiffs' "failure to marshal support for [their] proposed rule is underscored by the Restatement (Third) of Foreign Relations Law of the United States (1987)." 542 U.S. at 737 (noting that the absence of a proposed norm from the Restatement's "discussion of customary international human rights law" further confirms that it has not achieved a status comparable to "Blackstone's three common law offenses").[16] Only one of the seven norms on the Restatement's list is even relevant to the applicable subject matter, and that is the prohibition against "slavery or slave trade." RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW § 702(b). Neither this international law obligation nor the parallel "conventions outlawing slavery and slave trade" to which the U.S. is a party (*see id.*, com. e; *see also id.*, Part VII, intro. note at p.148) purport to prohibit the purchase of goods produced with forced labor or other forms of support.

Moreover, it can hardly be said that there is an applicable "binding customary rule" of international law "having the specificity [*Sosa*] require[s]," 542 U.S. at 738, when U.S. *domestic* law does not even contain the sort of prohibition that Plaintiffs seek to impose here. *Cf. Unocal Corp.*, 70 F. Supp. 2d at 1080-81 (rejecting ATS claim based on proposed norm against use of military labor on civilian projects without compensation because U.S. law permitted such use). In this regard, it is notable that, earlier this year, the U.S. Court of International Trade

---

certain defined circumstances and also pointedly chose *not* to provide a civil remedy for cruel, inhuman or degrading treatment. These legislative judgments must be respected. *Sosa*, 542 U.S. at 726-27 (emphasizing need to respect "legislative guidance" in applying federal common law under the ATS). Moreover, any proposed norm based on "cruel, inhuman, or degrading treatment" would be too vague to meet *Sosa*'s "requirement of clear definition." *Id.* at 733 n.21.

[16] *See also* RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW § 702, com. a (stating that "[t]his section includes as customary law only those human rights whose status as customary law is generally accepted (as of 1987) and whose scope and content are generally agreed"). Defendants do not concede that all of the norms mentioned in the Restatement would satisfy *Sosa*'s strict standard, but the *absence* of a norm from that list is, as the Supreme Court indicated, powerful evidence that (absent a compelling showing of a change in customary international law since 1987) the norm does not meet *Sosa*'s demanding standard of definition.

explicitly rejected the argument of the International Labor Rights Fund — counsel
for Plaintiffs here — that federal law prohibits the importation of Ivoirian cocoa
allegedly produced with forced labor. *See International Labor Rights Fund v.
United States*, 391 F. Supp. 2d 1370, 1375-76 (C.I.T. 2005). As the court held in
that case, the federal statutory prohibition on the importation of "goods, wares,
articles and merchandise mined, produced, or manufactured wholly or in part in any
foreign country by convict labor and/or forced labor and/or indentured labor under
penal sanctions," is expressly inapplicable where the goods in question "are not
mined, produced, or manufactured in such quantities in the United States as to meet
the consumptive demands of the United States." 19 U.S.C. § 1307; *see also ILRF
v. U.S.*, 391 F. Supp. 2d at 1374-75. Because it is unquestionable that "no domestic
cocoa production industry exists in the United States sufficient to meet domestic
consumptive demand," the prohibition of § 1307 is inapplicable on its face. *Id*. at
1375-76; *see also id*. at 1376 (holding that, despite numerous efforts to amend the
statute, it effectively "subordinates human rights concerns to the availability of the
goods at issue by means of domestic production"). Acceptance of Plaintiffs' ATS-
based federal-common-law theory of liability would effectively override Congress'
decision *not* to prohibit the importation of such goods. Such a result would be
flatly inconsistent with *Sosa*'s highly restrained notion of federal common law
authority in this area. *See* 542 U.S. at 731 (noting that federal common law
authority may not be invoked to reverse policy judgments made by Congress
"explicitly, or implicitly by treaties or statutes that occupy the field").[17]

---

[17] Plaintiffs' supposedly "universal" norm against purchasing goods produced
through tortious conduct finds no basis even in U.S. tort law. It is settled that the
relationship between a purchaser and seller of commodities does not constitute the
kind of "special relationship" that can give rise to a duty for the torts of another,
even if the relationship is accompanied by ancillary business arrangements such as
financing. *See, e.g.*, 2 D. B. Dobbs, THE LAW ON TORTS § 333, at 905-06 (listing
relationships that give rise to vicarious liability); RESTATEMENT (SECOND) OF TORTS
§§ 315-20 (1965) (listing relationships that give rise to an independent duty in tort);
*cf. J.S. Sweet Co., Inc. v. Sika Chemical Corp.*, 400 F.3d 1028, 1033 (7th Cir. 2005)
(rejecting claim of "special relationship" giving rise to tort duty on seller to

- 16 -

Nor does either domestic or international law recognize aiding and abetting liability based on alleged purchases of goods or associated financial support.  On the contrary, the law is clear that ordinary business transactions such as purchase and sale arrangements do not constitute the kind of "substantial assistance" that gives rise to aiding and abetting liability.  *See, e.g.*, *SEC v. Rogers*, 790 F.2d 1450, 1460 & n.22 (9th Cir. 1986) (defendant who acted as agent in securing leases for gold mining operations did not provide "substantial assistance" to alleged tax shelter fraud), *overruled on other grounds*, *Pinter v. Dahl*, 486 U.S. 622, 650 (1988); *Seattle-First National Bank v. Carlstedt*, 678 F. Supp. 1543, 1549 (W.D. Okla. 1987) ("the lending of money or performance of other regular banking operations is insufficient to create aiding and abetting liability.").

Even if Defendants' alleged "logistical support" helped the unidentified Ivoirian farmers remain in business, there are no allegations that Defendants "substantially assist[ed] *the principal violation*" — that is, the forced child labor itself.  *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983) (emphasis added); *see Jett v. Sunderman*, 840 F.2d 1487, 1495 (9th Cir. 1988) (civil aiding and abetting requires "substantial assistance *in the wrong*") (emphasis added).  Providing general support to a tortfeasor, however substantial, does not give rise to aiding and abetting liability; rather, a plaintiff must prove that a defendant rendered "substantial assistance" *to the primary violation*, not merely to the person committing the violation.  *Halberstam*, 705 F.2d at 477.[18]

Finally, it should come as no surprise that neither domestic law nor any norm

---

downstream purchaser; "[a]n arrangement as ordinary as this cannot be considered special").

[18] The Rome Statute of the International Criminal Court comes to a similar result by virtue of its requirement that the aider and abettor act "[f]or the purpose of facilitating the commission of such crime." Rome Statute, art. 25(3)(c), 37 I.L.M. at 1016 (not ratified by United States). Because Plaintiffs do not allege that Defendants provided "logistical support" to the Ivoirian farmers "for the purpose of" assisting them in their forced labor practices, they do not state a claim for aiding and abetting even under the standard set forth in the Rome Statute.

of international law holds purchasers liable for torts allegedly committed by upstream producers.  Under Plaintiffs' theory, any person who purchased goods from a seller in a country where reported instances of production-related human rights violations had occurred would have to conduct an investigation of each seller to determine whether that seller was free from any questionable practices.  Under precisely the same logic, a company that simply provides ordinary goods or services — such as cars, trucks, computers, or even electrical service — to a country known to have committed wrongful acts would risk liability to the victims of those acts.  Such a theory finds no support in the law and has been soundly rejected in the only instance in which it was raised.  *See In re South African Apartheid*, 346 F. Supp. 2d at 551-54 (dismissing with prejudice claims that defendant companies violated the ATS by "doing business" in, and financially supporting, apartheid South Africa knowing of its human rights record).

As Judge Sprizzo recognized in *In re South African Apartheid*, such a theory of corporate liability would create "serious impediments to the flow of international commerce," and would "hamper the policy of encouraging positive change in developing countries via economic investment."  *Id.* at 553 (citing, with respect to the latter point, the Statement of Interest submitted by the United States).  He observed:

> In a world where many countries may fall considerably short of ideal economic, political, and social conditions, this Court must be extremely cautious in permitting suits here based upon a corporation's doing business in countries with less than stellar human rights records, especially since the consequences of such an approach could have significant, if not disastrous, effects on international commerce.

