1   BRAD D. BRIAN (CBN 79001)
    Brad.Brian@mto.com
2   DANIEL P. COLLINS (CBN 139164)
    Daniel P. Collins@mto.com
3   MUNGER, TOLLES & OLSON LLP
    355 South Grand Avenue, 35th Floor
4   Los Angeles, CA  90071
    Telephone:  (213) 683-9100
5   Facsimile:  (213) 687-3702

6   Attorneys for Defendant
    ARCHER-DANIELS-MIDLAND
7   COMPANY

8   CRAIG A. HOOVER (CBN 113965)         LEE H. RUBIN (CBN 141331)
    CAHoover@HHLaw.com                   LRubin@mayerbrown.com
9   ROBERT C. TROYER (*Pro hac vice*)    MAYER BROWN LLP
    RCTroyer@HHLaw.com                   Two Palo Alto Square, Suite 300
10  HOGAN & HARTSON LLP                  Palo Alto, CA  94306
    555 Thirteenth Street, NW            Telephone:  (650) 331-2000
11  Washington, DC 20004                 Facsimile:   (650) 331-2060
    Telephone: (202) 637-6400
12  Facsimile:  (202) 637-5910           Attorneys for Defendant
                                         CARGILL, INCORPORATED
13  Attorneys for Defendant
    NESTLE U.S.A.

14              (Additional Counsel Listed on Next Page)

15

16              UNITED STATES DISTRICT COURT

17              CENTRAL DISTRICT OF CALIFORNIA

18  JOHN DOE I, Individually and on      CASE No.  CV-05-5133-SVW
    behalf of Proposed Class Members;
19  JOHN DOE II, Individually and on     **REVISED NOTICE OF MOTION
    behalf of Proposed Class members;    AND MOTION OF DEFENDANTS
20  JOHN DOE III, Individually and on    ARCHER-DANIELS-MIDLAND CO.;
    behalf of Proposed Class Members;    NESTLE U.S.A.; AND CARGILL, INC.
21  and GLOBAL EXCHANGE,                 TO DISMISS PLAINTIFFS'
                                         COMPLAINT PURSUANT TO FED.
22              Plaintiffs,              R. CIV. P. 12(b)(6) FOR FAILURE TO
                                         STATE A CLAIM UPON WHICH
23         vs.                           RELIEF CAN BE GRANTED;
                                         MEMORANDUM OF POINTS AND
24  NESTLE, S.A.; NESTLE U.S.A.;         AUTHORITIES**
    NESTLE Ivory Coast; ARCHER
25  DANIELS MIDLAND CO.;                 Time:  March 16, 2009, 1:30 P.M.
    CARGILL, Inc.; CARGILL               Ctrm:  #6, 312 N. Spring St.
26  COCOA; CARGILL WEST                  Honorable Stephen V. Wilson
    AFRICA, S.A.; and CORPORATE
27  DOES 1-10,

28              Defendants.

1   ANDREW J. PINCUS (*Pro hac vice*)
    APincus@mayerbrowm.com
2   MAYER, BROWN LLP
    1909 K Street, N.W.
3   Washington, DC 20006
    Telephone:   (202) 263-3000
4   Facsimile:    (202) 263-3300

5   Attorneys for Defendant
    CARGILL, INCORPORATED

6
    KRISTIN L. MYLES (CBN 154148
7   Kristin.Myles@mto.com
    JONATHAN H. BLAVIN (CBN 230269)
8   Jonathan.Blavin@mto.com
    MUNGER, TOLLES & OLSON LLP
9   560 Mission Street, 27th Floor
    San Francisco, CA  94105-2907
10  Telephone:   (415) 512-4000
    Facsimile:    (415) 512-4077

11  Attorneys for Defendant
    ARCHER-DANIELS-MIDLAND
12  COMPANY

13  HOGAN & HARTSON LLP
    JULIE A. SHEPPARD (Cal. Bar No. 175538)
14  JASheppard@HHLaw.com
    1999 Avenue of the Stars, Suite 1400
15  Los Angeles, CA  90067
    Telephone: (310) 785-4600
16  Facsimile: (310) 785-4601

17  Attorneys for Defendant
    NESTLE U.S.A.

18

19

20

21

22

23

24

25

26

27

28

1    TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

2    PLEASE TAKE NOTICE that on March 16, 2009, at 1:30 p.m., or as soon

3    thereafter as counsel may be heard, in the courtroom of the Honorable Stephen V.

4    Wilson (Courtroom 6) of the above-entitled Court, located at 312 North Spring

5    Street, Los Angeles, California, Defendants Archer-Daniels-Midland Company

6    ("ADM"), Nestlé U.S.A. ("Nestlé"), and Cargill, Incorporated ("Cargill") will and

7    hereby do move the Court to dismiss the Complaint, pursuant to Rule 12(b)(6) of the

8    Federal Rules of Civil Procedure, for failure to state a claim upon which relief may

9    be granted.

10    This revised motion is made following the conference of counsel pursuant to

11    Local Rule 7-3, which took place on October 12, 2005.  On January 8, 2009,

12    pursuant to the stipulation of the parties, this Court ordered Defendants to file a fully

13    revised motion in accordance with the schedule set forth in that order.

14    This Motion is based upon this Notice of Motion and Motion, the attached

15    Memorandum of Points and Authorities, the Declaration of Jonathan H. Blavin filed

16    concurrently herewith, the pleadings and records on file in this action, such

17    additional authority and argument as may be presented in any Reply and at the

18    hearing on this Motion, and such other matters of which this Court may take judicial

19    notice.

20    DATED: February 9, 2009              MUNGER, TOLLES & OLSON LLP

21

22                                        By: /s/ *Daniel P. Collins*
                                                 Daniel P. Collins
23                                        Attorneys for Defendant
                                          ARCHER-DANIELS-MIDLAND CO.

24    MAYER, BROWN LLP                     HOGAN & HARTSON LLP

25
      By:_____          By:_____
26            Lee H. Rubin                         Craig A. Hoover
      Attorneys for Defendant              Attorneys for Defendant
27    CARGILL, INCORPORATED                NESTLE U.S.A.

28

1  TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

2  PLEASE TAKE NOTICE that on March 16, 2009, at 1:30 p.m., or as soon

3  thereafter as counsel may be heard, in the courtroom of the Honorable Stephen V.

4  Wilson (Courtroom 6) of the above-entitled Court, located at 312 North Spring

5  Street, Los Angeles, California, Defendants Archer-Daniels-Midland Company

6  ("ADM"), Nestlé U.S.A. ("Nestlé"), and Cargill, Incorporated ("Cargill") will and

7  hereby do move the Court to dismiss the Complaint, pursuant to Rule 12(b)(6) of the

8  Federal Rules of Civil Procedure, for failure to state a claim upon which relief may

9  be granted.

10  This revised motion is made following the conference of counsel pursuant to

11  Local Rule 7-3, which took place on October 12, 2005.  On January 8, 2009,

12  pursuant to the stipulation of the parties, this Court ordered Defendants to file a fully

13  revised motion in accordance with the schedule set forth in that order.

14  This Motion is based upon this Notice of Motion and Motion, the attached

15  Memorandum of Points and Authorities, the Declaration of Jonathan H. Blavin filed

16  concurrently herewith, the pleadings and records on file in this action, such

17  additional authority and argument as may be presented in any Reply and at the

18  hearing on this Motion, and such other matters of which this Court may take judicial

19  notice.

20  DATED: February 9, 2009                    MUNGER, TOLLES & OLSON LLP

21

22                                              By: /s/ *Daniel P. Collins*
                                                       Daniel P. Collins
23                                              Attorneys for Defendant
                                                ARCHER-DANIELS-MIDLAND CO.
24  MAYER, BROWN LLP                            HOGAN & HARTSON LLP

25  By: *Lee H. Rubin /for*                     By: _____
26          Lee H. Rubin                                Craig A. Hoover
    Attorneys for Defendant                     Attorneys for Defendant
27  CARGILL, INCORPORATED                       NESTLE U.S.A.

28

1    TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

2    PLEASE TAKE NOTICE that on March 16, 2009, at 1:30 p.m., or as soon

3    thereafter as counsel may be heard, in the courtroom of the Honorable Stephen V.

4    Wilson (Courtroom 6) of the above-entitled Court, located at 312 North Spring

5    Street, Los Angeles, California, Defendants Archer-Daniels-Midland Company

6    ("ADM"), Nestlé U.S.A. ("Nestlé"), and Cargill, Incorporated ("Cargill") will and

7    hereby do move the Court to dismiss the Complaint, pursuant to Rule 12(b)(6) of the

8    Federal Rules of Civil Procedure, for failure to state a claim upon which relief may

9    be granted.

10    This revised motion is made following the conference of counsel pursuant to

11    Local Rule 7-3, which took place on October 12, 2005.  On January 8, 2009,

12    pursuant to the stipulation of the parties, this Court ordered Defendants to file a fully

13    revised motion in accordance with the schedule set forth in that order.

14    This Motion is based upon this Notice of Motion and Motion, the attached

15    Memorandum of Points and Authorities, the Declaration of Jonathan H. Blavin filed

16    concurrently herewith, the pleadings and records on file in this action, such

17    additional authority and argument as may be presented in any Reply and at the

18    hearing on this Motion, and such other matters of which this Court may take judicial

19    notice.

20    DATED: February 9, 2009          MUNGER, TOLLES & OLSON LLP

21

22                                      By: /s/ Daniel P. Collins
                                            Daniel P. Collins
23                                      Attorneys for Defendant
                                        ARCHER-DANIELS-MIDLAND CO.

24    MAYER, BROWN LLP                  HOGAN & HARTSON LLP

25

26    By:_____     By: _____
              Lee H. Rubin                       Craig A. Hoover
27    Attorneys for Defendant          Attorneys for Defendant
      CARGILL, INCORPORATED            NESTLE U.S.A.

28

# **Table of Contents**

**Page(s)**

TABLE OF AUTHORITIES ....................................................................... iv

INTRODUCTION ...................................................................................... 1

FACTUAL BACKGROUND ...................................................................... 2

ARGUMENT .............................................................................................. 3

I.   Plaintiffs Fail to State a Federal Common Law Claim Under the ATS ........ 3

    A.   *Sosa* Establishes a Rigorous Two-Part Test that Sets a "High Bar" for Recognizing a Federal Common Law Claim Under the ATS ................................ 3

    B.   Plaintiffs' Aiding-and-Abetting Theory Fails as a Matter of Law .......................................................... 4

        1.   *Sosa*'s Demanding Standards Bar *Corporate* Aiding-and-Abetting Liability for Violations of International Law ................................................. 5

            a.   There Is a Clear Consensus Against Extending the Relevant International-Law Norms to Corporations ............................................ 5

            b.   Recognizing Suits Against Corporations Under the ATS Would Disregard Congressional Policy Choices .................................... 6

        2.   The ATS Does Not Impose Aiding-and-Abetting Liability ............................................................. 7

            a.   There Is No Sufficiently Definite and Universal Norm of Aiding-and-Abetting Liability ................... 8

            b.   Federal Common Law Does Not Recognize Aiding-and-Abetting Liability ...................... 10

        3.   Even if the ATS Imposes Aiding-and-Abetting Liability, Plaintiffs' Allegations that Defendants Purchased Cocoa and Provided "Logistical Support" Fail to State a Claim ......................................... 13

            a.   Plaintiffs Fail to Allege That Defendants Knew Which Suppliers Employed Forced Child Labor and Then Purposely Assisted Their Alleged Wrongdoing ....................................... 13

            b.   Allegations of Cocoa Purchases and Logistical Support for Farming Activities Do Not Constitute "Substantial Assistance" of Forced Child Labor .......... 15

i

1

**Table of Contents (cont'd)**

2

Page(s)

3
C.   Under *Sosa*, None of Plaintiffs' Substantive International
4   Law Norms May Be Enforced in a Federal Common Law
Action .................................................................................... 16

5
1.   Plaintiffs Seek to Use the ATS to Override Congress's
6   Express Decision to Allow Importation of Cocoa
Notwithstanding the Possible Use of Forced Labor .............. 17

7
2.   Plaintitffs Improperly Seek to Use the ATS to Override
8   Both the Strictures of the TVPA and Congress's Refusal to
Create a Remedy for "Cruel, Inhuman, and Degrading
9   Treatment" .......................................................................... 18

10
D.   Plaintiffs' ATS Claim Also Fails Because the Dispute Lacks a
Significant Nexus to the United States............................................. 19

11   II.   Plaintiffs Fail to State a Claim Under the TVPA ....................................... 20

12
A.   The TVPA Imposes Liability Only on Natural Persons, Not on
13   Corporations ................................................................................ 21

14
B.   Plaintifs Do Not Adequately Allege the Requisite State Action ...... 22

15
C.   The TVPA Does Not Provide for Aiding-and-Abetting Liability .... 24

16   III.   Plaintiffs Fail to State a Claim Under the Thirteenth Amendment............. 26

17   IV.   Plaintiffs Fail to State Claims Under 18 U.S.C. §§ 1589, 1590,
or 1595 .................................................................................................... 28

18   V.   Plaintiffs' State-Law Claims Should Be Dismissed.................................... 29

19
A.   The Individual Plaintiffs' State-Law Claims Are Time-Barred........ 29

20
B.   Plaintiffs' State-Law Claims Are Preempted .................................... 29

21
C.   Plaintiffs' State-Law Claims Fail to State a Claim ........................... 32

22
1.   Breach of Contract (Count VII) ............................................... 32

23
2.   Negligence and Recklessness (Count VIII) ............................ 34

24
3.   California Bus. & Prof. Code § 17200 (Count X) .................. 36

25
a.   Gobal Exchange Fails to State a Claim ....................... 36

26
b.   The Individual Plaintiffs Fail to State a Claim............. 39

27
4.   Unjust Enrichment (Count IX) ............................................... 39

28
5.   California Constitution, Art. 1, Sec. 6 (Count VI) ................ 40

ii

1

## **Table of Contents (cont'd)**

2

**Page(s)**

3

CONCLUSION ..................................................................................................... 40

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CERTAIN DEFTS.' REVISED MOT. TO DISMISS UNDER FED. R. CIV. P. 12(b)(6); MEMO. OF P.'S & A.'S

# Table of Authorities

Page(s)

### FEDERAL CASES

*Abagninin v. AMVAC Chem. Corp.*,
    545 F.3d 733 (9th Cir. 2008) ........................................................................*passim*

*ABC Charters, Inc. v. Bronson*,
    __ F. Supp. 2d __, 2008 WL 4500352 (S.D. Fla. Oct. 1, 2008) ........................ 32

*Aldabe v. Aldabe*,
    616 F.2d 1089 (9th Cir. 1980) ............................................................................ 28

*Aldana v. Del Monte Fresh Produce, N.A., Inc.*,
    416 F.3d 1242 (11th Cir. 2005) ............................................................... 19, 22, 24

*Alma Soc'y Inc. v. Mellon*,
    601 F.2d 1225 (2d Cir. 1979) ............................................................................. 27

*Almog v. Arab Bank, PLC*,
    471 F. Supp. 2d 257 (E.D.N.Y. 2007) ............................................................... 14

*Am. Ins. Ass'n v. Garamendi*,
    539 U.S. 396 (2003) ........................................................................................... 31

*Arias v. Dyncorp*,
    517 F. Supp. 2d 221 (D.D.C. 2007) ................................................................... 26

*Baker v. McDonald's Corp.*,
    686 F. Supp. 1474 (S.D. Fla. 1987) ................................................................... 27

*Beanal v. Freeport-McMoRan, Inc.*,
    969 F. Supp. 362 (E.D. La. 1997) ...................................................................... 22

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ............................................................................................. 3

*Beverage Distrib., Inc. v. Olympia Brewing Co.*,
    440 F.2d 21 (9th Cir. 1971) ............................................................................... 32

*Bigio v. Coca-Cola Co.*,
    239 F.3d 440 (2d Cir. 2000) .............................................................................. 23

*Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics*,
    403 U.S. 288 (1971) ..................................................................................... 27, 28

*Blum v. Yaretsky*,
    457 U.S. 991 (1982) ........................................................................................... 24

*Bonneville Power Admin. v. FERC*,
    422 F.3d 908 (9th Cir. 2005) ............................................................................. 25

iv

1

**<u>Table of Authorities (cont'd)</u>**

2

**Page(s)**

3

*Bowoto v. Chevron Corp.*,
4    2006 WL 2455752 (N.D. Cal. Aug. 22, 2006)....................................14

*Bowoto v. Chevron Corp.*,
5    2006 WL 2604591 (N.D. Cal. Aug. 22, 2006)....................................22

6

*Cabello v. Fernandez-Larios*,
7    402 F.3d 1148 (11th Cir. 2005)....................................................25

*Cato v. United States*,
8    70 F.3d 1103 (9th Cir. 1995)........................................................27

9

*Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
10    511 U.S. 164 (1994) ..............................................................*passim*

