TERRY COLLINGSWORTH (DC Bar # 471830)
CHRISTIAN LEVESQUE (DC Bar # 501778)
ERIC HAGER (DC Bar # 975861)
CONRAD & SCHERER, LLP
731 8th Street, SE
Washington, D.C. 20003
Tel: 202-543-4001 / Fax: 202-527-7990

PAUL L. HOFFMAN  (S.B.# 71244)
SCHONBRUN, DeSIMONE, SEPLOW,
HARRIS & HOFFMAN LLP
723 Ocean Front Walk
Venice, California 90291
Tel: 310-396-0731 / Fax: 310-399-7040

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN DOE I, Individually and on behalf of Proposed Class Members; JOHN DOE II, Individually and on behalf of Proposed Class Members; JOHN DOE III, Individually and on behalf of Proposed Class Members; and GLOBAL EXCHANGE<br><br>                Plaintiffs,<br><br>v.<br><br>NESTLÉ, S. A, NESTLÉ U.S.A., NESTLÉ Ivory Coast, ARCHER DANIELS MIDLAND CO., CARGILL INCORPORATED COMPANY, CARGILL COCOA, CARGILL WEST AFRICA, S.A, and CORPORATE DOES 1-10<br><br>                Defendants. | **CASE NO.: CV 05-5133 (SVW)**<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES**<br><br>**JURY TRIAL DEMANDED** |

## I.   **NATURE OF THE ACTION**

1.      Plaintiffs John Doe I, John Doe II, and John Doe III (referred to herein as the "Former Child Slave" Plaintiffs) are all former child slaves of Malian origin who were trafficked and forced to work harvesting and/or cultivating cocoa beans on farms in Cote d'Ivoire, which supply cocoa beans to the Defendant companies named herein.  The Former Child Slave Plaintiffs bring this action on behalf of themselves and all other similarly situated former child slaves of Malian origin against Defendants: Nestlé, S.A., Nestlé,  U.S.A., and Nestlé  Cote d'Ivoire, S.A. (together as "Nestlé"); Cargill, Incorporated ("Cargill, Inc."), Cargill Cocoa, and Cargill West Africa, S.A. (together as "Cargill"); and Archer Daniels Midland Company ("ADM") (referred to collectively as the "Chocolate Importers" or Defendants) for the forced labor and torture they suffered as a result of the wrongful conduct either caused and/or aided and abetted by these corporate entities.  Specifically, the Former Child Slave Plaintiffs assert claims under the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350, and the Torture Victim Protection Act ("TVPA"), 28 U.S.C. § 1350, *note*. The Former Child Slaves also bring claims for breach of contract, negligence, unjust enrichment and unfair business practices under California's Business & Professions Code §§ 17200, *et. seq.*

2.      The Former Child Slave Plaintiffs bring their ATS and TVPA actions in the United States because such claims cannot be maintained in their home country of Mali as currently there is no law in Mali whereby such Plaintiffs can seek civil damages for their injuries against the major exporters of cocoa operating outside of Mali. Nor could claims be brought in Cote d'Ivoire as the judicial system is notoriously corrupt and would likely be unresponsive to the claims of foreign children against major cocoa corporations operating in and bringing significant revenue to Cote d'Ivoire. It is also likely that both Plaintiffs and their attorneys would be placed in danger following the civil unrest in Cote d'Ivoire and the general hostility by cocoa producers in the region where Plaintiffs were forced

to work. Further, the Former Child Slave Plaintiffs bring their claims in the United States as the U.S. has provided a forum for such human rights lawsuits with the passage of the ATS and TVPA.

3.     The Former Child Slave Plaintiffs bring this action using pseudonyms due to fear of retaliation against themselves and their families by those persons who trafficked them into Cote d'Ivoire; the owners of farms on which they were enslaved; and by the local buyers, who are employees and/or agents of the Defendants. Plaintiffs' case not only threatens to expose criminalized elements within the cocoa sector but also to dismantle the source of its significant profits, cheap labor procured through forced child trafficking. For this reason, Plaintiffs' lives are in great danger as evidence by the violence already wielded against other critics and investigators of corruption and child labor within the cocoa sector. French-Canadian reporter Guy André Kieffer, who was investigating the criminal elements within the cocoa sector disappeared and is presumed dead. Other journalists investigating cocoa and child labor have also received death threats.

4.     Plaintiff Global Exchange, along with the Former Child Slave Plaintiffs, bring this action against Defendants for the damages which they and their members have suffered as a result of Defendants' unlawful and unfair business practices prohibited under California Business & Professions Code §§ 17200, *et. seq.*

## II.   JURISDICTION AND VENUE

5.     Pursuant to 28 U.S.C. § 1331, this Court has federal question jurisdiction over this dispute pursuant to the ATS, 28 U.S.C. § 1350, and the TVPA, 28 U.S.C. § 1350, *note*, for the alleged violations of international human rights law.  The ATS provides federal jurisdiction for "any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States."  The TVPA provides federal jurisdiction for acts of torture

2

1  committed under the color of foreign authority.

2      6.      This Court has Supplemental Jurisdiction over Plaintiffs' state law

3  claims based on 28 U.S.C. §1332.

4      7.      Venue and Personal Jurisdiction over each Defendant is proper in

5  this judicial district, and in the United States as a whole for the foreign

6  Defendants, because, as more fully detailed below, Defendants either own, lease,

7  export to, or otherwise  conduct business activities, including the sale of cocoa and

8  cocoa derivative products, to chocolate retailers in the United States and/or in

9  California such that they maintain a general course of business activity within the

10  United States, including California, either directly through their own activities or

11  by virtue of their parent entities acting as their alter ego and/or agent.

12

13                          **III.   PARTIES**

14  **A.    Former Child Slave Plaintiffs**

15      8.      Plaintiff John Doe I is an adult citizen of Mali currently residing in

16  the city of Sikasso. He brings this action on behalf of himself and all other former

17  child slaves trafficked into Cote d' Ivoire from Mali for purposes of working on a

18  farm and/or farmer cooperative that provided cocoa beans to any one and/or more

19  of the Defendants named herein.

20      9.      Plaintiff John Doe II is an adult citizen of Mali currently residing in

21  the city of Sikasso. He brings this action on behalf of himself and all other former

22  child slaves of Malian origin forced to work on a farm and/or farmer cooperative

23  that provided cocoa beans to any one and/or more of the Defendants named herein.

