UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| JOHN DOE I, Individually and on behalf of Proposed Class Members; JOHN DOE II, Individually and on behalf of Proposed Class Members; JOHN DOE III, Individually and on behalf of Proposed Class Members; GLOBAL EXCHANGE, | ) ) ) ) ) ) ) ) | CV 05-5133 SVW (JTLx) |
| Plaintiffs, | ) ) | ORDER GRANTING DEFENDANTS ARCHER-DANIELS-MIDLAND CO., NESTLE U.S.A., AND CARGILL INC.'S MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT PURSUANT TO FED. R. CIV. P. 12(b)(6) FOR FAILURE TO STATE A CLAIM |
| v. | ) ) ) | |
| NESTLE, S.A.; NESTLE U.S.A.; NESTLE Ivory Coast; ARCHER DANIELS MIDLAND CO.; CARGILL, Inc.; CARGILL COCOA; CARGILL WEST AFRICA, S.A.; and CORPORATE DOES 1-10, | ) ) ) ) ) ) ) | [111] |
| Defendants. | ) ) | |

## I.    INTRODUCTION

On July 14, 2005, Plaintiffs John Doe I, John Doe II, John Doe III, and Global Exchange (collectively "Plaintiffs")[1] filed this class

---

[1] Global Exchange brings only a single cause of action (Cal. Bus. & Prof. Code § 17200).  The Court's use of the term "Plaintiffs" generally refers only to the "Doe" plaintiffs.

action for damages and injunctive relief.  On July 10, 2009, Plaintiffs filed a first amended complaint.  The amended complaint asserts causes of action under the Alien Tort Statute, 28 U.S.C. § 1350; the Torture Victim Protection Act, Pub. L. 102-256, 106 Stat. 73 (1992); state-law unjust enrichment; and Cal. Bus. & Prof. Code §§ 17200 *et seq.*[2]

Defendants are Nestle, S.A. (based in Switzerland), Nestle, U.S.A., and Nestle Cote d'Ivoire, S.A. (collectively "Nestle"); Cargill, Incorporated ("Cargill, Inc."), Cargill Cocoa (based in the United States), and Cargill West Africa, S.A. (collectively "Cargill"); and Archer Daniels Midland Company ("Archer Daniels Midland") (collectively "Defendants").[3]

Defendants Nestle U.S.A., Cargill Inc., and Archer Daniels Midland have filed a Motion to Dismiss the First Amended Complaint for failure to state a claim upon which relief can be granted.

## II.  LEGAL STANDARD

In order to survive a Rule 12(b)(6) Motion to Dismiss, a plaintiff's complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. __, 129 S.Ct. 1937, 1949 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that

---

[2] In their Opposition, Plaintiffs have conceded their fourth and fifth causes of action for breach of contract and negligence/recklessness under California state law.

[3] Plaintiffs allege that the subsidiary defendants were acting as agents of the parent defendants, and that the parent defendants controlled and ratified the actions of their subsidiaries. Plaintiffs also allege that the subsidiary defendants were alter egos of the parents.  Plaintiffs also sue ten unnamed "Corporate Does."

allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. "Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true." Twombly, 550 U.S. at 555. A complaint that offers mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." Iqbal, 129 S.Ct. at 1951; see also Moss v. U.S. Secret Service, 572 F.3d 962, 969 (9th Cir. 2009) (citing Iqbal, 129 S.Ct. at 1951). Courts should not "unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." Iqbal, 129 S.Ct. at 1950.

**III. FACTS**

The individual Plaintiffs are Malians who allege that they were forced to labor on cocoa fields in Cote d'Ivoire. Plaintiffs seek class status on behalf of similarly situated Malians who were forced to labor in Cote d'Ivoire. The remaining Plaintiff, Global Exchange, is a San Francisco-based human rights organization that promotes social justice.

Plaintiffs allege that they have filed suit in the United States because: (1) there is no law in Mali allowing civil damages for their injuries caused by non-Malian cocoa exporters (as all Defendants are American, European, or Ivorian corporations); (2) no suit can be brought in Cote d'Ivoire because "the judicial system is notoriously corrupt and would likely be unresponsive to the claims of foreign children against major cocoa corporations operating in and bringing significant revenue to Cote d'Ivoire" (FAC ¶ 2); (3) Plaintiffs and

their attorneys would be subjected to possible harm in Cote d'Ivoire on account of general civil unrest and "the general hostility by cocoa producers in the region"; and (4) the United States has provided an appropriate forum for these claims through the Alien Tort Statute and the Torture Victim Protection Act, 28 U.S.C. § 1350.

Plaintiffs claim that Defendants have aided and abetted violations of international law norms that prohibit slavery; forced labor; child labor; torture; and cruel, inhuman, or degrading treatment. Plaintiffs also seek relief under state-law unjust enrichment. All Plaintiffs (including Global Exchange) allege violations of Cal. Bus. & Prof. Code § 17200.

Plaintiffs allege that Defendants obtain an "ongoing, cheap supply of cocoa by maintaining exclusive supplier/buyer relationships with local farms and/or farmer cooperatives in Cote d'Ivoire." (FAC ¶ 33.)[4] These exclusive contractual arrangements allow Defendants "to dictate the terms by which such farms produce and supply cocoa to them, including specifically the labor conditions under which the beans are produced." (Id.) Defendants control the farms' labor conditions "by providing local farmers and/or farmer cooperatives *inter alia* ongoing

---

[4] Plaintiffs identify certain of Defendant Nestle's exclusive relationships with suppliers Keita Ganda and Keita Baba from plantations in Daloa, and supplier Lassine Kone from plantations in Sitafa. (FAC ¶ 35.) Plaintiffs identify certain of Defendant Archer Daniels Midland's exclusive relationships with suppliers including a farmer cooperative called "SIFCA." (FAC ¶ 39.) Plaintiffs identify certain of Defendant Cargill's exclusive relationships with Dote Colibaly, Soro Fonipoho, Sarl Seki, Lenikpo Yeo ("from which 19 Malian child slaves were rescued," FAC ¶ 42), Keita Ganda, and Keita Hippie. (FAC ¶ 42.) The Court notes that among the allegedly "exclusive" suppliers identified by Plaintiffs, one—Keita Ganda—is alleged to be an "exclusive" supplier of both Nestle and Cargill. (FAC ¶¶ 35, 42.)

financial support, including advance payments and personal spending
money to maintain the farmers' and/or the cooperatives' loyalty as
exclusive suppliers; farming supplies, including fertilizers, tools and
equipment; training and capacity[-]building in particular growing and
fermentation techniques and general farm maintenance, including
appropriate labor practices, to grow the quality and quantity of cocoa
beans they desire." (FAC ¶ 34.) This oversight requires Defendants to
engage in "training and quality control visits [that] occur several
times per year and require frequent and ongoing visits to the farms
either by Defendants directly or via their contracted agents." (Id.)

Plaintiffs identify certain of Nestle's representations in which
Nestle states that it "'provides assistance in crop production'" and
performs "'tracking inside our company supply chain, i.e. from the
reception of raw and packaging materials, production of finished
products to delivery to customers.'" (FAC ¶ 36 (quoting Nestle
"Principles of Purchasing," 2006).) Nestle also states that "'[i]n
dealing with suppliers, Purchasing must insist on knowing the origin of
incoming materials and require suppliers to communicate the origin of
their materials,'" and that it "'actively participate[s] as the first
link in an integrated supply chain,' 'develop[s] supplier
relationships,' and 'continually monitor[s] the performance,
reliability and viability of suppliers.'" (Id.) Nestle also states
that its "'Quality System covers all steps in the food supply chain,
from the farm to the consumer of the final products . . ., includ[ing]
working together with producers and suppliers of raw . . . materials.'"
(FAC ¶ 37.) Finally, Nestle has stated that "'[w]hile we do not own
any farmland, we use our influence to help suppliers meet better

standards in agriculture. . . .  Working directly in our supply chain we provide technical assistance to farmers.'" (FAC ¶ 38.)  This assistance "'ranges from technical assistance on income generation to new strategies to deal with crop infestation, to specific interventions designed to address issues of child labour,'" including "'[s]pecific programmes directed at farmers in West Africa [such as] field schools to help farmers with supply chain issues, as well as a grassroots 'training of trainers' programme to help eliminate the worst forms of child labour.'" (<u>Id.</u>)

Plaintiffs identify certain of Archer Daniels Midland's representations in which the company states that its relationship[5] with the SIFCA cooperative "'gives ADM Cocoa an unprecedented degree of control over its raw material supply, quality and handling.'" (FAC ¶ 39 (quoting ADM statements contained in 2001 article in <u>Biscuit World</u>).)  An Archer Daniels Midland executive has been quoted as saying "'ADM Cocoa can deliver consistent top quality products by control of its raw materials,' and that 'ADM is focused on having direct contact with farmers in order to advise and support them to produce higher quality beans for which they will receive a premium.'" (<u>Id.</u>)  Archer Daniels Midland has represented that it has a "'strong presence in [cocoa] origin regions,'" and that "'ADM is working hard to help provide certain farmer organizations with the knowledge, tools, and support they need to grow quality cocoa responsibly and in a sustainable manner. . . .  ADM is providing much needed assistance to

---

[5] In a conclusory manner, Plaintiffs identify Archer Daniels Midland's exclusive supplier relationship with SIFCA as involving an "acquisition," without explaining whether this "acquisition" involves an exclusive contract or a formal integration of SIFCA into Archer Daniels Midland's corporate structure. (<u>See</u> FAC ¶ 39.)

organizations representing thousands of farmers and farming communities.  These efforts are making an impact at the farm level.'" (FAC ¶ 40.)  It has also stated that it "'is actively involved in long term efforts to ensure that cocoa is grown responsibly and sustainably. Such efforts include research into environmentally sound crop management practices, plant breeding work to develop disease-resistant varieties, and farmer field schools to transfer the latest know-how into the hands of millions of cocoa farmers around the world.  Starting from the cocoa growers through to the world's top food and beverage manufacturers, ADM Cocoa is committed to delivering the best in product quality and service at every stage.'" (FAC ¶ 41 (quoting ADM Cocoa Brochure).)

Plaintiffs allege that Cargill opened cocoa buying stations in Daloa and Gognoa, and that Cargill's Micao cocoa processing plant has obtained ISO 9002 certification.  Plaintiffs allege that the ISO 9002 certification "is a system of quality standards for food processing from sourcing through processing that inherently requires detailed visits and monitoring of farms."  (FAC ¶ 43.)

With respect to all Defendants, Plaintiffs allege generally that "Defendants' ongoing and continued presence on the cocoa farms" provided "Defendants" with "first hand knowledge of the widespread use of child labor on said farms."  (FAC ¶ 44.)  Plaintiffs also allege that various governmental and non-governmental actors have provided "numerous, well-documented reports of child labor."  (Id.)  Plaintiffs allege that "Defendants not only purchased cocoa from farms and/or farmer cooperatives which they knew or should have known relied on forced child labor in the cultivating and harvesting of cocoa beans,

but Defendants provided such farms with money, supplies, and training

to do so with little or no restrictions from the government of Cote

d'Ivoire." (FAC ¶ 47.)   Plaintiffs allege that Defendants provided

this "money, supplies, and training . . . knowing that their assistance

would necessarily facilitate child labor." (FAC ¶ 52.)

Plaintiffs also allege that some of the cocoa farms are linked to

the Ivorian government: "Upon information and belief, several of the

cocoa farms in Cote d'Ivoire from which Defendants source are owned by

government officials, whether directly or indirectly, or are otherwise

protected by government officials either through the provision of

direct security services or through payments made to such officials

that allow farms and/or farmer cooperatives to continue the use of

child labor." (FAC ¶ 47.)

Plaintiffs allege that "Defendants, because of their economic

leverage in the region and exclusive supplier/buyer agreements, each

had the ability to control and/or limit the use of forced child labor

by the supplier farms and/or farmer cooperatives from which they

purchased their cocoa beans, and indeed maintained specific policies

against the use of such forced labor practices." (FAC ¶ 48.)

Plaintiffs identify various representations in which Defendants

asserted that they abide by international standards, do not use child

labor, and take efforts to prevent their business partners from using

child labor. (FAC ¶¶ 49-51.)

Plaintiffs also allege that Defendants lobbied against a 2001

United States Congressional proposal to require chocolate manufacturers

and importers to certify and label their products as "slave free."

(FAC ¶¶ 53-54.)   As a result of Defendants' lobbying efforts, the

8

mandatory law was replaced by a voluntary arrangement known as the Harkin-Engel protocol, in which the chocolate industry agreed upon certain standards by which it would self-regulate its labor practices. (FAC ¶ 55.)  Plaintiffs allege that "but for" this lobbying effort, Defendants' cocoa plantations would not have been able to use child labor.[6]

Plaintiff Global Exchange asserts a cause of action under Cal. Bus. & Prof. Code § 17200.  Plaintiffs allege that Global Exchange's members are American chocolate consumers who "have expressed a clear desire to purchase products that are not made under exploitative conditions but are incapable of determining whether products contain slave labor produced cocoa or non-slave labor produced cocoa." (FAC ¶ 61.)  Their "interests are being harmed by having to purchase products containing illegally imported, slave labor produced cocoa against their clearly expressed wishes," (FAC ¶ 61), thus causing them to "suffer[] specific and concrete injuries." (FAC ¶ 60.)  Additionally, Plaintiffs allege that Global Exchange "has fair trade stores" that sell "fair trade chocolate," and as a result of Defendants' actions, Global Exchange's stores "have been forced to pay a premium for this chocolate due to the unfair competition of slave produced chocolate." (FAC ¶ 60.)  Plaintiffs also allege that Global Exchange "has . . . been forced to spend significant resources in providing fairly traded chocolate, educating members of the public, and monitoring Defendants' corporate obligation not to use child labor." (FAC ¶ 62.)

///

---

[6] The Court notes that the Congressional effort took place in 2001, but the named Plaintiffs ceased working on the cocoa plantations in 2000.  (FAC ¶¶ 57-59.)

1    **IV.   SOSA V. ALVAREZ-MACHAIN AND INTERNATIONAL LAW**

2        **A.   CAUSES OF ACTION FOR VIOLATIONS OF INTERNATIONAL LAW**

3            **1.   SOSA V. ALVAREZ-MACHAIN**

4        In <u>Sosa v. Alvarez-Machain</u>, 542 U.S. 692 (2004), the Supreme Court

5    established the requirements for bringing an action under the Alien

6    Tort Statute, 28 U.S.C. § 1350.[7]  The Court held that § 1350 is solely a

7    jurisdictional statute and does not create any causes of action.

8    Instead, a limited number of international-law based causes of action

9    are provided by the common law.  Thus, although the Alien Tort Statute

10   provides broad federal court **jurisdiction** for any tort committed in

11   violation of customary international law, <u>Sosa</u> sharply circumscribed

12   the availability of **private causes of action** that are cognizable in

13   federal courts under § 1350.

14       Not all international law norms provide a common law cause of

15   action under § 1350 — to be actionable, it must be a well-defined and

16   universally recognized norm of international law.  As explained by the

17   Court, "the ATS was meant to underwrite litigation of a narrow set of

18   common law actions derived from the law of nations."  <u>Sosa</u>, 542 U.S. at

19   721.  In determining the scope of this "narrow set" of actions, courts

20   must engage in a two-part analysis: "courts should require any claim

21   based on the present-day law of nations to rest on [1] a norm of

22   international character accepted by the civilized world and [2] defined

23   with a specificity comparable to the features of the 18th-century

24

25   [7] Courts refer to 28 U.S.C. § 1350 as the Alien Tort Statute, Alien
     Tort Claims Act, or the Alien Tort Act.  This Court adopts the
26   Supreme Court's preferred version, the Alien Tort Statute.
         In its entirety, the Alien Tort Statute provides: "The district
27   courts shall have original jurisdiction of any civil action by an
     alien for a tort only, committed in violation of the law of nations
28   or a treaty of the United States."  28 U.S.C. § 1350.

1  paradigms we have recognized" — that is, the three common law

2  international law wrongs identified by Blackstone, "violation of safe

3  conducts, infringement of the rights of ambassadors, and piracy."  Id.

4  at 725-26.[8]  The Court added that federal courts "have no congressional

5  mandate to seek out and define new and debatable violations of the law

6  of nations," id. at 728, and firmly cautioned that "federal courts

7  should not recognize private claims under federal common law for

8  violations of any international law norm with less definite content and

9  acceptance among civilized nations than the historical paradigms

10 familiar when § 1350 was enacted."  Id. at 732.  In a footnote, the

11 Court noted that "[a] related consideration is whether international

12 law extends the scope of liability for a violation of a given norm to

13 the perpetrator being sued, if the defendant is a private actor such as

14 a corporation or individual."  Id. at 732 n.20.

15        **2.   SOURCES OF INTERNATIONAL LAW**

16      With these basic rules in mind, it is important to have a clear

17 understanding of the sources of international law upon which courts

---

18

19 [8] Commentators have suggested that only one of these three violations
   is the true inspiration for the Alien Tort Statute.  See Sosa, 542

20 U.S. at 716-17 (discussing 1784 Marbois affair, which involved
   private citizen's infringement of rights of French diplomatic

21 representative); Thomas H. Lee, The Safe-Conduct Theory of the Alien
   Tort Statute, 106 Colum. L. Rev. 830 (2006) (discussing safe conduct

22 as inspiration of Alien Tort Statute); Eugene Kontorovich, The Piracy
   Analogy: Modern Universal Jurisdiction's Hollow Foundation, 45 Harv.

23 Int'l L.J. 183 (2004) (discussing piracy as proper basis of Alien
   Tort Statute); see also Joseph Modeste Sweeney, A Tort Only in

24 Violation of the Law of Nations, 18 Hastings Int'l & Comp. L. Rev.
   445 (1995) (asserting that Alien Tort Statute applies only to the law

25 of prize; that is, capture of enemy merchant vessels on high seas).

26      In other words, "it is fair to say that a consensus
   understanding of what Congress intended has proven elusive."  Sosa,

27 542 U.S. at 718-19.  This Court agrees with the Supreme Court's
   observation that "we would welcome any congressional guidance" in

28 this area of law.  Id. at 731.

must rely in determining whether a particular norm is universally

accepted and defined with the requisite specificity.  As explained in

The Paquete Habana, 175 U.S. 677, 700 (1900) (cited in Sosa, 542 U.S.

at 734), "international law is part of our law," and courts should look

to the following sources for guidance:

> where there is no treaty and no controlling executive or
> legislative act or judicial decision, resort must be had to the
> customs and usages of civilized nations, and, as evidence of
> these, to the works of jurists and commentators who by years of
> labor, research, and experience have made themselves peculiarly
> well acquainted with the subjects of which they treat. Such works
> are resorted to by judicial tribunals, not for the speculations of
> their authors concerning what the law ought to be, but for
> trustworthy evidence of what the law really is.

The Paquete Habana, 175 U.S. at 700 (citing Hilton v. Guyot, 159 U.S.

113, 163, 164, 214, 215 (1895)).  The Court also stated that

international law norms must be agreed upon "by the general consent of

the civilized nations of the world," id. at 708, or, as phrased in

international law, *opinio juris*.

The approach set out in The Paquete Habana is consistent with the

modern view of customary international law.  As stated in the Statute

of the International Court of Justice (the authoritative institution in

adjudicating international law), the sources of international law are:

> a. international conventions, whether general or particular,
> establishing rules expressly recognized by the contesting states;
> b. international custom, as evidence of a general practice
> accepted as law;
> c. the general principles of law recognized by civilized nations;
> d. subject to the provisions of Article 59,[9] judicial decisions and
> the teachings of the most highly qualified publicists of the
> various nations, as subsidiary means for the determination of
> rules of law.

ICJ Statute, June 26, 1945, art. 38(1), 59 Stat. 1055, 1060, U.S.T.S.

---

[9] Article 59 provides that "[t]he decision of the Court has no binding
force except between the parties and in respect of that particular
case."  ICJ Statute, art. 59.

993.[10]

In practice, this requires an exhaustive examination of treaties, court decisions, and leading treatises.[11]   As a model example, the

---

[10] The <u>Restatement (Third) of Foreign Relations</u> outlines a similar set of guidelines:
> (1) A rule of international law is one that has been accepted as such by the international community of states
> > (a) in the form of customary law;
> > (b) by international agreement; or
> > (c) by derivation from general principles common to the major legal systems of the world.
> (2) Customary international law results from a general and consistent practice of states followed by them from a sense of legal obligation.
> (3) International agreements create law for the states parties thereto and may lead to the creation of customary international law when such agreements are intended for adherence by states generally and are in fact widely accepted.
> (4) General principles common to the major legal systems, even if not incorporated or reflected in customary law or international agreement, may be invoked as supplementary rules of international law where appropriate.

<u>Restatement</u>, § 102.  And as further explained in Section 103(2):
> In determining whether a rule has become international law, substantial weight is accorded to
> > (a) judgments and opinions of international judicial and arbitral tribunals;
> > (b) judgments and opinions of national judicial tribunals;
> > (c) the writings of scholars;
> > (d) pronouncements by states that undertake to state a rule of international law, when such pronouncements are not seriously challenged by other states.

<u>Id.</u> at § 103(2); <u>see also</u> <u>id.</u> at § 112 (noting that United States courts follow the approach contained in § 103, but that the Supreme Court's interpretations are binding upon lower courts).

[11] The Restatement, § 103 n.1, helpfully explains the role of scholarly sources as evidence of customary international law:
> Such writings include treaties and other writings of authors of standing; resolutions of scholarly bodies such as the Institute of International Law (Institut de droit international) and the International Law Association; draft texts and reports of the International Law Commission, and systematic scholarly presentations of international law such as this Restatement. Which publicists are "the most highly qualified" is, of course, not susceptible of conclusive proof, and the authority of writings as evidence of international law differs greatly. The

Supreme Court in Sosa, 542 U.S. at 732, referred to the lengthy, polyglot footnote in United States v. Smith, 18 U.S. (5 Wheat.) 153 (1820). The Smith Court examined over a dozen treatises in English, Latin, French, and Spanish, as well as English caselaw, and determined that these various sources all agreed upon the same basic definition of piracy under international law. Smith, 18 U.S. at 163-80 n.h.

### 3. INTERNATIONAL LAW CAUSES OF ACTION AFTER SOSA

Ultimately, Sosa provides that international law norms are only actionable if they are specifically defined and universally adhered to out of a sense of mutual obligation. Other courts, quoted in Sosa, 542 U.S. at 732, have explained that this requires a showing that the violation is one of a "handful of heinous actions," Tel-Oren v. Libyan Arab Republic, 726 F.2d 774, 781 (D.C. Cir. 1984) (Edwards, J., concurring), involving a norm that is "specific, universal, and obligatory," In re Estate of Marcos Human Rights Litigation, 25 F.3d 1467, 1475 (9th Cir. 1994), resulting in a finding that the actor is "*hostis humani generis*, an enemy of all mankind." Filartiga v. Pena-Irala, 630 F.2d 876, 890 (2d Cir. 1980).

In defining the relevant norms of international law, domestic courts should carefully distinguish the substance of international law from the procedures of international law. See Sosa, 542 U.S. at 729-30 & n.18 (referring to Erie R. Co. v. Tompkins, 304 U.S. 64 (1938), and discussing Alien Tort Statute as incorporating "substantive rules" of

---

> views of the International Law Commission have sometimes been considered especially authoritative.

In other words, it is important to exercise care when citing secondary sources as authorities on the meaning of international law. Accordingly, the Court has endeavored to rely on primary sources as much as possible.

international law[12]).  For example, the Ninth Circuit's lead *en banc*
opinion in Sarei v. Rio Tinto, addressing the issue of exhaustion of
remedies, noted that Sosa requires an inquiry into "whether exhaustion
is a substantive norm of international law, to which the 'requirement
of clear definition' applies; or if it is nonsubstantive, what source
of law – federal common law or international law – illuminates its
content."  Sarei v. Rio Tinto, PLC, 550 F.3d 822, 828 (9th Cir. 2008)
(en banc) (internal footnote and citations omitted).[13]  In other words,
courts applying the Alien Tort Statute must determine whether the rule
at issue is substantive or non-substantive (i.e., procedural), and then

---

[12] The relevance of Erie appears to animate the majority opinion in
Sosa – but the Court certainly could have made this analogy more
apparent.  See, e.g., Craig Green, Repressing *Erie*'s Myth, 96 Cal. L.
Rev. 595, 598 (2008) ("In Sosa v. Alvarez-Machain, Erie was a
touchstone of the Court's ATS analysis, and not one Justice
questioned Erie's relevance."); William R. Castro, The New Federal
Common Law of Tort Remedies for Violations of International Law, 37
Rutgers L. J. 635, 842-43 (2006) ("The federal courts' administration
of state law under the Erie doctrine presents a useful model for
thinking about international law as federal common law. . . .  In ATS
litigation, the most obvious divide between international and pure
United States domestic law is the separation of substance from
procedure. . . . [In examining international law's] substance, the
norm for which a remedy is provided in ATS litigation is clearly
governed by international law.  All questions as to whether the
defendant has acted unlawfully must be answered by recourse to rules
of decision found in international law.").

[13] The Sarei majority ultimately held that Alien Tort Statute claims
include an exhaustion requirement; this majority was split, however,
over whether exhaustion was substantive or procedural in nature.
Three judges held that exhaustion was a "prudential" requirement of
domestic law, 550 F.3d at 828, 830-31, two held that it was a
substantive element of the international law claim, id. at 834-36,
and one concurred in the result for other reasons, id. at 840-41.  A
dissenting opinion asserted that neither domestic nor international
law requires exhaustion of remedies prior to filing an Alien Tort
Statute action.  Id. at 843-45.
    The Court notes that Defendants' Motion does not raise the
exhaustion issues discussed in Sarei.

must determine whether that substantive international law is

sufficiently definite and universal to satisfy the requirements of

Sosa.[14]

In distinguishing between the substance and procedure of
international law, it is helpful to consider the guidelines set out by
a leading expert on international criminal law.  According to M. Cherif
Bassiouni, who is among the most prolific and prominent authorities on
international criminal law, "the penal aspects of international
[criminal] law include: international crimes, elements of international
criminal responsibility, the procedural aspects of the 'direct
enforcement system' of international criminal law, and certain aspects
of the enforcement modalities of the 'indirect enforcement system' of
the International Criminal Court."  M. Cherif Bassiouni, 1
International Criminal Law 5 (2008).  Customary international law
defines the **substantive** elements of the crimes and the elements of
criminal responsibility, whereas the **procedural** enforcement mechanisms
are established largely on a case-by-case basis in response to
particular atrocities (though today, the International Criminal Court
is meant to provide a permanent forum for enforcement actions).  Id. at

---

[14] The Ninth Circuit's lead opinion in Sarei somewhat enigmatically
held "that we may freely draw from both federal common law and
international law without violating the spirit of Sosa's instructions
or committing ourselves to a particular method regarding other
nonsubstantive aspects of ATS jurisprudence left open after Sosa."
Sarei, 550 F.3d at 828.  On its face, this language suggests that
Sosa did not establish a clear substance-procedure distinction, and
that general federal common law can be incorporated into an Alien
Tort Statute analysis.

Notably, however, the Sarei opinion specifically addressed
**exhaustion of remedies**, which was explicitly left open by the Supreme
Court as an area of law that is not necessarily governed by the
Court's discussion of the proper method of **substantive** international
law analysis.  Sosa, 542 U.S. at 733 n.21.

7-8.   The Supreme Court in <u>Sosa</u> instructed federal courts to look to the **substantive** aspects of international law, not the **procedural** details of particular international law enforcement mechanisms. Because the Alien Tort Statute itself provides an independent domestic enforcement mechanism, federal courts should not be distracted by the procedural quirks of foreign and international legal systems.   Federal courts must be careful to apply only **substantive** international law — that is, the elements of the criminal acts and the nature of criminal responsibility — rather than the procedural elements of international law.   See Bassiouni, 1 <u>International Criminal Law</u> at 5-8.

It is important for courts to apply international law with a careful eye on its substantive provisions, as <u>Sosa</u> repeatedly insisted that only clearly defined, universally recognized norms are actionable under the Alien Tort Statute.   Though courts must look to various sources to determine the scope of international law, courts should not just "pick and choose from this seemingly limitless menu of sources" and create a hybrid form of domestic common law that merely draws on customary international law when convenient.   See <u>Abdullahi v. Pfizer, Inc.</u>, 562 F.3d 163, 194 (2d Cir. 2009) (Wesley, J., dissenting), *cert. denied*, 130 S.Ct. 3541 (2010).   The Alien Tort Statute, as interpreted in <u>Sosa</u>, does not permit federal courts to codify a new form of what International Court of Justice Judge Philip Jessup termed "transnational law," which, as he explained, "includes both civil and criminal aspects, [] includes what we know as public and private international law, and [] includes national law both public and private."   Philip Jessup, <u>Transnational Law</u> 106 (1956).   Jessup justified his proposed legal mélange on the ground that "[t]here is no

1  inherent reason why a judicial tribunal, whether national or
2  international, should not be authorised to choose from all these bodies
3  of law the rule considered to be most in conformity with reason and
4  justice for the solution of any particular controversy." Id.  But, as
5  made abundantly clear in Sosa, such an idealized and ungrounded form of
6  international law is not a permissible source of authority for Alien
7  Tort Statute cases.  Sosa requires that federal courts cannot look to
8  general principles of "reason and justice" drawn *ad hoc* from
9  international and domestic rules; rather, courts must look carefully to
10 the substantive norms of international law that are **clearly defined** and
11 **universally agreed-upon**.  To do otherwise is to misapply Sosa and "open
12 the door" far too wide for Alien Tort Statute litigation.  Sosa, 542
13 U.S. at 729 ("[T]he judicial power should be exercised on the
14 understanding that the door is still ajar subject to vigilant
15 doorkeeping, and thus open to a narrow class of international norms
16 today.").

17    B.    **THE DISTINCTION BETWEEN CIVIL AND CRIMINAL INTERNATIONAL LAW**
18          **NORMS**

19        In its June 9, 2009 Order for further briefing, the Court
20 requested that the parties address the question of whether the
21 standards for liability under international law distinguish between
22 civil and criminal causes of action.  In particular, the Court was
23 concerned with whether Sosa requires international law to establish
24 well-defined norms of **civil** liability in order for an Alien Tort
25 Statute action to lie.  In light of this briefing, the Court has
26 reached the following conclusions.
27        There is no meaningful distinction in Alien Tort State litigation
28

between criminal and civil norms of international law.  See, e.g., Presbyterian Church of Sudan v. Talisman Energy, Inc., 582 F.3d 244, 257 n.7 (2d Cir. 2009) (citations omitted), *pet'n for cert. filed*, Apr. 15, 2010, May 20, 2010; Khulumani v. Barclay Nat. Bank Ltd., 504 F.3d 254, 270 n.5 (2d Cir. 2007) (Katzmann, J., concurring) (citations omitted).  This is supported by the Sosa opinion, by the historical materials relevant to the Sosa Court's construction of the Alien Tort Statute, and by Justice Breyer's concurrence in Sosa.

The majority opinion in Sosa pointedly quoted the proposition from international scholar Beth Stephens that a "mixed approach to international law violations, encompassing both criminal prosecution . . . and compensation to those injured through a civil suit, would have been familiar to the founding generation."  Sosa, 542 U.S. at 724 (quoting Beth Stephens, Individuals Enforcing International Law: The Comparative and Historical Context, 52 DePaul L. Rev. 433, 444 (2002)).  In other words, the Court suggested that international **criminal** law at the time of the founding also contained a **civil** component.

This conclusion is supported by an examination of Blackstone, upon whom the Sosa Court relied heavily.  Notably, Blackstone discussed the three "common law" international law violations (piracy, offenses on the high seas, and offenses against ambassadors) as being **criminal** offenses rather than **civil** offenses.  Blackstone did not suggest that these offenses could be redressed through common-law civil actions.  See Blackstone, 4 Commentaries, Ch. 5; see also Sosa, 542 U.S. at 723 ("It is true that Blackstone [] refer[red] to what he deemed the three principal offenses against the law of nations in the course of discussing **criminal sanctions**.") (emphasis added).  However, Blackstone

**did** explain that violations of an ambassador's safe-conduct were
subject to **statutory** restitution.  See Blackstone, 4 <u>Commentaries</u>, Ch.
5 ("if any of the king's subjects attempt or offend, upon the sea, or
in port within the king's obeisance, against any stranger in amity,
league, or under safe-conduct; and especially by attaching his person,
or spoiling him, or robbing him of his goods; the lord chancellor, with
any of the justices of either the king's bench or common pleas, **may
cause full restitution and amends to be made to the injured**.")
(emphasis added) (citing Statute of 31 Hen. VI., ch. 4).

As the Supreme Court recognized in <u>Sosa</u>, the Alien Tort Statute
requires that federal courts provide civil redress for these criminal
offenses.  <u>Sosa</u>, 542 U.S. at 724 ("We think it is correct . . . to
assume that the First Congress understood that the district courts
would recognize private causes of action for . . . torts corresponding
to Blackstone's three primary offenses.").  If we are to use
Blackstone's treatise as the lodestar of Alien Tort Statute analysis
(as the Supreme Court did in <u>Sosa</u>), then we must necessarily conclude
that the Alien Tort Statute exists precisely for the purpose of
providing civil redress to victims of violations of international
criminal law.  <u>See generally</u> Jaykumar A. Menon, <u>The Alien Tort Statute:
Blackstone and Criminal/Tort Law Hybridities</u>, 4 J. Int'l Crim. Just.
372 (2006) (discussing implications of Alien Tort Statute's status as a
hybrid of criminal law and tort law).

Justice Breyer went further than the <u>Sosa</u> majority in discussing
the relationship between international criminal law and civil causes of
action.  He noted that criminal punishment contains an element of

restitution in many legal systems.[15]  <u>Sosa</u>, 542 U.S. at 762-63 (Breyer, J., concurring).  Notably, the International Criminal Court provides for reparations and restitution as part of its jurisdiction over international criminal law.  <u>See</u> Rome Statute of the International Criminal Court, July 17, 1998, 2187 U.N.T.S. 90, at arts. 75(2) ("The Court may make an order directly against a convicted person specifying appropriate reparations to, or in respect of, victims, including restitution, compensation and rehabilitation."), 77(2)(b) ("In addition to imprisonment, the Court may order . . . [a] forfeiture of proceeds, property and assets derived directly or indirectly from that crime, without prejudice to the rights of bona fide third parties.").

In short, even in the absence of a universally recognized civil cause of action that exists under **international law**, the Alien Tort Statute provides a **domestic** civil cause of action which incorporates the universally recognized norms of international law, regardless of whether they are criminal or civil.  To hold otherwise would render <u>Sosa</u>'s references to Blackstone superfluous and, indeed, would cause the entire foundation of the Alien Tort Statute to crumble, given that there is no universally recognized norm of private civil liability for international law violations.  <u>See generally</u> Christine Gray, <u>Judicial Remedies in International Law</u> (1987) (noting, inter alia, that international law traditionally provides only for reparations between states, not private civil remedies).