*Id.* at 554.  For a court to impose such a regime as a matter of federal common law would be unprecedented, and would "expand precipitously the jurisdiction of the federal courts and would not be consistent with the 'extraordinary care and restraint'" a court must exercise in recognizing new theories of liability after *Sosa. Id.* (quoting *Flores v. S. Peru Copper Corp.*, 343 F.3d 140, 154 (2d Cir. 2003)).

1    **B.    Plaintiffs Fail to State a Claim Under the TVPA**

2         Section 2(a) of the TVPA, Pub. L. No. 102–256, 106 Stat. 73 (1992) (codified

3    at 28 U.S.C. § 1350, *Note*), imposes civil liability on "[a]ny individual who, under

4    actual or apparent authority, or color of law, of any foreign nation … subjects an

5    individual to torture" or "to extrajudicial killing." Plaintiffs' TVPA claim must be

6    dismissed for three separate reasons: the TVPA applies only to individuals, not

7    corporations; it reaches only conduct that is attributable to a foreign state; and it

8    does not create a cause of action against those alleged merely to have aided and

9    abetted the TVPA violations of others.

10        **1.    The TVPA Applies Only to "Individuals," Not Corporations**

11        By its plain terms, the TVPA creates liability only for an "*individual*" who,

12   under the authority or color of law of any foreign nation, commits torture or an

13   extrajudicial killing. 28 U.S.C. § 1350, *note*, § 2(a) (emphasis added). It is well-

14   settled that the term "individual" generally does not encompass corporations. As

15   the Supreme Court observed in *Clinton v. City of New York*, 524 U.S. 417 (1998):

16   "in ordinary usage both 'individual' and 'person' often refer to an individual human

17   being, *see, e.g.*, WEBSTER'S THIRD NEW INT'L DICTIONARY 1152, 1686 (1986)

18   ('individual' defined as a 'single human being'; 'person' defined as 'an individual

19   human being')." 524 U.S. at 428 n.13.

20        The term "person" often "has a broader meaning in the law," notwithstanding

21   this ordinary usage. *Id.* (citing Dictionary Act, 1 U.S.C. § 1, for the proposition that

22   "'person' includes '*corporations*, companies, associations, firms, partnerships,

23   societies, and joint stock companies, *as well as individuals*") (emphasis added).[19]

24   But courts typically interpret the term "individual" more narrowly, holding that it

25   includes a "corporation" only in the rare case where the context or history of a

26   statute shows that "Congress did not intend the result that the word 'individual'

27   ────────────────
     [19] *See also United States v. Middleton*, 231 F.3d 1207, 1211 (9th Cir. 2000) ("the
28   Dictionary Act's definition of 'person' implies that the words 'corporations' and
     'individuals' refer to different things").



1 | would dictate in other contexts." *Clinton*, 524 U.S. at 429 n.14.[20]

2 |      Here, the result "dictate[d]" by the use of the term "individual" is not

3 | "absurd" or "unjust," *cf. Clinton*, 524 U.S. at 428-29, but rather implements the

4 | plain intent of Congress, which chose the term "individual" to "make crystal clear

5 | that foreign states or their entities cannot be sued under this bill under any

6 | circumstances." S. Rep. No. 249, 102d Cong., 1st Sess. 10, at 7 (1991); H.R. Rep.

7 | No. 367, 102d Cong. 1st Sess. 5 (1991), *reprinted in* 1991 U.S.C.C.A.N. 84, 87.

8 | The only construction of the term "individual" that would exclude foreign states

9 | and entities, as Congress clearly intended, is the narrower one — *i.e.*, "a private or

10 | natural person as distinguished from a partnership, corporation, or association."

11 | BLACK'S LAW DICTIONARY 773 (6th ed. 1990). *See, e.g., Beanal v. Freeport-*

12 | *McMoRan, Inc.*, 969 F. Supp. 362, 382 (E.D. La. 1997), *aff'd on other grounds*,

13 | 197 F.3d 161, 169 (5th Cir. 1999).

14 |      Indeed, interpreting the TVPA to exclude corporations is necessary to *avoid*

15 | an absurd result. The statute describes liability in terms of "an individual" who

16 | subjects another "individual" to "torture;" which is then defined as acts "directed

17 | against an individual" that "cause severe pain and suffering." 28 U.S.C. § 1350,

18 | *note*, §§ 2(a), 3(b). Because Congress could not have intended "individual" to have

19 | different meanings in the same statute (much less in the same sentence),[21] the

20 |

21 | [20] In *Clinton*, the Court found "no plausible reason" why Congress, in passing the

22 | Line Item Veto Act's expedited review provision, "would have intended to provide for such special treatment of actions filed by natural persons and to have precluded

23 | entirely jurisdiction over comparable cases brought by corporate persons." *Id.* at 429. Likewise, in *Middleton*, the Ninth Circuit construed "individual" in 18 U.S.C.

24 | § 1030(a)(5) to criminalize "computer crime that damages natural persons and corporations alike" because another reading would "produce an 'absurd and unjust

25 | result,'" was inconsistent with the statutory text, and was unsupported by "the statute's purpose and legislative history." 231 F.3d at 1210-13.

26 | [21] *See Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 479 (1992) (describing "basic canon of statutory construction" that "identical terms within an

27 | Act bear the same meaning"); *Sorenson v. Secretary of Treasury*, 475 U.S. 851, 860 (1986) ("The normal rule of statutory construction assumes that 'identical words

28 | used in different parts of the same act are intended to have the same meaning.'") (quoting *Helvering v. Stockholms Enskilda Bank*, 293 U.S. 84, 87 (1934)).

1   TVPA must be construed as providing for a corporation to be either *both* a

2   perpetrator or victim of torture, or *neither* a perpetrator or victim. But it makes no

3   sense to speak of a corporation as a victim under the TVPA: corporations cannot be

4   tortured or killed, nor do they feel pain and suffering. Thus, the statute is saved

5   from an absurd construction only if "individual" is given its ordinary meaning.

6          Applying precisely such reasoning, the vast majority of courts have held that

7   the TVPA does not apply to corporations. *See Mujica v. Occidental Petroleum*

8   *Corp.*, 381 F. Supp. 2d 1164, 1175–76 (C.D. Cal. 2005) ("the only manner in which

9   the statute does not reach an 'absurd result' is by excluding corporations from the

10  scope of the statute's liability") (citation omitted); *Doe I v. Exxon Mobil Corp.*, 393

11  F. Supp. 2d 20, 28 (D.D.C. 2005) (relying on *Clinton*, 524 U.S. at 428-29 nn. 13 &

12  14); *In re Agent Orange Product Liability Litig.*, 373 F. Supp. 2d 7, 55–56

13  (E.D.N.Y. 2005) ("Because the TVPA uses the same term, 'individual' to identify

14  [both victims and offenders], the definition of 'individual' within the statute

15  appears to refer to a human being, suggesting that only natural persons can violate

16  the Act."); *In re Terrorist Attacks on Sept. 11, 2001*, 349 F. Supp. 2d 765, 828

17  (S.D.N.Y. 2005) (dismissing corporate defendants because "[o]nly individuals may

18  be sued under the TVPA"); *Arndt v. UBS AG*, 342 F. Supp. 2d 132, 141 (E.D.N.Y.

19  2004) (same); *Beanal*, 969 F. Supp. at 382 ("the plain meaning of the term

20  'individual' does not ordinarily include a corporation").[22]

21         Nor can Plaintiffs evade the plain language of the TVPA by alleging that the

22  acts of individual wrongdoers should be attributed to the corporate Defendants.