*Churchill Village, L.L.C. v. Gen. Elec. Co.*,
11    169 F. Supp. 2d 1119 (N.D. Cal. 2000)........................................39

12

*City of Memphis v. Greene*,
13    451 U.S. 100 (1981) ...............................................................27

*Clinton v. City of New York*,
14    524 U.S. 417 (1993) ...........................................................21, 22

15

*Collins v. Womancare*,
16    878 F.2d 1145 (9th Cir. 1989) ....................................................24

*Container Corp. of Am. v. Franchise Tax Bd.*,
17    463 U.S. 159 (1983) ..............................................................32

18

*Corr. Serv. Corp. v. Malesko*,
19    534 U.S. 61 (2001) ................................................................27

*Corrie v. Caterpillar, Inc.*,
20    403 F. Supp. 2d 1019 (W.D. Wash. 2005) ......................12, 14, 18, 22

21

*Cunningham v. Southlake Ctr. for Mental Health, Inc.*,
22    924 F.2d 106 (7th Cir. 1991)......................................................24

*Deirmenjian v. Deutsche Bank, A.G.*,
23    526 F. Supp. 2d 1068 (C.D. Cal. 2007)......................................29, 31

24

*Del Elmer v. Metzger*,
25    967 F. Supp. 398 (S.D. Cal. 1997) ...............................................27

*Desert Palace, Inc. v. Costa*,
26    539 U.S. 90 (2003) ................................................................21

27

*Deutsch v. Turner Corp*,
28    324 F.3d 692 (9th Cir. 2003)......................................................31

v

1

2
### **Table of Authorities (cont'd)**

3
**Page(s)**

4

5
*Doe I v. Exxon Mobil Corp.*,
  393 F. Supp. 2d 20 (D.D.C. 2005)...............................................................11, 22

*Doe I v. The Gap, Inc.*,
  2001 WL 1842389 (D.N. Mar. I. Nov. 26, 2001) ..............................................16

*Doe I v. Wal-Mart Stores, Inc.*,
  2007 WL 5975664 (C.D. Cal. Mar. 30, 2007) ...............................................33, 34

*Doe v. Saravia*,
  348 F. Supp. 2d 1112 (E.D. Cal. 2004) ............................................................14

*EEOC v. Arabian Am. Oil Co.*,
  449 U.S. 244 (1991) ..........................................................................................19

*Enahoro v. Abubakar*,
  408 F.3d 877 (7th Cir. 2005) ........................................................................7, 18

*English v. Gen. Elec. Co.*,
  496 U.S. 72 (1990) ............................................................................................30

*Estate of Rodriquez v. Drummond Co.*,
  256 F. Supp. 2d 1250 (N.D. Ala. 2003) ............................................................22

*Exxon Mobil Corp. v. Allapattah Servs.*,
  545 U.S. 546 (2005) ..........................................................................................25

*Flanigan v. Gen. Elec. Co.*,
  93 F. Supp. 2d 236 (D. Conn. 2000) ..................................................................11

*Franklin v. Fox*,
  312 F.3d 423 (9th Cir. 2002) .............................................................................24

*GA Escrow, LLC v. Autonomy Corp.*,
  2008 WL 4848036 (N.D. Cal. Nov. 7, 2008)................................................39, 40

*Greenwald v. Bohemian Club, Inc.*,
  2008 WL 2331947 (N.D. Cal. June 4, 2008) .....................................................29

*Griffin v. Breckinridge*,
  403 U.S. 88 (1971) ............................................................................................26

*Gritchen v. Collier*,
  254 F.3d 807 (9th Cir. 2001) .............................................................................23

*Hairston v. Pac. 10 Conference*,
  101 F.3d 1315 (9th Cir. 1996) ...........................................................................32

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CERTAIN DEFTS.' REVISED MOT. TO DISMISS UNDER FED. R. CIV. P. 12(b)(6); MEMO. OF P.'S & A.'S

1

## **Table of Authorities (cont'd)**

2

**Page(s)**

3

*Halberstam v. Welch,*
    705 F.2d 472 (D.C. Cir. 1983)......................................................................14, 15

4

*Harmsen v. Smith,*
    693 F.2d 932 (9th Cir. 1982) .............................................................................15

5

6

*Hayden v. Paul, Weiss, Rifkind, Wharton & Garrison,*
    955 F. Supp. 248 (S.D.N.Y. 1997) ....................................................................11

7

*Hilao v. Estate of Marcos,*
    103 F.3d 767 (9th Cir. 1996) .............................................................................26

8

9

*Hines v. Davidowitz,*
    312 U.S. 52 (1941) .............................................................................................30

10

*Holland v. Bd. of Trustees of Univ. of the Dist. of Columbia,*
    794 F. Supp. 420 (D.D.C. 1992).........................................................................27

11

12

*Hughes Aircraft Co. v. United States ex rel. Schumer,*
    520 U.S. 939 (1997) ...........................................................................................28

13

*Humphreys v. Nager,*
    962 F. Supp. 347 (E.D.N.Y. 1997).....................................................................27

14

15

*In re Agent Orange Prod. Liability Litig.,*
    373 F. Supp. 2d 7 (E.D.N.Y. 2005)........................................................14, 22, 26

16

*In re Currency Conversion Fee Antitrust Litig.,*
    265 F. Supp. 2d 385 (S.D.N.Y. 2003) ................................................................11

17

18

*In re Larry's Apartment, L.L.C.,*
    249 F.3d 832 (9th Cir. 2001) .............................................................................22

19

*In re Sinaltrainal Litig.,*
    474 F. Supp. 2d 1273 (S.D. Fla. 2006)...............................................................25

20

21

*In re Temporomandibular Joint (TMJ) Implants Prods. Liability Litig.,*
    113 F.3d 1484 (8th Cir. 1997) ...........................................................................15

22

23

*In re Yamashita,*
    327 U.S. 1 (1946) .........................................................................................25, 26

24

*Int'l Labor Rights Fund v. United States,*
    391 F. Supp. 2d 1370 (C.I.T. 2005) ..............................................................17, 30

25

*Japan Line, Ltd. v. Los Angeles Cty.,*
    441 U.S. 434 (1979) .......................................................................................30, 31

26

27

*Jeffries v. United States,*
    477 F.2d 52 (9th Cir. 1973) ...............................................................................35

28

CERTAIN DEFTS.' REVISED MOT. TO DISMISS UNDER FED. R. CIV. P. 12(b)(6); MEMO. OF P.'S & A.'S

1

**Table of Authorities (cont'd)**

2

**Page(s)**

3

*Johnson v. Duffy*,
   588 F.2d 740 (9th Cir. 1978) ................................................. 25

4

*Kadic v. Karadzic*,
   70 F.3d 232 (2d Cir. 1995) ................................................... 23

5

*Khulumani v. Barclay's Nat'l Bank Ltd.*,
   504 F.3d 254 (2d Cir. 2007) ..........................................*passim*

6

7

*Klamath Water Users Protective Ass'n v. Patterson*,
   204 F.3d 1206 (9th Cir. 1999) .............................................. 33

8

*Landgraf v. USI Film Prods.*,
   511 U.S. 244 (1994) ............................................................. 28

9

10

*Laster v. T-Mobile USA, Inc.*,
   407 F. Supp. 2d 1181 (S.D. Cal. 2005) ............................... 36

11

*Ledesma v. Jack Stewart Produce, Inc.*,
   816 F.2d 482 (9th Cir. 1987) .............................................. 29

12

13

*Lopez v. Sears, Roebuck and Co.*,
   493 F. Supp. 801 (D. Md. 1980).......................................... 27

14

*Louisiana ACORN Fair Housing v. Quarter House*,
   952 F. Supp. 352 (E.D. La. 1997) ...................................... 27

15

16

*Mastafa v. Australian Wheat Bd. Ltd.*,
   2008 WL 4378443 (S.D.N.Y. Sept. 25, 2008) ................... 14

17

*McConnell v. FEC*,
   540 U.S. 93 (2003) ........................................................ 37, 38

18

19

*MCI Telecomms. Corp. v. Graphnet, Inc.*,
   881 F. Supp. 126 (D.N.J. 1995)........................................... 11

20

*McKinney v. U.S. Dep't of Treasury*,
   614 F. Supp. 1226 (C.I.T. 1985)......................................... 30

21

22

*Moose Lodge No. 107 v. Irvis*,
   407 U.S. 163 (1972) ............................................................ 24

23

*Mora v. New York*,
   524 F.3d 183 (2d Cir. 2008) ................................................. 5

24

25

*Mujica v. Occidental Petroleum Corp.*,
   381 F. Supp. 2d 1164 (C.D. Cal. 2005) ................... 22, 25, 31

26

*Nattah v. Bush*,
   541 F. Supp. 2d 223 (D.D.C. 2008) .................................... 27

27

28

CERTAIN DEFTS.' REVISED MOT. TO DISMISS UNDER FED. R. CIV. P. 12(b)(6); MEMO. OF P.'S & A.'S

1

<u>**Table of Authorities (cont'd)**</u>

2

**Page(s)**

3

*Norwood v. Harrison,*

4
    413 U.S. 455 (1973) ........................................................................ 24

*Oliva v. Dept' of Justice,*

5
    433 F.3d 229 (2d Cir. 2005) ......................................................... 17

6

*Papa v. United States,*

7
    281 F.3d 1004 (9th Cir. 2002) ....................................................... 7

*Presbyterian Church of Sudan v. Talisman Energy, Inc.,*

8
    453 F. Supp. 2d 633 (S.D.N.Y. 2006) ...................................... 13, 14

9

*Roberson v. United States,*

10
    382 F.2d 714 (9th Cir. 1967) ....................................................... 35

*Roe v. Unocal Corp.,*

11
    70 F. Supp. 2d 1073 (C.D. Cal. 1999) ......................................... 17

12

*Romero v. Drummond Co.,*

13
    2008 WL 5274192 (11th Cir. Dec. 22, 2008) ............................. 22

*San Francisco Arts & Athletics, Inc. v. U.S. Olympic Comm.,*

14
    483 U.S. 522 (1987) ..................................................................... 24

15

*Sanders v. A.J. Canfield Co.,*

16
    635 F. Supp. 85 (N.D. Ill. 1986) .................................................. 27

17

*Sarei v. Rio Tinto, PLC,*
    550 F.3d 822, 832 (9th Cir. 2008) ................................................ 7

18

*Screws v. United States,*

19
    325 U.S. 91 (1945) ....................................................................... 23

*Shanks v. Dressel,*

20
    540 F.3d 1082 (9th Cir. 2008) ..................................................... 24

21

*Simon v. Weaver,*

22
    327 F. Supp. 2d 258 (S.D.N.Y. 2004) ......................................... 14

23

*Sinaltrainal v. Coca-Cola Co.,*
    256 F. Supp. 2d 1345 (S.D. Fla. 2003) ........................................ 22

24

*Smith v. United States,*

25
    507 U.S. 197 (1993) ..................................................................... 28

*Sosa v. Alvarez-Machain,*

26
    542 U.S. 692 (2004) .............................................................*passim*

27

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.,*

28
    128 S. Ct. 761 (2008) ................................................................... 11

ix

1

## **Table of Authorities (cont'd)**

2

**Page(s)**

3

*Sullivan v. Oracle Corp.*,
4
   547 F.3d 1177 (9th Cir. 2008) ................................................................ 39

5
*Sumpter v. Harper*,
   683 F.2d 106 (4th Cir. 1982) .................................................................. 27

6
*Terry Props., Inc. v. Standard Oil Co.*,
7
   799 F.2d 1523 (11th Cir. 1986) .............................................................. 27

8
*Turner v. Unification Church*,
   473 F. Supp. 367 (D.R.I. 1978) .............................................................. 27

9
*United States v. Approximately 64,695 Pounds of Shark Fins*,
10
   520 F.3d 976 (9th Cir. 2008) .................................................................. 16

11
*United States v. Middleton*,
   231 F.3d 1207 (9th Cir. 2000) ................................................................ 21

12
*United States v. Moore*,
13
   212 F.3d 441 (8th Cir. 2000) .................................................................. 16

14
*United Union of Roofers, Waterproofers & Allied Trades No. 40 v. Ins. Corp.*,
   919 F.2d 1398 (9th Cir. 1990) ................................................................ 39

15
*Van Strum v. Lawn*,
16
   940 F.2d 406 (9th Cir. 1991) .................................................................. 27

17
*Webb v. Smart Document Solutions, LLC*,
   499 F.3d 1078 (9th Cir. 2007) ................................................................ 38

18
*West v. Atkins*,
19
   487 U.S. 42 (1988) ................................................................................ 23

20
*Westray v. Porthole, Inc.*,
   586 F. Supp. 834 (D. Md. 1984) ............................................................ 27

21
*Zschernig v. Miller*,
22
   389 U.S. 429 (1968) .............................................................................. 30

23

### STATE CASES

24
*Alch v. Super. Ct.*,
25
   122 Cal. App. 4th 339 (2004) ................................................................ 37

26
*Artiglio v. Corning Inc.*,
   18 Cal. 4th 604 (1998) ........................................................................... 34

27
*Buckland v. Threshold Enters., Ltd.*,
28
   155 Cal. App. 4th 798 (2007) ................................................................ 37

x

1

**Table of Authorities (cont'd)**

2

**Page(s)**

3

*Byars v. SCME Mortgage Bankers, Inc.,*
109 Cal. App. 4th 1134 (2003)...................................................38

4

*Californians for Disability Rights v. Mervyn's, LLC,*
39 Cal. 4th 223 (2006)..........................................................37, 38

5

6

*Cel-Tech Comm'cns, Inc. v. Los Angeles Cellular Tel. Co.,*
20 Cal. 4th 163 (1999)..............................................................38

7

*Daro v. Super. Ct.,*
151 Cal. App. 4th 1079 (2007)..................................................37

8

9

*Davidson v. City of Westminster,*
32 Cal. 3d 197 (1982)................................................................35

10

*Doyle v. Rice Ranch Oil Co.,*
28 Cal. App. 2d 18 (1938).........................................................32

11

12

*Fiol v. Doellstedt,*
50 Cal. App. 4th 1318 (1996)....................................................16

13

*Gatto v. Sonoma Cty.,*
98 Cal. App. 4th 744 (2002).......................................................29

14

15

*Hall v. Time Inc.,*
158 Cal. App. 4th 847 (2008)...............................................36, 39

16

*In re Marriage of Smith & Maescher,*
21 Cal. App. 4th 100 (1993).......................................................33

17

18

*Jogani v. Super. Ct.,*
165 Cal. App. 4th 901 (2008)....................................................39

19

*Johnson v. Ventura Cty.,*
29 Cal. App. 4th 1400 (1994).....................................................35

20

21

*Ladas v. Cal. State Auto Ass'n,*
19 Cal. App. 4th 761 (1993).......................................................32

22

*McKell v. Wash. Mut., Inc.,*
142 Cal. App. 4th 1457 (2006)..................................................40

23

24

*Melchior v. New Line Prods., Inc.,*
106 Cal. App. 4th 779 (2003)....................................................40

25

*Morris v. De La Torre,*
36 Cal. 4th 260 (2005)..............................................................34

26

27

*Moss v. Super. Ct.,*
17 Cal. 4th 396 (1998)..............................................................40

28

xi

1

## <u>Table of Authorities (cont'd)</u>

2

**Page(s)**

3

4

*Norwest Mortgage, Inc. v. Super. Ct.*,
     72 Cal. App. 4th 214 (1999).................................................................39

5

*Paz v. California*,
     22 Cal. 4th 550 (2000)..............................................................34, 35

6

7

*Peterson v. Cellco P'ship*,
     164 Cal. App. 4th 1583 (2008)..............................................................37

8

*Rotolo v. San Jose Sports & Entm't, LLC*,
     151 Cal. App. 4th 307 (2007).............................................................34, 35

9

10

*Souza v. Westlands Water Dist.*,
     135 Cal. App. 4th 879 (2006)...............................................................33

11

*Williams v. California*,
     34 Cal. 3d 18 (1983).......................................................................35

12

13

### FEDERAL CONSTITUTIONAL PROVISIONS, STATUTES, RULES, AND REGULATIONS

14

U.S. CONST. art. 1, § 8 .......................................................................31

15

U.S. CONST. amend. XIII ...................................................................1, 26

16

1 U.S.C. § 1.................................................................................21

17

18 U.S.C. § 1589.........................................................................28, 29

18

18 U.S.C. § 1590.........................................................................28, 29

19

18 U.S.C. § 1595.........................................................................28, 29

20

19 U.S.C. § 1307.........................................................................17, 30

21

42 U.S.C. § 1983.........................................................................23, 25

22

Alien Tort Statute, 28 U.S.C. § 1350...............................................*passim*

23

Torture Victim Protection Act, 28 U.S.C. § 1350, *note* ............................*passim*

24

Trafficking Victims Protection Reauthorization Act of 2003,
     Pub. L. No. 108-193, 117 Stat. 2875 ............................................28, 29

25

26

Fed. R. Civ. P. 11 .............................................................................3