24      10.     Plaintiff John Doe III is an adult citizen of Mali currently residing in

25  the city of Sikasso. He brings this action on behalf of himself and all other former

26  child slaves of Malian origin forced to work on a farm and/or farmer cooperative

27  that provided cocoa beans to any one and/or more of the Defendants named herein.

28

**B.      Former Child Slave Plaintiffs Class Action Allegations**

11.      The Former Child Slave Plaintiffs bring this action individually, and pursuant to Fed. R. Civ. P. 23(a),  23(b)(2), and 23(b)(3), on behalf of the following class:

> All individuals during the period 1996 through the present who reside or did reside in the country of Mali, West Africa, and who were trafficked from Mali to any cocoa producing region of Cote d'Ivoire and forced to perform labor  as children under the age of 18 on any farm and/or farmer cooperative within any cocoa producing  region of Cote d' Ivoire, including but not limited to the geographical regions of Bouake, Bouaflé, Man, Daloa, and San Pédro, for the purpose of harvesting and/or cultivating cocoa beans that were supplied, either directly or indirectly, to any of the named Defendants herein.

12.      The class is so numerous that joinder of all members is impractical. The Former Child Slave Plaintiffs believe that there are thousands of class members.

13.      There are questions of law and fact common to the class. Key common questions include, but are not limited to, the following:

> a) Whether Plaintiffs and Proposed Class Members were unlawfully trafficked for purposes of forced child labor, in violation of International Labor Conventions 138 and 182, so as to work on cocoa farms, which supplied cocoa beans to the named Defendants herein?
>
> b) Whether Defendants caused and/or aided and abetted the forced labor and torture imposed on Plaintiffs by either providing logistical support to the supplier farms and/or failing to provide sufficient logistical support and/or take adequate action to prevent and stop such forced child labor in violation of international law, federal law and California state law?

4

14.     The Former Child Slave Plaintiffs' claims are typical of the claims of the class.  They seek redress for the same conduct that has affected all class members and press legal claims which are the same for all class members.

15.     The Former Child Slave Plaintiffs named herein will fairly and adequately represent the class.  These Plaintiffs do not have conflicts of interest with members of the class and have retained counsel who are experienced in complex litigation, including class actions and international litigation, who will vigorously prosecute this action.

16.     A class action is the superior method for adjudication of this controversy.  In the absence of a class action, courts will be unnecessarily burdened with multiple, duplicative individual actions, particularly in the case of Mali where class claims are not recognized.  Moreover, if a class is not certified, many meritorious claims will go un-redressed as the individual class members are not able to prosecute complex litigation against large defendant corporations.

## C.    Global Exchange

17.     Plaintiff Global Exchange is a San Francisco based human rights organization dedicated to promoting environmental, political and social justice globally.  Global Exchange's mission includes: 1) educating the U.S. public about critical global issues; 2) promoting respect for the rights outlined in the Universal Declaration of Human Rights; 3) encouraging both the U.S. government and private institutions, including corporations, to support policies that promote democratic and sustainable development; 4) linking people in the U.S. with people in the global South who are working for political, social and environmental justice.  Its membership includes American consumers of, among other things, chocolate, and other cocoa-based products. Plaintiff Global Exchange brings this action on behalf of itself and its members injured by Defendants' unfair business practices.

**D.    Chocolate Importer Defendants**

18.    Defendant Nestlé, SA, is the world's largest food and beverage company involved primarily in the manufacture and sale of beverages, milk products, chocolate, confectionery and biscuits. Based in Switzerland, it employs around 253,000 people and has factories or operations in almost every country in the world. Its stock is traded in the United States in the form of American Depositary Receipts (ADR), which is a negotiable security representing ownership of publicly traded shares in a non-US corporation. Nestlé's ADRs are held through Citibank, N.A., a major U.S. banking institution, and together with its ADR receipts and the sale of Nestlé brand products in the forum constitute significant contacts with the United States, including the forum.

19.    Nestlé, USA is a wholly-owned subsidiary of Nestlé, SA. Headquartered in California, it is one of the largest food and beverage companies in the U.S. with 21,000 employees nationwide, 42 manufacturing facilities, 6 distribution centers, and 58 sales offices across the country, including California. It is one of the largest purchasers, manufacturers, and retail sellers of cocoa products in North America .

20.    Defendant Nestlé Cote d'Ivoire, SA (or Nestle Ivory Coast) is a subsidiary of Nestlé, SA. Its purpose within the Nestlé enterprise is to process cocoa beans for export globally, including North America and California specifically.

21.    Defendant Archer-Daniels-Midland Company (ADM) is a publicly held Delaware corporation with its principal place of business in Decautur, Illinois. It is engaged in the business of procuring, transporting, storing, processing and merchandising agricultural commodities and products.  This includes specifically the processing of cocoa beans from Cote d' Ivoire and the production of cocoa liquor, cocoa butter, cocoa powder, chocolate and various cocoa compounds for the food processing industry primarily in the United States

market, including California.  In addition to providing cocoa products to California manufacturers and processors, ADM owns and operates several processing plants in California which process rice, bakery mix and specialty ingredients.

22.     Defendant Cargill, Incorporated Company ("Cargill, Inc.") is one of the largest privately held corporate providers of food and agricultural products and services worldwide with over 100,000 employees in 59 countries. Its activities include cultivating and processing grain, oilseeds and other agricultural commodities, including cocoa for distribution to food producers.  Headquartered in Minneapolis, it is a family business that is tightly controlled and centrally managed.

23.     Cargill Cocoa is a subsidiary of Cargill, Inc. incorporated in Pennsylvania. It is a major cocoa bean originator and processor. It offers a wide range of high-quality cocoa powder, butter and liquor products under the Gerkens and Wilbur brands to leading manufacturers of food, chocolate and confectionery products worldwide, including processors and manufacturers of cocoa and cocoa products in California. Products are sold through an international network of offices, agents and distributors. Its facilities include a production facility in Cote d'Ivoire for the production of cocoa liquor, butter and powder and origination of cocoa beans.

24.     Cargill West Africa, SA is a subsidiary of Cargill, Inc. and a member of the Cargill Group headed by Cargill, Inc. Formed in 1986, its purpose within the Cargill Group is to process and/or export cocoa beans supplied to it by farms and/or farmer cooperatives in Cote d'Ivoire.  Upon information and belief, Cargill West Africa, SA exports cocoa to the United States, including California, either directly or indirectly through other Cargill Group affiliates.