---

[15] For example, an Italian court recently held American CIA operatives criminally liable (in absentia) for the abduction and extraordinary rendition of an Egyptian while he was in Italy.  <u>See</u> *Italy Rules in Rendition Case*, <u>Wall St. J.</u>, Nov. 5, 2009, at A12.  In the verdict, the court also imposed a collective restitution obligation on the defendants in the amount of 1.5 million euros.

Accordingly, the Court concludes that the Alien Tort Statute provides a civil cause of action for international law violations even if international law itself does not clearly recognize a civil cause of action for violations of that norm.

## V.   THE ALLEGED PRIMARY VIOLATIONS OF INTERNATIONAL LAW

Plaintiffs allege that Cote d'Ivoire farmers are responsible for the following violations of Plaintiffs' rights under international law. Plaintiffs further allege that Defendants have aided and abetted these violations.

Defendants' Motion to Dismiss is aimed at the adequacy of Plaintiffs' allegations of aiding and abetting.  Because the Motion is not directed at the underlying primary violations of international law (i.e., the conduct of the Ivorian farmers), the Court assumes for purposes of this Order that Plaintiffs have adequately alleged primary violations of the following norms.  The Court summarizes the applicable facts and legal standards in order to provide context for the discussion of Defendants' contribution (or lack thereof) to those violations.  It is helpful to thoroughly examine the details of the alleged primary violation prior to addressing the parties' arguments regarding secondary liability.

### A.   FORCED LABOR

It is widely acknowledged that the use of forced labor violates international law.  See Adhikari v. Daoud & Partners, 697 F. Supp. 2d 674, 687 (S.D. Tex. 2009) ("trafficking and forced labor . . . qualify as universal international norms under Sosa); John Roe I v. Bridgestone Corp., 492 F. Supp. 2d 988, 1014 (S.D. Ind. 2007) ("some forms of

1   forced labor violate the law of nations"); <u>Jane Doe I v. Reddy</u>, No. C

2   02-05570 WHA, 2003 WL 23893010, at *9 (N.D. Cal. Aug. 4, 2003) ("forced

3   labor . . . is prohibited under the law of nations); <u>Iwanowa v. Ford</u>

4   <u>Motor Co.</u>, 67 F. Supp. 2d 424, 441 (D.N.J. 1999) ("[T]he case law and

5   statements of the Nuremberg Tribunals unequivocally establish that

6   forced labor violates customary international law."); <u>see also</u> <u>In re</u>

7   <u>World War II Era Japanese Forced Labor Litig.</u>, 164 F. Supp. 2d 1160,

8   1179 (N.D. Cal. 2001) ("this court is inclined to agree with the

9   <u>Iwanowa</u> court's conclusion that forced labor violates the law of

10  nations").

11       For present purposes, the Court adopts the definition of "forced

12  labor" supplied by the International Labour Organization Forced Labor

13  Convention of 1930: "all work or service which is exacted from any

14  person under the menace of any penalty and for which the said person

15  has not offered himself voluntarily."  International Labour

16  Organization Convention No. 29 Concerning Forced or Compulsory Labor,

17  art. 2., 39 U.N.T.S. 55, *entered into force*, May 1, 1932.  More

18  thorough definitions may be found in the treaties and conventions

19  identified in the Complaint (FAC ¶ 63), in the expert declaration of

20  Lee Swepston [docket no. 93], and in the Victims of Trafficking and

21  Violence Protection Act of 2000.[16]

22

23       [16] The Act provides that a person has engaged in forced labor if he:
         knowingly provides or obtains the labor or services of a person
24       by any one of, or by any combination of, the following means--
             (1) by means of force, threats of force, physical
25           restraint, or threats of physical restraint to that person
             or another person;
26           (2) by means of serious harm or threats of serious harm to
             that person or another person;
27           (3) by means of the abuse or threatened abuse of law or
             legal process; or
28

1   There are various examples of forced labor cases being brought

2   under the Alien Tort Statute (many of which, it should be noted,

3   predate <u>Sosa</u>).  In one case, the district court held that the

4   plaintiffs' allegations were insufficient to state a claim under

5   international law where:

> Plaintiffs allege that they have nothing left after they spend
> their wages at [the defendant's] company stores and other company
> facilities (such as schools), but they do not allege induced
> indebtedness. Plaintiffs allege that they are physically isolated
> at the Plantation, but they do not allege that [the defendant]
> keeps them physically confined there. To the extent plaintiffs
> allege psychological compulsion, they are clearly alleging what
> the [International Labor Organization] report calls "pure economic
> necessity, as when a worker feels unable to leave a job because of
> the real or perceived absence of employment alternatives," which
> is not forced labor under international law.

12  <u>John Roe I v. Bridgestone Corp.</u>, 492 F. Supp. 2d 988, 1014 (S.D. Ind.

13  2007).

14   In another case, the allegations were sufficient where the

15  plaintiffs alleged that they "were brought to the United States and

16  forced to work involuntarily[,] and [that] defendants reinforced their

17  coercive conduct through threats, physical beatings, sexual battery,

18  fraud and unlawful substandard working conditions." <u>Jane Doe I v.</u>

19  <u>Reddy</u>, 2003 WL 23893010, at *9.  Similarly, in <u>Licea v. Curacao Drydock</u>

20  <u>Co., Inc.</u>, 584 F. Supp. 2d 1355 (S.D. Fla. 2008), the plaintiffs

21  established that they were forced to work on oil platforms after having

22  been trafficked from Cuba to Curacao under threats of physical and

23  emotional harm.

24   In the present case, Plaintiffs allege that they were forced to

25

26   (4) by means of any scheme, plan, or pattern intended to
     cause the person to believe that, if that person did not
27   perform such labor or services, that person or another
     person would suffer serious harm or physical restraint.
28  18 U.S.C. § 1589(a).

24

labor on cocoa fields. (FAC ¶¶ 57-59.)  At least one Plaintiff (John
Doe I) alleges that he was trafficked from Mali to Cote d'Ivoire.  (FAC
¶ 57.)  All three Plaintiffs were locked on their respective farms and
plantations and monitored at night by guards armed with guns and whips.
(FAC ¶¶ 57-59.)  They were subjected to physical violence and related
psychological abuse that had the effect of forcing them to work and
remain on the farms.  (FAC ¶¶ 57-59.)  They were threatened with severe
beatings from whips and tree branches, being forced to drink urine, and
having their feet cut open.  (<u>Id.</u>)  They were not paid for their work,
were given inadequate amounts of food, and were forced to sleep in
groups in locked rooms, and at least one plaintiff was forced to sleep
on the floor.  (<u>Id.</u>)

Because Defendants have not disputed that adequacy of these
allegations, the Court concludes for present purposes that these
allegations are sufficient constitute forced labor under international
law.

**B.   CHILD LABOR**

It is clear that in some instances "child labor" constitutes a
violation of an international law norm that is specific, universal, and
well-defined.  "Yet whatever one's initial reaction is to the broad
phrase 'child labor,' reflection shows that national and international
norms accommodate a host of different situations and balance competing
values and policies. . . .  It is not always easy to state just which
practices under the label 'child labor' are the subjects of an
international consensus." <u>John Roe I v. Bridgestone</u>, 492 F. Supp. 2d
at 1020.

Plaintiffs submit an expert declaration from a former member of

1   the International Labour Organization, Lee Swepston. [Docket no. 93.]

2   Swepston's declaration reveals that the definitional concerns

3   identified by the <u>John Roe I v. Bridgestone</u> court apply with equal

4   force in the present case.[17]  Nevertheless, for present purposes, the

5   Court assumes that the allegations in the First Amended Complaint are

6   analogous to the allegations at issue in <u>John Roe I v. Bridgestone</u>, a

7   case involving allegations of forced labor and child labor on a

8   Liberian rubber plantation:

9       [T]he Complaint states that defendants are actively encouraging –
         even tacitly requiring – the employment of six, seven, and ten
10       year old children. Giving plaintiffs the benefit of their factual
         allegations, the defendants are actively encouraging that these
11       very young children perform back-breaking work that exposes them
         to dangerous chemicals and tools. The work, plaintiffs allege,
12       also keeps those children out of the [company-provided] schools.
         The court understands that defendants deny the allegations, but
13       defendants have chosen to file a motion that requires the court to
         accept those allegations as true, at least for now. [¶] The
14       circumstances alleged here include at least some practices that
         could therefore fall within the "worst forms of child labor"
15       addressed in ILO Convention 182. The conditions of work alleged by
         plaintiffs (and reported by the UN investigators) are likely to
16       harm the health and safety of at least the very youngest of the
         child plaintiffs in this case.

17
18  <u>John Roe I v. Bridgestone Corp.</u>, 492 F. Supp. 2d at 1021.[18]

19      The plaintiffs in the present case allege that they were forced to

20
21  [17] For example, a number of countries allow children of the age of 14
    or 15 to engage in most or all types of labor. (<u>See</u> Swepston Decl.
22  Ex. B (Australia, Ethiopia, Fiji, Finland, India, Pakistan, Sri
    Lanka, Trinidad & Tobago).) A number of states in the U.S. are
23  similar. (<u>See</u> <u>id.</u> (Illinois, Indiana, Nevada, Pennsylvania).)
        In addition, although most countries have adopted regulations
24  prohibiting children of varying ages from engaging in "hazardous"
    work activities, the precise definition of "hazardous" remains
25  unclear. (<u>See</u> <u>id.</u>)

26  [18] It should be noted that <u>John Roe I v. Bridgestone</u> involved claims
    for the defendants' **direct** violations of international law, not for
27  the defendant's aiding and abetting third parties' violations.  The
    plaintiffs in that case had alleged that the defendants "own and
28  control the plantation." 492 F. Supp. 2d at 990.

work "cutting, gathering, and drying" cocoa beans for twelve to
fourteen hours a day, six days a week.  (FAC ¶¶ 57-59.)  The plaintiffs
were between twelve and fourteen years old at the time they first began
working at the farms.  (Id.)

Because Defendants have not disputed the adequacy of these
allegations, the Court assumes for present purposes that Plaintiffs'
allegations establish violations of universal, well-defined
international law norms prohibiting child labor.[19]

**C.   TORTURE**

Torture is a well-established norm of international law that is
actionable under the Alien Tort Statute.  See In re Marcos Human Rights
Litig., 25 F.3d 1467, 1475 (9th Cir. 1994) (collecting authorities);
Filartiga v. Pena-Irala, 630 F.2d 876, 880-84 (2d Cir. 1980); see also
Sosa, 542 U.S. at 732 (citing those cases with approval).

A helpful working definition of "torture" can be found in the
Torture Victim Protection Act:

> the term 'torture' means any act, directed against an individual
> in the offender's custody or physical control, by which severe
> pain or suffering (other than pain or suffering arising only from
> or inherent in, or incidental to, lawful sanctions), whether
> physical or mental, is intentionally inflicted on that individual
> for such purposes as obtaining from that individual or a third
> person information or a confession, punishing that individual for
> an act that individual or a third person has committed or is
> suspected of having committed, intimidating or coercing that
> individual or a third person, or for any reason based on
> discrimination of any kind[.]

---

[19] The Court notes, however, that Plaintiffs' allegations are readily
distinguishable from the allegations at issue in John Roe I v.
Bridgestone, which involved the employment of significantly younger
children (six to ten years old, as opposed to twelve to fourteen in
the present case) and contained specific factual allegations that
they were not allowed to attend school and were forced to perform
"back-breaking work that expose[d] them to dangerous chemicals and
tools."  See John Roe I v. Bridgestone, 492 F. Supp. 2d at 1021.

Torture Victim Protection Act, Pub. L. 102-256, 106 Stat. 73 (1992), §
3(b)(1), *reprinted in* 28 U.S.C.A. § 1350 note.  In addition, the
Torture Victim Protection Act contains a state-action requirement, such
that liability only exists if the act of torture is done "under actual
or apparent authority, or color of law, of any foreign nation."  <u>Id.</u> at
§ 2(a)(1).[20]

Plaintiffs allege that they were severely beaten and/or threatened
with severe beatings in order to prevent them from leaving the cocoa
plantations.  Plaintiffs also allege that they were given inadequate
food, were forced to sleep in tightly-packed locked rooms, and were
threatened with being forced to drink urine.  (FAC ¶¶ 57-59.)

The Court will assume for purposes of this motion that these
allegations are sufficient to state the basic elements of torture:
"severe pain or suffering" was "intentionally inflicted on" Plaintiffs
for the "purposes" of "punishing" Plaintiffs for acts that Plaintiffs
committed, and/or for the "purposes" of "intimidating or coercing"
Plaintiffs.  Allegations of severe beatings, extended confinements, and
deprivation of food - causing both physical and mental injury -
generally constitute torture.  <u>See, e.g.</u>, <u>Doe v. Qi</u>, 349 F. Supp. 2d
1258, 1267-70, 1314-18 (N.D. Cal. 2004) (collecting cases).[21]

To the extent that the international law definition of torture

---

[20] This definition of torture is nearly identical, word-for-word, as
the leading international law definition found in the Convention
Against Torture and Other Cruel, Inhuman or Degrading Treatment or
Punishment, art. 1(1), S. Treaty Doc. No. 100-20 (1988), 1465
U.N.T.S. 113, *reprinted in* 23 I.L.M. 1027 (1984), *modified in* 24
I.L.M. 535 (1985).

[21] That said, in light of <u>Twombly</u> and <u>Iqbal</u>, the Court has serious
concerns about the adequacy of the factual details contained in
Plaintiffs' First Amended Complaint.

contains additional requirements (most importantly, the state-action requirement), the Court discusses these issues at greater length infra.

### D.   CRUEL, INHUMAN, AND DEGRADING TREATMENT

"Cruel, inhuman, or degrading treatment or punishment is defined as acts which inflict mental or physical suffering, anguish, humiliation, fear and debasement, which fall short of torture." Sarei v. Rio Tinto PLC, 650 F. Supp. 2d 1004, 1029 (C.D. Cal. 2009) (quoting Aldana v. Del Monte Fresh Produce, N.A., Inc., 452 F.3d 1284, 1285 n.1 (11th Cir. 2005) (Barkett, J., dissenting)), appeal pending, Nos. 02-56256, 02-56390, 09-56381 (9th Cir.).  "The principal difference between torture and [cruel, inhuman, or degrading treatment] is 'the intensity of the suffering inflicted.'"  Id. (quoting Restatement (Third) of Foreign Relations, § 702 n.5).

The prevailing view in the caselaw is that "cruel, inhuman, and degrading treatment" generally constitutes an actionable international law norm under Sosa.  See, e.g., Sarei, 650 F. Supp. 2d at 1028-29 (collecting cases).  However, as with child labor, there is a general consensus that only some types of activities constitute cruel, inhuman, and degrading treatment; and the central question is whether the "specific conduct at issue" fits within that core norm.  Id. at 1029-30 ("Because multiple elements of plaintiffs' CIDT claim do not involve conduct that has been universally condemned as cruel, inhuman, or degrading, the court concludes that the specific CIDT claim plaintiffs assert does not exclusively involve matters of universal concern.");  Bowoto, 557 F. Supp. 2d at 1093-94; John Roe I v. Bridgestone, 492 F. Supp. 2d at 1023-24 (recognizing cruel, inhuman, and degrading treatment as actionable norm under customary international law, but

holding that "exploitative labor practices" do not violate those
norms); <u>Doe v. Qi</u>, 349 F. Supp. 2d at 1321-25.

As with the allegations of torture, the Court assumes for purposes
of this Order that Plaintiffs have adequately alleged cruel, inhuman,
or degrading treatment with respect to Defendants' alleged severe
beatings, extended confinements, and deprivation of food.

**VI.   LEGAL STANDARD REGARDING LIABILITY FOR AIDING AND ABETTING
       VIOLATIONS OF INTERNATIONAL LAW**

**A.   INTRODUCTION**

There is an extensive body of precedent supporting aiding and
abetting-liability for violations of international law.  Aiding and
abetting liability is prominent in the Nuremberg Tribunals, the
International Criminal Tribunals for the Former Yugoslavia and Rwanda
(hereinafter "ICTY" and "ICTR"), and the Rome Statute of the
International Criminal Court.  <u>See</u> <u>Khulumani v. Barclay Nat. Bank Ltd.</u>,
504 F.3d 254, 270 (2d Cir. 2007) (Katzmann, J., concurring) ("the
individual responsibility of a defendant who aids and abets a violation
of international law . . . has been frequently invoked in international
law instruments as an accepted mode of liability [and] has been
repeatedly recognized in numerous international treaties.").
International conventions such as the Supplementary Convention on the
Abolition of Slavery require the punishment of aiders and abetters.
<u>See</u> Supplementary Convention on the Abolition of Slavery, the Slave
Trade, and Institutions and Practices Similar to Slavery, Sept. 7,

1956, 18 U.S.T. 3201, 226 U.N.T.S. 3.[22]  Similarly, domestic criminal law provides for aiding and abetting liability, see 18 U.S.C. § 2, and has done so for centuries with respect to aiding and abetting particular violations of international law such as piracy.[23]  There is little doubt, then, that certain Alien Tort Statute defendants may potentially be held liable under an aiding and abetting theory of liability.

   **B.   WHICH SOURCE OF LAW TO APPLY?**

   The key question is whether to examine domestic law or international law to derive the proper legal standard for determining aiding and abetting liability.  Plaintiffs assert that the proper source of aiding and abetting liability is domestic law.  Defendants

_____

[22] The Convention requires member states to prohibit "being accessory" to and "being a party to a conspiracy to accomplish" acts including "enslaving another person" and separating a child from his parents "with a view to the exploitation of the child['s] . . . labour."  18 U.S.T. 3201, arts. 1(d), 6(1)-(2).

[23] In light of Sosa's emphasis on Blackstone and the law of piracy, it is interesting to note the centuries-old domestic statutory provisions in England and the United States that criminalized aiding and abetting piracy.  See United States v. Palmer, 16 U.S. 610, 629 (1818) (discussing Apr. 30, 1790 Act providing for punishment by death for those who "knowingly and wittingly aid and assist, procure, command, counsel, or advise, any person or persons, to do or commit any murder, robbery, or other piracy," or who after the fact "furnish aid to those by whom the crime has been perpetrated") (citing 1 Stat. 112, 113-14, §§ 10-11); Blackstone, 4 Commentaries, Ch. 5 (discussing statute of  2 Hen. V. St. 1, ch. 6, by which the "breaking of truce and safe-conduct, or abetting and receiving the truce breakers, was (in affirmance and support of the law of nations) declared to be high treason against the crown and dignity of the king," and statutes of 11 & 12 Wm. III., ch. 7 and 8 Geo. I., ch. 24, which established criminal liability for "conspiring" to commit piracy and for "trading with known pirates, or furnishing them with stores or ammunition, or fitting out any vessel for that purpose, or in any wise consulting, combining, confederating, or corresponding with them," and further establishing that "all accessories to piracy, are declared to be principal pirates, and felons without benefit of clergy").

assert that international law is the proper source.

Ultimately, the Court agrees with and adopts the Second Circuit's resolution of this question: international law provides the appropriate definition of aiding and abetting liability.  See Presbyterian Church of Sudan v. Talisman Energy, Inc., 582 F.3d 244, 258-59 (2d Cir. 2009) (discussing Khulumani v. Barclay Nat. Bank Ltd., 504 F.3d 254 (2d Cir. 2007)).  The central principles are as follows.

The Supreme Court in Sosa repeatedly insisted that United States courts must follow international law in defining the nature of violative acts and the scope of liability.  See, e.g., Sosa, 542 U.S. at 732 ("federal courts should not recognize private claims under federal common law for violations of any international law norm with less definite content and acceptance among civilized nations than the historical paradigms familiar when § 1350 was enacted.").  Though Plaintiffs argue that federal law should be used to fill the gaps where international law is silent, it is clear that international law provides sufficiently well-established norms of secondary liability to satisfy Sosa's requirement of norms containing "definite content [that are] accept[ed] among civilized nations."  See id.  There is simply no reason to alter the well-defined scope of international law by introducing domestic law into the Alien Tort Statute.

It is clear from the authorities identified by the parties and discussed at greater length infra that international law recognizes aiding and abetting liability.  Because the act of **aiding and abetting** a human rights violation constitutes an independent violation of international law, the Court concludes that international law is the appropriate source of law under Sosa.

1  C.   **WHAT IS THE SCOPE OF AIDING AND ABETTING LIABILITY UNDER**

2      **INTERNATIONAL LAW?**

3      There is little doubt that aiding and abetting liability is a part

4  of international law.  Aiding and abetting liability is prominent in

5  the Nuremberg Tribunals,[24] the International Criminal Tribunals for the

6  Former Yugoslavia and Rwanda,[25] and the Statute of the International

7  Criminal Court.  See generally Khulumani, 504 F.3d at 270 (Katzmann,

8  J., concurring).

9      Although there are various formulations of the proper standard of

10  aiding and abetting liability in international law, it is important to

11  remember Sosa's instruction that norms are only actionable if they are

12  universally recognized and defined with specificity.  For example, as

13  noted by Justice Story in United States v. Smith, 18 U.S. 153, 161

14

15  [24] The London Charter that created the Nuremberg Tribunals provided
   for secondary as well as primary liability for the atrocities
16  committed by the Axis Powers during the Second World War.  Article
   Six provided that "Leaders, organizers, instigators and accomplices
17  participating in the formulation or execution of a common plan or
   conspiracy to commit any of the foregoing crimes [crimes against
18  peace, war crimes, and crimes against humanity] are responsible for
   all acts performed by any persons in execution of such plan."
19  Agreement for the Prosecution and Punishment of Major War Criminals
   of the European Axis, and Establishing the Charter of the
20  International Military Tribunal, Aug. 8, 1945, art. 6, 82 U.N.T.S.
   279 (hereinafter "London Charter").
21

22  [25] ICTY and ICTR allow for aiding and abetting liability by virtue of
   their enabling statutes, which create liability for those who have
23  "planned, instigated, ordered, committed, or otherwise aided and
   abetted in the planning, preparation or execution of a crime."
24  Statute of the International Tribunal for the Former Yugoslavia, art.
   7, adopted May 25, 1993, S.C. Res. 827, U.N. Doc. S/RES/827
25  (hereinafter "ICTY Statute"); Statute of the International Criminal
   Tribunal for Rwanda, art. 6, adopted Nov. 8, 1994, S.C. Res. 955,
26  U.N. Doc. S/RES/955 (hereinafter "ICTR Statute").  The ICTY and ICTR
   Statutes were drafted and approved by the Security Council of the
27  United Nations.  See Presbyterian Church of Sudan v. Talisman Energy,
   Inc., 374 F. Supp. 2d 331, 338 (S.D.N.Y. 2005).
28

(1820), "whatever may be the diversity of definitions, . . . all writers concur, in holding, that robbery or forcible depredations upon the sea, *animo furandi* [with the intention to steal] is piracy."[26]   In other words, where there are a variety of formulations, the court should look to the formulation that is agreed upon by all – a lowest common denominator or a common "core definition" of the norm. See Khulumani, 504 F.3d at 277 n.12 (Katzmann, J., concurring).   This approach has been adopted by the Ninth Circuit in Abagninin v. AMVAC Chem. Corp., 545 F.3d 733, 738-40 (9th Cir. 2008), which concluded that customary international law imposes a specific intent standard for genocide, despite an alternative "knowledge" standard established by one particular treaty.   In addition, this lowest common denominator approach has been adopted by other federal courts dealing with the question of aiding and abetting liability.   See Presbyterian Church of Sudan, 582 F.3d at 259 (concluding that the relevant "standard has been largely upheld in the modern era, with only sporadic forays in the direction of a [different] standard.").

### 1.   ACTUS REUS

With respect to the *actus reus* element of the violation, the Court, having examined the applicable authorities, believes that the International Criminal Tribunal for the former Yugoslavia has accurately and concisely restated the governing international law rule:

> an aider and abettor carries out acts **specifically directed** to assist, encourage, or lend moral support to the perpetration of a **certain specific crime**, which have a substantial effect on the perpetration of the crime. The *actus reus* need not serve as condition precedent for the crime and may occur before, during, or after the principal crime has been perpetrated.

---

[26] The Smith Court's analysis of piracy was cited with approval in Sosa, 542 U.S. at 732.

<u>Prosecutor v. Blagojevic</u>, No. IT-02-60-A, at ¶ 127 (ICTY Appeals
Chamber, May 9, 2007) (collecting cases) (citations and footnotes
omitted, emphasis added), *available at* http://www.icty.org/x/cases/
blagojevic_jokic/acjug/en/blajok-jud070509.pdf.[27]  This formulation
requires that the defendant must do something more than "[a]iding a
criminal" generally - the defendant must aid the commission of a
specific **crime**.  As other District Courts have aptly explained,
"[a]iding a **criminal** 'is not the same thing as aiding and abetting his
or her alleged **human rights abuses**.'"   <u>In re South African Apartheid
Litig.</u>, 617 F. Supp. 2d 228, 257 (S.D.N.Y. 2009) (emphasis added)
(quoting <u>Mastafa v. Australian Wheat Bd. Ltd.</u>, No. 07 Civ. 7955(GEL),
2008 WL 4378443, at *3 (S.D.N.Y. Sept. 25, 2008)).  In other words, the
aider and abettor's assistance must bear a **causative** relationship to
the **specific wrongful conduct** committed by the principal.  <u>Id.</u>  The

---

[27] Plaintiffs argue that the *actus reus* element does not require that
the acts are "specifically directed" to a "certain specific crime."
But as Plaintiffs concede (<u>see</u> 8/6/09 Opp. at 12), the
<u>Blagojevic</u> tribunal carefully explained that international law has
**always** required that the acts be "specifically directed" to assist in
a "certain specific crime"; however, the tribunal also noted that
some courts have **implicitly** concluded that this standard was
satisfied when the facts showed that the actor's conduct was
undertaken knowingly and had a "substantial effect on the
perpetration of the crime." <u>Blagojevic</u>, at ¶¶ 189, 193.  The Court
agrees with the <u>Blagojevic</u> tribunal's summary of the international
caselaw, which unanimously supports the conclusion that the *actus
reus* of aiding and abetting in international law requires that the
assistance is "specifically directed" to a "certain specific crime."
As explained in <u>Blagojevic</u>, alternative formulations of this standard
generally constitute *dictum* that is not uniformly accepted.  The
alternative formulations therefore fail to satisfy <u>Sosa</u>'s requirement
that the international law norm must be **universally** accepted.  <u>See</u>
<u>Presbyterian Church of Sudan</u>, 582 F.3d at 259 (adopting approach of
looking to common core definition to determine appropriate choice
among competing articulations of a standard); <u>Abagninin</u>, 545 F.3d at
738-40 (same).

1   assistance need not necessarily constitute a "but-for" cause or

2   *conditio sine qua non*, but it must have an actual effect on the

3   principal's criminal act.   <u>Id.</u>

4        This definition of the *actus reus* standard is consistent with the

5   caselaw summarized <u>infra</u> and, notably, retains a meaningful and clear

6   distinction between aiding and abetting liability and conspiracy/joint

7   criminal enterprise liability.  As explained by the International

8   Criminal Tribunal for the Former Yugoslavia, the distinctions between

9   aiding and abetting and joint criminal enterprise are as follows:

10       Participation in a joint criminal enterprise is a form of
    "commission" [of a crime] under Article 7(1) of the [ICTY]
11   Statute. The participant therein is liable as a co-perpetrator of
    the crime(s). Aiding and abetting the commission of a crime is
12   usually considered to incur a lesser degree of individual criminal
    responsibility than committing a crime. In the context of a crime
13   committed by several co-perpetrators in a joint criminal
    enterprise, the aider and abettor is always an accessory to these
14   co-perpetrators, although the co-perpetrators may not even know of
    the aider and abettor's contribution. Differences exist in
15   relation to the *actus reus* as well as to the *mens rea* requirements
    between both forms of individual criminal responsibility:
16       (i) The aider and abettor carries out acts specifically
    directed to assist, encourage or lend moral support to the
17   perpetration of a certain specific crime (murder, extermination,
    rape, torture, wanton destruction of civilian property, etc.), and
18   this support has a substantial effect upon the perpetration of the
    crime. By contrast, it is sufficient for a participant in a joint
19   criminal enterprise to perform acts that in some way are directed
    to the furtherance of the common design.
20       (ii) In the case of aiding and abetting, the requisite mental
    element is knowledge that the acts performed by the aider and
21   abettor assist the commission of the specific crime of the
    principal. By contrast, in the case of participation in a joint
22   criminal enterprise, i.e. as a co-perpetrator, the requisite *mens
    rea* is intent to pursue a common purpose.

23
    <u>Vasiljevic</u>, 2004 WL 2781932, at ¶ 102.  In other words, the aider and

24
    abettor must do something more than commit acts that "in some way"

25
    tenuously "further[] . . . the common design" of a criminal

26
    organization; that *actus reus* standard applies only to co-conspirators

27
    who knowingly and actively join in the criminal conspiracy and share

28

                                        36

its criminal purpose.  To establish aiding and abetting liability,
generalized assistance is not enough: the assistance must be
"specifically directed" - i.e., bear a direct causative relationship -
to a specific wrongful act, and the assistance must have a substantial
effect on that wrongful act.  Blagojevic, at ¶ 127.

This aiding and abetting *actus reus* standard necessarily "requires
a fact-based inquiry" that is context-specific.  See id. at ¶ 134.
However, one important issue must be noted at the outset of the
discussion.  There is a great deal of uncertainty about the *actus reus*
of "tacit approval and encouragement" — a theory of liability that,
according to Plaintiffs, dates back to Nuremberg-era precedents such as
The Synagogue Case and United States v. Ohlendorf ("The Einsatzgruppen
Case"), *in* 4 Trials of War Criminals Before the Nuremberg Military
Tribunals Under Control Council Law No. 10 ("T.W.C."), at 570-72
(William S. Hein & Co., Inc. 1997).  To the extent this form of
liability even exists, the modern caselaw supports liability only where
the defendant has "a combination of a position of authority and
physical presence at the crime scene[, which] allows the inference that
non-interference by the accused actually amounted to tacit approval and
encouragement."  Prosecutor v. Oric, No. IT-03-68-A, at ¶ 42 (ICTY
Appeals Chamber, July 3, 2008), *available at* 2008 WL 6930198.  As with
all aiding and abetting, it must be shown that the encouragement was
"substantial" - which necessarily requires that the "principal
perpetrators [were] aware of it," because otherwise, the support and
encouragement would not have had any effect (let alone a substantial
one) on the principal offense.  Prosecutor v. Brdjanin, No. IT-99-36-A,
at ¶ 277 (ICTY Appeals Chamber, April 3 2007), *available at* 2007 WL

1826003.   The specific situations in which courts have imposed such
liability are identified _infra_.

###    2.   **MENS REA**

The Court is aware that there is an ongoing debate among courts,
litigants, and commentators regarding the proper definition of aiding
and abetting liability.  <u>See, e.g.</u>, _Pet'n for Writ of Cert._,
<u>Presbyterian Church of Sudan v. Talisman Energy, Inc.</u>, No. 09-1262,
2010 WL 1602093, at *27-33 (Apr. 15, 2010) (collecting cases).   The
Court concurs with the five judges on the Second Circuit who have
concluded that the appropriate _mens rea_ for aiding and abetting
violations of international law requires that the defendant act with
"the purpose of facilitating the commission of that crime." <u>Khulumani</u>,
504 F.3d at 277 (Katzmann, J., concurring); <u>see also</u> <u>Presbyterian</u>
<u>Church of Sudan</u>, 582 F.3d at 259 (adopting Judge Katzmann's
formulation); <u>Khulumani</u>, 504 F.3d at 332-33 (Korman, J., concurring in
relevant part).   As the Second Circuit explained in its recent
<u>Presbyterian Church of Sudan</u> decision, a plaintiff must show that the
defendant acted with "purpose rather than knowledge alone" because only
a "purpose" standard "has the requisite 'acceptance among civilized
nations'" to satisfy <u>Sosa</u>'s stringent requirements.   <u>Presbyterian</u>
<u>Church of Sudan</u>, 582 F.3d at 259 (quoting <u>Sosa</u>, 542 U.S. at 732).   The
less-stringent "knowledge" standard, although it has often been
invoked, has not obtained **universal** recognition and acceptance.   <u>See</u>
<u>generally</u> <u>Prosecutor v. Furundzija</u>, IT-95-17/1-T, at ¶¶ 190-249 (ICTY
Trial Chamber, Dec. 10, 1998) (surveying international caselaw and
adopting "knowledge" _mens rea_ standard), _reprinted in_ 38 I.L.M. 317
(1999), _aff'd_, No. IT-95-17/1-A (ICTY Appeals Chamber, July 21, 2000),

*available at* 2000 WL 34467822.  As such, the "knowledge" standard is an improper basis for bringing an Alien Tort Statute action.

However, to the extent that a "knowledge" *mens rea* standard applies (a conclusion that the Court rejects), the Court believes that the proper articulation of the aiding and abetting standard would be the formulation adopted by the Appeals Chambers of the International Criminal Tribunals for the former Yugoslavia and Rwanda: "the requisite mental element of aiding and abetting is **knowledge** that the acts performed assist the commission of **the specific crime** of the principal perpetrator." Blagojevic, at ¶ 127 (collecting cases) (citations and footnotes omitted, emphasis added); see also Prosecutor v. Ntagerura, No. ICTR-99-46-A, at ¶ 370 (ICTR Appeals Chamber, July 2006) (same), *available at* 2006 WL 4724776; Prosecutor v. Blaskic, No. IT-95-14-A, at ¶ 45 (ICTY Appeals Chamber, July 2004) (same), *available at* 2004 WL 2781930; Prosecutor v. Vasiljevic, No. IT-98-32-A, at ¶ 102 (ICTY Appeals Chamber, Feb. 25, 2004) (same), *available at* 2004 WL 2781932. To the extent that the International Criminal Tribunals for the former Yugoslavia and Rwanda have occasionally adopted a less stringent standard, see, e.g., Mrksic, at ¶ 159; Furundzija, 38 I.L.M. 317 at ¶ 249, the Court believes that the standard articulated in Blagojevic, Ntagerura, Blaskic, and Vasiljevic best reflects the relevant caselaw discussed infra.[28]

---

[28] The Court also notes that, in the present context, the specific articulation of the *mens rea* standard is not necessarily determinative.  At the pleading stage, the "purpose" standard is similar to the Blagojevic tribunal's "knowledge that the acts assist a specific crime" standard.  A defendant's purposeful intent might potentially be inferred from factual allegations that establish that a defendant knew his action would substantially assist a certain **specific** crime (consistent with the *actus reus* principles articulated

1    Accordingly, to the extent that the "purpose" specific intent *mens*
2  *rea* standard does not apply and a "knowledge" general intent *mens rea*
3  standard does apply, the Court would apply the dominant approach taken
4  in the recent international appellate tribunal decisions.  This
5  approach requires that the aider and abettor must know or have reason
6  to know of **the relationship between his conduct and the wrongful acts**.
7  See Oric, 2008 WL 6930198, at ¶ 45.  It is not enough, as explained by
8  the Oric appeals tribunal, that the aider and abetter knew or had
9  reason to know that crimes were being committed - the aider and abetter
10 must know or have reason to know that his own acts or omissions
11 "assisted in the crimes."  Id. at ¶¶ 43, 45 & n.104.