23  Because theories of vicarious liability would frustrate Congress's deliberate choice

24  to limit liability to "individuals," the courts have rejected attempts to impose such

25  _____

26  [22] The courts in *Sinaltrainal v. Coca-Cola Co.*, 256 F. Supp. 2d 1345, 1358-59
    (S.D. Fla. 2003), and *Estate of Rodriguez v. Drummond Co.*, 256 F. Supp. 2d 1250,

27  1267-68 (N.D. Ala. 2003), reached a contrary result but their reasoning is
    unpersuasive. For example, *Sinaltrainal* incorrectly stated that under *Clinton*, "the

28  term 'individual' is synonymous with 'person,'" 256 F. Supp. 2d at 1358-59, when,
    as discussed above, *Clinton* holds the opposite.

1    liability under the TVPA.  *See Collett v. Socialist Peoples' Libyan Arab*

2    *Jamahiriya*, 362 F. Supp. 2d 230, 242 (D.D.C. 2005) (rejecting TVPA suit against

3    Libya and its intelligence agency, brought under *respondeat superior* principles, as

4    contrary to congressional intent).

5           **2.     Plaintiffs Do Not Adequately Allege the Requisite State Action**

6           Section 2(a) of the TVPA imposes liability only on individuals who have

7    acted "under actual or apparent authority, or color of law, of any foreign nation."

8    28 U.S.C. § 1350, *note*.  Congress's use of the phrase "under color of law" invokes

9    the familiar "color of law" jurisprudence of Section 1983 of title 28 of the United

10   States Code.  *Kadic v. Karadzic*, 70 F.3d 232, 245 (2d Cir. 1995); see also H.R.

11   Rep. No. 367, *supra*, at 87 ("[c]ourts should look to 42 U.S.C. § 1983" in

12   construing the "color of law" requirement of § 2(a)).  The Supreme Court has

13   explained that the "color of law" element — which is equivalent to the "state

14   action" requirement of the Fourteenth Amendment (*Lugar v. Edmondson Oil Co.*,

15   457 U.S. 922, 935 (1982)) — is satisfied only if "there is such a 'close nexus

16   between the State and the challenged action' that seemingly private behavior 'may

17   be fairly treated as that of the State itself.'"  *Brentwood Academy v. Tennessee*

18   *Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001) (quoting *Jackson v.*

19   *Metropolitan Edison Co.*, 419 U.S. 345, 351 (1974)).

20          The allegations of the Complaint fall far short of this standard.  The

21   Complaint states that "[d]efendants acted under color of law … by acting with the

22   implicit sanction of the state and/or through the intentional omission of responsible

23   state officials and/or their agents to act in preventing and/or limiting the trafficking

24   or otherwise the use of child slaves into Côte d'Ivoire."  (Complaint, ¶ 63.)  But the

25   Ivoirian government's failure to intervene, however intentional, does not convert

26   the farmers' misdeeds into state action.  *See San Francisco Arts & Athletics, Inc. v.*

27   *U.S. Olympic Committee*, 483 U.S. 522, 547 (1987) ("fail[ing] to supervise" private

28   party does not make its actions "those of the Government"); *Flagg Bros., Inc. v.*

- 22 -

1  *Brooks*, 436 U.S. 149, 164 (1978) ("This Court … has never held that a State's

2  mere acquiescence in a private action converts that action into that of the State.");

3  *Jackson*, 419 U.S. at 357 (concluding that "[a]pproval by a state utility commission

4  of such a request from a regulated utility, where the commission has not put its own

5  weight on the side of the proposed practice *by ordering it,* does not transmute a

6  practice initiated by the utility and approved by the commission into 'state

7  action.'") (emphasis added); *Aldana v. Del Monte Fresh Produce, N.A.*, 416 F.3d

8  1242, 1248 (11th Cir. 2005) (rejecting argument that Guatemala's "toleration of

9  private security forces … transform[s] these forces' acts into state acts.");

10  *Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442, 1450–51 (10th Cir. 1995)

11  (holding that state university official's knowledge and university police officers'

12  observance of illegal pat-down searches does not render them state action).

13       Plaintiffs do not even try to allege that the actions of all private Ivoirian

14  farmers and farming cooperatives constitute state action.  But even if the farmers'

15  conduct could somehow be equated with state action, there is no basis whatever for

16  holding that Defendants' purchases of cocoa, or alleged provision of unspecified

17  logistical support to privately run farm cooperatives (Compl. ¶ 37) satisfy that

18  standard.  *See In re South African Apartheid*, 346 F. Supp. at 548-49, 555 (doing

19  business in South Africa does not amount to state action).  Indeed, even purchases

20  directly from the Ivoirian government itself would not be under color of law.  *Bigio*

21  *v. Coca-Cola Co.*, 239 F.3d 440, 448 (2d Cir. 2000) (holding that "[a] private party

22  does not 'act under color of law' simply by purchasing property from the

23  government").[23]

---

24  [23] The Complaint also alleges on information and belief that "several farms" that

25  use child labor "are owned by government officials" or "are otherwise protected by government officials" either through "direct security services or through payments

26  made to such officials." (Complaint, ¶ 37.)  But, as noted above, there are no allegations that *Plaintiffs* were tortured by or at the direction of state officials on

27  these state-owned or protected farms, much less is there any allegation that Defendants controlled or directed any such person in torturing Plaintiffs. *See, e.g.,*

28  *King v. Massarweh*, 782 F.2d 825, 829 (9th Cir. 1986) (a party cannot be deemed a state actor "absent some showing that a private party had some control over state

3.     **The TVPA Does Not Provide for Aiding and Abetting Liability**

The sweeping aiding and abetting theory pressed by Plaintiffs in this case is contrary to the plain language of the TVPA, which imposes liability only upon an individual who "subjects" another individual to torture or extrajudicial killing, 28 U.S.C. § 1350, *Note*, § 2(a).

As noted earlier, "when Congress enacts a statute under which a person may sue and recover damages from a private defendant for the defendant's violation of some statutory norm, there is no general presumption that the plaintiff may also sue aiders and abettors." *Central Bank*, 511 U.S. at 182. The doctrine of civil aiding and abetting liability "has been at best uncertain in application … with the common-law precedents 'largely confined to isolated acts of adolescents in rural society." *Id.* (quoting *Halberstam v. Welch*, 705 F.2d 472, 489 (D.C. Cir. 1983)). Furthermore, Congress's decision to enact a general aiding and abetting statute for *criminal* actions but not for civil actions militates against inferring civil aiding and abetting liability from the existence of a cause of action against a violator. "Congress has instead taken a statute-by-statute approach to civil aiding and abetting liability," *id.*, and when it wishes to impose such liability it does so expressly.

The plain language Congress used in the TVPA is insufficient, under *Central Bank*, to demonstrate an intent to impose general aiding and abetting liability under the TVPA. The operative verb in the TVPA is "*subjects*," and that term plainly connotes direct, primary action; it requires "*personal participation*" in the specific act. *Johnson v. Duffy*, 588 F.2d 740, 743-44 (9th Cir. 1978) (emphasis added) (construing "subjects" in 42 U.S.C. § 1983). Had Congress intended to extend TVPA liability to secondary actors, it certainly knew how to do so. Title 42 U.S.C. § 1983 creates a cause of action against whomever "subjects, *or causes to be*

officials' decision" that led to the § 1983 violation); *Mann v. City of Tucson*, 782 F.2d 790, 793 (9th Cir. 1986) ("plaintiff must prove the private individuals exercised control over the decisionmaking in a police investigation").

1   *subjected*, any citizen of the United States ..." to a deprivation of rights. (Emphasis

2   added). It is this latter phrase in § 1983 — "causes to be subjected" — that

3   provides for secondary liability for a person acting with "the requisite causal

4   connection" to *another's* direct misconduct. *Johnson*, 588 F.2d at 743-44. Because

5   Congress was well aware of 42 U.S.C. § 1983 when it drafted the TVPA, *see*

6   S. Rep. No. 249, *supra*, at 8 (noting that Congress took the TVPA's "under color of

7   law" requirement from § 1983), its decision to include *only* liability for

8   "subject[ing]" a person to torture was intentional and must be respected. *See*

9   *Central Bank of Denver*, 511 U.S. at 184 ("The fact that Congress chose to impose

10  some forms of secondary liability, but not others, indicates a deliberate

11  congressional choice with which the courts should not interfere.").