27

19 C.F.R. §§ 12.42-12.45 .................................................................30

28

xii

## <u>Table of Authorities (cont'd)</u>

**Page(s)**

### STATE CONSTITUTIONAL PROVISIONS AND STATUTES

CAL. CONST. art. 1.................................................................................40

Cal. Bus. & Prof. Code § 17200 ......................................................36, 38

Cal. Bus. & Prof. Code § 17203 ............................................................38

Cal. Bus. & Prof. Code § 17204 ......................................................36, 37

Cal. Bus. & Prof. Code § 17208 ............................................................29

Cal. Civ. Code § 52.1 ............................................................................29

Cal. Civ. Code § 52.1(b) ........................................................................40

Cal. Code Civ. Proc. § 337(1) ...............................................................29

Cal. Code Civ. Proc. § 340(3) (2002 ed.)........................................27, 29

Cal. Code Civ. Proc. § 382 ....................................................................39

### INTERNATIONAL MATERIALS

Charter of the Int'l Military Tribunal at Nuremberg,
    82 U.N.T.S. 279 (1945) ..............................................................6

Convention Against Torture and Other Cruel, Inhuman or Degrading
    Treatment or Punishment, SEN. TREATY DOC. NO. 20, 100th Cong., 2d
    Sess. 1 (1988) ...........................................................................18

Draft Statute for the Int'l Criminal Ct., U.N. Doc. A/Conf. 183/2/Add.1
    (1998), *available at* http://www.un.org/law/n9810105.pdf ................6

*Prosecutor v. Vasiljevic*, ICTY-98-32-A (Feb. 25, 2004),
    *available at* 2004 WL 2781932.................................................8, 14

Rome Statute of the Int'l Criminal Ct.,
    37 I.L.M. 1002 (1998) ..............................................6, 8, 13, 15

Statute of the Int'l Criminal Tribunal for the Former Yugoslavia,
    32 I.L.M. 1192 (1993, updated 2004) .......................................6, 8, 15

Statute of the Int'l Criminal Tribunal for Rwanda,
    33 I.L.M. 1602 (1994) ..............................................................6, 8, 15

TRIALS OF WAR CRIMINALS BEFORE THE NUREMBERG MILITARY TRIBUNALS
    UNDER CONTROL COUNCIL LAW NO. 10............................................13

CERTAIN DEFTS.' REVISED MOT. TO DISMISS UNDER FED. R. CIV. P. 12(b)(6); MEMO. OF P.'S & A.'S

1

## **Table of Authorities (cont'd)**

2

**Page(s)**

3
U.N. Diplomatic Conf. of Plenipotentiaries on the Establishment of an Int'l
    Crim. Ct., U.N. Doc. A/Conf. 183/13 (Vol. II) (1998), *available at*
4
    http://untreaty.un.org/cod/icc/rome/proceedings/E/
    Rome%20Proceedings_v2_e.pdf.......................................................................... 6
5

6

## **OTHER AUTHORITIES**

7

8
136 Cong. Rec. S17486-01, S17492 (1990)............................................................. 18

9 ARTHUR L. CORBIN, CORBIN ON CONTRACTS (2002) ............................................. 33
9

Albin Eser, *Individual Criminal Responsibility*, in THE ROME STATUTE FOR AN
10
    INTERNATIONAL CRIMINAL COURT: A COMMENTARY 801 (2002)......................... 9

11
H.R. REP. NO. 102-367 (1991), *reprinted in* 1991 U.S.C.C.A.N. 84 ................22, 23

12
1 Op. Att'y Gen. 57 (1795)...................................................................................... 20

13
RESTATEMENT (THIRD) OF AGENCY (2006)............................................................... 5

14
RESTATEMENT (SECOND) OF TORTS (1979)............................................................. 14

15
S. REP. NO. 102-249 (1991) ..............................................................................22, 25

16
U.S. Amicus Br., *Isuzu Motors, Inc. v. Ntsebeza*, 128 S. Ct. 2424 (2008) (No.
    07-919), *available at* 2008 WL 408389 .................................................12, 13, 20
17

18
ELIES VAN SLIEDREGT, THE CRIMINAL RESPONSIBILITY OF INDIVIDUALS FOR
    VIOLATIONS OF INTERNATIONAL HUMANITARIAN LAW (2003) ............................ 9

19
1 B. WITKIN, SUMMARY OF CALIFORNIA LAW, CONTRACTS (10th ed. 2005) ..........33

20

21

22

23

24

25

26

27

28

xiv

1

## INTRODUCTION

2      The Plaintiffs—three citizens of Mali and Global Exchange, a San Francisco-

3 based organization—seek to hold Defendants Archer-Daniels-Midland, Cargill

4 Incorporated, and Nestlé U.S.A. ("Defendants") liable for the alleged forced labor

5 practices of unidentified farmers or farming cooperatives in Côte d'Ivoire.  The

6 individual Plaintiffs allege that the farmers or farming cooperatives trafficked one of

7 them to Côte d'Ivoire from Mali, forced them all to work on cocoa farms, and

8 subjected them to beatings and other mistreatment.

9      None of the farmers or farming cooperatives that allegedly committed these

10 wrongs has been sued (or even identified) by Plaintiffs.  Rather, Plaintiffs have sued

11 U.S. companies that they allege purchased cocoa beans produced in Côte d'Ivoire.

12 Plaintiffs do not allege that Defendants themselves participated in the alleged

13 trafficking and mistreatment, nor do they allege that Defendants knew of the

14 specific wrongful acts allegedly inflicted on Plaintiffs or who performed them.

15 Plaintiffs' theory is that Defendants are liable for aiding and abetting the Ivoirian

16 farmers' alleged wrongdoing because the use of forced child labor on Ivoirian cocoa

17 farms is "well-documented," Defendants purchased cocoa beans from and provided

18 unspecified "logistical support" to Ivoirian farmers, and each Plaintiff's alleged

19 mistreatment took place on a farm that cultivated cocoa beans eventually bought by

20 a Defendant.  Plaintiffs purport to state claims under the Alien Tort Statute ("ATS"),

21 28 U.S.C. § 1350; the Torture Victim Protection Act ("TVPA"), 28 U.S.C. § 1350,

22 *note*; the Thirteenth Amendment, and various other federal and state laws.

23      If accepted, Plaintiffs' breathtakingly expansive theory of liability would

24 make it impossible to conduct ordinary commercial activity in any country with a

25 less than perfect human rights record.  Merely doing business in that country—

26 something that invariably would be recast as the furnishing of financial or logistical

27 "support"—would subject a company to liability for any wrongful acts committed

28 by the counterparties to its business transactions.  Plaintiffs' Complaint should be

1

1   dismissed because buying goods (and thereby supplying the funds that enable their

2   production), even with a general knowledge of labor problems in the region, does

3   not give rise to liability under either domestic law or the very narrow class of

4   international-law norms cognizable under the ATS.

5   **FACTUAL BACKGROUND**

6        The individual Plaintiffs allege that, beginning between 1994 and 1998 (at a

7   time when each was no older than 14 years of age), they were forced to work

8   "harvesting and cultivating cocoa beans" at three different plantations in Côte

9   d'Ivoire.  Compl. ¶¶ 44-46.  John Doe I further alleges that he was "trafficked into

10   Cote d'Ivoire" for the purpose of performing such labor.  *Id.* ¶ 44.  In each case, the

11   forced labor is alleged to have continued until 2000.  *Id.* ¶¶ 44-46.  The Complaint

12   alleges that none of the Plaintiffs was paid for his labor; that John Does I and II

13   received only minimal nourishment; and that all three Plaintiffs were guarded and

14   were kept at night in a locked room.  *Id.*  The Complaint alleges that guards or

15   overseers whipped them or beat them with tree branches.  *Id.*

16        Plaintiffs do not allege that Defendants themselves engaged in any of these

17   beatings, acts of trafficking, or forced labor.  To the contrary, Plaintiffs repeatedly

18   state that those actions were committed by unidentified "guards" and "overseer[s]"

19   on "farm[s] and/or farmer cooperative[s]," none of whom is a party to this suit.  *Id.*

20   ¶¶ 8-10, 31-32, 37-38, 44-46.  Plaintiffs allege only that, upon information and

21   belief, the farms on which they worked "supplied [cocoa beans] to any one and/or

22   more of the Defendants."  *Id.* ¶¶ 44-46.

23        Plaintiffs allege that Defendants "knew or should have known" that the farms

24   or farmer cooperatives from which they purchased cocoa beans "relied on forced

25   child labor," because of the "well-documented" and "pervasive" use of child labor

26   on Ivoirian cocoa farms.  *Id.* ¶¶ 35-37.  According to Plaintiffs, Defendants had the

27   "economic leverage" to "control and/or limit the [farmers'] use of forced child

28   labor" (*id.* ¶ 38), but nonetheless purchased cocoa and provided farms with

2

1   unspecified "logistical support" and with "financial support, supplies, training

2   and/or other substantial assistance that contributed to the ability" of the "farm[s]

3   and/or farmer cooperative[s]" to "use and/or facilitate the use of child slave labor."

4   *Id.* ¶¶ 31, 37.[1]  Plaintiffs also allege that some farms had "agreement[s], contract[s],

5   and/or memorandum of understanding[s]" to supply cocoa to Defendants.  *Id.* ¶ 32.

6       Based on these allegations, the individual Plaintiffs seek to hold Defendants

7   liable under federal common law, the TVPA, and other laws.  Plaintiff Global

8   Exchange asserts a single claim under the California unfair competition law.

9                                   **ARGUMENT**

10  **I.    Plaintiffs Fail to State a Federal Common Law Claim Under the ATS**

11      Plaintiffs' federal common law claims under the ATS must be dismissed

12  because they do not satisfy the demanding requirements of *Sosa v. Alvarez-*

13  *Machain*, 542 U.S. 692 (2004).

14      **A.    *Sosa* Establishes a Rigorous Two-Part Test that Sets a "High Bar"**
            **for Recognizing a Federal Common Law Claim Under the ATS**

15      The ATS, enacted in 1789, states that "[t]he district courts shall have original

16  jurisdiction of any civil action by an alien for a tort only, committed in violation of

17  the law of nations or a treaty of the United States."  28 U.S.C. § 1350.  In *Sosa*, the

18  Supreme Court held that "the ATS is a jurisdictional statute creating no new causes

19  of action."  542 U.S. at 724.  The Court explained that the ATS confers jurisdiction

20  for "a narrow set" of violations of the law of nations that were recognized at

21

22  [1] In response to this generalized allegation concerning "logistical support" (Compl.
    ¶ 37), this Court inquired whether there is any "good faith belief under Federal Rule
23  of Civil Procedure 11(b)" that Defendants provided any support to the alleged
    wrongdoers *beyond the alleged monetary support arising from purchases of cocoa*.
24  Order Requiring Further Briefing at 5-6 (July 27, 2006).  Plaintiffs responded by
    pointing only to Defendants' alleged generic statements about their general efforts
25  (1) to ensure the high quality of the products they purchased and (2) to help *fight*
    child labor.  *See* Blavin Decl. Ex. A (excerpts of Plaintiffs' response).  It is thus
26  clear that Plaintiffs have failed to plead facts to support any theory of liability other
    than their core purchaser-liability theory.  *See Bell Atl. Corp. v. Twombly*, 550 U.S.
27  544, 555, 570 (2007) (Federal Rules "require[] more than labels and conclusions";
    rather, plaintiffs must allege "enough facts to state a claim to relief that is plausible
28  on its face.").  And that theory fails as a matter of law, as explained below.

CERTAIN DEFTS.' REVISED MOT. TO DISMISS UNDER FED. R. CIV. P. 12(b)(6); MEMO. OF P.'S & A.'S

common law in 1789. *Id*. at 715, 721.  Federal courts today continue to possess a "restrained" federal common law authority to "adapt[] the law of nations to private rights" for a "narrow class of international norms," but courts must exercise "great caution" before concluding that a claim meets this "high bar." *Id*. at 725, 727-29.

Specifically, the *Sosa* Court established two prerequisites for the recognition of any federal common law cause of action under the ATS.  *First*, the international law norm on which the claim is based must have as "definite content and acceptance among civilized nations" as the three "historical paradigms familiar when § 1350 was enacted" in 1789 (*id*. at 732)—*i.e.*, "Blackstone's three common law offenses" against the law of nations: "violation of safe conducts, infringement of the rights of ambassadors, and piracy." *Id*. at 724, 737; *see also Abagninin v. AMVAC Chem. Corp.*, 545 F.3d 733, 737 (9th Cir. 2008) (same).

*Second*, even if an international norm meets this "demanding standard of definition" (*Sosa*, 542 U.S. at 738 n.30), the court must determine whether, as a matter of domestic law, violations of the norm should be actionable.  As the Court put it, "the determination whether a norm is sufficiently definite to support a cause of action should (and, indeed, inevitably must) involve an element of judgment about the practical consequences of making that cause available to litigants in the federal courts." *Id*. at 732-33; *see also Abagninin*, 545 F.3d at 737.  In "making international rules privately actionable," courts must be "particularly wary of impinging on the discretion of the Legislative and Executive branches in managing foreign affairs" and should "look for legislative guidance before exercising innovative authority over substantive law." *Sosa*, 542 U.S. at 726-27.

**B.**   **Plaintiffs' Aiding-and-Abetting Theory Fails as a Matter of Law**

For multiple reasons, Defendants cannot be held liable for allegedly aiding and abetting cocoa farmers' alleged use of torture and forced child labor.[2]

_____

[2] Plaintiffs do not allege that Defendants are *directly* liable under the ATS, nor could they.  No norm of international law imposes direct liability for purchasing goods produced using forced labor, much less does so with the specificity and universality

4

1

### 1. *Sosa*'s Demanding Standards Bar *Corporate* Aiding-and-Abetting Liability for Violations of International Law

2

3    Plaintiffs' claims depend on this Court finding that the ATS authorizes

aiding-and-abetting liability.  But this Court need not resolve that question because

4    aiding-and-abetting liability for corporate entities does not satisfy *Sosa*.[3]

5

### a. There Is a Clear Consensus Against Extending the Relevant International-Law Norms to Corporations

6

7    Far from showing a definite and universal international-law norm of *corporate*

8    liability that might satisfy *Sosa*, the relevant international legal materials actually

9    reveal an international consensus rejecting such liability.

10    As *Sosa* itself makes clear, the Supreme Court's "demanding standard of

11    definition" (542 U.S. at 738 n.30), requires an ATS plaintiff to show, *inter alia*, that

12    "*international law* extends the scope of liability for a violation of a given norm *to*

13    *the perpetrator being sued*."  *Id.* at 732 n.20 (emphases added).  The text of the ATS

14    itself reinforces this requirement:  the statute requires that the "tort" for which suit is

15    brought must be one "committed in violation of the law of nations."  28 U.S.C.

16    § 1350.  *See also Khulumani v. Barclay's Nat'l Bank Ltd.*, 504 F.3d 254, 269 (2d

17    Cir. 2007) (Katzmann, J., concurring), *aff'd for lack of quorum sub nom. Am. Isuzu*

18    *Motors Inc. v. Ntsebeza*, 128 S. Ct. 2424 (2008); *id.* at 337 (Korman, J., concurring

19

20    required by *Sosa*.  For instance, none of the treaties or conventions that Plaintiffs cite (Compl. ¶ 50) even addresses purchasers of goods produced using proscribed forms of labor.  *See Mora v. New York*, 524 F.3d 183, 208 (2d Cir.) (rejecting claim because plaintiffs "pointed to no sources which evince support for the specific customary international law tort proposed"), *cert. denied*, 129 S. Ct. 397 (2008).

21

22    [3] Plaintiffs' Complaint cannot possibly be sustained on any other theory of vicarious liability.  Although Plaintiffs allege that the parent and subsidiary companies of certain Defendants are "agent[s]" and "alter ego[s]" (Compl. ¶¶ 26, 29), Plaintiffs conspicuously do not allege in those paragraphs that Defendants and the *cocoa farmers or farmer cooperatives* are "agents" or "alter egos."  Plaintiffs elsewhere suggest that any farm that had a contract to supply beans to a Defendant would be an "agent" (*id.* ¶ 32), but that is wrong as a matter of law:  It is settled that a contract to purchase goods does not make the purchaser vicariously liable for the acts of the seller.  *See, e.g.*, Restatement (Third) of Agency § 1.01 cmt. g (2006).  And the Complaint contains no facts whatsoever to sustain liability on the theory that Defendants were somehow "partners" (Compl. ¶ 32) with the primary tortfeasors.  *See Abagninin*, 545 F.3d at 740 ("conclusory" allegations are "insufficient to overcome a motion to dismiss" for failure to state a claim).