7

**E.      Unknown Corporate Defendants**

25.      Plaintiffs are currently unaware of the true names and capacities of Defendants sued herein as Corporate DOES 1-10, and therefore sue these Defendants by using fictitious names.  Plaintiffs will amend this complaint to allege their true names and capacities when ascertained.  Upon information and belief each fictitiously named Defendant is responsible in some manner for the occurrences herein alleged and that the injuries to Plaintiffs herein alleged were proximately caused in relation to the conduct of the named Defendants, as well as Corporate Does 1-10.

## IV.   AGENCY

26.      Plaintiffs contend that each of the subsidiaries identified herein is and was, at all relevant times, the agent of the parent companies identified herein. Specifically, the parent entities control the subsidiaries' operations, particularly with respect to the sourcing, purchasing, manufacturing, distribution, and/or retailing of cocoa and cocoa derived products from the Cote d' Ivoire.

27.      Plaintiffs further contend that each of the parent entities identified herein control and/or have the ability to control their subsidiaries' actions with respect to labor practices on the farms and/or farmer cooperatives from which cocoa products are sourced.

28.      Plaintiffs are informed and believe that at all material times each of the parent defendants and their relevant subsidiaries were the agent or otherwise working in concert with each other and that each such subsidiary was acting within the course and scope of such agency or concerted activity.  To the extent that said conduct was perpetrated by certain subsidiary defendants, the parent defendant corporations confirmed and ratified the same.

## V.   <u>ALTER EGO</u>

29.    Plaintiffs contend that each of the subsidiaries identified herein is and was, at all relevant times, the alter-ego of the parent companies identified herein. Specifically, the parent entities control every aspect of the subsidiaries' operations, particularly with respect to the sourcing, purchasing, manufacturing, distribution, and/or retailing of cocoa and cocoa derived products, and have used them merely as conduits for the receipt or transfer of funds and/or products with respect to cocoa products derived from the Cote d' Ivoire.

30.    Upon information and belief, the subsidiary and parent corporations named herein have common ownership, common board of directors, are inadequately capitalized for the risks at hand, and have failed to observe corporate formalities with respect to their operations. The inherent and pervasive failure to maintain separate identities constitutes improper conduct and disrespects the privilege of using the corporate form to conduct business.

## VI.   <u>AIDING AND ABETTING</u>

31.    Cote d'Ivoire is a country struggling to recover from years of civil conflict.  Active hostilities ended in January 2003, leaving the country divided into three zones of control: the government-controlled south, the rebel-held north and the Zone of Confidence, which was formally patrolled by international troops. Although several peace agreements have been signed, and the Zone of Confidence dismantled, acts of violence continue. Cote d'Ivoire's cocoa-producing regions, which lie mostly with the government controlled southern zone, are at the heart of the Ivorian conflict. In this conflict, the cocoa hierarchy has been described by the International Crisis Group as an "Enron-type structure" of front companies with secret bank accounts used to transfer funds with multiple layers of insulation between the criminal acts and their eventual beneficiaries.

9

32.    It is in this often lawless and clandestine backdrop that Cote d'Ivoire has emerged as the largest exporter of cocoa in the world, providing 70% of the world's supply.  A majority of this cocoa is imported to the US by the named Defendants herein. Indeed, journalist Carol Off explains in her 2006 book *"Bitter Chocolate: Investigating the Dark Side of the World's Most Seductive Sweet"* that the "dirty work" of buying and selling cocoa beans in this conflict ridden country has become the domains of large multinationals such as Nestle, ADM, and Cargill and that since the 1990s, Cote d'Ivoire cocoa production has been controlled by these companies with the unilateral goal of finding the cheapest sources of cocoa.

33.    Defendants are able to obtain this ongoing, cheap supply of cocoa by maintaining exclusive supplier/buyer relationships with local farms and/or farmer cooperatives in Cote d'Ivoire.  Through these exclusive supplier/buyer relationships, maintained in the form of memorandums of understanding, agreements, and/or contracts, both written and oral, Defendants are able to dictate the terms by which such farms produce and supply cocoa to them, including specifically the labor conditions under which the beans are produced.

34.    Defendants control such conditions by providing local farmers and/or farmer cooperatives with *inter alia* ongoing financial support, including advance payments and personal spending money to maintain the farmers' and/or the cooperatives' loyalty as exclusive suppliers; farming supplies, including fertilizers, tools and equipment; training and capacity building in particular growing and fermentation techniques and general farm maintenance, including appropriate labor practices, to grow the quality and quantity of cocoa beans they desire.  The training and quality control visits occur several times per year and require frequent and ongoing visits to the farms either by Defendants directly or via their contracted agents.

35.    Specifically, Defendant Nestlé is directly involved in the purchasing and processing of cocoa beans from Cote d' Ivoire. Among its exclusive

10

1  supplier/buyer relationships were agreements with suppliers Keita Ganda and
2  Keita Baba from plantations in Daloa; Lassine Kone from plantations in Sitafa.

3       36.    Nestlé's 2006 "Principles of Purchasing" states "purchasing should,
4  wherever possible, be part of the Supply Chain . . . and that Strategic Buyers
5  perform strategic activities such as market research or analysis [and] supplier
6  profiling and selection."  Under the section "Raw Materials", Nestlé states it
7  "provides assistance in crop production." Under the section, "Traceability," Nestlé
8  states "[t]raceability includes tracking inside our company supply chain, i.e. from
9  the reception of raw and packaging materials, production of finished products to
10 delivery to customers."  Indeed, Nestlé states that "[t]raceability of incoming
11 materials is of the utmost importance to Nestlé.  In dealing with suppliers,
12 Purchasing must insist on knowing the origin of incoming materials and require
13 suppliers to communicate the origin of their materials." Nestlé's Principles of
14 Purchasing also states that it "actively participate[s] as the first link in an
15 integrated supply chain"; that it "develop[s] supplier relationships"; and that it
16 "continually monitor[s] the performance, reliability and viability of suppliers"

17      37.    Nestle's 2005 Webpage on Suppliers Management also discusses the
18 importance of the Nestle Supply Chain for production operations. "The Nestle
19 Quality System covers all steps in the food supply chain, from the farm to the
20 consumer of the final products. Quality assurance activities are not confined to
21 production centers and head offices. They include working together with
22 producers and suppliers of raw . . . materials ."