12    That said, the Court concludes that the "purpose" *mens rea*
13 standard is the proper standard to use in Alien Tort Statute
14 litigation.  The less-stringent "knowledge" standard that was
15 originally synthesized by the International Criminal Tribunal for the
16 former Yugoslavia in Furundzija rests on a number of premises that,
17 while perhaps acceptable under that Tribunal's enacting authority, fail
18 to satisfy the requirements set forth by the Supreme Court in Sosa.

19    The appropriateness of the "purpose" standard is supported by the
20 following authorities.  As an initial matter, it is particularly
21 notable that the International Court of Justice — the central expositor
22 of international law, see Restatement (Third) of Foreign Relations, §
23 103 cmt. (b) ("The judgments and opinions of the International Court of
24 Justice are accorded great weight") — recently declined to decide

26    supra and developed further infra).  In light of this consideration,
27 the Court believes that the best resolution of the present case can
   be obtained by way of analogy to the **facts** of existing international-
28 law precedents.  The relevant cases are discussed at length infra.

whether the crime of aiding and abetting genocide requires that the aider and abettor **share** the perpetrator's criminal intent or merely **know** of the perpetrator's criminal intent.   Application of the Convention on the Prevention and Punishment of the Crime of Genocide (Bosnia and Herzegovina v. Serbia and Montenegro), 2007 I.C.J. No. 91, at ¶ 421 ("the question arises whether complicity presupposes that the accomplice shares the specific intent (*dolus specialis*) of the principal perpetrator"), *available at* http://www.icj-cij.org/docket/files/91/13685.pdf.   The fact that the International Court of Justice refrained from addressing this question supports the conclusion that the appropriate definition remains subject to reasonable debate.[29]   In light of Sosa, any doubts about the standard should be resolved in favor of the most stringent version.   See, e.g., Presbyterian Church of Sudan, 582 F.3d at 259 (adopting approach of looking to common core definition to determine appropriate choice among competing

---

[29] It is true that the International Court of Justice was only addressing allegations regarding aiding and abetting the crime of genocide, which is not at issue in the present case.   See Khulumani, 504 F.3d at 332 (Korman, J., concurring) (noting that Sosa "requires an analysis of the **particular norm** the defendant is accused of violating to determine whether a private party may be held responsible as an aider and abettor") (emphasis added).   However, the Court believes that the International Court of Justice's refusal to address the question undermines the analysis and conclusions reached by the *ad hoc* International Criminal Tribunals both with respect to genocide cases specifically, see, e.g., Prosecutor v. Ntakirutimana, ICTR-96-10-A, ICTR-96-17-A, at ¶¶ 500-01 & nn. 855-56 (ICTR Appeals Chamber Dec. 13, 2004) (collecting cases), *available at* 2004 WL 2981767, and all cases discussing the aiding and abetting *mens rea* more generally.   The International Court of Justice's refusal to adopt the *ad hoc* tribunals' conclusions provides compelling evidence of the tribunals' inadequacies as precedents for Alien Tort Statute litigation, an issue that is thoroughly and persuasively addressed in the concurring opinions in Khulumani.   See Khulumani, 504 F.3d at 278-79 (Katzmann, J., concurring); id. at 336-37 (Korman, J., concurring).

articulations of a standard); <u>Abaqninin</u>, 545 F.3d at 738-40 (same).

The Court notes that a Nuremberg-era precedent supports the view that the aider and abetter must act with the **purpose** of aiding the principal offender.  In the <u>Hechingen</u> case, a number of German citizens were accused of aiding and abetting the deportation of the Jewish population of two German towns.  <u>See The Hechingen and Haigerloch Case</u>, *translated in* <u>Modes of Participation in Crimes Against Humanity</u>, 7 J. Int'l Crim. Just. 131, 132 (2009).  The Gestapo had issued orders for the towns' Jewish populations to be deported and for their persons and luggage to be searched.  <u>Id.</u>  Two of the defendants, "Ho." and "K.," had participated in the searches and had collected the victims' jewelry to give to the town's mayor.  <u>Id.</u> at 144-45.  The trial court held that on account of these acts the defendants were guilty as accessories of participating "in a persecution on racial grounds and thus in a crime against humanity."  <u>Id.</u> at 145.  The trial court's conclusion was based on its view that the "knowledge" *mens rea* standard applied:  "Intent as an accessory requires, first, that the accused knew what act he was furthering by his participation; he must have been aware that the actions ordered from him by the Gestapo served persecution on racial grounds. . . . [And] second, that the accused knew that through his participation he was furthering the principal act."  <u>Id.</u> at 139.

This conclusion was reversed on appeal.  The appellate court explained that the underlying offense, "[p]ersecution on political, racial and religious grounds," may only be committed if the defendant "acted out of an inhumane mindset, derived from a politically, racially or religiously determined ideology."  <u>Id.</u> at 150.  The court explained that the aider and abettor must share this criminal intent - i.e., must

act with the intention of bringing about the underlying crime: "[t]he accessory [] to a crime against humanity is 'regarded as guilty of a crime against humanity, without regard to the capacity in which he acted.'  From this complete equation with the perpetrator it follows that the accessory must have acted from the same mindset as the perpetrator himself, that is, from an inhumane mindset and in persecutions under politically, racially or religiously determined ideologies." Id. at 150.  The court then concluded that "[t]he accused Ho. and K. were, according to the [trial court's] findings, involved only in a subordinate manner in the deportations.  In doing so they behaved particularly leniently and sympathetically, i.e. humanely[ toward the victims].  Their attitudes were not anti-Jewish.  Moreover, as the [trial court] judgment also explicitly finds, they did not have an awareness of the illegality of what they were doing." Id. at 151. Accordingly, the court of appeal reversed their convictions.  Id.

     In light of the Hechingen case – which has received surprisingly little attention from courts and litigants under the Alien Tort Statute, cf. Brief of Amici Curiae International Law Scholars William Aceves, et al., in support of Pet'n for Writ of Cert., Presbyterian Church of Sudan v. Talisman Energy, Inc., No. 09-1262, 2010 WL 1787371, at *7 & n.4 (Apr. 30, 2010) (arguing that "a single deviation from a long line of precedent does not modify customary international law") — the Court is compelled to conclude that the "purpose" mens rea standard is the correct standard for Alien Tort Statute purposes and the Furundzija "knowledge" standard is not.  The Hechingen precedent was simply brushed aside by the ICTY Trial Chamber in Furundzija, see 38 I.L.M. 317, at ¶ 248 ("the high standard proposed by [Hechingen] is not

reflected in the other cases"). But in light of <u>Sosa</u>, this Court is

not in a position to ignore international precedent so easily.[30]

Notably, this conclusion is further supported by the Rome Statute

of the International Criminal Court, July 17, 1998, 2187 U.N.T.S. 90,

which "has been signed by 139 countries and ratified by 105, including

most of the mature democracies of the world," <u>Khulumani</u>, 504 F.3d at

333 (Korman, J., concurring), and which "by and large may be taken as

constituting an authoritative expression of the legal views of a great

number of States." <u>Furundzija</u>, 38 I.L.M. 317, at ¶ 227. Importantly,

the Rome Statute, unlike many other international law sources,

specifically and clearly "articulates the *mens rea* required for aiding

and abetting liability" and harmonizes all of the relevant caselaw from

international tribunals. <u>Khulumani</u>, 504 F.3d at 275 (Katzmann, J.,

concurring); <u>cf. Abagninin</u>, 545 F.3d at 738-40 (rejecting plaintiffs'

reliance on Rome Statute with respect to genocide because Rome

Statute's definition of genocide conflicted with definition that was

uniformly adopted by other authorities).

The Rome Statute provides that "a person shall be criminally

responsible and liable for punishment for a crime within the

jurisdiction of the Court[31] if that person[,] . . . [f]or the **purpose** of

[30] It might be argued that the <u>Hechingen</u> court's opinion was directed
toward "joint criminal enterprise" (i.e., conspiracy) liability
rather than aiding and abetting liability. But this argument is
belied by the fact that the <u>Hechingen</u> court stated that the
defendants were accused of being an "**accessory**[ ] to a crime against
humanity." <u>The Hechingen and Haigerloch Case</u>, 7 J. Int'l Crim. Just.
at 150 (emphasis added).

[31] The Rome Statute establishes jurisdiction for "the most serious
crimes of concern to the international community as a whole," art.
5(1), namely, genocide, crimes against humanity, war crimes, and
aggression. "Crimes against humanity" include many of the claims at

facilitating the commission of such a crime, aids, abets or otherwise assists in its commission or its attempted commission, including providing the means for its commission." Article 25(3)(c) (emphasis added).  The "purpose" *mens rea* standard should be contrasted with the treaty's general "intent and knowledge" standard, art. 30(1),[32] the criminal negligence standard applicable to military commanders' liability for subordinates' actions, art. 28(a),[33] the criminal recklessness standard applicable to other superiors for their

_____

issue in this case, including enslavement, severe deprivation of physical liberty, and torture.  Art. 7(1)(c),(e),(f).

[32] Article 30 provides:
    1. Unless otherwise provided, a person shall be criminally responsible and liable for punishment for a crime within the jurisdiction of the Court only if the material elements are committed with intent and knowledge.
    2. For the purposes of this article, a person has intent where:
    (a) In relation to conduct, that person means to engage in the conduct;
    (b) In relation to a consequence, that person means to cause that consequence or is aware that it will occur in the ordinary course of events.
    3. For the purposes of this article, "knowledge" means awareness that a circumstance exists or a consequence will occur in the ordinary course of events. "Know" and "knowingly" shall be construed accordingly.

[33] Article 28(a) provides:
    A military commander or person effectively acting as a military commander shall be criminally responsible for crimes within the jurisdiction of the Court committed by forces under his or her effective command and control, or effective authority and control as the case may be, as a result of his or her failure to exercise control properly over such forces, where:
    (i) That military commander or person either knew or, owing to the circumstances at the time, should have known that the forces were committing or about to commit such crimes; and
    (ii) That military commander or person failed to take all necessary and reasonable measures within his or her power to prevent or repress their commission or to submit the matter to the competent authorities for investigation and prosecution.

subordinates' actions, art. 28(b),[34] and the intent and knowledge

standard applicable to conspirators (that is, members of "groups acting

with a common purpose").[35]  It is also noteworthy that the "purpose"

standard "was borrowed from the Model Penal Code of the American Law

Institute and generally implies a specific subjective requirement

stricter than knowledge."  See International Commission of Jurists,

Expert Legal Panel on Corporate Complicity in International Crimes, 2

Corporate Complicity & Legal Accountability 22 (2008) (citing Kai

Ambos, "Article 25: Individual Criminal Responsibility," in Otto

Triffterer, ed., Commentary on the Rome Statute (1999)).

---

[34] Article 28(b) provides:
     With respect to superior and subordinate relationships not
     described in paragraph (a), a superior shall be criminally
     responsible for crimes within the jurisdiction of the Court
     committed by subordinates under his or her effective authority
     and control, as a result of his or her failure to exercise
     control properly over such subordinates, where:
     (i) The superior either knew, or consciously disregarded
     information which clearly indicated, that the subordinates were
     committing or about to commit such crimes;
     (ii) The crimes concerned activities that were within the
     effective responsibility and control of the superior; and
     (iii) The superior failed to take all necessary and reasonable
     measures within his or her power to prevent or repress their
     commission or to submit the matter to the competent authorities
     for investigation and prosecution.

[35] Article 25(3)(d) provides:
     [A] person shall be criminally responsible and liable for
     punishment for a crime with the jurisdiction of the Court if
     that person . . . [i]n any other way contributes to the
     commission or attempted commission of such a crime by a group of
     persons acting with a common purpose.  Such contribution shall
     be intentional and shall either:
     (i) Be made with the aim of furthering the criminal activity or
     criminal purpose of the group, where such activity or purpose
     involves the commission of a crime within the jurisdiction of
     the Court; or
     (ii) Be made in the knowledge of the intention of the group to
     commit the crime.

Much like the Nuremberg-era _Hechingen_ case, the Rome Statute's "purpose" standard, was largely ignored by the _Furundzija_ tribunal. The _Furundzija_ tribunal cited Article 30 of the Rome Statute for the proposition that "knowledge" is the default _mens rea_ for violations of human rights law, and wholly failed to mention the more specific "purpose" standard set forth for aiding and abetting liability under Article 25 of the Rome Statute.   See _Furundzija_, 38 I.L.M. 317, at ¶ 244 & n.266; Rome Statute, at art. 25(3)(c) (establishing aiding and abetting liability where defendant acts "[f]or the **purpose** of facilitating the commission of" the principal offense) (emphasis added).   Yet as the _Furundzija_ court recognized, "[i]n many areas the [Rome] Statute may be regarded as indicative of the legal views, i.e. _opinio juris_ of a great number of States."   _Furundzija_, 38 I.L.M. 317, at ¶ 227; see also _Prosecutor v. Tadic_, No. IT-94-1-A, at ¶ 223 & n.282 (ICTY Appeals Chamber, July 15, 1999) (same), _available at_ 1999 WL 33918295.   The Rome Statute's "purpose" standard must be given great weight.   It should be noted as well that the Rome Statute's standard is not a lone outlier: the same articulation appears in the United Nations's regulations governing human rights tribunals in East Timor. See United Nations Transitional Administration in East Timor, "On the Establishment of Panels with Exclusive Jurisdiction Over Serious Criminal Offenses," § 14.3(c), UNTAET Reg. NO. 2000/15 (June 6, 2000), _available at_ http://www.un.org/en/peacekeeping/missions/past/etimor/ untaetR/Reg0015E.pdf.

Some (including Plaintiffs) have argued that the Rome Statute does not abrogate prior customary international law. (See 2/23/09 Opp. at 13 n.16.)   However, this argument rests in part on a misreading of the

Rome Statute itself.  This argument rests on Article 10 of the Statute,
which provides that "[n]othing in this Part shall be interpreted as
limiting or prejudicing in any way existing or developing rules of
international law for purposes other than this Statute."  Based on this
provision, Plaintiffs argue that the Rome Statute does not override
international caselaw to the contrary.  But Article 10 only establishes
that nothing "**in this Part**" affects existing customary international
law.  Rome Statute, art. 10 (emphasis added).  Article 10 appears in
**Part II**, which governs "Jurisdiction, admissibility and applicable
law."  On the other hand, Article 25, which establishes the rules
regarding individual criminal responsibility (including aiding and
abetting liability), appears in **Part III** of the Treaty, under the
heading "General principles of criminal law."  <u>See</u> Rome Statute, arts.
22-33 ("Part III"); <u>see also</u> <u>Tadic</u>, 1999 WL 33918295, at ¶ 223 n.282
(making same observation).  As such, Article 10 does not apply to the
present analysis, and it is therefore appropriate that the Rome
Statute's articulation of the relevant *mens rea* standard — which has
been approved by the majority of nations in the world — should prevail
over conflicting international caselaw.[36]

Accordingly, in light of <u>Sosa</u>'s requirement that international law
norms must be "accepted by the civilized world" and "defined with a
specificity comparable to" the eighteenth-century norms recognized by
Blackstone, <u>Sosa</u>, 542 U.S. at 725, the Court concludes that it is
appropriate to adopt the "purpose" *mens rea* standard rather than the

---

[36] In any event, as discussed throughout this Order, the Court
concludes that, even if the Rome Statute is not determinative, only
the "purpose" standard has achieved the requisite universal consensus
to satisfy <u>Sosa</u>.

1  "knowledge" standard.  See Presbyterian Church of Sudan, 582 F.3d at

2  259; Khulumani, 504 F.3d at 277 (Katzmann, J., concurring), 332-33

3  (Korman, J., concurring in relevant part).

4          **3.   SUMMARY OF AIDING AND ABETTING STANDARD**

5          In sum, the Court concludes that the "core" definition of aiding

6  and abetting under international law requires the following.  A person

7  is legally responsible for aiding and abetting a principal's wrongful

8  act when the aider and abettor (1) carries out acts that have a

9  substantial effect on the perpetration of a specific crime, and (2)

10 acts with the specific intent (i.e., for the purpose) of substantially

11 assisting the commission of that crime.  See Presbyterian Church of

12 Sudan, 582 F.3d at 259 (articulating *mens rea* standard); Blagojevic, at

13 ¶ 127 (articulating *actus reus standard*).  The Court concludes that the

14 relevant international caselaw, as construed in accordance with Sosa,

15 supports this articulation of the aiding and abetting standard.

16     **D.   NUREMBERG-ERA ILLUSTRATIONS OF AIDING AND ABETTING UNDER**

17          **INTERNATIONAL LAW**

18          The seminal cases discussing aiding and abetting liability were

19 issued following the Second World War by military tribunals operating

20 under the rules of the London Charter of the International Military

21 Tribunal at Nuremberg.[37]

22 _____

23 [37] These cases were decided by British and American military tribunals
   and by British, German, and French courts operating under the
24 standards set forth in the London Charter (which was incorporated by
   reference into Control Council Law Number 10, which established and
25 governed the tribunals).  See Flick v. Johnson, 174 F.2d 983, 984-86
   (D.C. Cir. 1949) (dismissing a petition for habeas corpus and holding
26 that the Control Council military tribunals were international rather
   than national judicial bodies); United States v. Flick ("The Flick
27 Case"), 6 T.W.C. at 1198 ("The Tribunal . . . is an international
   tribunal established by the International Control Council, the high
28

The most important illustration of aiding and abetting liability involves the prosecution of a bank officer named Karl Rasche in <u>United States v. von Weizsaecker et al.</u> ("<u>The Ministries Case</u>"), 14 T.W.C. at 308, 621-22.[38]  The three-judge military tribunal declined to impose criminal liability with respect to the bank's loans of "very large sums of money" to various SS enterprises that used slave labor and engaged in the forced migration of non-German populations.  <u>Id.</u> at 621.  The court held that it was insufficient that the defendant knew that the loan would be used for criminal purposes by the SS enterprises.  In full, the court held:

> The defendant is a banker and businessman of long experience and is possessed of a keen and active mind. Bankers do not approve or make loans in the number and amount made by the Dresdner Bank without ascertaining, having, or obtaining information or knowledge as to the purpose for which the loan is sought, and how it is to be used. It is inconceivable to us that the defendant did not possess that knowledge, and we find that he did.[39]
> The real question is, is it a crime to make a loan, knowing or having good reason to believe that the borrower will use the

---

legislative branch of the four Allied Powers now controlling Germany (Control Council Law No. 10, 20 Dec. 1945). . . .  The Tribunal administers international law.  It is not bound by the general statutes of the United States.").

[38] It is unclear whether this case addresses the *mens rea* element of aiding and abetting, see <u>Presbyterian Church of Sudan</u>, 582 F.3d at 259; <u>Khulumani</u>, 504 F.3d at 276 (Katzmann, J., concurring), 292-93 (Korman, J., concurring); or the *actus reus* element, see <u>In re South African Apartheid Litig.</u>, 617 F. Supp. 2d 228, 258, 260 (S.D.N.Y. 2009).  Regardless of how the case is categorized, its holding is plainly relevant with respect to the **facts** of the present case, particularly when taken in conjunction with similar Nuremberg-era precedents.

[39] In a separate part of the opinion which held Rasche liable as a member of the SS, the tribunal concluded that Rasche "knew of the Germanization and resettlement program, knew that it was accomplished by forcible evacuation of the native populations and the settlement of ethnic Germans on the farms and homes confiscated from their former owners, and knew it was one of the SS programs and projects." <u>Ministries Case</u>, 14 T.W.C. at 863.

funds in financing enterprises which are employed in using labor
in violation of either national or international law? Does he
stand in any different position than one who sells supplies or raw
materials to a builder building a house, knowing that the
structure will be used for an unlawful purpose? A bank sells money
or credit in the same manner as the merchandiser of any other
commodity. It does not become a partner in enterprise, and the
interest charged is merely the gross profit which the bank
realizes from the transaction, out of which it must deduct its
business costs, and from which it hopes to realize a net profit.
Loans or sale of commodities to be used in an unlawful enterprise
may well be condemned from a moral standpoint and reflect no
credit on the part of the lender or seller in either case, but the
transaction can hardly be said to be a crime. Our duty is to try
and punish those guilty of violating international law, and we are
not prepared to state that such loans constitute a violation of
that law, nor has our attention been drawn to any ruling to the
contrary.

Ministries Case, 14 T.W.C. at 622.  The court accordingly acquitted

Rasche on the charge of aiding and abetting the SS's use of slave labor

and forced migration.  Id.  The court applied an identical analysis in

acquitting Rasche on an additional count of aiding and abetting

spoliation (plundering) activities by financing the German government's

"spoliation agencies."  Id. at 784.

Rasche's case must be contrasted with the The Flick Case, 6 T.W.C.

at 1187.  The defendants Flick and Steinbrinck were charged with being

"members of the Keppler Circle or Friends of Himmler, [and] with

knowledge of its criminal activities, contributed large sums to the

financing of" the SS.  Id. at 1190.  Both Flick and Steinbrinck

gratuitously donated 100,000 Reichsmarks annually to a "cultural" fund

headed by Himmler (the head of the SS).  Id. at 1219-20.  The amount

was "a substantial contribution" - "even [for] a wealthy man" - and

plainly could have not have been used by Himmler solely for cultural

purposes.  Id. at 1220.  The court explained that although Flick and

Steinbrinck might have plausibly argued that they were initially

ignorant of the true purposes of their donations, they continued making

donations well after "the criminal character of the SS . . . must have been known" to them.  Id. at 1220.  The court held that Flick and Steinbrinck had effectively given Himmler "a blank check," by which "[h]is criminal organization was maintained."  Id. at 1221.  When a donor provides extensive sums of money to a criminal organization without asking for anything in return, it is "immaterial whether [the money] was spent on salaries or for lethal gas."  Id.  The donor becomes guilty of aiding and abetting the organization's criminal acts: "One who knowingly by his influence and money contributes to the support [of a criminal organization] must, under settled legal principles, be deemed to be, if not a principal, certainly an accessory to such crimes."  Id. at 1217.  Yet, at the same time, the tribunal also found that Flick and Steinbrinck had not joined in the Nazi Party's ideologies: "Defendants did not approve nor do they now condone the atrocities of the SS."  Id. at 1222.  The defendants "were not pronouncedly anti-Jewish," and in fact "[e]ach of them helped a number of Jewish friends to obtain funds with which to emigrate."  Id.  The tribunal found it "unthinkable that Steinbrinck, a V-boat commander who risked his life and those of his crew to save survivors of a ship which he had sunk, would willingly be a party to the slaughter of thousands of defenseless persons."  Id.  Similarly Flick "knew in advance of the plot on Hitler's life in July 1944, and sheltered one of the conspirators."  Id.  It thus cannot reasonably be argued that the defendants made their contributions for the **purpose** of assisting the SS's acts.

The distinctions between Flick and Steinbrinck in The Flick Case and Rasche in The Ministries Case are narrow, but important.  Neither

Flick nor Steinbrinck acted with the **purpose** of furthering the Nazi cause; indeed, the tribunal explicitly concluded that neither defendant shared the German government's genocidal intent.  However, by gratuitously donating money to the Nazi party with full knowledge of the fact that the money would be used to further the German government's atrocities, they were found guilty as accessories to those atrocities.  In The Ministries Case, the banker Rasche also acted with full knowledge that his loans would be used to benefit enterprises that used slave-labor and engaged in forced migrations.  14 T.W.C. at 622, 863.  But Rasche was acquitted.  Regardless of whether the holdings are categorized as turning on the defendant's *actus reus* or the *mens rea*,[40] the ultimate conclusion is clear: ordinary commercial transaction, without more, do not violate international law.  In one case, the defendant provided payments without asking for anything in return; in the other case, the defendant engaged in commercial transactions by lending money.  One is guilty of violating international law, and the other is not.

A similar distinction can be found by contrasting another pair of Nuremberg-era precedents, the Zyklon B Case, *in* 1 Law Reports of Trials of War Criminals 93 (1947), and The I.G. Farben Case, 8 T.W.C. 1081. In the Zyklon B Case, defendant Bruno Tesch and a colleague were engaged in the business of providing gasses and equipment for use in exterminating lice.  See 1 Law Reports of Trials of War Criminals at 94.  Tesch and his colleague provided the German government with

---

[40] As noted in footnote 38 supra, the Second Circuit in Khulumani and Presbyterian Church of Sudan has characterized these cases as reflecting a "purpose" *mens rea* standard, whereas the District Court in In re South African Apartheid has characterized them as reflecting the "substantial effect" *actus reus* standard.

"expert technicians to carry out . . . gassing operations" as well as training to the German government on using the gasses.  Id.  They did not physically supply the gas itself, but were exclusive sales agents for the gas in the relevant region of Germany.  Id.  The evidence showed not only that Tesch provided the gas, the training, and the tools for using the gas to carry out genocide; the evidence also showed that Tesch had suggested to the German government that the Germans use the gas in the first place.  Id. at 95.  Following the close of evidence, the prosecutor argued that "[t]he essential question was whether the accused knew of the purpose to which their gas was being put," because "by supplying gas, knowing that it was to be used for murder, the [] accused had made themselves accessories before the fact to that murder."  Id. at 100-01.  Both Tesch and his colleague (who was personally responsible for operating the business for approximately 200 days a year while Tesch was traveling) were convicted of being accessories to murder.  Id. at 102.

In contrast, in The I.G. Farben Case, various executives and directors of I.G. Farben were charged with supplying Zyklon B gas to the Germans for use in the concentration camps.  8 T.W.C. at 1168.  The defendants were directors of a company called "Degesch," which was 45% owned by I.G. Farben and which was one of two companies that manufactured and sold the Zyklon B gas.  Id. at 1168-69.  The tribunal explained that the evidence showed that the directors were not closely involved in the management of the company, and also that the German government's use of the Zyklon B gas in the concentration camps was kept top secret.  Id.  The court summarized the relevant considerations:

The proof is quite convincing that large quantities of Cyclon-B were supplied to the SS by Degesch and that it was used in the mass extermination of inmates of concentration camps, including Auschwitz. But neither the volume of production nor the fact that large shipments were destined to concentration camps would alone be sufficient to lead us to conclude that those who knew of such facts must also have had knowledge of the criminal purposes to which this substance was being put. Any such conclusion is refuted by the well-known need for insecticides wherever large numbers of displaced persons, brought in from widely scattered regions, are confined in congested quarters lacking adequate sanitary facilities.

Id. at 1169.

Accordingly, the I.G. Farben court held that the defendants, unlike Bruno Tesch in the Zyklon B Case, were not guilty as accessories to the gassing of the victims in the concentration camps.  Id.  In one case, the defendants had provided the tools and the training on using those tools for illegal purposes; in the other case, the defendants provided only the tools and were unaware of the illegal acts being done.

Having set forth these basic contours of aiding and abetting liability, it is useful to turn to the cases that Plaintiffs argue are most factually analogous, given that they involve businesspeople who directly benefitted from the use of forced labor.

In The Flick Case, defendant Flick, in addition to being convicted for contributing to Himmler and the SS, was also convicted of "participation in the slave-labor program of the Third Reich" because he acted with "knowledge and approval" of his co-defendant Weiss's decision to order additional freight-car production from a facility that utilized slave-labor.  6 T.W.C. at 1190, 1198.  Plaintiffs argue that this conviction resulted from aiding and abetting or accessorial liability.  However, Plaintiffs fail to note that Flick was the **controlling owner** of an industrial empire that included coal and iron

mining companies, steel-production companies, and finished-goods
companies that made machinery out of the raw steel produced by the
other companies.  Id. at 1192.  The indictment charged that Flick and
his co-defendants "sought and utilized . . . slave labor program [by
using] tens of thousands of slave laborers, including concentration
camp inmates and prisoners of war, in the industrial enterprises and
establishments owned, controlled, or influenced by them."  Id. at 1194
(addition in original).  The indictment further charged that Flick
"participated in the formulation and execution of such slave-labor
program."  Id.

        The tribunal held that Flick and the co-defendants were not guilty
of most of the charged offenses because "the slave-labor program had
its origin in Reich governmental circles and was a governmental
program, and . . . the defendants had no part in creating or launching
this program."  Id. at 1196.  The German government had **required** the
companies to employ "voluntary and involuntary foreign civilian
workers, prisoners of war and concentration camp inmates," and "the
defendants had no actual control of the administration of such
program."  Id.  The government allocated the involuntary labor and set
production quotas for the mines and factories.  Id. at 1197.
Accordingly, the tribunal acquitted the defendants on the basis of
necessity and duress because they had acted under government
compulsion.  Id. at 1201-02.

        There was, however, a single exception to the acquittal: defendant
Weiss had actively solicited an "increased freight car production
quota" and "took an active and leading part in securing an allocation
of Russian prisoners of war for use in the work of manufacturing such

increased quotas." Id. at 1198.  This decision was "initiated not in
governmental circles but in the plant management . . . for the purpose
of keeping the plant as near capacity production as possible." Id. at
1202.  The necessary effect of the increased production quota was to
lead directly to "the procurement of a large number of Russian
prisoners of war" to carry out the production.  Id.  The tribunal
accordingly found Weiss guilty of participation in the unlawful
employment of slave labor.

The tribunal also found Flick guilty for the same acts because
"[t]he active steps taken by Weiss [were made] with the knowledge and
approval of Flick." Id. at 1202; see also id. at 1198 (noting "the
active participation of defendant Weiss, with the knowledge and
approval of defendant Flick, in the solicitation of increased freight
car production quota").  It must be emphasized that Flick was the
controlling owner of the entire industrial enterprise, and Weiss was
Flick's nephew and chief assistant.  Id. at 1192-93.  Given the close
relationship between Flick and the direct perpetrator Weiss, and given
Flick's central role in the industrial enterprise that directly
employed the slave labor, the case is better viewed as imposing direct
liability on Flick as a personal participant in the employment of slave
labor.  See, e.g., In re Agent Orange Product Liability Litig., 373 F.
Supp. 2d 7, 98 (E.D.N.Y. 2005) ("Flick was found guilty of charges
reflecting his commercial activities and those of his corporations.").
Alternatively, Flick's liability could viewed as an example of the
operation of respondeat superior liability under agency principles, or
command responsibility, or, perhaps, aiding and abetting liability of
the type described in The Einsatzgruppen Case, where a top-level

commanding authority fails to prevent a known violation.  <u>See</u> <u>Einsatzgruppen Case</u>, 4 T.W.C. at 572; <u>see also</u> <u>Delalic</u>, 1998 WL 34310017, at ¶ 360 ("Noting th[e] absence of explicit reasoning [in <u>Flick</u>], the United Nations War Crimes Commission has commented that it 'seems clear' that the tribunal's finding of guilt was based on an application of the responsibility of a superior for the acts of his inferiors which he has a duty to prevent.") (citing <u>Trial of Friedrich Flick et al.</u>, <i>in</i> 9 <u>Law Reports of Trials of War Criminals</u> 54 (1949)); <u>accord</u> <u>Hilao v. Estate of Marcos</u>, 103 F.3d 767, 777-78 (9th Cir. 1996) (discussing principles of command responsibility).

The same conclusion may be drawn from the <u>I.G. Farben Case</u>'s discussion of slave labor (which is also relied upon by Plaintiffs). The I.G. Farben company had undertaken a construction project in Auschwitz to build a rubber factory.  <u>I.G. Farben Case</u>, 8 T.W.C. 1081, 1180-84.  Defendant Krauch was the Plenipotentiary General for Special Questions of Chemical Production, and was responsible for "pass[ing] upon the applications for workers made by the individual plants of the chemical industry."  <u>Id.</u> at 1187.  The tribunal held that, although Krauch was not responsible for certain wrongful acts in which he was not personally involved,

> he did, and we think knowingly, participate in the allocation of forced labor to Auschwitz and other places where such labor was utilized within the chemical field. . . .  In view of what he clearly must have known about the procurement of forced labor and the part he voluntarily played in its distribution and allocation, his activities were such that they impel us to hold that he was a willing participant in the crime of enslavement.

<u>Id.</u> at 1189.  Plaintiffs argue that Krauch's case illustrates the scope of aiding and abetting liability under international law, and that the tribunal's discussion reflects a "knowledge" <i>mens rea</i> standard.

However, the tribunal's decision plainly rests on the fact that Krauch "knowingly[] **participate[d]** in the allocation of forced labor to Auschwitz," and "was a willing **participant** in the crime of enslavement." Id. at 1189 (emphasis added). The case is plainly not an example of aiding and abetting liability.

These same observations regarding direct personal involvement apply equally to the third major Nuremberg-era case involving German industrialists. In United States v. Krupp ("The Krupp Case"), the tribunal convicted various directors and officers of the Krupp corporation for using forced labor in their factories. The tribunal cited evidence such as a letter from the Board of Directors to the German Army High Command stating that "we are . . . very anxious to employ Russian prisoners of war in the very near future, [and] we should be grateful if you would give us your opinion on this matter as soon as possible." Krupp, 9 T.W.C. at 1439. In this and other instances, "the Krupp firm had manifested not only its willingness but its ardent desire to employ forced labor." Id. at 1440. All but three of the defendants had "participated in the establishment and maintenance" of a particularly brutal forced labor camp at Dechenschule. Id. at 1400-02. Of the three who were not involved with Dechenschule, one (Pfirsch) was acquitted of forced labor charges because he was not involved in any of the company's forced labor activities. See generally id. at 1402-49 (court's factual summary and legal analysis is silent as to Pfirsch). One of the other three (Loeser) was found guilty because he had participated directly in the creation of a forced-labor factory at Auschwitz. Id. at 1414, 1449. The third (Korschan) was found guilty because he had directly

supervised a large contingent of Russian laborers and had signed a letter proposing the use of concentration-camp labor to increase the production of armaments toward the end of the war.  Id. at 1405, 1418-19, 1449.  The court accordingly rejected the Krupp employees' necessity defense and found all but one of them (Pfirsch) guilty of employing forced labor in their business.  Id. at 1441-49.

Thus, like the Krauch case, Krupp does not provide any discussion of secondary liability for the underlying violations.  Contrary to Plaintiffs' characterization, the defendants in these two cases were direct participants in the illegal acts, and these cases are inapposite to the present case.