12          Some courts, in construing the TVPA, have nonetheless erroneously

13  concluded that the *Central Bank* presumption against inferring secondary liability

14  has been overcome, relying largely upon statements in committee reports. *See, e.g.*,

15  *Cabello v. Fernandez-Larios*, 402 F.3d 1148, 1157-58 (11th Cir. 2005); *Mujica*,

16  381 F. Supp. 2d at 1172–74; *Doe v. Saravia*, 348 F. Supp. 2d 1112, 1148-49 (E.D.

17  Cal. 2004). But "[l]egislative history cannot trump the statute." *Bonneville Power*

18  *Admin. v. FERC*, 422 F.3d 908, 920 (9th Cir. 2005); *see also HUD v. Rucker*, 535

19  U.S. 125, 132 (2002) ("reference to legislative history is inappropriate when the

20  text of the statute is unambiguous"); *Ratzlaf v. United States*, 510 U.S. 135, 147-48

21  (1994) ("we do not resort to legislative history to cloud a statutory text that is

22  clear"). As the Supreme Court recently reiterated, "the authoritative statement is

23  the statutory text, not the legislative history or any other extrinsic material";

24  "judicial reliance on legislative materials like committee reports, which are not

25  themselves subject to the requirements of Article I, may give unrepresentative

26  committee members — or, worse yet, unelected staffers and lobbyists — both the

27  power and the incentive to attempt strategic manipulations of legislative history to

28  secure results they were unable to achieve through the statutory text." *Exxon Mobil*

- 25 -

1   *Corp. v. Allapattah Servs., Inc.*, 125 S. Ct. 2611, 2626 (2005).

2       Moreover, these courts misread the legislative history on which they rely.

3   The Senate Report's statement that the TVPA "is limited to lawsuits against

4   persons who ordered, abetted, or assisted in the torture" occurs in a paragraph that

5   is solely devoted to endorsing the unique doctrine of *command responsibility*, under

6   which senior military officers may be held liable for failing to prevent a "pervasive

7   pattern and practice" of wrongful acts committed by officers under their command.

8   S. Rep. No. 249, *supra*, at 8-9 (citing *In re Yamashita*, 327 U.S. 1 (1946)).

9   Command responsibility is clearly a form of *direct* liability, as *Yamashita* makes

10   clear: the Court there held that command responsibility doctrine is based on the

11   senior officer's *own* "breach of duty ... as an army commander to control the

12   operations of the members of his command." 327 U.S. at 14; *id.* at 16

13   (commanders have an "affirmative duty" to take measures to control their troops).

14   Because the term "subjects" comfortably subsumes a breach of this duty properly to

15   command troops, this snippet of legislative history merely elaborates the types of

16   *direct* liability that naturally fall within the scope of the statutory language.[24]

17       Furthermore, even if the TVPA were to be construed to impose some level of

18   aiding and abetting liability, it certainly would not impose liability on those who,

19   like Defendants here, were not themselves acting under the color of law. See *In re*

20   *South African Apartheid*, 346 F. Supp. 2d at 555 ("Since a prerequisite to TVPA

21   liability is that the individual be acting under color of law, this Court finds that

22   creating aider and abettor liability for private actors not acting under color of law

23   would be inconsistent with the statute and precluded by *Central Bank*."). And the

24

25   [24] In any event, even if the term "subjects" were construed to reach all acts of "aiding and abetting," § 3(b) of the TVPA requires that the plaintiff also show that the victim was in the "*offender's* physical custody and control." 28 U.S.C. § 1350, *note*, emphasis added. This additional requirement would thereby limit any secondary liability to only that subset of persons who shared in the "physical custody and control" of the plaintiffs. This requirement is fatal here, because there is no sense in which the Plaintiffs can be said to have been in the *Defendants'* custody and control.

- 26 -

1  complaint also fails to allege that Defendants acted with the specific intent of

2  bringing about the torture of Ivoirian child workers, a showing that would be

3  required for criminal aiding-and-abetting liability. *See, e.g., United States v.*

4  *Gaskins*, 849 F.2d 454, 459-60 (9th Cir. 1988). Nothing in the TVPA suggests that

5  Congress would have intended a lesser standard to apply.

6  **C.      Plaintiffs Fail to State a Claim Under the Thirteenth Amendment**

7  Plaintiffs' claim under the Thirteenth Amendment fails for several reasons.

8  *First*, the Amendment does not apply to conduct occurring outside the

9  jurisdiction of the United States. The Thirteenth Amendment's plain language

10  prohibits slavery and involuntary servitude "*within* the United States, or any place

11  subject to their jurisdiction." U.S. CONST. amend. XIII (emphasis added); *see*

12  *Griffin v. Breckenridge*, 403 U.S. 88, 105 (1971) ("the amendment is … 'an

13  absolute declaration that slavery or involuntary servitude shall not exist *in any part*

14  *of the United States*'" (quoting *Civil Rights Cases*, 109 U.S. 3, 20 (1883) (emphasis

15  added)). Because the alleged forced labor in this case occurred in Cote d'Ivoire, it

16  falls outside the scope of the Amendment.[25]

17  *Second*, Plaintiffs' claims are barred by the applicable statute of limitations.

18  However conceived, an implied private cause of action under the Thirteenth

19  Amendment would be subject to California's two-year statute of limitations for

20  personal injury torts. *See* Cal. Civ. Proc. Code § 335.1; *Van Strum v. Lawn*, 940

21  F.2d 406, 408-10 (9th Cir. 1991) (state personal injury statute of limitations applies

22  to *Bivens* claims); *Wilson v. Garcia*, 471 U.S. 261, 275-76 (1985) (same for § 1983

23  ────────────────────

[25] Reinforcing this conclusion, the Supreme Court has held that the Constitution
24  does not protect foreign citizens (such as the individual Plaintiffs who assert this
claim) who have not "come within the territory of the United States and developed
25  substantial connections with this country." *United States v. Verdugo-Urquidez*, 494
U.S. 259, 271, 275 (1990) (rejecting extraterritorial application of Fourth
26  Amendment to search of foreign citizen's residence in Mexico); *Johnson v.
Eisentrager*, 339 U.S. 763, 784 (1950) (rejecting extraterritorial application of the
27  Fifth Amendment to enemy combatants held in Germany after World War II);
*United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 318 (1936) ("Neither
28  the Constitution nor the laws passed in pursuance of it have any force in foreign
territory unless in respect of our own citizens….").

- 27 -

1    claims); *Goodman v. Lukens Steel Co.*, 482 U.S. 656, 662 (1987) (same for § 1981

2    claims). Thus, because the events alleged in the Complaint all occurred at least five

3    years before the action was filed, *see* Complaint, ¶¶ 44-46, Plaintiffs' Thirteenth

4    Amendment claims are time-barred.[26]

5         *Third*, numerous courts have held that the Thirteenth Amendment does not,

6    itself, give rise to a direct cause of action against private parties. *See, e.g., Del*

7    *Elmer v. Metzger*, 967 F. Supp. 398, 402 (S.D. Cal. 1997) ("the Thirteenth

8    Amendment does not give rise to an independent cause of action against private

9    parties"); *Turner v. Unification Church*, 473 F. Supp. 367, 373-74 (D.R.I. 1978)

10   (same).[27] These courts reason that implying a private cause of action for violations

11   of the Thirteenth Amendment is "not appropriate or necessary" because (1) the

12   alleged wrong can be "adequately redressed" by traditional state law causes of

13   action; (2) state law protections are "not inconsistent with or … hostile" to federal

14   interests; and (3) "Congress has actively protected the rights guaranteed by the

15   Thirteenth Amendment" through enforcing legislation. *Turner*, 473 F. Supp. at 374

16   (citing *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*,

17   403 U.S. 388 (1971)).[28] Supporting this analysis is recent Supreme Court case law

---

18   [26] That Plaintiffs purport to bring their claims on behalf of a class does not save the

19   Complaint. Without a valid cause of action, Plaintiffs cannot represent the class. *See, e.g., Piazza v. Ebsco Indus., Inc.*, 273 F.3d 1341, 1347 (11th Cir. 2001) ("It is

20   by now clear that a class representative whose claim is time-barred cannot assert the claim on behalf of the class."); *Great Rivers Co-op. of Southeastern Iowa v.*

21   *Farmland Indus., Inc.*, 120 F.3d 893, 899 (8th Cir. 1997) (affirming dismissal of putative class action because only named representative's claim was time-barred).