23

24

25

26

27

28

5

& dissenting) (joining this portion of Judge Katzmann's opinion).  Plaintiffs cannot show—much less with the high specificity and universality that *Sosa* requires—that international law imposes aiding-and-abetting liability on corporations.  The international consensus is against such liability.  *Khulumani*, 504 F.3d at 321-26 (Korman, J., concurring & dissenting) (noting that the relevant international materials "plainly do not recognize" vicarious liability for an "artificial entity").[4]

Plaintiffs have relied on the various statutes governing international criminal tribunals, which they contend reflect customary international law on the point.  But these statutes *uniformly* restrict the jurisdiction of these tribunals to "natural persons" and thus do not include corporations.[5]  This uniformity is not an oversight: the drafters of the Rome Statute explicitly considered—and refused—to recognize corporate liability.[6]  Indeed, the *United States* specifically opposed the inclusion of corporate liability.  U.N. Diplomatic Conf. at 134-35, ¶ 54.

Because there is a clear consensus against corporate liability in international law (including any form of secondary liability), Plaintiffs' ATS claims must be dismissed.  *Khulumani*, 504 F.3d at 321-26 (Korman, J., concurring & dissenting).

**b.**    **Recognizing Suits Against Corporations Under the ATS Would Disregard Congressional Policy Choices**

Even if international law uniformly and concretely extended liability to

---

[4] Judge Korman was the only judge in *Khulumani* to address the merits of this issue. The majority declined to reach the issue, concluding it had not been raised on appeal.  504 F.3d at 283 (Katzmann, J., concurring); *id.* at 289 (Hall, J., concurring).

[5] *See* Statute of the Int'l Criminal Tribunal for the Former Yugoslavia ("ICTY Statute"), art. 6, 32 I.L.M. 1192, 1194 (1993, updated 2004); Statute of the Int'l Criminal Tribunal for Rwanda ("ICTR Statute"), art. 5, 33 I.L.M. 1602, 1604 (1994); Rome Statute of the Int'l Criminal Ct. ("Rome Statute"), art. 25(1), 37 I.L.M. 1002, 1016 (1998) (not ratified by the U.S.); *accord* Charter of the Int'l Military Tribunal at Nuremberg, art. 6, 82 U.N.T.S. 279 (1945) (covered crimes are ones subject to "*individual* responsibility") (emphasis added).

[6] *See* Draft Statute for the Int'l Crim. Ct., art. 23, at 5-6 & n.3, U.N. Doc. A/Conf. 183/2/Add.1 (1998) (noting proposal), *available at* http://www.un.org/law/n9810105.pdf; U.N. Diplomatic Conf. of Plenipotentiaries on the Establishment of an Int'l Crim. Ct., at 133-36 ¶¶ 32-66, U.N. Doc. A/Conf. 183/13 (Vol. II) (1998) (recording debate), *available at* http://untreaty.un.org/cod/icc/rome/proceedings/E/Rome%20Proceedings_v2_e.pdf; *id.* at 275, ¶ 10 (deletion of corporate liability).

6

1    corporations, the second element of *Sosa*'s test precludes the courts from creating a

2    federal common law cause of action to enforce that norm.

3         A court considering whether to recognize a federal common law cause of

4    action to enforce a particular norm of international law must "look for legislative

5    guidance before exercising [such] innovative authority over substantive law." *Sosa*,

6    542 U.S. at 726-27.  This caution is consistent with the general rule that it would be

7    "anomalous" for a judicially created cause of action to sweep "beyond the bounds

8    [Congress] delineated for comparable express causes of action." *Cent. Bank of*

9    *Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 180 (1994).

10        As the plurality opinion of the en banc Ninth Circuit recently held, the TVPA

11   is the most closely analogous statutory cause of action to the ATS, and the TVPA

12   therefore "provides a useful, congressionally-crafted template to guide" the courts'

13   exercise of federal common law authority under the ATS.  *Sarei v. Rio Tinto, PLC*,

14   550 F.3d 822, 832 (9th Cir. 2008) (en banc) (plurality opinion); *see also Papa v.*

15   *United States*, 281 F.3d 1004, 1011-12 (9th Cir. 2002) (TVPA is the "appropriate

16   vehicle for interstitial lawmaking" for the ATS); *Enahoro v. Abubakar*, 408 F.3d

17   877, 885-86 (7th Cir. 2005) (same).  As explained below, Congress expressly

18   limited liability under the TVPA to "individuals" (*not* corporations).  *See infra* at

19   21-22.  In exercising any federal common law authority under the ATS, the courts

20   must respect the congressional policy judgments reflected in the TVPA, including

21   this bar on corporate liability.  *Cf. Abagninin*, 545 F.3d at 740 (no ATS claim for

22   genocide where U.S. criminal statute concerning genocide showed that "the United

23   States' government has clearly expressed" a different understanding).

24              **2.    The ATS Does Not Impose Aiding-and-Abetting Liability**

25        Plaintiffs' ATS claims fail for the additional reason that aiding-and-abetting

26   liability is wholly unavailable under the ATS.

27

28

CERTAIN DEFTS.' REVISED MOT. TO DISMISS UNDER FED. R. CIV. P. 12(b)(6); MEMO. OF P.'S & A.'S

### a.   There Is No Sufficiently Definite and Universal Norm of Aiding-and-Abetting Liability

Because this is a civil case, it is not enough for Plaintiffs to point to norms that purport to establish aiding and abetting in the criminal context.  The en banc plurality in *Sarei* rejected the view that, under international law, "universal *criminal* jurisdiction" establishes a similar "universal *civil* jurisdiction."  550 F.3d at 831; *see also Cent. Bank*, 511 U.S. at 181-82 (cautioning against extending *criminal* aiding and abetting to the civil context).  Because Plaintiffs refer exclusively to criminal norms, their ATS claims fail for that reason alone.

Even if international criminal law precepts were relevant here, the divergent and still-developing standards in that area preclude any finding of a *clearly defined* norm of *universal* application that would satisfy *Sosa*.  The three major recent international criminal tribunals—the ICC, the ICTY, and the ICTR—have sharply disagreed over the proper standards for criminal aiding-and-abetting liability.  On the one hand, the Rome Statute of the ICC requires that the aider and abettor "aid[], abet[] or otherwise assist[]" in the commission or attempted commission of the crime and do so "*[f]or the purpose* of facilitating the commission of such a crime." Rome Statute, art. 25(3)(c), 37 I.L.M. at 1016 (emphasis added).  By contrast, the ICTY and ICTR tribunals require only that the aider and abettor "assist, encourage or *lend moral support* to the perpetration of a specific crime" and do so merely with "*knowledge* that the acts performed by the aider and abettor assist the commission of a specific crime of the principal."  *Prosecutor v. Vasiljevic*, ICTY-98-32-A, ¶ 102 (Feb. 25, 2004), *available at* 2004 WL 2781932 (emphases added).[7]  That these international tribunals have adopted such divergent standards for both the *actus reus* and *mens rea* elements of aiding and abetting proves that *Sosa*'s requirement of a

---

[7] The Statutes creating the ICTY and ICTR (both of which were enacted by U.N. Security Council resolutions) recognize criminal aiding-and-abetting liability, but (unlike the Rome Statute) do not themselves further define the concept. *See* ICTY Statute, art. 7(1), 32 I.L.M. at 1194; ICTR Statute, art. 6(1), 33 I.L.M. at 1604.

1    clearly defined and universal norm is not met.  542 U.S. at 725.[8]

2          The correctness of this analysis is confirmed by the Ninth Circuit's decision

3    in *Abagninin*, which rejected a contention that an ATS claim for genocide could be

4    established based on a "knowledge" standard of *mens rea*.  545 F.3d at 738-40.  The

5    plaintiffs contended that "knowledge" was the standard required under the Rome

6    Statute, but the Court concluded that, on this point, the Rome Statute was in conflict

7    with, and represented a departure from, the stricter "specific intent" *mens rea*

8    standard reflected both in numerous other international legal materials (including the

9    decisions of the ICTY and the ICTR) and in U.S. domestic law.  *Id*. at 739-40.  As a

10   result, there was not "a sufficient consensus" to support the plaintiffs' proposed

11   "knowledge based norm" for genocide, and the ATS claim failed under *Sosa*.  *Id*. at

12   738.  Indeed, this case presents an even stronger case for rejecting the proposed ATS

13   claim than *Abagninin*, because here the *entire concept* of criminal aiding and

14   abetting under international law has been, and remains, unsettled.

15         We recognize that the Second Circuit in *Khulumani* held, by a two-to-one

16   vote, that "aiding and abetting violations of customary international law" can

17   provide a basis for ATS jurisdiction.  504 F.3d at 260 (per curiam).  Beyond

18   announcing this result, however, the judges were sharply divided.  Judge Hall

19   rejected reliance on international law at all and instead looked to domestic vicarious

20   liability principles (*id*. at 287-89)—a position that a majority of the panel expressly

21   rejected.  *Id*. at 268-70 (Katzman, J., concurring); *id*. at 337 (Korman, J., concurring

_____

22   [8] Several commentators have noted that the tribunals' criminal aiding-and-abetting
     standards vary greatly.  *See, e.g.,* ELIES VAN SLIEDREGT, THE CRIMINAL
23   RESPONSIBILITY OF INDIVIDUALS FOR VIOLATIONS OF INTERNATIONAL
     HUMANITARIAN LAW 93 (2003) ("[T]he *mens rea* standard [under the Rome Statute]
24   is higher than that established in the case law of the *ad hoc* tribunals.  Aiding and
     abetting 'for the purpose of facilitating' is a higher threshold than mere knowledge
25   that the accomplice aids the commission of the offence."); Albin Eser, *Individual
     Criminal Responsibility*, in THE ROME STATUTE FOR AN INTERNATIONAL CRIMINAL
26   COURT: A COMMENTARY 801 (2002) (Rome Statute's "purpose" requirement
     "means more than the mere knowledge that the accomplice aids the commission of
27   the offense, as would suffice for complicity according to the ICTR and ICTY
     Statutes, rather he must know as well as wish that his assistance shall facilitate the
28   commission of the crime.").

& dissenting) (joining Judge Katzmann's opinion on this point).  Judge Katzmann took the view that the Rome Statute's aiding-and-abetting standard could provide the basis for an ATS cause of action. *Id.* at 264-84.  The dissenting judge, Judge Korman, held that there was an insufficient consensus in international law to support criminal aiding-and-abetting liability at all, much less in the context of corporate defendants.  *Id.* at 319-26, 330-33.[9]

On this point, Judge Korman was correct.  No treaty ratified by the United States imposes such liability, the Restatement (Third) of Foreign Relations Law of the United States does not recognize it, and other nations do not uniformly and regularly impose it.  *Id.* at 319-26, 330-33 (Korman, J., concurring & dissenting). Even Judge Katzmann acknowledged the sharp conflict between the ICTY and ICTR standards and those embodied in the Rome Statute.  *Id.* at 276 n.12.  Although Judge Katzmann believed that courts nonetheless could carve out a "core definition" that reflects the common denominator among the conflicting standards, *id.*, this approach violates *Sosa*'s command not to "seek out and define new and debatable violations of the law of nations."  542 U.S. at 728; *see also Abagninin*, 545 F.3d at 737-38 (a court may *not* "extend and *redefine* those norms" in an effort to manufacture a consensus that does not yet exist) (emphasis added).

### b.   Federal Common Law Does Not Recognize Aiding-and-Abetting Liability

In any event, recognizing an ATS cause of action for aiding and abetting violations of international law would conflict with established domestic legal principles and produce significant adverse practical consequences, thereby failing *Sosa*'s second step.  On this point, *Central Bank* is controlling.  In that case, the Court held that the doctrine of civil aiding-and-abetting liability was "at best uncertain in application" and could not be applied to a judicially crafted private right

---

[9] Nonetheless, to provide guidance to the district court on remand, Judge Korman concurred in Judge Katzmann's articulation of a "customary international law standard for aiding-and-abetting based on the Rome Statute."  504 F.3d at 333.

1  of action without legislative authorization.  511 U.S. at 181-82; *see also Stoneridge*

2  *Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 128 S. Ct. 761, 768-69 (2008).  Given

3  *Sosa*'s explicit admonitions that courts should defer to legislative judgments, it

4  would stand *Sosa* on its head to conclude that the ATS is the one area of the law

5  where courts may take a "more aggressive role" (*Sosa*, 542 U.S. at 726), and do

6  what they are elsewhere forbidden to do—*i.e.*, imply a civil cause of action for

7  aiding and abetting.  *See also Doe I v. Exxon Mobil Corp.*, 393 F. Supp. 2d 20, 24

8  (D.D.C. 2005) (citing *Cent. Bank*), *appeal dismissed* 473 F.3d 345 (D.C. Cir. 2007).

9       In *Khulumani*, Judges Katzmann and Hall both sought to confine *Central*

10  *Bank*'s holding to the specific securities-law context in which it arose.  504 F.3d at

11  282 (Katzmann, J., concurring); *id*. at 288 n.5 (Hall, J., concurring).  This ignores

12  the substantial body of case law that applies *Central Bank* in a wide range of

13  contexts.[10]  But more importantly, it ignores the rationale of *Central Bank* itself.

14  One of the reasons why the Supreme Court in that case held that "there is no general

15  presumption that [a] plaintiff may also sue aiders and abettors" is precisely because

16  the Court held that the *common law* doctrine of civil aiding-and-abetting liability

17  was "at best uncertain in application."  511 U.S. at 182.  That rationale applies with

18  full force to an ATS federal common law claim, and it precludes extending civil

19  aiding-and-abetting liability here.  Judge Katzmann was also quite wrong in

20  attempting to distinguish *Central Bank* on the ground that international criminal law

21  itself extends liability to aiders and abettors.  504 F.3d at 282.  *Central Bank*

22  expressly rejects the view that the existence of *criminal* aiding-and-abetting liability

23  is sufficient to establish that *civil* aiding-and-abetting liability is likewise

24  appropriate.  511 U.S. at 181-82.

---

25
26  [10] *See In re Currency Conversion Fee Antitrust Litig.*, 265 F. Supp. 2d 385, 431-32 (S.D.N.Y. 2003) (Truth in Lending Act); *Hayden v. Paul, Weiss, Rifkind, Wharton*
27  *& Garrison*, 955 F. Supp. 248, 256 (S.D.N.Y. 1997) (RICO); *MCI Telecomms. Corp. v. Graphnet, Inc.*, 881 F. Supp. 126, 129 (D.N.J. 1995) (Sherman Act);
28  *Flanigan v. Gen. Elec. Co.*, 93 F. Supp. 2d 236, 254 (D. Conn. 2000) (ERISA), *aff'd*, 242 F.3d 78 (2d Cir. 2001).

11

Moreover, the "practical consequences" of recognizing civil aiding-and-abetting liability under the ATS would be dire.  *Sosa*, 542 U.S. at 732. Traditionally, ATS suits have been curtailed by sovereign immunity and the principle that only nations are bound by most international-law norms.  But that is not so for aiding-and-abetting claims.  They enable plaintiffs to instead sue any of a universe of private parties who may bear some tenuous connection to the alleged wrong.  Such claims also often involve inflammatory but diffuse allegations—such as the ones here—that defendants gave "support" to distant wrongdoers.  These allegations are easy to make but time-consuming and expensive to refute, thus making these suits ideal vehicles for strike suits.  Because the "collateral consequences" of permitting an ATS claim "without the check imposed by prosecutorial discretion" always warrants "judicial caution" (*id.* at 727), this Court should refuse to recognize the expansive cause of action that Plaintiffs seek.

Civil aiding-and-abetting lawsuits under the ATS also pose a grave threat to the political branches' ability to conduct foreign affairs.  For this reason, the U.S. Solicitor General supported the *Khulumani* defendants' petition for certiorari and urged the Supreme Court to reject civil aiding-and-abetting liability under the ATS. *See* U.S. Amicus Br., *Isuzu Motors, Inc. v. Ntsebeza*, 128 S. Ct. 2424 (2008) (No. 07-919), *available at* 2008 WL 408389.  The S.G. explained that such liability would "have a deterrent effect on the free flow of trade and investment, because it would create uncertainty for those operating in countries where abuses might occur."  *Id*. at *20; *see also Corrie v. Caterpillar, Inc.*, 403 F. Supp. 2d 1019, 1025 (W.D. Wash. 2005) (civil aiding and abetting under the ATS "'could have significant, if not disastrous effects on international commerce'") (citation omitted), *aff'd on other grounds*, 503 F.3d 974 (9th Cir. 2007).  As a result, aiding-and-abetting claims "interfere with the ability of the U.S. government to employ the full range of foreign policy options"—such as promoting commercial engagement— "when interacting with regimes whose policies the United States would like to

12

influence." U.S. *Ntsebeza* Amicus Br., 2008 WL 408389, at *21. These collateral consequences are precisely the ones that *Sosa* suggested should militate against recognition of an ATS action.

**3.     Even if the ATS Imposes Aiding-and-Abetting Liability, Plaintiffs' Allegations that Defendants Purchased Cocoa and Provided "Logistical Support" Fail to State a Claim**

Even if the ATS permitted aiding-and-abetting claims, Plaintiffs' purchaser-liability theory does not satisfy any conceivably applicable *mens rea* or *actus reus* standard.