23      38.    Nestlé's Commitment to Africa Brochure further states that "[w]hile
24 we do not own any farmland, we use our influence to help suppliers meet better
25 standards in agriculture. . . . Working directly in our supply chain, we provide
26 technical assistance to farmers." Nestlé goes on to state that the "[s]upport
27 provided to farmers ranges from technical assistance on income generation to new
28 strategies to deal with crop infestation, to specific interventions designed to

address issues of child labour." "Specific programmes directed at farmers in West Africa include field schools to help farmers with supply chain issues, as well as a grassroots 'training of trainers' programme to help eliminate the worst forms of child labour."

39.     Defendant ADM is also directly involved in the purchasing and processing of cocoa beans from Cote d' Ivoire. Among its exclusive suppliers is a farmer cooperative known as SIFCA. In a 2001 article found in *Biscuit World,* ADM explains that its acquisition of SIFCA in Cote d'Ivoire "gives ADM Cocoa an unprecedented degree of control over it raw material supply, quality and handling". In the same article,  an ADM executive states that "ADM Cocoa can deliver consistent top quality products by control of its raw materials", and that "ADM is focused on having direct contact with farmers in order to advise and support them to produce higher quality beans for which they will receive a premium."

40.     ADM's 2004 Cocoa Webpage openly states that ADM Cocoa has a "strong presence in origin regions," and in a section entitled "Farmers as Partners," ADM further states that "[t]he success of the thousands of small, family-owned farms on which cocoa is typically grown is vital to the cocoa industry. That is why ADM is working hard to help provide certain farmer organizations with the knowledge, tools, and support they need to grow quality cocoa responsibly and in a sustainable manner. . . . ADM is providing much needed assistance to organizations representing thousands of farmers and farming communities. These efforts are making an impact at the farm level."

41.     The ADM Cocoa Brochure, states that "[t]hrough its support of the World Cocoa Foundation, the European Cocoa Association, the US Chocolate Manufacturers Association and other programs, ADM is actively involved in long-term efforts to ensure that cocoa is grown responsibly and sustainably. Such efforts include research into environmentally sound crop management practices,

plant breeding work to develop disease-resistant varieties and farmer field schools to transfer the latest know-how into the hands of millions of cocoa farmers around the world. Starting from the cocoa growers through to the world's top food and beverage manufacturers, ADM Cocoa is committed to delivering the best in product quality and service at every stage."

42.     Like Nestlé and ADM, Defendant Cargill has a direct presence in Cote d'Ivoire cocoa farms. Carol Off notes that Cargill is possibly the largest privately owned corporation in the world and that its influence over the food we eat, in terms of where it comes from and how its produced, is staggering.  Among its exclusive supplier/buyer relationships are Dôté Colibaly, Soro Fonipoho, Sarl Seki, Lenikpo Yéo (alias "the Big One") from which 19 Malian child slaves were rescued, Keita Ganda, and Keita Hippie, who produce the bulk of the cocoa in the Bouaflé region.

43.     Cargill's Cote d'Ivoire Country Webpage states that in 2000/01, Cargill opened two up-country buying stations in Daloa and Gagnoa in the western cocoa belt, and that Cargill's Micao cocoa processing plant has obtained ISO 9002 certification, which is a system of quality standards for food processing from sourcing through processing that inherently requires detailed visits and monitoring of farms.

44.     As part of Defendants' ongoing and continued presence on the cocoa farms, Defendants had first hand knowledge of the widespread use of child labor on said farms, in addition to the numerous, well-documented reports of child labor by both international and U.S. organizations.

45.     The U.S. State Department, the International Labor Organization (ILO), and UNICEF, among others, have confirmed since the late 1990s the existence of child slavery with documented reports and statistics.  Notable non-governmental organizations have also independently confirmed that many, if not most, of the children working on Ivorian cocoa plantations are being forced to

1   work as slaves without any remuneration.

2   46.   In 1997, UNICEF reported that children from the neighboring

3   countries of Mali and Burkina Faso are being trafficked to Cote d'Ivoire to harvest

4   cocoa beans.  *See* Carol Ballamy, *The State of the World's Children 1997: Focus*

5   *on Child Labour*, Oxford University Press for UNICEF (1996).  The ILO estimates

6   there are 378,000 children working in Cote d'Ivoire in various sectors of the

7   economy.  International Programme on the Elimination of Child Labour, ILO,

8   *Combating Trafficking in Children for Labour Exploitation in West and Central*

9   *Africa* (2001).  The U.S. State Department has also estimated that there are at least

10   15,000 child laborers working on cocoa, coffee, and cotton farms**.**  Bureau of

11   Democracy, Human Rights and Labor, U.S. Dep't of State, *Country Reports on*

12   *Human Rights Practices, 2004: Cote d'Ivoire*.

13   47.   Despite the well-documented use of child labor on cocoa farms in

14   Cote d'Ivoire, Defendants not only purchased cocoa from farms and/or farmer

15   cooperatives which they knew or should have known relied on forced child labor

16   in the cultivating and harvesting of cocoa beans, but Defendants provided such

17   farms with money, supplies, and training to do so with little or no restrictions from

18   the government of Cote d'Ivoire.  Upon information and belief, several of the

19   cocoa farms in Cote d'Ivoire from which Defendants source are owned by

20   government officials, whether directly or indirectly, or are otherwise protected by

21   government officials either through the provision of direct security services or

22   through payments made to such officials that allow farms and/or farmer

23   cooperatives to continue the use child labor.

24   48.   Defendants, because of their economic leverage in the region and

25   exclusive supplier/buyer agreements each had the ability to control and/or limit the

26   use of forced child labor by the supplier farms and/or farmer cooperatives from

27   which they purchased their cocoa beans, and indeed maintained specific policies

28   against the use of such forced labor practices.

49.     Defendant Nestlé's Standards of Business Conduct states that "Nestlé is against all forms of exploitation of children. Nestlé does not provide employment to children before they have reached the age to have completed their compulsory education . . . and expects its suppliers to apply the same standards. Nestlé abides by national laws in all countries in which it has operations and complies with the International Labour Organisation (ILO) Convention 138 on Minimum Age for Employment and the ILO Convention 182 on the Worst Forms of Child Labour."  Nestle also requires all of its subcontractors and Outsourcing Contractors to adhere to Nestlé's Corporate Business Principles, and chooses its Suppliers based on, *inter alia,* their "minimum corporate social responsibility standards".