**E.   ILLUSTRATIONS UNDER THE ALIEN TORT STATUTE**[41]

These foundational principles of aiding and abetting liability are illustrated in the Second Circuit's recent decision in Presbyterian Church of Sudan v. Talisman Energy, Inc., 582 F.3d 244 (2d Cir. 2009). The Presbyterian Church of Sudan court held on summary judgment that a Canadian energy firm had not purposefully aided and abetted the Sudanese government in committing crimes against humanity.  The court examined the evidence and determined that there was no reasonable inference that the defendants acted with the **purpose** of furthering the

---

[41] The Court notes that the present Order largely avoids discussing international-law precedents from the International Criminal Tribunals for the Former Yugoslavia and Rwanda.  The Court has examined these cases and finds that they are factually inapposite because they discuss aiding and abetting liability in the context of civil war and military control of the population.  None of the International Criminal Tribunal cases offer analogous discussions of aiding and abetting liability with respect to business transactions.
For a thorough discussion of the limitations of the International Criminal Tribunal cases, see Khulumani, 504 F.3d at 334-37 (Korman, J., concurring).

Sudanese government's policies of clearing out the disfavored ethnic groups.  Specifically, the defendants' actions included the following: "(1) upgrading the Heglig and Unity airstrips; (2) designating areas 'south of the river' in Block 4 for oil exploration; (3) providing financial assistance to the Government through the payment of royalties; and (4) giving general logistical support to the Sudanese military."  Id. at 261 (quoting Presbyterian Church of Sudan, 453 F. Supp. 2d at 671-72) (alterations omitted).

The first issue involved the assistance with building roads and airstrips despite knowing that this infrastructure might be used by the government to conduct attacks on civilians.  The court recognized that the defendants "had a legitimate need to rely on the [Sudanese] military for defense" because of the unrest in the region; given this legitimate need, the evidence that the defendant was "coordinating with the military supports no inference of a purpose to aid atrocities." Id. at 262.  As for the second sets of acts – designating certain areas for oil exploration — there was no evidence that the oil exploration even occurred or that any international law violations took place.  Id. With respect to royalty payments to the government, the court explained that "[t]he royalties paid by [defendant] may have assisted the Government in its abuses, as it may have assisted any other activity the Government wanted to pursue. But there is no evidence that [defendants] acted with the purpose that the royalty payments be used for human rights abuses."  Id.  Finally, the act of providing fuel to the military was not criminal because "there is no showing that Talisman was involved in such routine day-to-day [defendant] operations as refueling aircraft. Second, there is no evidence that [defendant's]

1   workers provided fuel for the purpose of facilitating attacks on

2   civilians; to the contrary, an e-mail from a Talisman employee to his

3   supervisor, which plaintiffs use to show that the military refueled at

4   a [defendant] airstrip, expresses anger and frustration at the military

5   using the fuel." Id. at 262-63.  In short, none of the purported acts

6   of aiding and abetting were supported by the necessary "purpose" mens

7   rea.

8        Notably, the court stated that **something more** than mere knowledge

9   and assistance are required to hold commercial actors liable for third

10  parties' violations of international law.  The court explained:

11          There is evidence that southern Sudanese were subjected to attacks
            by the Government, that those attacks facilitated the oil
12          enterprise, and that the Government's stream of oil revenue
            enhanced the military capabilities used to persecute its enemies.
13          But if ATS liability could be established by knowledge of those
            abuses coupled only with such commercial activities as resource
14          development, the statute would act as a vehicle for private
            parties to impose embargos or international sanctions through
15          civil actions in United States courts. Such measures are not the
            province of private parties but are, instead, properly reserved to
16          governments and multinational organizations.

17  Id. at 264.

18       The Presbyterian Church of Sudan court's ultimate conclusion is in

19  full accord with the trend identified supra with respect to the

20  Nuremberg-era cases involving German industrialists.  When a business

21  engages in a commercial quid pro quo — for example, by making a loan to

22  a third party — it is insufficient to show merely that the business

23  person knows that the transaction will somehow facilitate the third

24  party's wrongful acts.  See The Ministries Case, 14 T.W.C. at 621-22.

25  Rather, the business person must participate more fully in the wrongful

26  acts - most obviously, in the cases involving the primary liability of

27  the industrialists who personally participated in planning and using of

28

slave labor.  See, e.g., Krupp, 9 T.W.C. at 1439-49; The I.G. Farben
Case, 8 T.W.C. at 1189; The Flick Case, 6 T.W.C. at 1190-93.  Or,
alternatively, the business person must be acting in a non-commercial,
non-mutually-beneficial manner, as with the banker in The Flick Case
who gratuitously funded the SS's criminal activities, 6 T.W.C. at 1219-
20, or the chemical-company employees in the Zyklon B Case who provided
the gas, tools, and specific training that facilitated the Germans'
genocidal acts.  Zyklon B Case, in 1 Law Reports of Trials of War
Criminals, at 95, 100-01.

This conclusion is supported by the domestic caselaw applying the
Alien Tort Statute.  In Corrie v. Caterpillar, Inc., 403 F. Supp. 2d
1019, (W.D. Wash. 2005), aff'd on other grounds, 503 F.3d 974, 977 (9th
Cir. 2007) (holding that case presented nonjusticiable political
question), the district court held that a bulldozer manufacturer could
not be held liable for aiding and abetting the Israeli military in
demolishing residences and causing deaths and injuries to the
residents.  The court explained that even if the defendant "knew or
should have known" (as the plaintiff conclusorily alleged in the pre-
Twombly era, see id. at 1023) that the bulldozers would be used to
commit those illegal acts, "[o]ne who merely sells goods to a buyer is
not an aider and abettor of crimes that the buyer might commit, even if
the seller knows that the buyer is likely to use the goods unlawfully,
because the seller does not share the specific intent to further the
buyer's venture."  Id. at 1027 (citing United States v. Blankenship,
970 F.2d 283, 285-87 (7th Cir. 1992) ("a supplier joins a venture only
if his fortunes rise or fall with the venture's, so that he gains by
its success")).

1    A relevant contrast to <u>Presbyterian Church of Sudan</u> and <u>Corrie</u> may
2    be found in the allegations against automakers Daimler, Ford, and
3    General Motors in <u>In re South African Apartheid Litig.</u>, 617 F. Supp. 2d
4    228 (S.D.N.Y. 2009), *on remand from* <u>Khulumani</u>, 504 F.3d 254.  The
5    plaintiffs in that case alleged that the automakers "aided and abetted
6    extrajudicial killing through the production and sale of specialized
7    military equipment."  <u>Id.</u> at 264; <u>see also</u> <u>id.</u> at 266-67.  The
8    defendants were not selling ordinary vehicles to the South African
9    government; they were selling "heavy trucks, armored personnel
10   carriers, and other specialized vehicles," including "military
11   vehicles."  <u>Id.</u> at 264, 266.  "These vehicles were the means by which
12   security forces carried out attacks on protesting civilians and other
13   antiapartheid activists."  <u>Id.</u> at 264.  The plaintiffs also alleged
14   that the automakers both knew of and affirmatively expressed their
15   support for the South African government's illegal activities.  <u>Id.</u>
16   Accordingly, the court held that the automakers could be held liable
17   for selling these military-type products to the South African
18   government, thereby aiding and abetting the government's atrocities.
19   On the other hand, the court held that the automakers could not be
20   liable for selling "passenger vehicles" and mass-market light trucks to
21   the government, because the "[t]he sale of cars and trucks without
22   military customization or similar features that link them to an illegal
23   use does not meet the *actus reus* requirement of aiding and abetting a
24   violation of the law of nations."  <u>Id.</u> at 267.
25       The <u>South African Apartheid</u> plaintiffs introduced similar
26   allegations with respect to computer manufacturer IBM.  The plaintiffs
27   alleged that IBM provided computers to the South African regime and
28

64

that the computers were used to further the regime's policies of

apartheid because the computers allowed the regime to create a registry

of individuals in order to relocate them and change their citizenship.

Id. at 265.   Importantly, the plaintiffs alleged that "IBM employees

also assisted in developing computer software and computer support

specifically designed to produce identity documents and effectuate

denationalization."   Id. at 265; see also id. at 268.   These

"customized computerized systems were indispensable to the organization

and implementation of a system of geographic segregation and racial

discrimination in a nation of millions."   Id. at 265.[42]

The distinction between Corrie and In re South African Apartheid

is instructive.   In one case (Corrie), a manufacturer sold its ordinary

goods to a foreign government and the foreign government, with the

_____

[42] The plaintiffs brought additional claims against the automakers and
also brought claims against an arms manufacturer whose weapons were
used by the South African government.

     The plaintiffs alleged that the automakers "provided information
about anti-apartheid activists to the South African Security Forces,
facilitated arrests, provided information to be used by
interrogators, and even participated in interrogations."   In re South
African Apartheid, 617 F. Supp. 2d at 264.   These allegations were
clearly analogous to defendant Ohlendorf's case in The Einsatzgruppen
Case, 4 T.W.C. at 569, in which the tribunal found the "defendant
guilty of aiding and abetting Nazi war crimes by turning over a list
of individuals who he knew 'would be executed when found.'"   In re
South African Apartheid, 617 F. Supp. 2d at 264 n.192 (quoting The
Einsatzgruppen Case, 4 T.W.C. at 569).

     In obiter dicta, the district court addressed those allegations
against the arms manufacturer despite the fact that the arms
manufacturer had not brought a motion to dismiss.   Id. at 269-70 &
n.231.   The court suggested that the allegations sufficiently stated
aiding and abetting claims with respect to the arms manufacturer's
provision of equipment used to commit extrajudicial killings and
enforcing apartheid.   Id. at 270.   The court suggested that the
allegations were insufficient with respect to acts of torture,
unlawful detention, and cruel, inhuman, and degrading treatment,
apparently because the complaint did not allege that the weapons were
used to perpetrate those crimes.   See id.

manufacturer's knowledge, used the goods to commit alleged atrocities. In the other case (In re South African Apartheid), manufacturers sold custom-made goods to a foreign government with the knowledge that those goods were an essential element of the foreign government's wrongful conduct.  The manufacturers in South African Apartheid affirmatively evidenced their support for the government's conduct, either implicitly by intentionally creating custom equipment or explicitly by expressing their support for the government.  As reflected in this comparison, a plaintiff must allege something more than ordinary commercial transactions in order to state a claim for aiding and abetting human rights violations.  Indeed, consistent with the generally aiding and abetting standard articulated supra, a plaintiff must allege that the defendant's conduct had a substantial effect on the principal's **criminal acts**.  Mere assistance to the principal is insufficient.[43]

Another example can be found in Almog v. Arab Bank, PLC, 471 F. Supp. 2d 257 (E.D.N.Y. 2007).  There, the plaintiffs sued the defendant bank for aiding and abetting various terrorist activities by Hamas and other radical groups in violation of international law.  The plaintiffs alleged that the defendant bank knew of Hamas's terrorist activities, knew that the bank accounts were being used to fund the terrorist activities directly, and even "solicited and collected funds for" organizations that were known to be fronts for Hamas.  Id. at 290.  The plaintiffs also alleged that the bank was directly involved with

---

[43] The Court does not intend to suggest that the South African Apartheid decision was correctly decided.  It is unclear to this Court whether (to take one example) an auto-manufacturer's act of selling military vehicles constitutes aiding and abetting human rights violations under established and well-defined international law.

Hamas's creation of bank accounts to provide for the families of
suicide bombers.  Id. at 291.  The bank allegedly knew about the nature
of the accounts, which "facilitated and provided an incentive for the
suicide bombings and other murderous attacks," and the bank both
maintained the accounts and "consulted with" a Hamas-related
organization "to finalize the lists of beneficiaries" of the funds.
Id. at 291-92.  In light of these allegations, the court held that the
defendant bank did not "merely provide[] routine banking services" that
benefitted the terrorist organization.  Id. at 291.  Rather, the bank
"active[ly] participat[ed]" in the terrorist organization's activities.
Id. at 292; see also Lev v. Arab Bank, PLC, No. 08 CV 3251(NG)(VVP),
2010 WL 623636, at *2 (E.D.N.Y. Jan. 29, 2010) (holding that
Presbyterian Church of Sudan's "purpose" mens rea standard was
satisfied by the allegations in Almoq because "Plaintiffs' plausible
factual allegations here permit the reasonable inference that Arab Bank
was not merely the indifferent provider of 'routine banking services'
to terrorist organizations, but instead purposefully aided their
violations of international law").

    A useful factual contrast to the Almoq case can be found in part
of the South African Apartheid case.  In South African Apartheid, the
plaintiffs alleged that a pair of banks had provided loans to the South
African government and purchased "South African defense forces bonds."
617 F. Supp. 2d at 269.  The court, relying heavily on the Nuremberg-
era Ministries Case in which the tribunal acquitted the banker Karl
Rasche, held that "supplying a violator of the law of nations with
funds - even funds that could not have been obtained but for those
loans - is not sufficiently connected to the primary violation to

fulfill the actus reus requirement of aiding and abetting a violation
of the law of nations." Id.

As a final pertinent example under the Alien Tort Statute, the
Ninth Circuit has analyzed a specific intent *mens rea* standard in
Abagninin v. AMVAC Chemical Corp., 545 F.3d 733 (9th Cir. 2008).[44]   The
plaintiffs' allegations in Abagninin related to the defendants' alleged
genocide through their use of agricultural pesticides that caused male
sterility in villages in the Ivory Coast. Id. at 735-36.   As defined
in international law, genocide requires a showing of "specific intent"
(which appears analogous to the "purpose" *mens rea* in the aiding and
abetting context) to **achieve the particular wrongful result** — namely,
to destroy a particular national or ethnic group as such. Id. at 739-
40.   The court specifically rejected a "knowledge" or general intent
standard, which would have required a showing of the defendant's
"awareness that a consequence will occur in the ordinary course of
events. Id. at 738.   Instead, the court required plaintiff to allege
that defendants intended to cause the particular (genocidal) harm.
Even though plaintiff alleged that the defendant knew of the likelihood
that the chemicals caused this particular harm, the court found
significant the fact that the plaintiff "fail[ed] to allege that [the
defendant] intended to harm him through the use of chemicals." Id. at
740.   The court refused to infer from the plaintiff's allegations of
**knowledge**, and rejected the plaintiff's conclusory statements that the

---

[44] The Abagninin case involved allegations that the defendant **directly**
participated in the crime of genocide.   The case is relevant because
of the court's discussion of the specific intent standard under the
law of genocide, which is generally analogous to the "purpose" or
"specific intent" *mens rea* standard under the law of aiding and
abetting.

defendant "acted with intent."  Id.  Finally, although one of the defendant's employees allegedly stated "[f]rom what I hear, they could use a little birth control down there," the court refused to attribute this statement to the corporate employer and also determined that the statement was not directed at the Ivory Coast (as is required to show genocidal intent with respect to Ivorians).  Id.

## VII. DISCUSSION REGARDING AIDING AND ABETTING ALLEGATIONS

### A.   BACKGROUND

Plaintiffs describe their allegations as encompassing three types of activities: financial assistance; provision of farming supplies, technical assistance, and training; and failure to exercise economic leverage.

Defendants break down the alleged conduct into five groups: financial assistance; providing farming supplies and technical farming assistance; providing training in labor practices; failing to exercise economic leverage; and lobbying the United States government to avoid a mandatory labeling scheme.

Because Plaintiffs bear the burden of pleading sufficient "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," the Court will adopt Plaintiffs' preferred approach.  See Ashcroft v. Iqbal, 556 U.S. __, 129 S.Ct. 1937, 1949 (2009).  As will be shown, the First Amended Complaint fails to allege that Defendants' conduct was "specifically directed to assist [or] encourage . . . the perpetration of a certain specific crime," and "ha[d] a substantial effect of the perpetration of the crime."  See Blagojevic (ICTY Appeals Chamber), at ¶ 127.

Additionally, the First Amended Complaint fails to allege that
Defendants acted with the "purpose" of facilitating the Ivorian farm
owners' wrongful acts.  See <u>Presbyterian Church of Sudan</u>, 582 F.3d at
259.[45]

    **B.   DISCUSSION OF ACTUS REUS**

    Plaintiffs assert that Defendants' conduct was "not only
substantial, it was essential" to the existence of child slavery in
Ivorian cocoa farming.  (8/6/09 Opp. at 2.)  Plaintiffs' fundamental
premise is that Defendants were not engaged in ordinary commercial
transactions; rather, Plaintiffs emphasize that Defendants "maintain[]
exclusive supplier/buyer relationships with local farms and/or farmer
cooperatives in Cote d'Ivoire," and that these exclusive relationships
allow Defendants "to dictate the terms by which such farms produce and
supply cocoa to them, including specifically the labor conditions under
which the beans are produced." (FAC ¶ 33.)  Plaintiffs further contend
that "Defendants, because of their economic leverage in the region and
exclusive supplier/buyer agreements[,] each had the ability to control
and/or limit the use of forced child labor by the supplier farms and/or
farmer cooperatives from which they purchased their cocoa beans." (FAC
¶ 48.)

    In support of their claims, Plaintiffs detail three types of
conduct: financial assistance; provision of farming supplies, technical
assistance, and training; and failure to exercise economic leverage.
The Court addresses each form of assistance in turn.

///

---

[45] And even if the Court were to apply the "knowledge" *mens rea*
standard, Plaintiffs' allegations fail to satisfy the applicable
standard as set forth <u>infra</u>.

### 1.   FINANCIAL ASSISTANCE

Plaintiffs allege that Defendants "provide ongoing financial
support, including advance payments and personal spending money to
maintain the farmers' and/or the cooperatives' loyalty as exclusive
suppliers." (FAC ¶ 34.) Plaintiffs argue that Defendants' financial
support "provide[d] the financial means . . . to commit international
human rights violations" and provided the "incentive for these farmers
to employ slave-labor." (8/6/09 Opp. at 14-15.)

As is repeatedly illustrated in the caselaw discussed <u>supra</u>,
merely "supplying a violator of the law of nations with funds" as part
of a commercial transaction, without more, cannot constitute aiding and
abetting a violation of international law.  <u>In re South African
Apartheid</u>, 617 F. Supp. 2d at 269.  The central example of this
principle is provided in the discussion of banker Karl Rasche in <u>The
Ministries Case</u>, 14 T.W.C. at 621-22.  Rasche provided a loan of "very
large sums of money" to enterprises that used slave labor, but was
acquitted of aiding and abetting the enterprises' wrongdoing.  <u>Id.</u> at
621.  Likewise, the banks in <u>South African Apartheid</u> provided loans to
the South African government and purchased government bonds.  617 F.
Supp. 2d at 269.  The act of providing financing, without more, does
not satisfy the *actus reus* requirement of aiding and abetting under
international law.

On the other hand, if defendant engages in additional assistance
beyond financing, or engages in financing that is gratuitous or
unrelated to any commercial purpose, the *actus reus* element has been
satisfied.  So, for example, the bank in <u>Almog v. Arab Bank</u> did not
just hold and transfer funds on behalf of the terrorist organization

Hamas; rather, the bank took the extra step of "solicit[ing] and
collect[ing]" those funds for Hamas.  Almoq, 471 F. Supp. 2d at 290.
As another example, the industrials Flick and Steinbrinck in The Flick
Case did not provide hundreds of thousands of Reichsmarks to Himmler
and the SS as part of a mutually beneficial commercial transaction;
rather, the funds were donated gratuitously, and served as "a blank
check" that ensured the "maintain[ence]" of the criminal organization.
The Flick Case, 6 T.W.C. at 1220-21.

> It is (or should be) undisputed that simply doing business
> with a state or individual who violates the law of nations is
> insufficient to create liability under customary international
> law. International law does not impose liability for declining to
> boycott a pariah state or to shun a war criminal. . . .
>        Money [as in The Ministries Case] is a fungible resource, as
> are building materials [which were also mentioned in The
> Ministries Case]. However, poison gas [as in the Zyklon B Case] is
> a killing agent, the means by which a violation of the law of
> nations was committed. The provision of goods specifically
> designed to kill, to inflict pain, or to cause other injuries
> resulting from violations of customary international law bear a
> closer causal connection to the principal crime than the sale of
> raw materials or the provision of loans.  Training in a precise
> criminal use only further supports the importance of this link.
> Therefore, in the context of commercial services, provision of the
> means by which a violation of the law is carried out is sufficient
> to meet the actus reus requirement of aiding and abetting
> liability under customary international law.

In re South African Apartheid, 617 F. Supp. 2d at 257-59 (citing The
Ministries Case, 14 T.W.C. at 621-22; The Zyklon B Case, in 1 Law
Reports of Trials of War Criminals, at 100-01).  In contrast,
"supplying a violator of the law of nations with funds - even funds
that could not have been obtained but for those loans - is not
sufficiently connected to the primary violation to fulfill the actus
reus requirement of aiding and abetting a violation of the law of

nations." Id. at 269.

Here, it is clear from Plaintiffs' allegations that Defendants were engaged in commercial transactions. Plaintiffs do not allege that Defendants gratuitously gave large sums of money to the Ivorian farmers in the manner that Flick and Steinbrinck gave money to the SS in The Flick Case. Rather, Plaintiffs' allegations specifically state that Defendants provided money to the farmers in order to obtain cocoa and to ensure a future cocoa supply. (FAC ¶ 34.) Even if the payments are described as "advance payments" (FAC ¶ 34), this is another way of stating that Defendants were paying for cocoa. See Black's Law Dictionary 1243 (9th ed. 2009) (defining "advance payment" as a "payment made in anticipation of a contingent or fixed future liability or obligation"). And to the extent that Plaintiffs allege that Defendants provided "personal spending money" to the farmers, Plaintiffs themselves assert that these payments were made "to maintain the farmers' and/or the cooperatives' loyalty as exclusive suppliers." (FAC ¶ 34.) Again, Plaintiffs' own Complaint identifies the commercial quid pro quo in which Defendants were engaged.

In short, Plaintiffs fail to allege any facts showing that Defendants' transfers of money were "specifically directed to assist . . . a certain specific crime" and had a "substantial effect on the perpetration of that crime." See Blagojevic (Appeals Chamber), at ¶ 127. Defendants' "financial assistance" does not constitute a sufficient actus reus under international law.

> ## 2. PROVISION OF FARMING SUPPLIES, TECHNICAL ASSISTANCE, AND TRAINING

Plaintiffs assert that Defendants provided "farming supplies,

including fertilizers, tools and equipment; training and capacity[-] building in particular growing and fermentation techniques and general farm maintenance, including appropriate labor practices, to grow the quality and quantity of cocoa beans they desire." (FAC ¶ 34.) "The training and quality control visits occur several times per year." (Id.) Plaintiffs cite to Nestle's representation that it "provides assistance in crop production," and "provide[s] technical assistance to farmers." (FAC ¶¶ 36, 38.) This assistance "ranges from technical assistance on income generation to new strategies to deal with crop infestation." (FAC ¶ 38.) Similarly, Plaintiffs cite to Archer Daniels Midland's representation that "ADM is working hard to help provide certain farmer organizations with the knowledge, tools, and support they need to grow quality cocoa responsibly and in a sustainable manner." (FAC ¶ 40.) Archer Daniels Midland provides "research into environmentally sound crop management practices, plant breeding work to develop disease-resistant varieties and farmer field schools to transfer the latest know-how into the hands of millions of cocoa farmers around the world." (FAC ¶ 41.)

Plaintiffs argue that these allegations show that "Defendant were providing the [Ivorian] farmers the necessary means by which to carry out slave labor." (Pls. Opp. (8/6/09), at 17.) Plaintiffs describe Defendants' actions as providing "logistical support and supplies essential to continuing the forced labor and torture." (Id. at 18.)

This line of argument is unavailing. Plaintiffs contend that Defendants' logistical support and other assistance generally furthered the Ivorian farmers' ability to continue using forced labor. However, Plaintiffs do not allege that Defendants provided supplies, assistance,

and training that was "specifically directed" to assist or encourage

"the perpetration of a certain specific crime," or that Defendants'

conduct had a "substantial effect" on the specific crimes of forced

labor, child labor, torture, and cruel, inhuman, and degrading

treatment.  Plaintiffs simply **do not** allege that Defendants' conduct

was specifically related to those primary violations.  Plaintiffs do

not allege, for example, that Defendants provided the guns and whips

that were used to threaten and intimidate the Plaintiffs, or that

Defendants provided the locks that were used to prevent Plaintiffs from

leaving their respective farms, or that Defendants provided training to

the Ivorian farmers about how to use guns and whips, or how to compress

a group of children into a small windowless room without beds, or how

to deprive children of food or water, or how to psychologically abuse

and threaten them.[46]  **That** is the type of conduct that gives rise to

aiding and abetting liability under international law - conduct that

has a **substantial effect** on a **particular criminal act**.  See, e.g.,

Vasiljevic, 2004 WL 2781932, at ¶¶ 41, 133-34 (affirming defendant's

guilt for aiding and abetting murder where defendant, armed with a gun,

escorted victims to murder site and pointed his gun at victims to

prevent them from fleeing).

Plaintiffs' allegations do not identify any specific criminal acts

that were substantially furthered by Defendants' general farming

assistance.  It is useful to compare Plaintiffs' allegations to the

relevant caselaw.  The defendants in the Zyklon B Case provided the gas

that was used to commit murder and the training on how to use that gas;

---

[46] This list of illustrations is not meant to be exhaustive, nor is it
meant to suggest that Plaintiffs' Complaint would adequately state a
claim for relief if it included such allegations.

the automakers in <u>In re South African Apartheid</u> provided the specialized military vehicles that were used to further extrajudicial killings, 617 F. Supp. 2d at 264, 266; and the computer company in that case provided customized software and technical support designed to facilitate a centralized identity database that supported the government's segregation, denationalization, and racial discrimination activities, <u>id.</u> at 265, 268.  In contrast to those examples, the heavy-equipment manufacturer in <u>Corrie</u> sold its ordinary product to an alleged human-rights abuser, 403 F. Supp. 2d at 1027, and the automakers in <u>South African Apartheid</u> were not liable for their sales of ordinary passenger vehicles to the apartheid regime, 617 F. Supp. 2d at 267.

Another salient example is <u>Prosecutor v. Delalic</u>, in which the ICTY acquitted the defendant on aiding and abetting charges based on his "logistical support" to a prison that engaged in the unlawful confinement of civilians.  <u>Delalic</u>, No. IT-96-21-T, at ¶ 1144 (Trial Chamber Nov. 16, 1998), *available at* 1998 WL 34310017, *aff'd*, No. IT-96-21-A, at ¶ 360 (Appeals Chamber Feb. 20, 2001), *available at* 2001 WL 34712258.  The trial court concluded that the defendant had no authority over the prison camp, 1998 WL 34310017, at ¶ 669, and the appeals court agreed that "he was not in a position to affect the continued detention of the civilians at the [prison] camp." <u>Delalic</u>, 2001 WL 34712258, at ¶ 355.  The appeals court explained that "the primary responsibility of Delalic in his position as co-ordinator was to provide logistical support for the various formations of the armed forces; that these consisted of, *inter alia*, supplies of material, equipment, food, communications equipment, railroad access,

transportation of refugees and the linking up of electricity grids."
Id. at ¶ 355 (citing Trial Chamber Judgment, at ¶ 664). The courts
concluded that Delalic's involvement in the camp - although essential
to its functioning - was unrelated to the specific offense of unlawful
confinement of civilians. Delalic, 1998 WL 34310017, at ¶ 669; 2001 WL
34712258, at ¶ 355. Accordingly, he was acquitted of aiding and
abetting the crimes of unlawful confinement.[47]

     Here, Plaintiffs allege that Defendants engaged in general
assistance to the Ivorian farmers' farming activities - mainly,
assisting crop production and providing training in labor practices.
Plaintiffs do not allege that Defendant provided any specific
assistance to the farmers' specific acts of slavery, forced labor,
torture, and the like. In light of the international caselaw described
supra, Plaintiffs' allegations do not give rise to a plausible

_____

[47] Plaintiffs unpersuasively argue that Delalic occupied "a role
equivalent to the prison camp's electrician and maintenance
provider." (8/6/09 Opp. at 18.) This description of Delalic is
plainly contradicted by the facts of the case. The Trial Chamber
noted that some of "his duties were to operate as an effective
mediator between the War Presidency, which is a civilian body, and
the Joint Command of the Armed Forces. His regular intervention was
designed to facilitate the work of the War Presidency with the
different formations constituting the defence forces in Konjic. . . .
Mr. Delalic was accountable to, and would report orally or in writing
to, the body within the War Presidency which gave him the task."
Delalic, 1998 WL 34310017, at ¶ 662. Delalic also helped prepare for
military operations by "provid[ing] supplies to [a military] unit,
including communications equipment, quartermaster supplies, uniforms
and cigarettes," and "ma[king] arrangements for the relevant needs
for first aid equipment, transport conveyance and such supplies and
facilities as could be provided by the civilian authorities." Id. at
¶¶ 666, 668.
     It should go without saying that these are odd responsibilities
to give to a mere "electrician and maintenance provider." The Court
is unpersuaded by Plaintiffs' attempt to downplay Delalic's
responsibilities.

77

1  inference that Defendants' conduct had a substantial effect on the

2  Ivorian farmers' specific human rights abuses.  As Defendants rightly

3  point out, "providing a farmer with . . . fertilizer does not

4  substantially assist forced child labor on his farm." (Defs. Reply

5  (8/24/09, at 13.)[48]  Plaintiffs' allegations establish, at most, that

6  Defendants generally assisted the Ivorian farmers in the act of growing

7  crops and managing their business - **not** that Defendants substantially

8  assisted the farmers in the acts of committing human rights abuses.

9            **3.   FAILURE TO EXERCISE ECONOMIC LEVERAGE**

10       Plaintiffs' final set of allegations focus on Defendants' implicit

11  moral encouragement and failures to act to prevent the Ivorian farmers'

12  abuses.  Plaintiffs assert that "Defendants, because of their economic

13  leverage in the region and exclusive supplier/buyer agreements each had

14  the ability to control and/or limit the use of forced child labor by

15  the supplier farms and/or farmer cooperatives from which they purchased

16  their cocoa beans." (FAC ¶ 48.)  Plaintiffs argue that the

17  international law *actus reus* standard is satisfied if "a different

18  course of conduct could have been pursued that would have mitigated or

19  prevented the [primary] offense." (Pls. Opp. (8/6/09), at 20.)

20            **a.   LEGAL AUTHORITY**

21       The precise nature of aiding and abetting liability for omissions,

22  moral support, and tacit approval and encouragement is uncertain.  As

23  noted by the District Court in <u>Presbyterian Church of Sudan v. Talisman</u>

24  <u>Energy</u>, omissions, moral support, and tacit approval and encouragement

25

26  [48] Indeed, the most reasonable conclusion is that Defendants' conduct
    **reduced** the extent of labor abuses on the Ivorian farms.  Defendants'
27  training in crop production techniques would have **increased** the
    efficiency of the Ivorian cocoa farms, thereby **reducing** the need for
28  forced labor and child labor.

fall outside the "core" definition of aiding and abetting liability

under international law.  That court proceeded as this Court is

proceeding - it applied the "core" notion of aiding and abetting but

refrained from reaching into the outer fringes of international law to

identify a novel and debatable aiding and abetting standard.  As the

court explained:

> Talisman [the defendant] also attempts to demonstrate that
> the *actus reus* standard for liability based on aiding and abetting
> is a source of disagreement in international law. Talisman points
> to a 1998 ICTY Trial Chamber decision that extended aiding and
> abetting liability in "certain circumstances" to "moral support or
> encouragement of the principals in their commission of the crime."
> *Prosecutor v. Furundzija*, No. IT-95-17/1-T, 1998 WL 34310018,
> para. 199 (Trial Chamber, Int'l Crim. Trib. for the Former
> Yugoslavia, Dec. 10, 1998). Discussing this standard, a Ninth
> Circuit panel decided to leave "the question whether such
> liability should also be imposed for moral support which has the
> required substantial effect to another day." *Doe I* [*v. Unocal
> Corp.*], 395 F.3d [932,] 951 [(9th Cir. 2002), *vacated on grant of
> rehearing en banc*, 395 F.3d 978, 979 (9th Cir. 2003)]. Talisman
> draws liberally from a concurring opinion in *Doe I* which noted
> that the inclusion of moral support is "far too uncertain and
> inchoate a rule for us to adopt without further elaboration as to
> its scope by international jurists," *id.* at 969-70 [Reinhardt, J.,
> concurring], and that "it is a novel standard that has been
> applied by just two ad hoc international tribunals." *Id.* at 969.
> The question of whether the "novel" moral support standard
> should be included in the definition of aider and abettor
> liability, however, did not prevent the Ninth Circuit from
> imposing liability for aiding and abetting another's violation of
> international law under a settled, core notion of aider and
> abettor liability in international law "for knowing practical
> assistance or encouragement which has a substantial effect on the
> perpetration of the crime." *Id.* at 951 [maj. op.]. Therein lies
> the flaw in Talisman's argument. The ubiquity of disagreement
> among courts and commentators regarding the fringes of customary
> international legal norms is unsurprising. The existence of such
> peripheral disagreement does not, however, impugn the core
> principles that form the foundation of customary international
> legal norms - principles about which there is no disagreement.

Presbyterian Church of Sudan, 374 F. Supp. 2d 331, 340-41 (S.D.N.Y.

2005) (order denying defendants' motion for judgment on the pleadings).

The international tribunals themselves have recognized the

uncertainty in this area of law.  As explained by the prominent ICTY

decision in <u>Prosecutor v. Tadic</u>:

> "mere presence [at the crime scene] seems not enough to constitute criminally culpable conduct, "[b]ut what further conduct would constitute aiding and abetting the commission of war crimes or some accessory responsibility is not known with sufficient exactitude for 'line-drawing' purposes."

<u>Tadic</u>, No. IT-94-1-T, at ¶ (Trial Judgment May 7, 1997) (internal footnote omitted) (quoting Jordan Paust, <u>My Lai and Vietnam</u>, 57 Mil. L. Rev. 99, 168 (1972)), *available at* 1997 WL 33774656.  The tribunal then summarized Nuremberg-era cases and emphasized that the cases "fail[ed] to establish specific criteria" governing this form of liability.  <u>Id.</u>

The state of the law has not cleared up in the years following that decision.  The International Tribunals for the Former Yugoslavia and Rwanda have engaged in a great deal of discussion of omissions, moral support, and tacit approval and encouragement, but have reached only a few concrete conclusions.  The law in this area is simply too unclear to satisfy <u>Sosa</u>'s requirements of definiteness and universality.  The Court therefore refrains from applying this "uncertain and inchoate" rule.  <u>See</u> <u>Presbyterian Church of Sudan</u>, 374 F. Supp. 2d at 340-41 (quotations omitted).  In support of this conclusion, the Court notes four additional observations regarding this body of law.