22   [27] *See also, e.g., Holland v. Bd. of Trustees of Univ. of the Dist. of Columbia*, 794

23   F. Supp. 420, 424 (D.D.C. 1992) ("The Thirteenth Amendment does not give rise to an independent cause of action"); *Baker v. McDonald's Corp.*, 686 F. Supp. 1474,

24   1480 n.12 (S.D. Fla. 1987) ("plaintiff may not maintain a cause of action directly under the Thirteenth Amendment"); *Doe v. Keane*, 658 F. Supp. 216, 220 (W.D.

25   Mich. 1987) ("it is well established that the Thirteenth Amendment does not allow for independent, private causes of action"); *Sanders v. A.J. Canfield Co.*, 635 F.

26   Supp. 85, 87 (N.D. Ill. 1986) (same); *Westray v. Porthole, Inc.*, 586 F. Supp. 834, 838-39 (D. Md. 1984) (same); *Vietnamese Fishermen's Assoc. v. Knights of the Ku*

27   *Klux Klan*, 518 F. Supp. 993, 1012 (S.D. Tex. 1981) (same).

     [28] While the U.S. Supreme Court and the Ninth Circuit have left open whether the

28   Thirteenth Amendment gives rise to a private cause of action, *see City of Memphis v. Greene*, 451 U.S. 100, 125-26 (1981); *Cato v. United States*, 70 F.3d 1103, 1110

1   which holds that *Bivens* does not authorize claims against private individuals acting

2   "under color of law." *See Correctional Service Corp. v. Malesko*, 534 U.S. 61, 68-

3   72 (2001); *Doe v. Gap, Inc.*, 2001 WL 1842389 at *17 (D.N. Mar. I. 2001) (finding

4   analysis in *Turner* and "weight of case law building on *Bivens*" support conclusion

5   that "there is no direct cause of action against private actors under the Thirteenth

6   Amendment"). Plaintiffs' Complaint, which purports to state a cause of action

7   under the Thirteenth Amendment against private parties, therefore fails.

8        *Finally*, Plaintiffs fail to state a claim under the Thirteenth Amendment

9   because, even were there such a cause of action, it would not extend to private

10   actors accused of aiding and abetting. The Supreme Court has indicated that the

11   *Central Bank* analysis is appropriate in determining whether to extend liability

12   under *Bivens*. *Malesko*, 534 U.S. at 67 n.3 (citing *Central Bank* as an example of

13   the more restrictive view of implied rights of action that the Court has taken since

14   its ruling in *Bivens*). Because the Thirteenth Amendment does not indicate an

15   intent to reach those who assist others in slavery or involuntary servitude, this Court

16   should refuse Plaintiffs' invitation to recognize an implied cause of action for

17   aiding and abetting.

18   **D.    Plaintiffs Fail to State a Claim Under 18 U.S.C. §§ 1589, 1590, and 1595**

19        Plaintiffs purport to assert a claim under 18 U.S.C. § 1595, which authorizes

20   an "individual who is a victim of a violation of section 1589 … [or] 1590 … of this

21   chapter" to bring a "civil action against the perpetrator" of such a violation. Section

22   1589 prohibits forced labor by making it a criminal offense to "provide[] or obtain[]

23   (9th Cir. 1995), some courts have either assumed or suggested in dicta, without
analysis, that claims might proceed directly under the 13th Amendment before
24   dismissing such claims on other grounds. *See Channer v. Hall*, 112 F.3d 214, 217
(5th Cir. 1997) ("assum[ing], *arguendo*, that the Thirteenth Amendment directly
25   gives rise to a cause of action for damages" under *Bivens*); *Terry Props., Inc. v.
Standard Oil Co.*, 799 F.2d 1523, 1533-34 (11th Cir. 1986) (stating, without
26   analysis, that Thirteenth Amendment gives rise to private cause of action because it
"absolutely prohibits the practice of slavery"); *Alma Soc'y Inc. v. Mellon*, 601 F.2d
27   1225, 1238 (2d Cir. 1979) (dismissing claim under Thirteenth Amendment without
addressing whether private right of action exists); *Flood v. Kuhn*, 443 F.2d 264, 268
28   (2d Cir. 1971) (same). As stated above, any such assumption is mistaken.

the labor or services of a person" by, *inter alia*, "threats of serious harm to, or physical restraint against, that person or another person." 18 U.S.C. § 1589. Section 1590 prohibits trafficking for purpose of forced labor by making it a federal crime to "knowingly recruit[], harbor[], transport[], provide[], or obtain[] by any means, any person for labor or services in violation of this chapter." 18 U.S.C. § 1590.[29] For multiple reasons, Plaintiffs' reliance upon these statutes fails.

To begin with, Plaintiffs may not maintain a claim under these statutes because § 1595 — the provision establishing the relevant civil remedy[30] — was not enacted until approximately three years *after* Plaintiffs' forced labor is alleged to have ended. *See* Trafficking Victims Protection Reauthorization Act of 2003, Pub. L. No. 108-193, 117 Stat. 2875, 2878 (2003); Complaint ¶¶ 44-46 (alleging that the named plaintiffs were freed or escaped from Cote d'Ivoire farms sometime in 2000. The Supreme Court has made clear that retroactivity is disfavored in the law, and a statute must not be construed as having retroactive effect unless its language requires that result. *See Landgraf v. USI Film Prods.*, 511 U.S. 244, 264 (1994); *id.* at 280 (statutes that would "increase a party's liability for past conduct" should not be applied to such conduct absent "clear congressional intent favoring such a result"); *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988). Here, neither the public law enacting § 1595, nor § 1595 itself, contains *any*

---

[29] In response to the Supreme Court's decision in *United States v. Kozminski*, 487 U.S. 931 (1988), which adopted a narrow definition of the "involuntary servitude" prohibited by the Thirteenth Amendment, Congress enacted § 1589 in 2000 in order to "provide federal prosecutors with the tools to combat severe forms of worker exploitation that do not rise to the level of involuntary servitude as defined in *Kozminski*." H.R. Rep. 106-939, 106th Cong., 2d Sess. 101 (2000). At the same time, it enacted § 1590 to create a second criminal offense for trafficking with respect to involuntary servitude or forced labor.

[30] Sections 1589 and 1590 do nothing more than define criminal offenses and, as such, they cannot form the basis of a private right of action. *See, e.g., Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th Cir. 1980); *see also Alexander v. Sandoval*, 532 U.S. 275, 286 (2001) ("Like substantive federal law itself, private rights of action to enforce federal law must be created by Congress."); *Doe v. Broderick*, 225 F.3d 440, 447-48 (4th Cir. 2000) ("The Supreme Court historically has been loath to infer a private right of action from 'a bare criminal statute'") (citation omitted).

1    indication that either applies retroactively. *See* 18 U.S.C. § 1595; 117 Stat. 2875.