**a.     Plaintiffs Fail to Allege That Defendants Knew Which Suppliers Employed Forced Child Labor and Then Purposely Assisted Their Alleged Wrongdoing**

Although there is no accepted, international-law norm of civil aiding-and-abetting liability (*see supra* at 8-10), the only category of conduct that results in criminal aiding-and-abetting liability under all of the international tribunals' standards is conduct meeting the Rome Statute's "purpose" standard (because that conduct necessarily satisfies the "knowledge" test, but the converse is not true). Under that standard, the alleged accomplice must have acted "[f]or the purpose of facilitating the commission of" the principal's wrong. Rome Statute, art. 25.3(c), 37 I.L.M. at 1016. This standard is consistent with *United States v. von Weizsaecker* (*The Ministries Case*), in which the Nuremberg Military Tribunal acquitted a bank officer despite his "knowing or having good reason to believe" that his actions would assist enterprises using forced labor. 14 TRIALS OF WAR CRIMINALS BEFORE THE NUREMBERG MILITARY TRIBUNALS UNDER CONTROL COUNCIL LAW NO. 10 at 308, 622 (William S. Hein & Co. 1997) (1949). Even the courts that have (wrongly) recognized aiding-and-abetting liability under the ATS have embraced the "purpose" standard. *See Khulumani*, 504 F.3d at 275 (Katzmann, J., concurring); *id.* at 332-33 (Korman, J., concurring & dissenting); *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 453 F. Supp. 2d 633, 673 (S.D.N.Y. 2006).

Under this "purpose" standard, Plaintiffs' aiding-and-abetting theory fails.

13

1  They have not alleged that Defendants' "business activity, which would otherwise

2  appear to be a normal component of the conduct of a lawful business, was in fact

3  *specifically directed* to assist" the cocoa farmers in using forced child labor.

4  *Presbyterian Church*, 453 F. Supp. 2d at 672 (emphasis added); *see also Corrie*, 403

5  F. Supp. 2d at 1027 (seller not an aider and abettor of buyer "because the seller does

6  not share the specific intent to further the buyer's" wrongful acts).

7       Even if the applicable *mens rea* standard required only "knowledge,"

8  Plaintiffs' aiding-and-abetting allegations would fall short.  At a minimum, a

9  defendant is not liable unless it knowingly assists a principal whom the defendant

10  knows is engaged in wrongdoing.[11]  For example, Judge Hall recently identified

11  those who sold Zyklon B gas to the Nazis and trained them in its use to kill humans

12  as a "clear example" of sellers who possess the requisite "knowledge" for aiding-

13  and-abetting liability under the ATS.  *Khulumani*, 504 F.3d at 289.  Similarly, in

14  *Almog v. Arab Bank, PLC*, 471 F. Supp. 2d 257 (E.D.N.Y. 2007), the defendant

15  bank "knew" not only that specific customers were "terrorist organizations" or

16  "charitable front organizations," but also that the accounts the bank was servicing

17  "were being used to fund suicide bombings and other attacks sponsored by the

18  terrorist organizations."  *Id.* at 290.

19       Plaintiffs do not allege that Defendants had the requisite knowledge of specific

20  

---

[11] *See, e.g.*, *Vasiljevic*, ICTY-98-32-A, ¶¶ 102(i)-(ii) (requiring "knowledge that the acts performed by the aider and abettor assist the commission of the specific crime"); *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983) ("the defendant must knowingly … assist the principal violation"); *Mastafa v. Australian Wheat Bd. Ltd.*, 2008 WL 4378443, at *5 (S.D.N.Y. Sept. 25, 2008) (aiding-and-abetting claim failed where "plaintiffs fail adequately to allege that [the defendant] knew that the money it disbursed … was being used to make" payments to the Hussein regime); *Bowoto v. Chevron Corp.*, 2006 WL 2455752, at *4 (N.D. Cal. Aug. 22, 2006) ("plaintiffs must show … that defendants knew that the Nigerian military intended to commit the crime"); *In re Agent Orange Prod. Liability Litig.*, 373 F. Supp. 2d 7, 54 (E.D.N.Y. 2005) ("the mens rea required [for aiding and abetting] is the knowledge that [one's] acts assist the commission of the offence"), *aff'd sub nom. Vietnam Ass'n for Victims of Agent Orange v. Dow Chem. Co.*, 517 F.3d 104 (7th Cir. 2008), *pet. for cert. filed*, No. 08-470 (U.S. Oct. 6, 2008); *Doe v. Saravia*, 348 F. Supp. 2d 1112, 1148-49 (E.D. Cal. 2004); *Simon v. Weaver*, 327 F. Supp. 2d 258, 262 (S.D.N.Y. 2004); RESTATEMENT (SECOND) OF TORTS § 876(b) (1979).

1   wrongdoing.  Instead, Plaintiffs assert merely that it is "well-documented" that some

2   cocoa farms use forced child labor and that Defendants thus "knew or should have

3   known" that some of their suppliers used those practices.  Compl. ¶ 37.  But

4   Plaintiffs do not allege that Defendants knew what the labor practices were at any

5   *particular* farm.  If merely continuing to buy cocoa and support farming activities in

6   the face of abstract knowledge about conditions in the farmer's country warrants

7   civil liability, then *all* commerce with Côte d'Ivoire would give rise to ATS liability,

8   as Plaintiffs also allege that it is well documented that "various [other] sectors of the

9   [Ivoirian] economy" employ child labor.  *Id.* ¶ 36.  Indeed, because other countries

10  also have well documented records of human rights abuses, Plaintiffs' theory of

11  ATS liability—if adopted by courts—would paralyze global commerce.

**b.   <u>Allegations of Cocoa Purchases and Logistical Support</u>**
12      **<u>for Farming Activities Do Not Constitute "Substantial</u>**
13      **<u>Assistance" of Forced Child Labor</u>**

14      Plaintiffs' aiding-and-abetting theory also fails for the independent reason that

15  Defendants' alleged dealings with the Ivoirian cocoa farmers did not sufficiently

16  assist the farmers' alleged use of forced child labor.  Plaintiffs allege that

17  Defendants assisted the farmers' agricultural activities, not their use of forced child

18  labor.  But under both international and domestic law, the aider and abettor must

19  have provided substantial assistance to the principal violation itself.[12]  Buying a

20  farmer's crops and providing "logistical support" to the farm does not materially

21  facilitate that farmer's labor abuses.  Indeed, refusing to do business with a farmer

22

23  ───────────────

24  [12] *See, e.g.*, Rome Statute art. 25.3(c), 37 I.L.M. at 1016 (defendant must have
    "aid[ed], abet[ed], or otherwise assist[ed] in [the] commission" of the "crime");
    ICTY Statute art. 7(1), 32 I.L.M. at 1194 (defendant must have "aided and abetted
25  in the planning, preparation or execution of a crime"); ICTR Statute art. 6(1), 33
    I.L.M. at 1604 (same); *Harmsen v. Smith*, 693 F.2d 932, 943 (9th Cir. 1982) (aiding
26  and abetting requires "substantial assistance in the wrong"); *see also In re
    Temporomandibular Joint (TMJ) Implants Prods. Liability Litig.*, 113 F.3d 1484,
27  1496 (8th Cir. 1997) (rejecting aiding-and-abetting liability where defendant did not
    "substantially assist" the "alleged tortious activity"); *Halberstam*, 705 F.2d at 477
28  (aiding and abetting requires "substantially assist[ing] the principal violation").

1   may well cause him to scrimp on his labor costs even more than before.[13]

2   The Ninth Circuit's recent decision in *United States v. Approximately 64,695*

3   *Pounds of Shark Fins*, 520 F.3d 976 (9th Cir. 2008), confirms this analysis by

4   expressly rejecting aiding-and-abetting liability premised on the "mere act of

5   purchasing." *Id.* at 981.  The Ninth Circuit held that the purchaser of shark fins does

6   not "aid[] or assist[]" the fishing vessel in engaging in unlawful shark finning

7   simply by purchasing, storing, and transporting the fins.  *Id.* at 980.  The theory that

8   "the simple act of purchasing would make a buyer an aider or abettor" was "simply

9   incorrect," the court held, because in such ordinary commercial transactions, "the

10  purchaser is doing no more than making a purchase that it desires to make for its

11  own business reasons."  *Id.* at 981.  That the seller also arguably "would benefit"

12  from the purchases "is irrelevant."  *Id.*  So too here.  Under *Shark Fins*, Plaintiffs'

13  allegations regarding Defendants' purchases therefore fall short of what is required

14  to establish that Defendants aided and abetted the farmers' supposed wrongs.[14]

15      **C.    Under *Sosa*, None of Plaintiffs' Substantive International Law
            Norms May Be Enforced in a Federal Common Law Action**

16      The ATS claims fail for the additional reason that, with respect to each of the

17  *substantive* norms invoked here (forced labor, torture, and cruel, inhuman, and

18  degrading treatment), Plaintiffs improperly seek to use federal common law to

19  override policy judgments embodied in federal statutes.

20

21

---

22  [13] Although Plaintiffs allege that Defendants failed to exercise their alleged
    "economic leverage" to "control and/or limit the use of forced child labor" (Compl.

23  ¶ 38), inaction "is not assistance in [a supplier's] alleged peonage, involuntary
    servitude, or labor violations."  *Doe I v. The Gap, Inc.*, 2001 WL 1842389, at *13

24  (D.N. Mar. I. Nov. 26, 2001); *see also Fiol v. Doellstedt*, 50 Cal. App. 4th 1318,
    1326 (1996) ("Mere knowledge that a tort is being committed and the failure to

25  prevent it does not constitute aiding and abetting.").  A buyer of commodities is not
    responsible for failing to stop the torts of the seller.

26  [14] Other federal courts likewise have held that the mere purchasing of illegal goods
    or goods produced under unlawful circumstances is insufficient to warrant aiding-

27  and-abetting liability.  *See, e.g., United States v. Moore*, 212 F.3d 441, 447 (8th Cir.
    2000) ("purchasing drugs from someone for resale" is not "standing alone,

28  demonstrative of the buyer's aiding or abetting the seller").

1
2

### 1.   **Plaintiffs Seek to Use the ATS to Override Congress's Express Decision to Allow Importation of Cocoa Notwithstanding the Possible Use of Forced Labor**

3   *Sosa* held that Congress may through "treaties or statutes" "shut the door" to

4   courts' use of "the law of nations" to formulate a federal common law cause of

5   action under the ATS.  542 U.S. at 731.  Congress has done that here.  Section 307

6   of the Tariff Act authorizes the importation of "goods … mined, produced or

7   manufactured … in any foreign country by … forced labor" when the goods are "not

8   mined, produced, or manufactured in such quantities in the United States as to meet

9   the consumptive demands of the United States."  19 U.S.C. § 1307.  Section 307

10   thus reflects a deliberate congressional choice to "subordinate[] human rights

11   concerns to the availability of the goods at issue by means of domestic production."

12   *Int'l Labor Rights Fund v. United States*, 391 F. Supp. 2d 1370, 1376 (C.I.T. 2005).

13   Relying on Section 307, the Court of International Trade held that federal law

14   permits the continued importation of Ivoirian cocoa despite allegations of the

15   "continued existence of forced child labor in the Ivoirian cocoa industry" because

16   "no domestic cocoa production industry exists in the United States sufficient to meet

17   domestic consumptive demand."  *Id.* at 1372-73, 1375.  Allowing Plaintiffs to assert

18   ATS claims premised on that same conduct would effectively—and

19   impermissibly—override Congress's judgment in the Tariff Act.  *See Abagninin*,

20   545 F.3d at 739-40 (Congress's enactment of a stricter standard of genocide in

21   domestic law could not be overridden by invoking the ATS); *Oliva v. Dep't of*

22   *Justice*, 433 F.3d 229, 236 (2d Cir. 2005) ("[C]lear congressional action trumps

23   customary international law."); *Roe v. Unocal Corp.*, 70 F. Supp. 2d 1073, 1080-81

24   (C.D. Cal. 1999) (rejecting claim that requiring military officers to perform labor on

25   public works violated international law because U.S. law authorizes such acts).

26
27
28

**2.**   **Plaintiffs Improperly Seek to Use the ATS to Override Both the Strictures of the TVPA and Congress's Refusal to Create a Remedy for "Cruel, Inhuman, and Degrading Treatment"**

Under *Sosa*, where "Congress has specifically provided a cause of action for [certain] violations and has set out how those claims must proceed," courts are not permitted to override those policy judgments by creating their own competing cause of action. *Enahoro*, 408 F.3d at 886. Because Congress designed a carefully crafted remedy for torture violations in the TVPA—and deliberately chose not to create a similar remedy for acts of "cruel, inhuman, or degrading treatment"—Plaintiffs cannot use the ATS to pursue federal common law claims for torture or "cruel, inhuman or degrading treatment." Compl. ¶¶ 57-65.

Congress, in passing the TVPA, balanced competing concerns of comity and providing redress for victims of torture. In doing so, Congress has plainly "occup[ied] the field" and thereby precluded enforcement of that norm under the ATS. *Sosa*, 542 U.S. at 731; *accord Enahoro*, 408 F.3d at 884-85; *Corrie*, 403 F. Supp. 2d at 1025. Allowing parallel claims under the ATS would disrupt Congress's carefully crafted scheme: "[n]o one would plead a cause of action under the Act and subject himself to its requirements if he could simply plead under international law." *Enahoro*, 408 F.3d at 885.

Nor can Plaintiffs' proffered norm against "cruel, inhuman, or degrading treatment" be enforced as federal common law. The Convention that Congress implemented in the TVPA covered not just torture but also "*Other Cruel, Inhuman or Degrading Treatment* or Punishment." SEN. TREATY DOC. NO. 20, 100th Cong., 2d Sess. 1 (1988) (emphasis added). In ratifying the Convention, Congress made civilly enforceable *only* the Convention's norms against torture and extrajudicial killing (*see* 28 U.S.C. § 1350, *note*), and the Senate expressly declared that the Convention's substantive provisions against, *inter alia*, cruel, inhuman, or degrading treatment are "not self-executing." 136 Cong. Rec. S17486-01, S17492 (1990).

18

Congress thus "expressly declined to give the federal courts the task of interpreting and applying" any such norm of international law. *Sosa*, 542 U.S. at 728. This "legislative guidance" must be respected. *Id.* at 726-27.

In any event, even had Congress not *twice* "shut the door" on the "cruel, inhuman, or degrading treatment" norm in the TVPA, it still fails under the *Sosa* standard, as it is far too vague to meet *Sosa*'s "requirement of clear definition." 542 U.S. at 733 n.21; *see also id.* at 736 n.27 (consensus on the norm cannot arise at too "high [a] level of generality"). On its face, the boundaries of this amorphous concept have no obvious limitation; they entirely fail to "specific[ally]" define the particular category of proscribed conduct. *Id.* at 725; *see also Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242, 1247 (11th Cir. 2005) ("cruel, inhuman, and degrading treatment" norm fails the strict requirements prescribed by *Sosa*).

**D.    Plaintiffs' ATS Claim Also Fails Because the Dispute Lacks a Significant Nexus to the United States**

The Supreme Court has held that U.S. law does not govern conduct in foreign countries unless Congress clearly expresses the contrary intent. *See EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991). This strong presumption "serves to protect against unintended clashes between our laws and those of other nations which could result in international discord." *Id.* That consideration carries special force in the ATS context, where the "risks of adverse foreign policy consequences" are at their zenith. *Sosa*, 542 U.S. at 727-28. Even when, as here, the defendants are non-governmental entities, ATS litigation over events occurring abroad threatens to deputize the U.S. courts into roving referees of foreign human-rights disputes. And in that role, U.S. courts will inevitably have to pass upon other nations' practices, effectively second-guessing the political branches' decisions about whether—and to what extent—it is appropriate to conduct commerce with those nations. Indeed, the *Sosa* Court questioned the extraterritorial reach of the authority conferred by the ATS. *Id.* (questioning whether federal courts could "go so far as to

1   claim a limit on the power of foreign governments over their own citizens").

2          The Solicitor General recently confirmed that the position of the United States

3   government is that the ATS cannot be applied to extraterritorial conduct.  *See* U.S.

4   *Ntsebeza* Amicus Br., *supra*.  The Solicitor General explained that "the presumption

5   against extraterritorial legislation was well-established at the time the ATS was

6   adopted."  *Id.* at *12 (citing, *inter alia*, 1 Op. Att'y Gen. 57, 58 (1795) (opinion of

7   the Attorney General that transactions occurring in a foreign country "are not within

8   the cognizance of our courts, nor can the actors be legally prosecuted or punished

9   for them by the United States")).  Therefore, to extend the ATS to actions involving

10  non-U.S. citizens concerning conduct that occurred outside U.S. territory would

11  "represent[] a dramatic expansion of U.S. law that is inconsistent with well-

12  established presumptions that Congress does not intend to authorize civil aiding and

13  abetting liability or extend U.S. law extraterritorially."  *Id.* at *5.