50.     Defendant ADM's Business Code of Conduct and Ethics, known as "The ADM Way," states with respect to Child Labor that "ADM will not condone the employment or exploitation of legally underage workers or forced labor and will not knowingly use suppliers who employ such workers or labor." ADM further states that its Code, including its Child Labor provision, is "a statement of the values to be recognized in the conduct of ADM's business by its employees, officers, directors and other agents.  "It is [also] the responsibility of all . . . its subsidiaries worldwide to comply with this Business Code of Conduct and Ethics . . . [and that] the values explained in this [Code] are to be consistently applied throughout the world in ADM's business, not only when it's convenient or consistent with other business objectives, but in all situations."  ADM also asserts that it "will deal fairly with its customers, suppliers and business partners [and that] no ADM representative should take unfair advantage of anyone through. . . misrepresentation of material facts or any other unfair dealing practice."

51.     Like Nestlé and ADM, Defendant Cargill's Position Paper on cocoa industry labor explicitly states that "[a]busive treatment towards children in agriculture or in any other industry is not acceptable." Cargill's International Code

15

of Conduct also states that Cargill will "comply with the letter and spirit of all applicable . . . laws designed to accomplish equal and fair opportunities in employment."

52.     Despite Defendants' knowledge of the widespread use of forced child labor on the cocoa farms from which they source and their specific policies prohibiting child labor, Defendants not only continued to provide cocoa farms money, supplies, and training to grow cocoa beans for their exclusive use knowing that their assistance would necessarily facilitate child labor, but they actively lobbied against all legal enforcement mechanisms that would have curbed forced child labor.

53.     In 2001, following news reports that child slavery was a key ingredient of American chocolate, U.S. Congressman Eliot Engel introduced a bill that would have forced U.S. chocolate importers and manufacturers to adhere to a certification and labeling system that their chocolate was "slave free".  The bill passed the House of Representatives with a vote of 291 to 115 in favor of the measure.

54.     The U.S. chocolate industry immediately moved to eradicate the bill urging the legislatures, concerned non-governmental organizations, and the public at large that there was no need for concrete, enforceable legislation against child slavery because they would instead implement a private, voluntary mechanism to ensure child labor free chocolate.

55.     Their multi-million dollar lobbying effort paid off by resulting in the Harkin-Engle Protocol, an entirely voluntary agreement whereby the chocolate industry would essentially police itself and in effect guarantee the continued use of the cheapest labor available to produce its product -- that of child slaves.

56.     By providing the logistical and financial assistance described herein across a period of years, Defendants knew that the farmers they were assisting were using and continued to use forced child labor, but nevertheless continued to

provide such assistance. But for Defendants' knowing and substantial assistance and their efforts to derail enforceable legal mechanisms via the Harkin-Engle Protocol, the farmers would not have been able to operate their cocoa plantations using forced child labor.

## VII.   HARM TO THE INDIVIDUAL PLAINTIFFS

**A. Former Child Slave Plaintiffs**

57.     Plaintiff John Doe I was trafficked into Cote d'Ivoire at age fourteen (14) to work on a large cocoa plantation located in Abobogou, near the town of Bouafle in Cote d'Ivoire. He was forced to work on the plantation until the age of nineteen (19), between the period of 1994 and 2000, when he finally escaped. During the four year period, he was forced to work harvesting and cultivating cocoa beans for up to twelve (12) hours a day and sometimes as many as fourteen (14) hours, six days a week.  This work included cutting, gathering, and drying the cocoa beans for processing.  Upon information and belief, the cocoa cultivated on this plantation is supplied to any one and/or more of the Defendants herein. He was not paid for his work and only given scraps of food to sustain him. He, along with the other children on the plantation, were heavily guarded at all times and at night kept in a locked room to prevent escape.  When the guards felt he was not working quickly enough, he was often beaten with tree branches.  He was beaten so hard that he suffered cuts on his hands and legs. Plaintiff John Doe I brings this action on behalf of himself and all other similarly situated former child slaves in Mali.

58.     Plaintiff John Doe II was forced to work as a child slave on a cocoa plantation for approximately 2 ½ years between the period of 1998-2000. During this time, he was between the age of 12-14 years old, below the legal working age in Cote d'Ivoire. The plantation was located in the Region de Man, Cote d'Ivoire. During the 2 ½  years, he was forced to work harvesting and cultivating cocoa

beans for up to twelve (12) hours a day and sometimes as many as fourteen (14) hours, six days a week.  This work included cutting, gathering, and drying the cocoa beans for processing.  Upon information and belief, the cocoa cultivated on this plantation is supplied to any one and/or more of the Defendants herein.  Once on the plantation, his movements were strictly controlled and he was not permitted to leave under the threat that he would be severely beaten and his feet cut open, as he had witnessed with the other children who attempted escape. At night, he, along with the other children working on the farm, were forced to sleep on the floor of a locked room until morning when they were again gathered for work. Plaintiff John Doe II was not paid, provided with only the bare minium of food, and beaten with a whip when the guards felt he was not performing adequately. Plaintiff John Doe II brings this action on behalf of himself and all other similarly situated former child slaves in Mali.

59.    Plaintiff John Doe III was forced into slavery at age 14 on a cocoa plantation located in the Bengalo Region de Man, Cote d'Ivoire. He was forced to work on the plantation for approximately four (4) years until he was 18 years old from 1996-2000. During this time, he worked between twelve (12) and fourteen (14) hours, six days a week cutting, gathering, and drying cocoa beans and was not paid for his work. Upon information and belief, the cocoa cultivated on this plantation is supplied to any one and/or more of the Defendants herein. John Doe III could not leave the plantation under fear that he would be severely beaten and forced to drink urine, as had been done with other the children who attempted escape. He was watched at gun point at all times and at night was forced to sleep in a small locked room with no windows and several other children on the floor. When he did not perform adequately, he was often whipped by the overseer. Plaintiff John Doe III brings this action on behalf of himself and all other similarly situated former child slaves in Mali.