First, one must attempt to distinguish omissions, moral support, and tacit approval and encouragement from the concept of "command responsibility," which "holds a superior responsible for the actions of subordinates." <u>Hilao v. Estate of Marcos</u>, 103 F.3d 767, 777 (9th Cir. 1996).  Under command responsibility, "a higher official need not have personally performed or ordered the abuses in order to be held liable.  Under international law, responsibility for [*jus cogens* violations]

extends beyond the person or persons who actually committed those acts – anyone with higher authority who authorized, tolerated or knowingly ignored those acts is liable for them." Id. (quoting S. Rep. No. 249, 102d Cong., 1st Sess. at 9 (1991)).

For example, in a case relied upon by Plaintiffs, United States v. Ohlendorf ("The Einsatzgruppen Case"), the defendant Fendler, the second in command in his unit, was convicted of aiding and abetting war crimes and crimes against humanity because he was aware of the large number of executions and murders being committed by the subordinates in his unit. Despite his knowledge of his subordinates' wrongful acts, "there [wa]s no evidence that he ever did anything about it." Einsatzgruppen Case, 4 T.W.C. at 572. The court emphasized that "[a]s the second highest ranking officer in the Kommando [unit], his views could have been heard in complaint or protest against what he now says was a too summary [execution] procedure, but he chose to let the injustice go uncorrected." Id. Had Fendler not been in such a high-level "position of authority," see Oric, 2008 WL 6930198, at ¶ 42, his inaction would not have been sufficient to establish his guilt.

Second, an "omission" or "failure to act" only gives rise to aiding and abetting liability if "there is a **legal duty** to act." Prosecutor v. Mrksic, No. IT-95-13/1-A, at ¶ 134 & n.481 (ICTY Appeals Chamber, May 5, 2009) (collecting cases) (quoting Oric, at ¶ 43) (emphasis added), available at http://www.icty.org/x/cases/mrksic/ acjug/en/090505.pdf. The most obvious "duty to act" is the commander's "affirmative duty to take such measures as were within his power and appropriate in the circumstances to protect prisoners of war and [] civilian population[s]." In re Yamashita, 327 U.S. 1, 16 (1946). In

this regard, "command responsibility" can be viewed as a form of aiding
and abetting liability in which a commander fails to satisfy his legal
duty of exercising his power to control his subordinates. See generally
Prosecutor v. Aleksovski, No. IT-95-14/1-T, at ¶ 72 (ICTY Trial
Chamber, June 25, 1999) ("Superior responsibility derives directly from
the failure of the person against whom the complaint is directed to
honour an obligation."), *available at* 1999 WL 33918298, *aff'd in
relevant part and rev'd in part*, No. IT-95-14/1-A, at ¶ 76 (ICTY
Appeals Chamber, Mar. 24, 2000) ("command responsibility . . . becomes
applicable only where a superior with the required mental element
failed to exercise his powers to prevent subordinates from committing
offences or to punish them afterwards."), *available at* 2000 WL
34467821; see also Prosecutor v. Kayishema, ICTR-95-1-T, at ¶ 202
(Trial Chamber May , 1999) (comparing aiding and abetting through tacit
approval and encouragement with command responsibility), *available at*
1999 WL 33288417, *aff'd*, No. ICTR-95-1-A (ICTR Appeals Chamber July 2,
2001), *available at* http://www.unictr.org/Portals/0/Case/English/
Kayishema_F/decisions/index.pdf.[49]

     In cases involving "omissions" by actors other than commanders,
"the question remains open as to whether the duty to act must be based
on criminal law, or may be based on a general duty" under other bodies
of law. Mrksic, at ¶ 149 (quoting prosecutor's brief); see also id. at
¶ 151 (refraining from answering question posed in prosecutor's brief;

---

[49] The central readily identifiable distinction between command
responsibility and aiding and abetting liability is that command
responsibility requires a finding of formal or actual control; that
is, an agency (or similar) relationship between the primary wrongdoer
and the defendant. See generally Blagojevic (Appeals Chamber), at ¶¶
300-03; see also Doe v. Qi, 349 F. Supp. 2d 1259, 1329-33 (N.D. Cal.
2004) (summarizing doctrinal elements of command responsibility).

see also Oric, 2008 WL 6930198, at ¶ 43 ("The Appeals Chamber has never
set out the requirements for a conviction for omission in detail.").
The only courts to reach definitive conclusions on this question have
held that the duty to act may arise under either criminal law or the
"laws and customs of war." See Mrksic, at ¶ 151 & n.537 (citing
Blaskic appeal judgment, at ¶ 663 n.1384). However, there are no cases
holding that omissions of other duties (such as non-criminal duties
existing under statute or common law) will give rise to aiding and
abetting liability. In light of this uncertainty, the Court will
assume that the requisite "universal consensus of civilized nations"
for purposes of the Alien Tort Statute only recognizes liability in
cases where the duty to act arises from an obligation imposed by
criminal laws or the laws and customs of war. See Presbyterian Church
of Sudan, 582 F.3d at 259 (adopting approach of looking to common core
definition to determine appropriate choice among competing
articulations of a standard); Abagninin, 545 F.3d at 738-40 (same).

        Third, it must be emphasized that aiding and abetting by way of
"moral support" and "tacit approval and encouragement" is a rare breed
(and, in fact, a non-existent breed for purposes of the Alien Tort
Statute). To the extent this type of liability even exists, **all** of the
international tribunal cases reviewed by the Court involve defendants
who held a position of formal authority. In many ways, the discussions
in these cases tend to overlap with discussions of command
responsibility and/or joint criminal enterprise. See generally
Khulumani, 504 F.3d at 334-37 (Korman, J., concurring) (discussing
inadequacies of International Tribunal decisions). To the extent that
these cases purport to identify an independent international law norm

regarding "moral support" and "tacit approval and encouragement," there simply is not a sufficiently well-defined, universally recognized norm to satisfy <u>Sosa</u>'s requirements.

As an initial matter, it is important to note that all of the "moral support" cases involve a defendant who held formal military, political, or administrative authority.  As summarized by the recent Appeals Chamber decision in <u>Oric</u>, in the cases that have "applied the theory of aiding and abetting by tacit approval and encouragement, . . . the combination of a position of authority and physical presence at the crime scene allowed the inference that non-interference by the accused actually amounted to tacit approval and encouragement." <u>Oric</u>, 2008 WL 6930198, at ¶ 42 & n.97 (citing <u>Brdjanin</u>, ¶ 273 nn. 553, 555). It is important to remember that "authority" requires a high degree of control, either <i>de jure</i> or <i>de facto</i>, over the perpetrators.  <u>See generally</u> <u>Kayishema</u>, 1999 WL 33288417, at ¶¶ 479-507 (discussing concepts of <i>de jure</i> and <i>de facto</i> control in context of command responsibility); <u>see also</u> <u>Black's Law Dictionary</u> 152 (9th ed. 2009) (defining "authority," in pertinent part, as "[g]overment power or jurisdiction").[50]  In this vein, all of the cases cited by the recent Appeals Chamber decisions in <u>Oric</u> and <u>Brdjanin</u> support the conclusion that only a **formal authority figure**'s presence and inaction may

---

[50] It is appropriate to cite <u>Black's Law Dictionary</u> when interpreting the decisions of the international tribunals.  <u>See, e.g.,</u> <u>Prosecutor v. Naletilic</u>, No. IT-98-34-A, at ¶ 24 & nn. 1400-01 (ICTY Appeals Chamber May 3, 2006) (citing <u>Black's</u> to define crime of "deportation"); ¶¶ 674-75 & nn. 1332-34 (ICTY Trial Chamber July 31, 2003) (same); <u>Prosecutor v. Semanza</u>, No. ICTR-97-20-T, at ¶¶ 380, 384 & nn. 629, 637-38 (ICTR Trial Chamber May 15, 2003) (citing, inter alia, <u>Black's</u> for definitions of "plan" and "aid and abet"), <i>available at</i> 2003 WL 23305800.

constitute tacit approval and encouragement.  See Aleksovski, 2000 WL 34467821, at ¶¶ 76, 170-72 (defendant was prison warden); Kayishema, 1999 WL 33288417, at ¶¶ 479-81 (defendant was prefect - i.e., top regional executive); Prosecutor v. Akayesu, No. ICTR-96-4-T, at ¶ 77 (ICTR Trial Chamber Sept. 2, 1998), (defendant was bourgmestre - i.e., town mayor with control over police), *available at* 1998 WL 1782077, *aff'd*, No. ICTR-96-4 (ICTR Appeals Chamber June 1, 2001), *available at* 2001 WL 34377585; Furundzija, 38 I.L.M. 317, at ¶¶ 122, 130 (defendant was police commander); see also Tadic, 1997 WL 33774656, at ¶ 686 (discussing Nuremberg-era case in which the mayor and members of German guard failed to intervene when civilians beat and killed American pilots parading in Germany) (citing United States v. Kurt Goebell ("Borkum Island case"), *in* Report, Survey of the Trials of War Crimes Held at Dachau, Germany, Case. no. 12-489, at 2-3 (Sept. 15, 1948)). In other words, "tacit approval or encouragement" requires that the defendant must hold a position of formal or *de facto* military, political, or administrative authority.  The rationale for this rule is that "it can hardly be doubted that the presence of an individual with authority will frequently be perceived by the perpetrators of the criminal act as a sign of encouragement likely to have a significant or even decisive effect on promoting its commission." Aleksovski, 1999 WL 33918298, at ¶ 65.

Plaintiffs rely heavily on a Nuremberg-era case that lies at the outer fringe of this line of cases, The Synagogue Case.  As an initial matter, the Court notes that The Synagogue Case is not an appropriate authority for purposes of the Alien Tort Statute.  The Court agrees with Defendants that The Synagogue Case "does not reflect customary

international law." (8/24/09 Reply at 15 n.9.)  The ICTY in Furundzija

explained that The Synagogue Case was decided "under the provision on

co-perpetration of a crime ('Mittäterschaft') of the then German penal

code (Art. 47 Strafgesetzbuch)."  Furundzija, 38 I.L.M. 317, at ¶ 206.

In other words, The Synagogue Case reflects German domestic law and is

therefore an inappropriate source of authority for purposes of the

Alien Tort Statute under Sosa.

        However, even if the Court were to consider The Synagogue Case as

a valid international law authority, the case stands for the general

proposition that defendants are only responsible for "moral support" if

they occupy a position of formal military, political, or administrative

authority vis-a-vis the perpetrators.  Specifically, in The Synagogue

Case, the defendant was found guilty of aiding and abetting the

destruction of a Jewish synagogue.  Although "he had not physically

taken part in" the acts of destruction, "[h]is intermittent presence on

the crime-scene, combined with his status as an 'alter Kämpfer,'" was a

sufficient actus reus to establish his guilt.  Furundzija, 38 I.L.M.

317, at ¶ 205.  Notably, an "'alter Kämpfer'" is a "long-time militant

of the Nazi party," a fact that places this case in line with the cases

from the ICTY and ICTR.  See id.  Secondary authorities reveal that

"alter Kämpfer" were not mere party members; rather, they were the core

members of the Nazi security and intelligence apparatus.[51]  As explained

by an expert on German history, the alter Kämpfer were "men who without

_____

[51] The Court notes that The Synagogue Case does not appear to be widely
available in English translation, and courts have been forced to rely
on the second-hand discussion contained in Furundzija.  Because of
the unavailability of the original text of The Synagogue Case, the
Court has resorted to secondary authorities to uncover the factual
context of the decision.

exception had willingly joined the SS and who most clearly personified its philosophy." David Clay Large, <u>Reckoning without the Past: The HIAG of the Waffen-SS and the Politics of Rehabilitation in the Bonn Republic, 1950-1961</u>, 59 Journal of Modern History 79, 90 (1987).  It should be recalled that "[t]he SS was the elite guard of the Nazi party" and was responsible for policing, intelligence, and security operations in Nazi Germany.  <u>United States v. Geiser</u>, 527 F.3d 288, 290 (3d Cir. 2008); <u>see also</u> <u>United States v. Negele</u>, 222 F.3d 443, 445 (8th Cir. 2000) ("The SS, an organ of the Nazi party, acted as the federal police force in Germany."); <u>United States v. Kwoczak</u>, 210 F. Supp. 2d 638, 641 (E.D. Pa. 2002) (describing testimony of history expert, who described the SS as "Hitler['s] own elite guard," which he used "to consolidate police power in Germany" in the 1930s and which "controlled networks of concentration camps"); <u>United States v. Hajda</u>, 963 F. Supp. 1452, 1462 (N.D. Ill. 1997) ("The SS was the elite guard and intelligence unit of the Nazi Party of Germany."); <u>see generally</u> <u>The Nuremberg Trial</u>, 6 F.R.D. 69, 140-43 (1946) (summarizing the history of the SS and its criminal activities).  The *alter Kämpfer* therefore were not civilians - they were members of the state security and police forces (the SS) and were, in fact, the most prominent members of those organizations.  In other words - and this is a point that Plaintiffs have apparently overlooked (<u>see</u> 8/6/09 Opp. at 19) - the defendant in <u>The Synagogue Case</u> possessed formal political and administrative authority.  Indeed, the <u>Furundzija</u> court emphasized that the defendant's status as an authority figure was a necessary element of his guilt.  <u>Furundzija</u>, 38 I.L.M. 317 at ¶ 209 ("The supporter must be of a certain status for [moral support] to be sufficient for

criminal responsibility."). Plaintiffs' own expert declaration

concurs. (See Collingsworth Decl. (2/23/09), Ex. A, Brief *Amicus*

*Curiae* of International Law Scholars Philip Alston, et al., <u>Khulumani</u>

<u>v. Barclay National Bank</u>, Nos. 05-2141, 05-2326 (2d Cir.) ("'[S]ilent

approval' or mere presence is not a convictable offense, at least among

civilians, though a spectator may aid and abet illegal conduct if he

occupies some position of authority.").) In short, a defendant is only

guilty of "tacit approval and encouragement" if the defendant occupies

a position of formal authority.

As a fourth and final observation about "moral support" and "tacit

approval and encouragement," it is important to distinguish aiding and

abetting through omissions, moral support, and tacit approval and

encouragement from other forms of secondary liability such as joint

criminal enterprises and conspiracies. As discussed <u>supra</u>, the

relevant distinctions are that:

> (i) The aider and abettor carries out acts specifically
> directed to assist, encourage or lend moral support to the
> perpetration of a certain specific crime (murder, extermination,
> rape, torture, wanton destruction of civilian property, etc.), and
> this support has a substantial effect upon the perpetration of the
> crime. By contrast, it is sufficient for a participant in a joint
> criminal enterprise to perform acts that in some way are directed
> to the furtherance of the common design.
> (ii) In the case of aiding and abetting, the requisite mental
> element is knowledge that the acts performed by the aider and
> abettor assist the commission of the specific crime of the
> principal. By contrast, in the case of participation in a joint
> criminal enterprise, i.e. as a co-perpetrator, the requisite *mens*
> *rea* is intent to pursue a common purpose.

<u>Vasiljevic</u>, 2004 WL 2781932, at ¶ 102.

To summarize, to the extent that "moral support" and "tacit

approval and encouragement" are even actionable under the Alien Tort

Statute (and the Court concludes that they are not adequately well-

defined and widely adopted to satisfy <u>Sosa</u>), there are four important

88

points to keep in mind.  First, some cases, such as the <u>Einsatzgruppen Case</u> relied upon by Plaintiffs, tend to blur the distinction between "command responsibility" and aiding and abetting.  Second, a person is liable for an "omission" or "failure to act" only if that person owes an affirmative duty under criminal law or the laws and customs of war.  Third, the concept of "moral support" has only been applied in cases involving persons possessing administrative, political, or military authority and who are personally present at the crime scene while the overt criminal acts are taking place.  Fourth, and finally, it is important to distinguish between the aiding and abetting *actus reus* and the conspiracy/joint-criminal-enterprise *actus reus*.  Unlike conspiracy cases, aiding and abetting requires that the assistance must bear a direct causative relationship to the underlying crime.

This discussion of "moral support" and "tacit encouragement and approval" ought to demonstrate that this area of law lacks the "specificity" and "definite content and acceptance among civilized nations" to support a cause of action under <u>Sosa</u>, 542 U.S. at 732, 738.  The Court therefore agrees with the Southern District of New York's observations quoted <u>supra</u>: "the inclusion of moral support is far too uncertain and inchoate a rule for us to adopt without further elaboration as to its scope by international jurists, and . . . it is a novel standard that has been applied by just two ad hoc international tribunals.  The question of whether the 'novel' moral support standard should be included in the definition of aider and abettor liability . . . does not, however, impugn the core principles that form the foundation of customary international legal norms - principles about which there is no disagreement."  <u>Presbyterian Church of Sudan</u>, 374 F.

Supp. 2d at 340-41 (internal citations and quotations omitted).

It is telling that no Alien Tort Statute case has permitted a plaintiff to proceed on the theory of aiding and abetting through "moral support" or "tacit encouragement and approval." Those words are often quoted as part of the general aiding and abetting legal standard, but there are simply no **holdings** that apply that portion of the standard. See, e.g., In re South African Apartheid, 617 F. Supp. 2d at 257 (quoting standard without applying it); Almoq, 471 F. Supp. 2d at 286-87 (same); Presbyterian Church of Sudan v. Talisman Energy, 453 F. Supp. 2d 633, 666-67 (S.D.N.Y. 2006) (order granting summary judgment) (same); Bowoto, 2006 WL 2455752, at *4 (same); In re Agent Orange, 373 F. Supp. 2d at 54 (same); Presbyterian Church of Sudan v. Talisman Energy, 244 F. Supp. 2d 289, 324-25 (S.D.N.Y. 2003) (order denying motion to dismiss) (same). The Presbyterian Church of Sudan came the closest to reaching such a holding, as it concluded on a motion to dismiss that the defendants had "encouraged Sudan" to "carry out acts of 'ethnic cleaning.'" Presbyterian Church of Sudan, 244 F. Supp. 2d at 324. However, that case does not support the proposition that "moral support" or "tacit encouragement and approval" are actionable under the Alien Tort Statute. The allegations in the Presbyterian Church of Sudan complaint showed that the defendants were not mere bystanders - in addition to "encourag[ing]" Sudan's actions, the defendants had also "worked with Sudan" and "provided material support to Sudan" in committing genocide. Id. at 324. Specifically, the complaint alleged that the defendants had worked in concert with Sudanese government to engage in ethnic cleansing, held "regular meetings" with Sudanese government, developed a "joint . . . strategy

. . . to execute, enslave or displace" civilians, and issued

"directives" and "request[s]" to the Sudanese government.  Id. at 300-

01.  Such conduct constitutes overt acts of assistance, not moral

support or tacit encouragement.

The Court accordingly concludes that the actus reus of "moral

support" and "tacit encouragement and approval" is not sufficiently

well-defined and universally accepted to constitute an actionable

international law norm under Sosa.

### b.   FURTHER DISCUSSION

If, however, "moral support" and "tacit encouragement and

approval" **were** actionable under the Alien Tort Statute (and the Court

firmly disagrees with such a proposition), Plaintiffs' allegations

would fail to meet the standard articulated in the international

caselaw discussed supra.  There is absolutely no legal authority - let

alone **well-defined** and **universally accepted** legal authority - to

support the proposition that an economic actor's long-term exclusive

business relationship constitutes aiding and abetting, either as tacit

"moral support" or as overt acts of assistance.  Although Plaintiffs

argue that Defendants are liable on account of their "failure to

exercise economic leverage" (8/6/09 Opp. at 19-21), there is absolutely

no international law authority to support such a legal standard - let

alone the type of authority that is well-defined and universally

agreed-upon to satisfy Sosa.  The Court refrains from extending the

existing caselaw (much of which consists of dicta rather than holdings)

to recognize such an unprecedented form of liability.

Plaintiffs have not, therefore, alleged a sufficient actus reus in

the form of tacit encouragement or moral support on account of

Defendants' failure to exercise their economic leverage over Ivorian farmers who committed human rights abuses.

### 4.   SUMMARY OF ACTUS REUS

Plaintiffs insist that it is inappropriate to undertake a "divide-and-conquer" analysis of the Complaint.  They assert that Defendants' conduct must be viewed as a whole, and that even if each individual element of Defendants' conduct does not rise to the level of an actionable international law violation, Defendants' conduct as a whole does reach that level.  However, even viewing Plaintiffs' allegations collectively rather than separately, the overwhelming conclusion is that Defendants were **purchasing** cocoa and assisting the **production** of cocoa.  It is clear from the caselaw that ordinary commercial transactions do not lead to aiding and abetting liability.  Even if Defendants were not merely engaged in commercial conduct, something more is required in order to find a violation of international law - the defendants' conduct must have a substantial effect on the perpetration of the specific crime.  Plaintiffs in this case have not identified any of Defendants' conduct, taken separately or holistically, that had a material and direct effect on the Ivorian farmers' specific wrongful acts.  In short, Plaintiffs "have not nudged their claims across the line from conceivable to plausible."  <u>Twombly</u>, 550 U.S. at 570.  The *actus reus* allegations are insufficient as a matter of law.

### C.   DISCUSSION OF MENS REA

In addition to the *actus reus* element of aiding and abetting, Defendants also challenge the adequacy of Plaintiffs' allegations regarding the *mens rea* standard.

92

Plaintiffs' Complaint adequately alleges that Defendants knew or should have known of the labor violations on the Ivorian farms. Defendants engaged in a long-term relationship with these farmers and had occasional ground-level contact with the farms.  (FAC ¶ 34.) Defendants undertook a number of activities that reflected an awareness of the labor problems.  Defendants represented to the public that Defendants were concerned about the farmers' labor practices and that Defendants were taking affirmative steps to reduce the amount of child labor/forced labor used on Ivorian farms.  (FAC ¶¶ 38, 49-51.) Defendants even took efforts to prevent Congress from enacting a stringent importation regime that would have required imported chocolate to be certified as "slave free."  (FAC ¶¶ 54-55.)  In light of these allegations, as well as allegations about the existence of various reports from public organizations documenting labor abuses in Cote d'Ivoire (FAC ¶¶ 45-46, 51), Plaintiffs have plausibly alleged that Defendants knew or reasonably should have known about the child-labor abuses on the Ivorian farms.

However, these allegations are insufficient to establish that Defendants acted with the *mens rea* required by international law.

Applying the "purpose" standard adopted in <u>Presbyterian Church of Sudan</u>, 582 F.3d at 259 - which is, as noted, supported by the Rome Statute, art. 25(3)(c), the <u>Hechingen Case</u>, *in* 7 J. Int'l Crim. Just. at 150, and the International Court of Justice's recent agnosticism in <u>Bosnia and Herzegovina v. Serbia and Montenegro</u>, 2007 I.C.J. No. 91, at ¶ 421 - Plaintiffs' allegations are inadequate to establish the requisite *mens rea*. Plaintiffs do not - and, as they conceded at oral argument on November 10, 2009, **cannot** - allege that Defendants acted

1  with the purpose and intent that their conduct would perpetuate child

2  slavery on Ivorian farms.[52]

3      The Ninth Circuit's analysis of the genocide allegations in

4  Abagninin, 545 F.3d at 740, provides a relevant analogy regarding

5  pleading standards.  The plaintiff in Abagninin had alleged that the

6  defendant knew that its chemicals could cause reproductive harms;

7  however, the Ninth Circuit held that the plaintiff "fail[ed] to allege

8  that [the defendant] **intended** to harm him through the use of [those]

9  chemicals."  Id. (emphasis added).  Where a specific intent *mens rea* is

10  required (as in Abagninin), it is insufficient to allege the

11  defendant's knowledge of likely consequences.  **Purpose** or **specific**

12  **intent** must be shown, and Plaintiffs' allegations fail to meet this

13  standard.  Plaintiffs' allegations do not support the conclusion that

14  Defendants **intended** and **desired** to substantially assist the Ivorian

15  farmers' acts of violence, intimidation, and deprivation.

16      Even if the Court were to apply the "knowledge" *mens rea* standard

17  articulated in certain international caselaw (an approach which the

18  Court has rejected, see supra), Plaintiffs' allegations would fail to

19  move "across the line from conceivable to plausible."  Twombly, 550

20  U.S. at 570.  As noted supra, the leading international law "knowledge"

21  standard requires that the defendant "**know**[**s**] that the acts performed

22  **assist the commission of the specific crime** of the principal

23  perpetrator."  Blagojevic, at ¶ 127 (emphasis added).

24      Plaintiffs' allegations fail to raise a plausible inference that

25

26  [52] Specifically, Plaintiffs' counsel stated: "Now, if what was
    required was a state of mind that the defendants wanted child slave

27  labor to go on, you know, positively desired it, which is what I
    think you're saying . . . [t]hen we would not be able to allege

28  that."

Defendants knew or should have known that the **general** provision of money, training, tools, and tacit encouragement (assuming, that is, that such acts even satisfied the *actus reus* standard discussed <u>supra</u>) helped to further the **specific** wrongful acts committed by the Ivorian farmers.  Again, it must be recalled that the specific alleged wrongs include the Ivorian farmers' acts of whipping, beating, threatening, confining, and depriving Plaintiffs.  (<u>See</u> FAC ¶¶ 57-59.)  There are no allegations that Defendants **knew** that their conduct substantially assisted those wrongful acts.  Instead, the allegations, and the plausible inferences drawn from them, show that Defendants knew about the general problem of child labor on certain Ivorian farms and engaged in general commercial transactions with those farmers.  Such allegations do not constitute aiding and abetting under international law.  Plaintiffs have not alleged that Defendant possessed "knowledge that the[ir] acts . . . assist[ed] the commission of the specific crime of the principal perpetrator." <u>Blagojevic</u>, at ¶ 127.  Thus, even if the "knowledge" *mens rea* standard applies, Plaintiffs' Complaint fails to state a claim upon which relief may be granted.

    **D.   SUMMARY OF AIDING AND ABETTING LIABILITY**

    Plaintiffs' First Amended Complaint fails to state a viable cause of action with respect to Defendants' alleged aiding and abetting human rights violations by cocoa farmers in Cote d'Ivoire.  Plaintiffs have not alleged facts from which one may plausibly conclude that Defendants' conduct violated a universally accepted and well-defined international law norm.  <u>See</u> <u>Sosa</u>, 542 U.S. at 732.  Plaintiffs' allegations fail to satisfy either the *actus reus* or *mens rea* standards illustrated in the leading international and domestic caselaw that

discuss aiding and abetting under international law.   Accordingly, Defendants' Motion to Dismiss Plaintiffs' cause of action alleging violations of customary international law is GRANTED.

### E.   AGENCY THEORIES

As an alternative to the aiding and abetting theories of liability, Plaintiffs also attempt to hold Defendants directly liable as the principals of the Ivorian farmers who allegedly violated Plaintiffs' human rights.

As an initial matter, the Court disagrees with Plaintiffs' reliance on domestic-law agency principles.  See generally infra Part X (holding that international law, not domestic law, must provide substantive rules of agency attribution).   However, the Court also concludes that Plaintiffs' allegations are insufficient even under the domestic agency law cited by Plaintiffs.  Plaintiffs cite to cases involving an employer-employee relationship, Quick v. Peoples Bank of Cullman County, 993 F.2d 793, 797 (11th Cir. 1993), an alleged parent-subsidiary corporate relationship, Bowoto v. Chevron Texaco Corp., 312 F. Supp. 2d 1229, 1241-46 (N.D. Cal. 2004), and a case that offered no substantive discussion whatsoever regarding agency, Aldana v. Del Monte Fresh Produce, N.A., Inc., 416 F.3d 1242 (11th Cir. 2005).  (See 2/23/09 Opp. at 19.)

Plaintiffs insist that Defendants can be liable as principals because "[u]nder general agency rules, a principal is liable for the actions of its agents when the acts are: (1) related to and committed within the course of the agency relationship; (2) committed in furtherance of the business of the principal; and (3) authorized or subsequently acquiesced in by the principal."  (2/23/09 Opp. at 19.)

Plaintiffs assert that their Complaint adequately "allege[s] that Defendants had a long term relationship with their farmers, and provided direction and support. This would allow an inference that the farmers were Defendants' agents. Further, that the Defendants continued to work with and support their farmers even though they had specific knowledge of the farmers' use of forced child labor, would constitute acquiescence or subsequent ratification." (Id.)

The Court disagrees with Plaintiffs' analysis.  First, the Court concludes that, under Sosa, international law rather than domestic law must provide the relevant body of agency rules.  Plaintiffs have failed to identify any international law in cases, treaties, or any other authority that recognizes an agency relationship between a purchaser of goods and a supplier of goods.  Furthermore, the Court disagrees with Plaintiffs' assertion that a "long-term" and "exclusive" buyer-supplier relationship transforms an arms-length commercial relationship into an agency relationship in which the buyer is liable for the suppliers' actions.[53]  Such a conclusion would be contrary to general principles of

---

[53] The Court finds persuasive the illustrations provided in the Restatement (Third) of Agency regarding the basic rules of commercial relationships:

10. P Corporation designs and sells athletic footwear using a registered trade name and a registered trademark prominently displayed on each item. P Corporation licenses A Corporation to manufacture and sell footwear bearing P Corporation's trade name and trademark, in exchange for A Corporation's promise to pay royalties. Under the license agreement, P Corporation reserves the right to control the quality of the footwear manufactured under the license. A Corporation enters into a contract with T to purchase rubber. As to the contract with T, A Corporation is not acting as P Corporation's agent, nor is P Corporation the agent of A Corporation by virtue of any obligation it may have to defend and protect its trade name and trademark. P Corporation's right to control the quality of footwear manufactured by A Corporation does not make A Corporation the agent of P Corporation as to the contract with T.

agency law and would eviscerate the well-established international law

rules discussed <u>supra</u> that limit secondary liability to certain

specific situations.

Finally, the Court disagrees with Plaintiffs' assertions regarding

agency liability because Plaintiffs misstate both the relevant law and

the operative allegations of the Complaint.   The appropriate standard

under federal common law[54] is that an agency relationship is created

"when one person (a 'principal') manifests assent to another person (an

'agent') that the agent shall act on the principal's behalf and subject

to the principal's control, and the agent manifests assent or otherwise

consents so to act."   <u>Restatement (Third) of Agency</u> § 1.01 (2006); <u>see</u>

---

11. Same facts as Illustration 10, except that P Corporation and
A Corporation agree that A Corporation will negotiate and enter
into contracts between P Corporation and retail stores for the
sale of footwear manufactured by P Corporation. A Corporation is
acting as P Corporation's agent in connection with the
contracts. . . .
13. P owns a shopping mall. A rents a retail store in the mall
under a lease in which A promises to pay P a percentage of A's
monthly gross sales revenue as rent. The lease gives P the right
to approve or disapprove A's operational plans for the store. A
is not P's agent in operating the store.
14. Same facts as Illustration 13, except that A additionally
agrees to collect the rent from the mall's other tenants and
remit it to P in exchange for a monthly service fee. A is P's
agent in collecting and remitting the other tenants' rental
payments. A is not P's agent in operating A's store in the mall.
<u>Restatement (Third) of Agency</u>, § 1.01 cmt. g, ill. 10-14.
   In light of these illustrations, it is noteworthy that
Plaintiffs' Complaint fails to include any facts suggesting that
Defendants and the Ivorian farmers agreed that the farmers would act
as Defendants' agents with respect to Defendants' procurement and
maintenance of its labor force (or for any other matters).

[54] <u>See</u> <u>United States v. Bonds</u>, 608 F.3d 495, 504-05 (9th Cir. 2010)
(suggesting that the Third Restatement is the appropriate source of
federal agency law); <u>see also</u> <u>Schmidt v. Burlington Northern and
Santa Fe Ry. Co.</u>, 605 F.3d 686, 690 n.3 (9th Cir. 2010) (noting that
the Third Restatement has "superceded" the Second Restatement).

also <u>id.</u> at § 3.01 ("[a]ctual authority . . . is created by a

principal's manifestation [through either words or conduct, <u>see</u> § 1.03]

to an agent that, as reasonably understood by the agent, expresses the

principal's assent that the agent take action on the principal's

behalf." ).  Plaintiffs have not even attempted to argue that an agency

relationship has been created according to these rules.  (<u>See</u> 2/23/09

Opp. at 19.)  Contrary to Plaintiffs' conclusory assertions in their

Opposition, Plaintiffs have not alleged any facts from which it may be

plausibly inferred that Defendants manifested an intent to the Ivorian

farmers that the farmers would act on Defendants' behalf.  Nor have

Plaintiffs alleged any facts from which it may be plausibly inferred

that the Ivorian farmers manifested their assent to Defendants' control

of the farmers' conduct.  Absent such allegations, there is no agency

relationship between Defendants and the Ivorian farmers.  <u>Accord</u>

<u>Bowoto</u>, 312 F. Supp. 2d at 1241 ("To establish actual agency a party

must demonstrate the following elements: (1) there must be a

manifestation by the principal that the agent shall act for him; (2)

the agent must accept the undertaking; and (3) there must be an

understanding between the parties that the principal is to be in

control of the undertaking. There is no agency relationship where the

alleged principal has no right of control over the alleged agent.")

(quotations and citation omitted).

Similarly, Plaintiffs' allegations fail to show that the Ivorian

farmers are Defendants' agents under rules of ratification and

acquiescence.  "Although a principal is liable when it ratifies an

originally unauthorized tort, the principal-agent relationship is still

a requisite, and ratification can have no meaning without it."  <u>Batzel</u>

v. Smith, 333 F.3d 1018, 1036 (9th Cir. 2003) (footnote omitted); see
also Restatement (Third of Agency) § 4.03 ("A person may ratify an act
if [and **only** if, see § 4.01(3)(a),] the actor acted or purported to act
as an agent on the person's behalf.").  In other words, absent a
preexisting principal-agent relationship, the concept of "ratification"
cannot operate independently to create such a principal-agent
relationship.

Accordingly, the Court rejects Plaintiffs' arguments that the
Defendants are liable for the Ivorian farmers' actions under an agency
theory.


**VIII. TORTURE VICTIM PROTECTION ACT**

Plaintiffs' third cause of action alleges that Defendants aided
and abetted acts of torture.  This cause of action is brought under
both the Alien Tort Statute and the Torture Victim Protection Act, Pub.
L. 102-256, 106 Stat. 73 (1992), *reprinted in* 28 U.S.C.A. § 1350 note.
The Torture Victim Protection Act provides:

> **Section 1. Short Title.**
>      This Act may be cited as the 'Torture Victim Protection Act
> of 1991'
>
> **Sec. 2. Establishment of civil action.**
>      **(a) Liability.**--An individual who, under actual or apparent
> authority, or color of law, of any foreign nation--
>      **(1)** subjects an individual to torture shall, in a civil
> action, be liable for damages to that individual; or
>      **(2)** subjects an individual to extrajudicial killing shall, in
> a civil action, be liable for damages to the individual's
> legal representative, or to any person who may be a claimant
> in an action for wrongful death.
>      **(b) Exhaustion of remedies**.--A court shall decline to hear a
> claim under this section if the claimant has not exhausted
> adequate and available remedies in the place in which the
> conduct giving rise to the claim occurred.
>      **(c) Statute of limitations**.--No action shall be maintained
> under this section unless it is commenced within 10 years
> after the cause of action arose.