2         Moreover, even if § 1595 could provide a civil remedy for pre-enactment

3    offenses, Plaintiffs' argument would still fail, because §§ 1589 and 1590 do not

4    apply to conduct outside the jurisdiction of the United States. It is well settled that

5    federal statutes are presumed *not* to apply extraterritorially. *See, e.g., Smith v.*

6    *United States*, 507 U.S. 197, 203-04 (1993); *see also Alvarez-Machain v. United*

7    *States*, 331 F.3d 604, 624 (9th Cir. 2003) (en banc) (reaffirming the "presumption

8    that, in most cases, if a substantive criminal provision is to be applied

9    extraterritorially, 'it is natural for Congress to say so in the statute'") (citation

10   omitted), *rev'd on other grounds sub nom. Sosa v. Alvarez-Machain, supra.* Here,

11   neither § 1589 nor § 1590 contains any language that would indicate an intent to

12   reach the sort of wholly extraterritorial conduct at issue here. Indeed, this

13   conclusion is inescapable when one compares the language of § 1589 and § 1590 to

14   that of § 1591. Section 1591, which addresses sex trafficking of children and which

15   was originally enacted simultaneously with §§ 1589 and 1590, has since been

16   amended so as to apply broadly to any such trafficking "in or *affecting* interstate or

17   *foreign commerce*." 18 U.S.C. § 1591(a)(1) (emphasis added).

18   In addition, Plaintiffs do not adequately allege that the *Defendants* actually

19   violated the substantive provisions of these statutes. As an initial matter, Plaintiffs

20   overlook the fact that both § 1589 and § 1590 were not enacted until late in 2000

21   (October 28, 2000), which would appear to post-date the conduct alleged here.

22   Complaint, ¶¶ 44-46 (alleging that forced labor ended in 2000). Moreover, the

23   Complaint contains *no* specific factual allegations establishing that the Defendants

24   committed the criminal offense of "obtain[ing]" labor by "threats of serious harm

25   ….or physical restraint" in violation of § 1589; or that they "recruit[ed], harbor[ed],

26   transport[ed], provide[d], or obtain[ed]" persons for such labor in violation of

27   § 1590. An allegation that Defendants purchased cocoa beans from, or provided

28   "logistical support" to, farms that allegedly engaged in such activities is wholly

- 31 -

1  inadequate. *See, e.g.*, H.R. Conf. Rep. No. 939, 106th Cong., 2d Sess., 101-02

2  (2000) (noting that Congress specifically decided "not to extend [§ 1590] to persons

3  who benefit financially or otherwise from the trafficking").

4  **E.    Plaintiffs' California Law Claims Are Barred by the Federal Foreign**

5  **Affairs Doctrine**

6  Plaintiffs' Complaint pointedly asserts no claim under Ivoirian law, instead

7  invoking *California* law with respect to their non-federal claims. Complaint, ¶ 50.

8  However, even assuming *arguendo* the doubtful premise that California law would

9  be applied under the applicable choice-of-law rules, Plaintiffs' California law

10  claims are barred by the federal foreign affairs doctrine, which limits "state

11  involvement in foreign affairs and international relations — matters which the

12  Constitution entrusts solely to the Federal Government." *Zschernig v. Miller*, 389

13  U.S. 429, 436 (1968).

14  As the Supreme Court recently stated, where a proposed application of state

15  law falls *outside* areas of "traditional state responsibility," the foreign affairs

16  doctrine applies even where there is no direct conflict between the state's policy

17  and that of the federal government. *See American Ins. Ass'n v. Garamendi*, 539

18  U.S. 396, 419 n.11, 425 (2003). The regulation of labor conditions in Cote

19  D'Ivoire, and the propriety of importing goods from that country, can hardly be said

20  to be an area of "traditional state responsibility" that may be left to the differential

21  regulation of each of the 50 States. And even if the matter were within California's

22  "traditional competence," *id.* at 419 n.11, Plaintiffs' state-law claims would still be

23  barred by the foreign affairs doctrine, because they would conflict with the federal

24  policy that permits the import of the goods in question (as described in *ILRF v.*

25  *U.S.*, 391 F. Supp. 2d at 1375-76). *See also Garamendi*, 539 U.S. at 419-20, 427;

26  *Deutsch v. Turner Corp.*, 324 F.3d 692, 714-16 (9th Cir. 2003); *Mujica v.*

27  *Occidental Petroleum Corp.*, 381 F. Supp. 2d 1164, 1187-88 (C.D. Cal. 2005).

28

1  **F.    Plaintiffs Fail To State a Claim Under the California Constitution**

2    Article I, section 6 of the California Constitution provides that "[s]lavery"

3  and "[i]nvoluntary servitude" are "prohibited except to punish crime." Plaintiffs

4  bring a claim against Defendants to enforce this section under the Bane Act, Cal.

5  Civ. Code § 52.1, which authorizes a private right of action against one who

6  interferes with the exercise of rights secured under the state constitution. Plaintiffs'

7  claim fails for several reasons.

8    *First*, the California Constitution's proscription against slavery does not

9  apply to conduct alleged to have occurred in West Africa. The California Supreme

10  Court has held that Article I, section 6 of the California Constitution "affords ... *no*

11  *greater* rights than does the Thirteenth Amendment to the federal Constitution."

12  *Moss v. Superior Court*, 17 Cal. 4th 396, 419–20 (1998) (emphasis added). Since

13  the Thirteenth Amendment is limited to conduct within the jurisdiction of the

14  United States, it follows that the California Constitution is limited to conduct

15  occurring within California. This conclusion is reinforced by the general

16  presumption against the extraterritorial application of California law. *See North*

17  *Alaska Salmon Co. v. Pillsbury*, 174 Cal. 1, 4 (1916); *Norwest Mortgage, Inc. v.*

18  *Superior Court*, 72 Cal. App. 4th 214, 222 (1999).

19    *Second*, Plaintiffs' claims under the Bane Act are time-barred. The statute of

20  limitations for such claims is one year if the claim evolved from the common law

21  and three years if it arose from a statute. *See Gatto v. County of Sonoma*, 98 Cal.

22  App. 4th 744, 759 (2002). Because the events upon which Plaintiffs base their

23  claims occurred more than five years ago, *see* Complaint, ¶¶ 44-46, their claims

24  must be dismissed as untimely. *See Soliman v. Philip Morris Inc.*, 311 F.3d 966,

25  971 (9th Cir. 2002) (affirming dismissal of complaint where "untimeliness is

26  apparent on the face of the liberally construed complaint").

27  **G.    Plaintiffs Fail To State a Valid Claim For Breach Of Contract**

28    Plaintiffs fail to state a valid breach of contract claim. In their Complaint,

- 33 -

1   they identify three possible sources for their claims: (1) Defendants' "codes of

2   conduct"; (2) Defendants' statements of "ethical business practices"; and (3) terms

3   restricting the use of forced child labor that are incorporated into Defendants'

4   agreements with their Ivoirian suppliers. Complaint, ¶¶ 39-43, 83. None of these

5   documents supports a claim for breach of contract against Defendants.[31]

6       *First*, Plaintiffs do not have any contractual rights under Defendants' codes

7   of conduct and business policies. Voluntary pledges not to engage in specified

8   conduct do not create contractually-binding obligations enforceable by third parties.

9   *See, e.g., Doyle v. Rice Ranch Oil Co.*, 28 Cal.App.2d 18, 20-21 (1938) (holding "a

10  mere declaration of policy on the part of [a] company" was not a contract);

11  *Schaefer v. Williams*, 15 Cal.App.4th 1243, 1246 (1993).

12      *Second*, even if Plaintiffs were third-party beneficiaries to the agreements

13  between Defendants and their suppliers, they cannot seek damages from *Defendants*

14  for the breach by the other party to the alleged contract, the Ivoirian farmers. The

15  Complaint alleges that Defendants sought promises from their suppliers (*i.e.*, the

16  Ivoirian farmers) that the suppliers would not use forced child labor. Thus, any

17  claim to enforce those alleged promises would lie against the party that made the

18  promise intended to benefit Plaintiffs, not against the party who sought the promise

19  for Plaintiffs' benefit. *See In re Marriage of Smith & Maescher*, 21 Cal. App. 4th

20  100, 106 (1993) ("if the promisor does not perform its obligation to the donee

21  beneficiary, the promisee will not be liable to the beneficiary for such

22  performance"); *cf. Shell v. Schmidt*, 126 Cal. App. 2d 279, 290 (1954) (where

23  promisor makes promise in a contract expressly intended to benefit a third party,

24  "[t]he promise ... is treated as having been made directly to the third party");

25  ─────────────────────────────

26  [31]   Plaintiffs also assert a cause of action for unjust enrichment. However, under
    California law, "there is no cause of action ... for unjust enrichment." *Melchior v.*

27  *New Line Prods., Inc.*, 106 Cal. App. 4th 779, 793 (2003). "The phrase 'Unjust
    Enrichment' does not describe a theory of recovery, but an effect: the result of

28  failure to make restitution under circumstances where it is equitable to do so."
    *Lauriedale Assocs. Ltd. v. Wilson*, 7 Cal. App. 4th 1439, 1448 (1992).