14         That is the case here.  Plaintiffs' ATS claims seek to redress injuries

15  committed in West Africa by West Africans against other West Africans.  Plaintiffs'

16  artifice of alleging that U.S. companies' subsequent purchases of cocoa make them

17  vicariously liable for actions taken half the world away by unknown third parties

18  cannot obscure the fact that the underlying torts are extraterritorial and lack any

19  meaningful connection to the U.S.  Because the ATS does not affirmatively direct

20  courts to recognize extraterritorial federal common law actions, such claims are

21  barred.  Indeed, because Plaintiffs allege that their mistreatment occurred with the

22  sanction of the Ivoirian government (Compl. ¶¶ 54, 60, 63), allowing this suit to

23  proceed would transform the ATS, a statute designed to ease tension with foreign

24  nations (*see Sosa*, 542 U.S. at 715-18), into a device for exacerbating it.

25  **II.     Plaintiffs Fail to State a Claim Under the TVPA**

26         The TVPA imposes civil liability on any "individual who, under actual or

27  apparent authority, or color of law, of any foreign nation … subjects an individual to

28  torture."  28 U.S.C. § 1350, *note*, § 2(a).  Plaintiffs' TVPA claim must be dismissed

20

for three reasons.  First, only natural persons—not corporations—may be sued under the TVPA.  Second, Plaintiffs fail to allege the requisite state action.  And third, the TVPA does not impose aiding-and-abetting liability.

### A.   The TVPA Imposes Liability Only on Natural Persons, Not on Corporations

Plaintiffs' TVPA claims fail at the threshold because Defendants are corporations, not human beings.  The TVPA imposes liability on an "individual" who subjects another "individual" to torture.  *Id.*  Congress could not have intended the word "individual" to have different meanings in the same sentence.  *See*, *e.g.*, *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 101 (2003).  The TVPA therefore must be construed to provide that corporations may be either *both* perpetrators and victims or *neither* perpetrators nor victims.  But the TVPA defines "torture" as "any act, directed against an individual ..., by which severe pain or suffering ..., whether physical or mental, is intentionally inflicted."  28 U.S.C. § 1350, *note*, § 3(b).  The notion that a corporation feels pain and suffering—physical or mental—is absurd. A corporation therefore cannot be an "individual" under the TVPA.

This interpretation of "individual" is confirmed by the Dictionary Act.  That Act defines "person" to include "*corporations*, companies, associations, firms, partnerships, societies, and joint stock companies, *as well as individuals*" (1 U.S.C. § 1 (emphasis added)), which "implies that the words 'corporations' and 'individuals' refer to different things" (*United States v. Middleton*, 231 F.3d 1207, 1211 (9th Cir. 2000)).  Indeed, the Supreme Court has explained that although the term "person" ordinarily includes a corporation, the term "individual" refers only to a "single human being," unless there is "no plausible reason" for giving the term "individual" its ordinary meaning and doing so would produce an "absurd and unjust result which Congress could not have intended."  *Clinton v. City of New York*, 524 U.S. 417, 428-29 & n.13 (1998); *see also Middleton*, 231 F.3d at 1211-12.

Congress here had a very good reason for limiting TVPA liability to natural

persons: "to make crystal clear that foreign states or their entities cannot be sued under [the TVPA] under any circumstances."  S. Rep. No. 102-249, at 7 (1991); H.R. Rep. No. 102-367, at 5 (1991), *reprinted in* 1991 U.S.C.C.A.N. 84, 85.  There is nothing "absurd" or "unjust" about Congress's decision to address that concern by using the term "individual" in its traditional sense, thereby restricting TVPA liability to natural persons.

Unsurprisingly, courts routinely reject the argument that the TVPA applies to corporations.  *See*, *e.g.*, *Bowoto v. Chevron Corp.*, 2006 WL 2604591, at *2 (N.D. Cal. Aug. 22, 2006) ("Congress intended only that the TVPA reach natural persons, not corporations."); *Corrie*, 403 F. Supp. 2d at 1026 ("the statute speaks in terms of individuals, and … 'individual' must mean the same thing with respect to both victim and perpetrators"); *Mujica v. Occidental Petroleum Corp.*, 381 F. Supp. 2d 1164, 1176 (C.D. Cal. 2005) ("[T]he only manner in which the statute does not reach an 'absurd result' … is by excluding corporations from the scope of the statute's liability."), *appeal pending*, No. 05-56056 (9th Cir.); *Doe I*, 393 F. Supp. 2d at 28; *In re Agent Orange*, 373 F. Supp. 2d at 55-56; *Beanal v. Freeport-McMoRan, Inc.*, 969 F. Supp. 362, 382 (E.D. La. 1997), *aff'd on other grounds*, 197 F.3d 161 (5th Cir. 1999).[15]  This Court should do the same.

### B.  Plaintiffs Do Not Adequately Allege the Requisite State Action

Plaintiffs' TVPA claim also fails because they do not allege, as they must, that Defendants acted "under actual or apparent authority, or color of law, of any

---

[15] Only three courts have reached the contrary result.  Two of them misunderstood *Clinton* as holding that "the term 'individual' is synonymous with 'person.'" *Sinaltrainal v. Coca-Cola Co.*, 256 F. Supp. 2d 1345, 1358-59 (S.D. Fla. 2003); *see also Estate of Rodriquez v. Drummond Co.*, 256 F. Supp. 2d 1250, 1267 (N.D. Ala. 2003). The court in the third case, *Romero v. Drummond Co.*, 2008 WL 5274192 (11th Cir. Dec. 22, 2008), believed that it was bound by a prior decision that it thought "held that a complaint under the [TVPA], stated a claim against a corporate defendant." *Id.* at *8 (citing *Aldana*).  But *Aldana* in fact did no such thing. The issue of corporate liability was never raised or argued in that case.  *See In re Larry's Apartment, L.L.C.*, 249 F.3d 832, 839 (9th Cir. 2001) ("Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having so decided as to constitute precedents") (internal quotation marks omitted).

CERTAIN DEFTS.' REVISED MOT. TO DISMISS UNDER FED. R. CIV. P. 12(b)(6); MEMO. OF P.'S & A.'S

1  foreign nation."  28 U.S.C. § 1350, *note*, § 2(a).  Congress modeled this requirement

2  after the familiar "color of law" jurisprudence of 42 U.S.C. § 1983.  *See Kadic v.*

3  *Karadzic*, 70 F.3d 232, 245 (2d Cir. 1995); H.R. REP. NO. 102-367, *supra*, at 87.

4  Under § 1983, "[t]he traditional definition of acting under color of state law requires

5  that the defendant ... exercise power possessed by virtue of state law and made

6  possible only because the wrongdoer is clothed with the authority of state law."

7  *West v. Atkins*, 487 U.S. 42, 49 (1988) (internal quotation marks omitted).

8  Plaintiffs' allegations fall far short of this standard.

9        Plaintiffs' sole allegations of state action are that "government officials"

10  "owned" or "otherwise protected"—through security services or bribes—some

11  cocoa farms in Côte d'Ivoire (although not necessarily the ones on which Plaintiffs

12  worked or even those from which Defendants bought cocoa).  Compl. ¶¶ 37, 63, 65.

13  Plaintiffs' only other allegations are of state inaction: that the Ivoirian government

14  failed "to act in preventing and/or limiting the trafficking or otherwise the use of

15  child slaves."  *Id.* ¶ 63.  None of these allegations suggests that the cocoa farmers—

16  much less the Defendants—acted under color of Ivoirian law.

17        To begin with, even if the cocoa farmers were acting under color of Ivoirian

18  law, their alleged customers—the Defendants—were not.  Even purchases directly

19  from the Ivoirian government would not make Defendants state actors.  *Bigio v.*

20  *Coca-Cola Co.*, 239 F.3d 440, 448 (2d Cir. 2000) ("A private party does not 'act

21  under color of law' simply by purchasing property from the government.").

22        Moreover, even the cocoa farmers themselves were not acting under color of

23  Ivoirian law.  It is settled that a government official's private ownership stake does

24  not constitute state action: "Acts of officers in the ambit of their personal pursuits

25  are plainly excluded" from the definition of acts "under 'color' of law."  *Screws v.*

26  *United States*, 325 U.S. 91, 111 (1945); *see also Gritchen v. Collier*, 254 F.3d 807,

27  812-13 & n.6 (9th Cir. 2001) (collecting cases).  In addition, the provision of police

28  protection or other government services to a private entity does not imbue that

23

1   private entity (or its customers) with the color of law.  *See Norwood v. Harrison*,

2   413 U.S. 455, 465 (1973); *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 173 (1972).

3   Finally, the Ivoirian government's failure to intervene, even if intentional,

4   does not convert the cocoa farmers' or Defendants' alleged misdeeds into state

5   action.[16]  That the Ivoirian government may have turned a blind eye to wrongful acts

6   by the farmers from whom Defendants later bought cocoa falls far short of the

7   "substantial degree of cooperation" between the government and the farmers that is

8   required to show state action.  *Franklin v. Fox*, 312 F.3d 423, 445 (9th Cir. 2002);

9   *see Collins v. Womancare*, 878 F.2d 1145, 1154 (9th Cir. 1989).  The connection

10  between the government and *Defendants* is even more tenuous.  Moreover, even if

11  Ivoirian officials were bribed by some unspecified third party to "allow farms ... to

12  continue the use [of] child labor" (Compl. ¶ 63), the officials are not alleged to have

13  shared with the cocoa farmers the common goal of torturing child laborers.  A

14  private party's joint action with an official constitutes state action only when, among

15  other requirements, they share the common goal of committing the specific,

16  challenged conduct at issue.  *See Franklin*, 312 F.3d at 445; *Cunningham v.*

17  *Southlake Ctr. for Mental Health, Inc.*, 924 F.2d 106, 107-08 (7th Cir. 1991).  And

18  even if Plaintiffs somehow sufficiently alleged a common goal between the officials

19  and the cocoa farmers, they have not alleged that *Defendants* shared that goal.

20  **C.     The TVPA Does Not Provide for Aiding-And-Abetting Liability**

21  Plaintiffs' TVPA claim also fails because the TVPA does not impose liability

22  on alleged aiders and abettors.  As explained above, when Congress creates a private

23  right of action, "there is no general presumption that the plaintiff may also sue

24  [16] *See, e.g.*, *San Francisco Arts & Athletics, Inc. v. U.S. Olympic Comm.*, 483 U.S.

25  522, 547 (1987) ("failing to supervise" private party "not enough to make [its]
     actions those of the Government"); *Blum v. Yaretsky*, 457 U.S. 991, 1004-05 (1982)

26  (government's "[m]ere approval of or acquiescence in" private action does not
     convert it into action of the state); *Shanks v. Dressel*, 540 F.3d 1082, 1088 (9th Cir.

27  2008) (city's "issuance of a building permit" did not make developers' conduct
     "fairly attributable" to government as state action); *Aldana*, 416 F.3d at 1248

28  ("Guatemala's registration and toleration of private security forces does not
     transform those forces' acts into state acts.").

24

1    aiders and abettors." *Cent. Bank*, 511 U.S. at 182.  That presumption is not

2    overcome here because every relevant factor confirms a deliberate congressional

3    choice to exclude aiding-and-abetting liability under the TVPA.

4         First, in imposing liability only on those who "subject[]" another to torture

5    (28 U.S.C. § 1350, *note*, § 2(a)), Congress used a verb that connotes "personal

6    participation" in the wrongful act.  *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir.

7    1978).  Second, although Congress modeled the TVPA after 42 U.S.C. § 1983,

8    Congress went on to omit the crucial language in § 1983 that the Ninth Circuit has

9    explained provides for aiding-and-abetting liability: "subjects, or *causes to be*

10   *subjected*."  *Johnson*, 588 F.2d at 743-44 (quoting 42 U.S.C. § 1983) (emphasis

11   added).  Congress did not casually overlook imposing aiding-and-abetting liability

12   when it enacted the TVPA.  It chose not to do so, and its choice must be respected.

13        Some courts erroneously rely upon statements in the TVPA's committee

14   reports to conclude that the *Central Bank* presumption against inferring secondary

15   civil liability has been overcome.  *See*, *e.g.*, *Cabello v. Fernandez-Larios*, 402 F.3d

16   1148, 1157 (11th Cir. 2005); *In re Sinaltrainal Litig.*, 474 F. Supp. 2d 1273, 1282-

17   83 (S.D. Fla. 2006); *Mujica*, 381 F. Supp. 2d at 1172-74.  But "[l]egislative history

18   cannot trump the statute."  *Bonneville Power Admin. v. FERC*, 422 F.3d 908, 920

19   (9th Cir. 2005), *cert. denied*, 128 S. Ct. 804 (2007).  "[T]he authoritative statement

20   is the statutory text, not the legislative history or any other extrinsic matter."  *Exxon*

21   *Mobil Corp. v. Allapattah Servs.*, 545 U.S. 546, 568 (2005).

22        Moreover, these courts misinterpret the legislative history on which they rely.

23   The Senate Report's statement that the TVPA is "limited to lawsuits against persons

24   who ordered, aided, or assisted" in torture occurs in the context of a discussion of

25   the specialized doctrine of command responsibility, which imposes criminal liability

26   on military officers who fail to prevent a "pervasive pattern and practice" of

27   wrongful acts committed by soldiers under their command.  S. REP. NO. 102-249,

28   *supra*, at 8-9 (citing *In re Yamashita*, 327 U.S. 1 (1946)).  Command responsibility

25

1  is a form of *direct* liability, as *Yamashita* makes clear:  The Court there held that the

2  doctrine is based on the senior officer's *own* "unlawful breach of duty ... to control

3  the operations of the members of his command."  327 U.S. at 14.  Thus, this snippet

4  of legislative history merely elaborates the types of direct liability that fall within

5  the scope of the TVPA's "subjects" language, and provides no support for imposing

6  secondary TVPA liability on private parties who are far removed from and have no

7  control over alleged acts of torture.[17]

8        Finally, even if the TVPA authorized some form of aiding-and-abetting

9  liability, such a claim here would fail because, as discussed above, Plaintiffs do not

10  allege that Defendants acted with the specific intent of bringing about the torture of

11  child workers or had any knowledge (much less involvement) in any particular

12  instances of torture alleged.  Plaintiffs also fail to allege that Defendants had

13  "physical custody or control" of Plaintiffs during the torture, as § 3(b) of the TVPA

14  requires.  *See Arias v. Dyncorp*, 517 F. Supp. 2d 221, 226 (D.D.C. 2007); *In re*

15  *Agent Orange*, 373 F. Supp. 2d at 112.  Accordingly, Plaintiffs' TVPA claim must

16  be dismissed.

17  **III.   Plaintiffs Fail to State a Claim Under the Thirteenth Amendment**

18        Plaintiffs' Thirteenth Amendment claim fails for four reasons.  First, the

19  Amendment does not apply extraterritorially to forced labor in Côte d'Ivoire.  The

20  Amendment prohibits slavery and involuntary servitude "*within* the United States,

21  or any place subject to their jurisdiction."  U.S. Const. amend. XIII (emphasis

22  added); *see also*, *e.g.*, *Griffin v. Breckinridge*, 403 U.S. 88, 105 (1971) (Amendment

23  prohibits slavery "in any part of the United States").  The alleged conduct in Côte

24  d'Ivoire is outside the scope of the Amendment.

25  _____

26  [17] Relying upon this doctrine of command responsibility, the Ninth Circuit held in
   *Hilao v. Estate of Marcos*, 103 F.3d 767 (9th Cir. 1996), that a jury had been

27  properly instructed that Ferdinand Marcos's estate could be held liable under the
   TVPA for acts not "actually committed by Ferdinand Marcos."  *Id.* at 779.  Because
   it relied upon a category of primary liability, *Hilao* does not support the view that

28  the TVPA imposes liability for aiding and abetting.

CERTAIN DEFTS.' REVISED MOT. TO DISMISS UNDER FED. R. CIV. P. 12(b)(6); MEMO. OF P.'S & A.'S

Second, the Amendment does not itself create a private cause of action against private parties. *See, e.g.*, *Nattah v. Bush*, 541 F. Supp. 2d 223, 234 (D.D.C. 2008); *Del Elmer v. Metzger*, 967 F. Supp. 398, 402 (S.D. Cal. 1997).[18] Implying a private right of action is "not appropriate or necessary" here because (1) traditional state-law causes of action "adequately redress[]" violations of the Thirteenth Amendment, (2) Congress has "actively protected" the rights guaranteed by the Thirteenth Amendment through enforcing legislation, and (3) doing so "truly would 'constitutionalize' a large portion of state tort law." *Turner v. Unification Church*, 473 F. Supp. 367, 374 (D.R.I. 1978) (citing *Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics*, 403 U.S. 288 (1971)), *aff'd*, 602 F.2d 458 (1st Cir. 1979); *id.* at 375-76.