**B. Global Exchange**

60.    Global Exchange is a San Francisco based human rights organization dedicated to promoting environmental, political and social justice globally. Global Exchange's members, who are American consumers of cocoa-based products, have suffered specific and concrete injuries due to Defendants' use of slave child labor on farms from which their cocoa is sourced. In addition, Global Exchange has fair trade stores (both physical and on the internet) selling fair trade chocolate, and have been forced to pay a premium for this chocolate due to the unfair competition of slave produced chocolate.

61.    Global Exchange's members have expressed a clear desire to purchase products that are not made under exploitative conditions but are incapable of determining whether products contain slave labor produced cocoa or non-slave labor produced cocoa.  The members' interests are being harmed by having to purchase products containing illegally imported,  slave labor produced cocoa against their clearly expressed wishes.

62.    Global Exchange has also been forced to spend significant resources in providing fairly traded chocolate, educating members of the public, and monitoring Defendants' corporate obligation not to use child labor.


**VIII.    DEFENDANTS' VIOLATIONS OF LAW**

63.    The causes of action maintained herein arise under and violate the following laws, agreements, conventions, resolutions and treaties:

(a)  Alien Tort Statute (ATS), 28 U.S.C. § 1350;

(b)  Torture Victim Protection Act, 28 U.S.C. § 1350, *note*;

(c)  Protocol Amending the Slavery Convention, <u>done</u> Dec. 7, 1953, 7 U.S.T. 479 (<u>entered into force</u> Dec. 7, 1953);

(d)  Slavery Convention, <u>concluded</u> Sept. 1926, 46 Stat. 2183, T.S. No. 788. 60 I.N.T.S 253 (<u>entered into force</u> Mar. 9, 1927);

(e)  Supplementary Convention on the Abolition of Slavery, the Slave Trade, and Institutions and Practices Similar to Slavery;

(f)  International Labour Organisation Convention No. 29 Concerning Forced or Compulsory Labor (1930), 39 U.N.T.S. 55 (entered into force May 1, 1932);

(g) International Labour Organisation Convention No. 105 Concerning the Abolition of Forced Labour Convention;

(h) International Labour Organisation (ILO) Convention 138 on Minimum Age for Employment (1973) 1015 U.N.T.S. 297 (entered into force June 19, 1976);

(i) ILO Convention 182 on the Worst Forms of Child Labour (1999) 38 I.L.M. 1207(entered into force November 19, 2000);

(j)  United Nations Charter, 59 Stat. 1031, 3 Bevans 1153 (1945);

(k)  Universal Decl. of Human Rights, G.A. Res. 217A(iii), U.N. Doc. A/810 (1948);

(l)  International Covenant on Civil and Political Rights, G.A. Res. 2220A(xxi), 21 U.N. Doc., GAOR Supp. (No. 16) at 52, U.N. Doc. A/6316 (1966);

(m)  Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, G.A. res. 39/46, 39 U.N. Doc., GAOR Supp. (No. 51) at 197, U.N. Doc. A/39/51 (1984);

(n)  Declaration on the Protection of All Persons From Being Subjected to Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, G.A. Res. 3452, 30 U.N. Doc., GAOR Supp. (No. 34) at 91, U.N. Doc. A/10034 (1976);

(o)  Customary international law;

(p) Federal Common and Statutory Law;

(q) California state law, including the Code of Business & Professional Conduct, §§17200, *et. seq*.

## IX.   CLAIMS FOR RELIEF

### COUNT I
### FORCED LABOR BY ALL FORMER CHILD SLAVE PLAINTIFFS
### AGAINST ALL DEFENDANTS
### THE ALIEN TORT STATUTE, 28 U.S.C. § 1350

64.    The Former Child Slave Plaintiffs incorporate by reference paragraphs 1-63 of this Complaint as if fully set forth herein.

20

65.    The Former Child Slave Plaintiffs were placed in fear for their lives, were deprived of their freedom, separated from their families and forced to suffer severe physical and mental abuse.

66.    Defendants' use of forced labor under these conditions of torture violate the law of nations, customary international law, and worldwide industry standards and practices, including, but not limited to those identified in paragraph 63.

67.    To the extent necessary, Defendants' actions occurred under color of law and/or in conspiracy or on behalf of those acting under color of official authority, such that the injuries inflicted on these Plaintiffs as a result of the forced labor were inflicted deliberately and intentionally through the acts and/or omission of responsible state officials and/or their agents to act in preventing and/or limiting the trafficking or otherwise the use of child slaves. Upon information and belief, there are also several farms which are owned by government officials, whether directly or indirectly, or are otherwise protected by government officials either through the provision of security services or through payments made to such officials that allow farms and/or farmer cooperatives to continue the use of child labor.

68.    Defendants' conduct in violation of customary international law either directly caused these injuries, or Defendants are liable for these injuries because they provided knowing, substantial assistance to the direct perpetrators, or because the direct perpetrators were agents, and/or employees of Defendants or of companies that are the alter egos of Defendants.

69.    The conduct of Defendants was malicious, fraudulent and/or oppressive and done with a willful and conscious disregard for the Former Child Slave Plaintiffs' rights and for the deleterious consequences of Defendants' actions.  As a result, the Former Child Slave Plaintiffs have sustained significant injuries and these Plaintiffs will continue to experience  pain and suffering and

extreme and severe mental anguish and emotional distress. The Former Child Slave Plaintiffs are thereby entitled to compensatory and punitive damages in amounts to be proven at trial.

**COUNT II**
**CRUEL, INHUMAN, OR DEGRADING TREATMENT**
**BY ALL FORMER CHILD SLAVE PLAINTIFFS**
**AGAINST ALL DEFENDANTS**
**THE ALIEN TORT STATUTE, 28 U.S.C. § 1350**

70.     The Former Child Slave Plaintiffs incorporate by reference paragraphs 1-69 of this Complaint as if fully set forth herein.

71.     The acts described herein had the intent and the effect of grossly humiliating and debasing the Former Child Slave Plaintiffs, forcing them to act against their will and conscience, inciting fear and anguish, and breaking their physical and/or moral resistance.

72.     Defendants' actions forced the Former Child Slave Plaintiffs against their will and under fear of harm, to labor for Defendants' economic benefit and in doing so the Former Child Slave Plaintiffs were placed in great fear for their lives and forced to suffer severe physical and psychological abuse and agony.