**Sec. 3. Definitions.**
"**(a) Extrajudicial killing.**--For the purposes of this Act,
the term 'extrajudicial killing' means a deliberated killing
not authorized by a previous judgment pronounced by a
regularly constituted court affording all the judicial
guarantees which are recognized as indispensable by civilized
peoples. Such term, however, does not include any such
killing that, under international law, is lawfully carried
out under the authority of a foreign nation.
"**(b) Torture.**--For the purposes of this Act--
"**(1)** the term 'torture' means any act, directed against an
individual in the offender's custody or physical control, by
which severe pain or suffering (other than pain or suffering
arising only from or inherent in, or incidental to, lawful
sanctions), whether physical or mental, is intentionally
inflicted on that individual for such purposes as obtaining
from that individual or a third person information or a
confession, punishing that individual for an act that
individual or a third person has committed or is suspected of
having committed, intimidating or coercing that individual or
a third person, or for any reason based on discrimination of
any kind; and
"**(2)** mental pain or suffering refers to prolonged mental harm
caused by or resulting from--
"**(A)** the intentional infliction or threatened infliction of
severe physical pain or suffering;
"**(B)** the administration or application, or threatened
administration or application, of mind altering substances or
other procedures calculated to disrupt profoundly the senses
or the personality;
"**(C)** the threat of imminent death; or
"**(D)** the threat that another individual will imminently be
subjected to death, severe physical pain or suffering, or the
administration or application of mind altering substances or
other procedures calculated to disrupt profoundly the senses
or personality."

28 U.S.C.A. § 1350 note.

Defendants argue that the Torture Victim Protection Act supercedes

the Alien Tort Statute with respect to torture and related offenses.

This is the approach taken by the divided panel in <u>Enahoro v. Abubakar</u>,

408 F.3d 877, 884-85 (7th Cir. 2005), a much-criticized case[55] which

---

[55] <u>See, e.g.</u>, Philip Mariani, Comment, <u>Assessing the Proper
Relationship Between the Alien Tort Statute and the Torture Victim
Protection Act</u>, 156 U. Pa. L. Rev. 1383, 1386 (2008) ("the Seventh
Circuit's preclusive interpretation . . . produces an inappropriate
result for courts to follow); Ved P. Nanda & David K. Pansius, 2

concluded that the Torture Victim Protection Act's statutory exhaustion
requirement would be rendered meaningless if plaintiffs could simply
plead torture-related violations under customary international law.

The Court disagrees with Defendants' assertion.  While it is true
that the Torture Victim Protection Act "was intended to codify judicial
decisions recognizing such a cause of action under the Alien Tort
[Statute]," <u>Hilao v. Estate of Marcos</u>, 103 F.3d 767, 778 (9th Cir.
1996), there is no clear congressional intent that the Alien Tort
Statute cannot also provide a cause of action for torture and related
acts.  Notably, the Ninth Circuit affirmed a judgment which contained
causes of action for torture brought under **both** the Alien Tort Statute
and the Torture Victim Protection Act.  <u>See Hilao v. Estate of Marcos</u>,
103 F.3d at 777-78.

The Court agrees with and adopts the discussion of this question
in <u>Bowoto v. Chevron Corp.</u>, 557 F. Supp. 2d 1080, 1084-86 (N.D. Cal.
2008), and <u>Mujica v. Occidental Petroleum Corp.</u>, 381 F. Supp. 2d 1164,
1179 n.13 (C.D. Cal. 2005) (explaining that Torture Victim Protection
Act was intended to enhance, not limit, remedies available to torture
victims, and that "repeals by implication are not favored") (collecting
authorities), *remanded on other grounds by* 564 F.3d 1190, 1192 (9th
Cir. 2009) (ordering district court to consider applicability of

<u>Litigation of International Disputes in U.S. Courts</u>, § 9:9, at n. 366
and accompanying text (2010 supp.) ("The text projects that in the
long run Judge Cudahy's [dissenting] argument [from <u>Enahoro</u>] will
prevail in most circuits.  Congress did not repeal the AT[S]. <u>Sosa</u>
did not reject the proposition that torture was an actionable norm
under the AT[S].  <u>Sosa</u> also indicated no disagreement with the case
law that had consistently treated the AT[S] and TVPA as mutually
coexisting."); <u>see also</u> <u>Adhikari v. Daoud & Partners</u>, 697 F. Supp. 2d
674, 687-88 (S.D. Tex. 2009) (pointedly refusing to adopt holding of
<u>Enahoro</u>).

prudential exhaustion requirement articulated in <u>Sarei v. Rio Tinto</u>,
550 F.3d 822 (9th Cir. 2008) (en banc)); <u>see generally</u> Philip Mariani,
Comment, <u>Assessing the Proper Relationship Between the Alien Tort
Statute and the Torture Victim Protection Act</u>, 156 U. Pa. L. Rev. 1383
(2008) (closely examining the question and rejecting Seventh Circuit's
contrary conclusion).

In any event, even if the Court were to follow the reasoning of
the Seventh Circuit in <u>Enahoro</u>, the concerns motivating the Seventh
Circuit (namely, the interaction between the Torture Victim Protection
Act and the Alien Tort Statute regarding exhaustion of remedies) are
not present in the instant case.  Defendants have not argued that the
Torture Victim Protection Act's statutory exhaustion requirement would
be eviscerated if the Court applied the Alien Tort Statute in this
case.  Accordingly, <u>Enahoro</u>'s reasoning is inapposite.

**A.   PLAINTIFFS' ALLEGATIONS FAIL TO STATE A VIABLE CAUSE OF
ACTION FOR AIDING AND ABETTING TORTURE**

The Court assumes for purposes of this Order that the Torture
Victim Protection Act creates a cause of action relating to a
defendant's act of aiding and abetting torture.  Because the Act
creates a **statutory** cause of action, this question is distinct from the
common law-based Alien Tort Statute analysis discussed <u>supra</u>.  Whereas
Alien Tort Statute claims are derived from international law, a Torture
Victim Protection Act claim derives from federal statute.  The
existence of aiding and abetting liability is therefore a matter of
statutory interpretation.  The Court refrains from engaging in this
exercise at the present juncture.  <u>See generally</u> Ved P. Nanda & David
K. Pansius, 2 <u>Litigation of International Disputes in U.S. Courts</u>, §

9:9, at nn. 257-29 and accompanying text (2010 supp.) ("In a TVPA case complicity liability would derive from the terms of that statute to the extent that a court may consider the issue addressed in the statute or its legislative history. . . . Under the ATS the cause of action must arise from a norm of international law.").

However, even assuming that the Torture Victim Protection Act recognizes aiding and abetting liability, the Court grants Defendants' Motion to Dismiss the Torture Victim Protection Act cause of action for the same reasons that it grants the motion on the common-law international law causes of action brought under the Alien Tort Statute. As discussed <u>supra</u>, Plaintiffs have not alleged sufficient facts to establish a plausible inference that Defendants aided and abetted third parties' torture of Plaintiffs.

### B.  CORPORATE LIABILITY UNDER THE TORTURE VICTIM PROTECTION ACT

In addition, the Court grants Defendants' Motion to Dismiss the Torture Victim Protection Act cause of action because Congress only extended liability to natural persons, not corporations.

The overwhelming majority of courts have concluded that only natural persons, not corporations, may be held liable under the Torture Victim Protection Act. <u>See</u> <u>Ali Shafi v. Palestinian Authority</u>, 686 F. Supp. 2d 23, 28 (D.D.C. 2010) ("Defendants correctly assert that Ali may not plead a cause of action against non-natural persons under the TVPA."); <u>Bowoto v. Chevron Corp.</u>, No. C 99-02506-SI, 2006 WL 2604591, at *1-2 (N.D. Cal. Aug. 22, 2006);); <u>Corrie v. Catepillar, Inc.</u>, 403 F. Supp. 2d 1019, 1026 (W.D. Wash. 2005), *aff'd on other grounds*, 503 F.3d 974 (9th Cir. 2007); <u>Doe v. Exxon Mobil Corp.</u>, 393 F. Supp. 2d 20, 28 (D.D.C. 2005); <u>In re Terrorist Attacks on September 11, 2001</u>, 392 F.

Supp. 2d 539, 565 (S.D.N.Y. 2005); <u>Mujica v. Occidental Petrol. Corp.</u>, 381 F. Supp. 2d 1164, 1175 (C.D. Cal. 2005); <u>In re Agent Orange Prod. Liability Litig.</u>, 373 F. Supp. 2d 7, 55-56 (E.D.N.Y. 2005); <u>Arndt v. UBS AG</u>, 342 F. Supp. 2d 132, 141 (E.D.N.Y. 2004); <u>Friedman v. Bayer Corp.</u>, No. 99-CV-3675, 1999 WL 33457825, at *2 (E.D.N.Y. Dec. 15, 1999); <u>Beanal v. Freeport-McMoran, Inc.</u>, 969 F. Supp. 362, 381-82 (E.D. La. 1997), *aff'd on other grounds*, 197 F.3d 161, 169 (5th Cir. 1999) (holding that complaint failed to allege facts sufficient to show that torture occurred); <u>but see</u> <u>Sinaltrinal v. Coca-Cola Co.</u>, 256 F. Supp. 2d 1345, 1358-59 (S.D. Fla. 2003) (reaching contrary conclusion); <u>Estate of Rodriquez v. Drummond Co., Inc.</u>, 256 F. Supp. 2d 1250, 1266-67 (N.D. Ala. 2003) (same)

The central animating logic behind these decisions is that the Act prohibits **individuals** from inflicting torture on other **individuals**. <u>See</u> 28 U.S.C.A. § 1350 note § 2(a)(1) ("An **individual** who . . . subjects an **individual** to torture shall, in a civil action, be liable for damages to that individual.") (emphasis added). Because a corporation cannot be tortured, it appears that the Act's use of word "individual" refers only to natural persons, not corporations. As noted in <u>Mujica</u>, corporations are quite obviously incapable of being "tortured":

> The Court does not believe it would be possible for corporations to be tortured or killed. The Court also does not believe it would be possible for corporations to feel pain and suffering. <u>See</u> <u>Leocal [v. Ashcroft</u>, 543 U.S. 1,] 125 S.Ct. [377,] 382 [(2004)] ("When interpreting a statute, we must give words their 'ordinary or natural' meaning."). Thus, the only manner in which the statute does not reach an 'absurd result,' is by excluding corporations from the scope of the statute's liability.

<u>Mujica</u>, 381 F. Supp. 2d at 1176.

Another strand of reasoning involves reference to the default

rules of linguistic interpretation set forth by Congress itself. Congress's Dictionary Act defines "person" as including both "corporation" and "individuals."   See 1 U.S.C. § 1 ("In determining the meaning of any Act of Congress, unless the context indicates otherwise – . . . the words 'person' and 'whoever' include corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals").  "[T]he Dictionary Act's definition of 'person' implies that the words 'corporations' and 'individuals' refer to different things," and that implied meaning should govern as long as the context does not indicate otherwise. United States v. Middleton, 231 F.3d 1207, 1211 (9th Cir. 2000).  Here, context supports the implied meaning given in the Dictionary Act – that is, that "individual" refers to "natural persons" – and there is no reason to hold otherwise.  Bowoto, 2006 WL 2604591, at *1-2.

As persuasive authority in favor of holding corporations liable under the Torture Victim Protection Act, Plaintiffs point to the statement of Sen. Specter, the bill's sponsor, who said that the bill would allow suits against "persons" who were involved in committing torture.  (See 2/23/09 Opp. at 22.)  This single statement is an insufficient basis for reaching a conclusion that is contrary to basic principles of statutory construction.  See generally United States v. Tabacca, 924 F.2d 906, 910-911 (9th Cir. 1991) ("The remarks of a legislator, even those of the sponsoring legislator, will not override the plain meaning of a statute."); see also Weinberger v. Rossi, 456 U.S. 25, 35 n.15 (1982) ("The contemporaneous remarks of a sponsor of legislation are not controlling in analyzing legislative history."); Bath Iron Works Corp. v. Director, Office of Workers' Compensation, 506

106

U.S. 153, 166 (1993) (where the language of the statute was unambiguous on the issue, the Court gave "no weight" to a single senator's reference during a floor debate in the Senate).  Furthermore, no court has relied on Sen. Specter's statement as dispositive; to the extent that courts have relied on the legislative history to show that corporations may be sued, they have concluded that this history "does not reveal an intent to **exempt** private corporations from liability." Sinaltrinal v. Coca-Cola Co., 256 F. Supp. 2d 1345, 1358-59 (S.D. Fla. 2003) (emphasis added); see also Estate of Rodriguez v. Drummond Co., Inc., 256 F. Supp. 2d 1250, 1266-67 (N.D. Ala. 2003) (following Sinaltrinal).[56]  But in light of the plain statutory language of the Act, the Court concludes that the majority of courts are correct that the Act does not extend liability to corporations.  Congress simply has not provided for corporate liability.

### C.   STATE ACTION

As a final matter, the Court grants Defendants' Motion to Dismiss the Torture Victim Protection Act cause of action because Plaintiffs have not adequately alleged "state action" for purposes of the Act. The Act establishes liability where "[a]n individual who, **under actual**

---

[56] The Eleventh Circuit has affirmed both of these decisions and extended liability to corporations, but has never explicitly stated its reasoning for permitting a corporation to be sued under the Act. In Romero v. Drummond Co., Inc., 552 F.3d 1303, 1315 (11th Cir. 2008), the court stated that "we are bound by th[e] precedent" of Aldana v. Del Monte Fresh Produce, Inc., 416 F.3d 1242, 1315 (11th Cir. 2005), that a plaintiff may "state[] a claim against a corporate defendant" under the Torture Victim Protection Act.  However, the Aldana court did not expressly address the issue.  See generally Aldana, 417 F.3d at 1244-53.  Later, in Sinaltrainal v. Coca-Cola Co., 578 F.3d 1252, 1263 (11th Cir. 2009), the court suggested that Romero, not Aldana, was the operative precedent regarding corporate liability under the Torture Victim Protection Act.

**or apparent authority, or color of law, of any foreign nation**-- subjects an individual to torture."  28 U.S.C.A. note § 2(a)(1) (emphasis added).  This statutory provision requires that the principal offender committing torture - here, the Ivorian farmers - was acting under color of law.

Unlike the Alien Tort Statute, the Torture Victim Protection Act contains an explicit reference to domestic law to define the state-action requirement of the Torture Victim Protection Act.  As explained in a recent *en banc* decision issued by the Second Circuit's decision, "[i]n construing the term 'color of law,' courts are instructed to look to jurisprudence under 42 U.S.C. § 1983."  <u>Arar v. Ascroft</u>, 585 F.3d 559, 568 (2d Cir. 2009) (en banc) (citing H.R. Rep. No. 367, 102d Cong., 2d Sess., at 5 (1991) *reprinted in* 1992 U.S.C.C.A.N. 84, 87) (alterations omitted), *cert. denied*, 130 S.Ct. 3409 (2010).  Accordingly, the Court will consider precedents construing both the Torture Victim Protection Act and 42 U.S.C. § 1983.

The essence of Plaintiffs' state-action argument is that some farms were owned by government officials, or were protected by government-based security services, or were insulated from government attention through payments to government officials.  (FAC ¶¶ 47, 67, 73, 77.)  Specifically, Plaintiffs allege that "several of the cocoa farms in Cote d'Ivoire from which Defendants source [cocoa] are owned by government officials, whether directly or indirectly, or are otherwise protected by government officials either through the provision of direct security services or through payments made to such officials that allow farms and/or farmer cooperatives to continue the use child labor."  (<u>Id.</u> at ¶ 47.)  Plaintiffs also assert that the

farmers' wrongful actions were done with the "implicit sanction of the state" or through "the intentional omission of responsible state officials . . . to act in preventing and/or limiting the trafficking" of child slaves into Cote d'Ivoire. (Id. at ¶ 77.)

Plaintiffs assert that these allegations establish a form of "joint action" between the state actors and the private defendants. (2/23/09 Opp. at 23.)  Plaintiffs cite to Dennis v. Sparks, 449 U.S. 24, 27-28 (1980), which explained that "[p]rivate persons, jointly engaged with state officials in the challenged action, are acting 'under color' of law for purposes of § 1983 actions." Dennis involved allegations that a private party had entered into a "corrupt conspiracy involving bribery of [a] judge."  The Court explained that "the private parties conspiring with the judge were acting under color of state law." Id. at 28.

The "joint-action" principle is further illustrated in a number of Torture Victim Protection Act cases.  In Mujica v. Occidental Petroleum, the plaintiffs alleged that the Colombian Air Force, while providing paid-for security services at one of the defendant's oil production facilities and oil pipelines, committed torture by dropping cluster bombs on groups of civilians in a residential area. Mujica, 381 F. Supp. 2d at 1168.  The court held that these allegations were sufficient to satisfy the Torture Victim Protection Act's requirement that the wrongful conduct be done under color of law.

Similarly, in Wiwa v. Royal Dutch Petrol. Co., No. 96 CIV. 8386(KMW), 2002 WL 3129887 (S.D.N.Y. Feb. 28, 2002), the court held that the allegations were sufficient to satisfy the state action requirement where the plaintiff alleged that the defendants "jointly

collaborated" with a foreign government "in committing several of the claimed violations of international law." Id. at *14.  The court explained that "individuals engaged in a conspiracy with government actors to deprive others of their constitutional rights act 'under color of law' to commit those violations."  Id.

In Aldana v. Del Monte Fresh Produce, the plaintiffs alleged that they had been taken hostage and were threatened with death during labor negotiations in Guatemala.  Aldana, 416 F.3d at 1245.  The Eleventh Circuit reversed the district court's dismissal of the Torture Victim Protection Act claims to the extent that the plaintiffs alleged that the local mayor had personally acted as an "one of the armed aggressors" who personally participated in taking the plaintiffs hostage and threatening them with death.  Id. at 1249.  (The court noted that the private-party defendants were secondarily liable for the mayor's conduct because the mayor was acting "at the urging of [the] Defendants."  Id.)  Because the mayor was personally involved in the underlying wrongdoing, the plaintiffs had adequately alleged state action.  Id.

In contrast to the allegations involving the mayor, the Aldana court held that there was no state action where the government provided "registration and toleration" of the organizations responsible for the wrongful acts.  Id. at 1248.  The court cited the Supreme Court's decision in Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 175-78 (1972), in which the Court held that a "state's alcohol licensing and regulatory scheme did not transform a private club with a liquor license into a state actor."  Aldana, 416 F.3d at 1248.

In Sinaltrainal v. Coca-Cola, the plaintiffs alleged that private

"paramilitary forces" engaged in torture.  The Eleventh Circuit

explained that "[m]ere toleration of the paramilitary forces does not

transform such forces' acts into state acts."  <u>Sinaltrainal</u>, 578 F.3d

at 1270.  Relying on the pleading rules as construed in <u>Iqbal</u>, the

court rejected the plaintiffs' conclusory allegations that "the

paramilitary are 'permitted to exist' and are 'assisted' by the

Colombian government."  <u>Id.</u> at 1266.  The court explained that the

plaintiffs offered only the "naked allegation the paramilitaries were

in a symbiotic relationship with the Colombian government and thus were

state actors," and "absent any factual allegations to support this

legal conclusion," the motion to dismiss was properly granted.  <u>Id.</u>

    The present case, in contrast to <u>Dennis</u>, <u>Mujica</u>, <u>Wiwa</u>, and the

portion of <u>Aldana</u> addressing the mayor's conduct, does not involve any

allegations that Ivorian government officials jointly conspired or

participated with the farmers who were directly engaged in wrongdoing.

Rather, Plaintiffs allege in a wholly conclusory fashion that the

Ivorian government somehow "protected" the farmers and otherwise

allowed them "to continue to use child labor."  (FAC ¶ 47.)  Like the

complaint in <u>Sinaltrainal</u>, Plaintiffs' Complaint lacks any factual

allegations showing that the Ivorian government jointly participated in

the underlying human rights abuses, as was the case with the mayor in

<u>Aldana</u> and the corrupt judge in <u>Dennis</u>.  <u>See also</u> <u>Romero</u>, 552 F.3d at

1317 (granting summary judgment to defendant because "proof of a

general relationship [between the Colombian government and alleged

wrongdoer] is not enough. The relationship must involve the subject of

the complaint. . . . [T]he [evidence] do[es] not even suggest that the

Colombian military was involved in those crimes."); <u>Alomang v.</u>

111

<u>Freeport-McMoran Inc.</u>, Civ. A. No. 96-2139, 1996 WL 601431 (E.D. La.
Oct. 17, 1996) (plaintiff's complaint failed to satisfy state action
requirement because it "does not explicitly link the alleged human
rights violations to the alleged presence of Indonesian troops at the
Grasberg Mine site").

To the extent that Plaintiffs allege that Ivorian government
officials **owned** the farms on which the violations took place, it is
well established that government officials' private conduct does not
satisfy the state action requirement.  <u>See, e.g.</u>, <u>Screws v. United
States</u>, 325 U.S. 91, 111 (1945) ("acts of officers in the ambit of
their personal pursuits are plainly excluded . . . [from] the words
'under color of any law'"); <u>see also</u> <u>Gritchen v. Collier</u>, 254 F.3d 807,
812 n.6 (9th Cir. 2001) (collecting cases).  Plaintiffs fail to allege
any facts establishing that the Ivorian farms were operated by or for
the benefit of the government.

Finally, the Court rejects Plaintiffs' argument that these state
action issues should be left to the summary judgment stage of
litigation rather than the motion to dismiss stage.  Plaintiffs'
authority predates the Supreme Court's clear authority in <u>Twombly</u> and
<u>Iqbal</u>, requiring plaintiffs to allege facts supporting their claim for
relief.  The cases cited by Plaintiffs apply a different legal
standard.  See <u>National Coalition Government of Union of Burma v.
Unocal, Inc.</u>, 176 F.R.D. 329, 346 (C.D. Cal. 1997) ("[T]he Court
considers Unocal's argument that plaintiffs **cannot possibly prevail** on
a joint action theory based on the allegations of the complaint.")
(emphasis added).  Admittedly, it is somewhat difficult for the Court
to analyze the sufficiency of Plaintiffs' legal theory at the present

stage of litigation - but that is only because the Complaint contains conclusory assertions rather than factual allegations.  On that basis alone, the Motion to Dismiss must be granted.

### D.   SUMMARY OF TORTURE VICTIM PROTECTION ACT

Accordingly, the Court concludes that: Plaintiffs' Complaint fails to allege sufficient facts from which it may be reasonably inferred that Defendants aided and abetted torture; corporations cannot be held liable under the Torture Victim Protection Act because the statute precludes such a result; and Plaintiffs' Complaint fails to allege sufficient facts from which it may be reasonably inferred that the Ivorian farmers acted under "color of law."

## IX.   STATE-LAW CAUSES OF ACTION

Plaintiffs' Complaint alleges four causes of action under California law: breach of contract, negligence, unjust enrichment, and unfair business practices.  Plaintiffs concede that the Ninth Circuit's decision in <u>Doe I v. Wal-Mart Stores, Inc.</u>, 572 F.3d 677 (9th Cir. 2009), forecloses the contract and negligence claims.  (<u>See</u> 8/6/09 Opp. at 2.)[57]

### A.   UNJUST ENRICHMENT

With respect to the unjust enrichment cause of action, Plaintiffs allege that:

---

[57] <u>Doe I v. Wal-Mart Stores</u> addressed causes of action arising out of Wal-Mart's public relations statements about its human rights standards (it had issued a "code of conduct" regarding its labor practices).  The court rejected the plaintiffs' contract and negligence claims arising out of the code of conduct because Wal-Mart was an indirect purchaser of the goods manufactured by the laborer-plaintiffs.  As Plaintiff concede, the same type of analysis applies in the present case.

As a result of the forced labor practices utilized by farms and/or
farmer cooperatives from which Defendants sourced cocoa beans,
Defendants received benefits by being able to purchase cocoa beans
from such farms at significantly lower prices as the farms' total
labor costs were greatly diminished by reliance on forced child
labor. Defendants' conduct thereby constitutes unjust enrichment
and Defendants are under a duty of restitution to the Former Child
Slave Plaintiffs for the benefits received therefrom.

(FAC ¶¶ 90-91.)

A thorough and relevant discussion of California's law of unjust

enrichment appears in Doe I v. Wal-Mart Stores:

We turn finally to Plaintiffs' claim of unjust enrichment.
Plaintiffs allege that Wal-Mart was unjustly enriched at
Plaintiffs' expense by profiting from relationships with suppliers
that Wal-Mart knew were engaged in substandard labor practices.
Unjust enrichment is commonly understood as a theory upon which
the remedy of restitution may be granted. See 1 GEORGE E. PALMER, LAW
OF RESTITUTION § 1.1 (1st ed. 1978 & Supp. 2009); Restatement of
Restitution § 1 (1937) ("A person who has been unjustly enriched
at the expense of another is required to make restitution to the
other."). California's approach to unjust enrichment is consistent
with this general understanding: "The fact that one person
benefits another is not, by itself, sufficient to require
restitution. The person receiving the benefit is required to make
restitution only if the circumstances are such that, as between
the two individuals, it is unjust for the person to retain it."
First Nationwide Sav. v. Perry, 11 Cal.App.4th 1657, 15
Cal.Rptr.2d 173, 176 (1992) (emphasis in original).
    The lack of any prior relationship between Plaintiffs and
Wal-Mart precludes the application of an unjust enrichment theory
here. See Smith v. Pac. Props. & Dev. Corp., 358 F.3d 1097, 1106
(9th Cir.2004) (noting that a party generally may not seek to
disgorge another's profits unless "a prior relationship between
the parties subject to and benefiting from disgorgement
originally resulted in unjust enrichment"). Plaintiffs essentially
seek to disgorge profits allegedly earned by Wal-Mart at
Plaintiffs' expense; however, we have already determined that
Wal-Mart is not Plaintiffs' employer, and we see no other
plausible basis upon which the employee of a manufacturer, without
more, may obtain restitution from one who purchases goods from
that manufacturer. That is, the connection between Plaintiffs and
Wal-Mart here is simply too attenuated to support an unjust
enrichment claim. See, e.g., Sperry v. Crompton Corp., 8 N.Y.3d
204, 831 N.Y.S.2d 760, 863 N.E.2d 1012, 1018 (2007) (holding that
"the connection between the purchaser of tires and the producers
of chemicals used in the rubbermaking process is simply too
attenuated to support" the purchaser's claim of unjust
enrichment).

Doe I v. Wal-Mart Stores, 572 F.3d at 684-85.

114

The Ninth Circuit's observations about the "attenuated" nature of the relationship between the plaintiffs and the defendant applies with equal force in the present case.  Plaintiffs assert that <u>Doe v. Wal-Mart</u> is not controlling because the present case involves a "long term exclusive relationship" between Defendants and the "specific farmers that enslaved Plaintiffs and other children."  (8/6/09 Opp. at 2.)  However, Plaintiffs fail to identify any legal authority for their conclusion that Defendants' long-term exclusive relationship with the **Ivorian farmers** constitutes a "prior relationship" between **Plaintiffs** and Defendants.  In <u>Doe v. Wal-Mart</u>, the Ninth Circuit affirmed the dismissal of an unjust enrichment claim where there was no "prior relationship" between the plaintiffs and defendant, and Plaintiffs have failed to identify any such relationship between Plaintiffs and Defendants in this case.  The Motion to Dismiss the unjust enrichment cause of action is therefore granted.

**B.   UNFAIR BUSINESS PRACTICES**

All Plaintiffs – both the Malian child-laborer Plaintiffs and the Global Exchange Plaintiffs – allege unfair competition violations under Cal. Bus. & Prof. Code §§ 17200 *et seq*.  The basic allegations are that Defendants engaged in fraudulent and deceptive business practices by making materially false misrepresentations and omissions that:

> den[ied] the use of child slaves and/or [] create[d] the false impression that the problem of child slaves is being adequately addressed, either directly by Defendants and/or through their various trade associations, including that an independent, credible system of monitoring, certification, and verification would be in place by July 1, 2005.

(FAC ¶ 95.)  Defendants also allegedly engaged in unfair business practices by "us[ing] . . . unfair, illegal, and forced child labor" to gain an unfair business advantage over competitors.  (FAC ¶ 96.)

### 1.   ALLEGATIONS BY FORMER CHILD LABORERS

The child-laborer Plaintiffs fail to allege any facts showing that they suffered harm on account of Defendants' conduct in California.

Plaintiffs correctly recognize that the Unfair Competition Law allows claims by "non-California plaintiffs when the alleged **misconduct** or **injuries** occurred **in California**." (2/23/09 Opp. at 36 (collecting cases) (emphasis added).)  California courts have consistently held that out-of-state plaintiffs may not bring Unfair Competition Law claims for out-of-state misconduct or injuries.  See, e.g., Churchill Village, L.L.C. v. General Elec. Co., 169 F. Supp. 2d 1119, 126 (N.D. Cal. 2000) ("section 17200 does not support claims by non-California residents where none of the alleged misconduct or injuries occurred in California") (citing Norwest Mortgage, Inc. v. Superior Court, 72 Cal. App. 4th 214 (1999)), aff'd, 361 F.3d 566 (9th Cir. 2004).

Plaintiffs fail to articulate any theory through which the child-laborer Plaintiffs were harmed by Defendants' California-based conduct. Plaintiffs assert that "Plaintiffs allege that Defendants have been making false and misleading statements in California" (2/23/09 Opp. at 36), but Plaintiffs fail to explain how the child-laborer **Plaintiffs** were **harmed** by those false and misleading statements.

Absent allegations that the child-laborer Plaintiffs suffered injuries based on Defendants' conduct in California, the Unfair Competition Law claims of the child-laborer Plaintiffs are dismissed. See Jane Doe I v. Wal-Mart Stores, Inc., No. CV 05-7307 AG (MANx), 2007 WL 5975664, at *6 (C.D. Cal. Mar. 30, 2007) (holding that no "case supports finding an injury in fact in a consumer deception case when the plaintiff is not a consumer. Plaintiffs have not shown any legal

authority for such an extension of a consumer protection law.").[58]

## 2. ALLEGATIONS BY GLOBAL EXCHANGE

The Court declines to exercise supplemental jurisdiction over
Global Exchange's Unfair Competition Law claims against Defendants.
Global Exchange's claims relate to Defendants' marketing and sales
conduct, not Defendants' alleged aiding and abetting human rights
abuses.  (See FAC ¶¶ 90-91.)  The Court concludes that Global
Exchange's Unfair Competition Law claims are not "so related to claims
in the action within such original jurisdiction that they form part of
the same case or controversy under Article III of the United States
Constitution."  28 U.S.C. § 1367(a).  "Nonfederal claims are part of
the same 'case' as federal claims when they 'derive from a common
nucleus of operative fact' and are such that a plaintiff 'would
ordinarily be expected to try them in one judicial proceeding.'"
Trustees of Construction Industry and Laborers Health and Welfare Trust
v. Desert Valley Landscape & Maintenance, Inc., 333 F.3d 923, 925 (9th
Cir. 2003) (quoting Finley v. United States, 490 U.S. 545, 549 (1989)).
Here, Global Exchange's claims do not "derive from a common nucleus of
operative fact" as the child-laborers' claims.  See id. at 925.

The Court also concludes that even if supplemental jurisdiction
were appropriate under 28 U.S.C. § 1367(a), the Court would decline to
exercise supplemental jurisdiction because "the claim raises a novel or
complex issue of State law."  28 U.S.C. § 1367(c)(1); see also Medrano
v. City of Los Angeles, 973 F.2d 1499, 1506 (9th Cir. 1992) (affirming
dismissal of claims involving "complicated state law issues").

---

[58] The Doe v. Wal-Mart plaintiffs did not appeal this portion of the
district court's holding.

California's Unfair Competition Law is in a state of flux and the Court
concludes that the state courts, not federal courts, should resolve the
statute's uncertainties.  See generally Clayworth v. Pfizer, Inc., 49
Cal. 4th 758 (2010); In re Tobacco II Cases, 46 Cal. 4th 298 (2009);
see also Janda v. T-Mobile USA, Inc., No. 09-15770, 2010 WL 1849028, at
*2 (9th Cir. May 10, 2010) ("In the context of a UCL consumer claim it
is unclear whether a plaintiff must (1) show that the harm to the
consumer of a particular practice outweighs its utility to defendant,
or (2) allege unfairness that is tethered to some legislatively
declared policy.") (citations and quotations omitted) (citable pursuant
to Fed. R. App. P. 32.1(a); 9th Cir. R. 36-3(b)).[59]

     In addition, the Court would also decline to exercise supplemental
jurisdiction under 28 U.S.C. § 1367(c)(3).  See, e.g., Construction
Industry and Laborers Health and Welfare Trust, 333 F.3d at 926 ("we
[have] held that it was appropriate for the district court to decline
jurisdiction over the supplemental state claims because the federal
claim had proven to be unfounded.").

     Although Defendants did not argue for the dismissal of Global
Exchange's claims on jurisdictional grounds, "[c]ourts have an
independent obligation to determine whether subject-matter jurisdiction
exists." Hertz Corp. v. Friend, 559 U.S. __, 130 S.Ct. 1181, 1193
(2010) ((citing Arbaugh v. Y & H Corp., 546 U.S. 500, 514 (2006)).
Here, the Court concludes that subject matter jurisdiction does not
exist because Global Exchange's claims are not part of the same "case

---

[59] The Court further notes that the precise basis of Plaintiffs'
Unfair Competition Law claim is unclear given the paucity of the
factual allegations.  It is unclear whether Plaintiffs' claims are
governed by cases discussing injuries to **competitors** or by cases
discussing injuries to **consumers**.

or controversy."  Furthermore, even if subject matter jurisdiction

would be permissible under 28 U.S.C. § 1367, the Court exercises its

discretion to decline to exercise supplemental jurisdiction.  See

Estate of Amergi v. The Palestinian Authority, __ F.3d __, 2010 WL

2898991, at *14-15 (11th Cir. 2010) (affirming district court's

dismissal of supplemental wrongful-death claim where federal claims

were premised on Alien Tort Statute).

    Plaintiffs have not pled any alternative bases other than 28

U.S.C. § 1367 that would support subject matter jurisdiction.  Although

they assert that jurisdiction is proper under 28 U.S.C. § 1332 (see FAC

¶ 6), they have failed to allege the citizenship of the individual

members of Global Exchange.  See, e.g., Stark v. Abex Corp., 407 F.