1  *Murphy v. Allstate Ins. Co.*, 17 Cal. 3d 937, 943 (1976); 1 Witkin, Summary of Cal.

2  Law §§ 686, 696 (10th ed. 2005) (same).

3  *Third*, all of Plaintiffs' contract claims are time-barred. A claim for breach

4  of a written contract is subject to a four-year statute of limitations, which accrues at

5  the time that the contract is breached. *See* Cal. Civ. Proc. Code § 337; *E.O.C. Ord,*

6  *Inc. v. Kovakovich*, 200 Cal. App. 3d 1194, 1203 (1988); *Niles v. Louis H.*

7  *Rapoport & Sons* 53 Cal. App. 2d 644, 651 (1942). Based on the allegations of the

8  Complaint, Plaintiffs' claims for breach of contract arose — at the latest — when

9  they were forced into child labor between 1994 and 2000. Complaint, ¶¶ 44–46.

10  Accordingly, the claims for breach of contract are barred.

11  **H.    Plaintiffs' Negligence and Recklessness Claims Must be Dismissed**

12  Plaintiffs contend that Defendants breached a "duty of care" owed to them by

13  failing to "adequately monitor and prevent the use of forced child labor on the

14  farms from which they source cocoa beans." Complaint, ¶¶ 86-87. These

15  allegations fail to state a valid claim for multiple reasons.

16  *First*, they are barred by California's two-year statute of limitations for

17  personal injury actions. *See* Cal. Civ. Proc. Code § 335.1. At the latest, Plaintiffs'

18  claims accrued in 2000 when each Plaintiff either escaped or were released from

19  forced labor. Compl. ¶¶ 44–46.

20  *Second*, Plaintiffs do not allege facts sufficient to establish an actionable duty

21  on the part of Defendants. "As a general rule, there is no duty to act to protect

22  others from the conduct of third parties." *Morris v. De La Torre*, 36 Cal. 4th 260,

23  269 (2005); *see Davidson v. City of Westminster*, 32 Cal. 3d 197, 203 (1982) ("[a]s

24  a general rule, one owes no duty to control the conduct of another, nor to warn

25  those endangered by such conduct"). Such a duty arises only when a defendant

26  shares a "'special relation'" with either the plaintiff or the third-party actor.

27  *Thompson v. County of Alameda*, 27 Cal. 3d 741, 751–52 (1980) (quoting

28  RESTATEMENT (SECOND) OF TORTS § 315 (1965)).

- 35 -

1    In this case, Plaintiffs do not allege that Defendants occupied the kind of

2    "special relation" that would give rise to their claimed "duty of care." The law does

3    not regard a buyer of goods as standing in a "special relation" with the seller. Nor

4    does the law impose a duty on a buyer of goods to monitor the seller's labor

5    practices. Such a relationship simply does not qualify as the kind of "special

6    relations" recognized under the case law. *See* RESTATEMENT (SECOND) OF TORTS

7    §§ 316-20 (describing "special relations" giving rise to a duty to protect as

8    including parent-child, master-servant, property owner-guest, one who has charge

9    over a dangerous person, and one who has custody over another); *cf. J.S. Sweet Co.,*

10   *Inc. v. Sika Chemical Corp.*, 400 F.3d 1028, 1033 (7th Cir. 2005) (no special

11   relationship" between seller and downstream purchaser; "[a]n arrangement as

12   ordinary as this cannot be considered special").

13   Indeed, Plaintiffs' theory of liability would discourage trade by turning

14   purchasers into the insurers of their suppliers. *See Titus v. Canyon Lake Property*

15   *Owners Assn*, 118 Cal. App. 4th 906, 913-14 (2004) (cautioning against the

16   recognition of tort duties that would impose undue burdens on potential defendants

17   and have far-reaching consequences to the community).

18   **I.    Plaintiffs Fail to State a Claim Under California's Business and**

19   **        Professions Code §17200**

20   Plaintiffs' claim under California's unfair competition law, Cal. Bus. & Prof.

21   Code § 17200 *et seq.* ("UCL"), fails for multiple reasons.

22   The UCL claim is the only cause of action in the Complaint that is asserted

23   by Plaintiff Global Exchange, but Global Exchange fails to satisfy the statutory

24   standing requirements imposed by the 2004 enactment of Proposition 64. *See* Prop.

25   64, 3 WEST'S CALIFORNIA SESSION LAWS A-70 (2004) (amending, *inter alia*, the

26   standing provisions of Cal. Bus. & Prof. Code § 17204).[32]  A nongovernmental

27   ――――――――――――
[32] Although the California Supreme Court has before it the question whether

28   Proposition 64 applies retroactively to suits that were pending on the date of its
     enactment, *see Arizona Cartridge Remanufacturers Ass'n v. Lexmark Int'l Inc.*, 421

- 36 -

1   plaintiff may maintain an action under the current UCL only if it can plead and
2   prove that it "has suffered injury in fact *and* has lost money or property *as a result*
3   *of* unfair competition or false advertising." Cal. Bus. & Prof. Code § 17204
4   (emphasis added). Global Exchange's allegations on this score fall far short of this
5   demanding standard.

6        Specifically, Global Exchange alleges that it was "forced to expend
7   significant resources in educating [its] members and the general public about the
8   [alleged] use of child labor by Defendants, by promoting and selling 'fairly traded'
9   chocolate, and effectively monitoring the corporate commitments made by
10  Defendants." Complaint, ¶ 97. Even assuming *arguendo* that Global Exchange has
11  thereby suffered "injury in fact,"[33] Global Exchange has wholly failed to allege
12  facts establishing that any of these purported injuries occurred "as a result of," *i.e.*,
13  was proximately caused by, Defendants' allegedly unfair practices. Cal. Bus. &
14  Prof. Code § 17204. On the contrary, the Complaint makes clear that Global
15  Exchange's alleged injuries were the result of its own voluntary decision to
16  "monitor[]" Defendants' actions and to "educat[e] [its] members" about
17  Defendants' alleged misconduct. Complaint, ¶ 97. If a plaintiff could satisfy
18  Proposition 64's heightened standards simply by taking upon itself to spend money
19  investigating a defendant's conduct and publicizing the plaintiff's allegations about
20  that conduct, then Proposition 64 would be rendered a nullity: any plaintiff could
21  thereby obtain standing, entirely at its own option, against any defendant with
22  respect to almost any subject.

23        Global Exchange's allegation concerning its "promoting and selling of 'fairly

24

25  F.3d 981, 985 n.4 (9th Cir. 2005), there is no doubt that Proposition 64 applies to
    this case, which was not filed until well after Proposition 64 took effect.
26  [33] It has not. A plaintiff has standing to bring an action in federal court only if he or
    she can establish, among other things, that the injury can be fairly traced to the
27  action challenged. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). For
    the reasons set forth in the text, Global Exchange cannot establish that its alleged
28  injuries are fairly traceable to the Defendants' alleged conduct.