Third, even if a private right of action were implied here under *Bivens*, it would not include aiding-and-abetting liability. *Central Bank*'s principles barring aiding-and-abetting liability would govern that implied cause of action. *Corr. Serv. Corp. v. Malesko*, 534 U.S. 61, 67 n.3 (2001).

Fourth, any claim would be barred by California's then-applicable one-year statute of limitations (Cal. Code Civ. Proc. § 340(3) (2002 ed.)), which would govern any cause of action implied under the Thirteenth Amendment. *See Van Strum v. Lawn*, 940 F.2d 406, 408-10 (9th Cir. 1991) (state personal-injury

---

[18] Although the Supreme Court and Ninth Circuit have left open whether the Thirteenth Amendment gives rise to a private cause of action (*City of Memphis v. Greene*, 451 U.S. 100, 125-26 (1981); *Cato v. United States*, 70 F.3d 1103, 1110 (9th Cir. 1995)), the courts that have analyzed that issue have held that none exists. *See Louisiana ACORN Fair Housing v. Quarter House*, 952 F. Supp. 352, 357-88 (E.D. La. 1997); *Holland v. Bd. of Trustees of Univ. of the Dist. of Columbia*, 794 F. Supp. 420, 424 (D.D.C. 1992); *Sanders v. A.J. Canfield Co.*, 635 F. Supp. 85, 87 (N.D. Ill. 1986); *Baker v. McDonald's Corp.*, 686 F. Supp. 1474, 1480 n.12 (S.D. Fla. 1987), *aff'd*, 865 F.2d 1272 (11th Cir. 1988) (table); *Westray v. Porthole, Inc.*, 586 F. Supp. 834, 838-39 (D. Md. 1984); *Lopez v. Sears, Roebuck & Co.*, 493 F. Supp. 801, 806-07 (D. Md. 1980). By contrast, the courts that have assumed the opposite conclusion did so in dicta and without analysis, and then dismissed the claims under other grounds. *See, e.g.*, *Terry Props., Inc. v. Standard Oil Co.*, 799 F.2d 1523, 1533-34 (11th Cir. 1986); *Sumpter v. Harper*, 683 F.2d 106, 108 (4th Cir. 1982); *Alma Soc'y Inc. v. Mellon*, 601 F.2d 1225, 1238 (2d Cir. 1979); *Humphreys v. Nager*, 962 F. Supp. 347, 356 (E.D.N.Y. 1997).

27

1  limitations period applies to *Bivens* claims).   Plaintiffs allege that their mistreatment

2  occurred at least five years before they filed suit.  Compl. ¶¶ 44-46.

3  **IV.   Plaintiffs Fail to State Claims Under 18 U.S.C. §§ 1589, 1590, or 1595**

4          Plaintiffs purport to assert civil claims under 18 U.S.C. §§ 1589 and 1590,

5  which criminalize forced labor and the trafficking of persons for that purpose, as

6  well as under § 1595, which creates a civil remedy for violations of §§ 1589 and

7  1590.  For a multitude of reasons, these claims fail.

8          First, Plaintiffs cannot sue directly under §§ 1589 and 1590 because those are

9  criminal statutes, and thus do not give rise to private causes of action.  *See*, *e.g.*,

10  *Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th Cir. 1980).

11          Second, Plaintiffs cannot sue under § 1595—the provision that does create a

12  private right of action—because it was not enacted until 2003.  Trafficking Victims

13  Protection Reauthorization Act of 2003 ("TVPRA"), Pub. L. No. 108-193,

14  § 4(a)(4)(A), 117 Stat. 2875, 2878.  That is approximately three years *after*

15  Plaintiffs' alleged forced labor ended.  Compl. ¶¶ 44-46.  Because § 1595 does not

16  expressly have retroactive effect, it cannot be applied to "increase a party's liability

17  for past conduct" alleged to have occurred before its enactment, as Plaintiffs seek to

18  do here.  *See Landgraf v. USI Film Prods.*, 511 U.S. 244, 264, 280 (1994); *see also*

19  *Hughes Aircraft Co. v. United States ex rel. Schumer*, 520 U.S. 939, 948-49 (1997).

20          Third, even if § 1595 were retroactive, it does not impose aiding-and-abetting

21  liability.  Because § 1595 does not expressly reach aiders and abettors, such liability

22  may not be inferred.  *See Cent. Bank*, 511 U.S. at 182, 190-91.

23          Finally, even if § 1595 did retroactively impose aiding-and-abetting liability,

24  Defendants did not violate those statutes because they do not apply extraterritorially

25  to the alleged conduct in Côte d'Ivoire.  Federal statutes are presumed not to have

26  extraterritorial application.  *See Smith v. United States*, 507 U.S. 197, 204 (1993).

27  And §§ 1589 and 1590 do not contain any language suggesting that Congress

28  intended to exempt them from that presumption.  Indeed, to the contrary, Congress

28

1   later amended another section of the same statute (§ 1591)—which had been enacted

2   at the same time as §§ 1589 and 1590—to extend its reach to sex trafficking of

3   children "in or affecting interstate or *foreign* commerce."  TVPRA § 5(a)(2), 117

4   Stat. at 2879 (emphasis added).  The amendment would have been unnecessary if

5   these provisions already had extraterritorial effect.

6   **V.    Plaintiffs' State-Law Claims Should Be Dismissed**

7        Plaintiffs' state-law claims fail on multiple grounds.  Not only are they time-

8   barred, they are preempted and fail on their own merits.

9        **A.    The Individual Plaintiffs' State-Law Claims Are Time-Barred**

10       The individual Plaintiffs' state-law claims should be dismissed because "it is

11  apparent on the face of the pleading that [their] claims are barred by the statute of

12  limitations."  *Deirmenjian v. Deutsche Bank, A.G.*, 526 F. Supp. 2d  1068, 1073

13  (C.D. Cal. 2007); *see also Ledesma v. Jack Stewart Produce, Inc.*, 816 F.2d 482,

14  484 n.1 (9th Cir. 1987).  In the Complaint, Plaintiffs allege that each individual

15  Plaintiff's forced labor stopped by 2000.  *See* Compl. ¶¶ 44-46.  But Plaintiffs did

16  not bring this suit until July 2005—at least four and a half years later.  That was too

17  late because their state-law claims are governed by statutes of limitations ranging

18  from just one to four years.  *See* Cal. Code Civ. Proc. § 337(1) (breach of contract,

19  four years); *id.* § 340(3) (2002 ed.) (negligence, one year); *Greenwald v. Bohemian

20  Club, Inc.*, 2008 WL 2331947, at *9 (N.D. Cal. June 4, 2008) (Bane Act, Cal. Civ.

21  Code § 52.1, to enforce rights secured under state constitution, one year); *Gatto v.

22  Sonoma Cty.*, 98 Cal. App. 4th 744, 759 (2002) (same); Cal. Bus. & Prof. Code

23  § 17208 (unfair business practices, four years).  These claims are all time-barred.

24       **B.    Plaintiffs' State-Law Claims Are Preempted**

25       The state-law claims for all Plaintiffs—Global Exchange included—should be

26  dismissed for an additional threshold reason:  they are preempted by federal law.

27       To begin with, these state-law claims conflict with Section 307 of the Tariff

28  Act, which authorizes the importation of goods made by forced labor when those

29

1    goods are not produced "in such quantities in the United States as to meet the

2    consumptive demand of the United States."  19 U.S.C. § 1307.  As noted above,

3    Section 307 represents Congress's deliberate choice to "subordinate" any "desire to

4    improve foreign labor conditions" to "concern for the American consumer's access

5    to merchandise."  *McKinney v. U.S. Dep't of Treasury*, 614 F. Supp. 1226, 1233

6    (C.I.T. 1985), *aff'd*, 799 F.2d 1544 (Fed. Cir. 1986).  Moreover, the Court of

7    International Trade has determined that the precise conduct that Plaintiffs here seek

8    to penalize and enjoin under state law—importing Ivoirian cocoa—is authorized by

9    Section 307.  *See supra* at 17 (citing *Int'l Labor Rights Fund*, 391 F. Supp. 2d at

10   1272-73).  Accordingly, Plaintiffs' state-law claims "stand[] as an obstacle to the

11   accomplishment and execution of the full purposes and objectives of Congress" in

12   enacting Section 307, and thus are barred under the doctrine of conflict preemption.

13   *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941).

14           In any event, Plaintiffs' claims are also barred by the doctrine of field

15   preemption.  That is because Plaintiffs' state-law claims concern "a field in which

16   the federal interest is so dominant that the federal system will be assumed to

17   preclude enforcement of state laws on the same subject."  *English v. Gen. Elec. Co.*,

18   496 U.S. 72, 79 (1990) (internal quotation marks omitted).  It goes without saying

19   that "[f]oreign commerce is pre-eminently a matter of national concern."  *Japan*

20   *Line, Ltd. v. Los Angeles County*, 441 U.S. 434, 448 (1979).  And Section 307 and

21   its implementing regulations (19 C.F.R. §§ 12.42-12.45) weave a "pervasive"

22   "scheme of federal regulation" in that peculiarly federal field.  *English*, 496 U.S. at

23   79 (internal quotation marks omitted).  Because "the federal interest [here] is so

24   dominant," Plaintiffs' state-law claims are preempted.  *Id.*

25           In the same vein, Plaintiffs' state-law claims are barred under the foreign-

26   affairs doctrine.  This doctrine limits "state involvement in foreign affairs and

27   international relations—matters which the Constitution entrusts solely to the Federal

28   Government."  *Zschernig v. Miller*, 389 U.S. 429, 436 (1968).  Where a state law

1   does not address an area of "traditional state responsibility," "state action with more

2   than incidental effect on foreign affairs is preempted, even absent any affirmative

3   federal activity in the subject area of the state law, and hence without any showing

4   of conflict." *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 418-19 (2003).

5        The regulation of labor conditions for Malians working in Côte d'Ivoire is—

6   needless to say—not an area of traditional legislative concern for California.  That

7   alone warrants dismissal under the doctrine.  *Id.*; *see Deutsch v. Turner Corp*, 324

8   F.3d 692, 708-15 (9th Cir. 2003) (California law creating cause of action for victims

9   of World War II slave labor is preempted by foreign-affairs doctrine); *Deirmenjian*,

10  526 F. Supp. 2d at 1076 (California law regarding claims by victims of Armenian

11  genocide "exceeds California's power to engage in foreign affairs"); *Mujica*, 381 F.

12  Supp. 2d at 1187-88  (barring state-law tag-along claims to ATS claim under foreign

13  affairs doctrine because plaintiffs "have never resided in [California]" and "the

14  tortious conduct did not take place in California").

15       Even if a conflict with federal policy were required, Plaintiffs' claims still

16  would be precluded because, as noted above, there is a direct conflict between the

17  claims asserted and the federal policy authorizing the importation of cocoa without

18  regard to the conditions under which it was harvested.  Plaintiffs' state-law claims

19  also threaten to do grave damage to U.S.-Ivoirian relations, as Plaintiffs effectively

20  seek a retroactive embargo of one of Côte d'Ivoire's most important industries.

21  When—as here—the claim asserted has little to do with "traditional legislative

22  subject matter" and the state's interest is "weak[]," "any doubt about the clarity of

23  the conflict" between the state action and federal policy toward foreign affairs

24  "would have to be resolved" in favor of preemption.  *Garamendi*, 539 U.S. at 425.

25  The state-law claims therefore should be dismissed.[19]

---

[19] For the same reason, Plaintiffs' state law claims are barred by the Foreign
Commerce Clause.  *See* U.S. CONST. art. I, § 8.  It is indisputable that foreign
commerce is an area where "federal uniformity is essential."  *Japan Line*, 441 U.S.
at 448.  It is equally well established that when a theory of liability under state law
"implicates foreign policy issues which must be left to the Federal Government *or*

31

## C.     **Plaintiffs' State-Law Claims Fail to State a Claim**

Plaintiffs' state-law claims also fail on the merits.  Whether dressed up as a breach of contract, tort, or unfair business practices, Defendants' alleged cocoa purchases are not actionable under California law.

### 1.     **Breach of Contract (Count VII)**

Plaintiffs base their breach-of-contract claim on alleged aspirational statements in Defendants' codes of conduct or codes of ethical business practices. Advancing a radical view of contract law, Plaintiffs insist that Defendants conferred contract rights on distant Malian workers by allegedly incorporating these "ethical business practices regarding forced child labor" into the contracts under which Defendants purchased cocoa from Ivoirian farmers.  Compl. ¶¶ 39-43, 83. Plaintiffs' breach-of-contract claim here fails for at least two basic reasons.

First, no contractual obligations run from Defendants to Plaintiffs.  Here, Plaintiffs invoke only Defendants' hortatory declarations of the ethical and business standards they strive to meet.  But the Ninth Circuit has squarely held that "[a] gratuitous and unsolicited statement of policy or of intention which receives the concurrence of the party to whom it is addressed, does not constitute a contract." *Beverage Distrib., Inc. v. Olympia Brewing Co.*, 440 F.2d 21, 29 (9th Cir. 1971). And the California courts have recognized for decades that "[a] mere declaration of policy on the part of the company" cannot, as a matter of law, be regarded as an enforceable contract.  *Doyle v. Rice Ranch Oil Co.*, 28 Cal. App. 2d 18, 21 (1938).[20] Thus, these cases confirm that Nestlé's statement that it is "against" exploitation of

violates a clear federal directive," it is preempted by the Foreign Commerce Clause. *Container Corp. of Am. v. Franchise Tax Bd.*, 463 U.S. 159, 194 (1983); *see ABC Charters, Inc. v. Bronson*, __ F. Supp. 2d __, 2008 WL 4500352, at* 21 (S.D. Fla. Oct. 1, 2008) (enjoining state law under Foreign Commerce Clause).  Because Plaintiffs' state-law claims would upset the uniform rule Congress adopted in Section 307, they are preempted under the Foreign Commerce Clause.

[20] *See also Hairston v. Pac. 10 Conference*, 101 F.3d 1315, 1320 (9th Cir. 1996) ("vague, hortatory pronouncements" cannot give rise to third-party beneficiary claim); *Ladas v. Cal. State Auto Ass'n*, 19 Cal. App. 4th 761, 770 (1993) (alleged promise "too vague and indefinite to give rise to an enforceable contractual duty").

1   children, ADM's statement that it "will not condone" child labor, and Cargill's

2   statement that abuse of children in agriculture is "not acceptable" (Compl. ¶¶ 40, 41,

3   43) are general statements of policy that cannot reasonably be construed as the sort

4   of offer-and-acceptance on which contract law is built.

5        Second, even assuming that Defendants incorporated statements of ethical

6   business practices into their contracts with Ivoirian farmers, Plaintiffs cannot sue as

7   third-party beneficiaries.  A promise by the cocoa farmers to Defendants not to use

8   forced child labor would be enforceable only against the farmers.  *In re Marriage of*

9   *Smith & Maescher*, 21 Cal. App. 4th 100, 106 (1993); *Doe I v. Wal-Mart Stores,*

10  *Inc.*, 2007 WL 5975664, at *3-4 (C.D. Cal. Mar. 30, 2007).

11       Moreover, any reciprocal promise by Defendants to the farmers to police their

12  labor practices would not be actionable at all.  A third-party beneficiary may enforce

13  a promise against the promisor when "the circumstances indicate that *the promisee*

14  intends to give the beneficiary the benefit of the promised performance."  1 B.

15  WITKIN, SUMMARY OF CALIFORNIA LAW, CONTRACTS, § 687 (10th ed. 2005)

16  (emphasis added); *see also* 9 ARTHUR L. CORBIN, CORBIN ON CONTRACTS § 777

17  (2002) (same).  To prevail, Plaintiffs would therefore need to allege a bizarre fact

18  pattern:  that the cocoa farmers had bargained to have their labor policies monitored

19  and intended to endow their workers with the power to sue to enforce that promise.

20  *See Souza v. Westlands Water Dist.*, 135 Cal. App. 4th 879, 892-93 (2006) ("The

21  point of the third-party-beneficiary doctrine is to allow a third party to enforce,

22  against a promisor, rights running to the third party for which the *promisee*

23  bargained.  The promisor's intent is not at issue….") (emphasis in original).  But the

24  Complaint (not surprisingly) contains no such allegation.  *See id.* at 894 ("We are

25  aware of no case in which a third-party-beneficiary contract was formed when a

26  promisee bargained for and obtained a promisor's engagement to force the promisee

27  to satisfy its own obligations to the third party."); *see Klamath Water Users*

28  *Protective Ass'n v. Patterson*, 204 F.3d 1206, 1211-12 (9th Cir. 1999) (provisions

33

1   that "grant[] discretion" by one party "to enforce the Contract" against the other do

2   not "confer rights on [third parties]").  Indeed, another judge of this Court rejected a

3   similar claim brought against Wal-Mart on the basis of its code of conduct for its

4   foreign suppliers.  *Doe I*, 2007 WL 5975664, at *2-5.  The Court explained that the

5   claim "more than strains logic" and would require "reality bending allegations" to

6   sustain.  *Id.* at *4.  Plaintiffs' claim here is equally untenable.