73.     In acting through the implicit sanction of the state, Defendants acted under color of law and/or in conspiracy or on behalf of those acting under color of official authority, and the injuries inflicted on the Former Child Slave Plaintiffs as a result of the cruel, inhuman and degrading treatment were inflicted deliberately and intentionally through the omission of responsible state officials and/or their agents to act in preventing and/or limiting the trafficking or otherwise the use of child slaves. Upon information and belief, there are also several farms which are owned by government officials, whether directly or indirectly, or are otherwise protected by government officials either through the provision of security services or through payments made to such officials that allow farms and/or farmer cooperatives to continue the use of child labor.

74.   The acts described herein constitute cruel, inhuman or degrading treatment in violation of the law of nations under the ATS and Defendants are liable because they directly caused these injuries or they provided knowing, substantial assistance to the direct perpetrators, or because the direct perpetrators were agents, and/or employees of Defendants or of companies that are the alter egos of Defendants.

75.   Former Child Slave Plaintiffs are thereby entitled to compensatory and punitive damages in amounts to be proven at trial.

**COUNT III**
**TORTURE BY ALL FORMER CHILD SLAVE PLAINTIFFS**
**AGAINST ALL DEFENDANTS**
**THE ALIEN TORT STATUTE, 28 U.S.C. § 1350**
**TORTURE VICTIMS PROTECTION ACT, 28 U.S.C. § 1350, *note***

76    The Former Child Slave Plaintiffs incorporate by reference paragraphs 1-75 of this Complaint as if fully set forth herein.

77.   Defendants' actions were undertaken under the color of foreign authority as that term is specifically defined under the TVPA. Specifically, Defendants acted under color of law, and/or in conspiracy or on behalf of those acting under color of official authority, by acting with the implicit sanction of the state and/or through the intentional omission of responsible state officials and/or their agents to act in preventing and/or limiting the trafficking or otherwise the use of child slaves into Cote d' Ivoire.  Upon information and belief, there are also several farms which are owned by government officials, whether directly or indirectly, or are otherwise protected by government officials, either through the provision of security services or through payments made to such officials that allow farms and/or farmer cooperatives to continue the use of child labor.

78.   Defendants' conduct in violation of the TVPA either directly caused Plaintiffs' injuries, or they are liable for Plaintiffs' injuries because they provided

knowing, substantial assistance to the direct perpetrators, or because the direct perpetrators were agents, and/or employees of Defendants or of companies that are the alter egos of Defendants.

79.     The acts described herein were inflicted deliberately and intentionally for purposes which included, among others, punishing the victim or intimidating the victim or third persons, and constitute torture in violation of the law of nations under both the ATS and the TVPA.

80.     Defendants' tortious acts described herein placed all members of the Former Child Slave Plaintiffs in great fear for their lives and caused them to suffer severe physical and mental pain and suffering. The Former Child Slave Plaintiffs are thereby entitled to compensatory and punitive damages in amounts to be proven at trial.

**COUNT IV**
**BREACH OF CONTRACT UNDER CORPORATE CODE OF CONDUCT**
**BY ALL FORMER CHILD SLAVE PLAINTIFFS**
**AGAINST ALL DEFENDANTS**

81.     The Former Child Slave Plaintiffs incorporate by reference paragraphs 1 to 80 of this Complaint as if set forth herein.

82.     As stated in paragraphs 49-51 of this Complaint, each of the Defendants maintain strict business practices, as incorporated into their code of conduct and/or code of ethical business practices, which prohibit the use of forced child labor and that requires compliance with all local and international laws on the issue of child labor.

83.     Upon information and belief, such ethical business practices regarding forced child labor are incorporated into exclusive buyer contracts, agreements, and/or memorandum of understandings (MOUs) that Defendants maintain with their supplier farms and/or farmer cooperatives, whether directly or indirectly through specified buyers, agents, or middlemen, and that such

provisions were intended to specifically benefit children who would be subject to forced labor.

84.     In failing to leverage their economic power and operative control over supplier farms and/or buyers to adequately monitor the working conditions on said farms, take adequate steps to ensure compliance by supplier farms, and/or to terminate their business relationship with farms found to be in non-compliance with obligations prohibiting forced child labor, Defendants breached their contractual obligations under their code of conduct or code of ethical business practice to the direct detriment of Plaintiffs and similarly situated Proposed Class Members. Plaintiffs are accordingly entitled to compensatory damages for Defendants' breach in amounts to be ascertained at trial.

**COUNT V**
**NEGLIGENCE AND RECKLESSNESS**
**BY ALL FORMER CHILD SLAVE PLAINTIFFS**
**AGAINST ALL DEFENDANTS**

85.     The Former Child Slave Plaintiffs incorporate by reference paragraphs 1 to 84 of this Complaint as if set forth herein.

86.     Defendants owed a duty to the Former Child Slave Plaintiffs to exercise due care in conducting its international ventures.  Defendants breached their duty of care by engaging in business activities which failed to adequately monitor and prevent the use of forced child labor on the farms from which they source cocoa beans.

87.     Defendants knew or should have known, through due diligence, that the use of forced child labor was prevalent in the West Africa region and likely to be used by the farmers from which they sourced cocoa beans.  Documented reports of child labor in the region were publicly available as early 1994. Accordingly, Defendants knew or should have known that specific and concrete actions would be necessary to ensure compliance with local law and with international human

1   rights conventions that prohibit the use of forced child labor.

2        88.    As a direct and proximate result of Defendants' breaches of duties,

3   the Former Child Slave Plaintiffs have suffered injuries to their persons as

4   described herein. Such Plaintiffs are thereby entitled to compensatory and punitive

5   damages in amounts to be ascertained at trial.

6

7   **COUNT VI**
**UNJUST ENRICHMENT**

8   **BY ALL FORMER CHILD SLAVE PLAINTIFFS**
**AGAINST ALL DEFENDANTS**

9

10        89.    The Former Child Slave Plaintiffs incorporate by reference

11   paragraphs 1 to 88 of this Complaint as if set forth herein.

12        90.    As a result of the forced labor practices utilized by farms and/or

13   farmer cooperatives from which Defendants sourced cocoa beans, Defendants

14   received benefits by being able to purchase cocoa beans from such farms at

15   significantly lower prices as the farms' total labor costs were greatly diminished

16   by reliance on forced child labor.

17        91.    Defendants' conduct thereby constitutes unjust enrichment and

18   Defendants are under a duty of restitution to the Former Child Slave Plaintiffs for

19   the benefits received therefrom and these Plaintiffs are entitled to compensatory

20   and punitive damages in amounts to be ascertained at trial.