Supp. 2d 930, 934 (N.D. Ill. 2005) (plaintiff bears burden of showing

complete diversity between plaintiff and individual members of

defendant trade association); see generally Walter W. Jones,

Annotation, Determination of citizenship of unincorporated

associations, for federal diversity of citizenship purposes, in actions

by or against such associations, 14 A.L.R. Fed. 849 (1973, 2010 supp.).

Plaintiffs bear the burden of alleging diversity, and they have failed

to meet this burden.  See Bautista v. Pan American World Airlines,

Inc., 828 F.2d 546, 552 (9th Cir. 1987).  Plaintiffs may amend their

Complaint to remedy this deficiency.  See Snell v. Cleveland, Inc., 316

F.3d 822, 828 n.6 (9th Cir. 2002).  However, it appears that Plaintiffs

are likely fail on this ground because by their own admission Plaintiff

Global Exchange is based in California and Defendant Nestle USA is

headquartered in California.  (FAC ¶¶ 17-19.)

///

**X.    CORPORATE LIABILITY UNDER THE ALIEN TORT STATUTE**

Although the foregoing discussion resolves Plaintiffs' international law claims in Defendants' favor, the Court wishes to address an issue that was fully briefed for the Court and will require further attention if Plaintiffs elect to file an amended complaint.

Defendants argue that international law does not extend liability to corporations. (2/9/09 Mot. at 5-6.) With a single exception, this argument has been uniformly rejected or ignored by other courts. This Court, however, agrees with Defendants. For the following reasons, the Court concludes that international law does not recognize corporate liability for violations of international law. Accordingly, the Court concludes that the Alien Tort Statute, as interpreted in <u>Sosa</u>, does not recognize an international law cause of action for corporate violations of international law.

**A.    <u>SOSA</u>'S REQUIREMENTS AND INTERNATIONAL LAW**

First and foremost, the Court is guided by the choice-of-law principles enunciated in <u>Sosa</u>: federal common law (actionable under this Court's jurisdiction conferred by the Alien Tort Statute) only recognizes causes of action derived from (1) universal and (2) well-defined norms of (3) international law. <u>Sosa</u>, 542 U.S. at 725 ("[C]ourts should require any claim based on the present-day law of nations to rest on a norm of international character accepted by the civilized world and defined with a specificity comparable to the features of the 18th-century paradigms we have recognized."). Thus, this Court must rely on **international** rather than **domestic** law; and must rely on norms that are **universally** accepted by a consensus of civilized nations, rather than norms that are accepted by a select

group of nations; and, finally, the Court must rely on **definite** legal

standards, not **disputed** or **uncertain** ones.  See Sosa, 542 U.S. at 738

n.30 (noting "our demanding standard of definition").

In undertaking an analysis of whether Sosa permits suits to be

brought against corporate defendants, other federal courts appear to be

pushed and pulled by two opposing concerns.  First is the Sosa Court's

observation that "the First Congress did not pass the ATS as a

jurisdictional convenience to be placed on the shelf for use by a

future Congress or state legislature that might, someday, authorize the

creation of causes of action or itself decide to make some element of

the law of nations actionable for the benefit of foreigners."  Sosa,

542 U.S. at 719.  In order to prevent the Alien Tort Statute from

"lying fallow indefinitely," see id., lower courts occasionally appear

eager to entertain Alien Tort Statute claims.  Perhaps these courts are

guided by Chief Justice Marshall's declaration that every "individual

who considers himself injured, has a right to resort to the laws . . .

for a remedy." Marbury v. Madison, 5 U.S. (1 Cranch) 137, 166 (1803).

To these courts, it would be inequitable, and perhaps even a bit

unseemly, to bar the courthouse doors simply because a particular

international law norm is not quite definite enough, or is not

recognized by a sufficient number of civilized nations as applying to

corporations.

In seeking to open the courthouse doors to Alien Tort Statute

litigants, courts have run up against the second major concern raised

by Sosa: courts are prohibited from being "aggressive" or "creativ[e]"

in interpreting international law, because "Congress intended the ATS

to furnish jurisdiction for a relatively **modest set** of actions alleging

violations of the law of nations." Sosa, 542 U.S. at 720, 726, 728 (emphasis added).  The emphasis must be placed on the word **modest**. According to the Supreme Court, Congress has implicitly commanded to the courts that there must be a "restrained conception of the discretion a federal court should exercise in considering a new cause of action" under international law.  Id. at 725.  As the Court explained, lower courts must exercise "**caution**" when identifying actionable legal theories.[60]  The Court further stated that it was imposing a "high bar to new private causes of action for violating international law," and that courts must exercise "vigilant doorkeeping" in allowing a "narrow class" of appropriate cases.  Id. at 727, 729.

Sosa's repeated use of words like "caution" and "modest[y]" is particularly telling in light of the Court's discussion of the evolution in judicial thinking toward the common law.  In the past, the common law was "found or discovered" by courts; but today we acknowledge that the common law is "made or created" by judges through their exercise of "a substantial element of discretionary judgment in the decision."  Id. at 725-26.  In order to restrain this judicial discretion, "the general practice has been to look for legislative guidance before exercising innovative authority over substantive law." Id. at 726.  As the Court explained, "we now tend to understand common law not as a discoverable reflection of universal reason but, in a positivistic way, as a product of human choice."  Id. at 729.

Here, the "product of human choice" to which the Court must defer

---

[60] The Sosa majority uses the word "caution" (occasionally modified to read "**great** caution") five separate times.  Id. at 725, 727, 728.

is the Alien Tort Statute, 28 U.S.C. § 1350.  And as explained by <u>Sosa</u>,
this statute requires courts to look abroad to "f[ind] or discover[]"
only those international legal principles that are **universal** and **well-
defined**.  Domestic federal courts are simply not authorized to create
new international law, nor are they authorized to push the boundaries
of existing international law beyond those that have been defined by
other authorities.  Notably, this narrowly defined, positivistic view
is in accord with the modern conception of international law as being a
product of affirmative human choices rather than a form of "natural
law" that exists somewhere in the ether.  <u>See, e.g.</u>, <u>The Case of the
S.S. "Lotus"</u>, P.C.I.J., Ser. A., No. 10, 1927, at 18 ("The rules of law
binding upon States therefore emanate from their own free will as
expressed in conventions or by usages generally accepted as expressing
principles of law and established in order to regulate the relations
between these co-existing independent communities or with a view to the
achievement of common aims.").

Accordingly, the Supreme Court concluded that the appropriate
source of law under the Alien Tort Statute is well-defined,
universally-accepted international law.  In order to determine the
details of this source of law, it is necessary to apply the three-
tiered approach articulated by the Supreme Court in <u>The Paquete Habana</u>,
175 U.S. at 700, codified by American academics in the <u>Restatement
(Third) of Foreign Relations</u>, § 102, and adopted as the substantive
foundation for the primary contemporary authority on international law,
the International Court of Justice, <u>see</u> ICJ Statute, art. 38.  The
central sources of law are treaties and customary international law; by
way of analogy, these two bodies of law may be viewed respectively as

something like the statutes and common law in our domestic system.  The
secondary body of law is the gap-filling "general principles of law
common to the major legal systems."  <u>Restatement (Third) of Foreign
Relations</u>, § 102(4) & n.7; <u>see also</u> ICJ Statute, art. 38(1)(c) ("the
general principles of law recognized by civilized nations").[61]

     With those three sources of international law in mind, it is
important to refocus on <u>Sosa</u>'s directive that lower courts may only
apply international law that is universally accepted and well-defined.
Notably, in addition to this general description of the Alien Tort
Statute, the Supreme Court in <u>Sosa</u> also stated that lower courts must
specifically examine "whether international law extends the scope of
liability for a violation of a given norm to the perpetrator being
sued, if the defendant is a private actor such as a corporation or
individual."  <u>Sosa</u>, 542 U.S. at 732 n.20.  Thus, in order to address
Defendants' argument that corporations are not liable under the Alien
Tort Statute for violations of international law, the Court concludes
that the correct approach under <u>Sosa</u> is to determine whether universal,
well-defined international law "extends the scope of liability for a
violation of a given norm to . . . corporation[s]."  <u>See</u> <u>Sosa</u>, 542 U.S.
at 732 n.20.

     After <u>Sosa</u>, it is appropriate to look to international law rather
than domestic law to provide standards governing corporate liability,
agency attribution, joint venture theories, piercing the corporate
veil, and the like.  Some might argue that corporate liability can be

---

[61] Secondary authorities are recognized as "as subsidiary means for
the determination of rules of law."  ICJ Statute, art. 38(1)(d).
Secondary authorities are not themselves a source of international
law.  <u>See</u> <u>id.</u>

provided by operation of "federal common law."  See, e.g., In re Agent
Orange, 373 F. Supp. 2d at 59 ("In any event, even if it were not true
that international law recognizes corporations as defendants, they
still could be sued under the ATS. . . . [T]he Supreme Court made clear
that an ATS claim is a federal common law claim and it is a bedrock
tenet of American law that corporations can be held liable for their
torts.") (quotation omitted).  However, such an approach improperly
superimposes American legal rules on top of international law norms,
which directly contravenes Sosa's insistence that courts must determine
"whether **international law** extends the scope of liability for a
violation of a given norm to the perpetrator being sued."  Sosa, 542
U.S. at 732 n.20.

    The following example will illustrate the logic animating the
Court's conclusion that international law, not domestic common law,
must provide for corporate liabilty.  At the time the Alien Tort
Statute was enacted, the common law included a rule known as
"coverture," which treated husbands and wives as a single legal entity.
See generally Samantha Ricci, Note, Rethinking Women and the
Constitution: An Historical Argument for Recognizing Constitutional
Flexibility with Regards to Women in the New Republic, 16 Wm. & Mary J.
Women & L. 205, 212-21 (2009).  As explained by Blackstone: "By
marriage, the husband and wife are one person in law: that is, the very
being or legal existence of the woman is suspended during the marriage,
or at least is incorporated and consolidated into that of the husband:
under whose wing, protection, and cover, she performs every thing; and
is therefore called in our law-french a *feme-covert*; is said to be
covert-baron, or under the protection and influence of her husband, her

baron, or lord; and her condition during her marriage is called her

coverture." Blackstone, 1 <u>Commentaries</u>, Ch. 15.  Under this doctrine

of coverture, according to one study of criminal records in

Pennsylvania, "[i]n a fifty-year span between 1750 and 1800, 276 wives

were prosecuted alongside their husbands, and 266 other wives were

charged independently with the same crime their spouse had committed."

Ricci, <u>Rethinking Women and the Constitution</u>, 16 Wm. & Mary J. Women &

L. at 214 (citing G.S. Rowe, <u>Femes Covert and Criminal Prosecution in</u>

<u>Eighteenth-Century Pennsylvania</u>, 32 Am. J. L. Hist. 138, 142 (1988)).

In other words, women could be - and, based on the historical record,

apparently **were** - held legally responsible for acts committed by their

husbands.

In contrast to the common law rules, Blackstone noted, coverture

did not exist in civil law countries.  Blackstone, 1 <u>Commentaries</u>, Ch.

15.  In those countries, "the husband and wife are considered as two

distinct persons; and may have separate estates, contracts, debts, and

injuries: and therefore, in our ecclesiastical courts, a woman may sue

and be sued without her husband." <u>Id.</u>

In light of these clear distinctions between the common law

tradition and the civil law tradition, it would be quite inappropriate

for a United States court to apply principles of coverture under the

Alien Tort Statute.  No one could reasonably argue that United States

courts should impose American views of marital relations on all

international wrongdoers.  There is no authority in international law

allowing for the wife of a *hostis humanis generis* to be held equally

liable for her husband's wrongdoing, and it would be judicial

imperialism at its worst for American courts to inject coverture into

1  the Alien Tort Statute absent some clear authorization to do so from

2  either Congress or international law.

3      Of course, coverture no longer exists in domestic law, so there is

4  little risk that courts will engage in such absurdity.  But the purpose

5  of this discussion is to illustrate the nature of agency attribution in

6  a circumstance that is much less familiar than corporate liability,

7  joint venture liability, and general principal-agent liability.  <u>See</u>

8  <u>generally</u> Blackstone 1 <u>Commentaries</u> Chs. 14-17 (discussing four types

9  of agency relationships: master-servant, husband-wife, parent-child,

10  and guardian-ward).  Although no Alien Tort Statute court would think

11  it appropriate to hold a wife liable for her husband's wrongdoing based

12  on idiosyncratic domestic rules such as coverture, Alien Tort Statute

13  courts **routinely** apply domestic conceptions of agency liability with

14  respect to corporations, joint venturers, and others who have entered

15  into commercial principal-agent relationships.  Such an approach is, in

16  this Court's view, improper.  Under <u>Sosa</u>, corporate liability and other

17  types of agency liability must be created by international law.  And as

18  the following discussion demonstrates, there is not a well-defined

19  consensus regarding corporate liability in international law.

20     **B.   OTHER COURTS' CONCLUSIONS**

21      Despite the stringent standards set forth in <u>Sosa</u>, domestic courts

22  have almost uniformly concluded that corporations may be held liable

23  for violations of international law.  <u>See Romero v. Drummond Co., Inc.</u>,

24  552 F.3d 1303, 1315 (11th Cir. 2008) ("The text of the Alien Tort

25  Statute provides no express exception for corporations, and the law of

26  this Circuit is that this statute grants jurisdiction from complaints

27  of torture against corporate defendants.") (citations omitted);

28

<u>Khulumani v. Barclay Nat. Bank Ltd.</u>, 504 F.3d 254, 282 (2d Cir. 2007)
(Katzmann, J., concurring) ("the issue of whether corporations may be
held liable under the Alien Tort Statute is indistinguishable from the
question of whether private individuals may be"); <u>Al-Quraishi v.
Nakhla</u>, __ F. Supp. 2d __, 2010 WL 3001986, at *39-41 (D. Md. 2010); <u>In
re XE Services Alien Tort Litigation</u>, 665 F. Supp. 2d 569, 588 (E.D.
Va. 2009) ("Nothing in the ATS or <u>Sosa</u> may plausibly be read to
distinguish between private individuals and corporations."); <u>In re
South African Apartheid</u>, 617 F. Supp. 2d at 254-55 ("On at least nine
separate occasions, the Second Circuit has addressed ATCA cases against
corporations without ever hinting-much less holding-that such cases are
barred. . . . [T]his Court is bound by the decisions of the Second
Circuit."); <u>Arias v. Dyncorp</u>, 517 F. Supp. 2d 221, 227 (D.D.C. 2007)
("It is clear that the ATCA may be used against corporations acting
under 'color of state law,' or for a handful of private acts, such as
piracy and slave trading.") (alterations omitted); <u>Bowoto v. Chevron
Corp.</u>, No. C 99-02506 SI, 2006 WL 2455752, at *9 (N.D. Cal. Aug. 22,
2006) ("The dividing line for international law has traditionally
fallen between states and private actors. Once this line has been
crossed and an international norm has become sufficiently well
established to reach private actors, there is very little reason to
differentiate between corporations and individuals."); <u>Presbyterian
Church of Sudan v. Talisman Energy Inc.</u>, 374 F. Supp. 2d 331, 335-37
(S.D.N.Y. 2005); <u>In re Agent Orange Prod. Liab. Litig.</u>, 373 F. Supp. 2d
7, 58-59 (E.D.N.Y. 2005) ("Limiting civil liability to individuals
while exonerating the corporation directing the individual's action
through its complex operations and changing personnel makes little

sense in today's world."). Other courts have held corporations liable without specifically addressing the issue. See Abdullahi v. Pfizer, Inc., 562 F.3d 163 (2d Cir. 2007); Aldana v. Del Monte Fresh Produce, N.A., Inc., 416 F.3d 1242 (11th Cir. 2005); John Roe I v. Bridgestone Corp., 492 F. Supp. 2d 988 (S.D. Ind. 2007); Mujica v. Occidental Petroleum Corp., 381 F. Supp. 2d 1164 (C.D. Cal. 2005).

The two most thorough opinions on this question were issued by a pair of district courts in the Second Circuit. In Presbyterian Church of Sudan v. Talisman Energy, Inc., 244 F.Supp.2d 289 (S.D.N.Y. 2003), and In re Agent Orange Product Liability Litig., 373 F. Supp. 2d 7 (E.D.N.Y. 2005), Judge Schwartz and Judge Weinstein respectively discussed corporate liability in detail and concluded that corporations may be held liable for violating international law.[62] Many other courts have relied almost exclusively on the reasoning employed by these two decisions. See, e.g., In re XE Services, 665 F. Supp. 2d at 588; In re South African Apartheid, 617 F. Supp. 2d at 255 ("[I]n Presbyterian Church of Sudan v. Talisman Energy, Inc., Judge Denise Cote [sic] of the Southern District of New York wrote two lengthy and persuasive explanations of the basis for corporate liability in ATCA cases. This Court need not repeat her analysis.") (footnote omitted); Bowoto, 2006

---

[62] Shortly before passing away, Judge Schwartz wrote the initial Presbyterian Church of Sudan opinion addressing corporate liability. The case was transferred to Judge Cote. Following Sosa, Judge Cote reaffirmed the validity of Judge Schwartz's reasoning and added a few additional observations. See Presbyterian Church of Sudan, 374 F. Supp. 2d at 335 ("The 2003 Opinion meticulously demonstrated that corporations may be held liable under international law for violations of jus cogens norms, citing Second Circuit and other federal precedent, as well as a wide array of international law sources."). The Court refers to Judge Schwartz's opinion as Presbyterian Church of Sudan I and Judge Cote's opinion as Presbyterian Church of Sudan II.

WL 2455752, at *9.  Accordingly, this Court's analysis focuses heavily on the authorities and reasoning contained in Presbyterian Church of Sudan and In re Agent Orange.

Having examined the reasoning of those two cases and related authorities, the Court concludes there is no well-defined international consensus regarding corporate liability for violating international human rights norms.  Despite the weight of domestic authority supporting that conclusion, this issue remains open to reasonable debate.  Notably, the Second Circuit recently ordered further briefing on this issue, which reveals that the question is not settled in that Circuit.  See In re South African Apartheid, 617 F. Supp. 2d at 255 n.127; see also Docket no. 133 (Plaintiffs' Filing of Supplemental Briefing in Presbyterian Church of Sudan).  After receiving (and presumably reviewing) that briefing, the Second Circuit simply noted that Sosa specifically requires an inquiry into "'whether international law extends the scope of liability' to corporations,"  and assumed **without deciding** that "corporations such as Talisman may be held liable for the violations of customary international law that plaintiffs allege." Presbyterian Church of Sudan, 582 F.3d at 261 n.12 (quoting Sosa, 542 U.S. at 732 n. 20).  In addition, the Second Circuit again requested briefing on this issue in a recent appeal of the South African Apartheid decision.  See Balintulo v. Daimler AG, Case No. 09-2778-cv(L) (Dec. 4, 2009 order requesting further briefing).  This Court therefore believes that, contrary to Plaintiffs' assertions that this issue is well-settled, corporate liability remains open to scrutiny.

Accordingly, the Court wishes to undertake a critical examination

of the legal arguments *pro* and *con* regarding corporate liability under

the Alien Tort Statute.  As noted <u>supra</u>, this discussion draws heavily

on the two key cases resolving the question in favor of corporate

liability (the <u>Presbyterian Church of Sudan</u> and <u>In re Agent Orange</u>

district court opinions).  These cases' reasoning is contrasted with

the only judicial decision to the contrary, Judge Korman's dissent in

<u>Khulumani v. Barclay Nat. Bank Ltd.</u>, 504 F.3d 254, 321-26 (2d Cir.

2007).  Having examined these and related authorities, the Court

concludes that the existing cases have not adequately identified any

international law norms governing corporations.  Accordingly, the Court

concludes that corporations cannot be held directly liable under the

Alien Tort Statute for violating international law.

**C.   THE VARIOUS LINES OF REASONING**

Simply put, the existing caselaw fails to provide persuasive

analysis of the question of corporate liability under international

law.  The courts have mainly relied on the following lines of argument.

The Court examines the inadequacies of each argument, and concludes

that the existing cases fail to identify a universal, well-defined norm

of corporate liability under international law.

**1.   PRINCIPLE- AND LOGIC-BASED ARGUMENTS**

One of the most prominent approaches to corporate liability rests

on general principles of fairness and logic.  Courts have repeatedly

justified corporate liability on the ground that there is **no** reason why

corporations should **not** be liable for violating international law.

<u>See, e.g.</u>, <u>Romero v. Drummond Co., Inc.</u>, 552 F.3d 1303, 1315 (11th Cir.

2008) ("The text of the Alien Tort Statute provides no express

exception for corporations."); <u>Khulumani v. Barclay Nat. Bank Ltd.</u>, 504

F.3d 254, 282 (2d Cir. 2007) (Katzmann, J., concurring) ("the issue of whether corporations may be held liable under the Alien Tort Statute is indistinguishable from the question of whether private individuals may be"); In re XE Services, 665 F. Supp. 2d at 588 ("Nothing in the ATS or Sosa may plausibly be read to distinguish between private individuals and corporations. . . . [T]here is **no identifiable principle** of civil liability which would distinguish between individual and corporate defendants in these circumstances.") (emphasis added); Bowoto v. Chevron, 2006 WL 2455752, at *9 ("The dividing line for international law has traditionally fallen between states and private actors. Once this line has been crossed and an international norm has become sufficiently well established to reach private actors, there is **very little reason** to differentiate between corporations and individuals.") (emphasis added); Presbyterian Church of Sudan II, 374 F. Supp. 2d at 336 n.10 ("there is **no principled basis** for contending that acts such as genocide are of mutual and not merely several concern to states when the acts are performed by some private actors, like individuals, but not by other private actors, like corporations") (emphasis added); In re Agent Orange, 373 F. Supp. 2d at 58-59 ("Limiting civil liability to individuals while exonerating the corporation directing the individual's action through its complex operations and changing personnel **makes little sense** in today's world.") (emphasis added); Presbyterian Church of Sudan I, 244 F. Supp. 2d at 318 ("[T]here is **no logical reason** why corporations should not be held liable, at least in cases of *jus cogens* violations.") (emphasis added).

The most thorough elaboration of this argument appears in In re

1    <u>Agent Orange</u>.   Judge Weinstein explained:

2

3          Limiting civil liability to individuals while exonerating the
corporation directing the individual's action through its complex
operations and changing personnel makes little sense in today's
world. Our vital private activities are conducted primarily under

4          corporate auspices, only corporations have the wherewithal to
respond to massive toxic tort suits, and changing personnel means

5          that those individuals who acted on behalf of the corporation and
for its profit are often gone or deceased before they or the

6          corporation can be brought to justice. . . .  Defendants present
no policy reason why corporations should be uniquely exempt from

7          tort liability under the ATS, and no court has presented one
either. . . .  Such a result should hardly be surprising. A

8          private corporation is a juridical person and has no *per se*
immunity under U.S. domestic or international law. Given that

9          private individuals are liable for violations of international law
in certain circumstances, there is no logical reason why

10         corporations should not be held liable, at least in cases of *jus
cogens* violations. . . . Indeed, while [the defendant] disputes

11         the fact that corporations are capable of violating the law of
nations, it provides no logical argument supporting its claim.

12

13 <u>In re Agent Orange</u>, 373 F. Supp. 2d at 58-59 (citations and quotations

14 omitted).

15       This approach may be persuasive as a matter of abstract reasoning,

16 but it fails to comport with the Supreme Court's directives in <u>Sosa</u>.

17 Federal courts addressing claims under the Alien Tort Statute may only

18 recognize claims that "rest on a norm of international character

19 accepted by the civilized world and defined with a specificity

20 comparable to the features of the 18th-century paradigms we have

21 recognized [that is, piracy, safe-conduct violations, and infringements

22 of the rights of ambassadors]." <u>Sosa</u>, 542 U.S. at 725.  As the <u>Sosa</u>

23 Court noted, "we now adhere to a conception of limited judicial power .

24 . . that federal courts have no authority to derive 'general' common

25 law." <u>Id.</u> at 729.  The Court emphasized that Alien Tort Statute claims

26 are not drawn from the ether but rather are "derived from the law of

27 nations." <u>Id.</u> at 731 n.19.  Thus, under <u>Sosa</u>, federal judges may not

28 rely on their own ideas of what is right, fair, or logical.  To

paraphrase Justice Scalia's concurrence, although "we" - i.e., federal judges - "know ourselves to be eminently reasonable, self-awareness of eminent reasonableness is not really a substitute for" universal and well-defined norms of international law.  Id. at 750 (Scalia, J., concurring).  Whatever the logical force of the domestic courts' conclusions, Sosa simply prohibits that method of analysis.  This Court therefore concurs with Judge Korman's observation that "the issue here is not whether policy considerations favor (or disfavor) corporate responsibility for violations of international law." Khulumani, 504 F.3d at 325 (Korman, J., dissenting).[63]

Furthermore, the Court is not fully convinced that reason and logic clearly compel the conclusion that corporations should be liable under the Alien Tort Statute.  As noted by Judge Korman:

> There is a significant basis for distinguishing between personal and corporate liability. Where the private actor is an individual, he is held liable for acts which he has committed and for which he bears moral responsibility. On the other hand, "legal entities, as legal abstractions can neither think nor act as human beings, and what is legally ascribed to them is the resulting harm produced by individual conduct performed in the name or for the benefit of those participating in them or sharing in their benefits."

Khulumani, 504 F.3d at 325 (Korman, J., dissenting) (quoting M. Cherif Bassiouni, Crimes Against Humanity in International Criminal Law 378

---

[63] It should be emphasized that Sosa requires the international law norm to be well-defined and widely recognized.  International law may, as a general matter, allow jurists to apply basic principles of logic and reason.  See, e.g., In re Piracy Jure Gentium, [1934] A.C. 586, 595 (P.C.) (rejecting argument that actual robbery is a sine qua non of piracy, and noting with respect to this argument that "their Lordships are almost tempted to say that a little common sense is a valuable quality in the interpretation of international law").  However, Sosa appears to bar domestic courts from engaging in that mode of analysis.  Under Sosa, applicable rules of international law must be derived from universally recognized, well-defined international-law sources, not federal judges' particular notions of "common sense."

(2d ed.1999)).  Ultimately, **individuals**, not **legal entities**, perform
the actions that violate international law.  Therefore, it stands to
reason that the individuals should be held responsible.

One of the central animating forces behind domestic courts'
conclusions is an aspirational view of what the law **should** contain, not
what the law **actually** contains.  However, <u>Sosa</u> prohibits courts from
substituting abstract aspirations - or even pragmatic concerns - in
place of specific international rules.  <u>See</u> <u>Sosa</u>, 542 U.S. at 738
(rejecting plaintiff's argument because it "expresses an aspiration
that exceeds any binding customary rule having the specificity we
require.").  The real question is whether international law actually
provides for corporate liability.

### 2. *STARE DECISIS*-BASED ARGUMENTS

The second most prominent line of argument relies on the fact that
domestic courts have consistently upheld corporate liability under the
Alien Tort Statute.  For example, in <u>Abdullahi v. Pfizer</u>, the court
cited the *per curiam* decision in <u>Khulumani</u> for the proposition that "we
held that the ATS conferred jurisdiction over multinational
corporations that purportedly" violated international law.  <u>Abdullahi
v. Pfizer</u>, 562 F.3d 163, 174 (2d Cir. 2009), *cert. denied*, 130 S.Ct.
3541 (2010).  The <u>Abdullahi v. Pfizer</u> court accordingly treated the
question as settled.[64]  District courts in the Second Circuit have
reached the same conclusion.  <u>In re South African Apartheid</u>, 617 F.
Supp. 2d at 254-55; <u>Presbyterian Church of Sudan II</u>, 374 F. Supp. 2d at
335 (noting that, after <u>Presbyterian Church of Sudan I</u>, "the Second

---

[64] As noted <u>supra</u>, this question is decidedly **not** settled in the
Second Circuit.  <u>See</u> <u>Presbyterian Church of Sudan</u>, 582 F.3d at 261
n.12.

Circuit twice confronted ATS cases with corporate defendants, and
neither time did it hold that corporations cannot be liable under
customary international law"); In re Agent Orange, 373 F. Supp. 2d at
58 ("The Second Circuit has considered numerous cases where plaintiffs
sued a corporation under the ATCA for alleged breaches of international
law.") (quotation omitted) (collecting cases); Presbyterian Church of
Sudan I, 244 F. Supp. 2d at 311-13 ("While the Second Circuit has not
explicitly held that corporations are potentially liable for violations
of the law of nations, it has considered numerous cases . . . where a
plaintiff sued a corporation under the ATCA for alleged breaches of
international law. . . . In each of these cases, the Second Circuit
acknowledged that corporations are potentially liable for violations of
the law of nations that ordinarily entail individual responsibility,
including jus cogens violations.") (collecting cases).  Courts in other
circuits have adopted the same line of analysis.  See Romero v.
Drummond Co., 552 F.3d 1303, 1315 (11th Cir. 2008) ("[T]he law of this
Circuit is that this statute grants jurisdiction from complaints of
torture against corporate defendants."); In re XE Services, 665 F.
Supp. 2d 569, 588 (E.D. Va. 2009) ("all courts to have considered the
question have concluded that" corporations may be held liable under
international law); In re South African Apartheid, 617 F. Supp. 2d at
254-55 ("On at least nine separate occasions, the Second Circuit has
addressed ATCA cases against corporations without ever hinting-much
less holding-that such cases are barred. . . . [T]his Court is bound by
the decisions of the Second Circuit."); Bowoto v. Chevron, 2006 WL
2455752, at *9 (N.D. Cal. Aug. 22, 2006) ("Both before and after Sosa,
courts have concluded that corporations may be held liable under the

ATS.").

None of these cases identifies a universal and well-defined standard of international law.  In fact, none of these cases quotes or cites an earlier case that identifies a universal and well-defined standard of international law.  Most of these cases refer to earlier cases that did not even **mention** corporate liability.  Compare Romero v. Drummond Co., 552 F.3d at 1315 (citing Aldana v. Del Monte Fresh Produce, Inc., 416 F.3d 1242 (11th Cir. 2005), as binding circuit "precedent") with Aldana v. Del Monte Fresh Produce, Inc., 416 F.3d at 1244-53 (opinion is silent regarding corporate liability).  This approach ignores the fundamental principle that "[q]uestions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents."  Webster v. Fall, 266 U.S. 507, 511, 45 S.Ct. 148, 69 L.Ed. 411 (1925); see also E. & J. Gallo Winery v. EnCana Corp., 503 F.3d 1027, 1046 n.14 (9th Cir. 2007) (same).

Accordingly, the Court affords little weight to the fact that various domestic courts have contemplated corporate liability (either explicitly or implicitly).  Under Sosa, domestic precedents are only relevant to the extent that they identify a well-defined international law consensus.

### 3.  EARLY HISTORICAL PRECEDENTS

As Sosa noted, piracy is one of the oldest and most well-defined examples of international law.  There is some authority for the proposition that piracy can only be committed by individuals, not legal entities.  As explained in Samuel Rutherford's seventeenth century treatise Lex, Rex, which is quoted among the extensive citations in

<u>United States v. Smith</u>, 18 U.S. 153 (1820):

> A band of robbers or a company of pirates may in fact be united to
> one another by compact, &c. But they are still, by the law of
> nature, only a number of unconnected individuals; and
> consequently, **in the view of the law of nations they are not
> considered as a collective body or public person**. For the compact
> by which they unite themselves is void, because the matter of it
> is unlawful, &c. &c. The common benefit which a band of robbers or
> a company of pirates propose to themselves consists in doing harm
> to the rest of mankind.

<u>Smith</u>, 18 U.S. at 168-69 n.h quoting Rutherford, 2 <u>Lex, Rex</u>, ch. 9

(1644)) (emphasis added).  In other words, a legal entity used for an

illegal purpose is traditionally void in international law.

This same view is stated by Blackstone regarding corporate crimes

more generally.  As Blackstone wrote, "[a] corporation cannot commit

treason, or felony, or other crime, in its corporate capacity: though

its members may, in their distinct individual capacities.  Neither is

it capable of suffering a traitor's, or felon's punishment, for it is

not liable to corporeal penalties, nor to attainder, forfeiture, or

corruption of blood."  Blackstone, 1 <u>Commentaries</u>, Ch. 18.

On the other hand, the early authorities do not uniformly prohibit

corporate liability.  Notably, in the early twentieth century the

Attorney General of the United States recommended that the Alien Tort

Statute could be used to remedy harms caused by a corporation's

violation of a water-rights treaty between the United States and

Mexico.  Charles J. Bonaparte, <u>Mexican Boundary - Diversion of the Rio

Grande</u>, 26 Op. Atty. Gen. 250 (1907).  The attorney general stated that

the Alien Tort Statute provides both "a right of action and a forum"

for Mexican citizens to bring an action against the corporation for the

harm they may have suffered from the diversion of the Rio Grande.  <u>Id.</u>

at 252-53.  The attorney general hedged a bit by noting that he could

not "undertake to say whether or not a suit under . . . the foregoing

statute[] would be successful," as such questions "could only be

determined by judicial decision." Id.  This opinion, although somewhat

ambiguous and certainly not binding on this Court, provides at least

some historical support for the view that corporations may potentially

be held liable for violating international law.

### 4.   NUREMBERG-BASED PRECEDENTS

Another set of historical precedents is contained in the decisions

of the Nuremberg Tribunals, which are generally viewed as the seminal

authorities in modern international criminal law.

The London Charter (the agreement through which the Nuremberg

Tribunals were formed and governed) explicitly recognized the existence

of "criminal organizations."  The Charter specifically provided that

the Tribunal was empowered to declare certain organizations to be

"criminal organization[s]."  London Charter, Art. 9.  The effect of

this declaration was not to impose liability upon the organization

itself; rather, the declaration, if unrebutted before the Tribunal,

imposed automatic liability on the organization's **individual members**.

See Art. 9-10.[65]  (Notably, Karl Rasche - the banker in "The Ministries

---

[65] In full, Article 9 reads:
> At the trial of any individual member of any group or
> organization the Tribunal may declare (in connection with any
> act of which the individual may be convicted) that the group or
> organization of which the individual was a member was a criminal
> organization.
> After the receipt of the Indictment the Tribunal shall give such
> notice as it thinks fit that the prosecution intends to ask the
> Tribunal to make such declaration and any member of the
> organization will be entitled to apply to the Tribunal for leave
> to be heard by the Tribunal upon the question of the criminal
> character of the organization. The Tribunal shall have power to
> allow or reject the application. If the application is allowed,
> the Tribunal may direct in what manner the applicants shall be

<u>Case</u>" – was found guilty of being a member of the SS, which had been deemed a "criminal organization" pursuant to this provision.  <u>United States v. Von Weizsaecker</u>, 14 T.W.C. at 863.)