1  traded' chocolate," Complaint ¶ 97, fare no better.  Global Exchange alleges that

2  Defendants' alleged purchase of forced-labor-produced cocoa beans ultimately ends

3  up decreasing the price of the resulting chocolate products as compared with the

4  price of the finished "fair trade" chocolate products that Global Exchange buys and

5  markets at retail.  *Id.*  Once again, any injury is self-inflicted:  Global Exchange's

6  costs are proximately caused, not by the conduct of Defendants' suppliers, but by

7  Global Exchange's insistence that it will only sell chocolate products that meet its

8  own particular criteria.  Moreover, the alleged chain of causation is too attenuated

9  and remote to satisfy Proposition 64.  Global Exchange, a retailer of finished

10  products, is too far removed from the conduct challenged here, *i.e.*, the growing

11  practices of farmers who supply, to other companies, raw materials that, through a

12  chain of manufacture and distribution, ultimately end up in a different set of

13  finished products (some of which may or may not compete with Global Exchange's

14  finished products).  It would be simply rank speculation to assume that, if

15  Defendants were to cease buying cocoa beans from Cote D'Ivoire, the prices that

16  Global Exchange would pay to its wholesalers — who are downstream in a

17  different chain of distribution — would decrease.  *See, e.g., Dellums v. U.S.*

18  *Nuclear Regulatory Comm'n*, 863 F.2d 968, 973-74 (D.C. Cir. 1988) ("[p]etitioners

19  make no claim that the market opening created by a ban on the importation of South

20  Africa [uranium] would not merely be absorbed by other foreign suppliers"); *id.* at

21  974 (a "favorable change in economic incentives alone" is insufficient to establish

22  causation).[34]

23

---

24  [34] Moreover, even assuming *arguendo* that Global Exchange had standing under
Proposition 64, its theory on this score fails for yet another reason.  The gravamen

25  of Global Exchange's "fair trade" chocolate theory is that Defendants allegedly
violated the UCL by purchasing cocoa beans allegedly produced with forced labor

26  in Cote D'Ivoire and causing them ultimately to be used in competing finished
products in the United States (specifically, in California).  It is well settled,

27  however, that where a legislative determination has been made that certain conduct
is lawful, "courts may not override that determination under the guise of the unfair

28  competition law."  *Cel-Tech Communications, Inc. v. Los Angeles Cellular
Telephone Co.*, 20 Cal.4th 163, 183 (1999); *see also Rubin v. Green*, 4 Cal.4th

The individual Plaintiffs' UCL claim also fails.  As an initial matter, the individual plaintiffs, who were all allegedly former child slaves in Cote D'Ivoire, cannot bring an action under the UCL because they do not allege that they were injured within California.  It is well settled that the UCL "does not support claims by non-California residents where none of the alleged misconduct or injuries occurred in California." *Churchill Village, L.L.C. v. Gen. Elec. Co.*, 169 F. Supp. 2d 1119, 1126 (N.D. Cal. 2000); *see Norwest Mortgage, Inc.*, 72 Cal. App. 4th at 222.[35]

Moreover, Plaintiffs' UCL claims are time-barred.  The UCL has a four-year statute of limitations, *see* Cal. Bus. & Prof. Code § 17208, but the forced labor alleged in the Complaint ended *five* years ago, in 2000.  Complaint, ¶¶ 44-46. Plaintiffs do not identify when exactly Defendants' alleged misrepresentations were made, but nothing in the Complaint indicates why a denial of "the use of child slaves" made during the past four years would have been false, given that the alleged forced-labor practices ended five years ago.  Complaint, ¶ 95; *see, e.g., In re African-American Slave Descendants Litig.*, 375 F. Supp. 721, 773 (N.D. Ill. 2005) (finding that corporations' public statements regarding use of slave labor were true when made and therefore did not toll the statute of limitations); *Harley-Davidson Motor Co. v. Powersports, Inc.*, 319 F.3d 973, 989 (7th Cir. 2003) (misrepresentations consist of assertions "that d[o] not accord with the facts as they *exist*," not as they once existed) (emphasis added).

---

1187, 1202 (1993) (holding that a bar against an action "may not be circumvented by recasting the action as one under Business and Professions Code section 17200").  As explained above, Congress has already determined that cocoa beans may lawfully be imported into the United States from Cote D'Ivoire, notwithstanding Plaintiffs' counsel's allegations of forced labor. *See ILRF v. U.S.*, 391 F. Supp. 2d at 1275-76.

[35] To the extent that the Complaint relies upon allegedly false denials of the use of forced child labor, the Complaint does not and cannot allege any conceivable theory by which the individual Plaintiffs "suffered injury in fact" or "lost money or property as a result of" such statements.  Cal. Bus. & Prof. Code § 17204.

1

## IV. <u>CONCLUSION</u>

2    For the above reasons, the Complaint should be dismissed with prejudice.

3    DATED: December 5, 2005                    MUNGER, TOLLES & OLSON LLP

4

5                                              By: _____
6                                                       Brad D. Brian
                                               Attorneys for Defendant
7                                              ARCHER-DANIELS-MIDLAND CO.

8    MAYER, BROWN,                             O'MELVENY & MYERS LLP
     ROWE & MAW LLP
9

10   By: _____            By: _____
              Lee H. Rubin                              Daniel M. Petrocelli
11   Attorneys for Defendant                  Attorneys for Defendant
     CARGILL, INCORPORATED                     NESTLE U.S.A.
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## PROOF OF SERVICE BY OVERNIGHT MAIL

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is 355 South Grand Avenue, Thirty-Fifth Floor, Los Angeles, California 90071-1560.

On December 5, 2005, I served the foregoing document described as:

**NOTICE OF MOTION AND MOTION OF DEFENDANTS ARCHER-DANIELS-MIDLAND CO.; NESTLE, U.S.A.; AND CARGILL, INC. TO DISMISS PLAINTIFFS' COMPLAINT PURSUANT TO FED. R. CIV. P. 12(B)(6) FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED; MEMORANDUM OF POINTS AND AUTHORITIES**

on the interested party in this action by placing true copies thereof enclosed in a sealed overnight envelope addressed as follows:

### See Service List Attached

I am "readily familiar" with the firm's practice of collection and processing correspondence for delivery to an employee of Federal Express. Under that practice it would be delivered to an employee of Federal Express on that same day at Los Angeles, California with charges to be billed to Munger, Tolles & Olson LLP's account to be delivered to the offices of the addressee(s) on December 6, 2005 in the ordinary course of business.

I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on December 5, 2005, at Los Angeles, California.

/s/ *L E Thoms*

Laurie E. Thoms

1144822.1

**SERVICE LIST**
*John Doe I v. Nestle, S.A., et al.*
Case No. CV-05-5133-SVW

| | |
|---|---|
| Terry Collingsworth | Attorneys for Plaintiffs |
| Natacha Thys | |
| International Labor Rights Fund | |
| 733 15th Street, N.W., Suite 920 | |
| Washington, D.C. 20005 | |
| Telephone: (202) 347-4100 | |
| Facsimile: (202) 347-4885 | |

Robert F. Childs, Jr.            Attorneys for Plaintiffs
Robert L. Wiggin, Jr.
Rusty N. Johnson, Jr.
Wiggins, Childs, Quinn & Pantazis, L.L.C.
Kress Building, 301 19th Street North
Birmingham, Alabama 35203
Telephone: (205) 328-0640
Facsimile: (205) 254-1500

Paul L. Hoffman            Attorneys for Plaintiffs
Schonbrun, DeSimone, Seplow, Harris &
Hoffman LLP
723 Ocean Front Walk
Venice, California 90291
Telephone: (310) 396-0731
Facsimile: (310) 399-7040

Daniel M. Petrocelli            Attorneys for Defendant
Wallace Allan            NESTLE U.S.A.
O'Melveny & Myers LLP
1999 Avenue of the Stars, Suite 700
Los Angeles, California 90067
Telephone: (310) 246-6850
Facsimile: (310) 246-6779

Lee H. Rubin            Attorneys for Defendant
Mayer, Brown, Rowe & Maw LLP            CARGILL, INC.
Two Palo Alto Square, Suite 300
Palo Alto, California 94306
Telephone: (650) 331-2000
Facsimile: (650) 331-2060