7                    **2.    Negligence and Recklessness (Count VIII)**

8           The reason that Plaintiffs fail to state a negligence or recklessness claim is a

9   straightforward one:  Defendants did not owe a duty to Plaintiffs.  "As a general

10  matter, there is no duty to act to protect others from the conduct of third parties."

11  *Morris v. De La Torre*, 36 Cal. 4th 260, 269 (2005).  Plaintiffs have previously

12  indicated they are relying on an exception to this general rule for negligent

13  undertaking (also known as the Good Samaritan rule), a doctrine that "is not favored

14  in the law."  *Rotolo v. San Jose Sports & Entm't, LLC*, 151 Cal. App. 4th 307, 336

15  (2007).  The negligent-undertaking doctrine requires allegations that (1) the actor

16  undertook to render services to another, (2) the services rendered were of the kind

17  the actor should have recognized as necessary for the protection of third persons,

18  (3) the actor failed to exercise reasonable care in performing the services, (4) the

19  failure to exercise reasonable care caused physical harm to the third persons, and (5)

20  either the actor's carelessness "increased the risk of such harm" or "the harm was

21  suffered because either the other or the third persons relied on the actor's

22  undertaking."  *Paz v. California*, 22 Cal. 4th 550, 559 (2000).

23          Although Plaintiffs fail to satisfy any of these factors, their inability to

24  demonstrate the first and last factors is particularly stark.  Plaintiffs do not allege in

25  the Complaint (nor could they) that Defendants undertook to render services to

26  another for the benefit of Plaintiffs.  *See Artiglio v. Corning Inc.*, 18 Cal. 4th 604,

27  614 (1998) ("The foundational requirement of the good Samaritan rule is that in

28  order for liability to be imposed upon the actor, he must specifically have

34

1  undertaken to perform the task that he is charged with having performed

2  negligently….").  Nor is it enough to allege, as Plaintiffs do, that Defendants

3  purported to "'continually monitor[] the performance, reliability and viability of

4  suppliers.'"  Compl. ¶ 39; *id.* ¶¶ 40-43.  The Ninth Circuit has held that a program

5  designed to monitor the work of others is *not* an "undertaking to render services."

6  *Roberson v. United States*, 382 F.2d 714, 721 (9th Cir. 1967).  Rather, such a

7  program seeks "only to protect [the principal party's] own interest, namely to assure

8  itself that the [other party] was performing in the manner required of it under the

9  contract."  *Id.*; *accord Jeffries v. United States*, 477 F.2d 52, 56 (9th Cir. 1973).

10  Nor do Plaintiffs adequately allege the last factor of the negligent-undertaking

11  tort:  that Plaintiffs relied on Defendants' undertaking or that Defendants

12  "contributed to, increased, and changed the risk which would have otherwise

13  existed."  *Williams v. California*, 34 Cal. 3d 18, 25 (1983).  Plaintiffs do not claim to

14  have known of the supposed undertaking, which proves they could not have relied

15  on it.  *See Rotolo*, 151 Cal. App. 4th at 336 (no negligent undertaking when

16  plaintiffs did not allege they knew about the undertaking).  Moreover, Plaintiffs do

17  not allege that Defendants increased the risk of harm.  It is not enough that the risk

18  of child labor might have *decreased* had Defendants more aggressively "monitored"

19  their suppliers (*see* Compl. ¶¶ 86-88), as "a failure to alleviate a risk cannot be

20  regarded as tantamount to increasing that risk."  *Paz*, 22 Cal. 4th at 560; *see also*

21  *Davidson v. City of Westminster*, 32 Cal. 3d 197, 208 (1982) (same).  Thus, absent

22  an allegation that "defendants' conduct increased the risk of physical harm to

23  plaintiff[s] beyond that which allegedly existed" in Côte d'Ivoire before Defendants

24  came along (*Paz*, 22 Cal. 4th at 560), Plaintiffs have failed to state a claim. [21]

25

26  [21] *See also Rotolo*, 151 Cal. App. 4th at 336 (ice rink's installation of automatic external defibrillators not a negligent undertaking because installing the devices did not increase the risk of harm); *Johnson v. Ventura Cty.*, 29 Cal. App. 4th 1400, 1406

27  (1994) (police officers' responding to call but failing to stop escaped mental patient from stabbing woman not a negligent undertaking because the officers "did not

28  *increase* the risk of harm," but merely "left" the parties "as they were").

35

### 3.   California Bus. & Prof. Code § 17200 (Count X)

The unfair competition claim brought by both Global Exchange and the individual Plaintiffs fails to state a claim under California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq*. ("UCL").

### a.   Global Exchange Fails to State a Claim

Global Exchange's UCL claim rests on two alternative theories of injury: (1) it spent money educating the public about Defendants' purported conduct, and (2) cocoa identified as "fair trade cocoa" is more expensive than cocoa that is not so identified.  It also asserts a claim on behalf of its members.  All three theories fail.

**Voluntary Efforts.**  Global Exchange cannot state a UCL claim based on its voluntary efforts to educate the public.  Since Proposition 64 went into effect, a private plaintiff has standing to assert a UCL claim only if it pleads facts sufficient to show that it "has suffered injury in fact and has lost money or property *as a result of the unfair competition*."  Cal. Bus. & Prof. Code § 17204 (emphasis added).  Global Exchange's decision to expend money to "monitor[]" Defendants' actions and to "educat[e] [its] members" about Defendants' alleged misconduct (Compl. ¶ 97) was an entirely voluntary undertaking and cannot satisfy either the causation or injury-in-fact requirements of Proposition 64.

First, Global Exchange does not adequately allege that its loss of money or property was proximately caused by the Defendants' alleged conduct.  *See Hall v. Time Inc.*, 158 Cal. App. 4th 847, 855 (2008); *Laster v. T-Mobile USA, Inc.*, 407 F. Supp. 2d 1181, 1194 (S.D. Cal. 2005), *aff'd*, 252 F. App'x 777 (9th Cir. 2007), *cert. denied*, 128 S. Ct. 2500 (2008).  The only money that Global Exchange lost was money that it *chose* to spend on monitoring Defendants and educating the public.  Compl. ¶ 97.[22]  If a plaintiff could satisfy the UCL's heightened causation

---

[22] Moreover, to the extent that Global Exchange's voluntary expenditures were directed at correcting alleged misrepresentations about Ivoirian labor conditions, its theory fails for the additional reason that a UCL claim based on misrepresentation requires a showing of reliance on the misrepresentation.  *Hall*, 158 Cal. App. 4th at

36

1  standard by voluntarily spending money investigating a defendant's conduct and

2  publicizing the plaintiff's opinions about that conduct, any plaintiff could create

3  standing against any defendant with respect to almost any subject.  That is contrary

4  to Proposition 64, § 1(f), which states that "'only the California Attorney General

5  and local public officials [would] be authorized to file and prosecute actions on

6  behalf of the general public.'"  *Californians for Disability Rights v. Mervyn's, LLC*,

7  39 Cal. 4th 223, 228 (2006) (quoting § 1(f)).

8       Second, Global Exchange fails to satisfy Proposition 64's requirement that

9  Global Exchange had "suffered injury in fact."  Cal. Bus. & Prof. Code § 17204.

10 This "injury in fact" requirement is modeled after "the standing requirements of the

11 United States Constitution."  Prop. 64, § 1(e).  A self-inflicted harm is obviously not

12 the sort of injury-in-fact that satisfies Article III's case-or-controversy requirement.

13 *See*, *e.g.*, *McConnell v. FEC*, 540 U.S. 93, 228 (2003) (holding a group of

14 candidates lacked standing because the plaintiffs' alleged "competitive injury" arose

15 "from their own personal 'wish' not to solicit or accept large contributions, *i.e.*, their

16 personal choice").  Global Exchange's voluntary decision to spend money

17 criticizing Defendants thus does not give it standing to challenge Defendants'

18 conduct under the UCL.  *See Peterson v. Cellco P'ship*, 164 Cal. App. 4th 1583,

19 1592 (2008); *Daro v. Super. Ct.*, 151 Cal. App. 4th 1079, 1098 (2007).

20      Third, Proposition 64 "limit[s] standing to individuals who suffer losses of

21 money or property that are eligible for restitution" under the UCL.  *Buckland v.*

22 *Threshold Enters., Ltd.*, 155 Cal. App. 4th 798, 817 (2007).  Because none of the

23 funds that Global Exchange spent criticizing Defendants were given to *them*, the

24 funds are not recoverable as restitution under the UCL.  *See Alch v. Super. Ct.*, 122

25 Cal. App. 4th 339, 404 (2004) ("[I]t is settled that restitution [under the UCL] is

26 available only if a defendant has wrongfully acquired funds or property in which a

27

28 855-58.  If Global Exchange set out to correct an alleged misrepresentation, it
   necessarily did not *rely* upon it.

CERTAIN DEFTS.' REVISED MOT. TO DISMISS UNDER FED. R. CIV. P. 12(b)(6); MEMO. OF P.'S & A.'S

1    plaintiff has an ownership or vested interest.").  Plaintiffs therefore lack standing.

2          **Higher Prices for "Fair Trade" Cocoa.**  Global Exchange's alternative

3    theory for how it suffered injury—that it pays higher prices for "fair trade" cocoa—

4    fares no better.  This theory suffers from three key legal defects.  First, like the

5    monitoring-expenses theory, the higher-price-cocoa theory fails because Global

6    Exchange's injury is a result of its "personal choice" to sell only pricier chocolate

7    products that meet its particular standards; Defendants did not cause that "harm."

8    *See McConnell*, 540 U.S. at 228.  Second, Global Exchange's price-increase theory

9    of injury conflicts with the settled rule that "[i]f the Legislature has permitted certain

10   conduct or considered a situation and concluded no action should lie, courts may not

11   override that determination" by invoking the UCL.  *Cel-Tech Comm'cns, Inc. v. Los*

12   *Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 182 (1999); *see Webb v. Smart*

13   *Document Solutions, LLC*, 499 F.3d 1078, 1082 (9th Cir. 2007) (same).[23]  As

14   explained above (*supra* at 17), Section 307 of the Tariff Act expressly allows

15   Defendants to import Ivoirian cocoa regardless of how it was grown.  Third, Global

16   Exchange's higher-price theory relies on a chain of causation that, as a matter of

17   law, is too attenuated and speculative.  Because Plaintiffs' theory of liability

18   depends on too many intervening actions of independent decisionmakers, it cannot

19   satisfy Proposition 64's proximate-causation requirement.[24]

20         **Standing on Behalf of It Members.**  Global Exchange cannot assert a UCL

21   claim on behalf of its members.  California law permits associational standing only

22   if Global Exchange can *itself* meet the "injury in fact" and proximate causation

23   requirements of Proposition 64 and also meet associational standing requirements.

24

25   [23] *Accord Byars v. SCME Mortgage Bankers, Inc.*, 109 Cal. App. 4th 1134, 1147-48
     (2003) ("A business practice that might otherwise be considered unfair or deceptive
26   cannot be the basis of a section 17200 cause of action if the conduct has been
     deemed lawful.").

27   [24] And it makes no economic sense, to boot; there is no basis to assume that the
     price for "fair trade" chocolate would drop, as opposed to rise, if there were
28   increased competition for it.

1   *See* Cal. Bus. & Prof. Code § 17203; *Californians for Disability Rights*, 39 Cal. 4th

2   at 233 n.4 (a claimant who brings a representative claim must satisfy both

3   Proposition 64's standing requirements and Cal. Code Civ. Proc. § 382's procedural

4   requirements for associational standing).  Global Exchange does not satisfy the

5   UCL's threshold standing requirements and cannot, therefore, bring *any* UCL claim

6   on behalf of its members, whether for monetary relief or injunctive relief.[25]

7   **b.    The Individual Plaintiffs Fail to State a Claim**

8          The individual Plaintiffs also cannot assert a claim under the UCL because

9   that law "does not support claims by non-California residents where none of the

10   alleged misconduct or injuries occurred in California."  *Churchill Village, L.L.C. v.*

11   *Gen. Elec. Co.*, 169 F. Supp. 2d 1119, 1126 (N.D. Cal. 2000), *aff'd*, 361 F.3d 566

12   (9th Cir. 2004); *see also Sullivan v. Oracle Corp.*, 547 F.3d 1177, 1187 (9th Cir.

13   2008) (unlawful prong of UCL "does not apply to allegedly unlawful behavior

14   occurring outside California causing injury to nonresidents of California"); *Norwest*

15   *Mortgage, Inc. v. Super. Ct.*, 72 Cal. App. 4th 214, 222 (1999).  Because the

16   individual Plaintiffs reside in Mali and allege they were mistreated in Côte d'Ivoire,

17   they cannot sue under the UCL.[26]

18   **4.    Unjust Enrichment (Count IX)**

19          The unjust-enrichment claim fails because it is a theory of recovery, not a

20   claim.  As one district court recently reiterated, "there is no cause of action in

21   California for unjust enrichment."  *GA Escrow, LLC v. Autonomy Corp.*, 2008 WL

---

22   [25]  Moreover, it is settled that an associational plaintiff lacks standing to seek

23   monetary relief on behalf of its members because such claims require individual
    participation in the lawsuit.  *See United Union of Roofers, Waterproofers & Allied*

24   *Trades No. 40 v. Ins. Corp.*, 919 F.2d 1398, 1400 (9th Cir. 1990).

25   [26]  Nor could the individual Plaintiffs base a UCL claim on Defendants' alleged
    misrepresentations in California about labor practices in Côte d'Ivoire.  Proposition
    64 declares that the purpose of the UCL is "to protect *California businesses and*

26   *consumers* from unlawful, unfair, and fraudulent business practices."  Prop. 64,
    § (1)(a) (emphasis added).  The individual Plaintiffs fit neither protected category.

27   Moreover, the individual Plaintiffs cannot satisfy Proposition 64's standing
    requirement that a plaintiff actually *relied* on the misrepresentation and as a result,

28   was injured thereby.  *Hall*, 158 Cal. App. 4th at 856-58.

39

4848036, at *6 (N.D. Cal. Nov. 7, 2008) (citing *Jogani v. Super. Ct.*, 165 Cal. App. 4th 901, 911 (2008)).  Rather than being a stand-alone claim, unjust enrichment is "a general principle underlying various doctrines and remedies, including quasi-contract."  *Melchior v. New Line Prods., Inc.*, 106 Cal. App. 4th 779, 792 (2003); *see McKell v. Wash. Mut., Inc.*, 142 Cal. App. 4th 1457, 1490 (2006) ("There is no cause of action for unjust enrichment.  Rather, unjust enrichment is a basis for obtaining restitution based on quasi-contract or imposition of a constructive trust.").  Moreover, those equitable doctrines cannot be invoked when, as here, "the complaint also alleges tort" and "contract" claims.  *GA Escrow*, 2008 WL 4848036, at *6 (gathering cases).  Plaintiffs' unjust-enrichment claim should therefore be dismissed.

### 5.   California Constitution, Art. 1, Sec. 6 (Count VI)

The individual Plaintiffs assert that Defendants, or those working in concert with them, violated the prohibition on slavery and involuntary servitude in the California Constitution.  CAL. CONST. art. 1, § 6; Cal. Civ. Code § 52.1(b).  But the California Constitution bars slavery in California; it does not bar slavery worldwide, and it does not apply to conduct alleged to have occurred in West Africa.  Moreover, because the California constitutional bar on slavery affords "no greater rights than does the Thirteenth Amendment to the federal Constitution" (*Moss v. Super. Ct.*, 17 Cal. 4th 396, 419-420 (1998)), Plaintiffs' California constitutional claim fails along with their federal constitutional claim.  *See supra* at 26-28.

### CONCLUSION

For the above reasons, the Complaint should be dismissed with prejudice.

DATED: February 9, 2009              MUNGER, TOLLES & OLSON LLP


By: /s/ *Daniel P. Collins*
_____
                                Daniel P. Collins
                        Attorneys for Defendant
                        ARCHER-DANIELS-MIDLAND CO.

40

1   MAYER, BROWN LLP                    HOGAN & HARTSON LLP

2

3   By: _Lee H. Rubin /bn_ .           By:_____
                Lee H. Rubin                        Craig A. Hoover
4   Attorneys for Defendant            Attorneys for Defendant
    CARGILL, INCORPORATED              NESTLE U.S.A.

5

6

7

8

9

10

11

12

13

14                          .

15

16

17

18

19

20

21

22

23

24

25                          .

26

27

28

CERTAIN DEFTS.' REVISED MOT. TO DISMISS UNDER FED. R. CIV. P. 12(b)(6); MEMO. OF P.'S & A.'S

1

MAYER, BROWN LLP

HOGAN & HARTSON LLP

2

3

By:_____

By:_____

Lee H. Rubin

Craig A. Hoover

4

Attorneys for Defendant
CARGILL, INCORPORATED

Attorneys for Defendant
NESTLE U.S.A.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

41