21

22   **COUNT VII**

23   **VIOLATION OF CALIFORNIA BUSINESS**
**AND PROFESSIONS CODE § 17200, *et. seq.***

24   **BY ALL PLAINTIFFS AGAINST ALL DEFENDANTS**

25        92.    Both the Former Child Slave Plaintiffs and Global Exchange

26   incorporate by reference paragraphs 1-91 of this Complaint as if set forth herein.

27        93.    Together all Plaintiffs bring a cause of action pursuant to California's

28

1   Business and Professions Code § 17204.  The conduct of the Defendants named

2   herein has and continues to be detrimental to the general public, and Plaintiffs are

3   seeking to enforce important rights affecting the public interest within the meaning

4   of the Code of Civil Procedure § 1021.5.

5         94.    The fraudulent and deceptive practices of Defendants alleged herein

6   constitute ongoing and continuous unfair business practices within the meaning of

7   California's  Business and Professions Code § 17200.  Such practices include, but

8   are not limited to, the knowing use of forced labor in the cultivating and

9   harvesting of cocoa beans by child slaves in Cote d'Ivoire, and the making of

10  material misrepresentations and omissions, whether directly or indirectly, through

11  various trade associations including, but not limited to, the National Confectionary

12  Association, the Chocolate Manufacturers Associations, and the World Cocoa

13  Foundation.

14        95.    These material misrepresentations and omissions include, but are not

15  limited to: statements made to either deny the use of child slaves and/or to create

16  the false impression that the problem of child slaves is being adequately

17  addressed, either directly by Defendants and/or through their various trade

18  associations, including that an independent, credible system of monitoring,

19  certification, and verification would be in place by July 1, 2005.

20        96.    The conduct as alleged herein constitutes a violation of California

21  laws relating to labor practices, criminal statutes, as well as obligations under

22  customary international law. The use of such unfair, illegal, and forced child labor

23  creates an unfair business advantage over competitors within California and the

24  United States, and members of the public have been in the past and will likely be

25  in the future damaged by these practices, as such persons were falsely made to

26  believe that the chocolate produced by Defendants was either not made with child

27  labor and/or that the use of child labor was being adequately addressed.

28        97.   Plaintiff Global Exchange was forced to expend significant resources

in educating their members and the general public about the use of child labor by

Defendants, by promoting and selling "fairly traded" chocolate, and effectively

monitoring the corporate commitments made by Defendants, whether directly or

indirectly.  As a result of Defendants' failure to adequately address the issue of

child labor, utilize fair trade cooperatives, and compensate the Former Child

Slaves, Plaintiff Global Exchange has lost significant resources.  In addition,

Global Exchange has fair trade stores (both physical and on the internet) selling

fair trade chocolate, and it has been forced to pay a premium for this chocolate due

to the unfair competition of slave produced chocolate.

98.    Plaintiffs therefore collectively seek injunctive relief, disgorgement

of all profits resulting from these unfair business practices, restitution and other

appropriate relief on behalf of themselves and members of the general public as

provided in Business and Professions Code

§ 17203.

## X. <u>LIABILITY</u>

99.    Both the Former Child Slave Plaintiffs and Global Exchange

incorporate by reference paragraphs 1-98 of this Complaint as if set forth herein.

100.   Defendants are directly liable for any actions that they aided and

abetted by knowingly providing financial support, supplies, training, and/or other

substantial assistance that contributed to the ability of their agents, employees

and/or partners to use and/or facilitate the use of child slave labor, including but

not limited to any farm and/or farmer cooperative that held any agreement,

contract, and/or memorandum of understanding, written or oral, to supply cocoa

beans.

101.   To the extent that Defendants can be said to have acted indirectly,

Defendants are vicariously liable for the actions of their agents, employees, co-

venturers and/or partners, including specifically any farm and/or farmer

cooperative which held any agreement, contract, and/or memorandum of

1   understanding, written or oral, to supply cocoa beans to such Defendants.

2      102.  To the extent that any such agent, employee, co-venturers and/or

3   partner used and/or facilitated the use of child slave labor and/or made material

4   misrepresentations and omissions, such entity was acting within the course and

5   scope of such agency, enterprise, or venture and Defendants confirmed and

6   ratified such conduct.

7      103.  Defendants are further liable for the acts of any and all corporations

8   and/or entities found to be their alter ego.  Defendants' control over these entities'

9   operations, particularly with respect to the sourcing, purchasing, manufacturing,

10   distribution, and/or retailing of cocoa and cocoa derived products, renders them

11   mere conduits for the receipt or transfer of funds and/or products with respect to

12   cocoa products derived from the Cote d' Ivoire. Such inherent and pervasive

13   failure to maintain separate identities constitutes improper conduct and disrespects

14   the privilege of using the corporate form to conduct business.

15

16         **XI.**    **DEMAND FOR JURY TRIAL**

17      104.  Plaintiffs demand a trial by jury on all issues so triable.

18

19         **XII.**    **PRAYER FOR RELIEF**

20      105.  WHEREFORE, Plaintiffs respectfully request the Court to:

21      (a) enter judgment in favor of the Former Child Slave Plaintiffs on all

22   counts of the Complaint;

23      (b) award the Former Child Slave Plaintiffs compensatory and punitive

24   damages;

25      (c) grant the Former Child Slave Plaintiffs equitable relief including, but not

26   limited to, an injunction prohibiting further damage to their persons, and their

27   rights under the laws of California and customary international law;

28      (d) award all Plaintiffs injunctive relief, disgorgement of all profits

1  resulting from these unfair business practices alleged herein such that restitution is

2  made to the general public and Global Exchange;

3        (e) award Plaintiffs the costs of suit including reasonable attorneys' fees;

4  and

5        (f) award Plaintiffs such other and further relief as the Court deems just

6  under the circumstances.

Dated: July 10, 20009

_____

Terry Collingsworth (DC Bar # 471830)
CONRAD & SCHERER, LLP
*Attorneys for All Plaintiffs*

30

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 10, 2009, I electronically filed the foregoing Plaintiffs' First Amended Complaint with the United States District Court for the Central District of California by using the CM/ECF system.

A copy of the foregoing will be sent electronically to the registered ECF participants as identified on the Notice of Electronic Filing and a copy will be sent by U.S. mail to all non-registered parties.


/s/ Susana Tellez
_____

Susana Tellez

31