Some courts have viewed this "criminal organization" provision as an example of corporate liability.  <u>See</u> <u>Presbyterian Church of Sudan I</u>, 244 F. Supp. 2d at 315.  The better view – expressed by the Nuremberg Tribunal itself – is that the "criminal organization" provision was a mechanism for holding individual members of the organization liable for other members' acts in the same manner that joint criminal enterprise or conspiracy provides for such individual liability.  <u>See</u> <u>The Nuremberg Trial</u>, 6 F.R.D. 69, 132 (1946) ("A criminal organization is analogous to a criminal conspiracy in that the essence of both is cooperation for criminal purposes. There must be a group bound together and organized for a common purpose. The group must be formed or used in connection with the commission of crimes denounced by the Charter."); <u>see generally</u> <u>Prosecutor v. Vasiljevic</u>, 2004 WL 2781932, at ¶ 102 (describing differences between aiding and abetting liability and joint criminal enterprise liability).  The London Charter did not provide for entity responsibility as such; rather, it only authorized the Tribunals to convict those person who "as **individuals** or as **members of organizations**, committed" certain crimes.  London Charter, art. 6 (emphasis added).  In other words, the Charter recognized that some

represented and heard.
Article 10 reads:
In cases where a group or organization is declared criminal by the Tribunal, the competent national authority of any Signatory shall have the right to bring individual to trial for membership therein before national, military or occupation courts. In any such case the criminal nature of the group or organization is considered proved and shall not be questioned.

individuals were acting "as members of organizations," but determined that the individual members, rather than the organizations themselves, were the proper defendants.  In short, the Tribunal was only authorized to establish "individual responsibility," art. 6, and simply could not punish organizations.  See United States v. Krauch, 8 T.W.C. at 1153 ("It is appropriate here to mention that the corporate defendant, Farben, is not before the bar of this Tribunal and cannot be subjected to criminal penalties in these proceedings."); see generally Khulumani, 504 F.3d at 322 & n.10 (Korman, J., dissenting).

     That said, the Tribunals occasionally suggested that corporations and organizations could be held separately responsible.  Domestic courts have relied heavily on these statements from the Tribunals.  See In re Agent Orange, 373 F. Supp. 2d at 57; Presbyterian Church of Sudan I, 244 F. Supp. 2d at 315-16.  The Tribunals' clearest discussion of corporations appears in the United States v. Krauch decision, in which the panel explicitly suggested that corporations may be liable for certain war crimes relating to wartime plunder (or "spoliation," in the terms used by the tribunal):

> Where private individuals, **including juristic persons**, proceed to exploit the military occupancy by acquiring private property against the will and consent of the former owner, such action, not being expressly justified by any applicable provision of the Hague Regulations, is in violation of international law.  The payment of a price or other adequate consideration does not, under such circumstances, relieve the act of its unlawful character. Similarly where a private individual or **a juristic person** becomes a party to unlawful confiscation of public or private property by planning and executing a well-defined design to acquire such property permanently, acquisition under such circumstances subsequent to the confiscation constitutes conduct in violation of the Hague Regulations.

Krauch, 8 T.W.C. at 1132-33 (emphasis added).

     The tribunal went on to explain, however, that the corporation

could not be held responsible for violating international law: "corporations act **through individuals** and, under the conception of personal individual guilt . . . , the prosecution, to discharge the burden imposed upon it in this case, must establish by competent proof . . . that **an individual defendant** was either a participant in the illegal act or that, being aware thereof, he authorized or approved it." Krauch, 8 T.W.C. at 1153 (emphasis added).[66]  The tribunal explained that its discussion of "corporations" and "juristic persons" was mere *obiter dictum* that was "descriptive of the instrumentality of cohesion in the name of which the enumerated acts of spoliation were committed." See id.  In other words, the tribunal's references to the company were placeholders meant as shorthand for the individual members of the company.  The tribunal's references to the company were not substantive discussions regarding legal responsibility.  Accord In re Agent Orange, 373 F. Supp. 2d at 57 ("In fact, in the Nuremberg trials, this point of lack of corporate liability appeared to have been explicitly stated.").

An illustration of the tribunals' "shorthand" approach can be found in United States v. Krupp.  The tribunal concluded "that the confiscation of the Austin plant [a French tractor plant owned by the

---

[66] In an oft-quoted statement, one of the post-Nuremberg tribunals expressed in strong, clear terms that only **individuals** were capable of being punished for violating international law: "Crimes against international law are committed by men, not by abstract entities, and only by punishing individuals who commit such crimes can the provisions of international law be enforced." The Nuremberg Trial, 6 F.R.D. 69, 110 (1946).  The context of that discussion, however, reveals that the tribunal was rejecting the argument that international law applies only to **sovereign states**. See id.; see also Krauch, 8 T.W.C. at 1125.  The tribunal was not referring specifically to questions of corporate liability.

Rothschilds] . . . and its subsequent detention **by the Krupp firm** constitute a violation of Article 43 of the Hague Regulations which requires that the laws in force in an occupied country be respected; that it was also a violation of Article 46 of the Hague Regulations which provides that private property must be respected; [and] that **the Krupp firm**, **through defendants Krupp, Loeser, Houdremont, Mueller, Janssen, and Eberhardt**, voluntarily and without duress participated in these violations by purchasing and removing the machinery and leasing the property of the Austin plant and in leasing the Paris property." Krupp, 9 T.W.C. at 1352-53 (emphasis added).  In light of this factual conclusion, the tribunal held the individual defendants - not the corporation itself - responsible for the wrongful acts.  Id. at 1448-49; see also Khulumani, 504 F.3d at 322 (Korman, J., dissenting) (noting similar discussion in United States v. Krauch, 7 T.W.C. at 11-14, 39, 50, 59).

Based on these cases, the fundamental conclusion is that the Nuremberg-era tribunals did not impose any form of liability on corporations or organizations as such.  Rather, these tribunals were imposing liability solely on the individuals members of the corporations and organizations.  The tribunals repeatedly noted this fact, and their stray references to the contrary constitute nothing more than *dicta*.  The courts that have relied on this *dicta* have failed to identify a sufficiently universal and well-defined international law norm of corporate liability that satisfies Sosa.  See Khulumani, 504 F.3d at 321-22 (Korman, J., dissenting).

### 5.   TREATY- AND CONVENTION-BASED PRECEDENTS

With few exceptions, international treaties bind sovereign states

rather than private parties.  See generally Presbyterian Church of
Sudan I, 244 F. Supp. 2d at 317 ("Treaties, by definition, are
concluded between states."); see also Edye v. Robertson (Head Money
Cases), 112 U.S. 580, 598 (1884) ("A treaty is primarily a compact
between independent nations.").  In fact, the "major conventions
protecting basic human rights, such as the Genocide Convention and
common article 3 of the Geneva Convention, do not explicitly reach
corporations." Presbyterian Church of Sudan, 244 F. Supp. 2d at 317.
Instead, human rights conventions and treaties bind states or, on
occasion, natural persons.  For example, treaties bind nations by
requiring them to enact domestic legislation outlawing slavery or the
slave trade, see 1926 Geneva Slavery Convention, arts. 2(b), 6;
requiring nations to outlaw forced labor and other wrongful labor
practices, see, e.g., Convention Concerning Forced or Compulsory Labor,
ILO no. 29, arts. 25-26, 39 U.N.T.S. 55, entered into force May 1,
1932; or requiring nations to outlaw illegal shipments of hazardous
wastes, see, e.g., Basel Convention on the Control of Transboundary
Movements of Hazardous Wastes and Their Disposal, Arts. 4(2), 4(4),
4(7), 9(5), 1673 U.N.T.S. 57.  Of course, domestic laws that implement
these treaties might be enforceable against corporations; but this
results from the operation of the domestic implementing law, not
international treaty law.  The treaties themselves are silent regarding
corporate liability.

        Despite these general principles of treaty law, the district court
in Presbyterian Church of Sudan identified a handful of treaties that
explicitly contemplate corporate liability.  See generally Presbyterian
Church of Sudan, 244 F. Supp. 2d at 317.  An oil pollution treaty

provides that a ship "owner" (defined as any "person" registered as the owner) is liable for oil pollution damage caused by the ship's discharge.  Id. at 317 (citing International Convention on Civil Liability for Oil Pollution Damage, Nov. 29, 1969, art. 3(1), 26 U.S.T. 765, 973 U.N.T.S. 3).  Similarly, a nuclear treaty provides that "[t]he operator of a nuclear installation" is liable for damage caused by the installation; notably, the treaty specifically defines "operator" as "any private or public body whether corporate or not."  Id. (citing Vienna Convention on Civil Liability for Nuclear Damage, May 21, 1963, art. 2(1), 1063 U.N.T.S. 265).  The 1976 Convention on Civil Liability for Oil Pollution Damage Resulting from Exploration for and Exploitation of Seabed Mineral Resources contains an identical extension of liability to any person "whether corporate or not."  Dec. 17, 1976, art. 5, reprinted at 16 I.L.M. 1450 (cited in Presbyterian Church of Sudan I, 244 F. Supp. 2d at 317).

These treaties provide marginal authority at best with respect to the relevant inquiry under Sosa of identifying a universal and well-defined international consensus regarding corporate liability for human rights violations.  These treaties involve transnational environmental torts such as oil spills and nuclear accidents.  See Steven R. Ratner, Corporations and Human Rights: A Theory of Legal Responsibility, 111 Yale L.J. 443, 479-81 (2001).  The international community has a direct interest in regulating these forms of private behavior, as the harms that flow from these torts extend beyond the national borders of the situs of the act.  See id.  In fact, many scholars view these treaties as constituting rules of private law rather than public international law.  Id. at 481 & nn.152-54.  In any event, regardless of how these

treaties are characterized, they fail to identify a universal and well-defined international law standard for holding corporations responsible for human rights abuses.

In addition to the specific environmental tort treaties, domestic courts have also pointed to other international conventions and international rule-making as indirect evidence of corporate liability. See Presbyterian Church of Sudan I, 244 F. Supp. 2d at 318.  The Presbyterian Church of Sudan court relied on the declaration of Professor Ralph G. Steinhardt for the proposition that the major human rights treaties "do not distinguish between natural and juridical individuals, and it is implausible that international law would protect a corporation" that violated fundamental norms of international law. Id.  The Presbyterian Church of Sudan I court also looked to labor treaties – none of which actually state that they apply to corporations – which, in the court's words, "clearly 'presuppose[] . . . a duty on the corporation not to interfere with the ability of employees to form unions.'" Id. at 317 (quoting Ratner, Corporations and Human Rights, 111 Yale L.J. at 478-79).  In light of Sosa, it should be clear that Sosa's requirements are not satisfied by the **possibility** of corporate liability, id. at 316 ("corporations **may** be liable under codified international law") (emphasis added), or by one professor's suggestion as to what is or is not **plausible**, id. ("it is **implausible** that international law would protect a corporation") (emphasis added), or by yet another professor's conclusion that labor treaties implicitly **presuppose** corporate liability, id. at 317 ("a major International Labour Organization convention clearly '**presupposes** . . .  a duty on the corporation'") (emphasis added).

146

The <u>Presbyterian Church of Sudan I</u> court also relied on the

Universal Declaration of Human Rights, which the court asserted was

"binding on states as well as corporations." <u>Id.</u> at 318.   The

Universal Declaration provides that "every individual and every organ

of society" shall "strive . . . to promote respect" for the fundamental

human rights described in the Convention.   Notably, the <u>Sosa</u> Court

expressly **rejected** the plaintiff's reliance on the Universal

Declaration of Human Rights because "the Declaration does not of its

own force impose obligations as a matter of international law," but

rather is "'a statement of principles'" that are non-binding in nature.

<u>Sosa</u>, 542 U.S. at 734-35 (quoting Eleanor Roosevelt, cited in Humphrey,

<u>The UN Charter and the Universal Declaration of Human Rights</u> 39, 50 (E.

Luard ed. 1967)). In any event, even if the Universal Declaration were

a binding statement of international law, it is unclear that it

actually applies to corporations.   The <u>Presbyterian Church of Sudan I</u>

court relied on a short essay written by the prominent international

law professor Louis Henkin, which explains that "every individual and

every organ of society" as used in the Universal Declaration "includes

juridical persons.   Every individual and every organ of society

excludes no one, no company, no market, no cyberspace. The Universal

Declaration applies to them all."   Louis Henkin, <u>The Universal</u>

<u>Declaration at 50 and the Challenge of Global Markets</u>, 25 Brook. J.

Int'l L. 17, 25 (1999) (quoted in <u>Presbyterian Church of Sudan I</u>, 244

F. Supp. 2d at 318).   But notably absent from the <u>Presbyterian Church</u>

<u>of Sudan I</u>'s discussion is the opening sentence of that paragraph of

Henkin's essay: "At this juncture the Universal Declaration **may** also

address multinational companies."   Henkin, <u>The Universal Declaration at</u>

50, 25 Brook. J. Int'l L. at 25 (emphasis added).  Needless to say, the mere **possibility** of corporate liability is different from a well-defined international consensus on the issue.  See Khulumani, 504 F.3d at 324 (Korman, J., dissenting) (citing Carlos M. Vázquez, Direct vs. Indirect Obligations of Corporations Under International Law, 43 Colum. J. Transnat'l L. 927, 942 (2005)).  The Universal Declaration of Human Rights therefore stands among the other aspirational international attempts at identifying and defining corporate liability for human rights violations.[67]  As the Supreme Court wrote in Sosa, "that a rule as stated is as far from full realization as the one [plaintiff] urges is evidence **against** its status as binding law."  Sosa, 542 U.S. at 738 n.29 (emphasis added).

As a final source of international law, the Presbyterian Church of Sudan I court also relied on the United Nations' practice of imposing economic sanctions, which although "formally directed at states, they also entail certain duties for corporations."  Presbyterian Church of

---

[67] For example, the United Nations Code of Conduct on Transnational Corporations has been through a pair of drafts (one in 1983 and another in 1990), but has never been formally adopted by any nation. Similar efforts have likewise resulted in purely aspirational, theoretical documents that are non-binding and in no way reflective of international law.  See Development and International Economic Co-operation: Transnational Corporations, U.N. ESCOR, 2d Sess., U.N. Doc. E/1990/94 (1990); Draft United Nations Code of Conduct on Transnational Corporations, U.N. ESCOR, Spec. Sess., Supp. No. 7, Annex II, U.N. Doc. E/1983/17/Rev.1 (1983); see also U.N. Econ. & Soc. Council (ECOSOC), Sub-Comm'n on Promotion & Prot. of Human Rights, Norms on the Responsibilities of Transnational Corporations and Other Business Enterprises with Regard to Human Rights, U.N. Doc. E/CN.4/Sub.2/2003/L.8 (Aug. 7, 2003); cf. Report of the Special Representative of the Secretary-General on the Issue of Human Rights and Transnational Corporations and Other Business Enterprises, Business and Human Rights: Mapping International Standards of Responsibility and Accountability for Corporate Acts, UN Doc. A/HRC/4/35, ¶ 20 (Feb. 19, 2007).

<u>Sudan I</u>, 244 F. Supp. 2d at 318.  None of the sanctions were directly applied to corporations, though; if a corporate act violated the sanctions, the state of the corporation's citizenship would be held responsible for violating the sanctions.  <u>Id.</u>  The court also pointed to United Nations General Assembly Resolutions, which by their very nature are non-binding.  <u>See</u> <u>Flores v. Southern Peru Copper Corp.</u>, 414 F.3d 233, 259-62 (2d Cir. 2003).  In addition, the court relied on the practice of the European Union, which, under the 1957 Treaty of Rome (which established the Union) and subsequent treaties, has implemented regulations directly against corporations in areas such as antitrust and socioeconomic discrimination.  <u>Presbyterian Church of Sudan I</u>, 244 F. Supp. 2d at 318.

In short, courts have identified various treaties, conventions, and international proclamations as support for the view that international law recognizes corporate liability.  However, none of these international law sources provides a well-defined universal consensus regarding corporate liability.  These authorities, without more, fail to satisfy <u>Sosa</u>'s requirements.

On the contrary, treaty-based international law provides a rather compelling (although not definitive) argument **against** treating corporate liability as an actionable rule of international law.  The drafting history of the 1998 Rome Statute of the International Criminal Court reveals that the global community of nation-states in fact **lacks** a consensus regarding corporate liability for human rights violations.  <u>See</u> <u>Khulumani</u>, 504 F.3d at 322-23 (Korman, J., dissenting).  Thus, not only have the **supporters** of corporate liability failed to meet their affirmative burden of identifying well-defined, universally

149

acknowledged international norms of corporate liability, but the **opponents** of corporate liability have affirmatively shown that such a well-defined global consensus **does not** exist.  "Since as a practical matter it is never easy to prove a negative," Bartnicki v. Vopper, 532 U.S. 514, 552, 121 S.Ct. 1753, 1775 (2001) (quoting Elkins v. United States, 364 U.S. 206, 218, 80 S.Ct. 1437, 1445 (1960)), the Rome Statute negotiating history provides particularly compelling evidence that there is **not** a global consensus of corporate responsibility for human rights violations under international law.

The negotiating history of Rome Statute shows that the global community has been unable to reach a consensus regarding corporate responsibility for international human rights violations.  Although the initial drafts of the Statute provided for corporate liability, this provision was specifically **deleted** from the final version.  See 2 United Nations Diplomatic Conference of Plenipotentiaries on the Establishment of an International Criminal Court, Rome, 15 June - 17 July 1998, at 135 (2002). There were a number of reasons for deleting the provision,[68] and the most prominent reason was the absence of international uniformity regarding "acceptable definitions" of corporate liability.  Delegates from China, Lebanon, Sweden, Mexico, Thailand, Syria, Greece, Egypt, Poland, Slovenia, El Salvador, Yemen, and Iran firmly opposed the inclusion of corporate liability.

---

[68] In full, the chairman summarized negotiations as centering on these questions: "Many delegations had difficulty in accepting any reference to 'legal persons' or 'criminal organizations', the reasons given being the problem of implementation in domestic law, the difficulty of finding acceptable definitions, the implications for the complementarity principle, the possible creation of new obligations for States, and the challenge to what was considered the exclusive focus of the Statute, namely individual criminal responsibility."  Id. at 135.

Delegates from Australia, Ukraine, Cuba, Argentina, Singapore, Venezuela, Algeria, the United States, Denmark, Finland, Portugal, and Korea expressed hesitation on account of the disparity in practice among states. Id. at ¶¶ 35-39, 43-48, 51, 53-65. One of the central points of concern involved the lack of a clear definition among states (and indeed, the absence of corporate criminal liability in many states). See id.[69] As a result, the Rome Statute only applies to "natural persons." Rome Statute, art. 25(1).

The Rome Statute's negotiating history therefore reveals that corporate liability fails to satisfy either of Sosa's two key requirements - that the norm must be based on clearly defined and universally recognized international law. As noted in Sosa, "we now tend to understand common law not as a discoverable reflection of universal reason but, in a positivistic way, as a product of human choice." Sosa, 542 U.S. at 729. The positivistic approach leads to a

---

[69] The negotiating history of the Rome Statute is further supported by specific evidence of legal practice among foreign nations. There is a wide variety of forms of corporate liability within domestic legal systems. Some countries do not even recognize corporations as being capable of committing crimes. See, e.g., Hans de Doelder & Klaus Tiedemann, eds., Criminal Liability of Corporations 343 (1996) (Russia only recognizes natural persons as capable of committing crimes). Even the countries that recognize corporate criminal liability are divided on the appropriate rules of attributing conduct and culpability to the corporate entity. See id. at 104-05, 186-87, 131, 372, 398 (standards include attribution through the acts of control persons [Australia, United Kingdom], the acts of any agent [United States, Finland], or other formulations of liability [Canada, Netherlands]). This divergence in opinion is not merely a disagreement on the procedural aspects of criminal punishment. It reflects a fundamental disagreement on the legal capacity of corporations to commit particular acts and the substantive rules of attributing an agent's conduct to the principal. Given this widespread disagreement, it seems clear that the relevant norms are not sufficiently well-defined among foreign nations to satisfy the requirements of Sosa.

clear conclusion: there has not been a clear "human choice" to impose liability on corporations for violating international norms.  Indeed, to the extent that there has been a choice, the governments drafting the Rome Statute chose **not** to extend liability to corporations.

Of course, the Court does not intend to suggest that the Rome Statute is the sole authority for construing international law norms under <u>Sosa</u>.  <u>See, e.g.</u>, <u>Abagninin</u>, 545 F.3d at 738-40 (rejecting plaintiffs' reliance on Rome Statute with respect to genocide because Rome Statute's definition of genocide conflicted with definition that was uniformly adopted by other authorities).  Nor does the negotiating history of the Rome Statute provide a definitive international rejection of corporate liability in international law.  A fair amount of the delegates' opposition to corporate liability arose from the eleventh-hour nature of the proposal to include corporate liability. <u>See generally</u> 2 <u>United Nations Diplomatic Conference on the Establishment of an International Criminal Court, Rome, 15 June - 17 July 1998</u>, at 133-36. In addition, others were concerned with the idea of imposing corporate **criminal** responsibility, but were silent regarding the possibility of corporate **civil** responsibility.  <u>Id.</u>  As international-crimes expert Professor Bassiouni has emphasized, it is important to distinguish the **substantive** elements of international law from the sometimes-idiosyncratic procedural systems that are used to enforce those substantive rules.  M. Cherif Bassiouni, 1 <u>International Criminal Law</u> 5, 7-8 (2008).  It is important not to place too much weight on the Rome Statute, which defined certain crimes and created certain enforcement mechanisms, but was not intended to serve as an encyclopedic restatement of the full body of international law.  The

1  negotiating history must therefore be viewed as persuasive rather than
2  conclusive authority for purposes of the Alien Tort Statute.
3      In the end, though, international treaties and conventions reveal
4  an absence of international human rights norms governing corporate
5  conduct.  As noted by the United Nations Special Representative of the
6  Secretary-General, "states have been unwilling to adopt binding
7  international human rights standards for corporations."  Representative
8  of the Secretary-General, <u>Business and Human Rights: Mapping</u>
9  <u>International Standards of Responsibility and Accountability for</u>
10 <u>Corporate Acts</u>, at ¶ 44 (2007).  Instead, the only pertinent
11 authorities are "soft law standards and initiatives."  <u>Id.</u>  Such non-
12 binding, aspirational norms are insufficient under <u>Sosa</u>.
13          **6.   INTERNATIONAL PRACTICE**
14     Another line of reasoning was set forth in Judge Cote's decision
15 in <u>Presbyterian Church of Sudan II</u>, which re-affirmed Judge Schwartz's
16 prior decision and, in light of the intervening Supreme Court decision
17 in <u>Sosa</u>, supplemented Judge Schwartz's reasoning.
18     In re-assessing the applicability of Alien Tort Statute to
19 corporations in light of <u>Sosa</u>, the <u>Presbyterian Church of Sudan II</u>
20 court relied heavily on the fact that no country had ever objected to
21 domestic courts' exercise of jurisdiction over corporations under the
22 Alien Tort Statute.  The court stated that "[o]ne of the clearest means
23 for determining the content of a rule of customary international law is
24 to examine situations where a governmental institution asserts a claim
25 purportedly based on the customary rule, and to consider, as part of
26 state practice, whether States with competing interests object."
27 <u>Presbyterian Church of Sudan II</u>, 374 F. Supp. 2d at 336.  This
28

proposition is drawn from the general rule that there is "only [one] way that customary international law can change – by one state's violating the old norm and other states' acquiescing in the violation." Phillip R. Trimble, The Supreme Court and International Law, 89 Am. J. Int'l L. 53, 55 (1995).  However, this general rule presupposes that a customary international law norm exists in the first instance – i.e., that there is an "old norm" governing state behavior.  Objections become relevant only **after** that "old norm" exists; once the rule is established, the rule may be altered when other states deviate and no objections are lodged.  This is the approach stated in the Restatement, which explains that state practice is evidence of customary international law only "where there is **broad acceptance** and no or little objection" by other states.  Restatement (Third) of Foreign Relations Law, § 102 n.2 (emphasis added).  In other words, objections are only relevant if states have already accepted a particular norm as constituting binding international law.

     The Presbyterian Church of Sudan II court concluded that it was highly relevant that foreign governments acquiesced in the domestic courts' exercise of Alien Tort Statute jurisdiction over those governments' corporations.  Presbyterian Church of Sudan II, 374 F. Supp. 2d at 337.  The court explained that those governments presumably would have objected if domestic courts were incorrectly applying international law against corporate defendants.  Id.  As the court explained: "Talisman has not cited a single case where any government objected to the exercise of jurisdiction over one of its national corporations based on the principle that it is not a violation of international law for corporations to commit or aid in the commission

of genocide or other similar atrocities. If this issue was a genuine
source of disagreement in the international community, it would be
expected that the assertion of such a rule as customary would provoke
objections from States whose interests were implicated by the assertion
of the rule in those cases against their nationals." Id.

The Court recognizes that the Presbyterian Church of Sudan II
court's analysis would be correct **if** in fact there was, as that court
suggested, "compelling evidence of state practice" holding corporations
responsible for international human rights violations. Id. However,
the Court disagrees with the premise that there is "compelling
evidence" of an international consensus regarding corporate liability.
See generally supra. Absent any "old norm" of corporate liability, see
Trimble, 89 Am. J. Int'l L. at 55, that has achieved "broad acceptance"
among the international community, see Restatement, § 102 n.2, the
Court disagrees with the Presbyterian Church of Sudan II court's
reliance on the absence of objections from foreign governments. Mere
silence and acquiescence does not provide probative evidence of a well-
defined universal norm of international law.

### 7.   SUMMARY OF DOMESTIC COURTS' REASONING

Above all, domestic courts have been guided by a single erroneous
assumption: that the burden is on **corporations** to show that
international law **does not** recognize corporate liability. See, e.g.,
In re Agent Orange, 373 F. Supp. 2d at 59 ("Defendants present no
policy reason why corporations should be uniquely exempt from tort
liability under the ATS, and no court has presented one either.")
(quotations omitted); Presbyterian Church of Sudan I, 244 F. Supp. 2d
at 319 ("while Talisman disputes the fact that corporations are capable

of violating the law of nations, it provides no logical argument
supporting its claim."). Instead, this Court believes that Sosa
requires courts to undertake the opposite analysis: the **plaintiffs** must
bear the burden to show that international law **does** recognize corporate
liability. As the Supreme Court emphasized, "federal courts should not
recognize private claims under federal common law for violations of any
international law norm with less definite content and acceptance among
civilized nations than the historical paradigms familiar when § 1350
was enacted." Sosa, 542 U.S. at 732. Plaintiffs seeking to identify a
cause of action under international law bear the burden of persuading
the Court that international law contains a norm with sufficiently
"definite content and acceptance among civilized nations." Id. If the
Court is not persuaded that international law satisfies this standard,
then the plaintiff's claim must fail. This burden-shifting approach is
consistent with the general rule that plaintiffs bear the burden of
proving the elements of their claims. See generally Schaffer ex rel.
Schaffer v. Weast, 546 U.S. 49, 56-57 (2005) (collecting cases).
Furthermore, this is the burden-shifting approach applied by Sosa
itself: because the plaintiff Alvarez-Machain had not shown that he
suffered an injury in violation of international law, his claims
failed. See Sosa, 542 U.S. at 736 ("Alvarez cites little authority
that a rule so broad has the status of a binding customary norm
today"), 737 ("Alvarez's failure to marshal support for his proposed
rule is underscored by the Restatement (Third) of Foreign Relations Law
of the United States"), 738 ("Whatever may be said for the broad
principle Alvarez advances, in the present, imperfect world, it
expresses an aspiration that exceeds any binding customary rule having

the specificity we require.").

In other words, international law must contain rules establishing corporate **liability**.  This Court therefore disagrees with the other courts that have inverted this legal standard and examined whether international law contains rules establishing corporate **immunity**.  <u>See</u> <u>Romero v. Drummond Co., Inc.</u>, 552 F.3d at 1315 ("The text of the Alien Tort Statute provides **no express exception** for corporations.") (emphasis added); <u>In re Agent Orange</u>, 373 F. Supp. 2d at 59 ("Defendants present no policy reason why corporations should be **uniquely exempt** from tort liability under the ATS, and no court has presented one either."); <u>Prebyterian Church of Sudan I</u>, 244 F. Supp. 2d at 319 ("A private corporation . . . has no **per se immunity** under U.S. domestic or international law.") (emphasis added); <u>see also</u> <u>In re South African Apartheid</u>, 617 F. Supp. 2d at 255 n.127 (noting that Second Circuit could potentially "determine that corporations are **immune from liability** under customary international law") (emphasis added).  These courts start from the erroneous premise that international law norms **do** apply to corporations, and then search for significant international precedents that **reject** corporate liability.  However, as demonstrated <u>supra</u>, no court has yet identified a sufficiently well-defined and universally recognized international law norm establishing corporate liability in the first place.  In this Court's view, the Supreme Court's guidance in <u>Sosa</u> requires that, at present, corporations may not be held liable under international law in an Alien Tort Statute action.

       **8.   THIS COURT'S CONCLUSION**

Having examined the legal arguments *pro* and *con* regarding

corporate liability for international human rights violations, the Court concludes that corporations as such may not presently be sued under Sosa and the Alien Tort Statute.  There is no support in the relevant sources of international law for the proposition that corporations are legally responsible for international law violations. International law is silent on this question: no relevant treaties, international practice, or international caselaw provide for corporate liability.  Instead, **all** of the available international law materials apply **only** to states or natural persons.  Sosa's minimum standards of definiteness and consensus have not been satisfied.  It is impossible for a rule of international law to be universal and well-defined if it does not appear in anything other than a handful of law review articles.  Judicial *diktat* cannot change the basic fact that international law does not recognize corporate liability.

To the extent that corporations should be liable for violating international law, that is a matter best left for Congress to decide. See Sosa, 542 U.S. at 728 ("We have no congressional mandate to seek out and define new and debatable violations of the law of nations, and modern indications of congressional understanding of the judicial role in the field have not affirmatively encouraged greater judicial creativity.").  However, to the extent that Congress has ever addressed the question of corporate liability for violating international law, it has explicitly **refrained** from extending liability beyond natural persons under the Torture Victim Protection Act.  See supra Part VIII.B.  Accordingly, the Court concludes that corporations as such may not be sued under the Alien Tort Statute.  Corporate agents - i.e., natural persons - are subject to civil actions, but corporations

themselves are not.  Based on the authorities identified by the parties and by other courts, the Court concludes that corporations may not be sued under the Alien Tort Statute.[70]

_____

[70] The Court is aware of potential arguments premised on the existence of generally recognized principles of corporate liability and/or principal-agent liability under domestic bodies of law.  See, e.g., Supp. Brief of Plaintiffs-Appellants/Cross-Appellees, Sarei v. Rio Tinto, PLC, 2010 WL 804413, at *53 (9th Cir. Jan. 22, 2010); Brief of Amicus Curiae Earthrights International in Support of Plaintiffs-Appellants, Presbyterian Church of Sudan, No. 07-0016, 2007 WL 7073749, at *18-19 & nn. 5-7 (2d Cir. Mar. 9, 2007).  The Court notes that international law sometimes looks to "general principles common to the major legal systems of the world" that operate "interstitially" to fill gaps in international law "when there has not been practice by states sufficient to give the particular principle status as customary law and the principle has not been legislated by general international agreement." Restatement (Third) of Foreign Relations, § 102(1)(c) & cmt. l.  However, the Court also notes that international law does not address "[m]atters of 'several' concern among States" – that is, "matters in which States are **separately** and **independently** interested." Flores, 414 F.3d at 249 (emphasis added).  Accordingly, while theft and murder (for example) are prohibited around the world, these rules do not constitute customary international law because the "nations of the world have not demonstrated that this wrong is of mutual, and not merely several, concern." Id. (quotations omitted).

Furthermore, even if litigants attempted to identify general international norms that might form the building blocks of corporate liability, the Court disagrees with the premise that Sosa allows federal courts to build a new rule of international law by combining separate and distinct rules.  So even if a court were to conclude that the "general principles" of law recognize corporations as legal persons, see, e.g., Case Concerning The Barcelona Traction, Light & Power Co., 1970 I.C.J. 3, and were further to conclude that the "general principles" of law incorporate general principles of agency responsibility, see, e.g., Blackstone, 1 Commentaries, ch. 14; Vienna Convention on the Law of Treaties, art. 7, May 23, 1969, 1155 U.N.T.S. 331;  International Law Commission, Draft Articles of State Responsibility, arts. 4, 5, 7, 8, 11; but see Convention on the Law Applicable to Agency, Mar. 14, 1978 (only four countries have adopted international treaty regarding agency law), the Court would be inclined to conclude that Sosa requires plaintiffs to identify well-defined rules of law that have already achieved clear recognition by a wide consensus of states in the exact form in which they are being applied under the Alien Tort Statute.  Under Sosa, proponents of corporate liability are faced with the steep hurdle of showing that not only that general principles of agency liability **exist**, but that

**D.   SUMMARY OF CORPORATE LIABILITY**

Having thoroughly considered the question of corporate liability
under the Alien Tort Statute, the Court concludes that the existing
authorities fail to show that corporate liability is sufficiently well-
defined and universal to satisfy <u>Sosa</u>.

**XI.   CONCLUSION**

In light of the foregoing analysis, the Court GRANTS Defendants'
Motion to Dismiss.  To the extent that the Court has not addressed any
the parties' remaining arguments, the Court's analysis has rendered
those issues moot.

Given Plaintiffs' representations in its briefing and at oral
argument, it appears that further amendment of the Complaint would be
futile.  Plaintiffs have already amended the Complaint in order to
provide additional factual details, and they have not suggested to the
Court that they left out any material facts.  It appears to the Court
that Plaintiffs hold a very different view of the legal principles
discussed in this Order.  If that is the case, Plaintiffs would be
well-advised to consider filing an appeal rather than filing an amended
complaint.  However, because the Ninth Circuit has articulated a strong
policy in favor of permitting complaints to be amended, <u>e.g.</u>, <u>Eminence</u>
<u>Capital, LLC v. Aspeon, Inc.</u>, 316 F.3d 1048, 1051-52 (9th Cir. 2003),
the Court will provide Plaintiffs another opportunity to amend their
Complaint.

---

these principles are **well-defined** and **well-established** in the
**corporate** context.  Absent such a showing, domestic courts simply
cannot conclude that rules of corporate agency attribution are
clearly defined and universally agreed-upon.

1       Accordingly, Defendants' Motion to Dismiss is **GRANTED** with leave

2   to amend.  If Plaintiffs elect to file an amended complaint, they shall

3   do so no later than **September 20, 2010**.  If Plaintiffs fail to file an

4   amended complaint at that time, Defendants shall submit a proposed

5   final judgment no later than **September 22, 2010**.

6

7

8

9       IT IS SO ORDERED.

10

11

12  DATED: September 8, 2010

13                          STEPHEN V. WILSON

14                  UNITED STATES DISTRICT JUDGE

15

16

17

18

19

20

21

22

23

24

25

26

27

28