1              UNITED STATES DISTRICT COURT

2             CENTRAL DISTRICT OF CALIFORNIA

3                        ---

4         HONORABLE STEPHEN V. WILSON, JUDGE PRESIDING

5                        ---

6

7

8    JOHN DOE I, et al,                        )
                                               )
9                                              )
                                               )
10                        Plaintiffs,          )
                                               )No. 05-5133SVW
11            VS                                )
                                               )
12   NESTLE, S.A., et al,                      )
                                               )
13                                             )
                          Defendants.          )
14   _____)

15

16              Reporter's Transcript of Proceedings
                        Motion Hearing
17                   Los Angeles, California
                     Monday, June 8, 2009
18

19

20

21

22

23              Anne Kielwasser, RPR No. 50901
                 Federal Official Court Reporter
24              312 North Spring Street, Room 432
                 Los Angeles, California 90012
25                  Phone: (213) 894-2969
                    annekielwasser@aol.com

```
1                    A P P E A R A N C E S

2

3    ON BEHALF OF THE PLAINTIFFS:

4    Terry Collingsworth
     Conrad and scherer
5    731 8th Street SE
     Washington, DC 20003
6    202-543-4001
     Email:  Tc@conradscherer.com
7

8

9    ON BEHALF OF THE DEFENDANTS:

10   Andrew J Pincus
     Mayer Brown
11   1909 K Street NW
     Washington, DC 20006
12   202-263-3000

13   Lee H Rubin
     Mayer Brown
14   Two Palo Alto Square
     3000 El Camino Real, Suite 300
15   Palo Alto , CA 94306
     650-331-2037
16   Email:  Lrubin@mayerbrownrowe.com

17   Kristin Linsley Myles
     Daniel Collins
18   Munger Tolles & Olson
     33 New Montgomery St, 19th Fl
19   San Francisco , CA 94105-9781
     415-512-4000
20   Email:  Kristin.myles@mto.com

21   Craig A Hoover
     Hogan & Hartson
22   Columbia Square
     555 13th Street NW
23   Washington, DC 20004-1109
     202-637-5694
24   Email:  Cahoover@hhlaw.com

25
```

```
 1   MONDAY, JUNE 8, 2009                              1:17 P.M.

 2                           ~ ~ ~

 3                    P R O C E E D I N G S

 4                           ~ ~ ~

 5          COURT CLERK:  Item No. 12.  CV-05-5133SVW.  John

 6   John Doe, et al, versus Nestle S.A., et al.

 7               Counsel, please state your appearances for

 8   the record.

 9          MR. COLLINGSWORTH:  Good afternoon, Your Honor.

10   Terry Collingsworth for the plaintiffs.

11          MR. PINCUS:  Good afternoon, Your Honor.  Andrew

12   Pincus, Lee Rubin for defendant, Cargill.

13          MR. HOOVER:  Good afternoon, Your Honor.  Craig

14   Hoover of Hogan and Hartson for defendant, Nestle, USA.

15          MS. MYLES:  Good afternoon, Your Honor.  Kristin

16   Myles of Munger, Tolles & Olson for defendant

17   Archer-Daniels-Midland.  With me also is Mr. Daniel Collins

18   of Munger, Tolles.  He stepped out of the courtroom.  He

19   should be back in a moment.

20          THE COURT:  Well, trying to think of a place to

21   begin.  There are so many questions.

22          MS. MYLES:  Why don't I get up, Your Honor -- I'll

23   give the Court what we have done, what we're prepared to

24   cover.

25          THE COURT:  Well, I'd rather do it my way and not
```

```
 1    have you do that yet.

 2                    Actually, I had some questions of you, more

 3    than Ms. Myles.  So why don't you take the lectern first.

 4                    MS. COLLINGSWORTH:  Once again, Terry

 5    Collingsworth, Your Honor.

 6                    THE COURT:  Is Mr. Hoffman still a co-counsel?

 7                    MR. COLLINGSWORTH:  Yes, he is, Your Honor.  He's

 8    staring a trial in the Leva (phonetically spelled) case in

 9    New York.  It's one of these similar cases.  So he's

10    out-of-pocket for a while.

11                    THE COURT:  Well, frankly, many of the cases in

12    this area are hard to reconcile, at least from my reading of

13    them.  It seems that some courts have concluded that aiding

14    and abetting is a cause of action that's recognized under

15    international norms, correct?

16                    MR. COLLINGSWORTH:  Well, Your Honor, if I could,

17    *aiding and abetting* is not a cause of action, that the first

18    step is to find a *law of nations norm*.

19                    THE COURT:  Well, let's get past that, because I'm

20    assuming that slavery, as you allege, is within that norm.

21                    MR. COLLINGSWORTH:  And defendants don't really

22    contest that.

23                    THE COURT:  There may be an issue regarding the

24    question of torture, which is another one of your

25    allegations; and torture may be preempted under another
```

```
 1    statute.  But leaving that aside for the moment, and let's
 2    start from the platform that there is an international norm
 3    that would at least be consistent with one of your
 4    allegations, slavery.
 5                      In terms of a civil liability for aiding and
 6    abetting, how and where do you find support for that being
 7    part of the alien tort statute?
 8                      MR. COLLINGSWORTH:  Thank you, Your Honor.  Well,
 9    first of all, on pages 8 and 9 of our Response, we cite all
10    of the cases that have gone through this analysis, and it's
11    now true that 100 percent of that that are good law have
12    found that aiding and abetting is a means of liability for
13    the alien tort statute.
14                      When we first started this case --
15                      THE COURT:  You know, I'm aware of the cases; and
16    the fact that some of the cases may support that view is not
17    necessarily determinative insofar as my examination is
18    concerned.
19                      More specifically, are you finding support in
20    that aiding and abetting is a cause of action that is
21    supported by international norms, or do you argue that you
22    don't have to look to international norms for aiding and
23    abetting but can look to domestic law?
24                      MR. COLLINGSWORTH:  It is our position, Your
25    Honor, first of all, that it doesn't matter in this case with
```

1  aiding and abetting but that, to be pure about it, that Sosa,

2  itself, said that once you have a law of *nations norm*, then

3  you look to the federal common law to shape the other issues

4  that you would need to reach your liability.

5        THE COURT:  Where does Sosa say that?

6        MR. COLLINGSWORTH:  Well, I will have a cite for

7  you, Your Honor, but I'd like to talk about all of the cases

8  that say that Sosa said that.

9        THE COURT:  So, it would be your view of the

10 statute, is that once you establish that there is a violation

11 that is recognized as such by international standards, such

12 as slavery, that in terms of fine-tuning it, as you will, in

13 terms of whether aiding and abetting, liability is compatible

14 with the statute or a corporate civil liability, then you

15 don't have to look to international norms but can look to

16 federal common law.

17       MR. COLLINGSWORTH:  That's correct, Your Honor.

18 And the cite for Sosa is 542 US at 728, 29, where the Court

19 uses this federal common law language.

20       THE COURT:  Just one moment.  The way I want to do

21 this, so that all the issues are clear in my mind, is to

22 rotate the arguments.

23            So just on that one point, I'd like the

24 defendants to give me their view of that; and then I'll get

25 back to another point with you.

1          MR. COLLINGSWORTH:  Yes.  But I would just say,

2     Your Honor, as I tried to say, with this norm, with this

3     issue of aiding and abetting, both international law and

4     federal common law are identical, and that it's a standard of

5     substantial of knowing assistance, so that it's somewhat of

6     an academic debate in this particular circumstance.

7          THE COURT:  Okay.  The only question that should

8     be addressed now is whether *aiding and abetting* is a matter

9     that has to be established by international norms or whether,

10    assuming there is slavery established as a cause of action

11    under international norms, whether a court should look to

12    federal common law to determine whether aiding and abetting

13    is allowed.

14         MS. MYLES:  Your Honor just wants to hear that

15    single question, the choice of law but not the question of

16    "civil" versus "criminal" at this point?

17         THE COURT:  Yes.

18         MS. MYLES:  Okay.

19         THE COURT:  In other words, do you agree that

20    Sosa -- to me the issue is:  What does Sosa really mean by

21    looking at federal common law?  In other words, my initial

22    thought is that *aiding and abetting* is not just a procedural

23    nicety, that *aiding and abetting* is a part of a substantive

24    crime; and an argument could be made that aiding and abetting

25    has to be supported by international norms, and that it isn't

```
 1    enough that slavery is.
 2              MS. MYLES:  Uh-huh.
 3              THE COURT:  And the plaintiffs seems to say that
 4    you can look to federal common law, and he argues that
 5    federal common law and international law would bring to the
 6    same result.
 7                   I'm going to ask you in a moment your view on
 8    whether international law would support aiding and abetting,
 9    but first I'm interested in whether you believe aiding and
10    abetting has to be established by international norms and not
11    by federal common law.
12              MS. MYLES:  Uh-huh.  Our position is that Sosa
13    says that international law should apply to that question.
14              THE COURT:  Why do you -- where do you get that
15    from Sosa?  I ask --
16              MS. MYLES:  The passage in Sosa that's most
17    directly on point is in a footnote.  It's Footnote 20 on page
18    732 of Sosa.  What Footnote 20 says is, that international --
19    and this is also in Justice Breyer's concurring opinion.  He
20    makes the same point, that plaintiff must show that, quote:
21    International law extends the scope of liability for a
22    violation of the given norm through the perpetrator being
23    sued.
24                   So that comports with Your Honor's instinct
25    that --
```

```
1                THE COURT:  It isn't instinct.  I read the same
2        footnote.
3                     Then, let's get past that.  I know what
4        you're saying.  If that'd be the case, then how is it that in
5        the -- I want to switch you now to the Second Circuit case,
6        the --
7                THE MS. MYLES:  Khulumani?
8                THE COURT:  Just one moment, let me make sure.
9        Yes, yes, the Khulumani case.  And there were three opinions.
10       One judge, I think it was Hall, who said that you could look
11       to domestic law, and it seemed as though the other two
12       judges, Korman and Katzmann, thought you ought to look to
13       international law, correct?
14               MS. MYLES:  Right, that's right.
15               THE COURT:  How did they come out on the question
16       of civil corporate liability?  And this may invite some
17       discussion about the actual norm regarding *aiding and*
18       *abetting* and whether the norm is established, perhaps, in
19       criminal *aiding and abetting* and not the civil *aiding and*
20       *abetting*; but I'm interested first in your interpretation of
21       what that court did.
22                     I have the view that the Korman and Katzmann
23       both believe that you look to the international norm.
24               MS. MYLES:  Uh-huh.
25               THE COURT:  And that Korman took the view that
```

1   would be favorable to your position, that there was no well

2   settled international norm of civil *aiding and abetting*.

3           MS. MYLES:  Exactly.  Yeah.

4           THE COURT:  And that Katzmann didn't go as far as

5   Korman did but actually felt that the issue wasn't presented

6   squarely to the court, and more or less side-stepped it.  Is

7   that a fair statement, or do you feel that Katzmann did more

8   to support your view?

9           MS. MYLES:  Judge Katzmann -- you're right about

10  Judge Korman.  Judge Korman said international law applies,

11  and under international law, there is no consensus, there is

12  no actionable norm because it's not --

13          THE COURT:  Frankly, I found his analysis

14  persuasive.

15          MS. MYLES:  I think it's the most persuasive

16  opinion I've seen in this whole area.

17          THE COURT:  But Hall seems to be in his own

18  sphere.  But what I'm interested in is, in your view as to

19  what extent Katzmann either supported or didn't support or

20  side-stepped what Korman said.

21          MS. MYLES:  Katzmann seemed to think that there

22  might be some middle ground that could be reached.  He

23  acknowledged that the standard under international law were

24  divergent so that they didn't agree.  You had the Yugoslav

25  and Rwanda tribunals on the one hand with what was

```
 1    essentially acknowledgement --

 2              THE COURT:  Why -- in other words, what I don't

 3    understand is, when the supreme court says something is, has

 4    to be well settled, why is the court looking to reconcile or

 5    find common ground?  It seems structurally wrong.  I mean,

 6    well settled means well settled, not that there are

 7    differences; and the differences, perhaps, can be harmonized.

 8              So, what did Katzmann say?  Give me your

 9    take.

10              MS. MYLES:  Well, I'm just trying to flip to the

11    Opinion, Your Honor, if you'd give me a moment, because I

12    don't want to misstate.  He tried to find someplace in the

13    middle.

14              THE COURT:  I mean, why is it his role to find

15    someplace in the middle?  I mean, the Supreme Court said this

16    statute is to be used very, very selectively; and unless the

17    norm is well settled and under international law standards,

18    it's -- there is no cause of action.

19              And assuming that you have to look to

20    international norms for aiding and abetting which, both

21    Katzmann and Korman, I think agreed upon, then if Katzmann is

22    trying to reconcile things, isn't he implicitly saying that

23    there is not harm in it?

24              MS. MYLES:  Yes, and it violates the Supreme

25    Court's decision in Sosa; in particular, that the requirement
```

1    that the norm in question be universally adhered to, and that

2    it also be at a level of specificity and clarity that's the

3    equivalent of "settled," 18th century paradigms that the

4    Court identifies piracy, et cetera.  It seems to us that if

5    there is a difference in the applicable standards, then by

6    definition there is not that kind of --

7              THE COURT:  But didn't --

8              MS. MYLES:  -- clarity.

9              THE COURT:  -- Katzmann say something about the

10   issue not being directly before the court?  That is, whether

11   *aiding and abetting* was a part of an international norm?  I

12   think he said that.

13             MS. MYLES:  I'm just trying to find that.

14             THE COURT:  The reason I'm sort of looking toward

15   this case is because it seems to be the last word on this

16   subject, and it's an opinion from a respected court.  It's

17   post Sosa, and it has to be looked at, and --

18             MS. MYLES:  Well --

19             THE COURT:  Certainly the Ninth Circuit hasn't

20   spoken to these issues, has it?

21             MS. MYLES:  No, I was going to answer the

22   immediate question, but he opines that there is a cause of

23   action for *aiding and abetting*.  He just doesn't agree on

24   where it comes from or what it means with either of the other

25   two judges.

1             THE COURT:  So, the result would not support your

2     position, but you're arguing that some of the analysis does.

3             MS. MYLES:  Two judges say international laws is

4     the correct source.  That is our argument.  Two judges say

5     there is a cause of action for *aiding and abetting*.  That's

6     what's in the procuring opinion, and that's also reflected in

7     the judge --

8             THE COURT:  The two judges would be Hall and --

9             MS. MYLES:  And Katzmann, yes.

10            THE COURT:  And Hall, you know, is relying on

11    domestic law.

12            MS. MYLES:  Right.  There is no consensus for the

13    proposition that -- there are not two judges for the

14    proposition that international law provides for *aiding and*

15    *abetting* in a way that can be introduced into the ATF.

16            THE COURT:  Now, what about the Ninth Circuit?

17            MS. MYLES:  The Ninth Circuit has spoken to this

18    issue indirectly in the case of Abagninin, which we've cited.

19    I don't know if that's the right pronunciation, but -- and

20    what the --

21            THE COURT:  Is that a post Sosa case?

22            MS. MYLES:  Post Sosa.  It's the only known

23    circuit case that really addresses Sosa at all.

24                In Abagninin, what the Court said, there is a

25    very similar inquiry, the Court was looking to see if there

```
 1    was a consensus under Sosa, and the question was what the

 2    knowledge standard for genocide would be.  Was it a specific

 3    intent crime, or was it a crime that could be proven -- was

 4    it something that could be proven with a general intent.

 5               And the Court -- there's an argument made to

 6    the Court that there was universal criminal jurisdiction over

 7    that -- over the -- over the crime -- I'm sorry.

 8               What the Court said -- there is -- there's

 9    two cases -- and I'm sorry, Your Honor, I just mixed them up.

10               In the Abagninin case the Court was

11    addressing the genocide directed issue, and under the Rome

12    statute, the intention of this was one thing.  It was a lower

13    standard under the Rome statute than the specific intent.

14    Under the other statute of Rwanda and Yugoslav, it was the

15    higher standard.

16               The Court said the existence of that

17    disagreement between the applicable standards under

18    international law made it impossible for there to be a

19    consensus under Sosa.  So the Court found that there was no

20    consensus under Sosa, and the same cause of action couldn't

21    be recognized.

22               That's exactly the dilemma that was facing

23    Korman and Katzmann as they were debating the issue of

24    whether the standards are different.  Katzmann says:  Now, if

25    the standards are different, I can just find a place in the
```

```
 1    middle and pick that as the standard, which I don't think

 2    comports with Sosa, but it's rejected by the Ninth Circuit

 3    and Abagninin, that approach.

 4              THE COURT:  Not to get too far off by another

 5    issue, what would be your response to an argument that the

 6    Ninth Circuit in the Abagninin case, or whatever it was, was

 7    dealing with an element of an offense, and that aiding and

 8    abetting is a more procedural than substantive?  I don't

 9    agree with that.  I'm just asking you the question.

10              In other words, how could a court in some

11    discriminating way say that you would look to international

12    norm for the state of mind requirement of a crime such as

13    that in the Ninth Circuit case and that you wouldn't have to

14    look to international norm for aiding and abetting?

15              In other words, it seems to me the

16    examination would lead you to the same place, that aiding and

17    abetting is no more a federal common law matter than the

18    state of mind would be via specific intent, a general intent,

19    in the genocide crime, wouldn't you agree?

20              MS. MYLES:  I think --

21              THE COURT:  That was a lollipop question.

22              MS. MYLES:  There is no basis for saying that

23    aiding and abetting is somehow a procedural issue.

24              I think you go back to the Footnote 20 of

25    Sosa.  That's why the Court goes out of its way to say:  You
```

```
 1    also have to have international law extending liability to
 2    the particular defendant, whether the issue is state actor
 3    versus the private actor, that's something that goes to --
 4    you have to look to international law for that, whether it's
 5    a corporation or a natural person, whether it's *aiding and*
 6    *abetting* or only primary.  It makes sense, because you're
 7    looking at the conduct of the defendant.
 8              Is the conduct of the defendant such that
 9    international law is going to allow --
10         THE COURT:  These are, you know, procedural
11    questions.  These matters of state of mind and *aiding and*
12    *abetting* seem to be intertwined with the question of
13    liability.
14         MS. MYLES:  Uh-huh.
15         THE COURT:  Don't they?
16         MS. MYLES:  Yes, I agree.
17         THE COURT:  Aside from that Ninth Circuit case,
18    are there any other post Sosa Ninth Circuit cases that deal
19    with this question?
20              There are cases, it seems, where there is no
21    discussions, but there is a corporate defendant; and rather
22    than just say we need not deal with this issue because
23    corporations are not liable under international norms, the
24    Court goes ahead and addresses things:  What can this Court
25    take from those types of opinions?  How should I view those?
```

```
 1    Should I say, well, implicitly the Court is approving
 2    corporate liability under international norm?  Or how should
 3    the Court weigh that type of opinion?
 4              MS. MYLES:  Uh-huh.  There is, so, there are --
 5    there's two issues that the Ninth Circuit has addressed,
 6    apart from what we've talk about.
 7              The Court has not addressed aiding and
 8    abetting, the issue that we were just on, other than the
 9    opinion that was vacated and no longer can be cited which is
10    the Unocal case.
11              That's been cited by some courts, for
12    example, in the Occidental case that the plaintiff cited, the
13    Court relied on that case.  It shouldn't have done that.
14    It's not citable.
15              But other than that, the Court hasn't
16    addressed aiding and abetting in the matter that we have been
17    talking about.  The closest precedent there is Abagninin
18    because of the analysis that was done.
19              On the issue of corporate, Your Honor is
20    right.  There are cases out there where corporations were
21    defendants, and nobody said anything about it.
22              THE COURT:  Well, what do you take from that type
23    of an opinion as a lower court?  Should we say:  Well, the
24    Ninth Circuit has implicitly made a statement?  Or should we
25    say:  The issue was not before the Ninth Circuit, and we
```

```
1   can't -- we can't make a -- we can't rely on it?
2             MS. MYLES:  If the issue was not raised in that
3   case, it's not precedent.  It was not raised.  It was not
4   ruled upon.  It's not even dictum.  It's not precedent at all
5   if it wasn't raised in those cases and decided in those
6   cases.
7             THE COURT:  Best you can say --
8             MS. MYLES:  Same thing is true in the Second
9   Circuit.  The Second Circuit cases, there's some corporations
10  that are named, but the issue wasn't raised.
11            So, until you got to this Khulumani, that was
12  the first time the issue was really discussed; and again it
13  was Judge Korman, I think, that has the best analysis of it.
14            THE COURT:  So, in terms of *aiding and abetting*,
15  didn't Korman say that he thought international norm
16  supported *aiding and abetting*?
17            MS. MYLES:  No.  What he said was that it was --
18  that there was not a consensus under international law to
19  support a claim for *aiding and abetting*.  But if there were,
20  if there were, because he wanted to create some guidance for
21  the district court, because it was going to go back to the
22  district with two votes in favor of the possibility of *aiding
23  and abetting*, but not to the same sources of law.
24            So, he said because Judge Katzmann and I
25  agree on this source of law, I'm going to go one step
```

 1    further, and my opinion is, that there is no consensus, that

 2    therefore should be no *aiding and abetting*.

 3                But just to give guidance, as it turned out

 4    Judge Scheindlin, at the time it was going to be Judge

 5    Sprizzo, he said that he thought if there were to be a

 6    standard, it would be the Rome statute.  Give it much

 7    guidance, essentially, because it still created two

 8    international -- a disagreement under what the proper

 9    standing was between Katzmann and Korman.  That's why he does

10    opine on what the choice of standard would be.

11                THE COURT:  But he also went on to say, I believe,

12    on the question of corporate liability that there was no

13    corporate liability.

14                MS. MYLES:  Correct.

15                THE COURT:  And that's the question that Katzmann

16    didn't directly address.

17                MS. MYLES:  Neither Katzmann nor Hall addressed

18    that question, only Judge Korman.  Neither of them addressed

19    it one way or the other.  I think it's open, it's still an

20    open question as the case goes back.

21                THE COURT:  Say that again, what did you --

22                MS. MYLES:  They didn't address it one way or the

23    other.  They didn't either find in favor of corporate

24    liability --

25                THE COURT:  Katzmann or Hall.

1          MS. MYLES:  Right, they didn't address it.  So

2     it's just not -- it's not -- there is no ruling on it.

3          THE COURT:  Now, in terms of the authorities out

4     there on the international norms insofar as *aiding and*

5     *abetting*, in your view is Korman's analysis comprehensive, or

6     is there something that you know of that would even further

7     his argument?

8          MS. MYLES:  His analysis is, in my opinion, pretty

9     comprehensive.

10          THE COURT:  Seems that way to me.

11          MS. MYLES:  Yeah, he covers a lot of the arguments

12     that were made here, including, he talks about the

13     differences among the Rome statutes, the Yugoslav, the

14     Rwanda.  He talks about, obviously it's a critical point, is

15     the absence of any civil precedent internationally.  There is

16     no precedent for there being a civil --

17          THE COURT:  Let me ask you about that.

18          MS. MYLES:  Okay.

19          THE COURT:  Sort of in a different framework now.

20          In terms of establishing these so-called

21     international norms, can you glean a civil international norm

22     from a criminal international norm?

23          In other words, if something is established

24     as being absorbed internationally from a higher standard of

25     proof -- generally speaking, criminal cases have a higher

```
 1    standard of proof -- wouldn't that mean that there would be a
 2    civil counterpart?  Or is it your view that the civil cause
 3    of action would have to be established independently by
 4    international norms without interpreting a criminal norm?  Do
 5    you understand what I'm saying?
 6               MS. MYLES:  I do, I do.  It's a little bit of a
 7    complex question.
 8               THE COURT:  Yes.
 9               MS. MYLES:  If you don't mind --
10               THE COURT:  You can help the question along by
11    reframing it, because I think I got it a little twisted,
12    myself.
13               MS. MYLES:  No, no, no.  I can try to rephrase --
14    but I think what Your Honor is asking is whether it's ever
15    possible to glean from criminal international law
16    prohibitions a civil norm under Sosa.
17                    If I could simplify the question; and if I
18    could try to answer it in a few pieces, in no particular
19    order.  One is, that certainly some norms out there are
20    supported by a variety of sources.
21                    Now, when it's been decided -- the Second
22    Circuit went back, in 1980, that the Court would look to
23    international law sources under an old case called Paquete
24    Habana.  That was what the Court is supposed to do, looked at
25    a variety of sources:  Judicial decision, statutes, other
```

1    things.

2              What *other things* is still a matter of some

3    debate, that's for law professors, articles, et cetera, who

4    knows; but at a minimum, judicial decisions, statutes,

5    treaties, obviously, and some of those are criminal that the

6    court has looked at.

7              But there's other authorities that the courts

8    have looked that are general in nature, that aren't either

9    specifically criminal or specifically civil.  Some of them

10   not specifically addressing the question of whether there is

11   a cause of action.

12             So, I think a simple answer to Your Honor's

13   question is:  It doesn't always have to be the case that

14   there is a specifically recognized civil cause of action

15   before a civil claim can be -- has been recognized under

16   domestic United States cases.

17             That being said, here, all there is is

18   criminal statutes, and it's a handful.  It's not -- you don't

19   have a whole line of history of precedent here.  We're just,

20   we're looking at even in the criminal area of the laws, the

21   law is not very well developed as we've seen.

22             There is no civil law precedent whatsoever,

23   nor are the general proper notions -- *aiding and abetting*

24   law, so you don't have that, nor are judicial decisions that

25   anyone can look to can recognize civil liability.

```
 1                    And here, you have two other guide posts, one
 2    of which is Central Bank.  The Supreme Court decision in
 3    Central Bank, which just says flat out that aiding and
 4    abetting is not something -- the civil aiding and abetting is
 5    not something that can be implied by the existence of
 6    criminal aiding and abetting.  And the Court's analysis there
 7    is, that you cannot make --
 8                    THE COURT:  That's a domestic --
 9                    MS. MYLES:  It's a domestic law case.  It comes in
10    under step 2 of Sosa, which partly goes to Your Honor's
11    question, which is why there's different parts to the answer.
12                    At some point you do have to get to step 2
13    and say if the court is going to recognize the cause of
14    action for this norm.  So even if assuming there is a norm
15    out there, does it make sense to recognize it as a cause of
16    action?
17                    Sosa says explicitly that the court has to
18    exercise an element of judgment on whether there will be a
19    cause of action.  It's directly relevant because it gives you
20    the analysis of how you'd go about step 2.  And step 2 says,
21    no, you cannot -- even if there is a federal aiding and
22    abetting statutes out there, you can't just imply civil
23    liability.
24                    The other precedent that is relevant to that
25    point is Sarei, which I sort of alluded to before, in Sarei
```

 1   because there's universal criminal jurisdiction can you imply

 2   universal civil jurisdiction?  The Court said no.  That's the

 3   case that's worth reading on that point, because it follows

 4   the same point as Central Bank, that puts it in the context

 5   of the ATF.  It says no, in ATF you can't infer civil

 6   jurisdiction from criminal jurisdiction.  So, that's a longer

 7   answer.

 8             But the shorter answer is, in the context of

 9   *aiding and abetting*, you can't just take the criminal

10   precedents and put them under civil context, under the logic

11   of both Sarei and Central --

12         THE COURT:  If you can't do it as a general

13   matter, would there be circumstances where you could do it?

14         MS. MYLES:  Where you could infer *aiding and*

15   *abetting* liability?

16         THE COURT:  Civil *aiding and abetting* from a

17   criminal *aiding and abetting*.  In other words, if it doesn't

18   follow as a general rule, are there circumstances where you

19   could say that once the criminal liability -- the criminal

20   *aiding and abetting* norm is established, there is a civil

21   counterpart.

22             In other words, what I understood you to say,

23   is, that one doesn't follow the other necessarily, and that

24   you said that there were certain circumstances in which the

25   Supreme Court has said you can't say that there is civil

```
 1    aiding and abetting just because there was criminal aiding

 2    and abetting.  But could there be circumstances, and perhaps

 3    looking to this situation here, that would allow that

 4    interpretation?

 5              MS. MYLES:  If you had international law authority

 6    recognizing aiding and abetting as a civil matter -- the

 7    court in Central Bank notices the absence of any general

 8    criminal -- I mean, civil statute under aiding and abetting,

 9    if there hadn't been one, the case would have come out

10    differently, because even a general practice of having aiding

11    and abetting in civil cases that you can just then attach to

12    any cause of action that came along.

13              THE COURT:  So, do I understand you to say that,

14    even if Court -- and here is where I'm getting, frankly, a

15    little confused.  Are you saying that if the Court found that

16    there was authority for an international norm for civil

17    aiding and abetting that the Court would still have to filter

18    that authority through another step of analysis under Sosa,

19    and that then the Court would have to look at some authority

20    like the Central Bank?

21              MS. MYLES:  Uh-huh, yes.

22              THE COURT:  It seems like you're saying that then

23    international law would then have to be filtered through

24    domestic law, and that --

25              MS. MYLES:  Well, if there were -- I think that if
```

 1    there were already an international consensus on the

 2    existence of civil *aiding and abetting* liability --

 3              THE COURT:  That's the end of --

 4              MS. MYLES:  -- then you'd probably just slide

 5    right through step 2 on that issue, right?  The question then

 6    wouldn't be:  Well, are you going to imply such a cause of

 7    action.  Implying --

 8              THE COURT:  Let me ask you this.  It raises a

 9    point.  Should a court be in the business, in this area of

10    implying things when the Sosa court said it has to be well

11    settled?

12              MS. MYLES:  I think the answer is no.  That's why

13    Your Honor's last question was a good one, because if the

14    *aiding and abetting* were already well settled under

15    international law as a civil matter in a manner that

16    satisfied Sosa's step 1, that you may have other questions

17    that come into mind under step 2, such as foreign policy

18    implications or other issues that might be considered.

19              But then the question wouldn't be:  Is it

20    appropriate for the Court to imply?  If there is no

21    consensus, then, the Court necessarily is implying the

22    existence of something that doesn't satisfy Sosa's step 1

23    standard, and that's wrong.  That's exactly what the courts

24    say the court is not supposed to do.

25              THE COURT:  Now, with regard to the -- in other

1    words, assuming that there is an established international

2    norm of *aiding and abetting*, with regard to Judge Korman's

3    view that it wouldn't allow for a corporate liability under

4    that test, do you believe Korman's analysis is comprehensive,

5    or are there arguments that you feel are relevant on the

6    issue of corporate liability beyond those that he made?  He

7    was fairly comprehensive.

8           MS. MYLES:  Yeah, I think -- I'm just trying to

9    think if there is anything he left out that I would have

10   said.  He did make the point that the TVPA doesn't authorize

11   corporate liability, didn't he?  I think he did.

12          THE COURT:  Now, let me raise this question with

13   you.  There is another case in the Second Circuit that's

14   floating around out there.  It's referred to as a Talisman 1.

15   And I have received information, actually, it may not be that

16   mysterious about it -- my law clerks went online, and they

17   could figure all this stuff out, that the judges on that

18   panel, the Second Circuit, had requested further briefing,

19   and they have actually requested further briefing on

20   corporate liability.

21          Katy, is that right?

22          LAW CLERK:  (Nodding head affirmatively.)

23          THE COURT:  Of corporate liability.  And the

24   judges of that panel are different than the judges of the

25   case we just discussed.  The judges on that panel were judges

1    Cabranes, Jacobs and Leval.  And so, they were sufficiently

2    interested.

3            MS. MYLES:  Uh-huh.

4            THE COURT:  And I don't know where that matter

5    stands.  Obviously the case hasn't been decided.  I don't

6    know whether they got the additional briefing or whether they

7    held further arguments.

8                You might want to -- and I'm looking at the

9    plaintiff now along with the defendant -- you might want to

10   look into that, because, frankly, that -- unless they drag

11   that on for as long as Judge Sotomayor's environmental

12   decision is pending, I think that I would not wait.

13           MS. MYLES:  You would not wait for it.

14           THE COURT:  No, I mean, I can't wait forever.

15   It's not the Supreme Court.

16           MS. MYLES:  Yes, I will say this:  For what it's

17   worth, the Talisman opinion below, Judge Korman did address

18   this issue obviously, the corporate; and it was the same sort

19   of analysis that we discussed earlier, which is one of the

20   Second Circuit cases where there were defendants that were

21   corporations, therefore there must be --

22           THE COURT:  The problem in this area -- and this

23   is why the analysis has to be critical -- is, that there are

24   pre and post Sosa cases, and I think the world changed with

25   Sosa.  I mean, it may not have changed, but it may -- it may

```
1   have always been what law was or should have been, but Sosa

2   said what it was, and frankly if not for a quip here and

3   there from Justice Souter, it would not even be as open a

4   matter.

5               But, in any event -- and, incidentally, Sosa

6   was my case.  I decided Sosa at the trial court level, and so

7   I'm very familiar with the Sosa opinion.

8               But some of these cases where, like, district

9   judges say, well, you know, this case said this or that, you

10  have to look and see whether that was pre Sosa or post Sosa.

11          MS. MYLES:  Yes, absolutely.

12          THE COURT:  And also these cases, like so much of

13  the law, sometimes it builds on a weak foundation.  All of a

14  sudden you say this is set of law, and then you go back to

15  the first case, and not much of a foundation.

16          MS. MYLES:  There is a lot that in this area where

17  there is a conclusion -- I think on page 6 of our brief, we

18  had a bunch of decisions that had addressed some of these

19  issues but none of them that have really analyzed them.  So

20  if you're looking for judges that have analyzed the issue,

21  then their opinions are sort of few and far in between.

22              Talisman, Judge Cote did analyze the issue,

23  but I just think the analysis was flawed, in that, he

24  concluded -- she concluded, excuse me, from the existence --

25  and none of these cases were pre Sosa.  The existence of
```

```
 1    corporations indicates -- and no one had raised these issues.
 2    These are complicated cases with lots of issues.  Not
 3    everybody raises every issue in every case.  And to conclude
 4    from that, that that meant that that was the law in the
 5    Second Circuit I think is just not right.
 6              And then Judge Cote also said that, well, if
 7    there had been a problem with -- there is an international
 8    consensus because these cases have been decided with
 9    corporations in them, and you haven't seen other nations
10    coming in and complaining about it to us.
11              It's sort of the opposite of what Sosa says.
12    There has to be a settled international consensus.  The
13    analysis there is, well, there has to be -- if there is an
14    absence of protest from other nations, even though the issues
15    that were raised are adjudicated, that itself was an
16    international consensus.
17              Well, that can't be right, and I'm not
18    surprised at all that the Second Circuit wants more briefing
19    on this subject, because the analysis in that opinion just
20    can't be right.
21         THE COURT:  Let me interrupt your presentation
22    just for a few minutes, and let me ask Mr. Collingsworth to
23    take the lectern.
24              Mr. Collingsworth, you seemed to respond when
25    I raised the Talisman 1 briefing issue.  Do you have more
```

 1    information about that for the Court?

 2            MR. COLLINGSWORTH:  Yes, Your Honor, but could I

 3    give you, just one minute, going back to Judge Korman?  You

 4    talked about it quite a bit.

 5            THE COURT:  Yes.

 6            MR. COLLINGSWORTH:  First of all, of course, Judge

 7    Korman's opinion was a dissent, and he relied upon the Rome

 8    statute.  He wanted to literally apply the Rome statute, and

 9    the dispute of course between the judge was over whether

10    specific intent --

11            THE COURT:  Are you talking about the corporate

12    liability or *aiding and abetting*?

13            MR. COLLINGSWORTH:  *Aiding and abetting*, Your

14    Honor.

15            And the Abagninin case in the Ninth Circuit

16    at 545, F.3d, 739 to 40, said you can't apply the Rome

17    statute as a ternary statute because the United States didn't

18    ratify it.

19            Now, what was missing from the discussion

20    here is, that on remand, a case that we submitted to you as

21    Exhibit A in the supplemental authority, *in re South Africa*

22    *Apartheid Litigation* decision, on remand from Khulumani, the

23    court then took that guidance from the court of appeals and

24    said, well, the Rome statute is interesting, but we can't

25    apply it, and it's a source of customary international law,

```
 1    and then ended up concluding that there is an international

 2    norm of aiding and abetting, and that it does not require

 3    specific intent.

 4                  Now, after that, a case that has not been

 5    mentioned, the Second Circuit then in a three-to-zero

 6    opinion, the Abdullahi case versus Pfizer, held that both

 7    that there was aiding and abetting and that corporate

 8    liability attaches.  And they site to Khulumani, but this

 9    time it was a three-to-O decision, and Judge Korman's dissent

10    kind of, you know, disappeared.  It might be interesting, but

11    he's absolutely wrong if he were in the Ninth Circuit, based

12    on the Abagninin decision, because you can't apply the Rome

13    statute as if it were a statute or a treaty.  It's a mere

14    source.

15                  And, Your Honor, just one more thing, and I

16    said at the outset, that the standards are essentially the

17    same.

18                  Now, we attached to our brief as Exhibit A

19    something we call the Scholars' Brief, and it's page 14

20    to 23.  There is a detailed analysis of both civil and

21    criminal application, internationally of aiding and abetting.

22                  Now, that brief is the exact brief that was

23    submitted to the Second Circuit in Khulumani.  It's based on

24    what Sosa said going back to Paquete Habana -- the Paquete --

25    the Paquete Habana case in the U.S. verus Snip case, you're
```

1   supposed to look to scholars in the field with expertise, and

2   this is quite a collection of international law scholars who

3   made this conclusion.

4                Now, I do know about the Talisman, because my

5   co-counsel, Mr. Hoffman is counsel of record in that case,

6   and the main inquiry was about whether there is state

7   practice, evidence of state practice of holding corporations

8   liable.

9                The relevance of that is, that one source of

10  the international law that you can look to, if you're trying

11  to identify a consensus is:  What do countries do?  And

12  certainly criminal statutes and civil statutes are all

13  indicators of the fact that there is a practice of applying

14  *aiding and abetting* or a *corporate liability*.

15               Now, I believe that the Abdullahi case versus

16  Pfizer is dispositive now.  I don't think that the Second

17  Circuit is going to rethink that.  We cited in our brief,

18  when it was first a Westlaw cite, but now the cite is 562

19  F.3d, and the relevant portion is at pages 174 to 75.

20               On the issue of corporate liability, Your

21  Honor, I just would like to note that Sosa, the very footnote

22  that the defendants cite for the notion that international

23  law applies to *aiding and abetting*, Footnote 20, the Court

24  goes on to say:  If you're looking at that liability issues

25  for cases brought against, quote, an individual actor, such

```
 1   as a corporation or an individual, closed quote.  So, clearly

 2   says that at Footnote 20 assumed, at least, that you could

 3   bring a case against the corporation, and certainly the

 4   Second Circuit's position now is that you can.  We haven't

 5   talked about the Eleventh Circuit and on that points --

 6              THE COURT:  Don't worry about the Eleventh

 7   Circuit.

 8              MR. COLLINGSWORTH:  Thank you.

 9              THE COURT:  I didn't raise that because I'm aware

10   of that.

11              Let me ask you something else -- and I will

12   look at what you just mentioned.  When you first filed the

13   Complaint in this case, did you amend the Complaint, or was

14   it always -- was this the original Complaint.

15              MR. COLLINGSWORTH:  It's still the original

16   Complaint.

17              THE COURT:  Yeah.  And things have changed a bit

18   because of the Twombly opinion.  And in your Complaint, you

19   talk about the fact that the Nestle Company defendant gave

20   logistical support to the farmers.  What do you mean by

21   "logistical support"?

22              MR. COLLINGSWORTH:  Your Honor, you asked us that

23   question in supplemental briefing in Item No. 6, and we

24   provided some more material.

25              To explain it, I would like to get you to
```

 1    think about this, that the -- all three of the defendants,

 2    but certainly Nestle, have, in our allegations, specific

 3    farms that they're purchasing from, and they're spread all

 4    around areas where you can grow cocoa in Cote D'lvoire.

 5                    For those farmers, we allege, provided

 6    assistance, technical training, and the biggest form of

 7    assistance was getting their products to market, buying 100

 8    percent of their cocoa beans knowing that they were produced

 9    with child labor.

10              THE COURT:  Now, let me just -- slow down and let

11    me absorb what you're saying.

12                    Aside from buying the products, and let's

13    assume that the products were bought with the knowledge that

14    the farmers were exploiting child labor, what type of

15    technical support were the -- was Nestle given to the

16    farmers?

17              MR. COLLINGSWORTH:  Well, what we allege, Your

18    Honor, is that they gave them instruction on cultivation, on

19    harvesting, on fertilizers.  That's in paragraph 37 of our

20    Complaint.

21                    And lately, after our Complaint was filed, or

22    really starting in 2005, about when our Complaint was filed,

23    they are publicly stating that they're trying to train them

24    not to use child labor.

25                    And so that is really the conundrum here, is,

```
1    that they are, on the one hand, failing the public and

2    Congress.  They've been in Congress lobbying this and saying,

3    we're going to solve this problem; but only here in court are

4    they saying:  We're just buyers.  We don't even know what's

5    going on way over there in Cote D'Ivoire, but they're

6    actively integrated.

7                 THE COURT:  I'm not actually getting into the

8    question of knowledge.  I'm assuming knowledge.  That may or

9    may not be, but I'm assuming that they have knowledge.

10                You're saying that they -- beyond buying the

11   product, actually give the farmers agricultural advice about

12   growing the cocoa plant in a more productive way, fertilizers

13   and the like.  Is that it?

14                MR. COLLINGSWORTH:  That's correct, Your Honor.

15   So they've had people out there.  They're integrated into the

16   operation.

17                And if this were occurring in one factory,

18   just one big box where the cocoa went in and the product came

19   out, there would be no question that if you were the company

20   that were operating that in terms of providing all the

21   natural resources, providing the money and then getting the

22   output, that that is much more than substantial assistance,

23   that is, in effect, joint ownership.  But that is what we

24   allege here.

25                THE COURT:  I understand, okay.
```

```
 1            MR. COLLINGSWORTH:  Yes, Your Honor.

 2            THE COURT:  Now, in terms of the mens rea state of

 3    mind that is necessary for aiding and aiding under these

 4    circumstances, there is the standard of general intent, just

 5    knowledge and purposeful conduct, specific intent; in your

 6    view, does the mens rea aspect have to be well settled under

 7    international law?

 8            MR. COLLINGSWORTH:  Yes, under whether, if it were

 9    right that it's the federal common law, the standard has to

10    be well settled, and the standard is well settled in that

11    it's simply knowledge, not specific intent.

12            THE COURT:  How is it -- where do you find support

13    that the standard is well settled, and it's just knowledge?

14            MR. COLLINGSWORTH:  And as we cite in our brief,

15    the cases dealing with international law, I'm citing on page

16    10 to 13, whether you go back to the Nuremberg tribunals, all

17    of the other tribunals, there was simply a standard of

18    knowledge plus assistance applied.

19                 None of those cases involved a situation

20    where the person charged with aiding and abetting actually

21    knew the specific victim or intended for there to be a

22    specific victim.  That's conspiracy.  That's a higher

23    standard.  I think the Paquete Habana decision in the

24    Eleventh Circuit makes this distinction very well in terms of

25    the difference between aiding and abetting and specific
```

1  *knowledge.*

2          But most important, Your Honor, on remand the

3  Khulumani --

4          THE COURT:  The difference is, it can't be with

5  *aiding and abetting* and specific intent because generally

6  speaking one who aids and abets has to have the same

7  necessary state of mind as the principal actor.

8          So, if the offense calls for a certain mens

9  rea, generally speaking, at least in criminal law, that's

10  what the *aiding and abetting* state of mind is.

11          Are you saying that in this realm it's

12  different, that even if the slavery required specific intent,

13  that you can be an aider and abettor with general knowledge?

14          MR. COLLINGSWORTH:  That's correct, unless there

15  is some aspect of the other norm, which is why I don't think

16  that makes sense.  I think you have the substantive norm with

17  whatever you find it, whatever intent in requirement is

18  there; and then liability issues, including who else can be

19  liable are more incidental issues.

20          THE COURT:  Can I ask you to just allow the

21  defendant a word?  Then I want to get back to you.

22          MR. COLLINGSWORTH:  Okay, just to conclude on

23  that, the South Africa Apartheid decision on remand, the

24  Court specifically said that *aiding and abetting* makes no

25  distinction between *amoral* and *immoral* as long as you have

 1   *knowing, substantial assistance.*  We think that's right here.

 2              THE COURT:  Thank you.

 3              MS. MYLES:  Your Honor, do you want -- we've

 4   divided at argument.

 5              THE COURT:  Oh, it's okay.  I don't care who

 6   argues.  I do want you to respond, but just to make sure

 7   we're on the same wavelength here, I'm interested in your

 8   view as to whether the mens rea standard -- assuming

 9   everything else to be so -- in other words, let's just assume

10   that international norms allow *aiding and abetting*,

11   international norms allow corporate liability, all those

12   things, the question is, in order to prove *aiding and*

13   *abetting*, do -- have international norms established a state

14   of mind either general intent or specific intent?  Was that

15   what you wanted to address?

16              MR. PINCUS:  No, I think my colleague will --

17              THE COURT:  Okay.

18              MS. MYLES:  I mean, why don't I quickly just say

19   how we broke it down, that will explain why different ones

20   keep popping up.

21              THE COURT:  It's okay.

22              MS. MYLES:  I'm dealing with mainly the legal

23   issues that we've been talking about.

24              THE COURT:  Anything.  I'm just interested in the

25   information, not who argues it.  Go ahead.

1          MS. MYLES:  Okay.  So the question is -- just so I

2     can make sure I understand the question --

3          THE COURT:  Here we're talking about, you know, if

4     you're an aider and better, I'm assuming *aiding and abetting*

5     is something that international norms recognize, and I'm

6     assuming that corporate liability is something international

7     norms would recognize.

8               Does the Court, does this Court have to find,

9     or should it find, that even if *aiding and abetting* is

10    generally recognized, that there has to be a further

11    recognition of a state of mind that accompanies *aiding and*

12    *abetting*; and can that state of mind, or does that state of

13    mind differ depending upon the circumstance?

14              And, finally, what is the landscape with

15    regard to the state of mind question in this instance?  So

16    that's what I'm interested in.

17         MS. MYLES:  Uh-huh.  A three part question.  Well,

18    on the first question, which is:  Does there have to be a

19    consensus as to what the state of mind needs to be?

20         THE COURT:  In international norms.

21         MS. MYLES:  Yeah.  Now, that question is pretty

22    close to directly answered by Abagninin.  A-B --

23         THE COURT:  Mr. Collingsworth candidly said that

24    was so.

25         MS. MYLES:  Okay.

1           THE COURT:  He said that.

2           MS. MYLES:  Okay.  So, there does need to be --

3           THE COURT:  Does need to be a norm.

4           MS. MYLES:  Yeah.  And so if you look at the

5    current, the current state of play in international law, what

6    most frequently gets cited are the materials that Judge

7    Katzmann and Judge Korman discussed, the Rome statute.

8           Now, the Rome statute, I think everyone

9    agrees cannot by itself create a norm that satisfies Sosa.

10   Why?  Because the United States didn't ratify it.

11          And the cases are pretty clear, that if the

12   United States doesn't ratify it, it cannot, standing alone,

13   be recognized under Sosa as creating a norm.

14          So when -- then it becomes:  Does it reflect

15   the existence of a norm that already exists?  Because a lot

16   of nations have joined it.  So the Rome statute requires

17   purpose, very explicitly.

18          THE COURT:  In other words, what does *purpose*

19   means?  So, if just as Mr. Collingsworth just said, if -- and

20   this is what I understood him to say, and Mr. Collingsworth

21   rectify, make your argument in a way that you didn't wish to

22   make it or I didn't perceive correctly, you can correct me in

23   a moment.

24          But what I thought he said was that there was

25   some distinction between general knowledge that slaves were

1    being used to grow the crops as contrasted to knowledge of a

2    specific person.  That's the way he seemed to make the

3    distinction, correct?

4               MR. COLLINGSWORTH:  Yes, Your Honor.

5               MS. MYLES:  Okay.

6               THE COURT:  Frankly, I didn't understand that,

7    because to me that isn't -- there is no distinction there.

8    They're both *knowledge*, and because you know of a specific

9    person, that doesn't make it a specific intent.

10                   To me *specific intent* means that you know

11   that something is contrary to law and you're doing something

12   affirmatively to carry it out as opposed to you're doing an

13   act, and you're doing the act knowingly, not negligently, not

14   accidentally, and it turns out that that was crumbling.

15              MS. MYLES:  Uh-huh.

16              THE COURT:  So, whether someone knew of a specific

17   slave or not doesn't seem to have any impact on the analysis.

18                   So, how do you see it?

19              MS. MYLES:  Our analysis doesn't -- the crux of

20   our argument is not whether there is, whether there is an

21   identified, particular person who was -- that someone

22   intended to harm that person.  It's more of what Your Honor

23   just said:  What is the intent?  Was the intent to further

24   the alleged violation or -- now, there is a distinction

25   between *purpose* and *knowledge*.

```
 1                    But you're -- both the purpose standard and

 2       the knowledge standard require there to be an intent to

 3       further the primary violation.  Your intent has to be the

 4       same as the primary violator.

 5              THE COURT:  But where do you get -- if this is a

 6       matter of international norm, I can answer the question very

 7       easily in terms of United States law.  I mean, I do it all

 8       the time.  I instruct the juries on these kinds of things all

 9       the time.

10                    But where do we get these principles from

11       international law?

12              MS. MYLES:  Well, if you look at the --

13              THE COURT:  Even the treaty of Rome, or the Rome

14       statute -- I mean, how specifically does that statute speak

15       to it?

16              MS. MYLES:  Well, the Rome statute is the most

17       specific of all of them.  It says that the aider and abettor,

18       must aid, abet or otherwise assist in the commission or

19       attempted commission of the crime and do so, quote:  For the

20       purpose of facilitating the commission of such a crime, for

21       the purpose of facilitating the commission.

22              THE COURT:  So, that sounds like a specific

23       intent.

24              MS. MYLES:  Yes.

25              THE COURT:  So, in this instance, assuming that to
```

1    be the standard, how would you argue that your clients didn't

2    have that state of mind?

3                    I mean, I would have to accept at this point

4    the plaintiff's pleading that Nestle bought these cocoa

5    crops, perhaps maybe the majority or all of the cocoa crops

6    from some of these farms, and that it told these farmers how

7    to increase their productivity with fertilizer and other

8    things, would that satisfy the Rome statute of *aiding and*

9    *abetting* slavery?

10                   MS. MYLES:  I'll answer that very briefly, and

11   then if Your Honor wants more detail on it, I'll let

12   Mr. Pincus deal with it.

13                   THE COURT:  Okay.

14                   MS. MYLES:  But just very briefly, the answer is

15   no, because there's no allegation that the provision of these

16   means of assistance including alleged financial assistance

17   and logistical support, whatever that means, that any of that

18   was given with the purpose of furthering labor violations or

19   any other violations relating to forced labor or slavery or

20   anything else.

21                   There is no allegation that any of the

22   support that defendants provided to the farmers were given

23   with that purpose, pure and simple.

24                   THE COURT:  You mean no allegation in the

25   Complaint right now?

1          MS. MYLES:  Correct.  Nor have we ever heard that

2     there would be an allegation.  We never heard anything.

3          THE COURT:  And certainly the amended Complaint,

4     to state such an allegation that they said that the -- that

5     the -- let's say the Complaint was amended, instead of the

6     term "logistical support," which, who knows what that means,

7     they now allege, as Mr. Collingsworth has said, that they,

8     Nestle, aided and abetted by buying the complete crop by

9     loaning money to the farmers, by instructing the farmers how

10    to increase productivity through fertilizers and so forth --

11         MS. MYLES:  There is two answers to that.

12         THE COURT:  -- would that be -- and let's say

13    along with that they had knowledge of slavery, would they be

14    -- would they satisfy the mens rea specific intent

15    requirement?

16         MS. MYLES:  No, it wouldn't satisfy the mens rea

17    specific intent requirements, and it wouldn't satisfy the act

18    of mens rea requirement either, because they didn't just show

19    that any of those things assisted in the violation, and they

20    wouldn't be showing that there is a purpose to further the

21    violation by providing those things.

22              Even if that level of detail was given, there

23    still would be a failure on the mens rea because you wouldn't

24    be showing that the purpose of providing those things that

25    Your Honor just listed was to further or to assist in a human

```
 1    rights violation, slavery or anything else.
 2              THE COURT:  Just one moment, just --
 3                   Mr. Collingsworth, since you did file the
 4    Complaint pre Twombly, Twombly -- I never know how to say
 5    that word.  How do you say that?
 6              MS. MYLES:  Twombly.
 7              THE COURT:  Twombly, okay.  I can tell you that I
 8    would find your Complaint lacking under Twombly -- Twombly --
 9    I don't know why I have a mental block about that, but
10    whatever it is -- and if I granted a motion to dismiss, I
11    would certainly give you leave to amend.
12                   If you amended, would you amend as you have
13    just alleged?
14              MR. COLLINGSWORTH:  Yes, Your Honor, we have all
15    those facts that we put into the Answer to Supplemental
16    Question No. 6 that you asked us; and there is even more
17    information that we have now.  But, yes, we can put that in.
18              THE COURT:  Well, why don't I give you a chance to
19    amend your Complaint?  I'm interested in hearing more of
20    this.  And so let me give you 20 days to amend your
21    Complaint.  I mean, it's only this part that you want to put
22    in.  I mean, because the rest of your Complaint probably is
23    okay.  And then when you amend your Complaint, I would like
24    you to address it as amended.
25                   I think I've gone as far as I can now.  I'm
```

```
1    not going to rule now.  And so anticipating that that will be

2    the Amended Complaint.  You ought to start working on that,

3    and I'll give you 10 days after that to file your motion, and

4    then we'll have a hearing sometime in the middle of July.

5    And maybe by then there will be something else floating

6    around, some authority, maybe this Talisman case is cited or

7    briefed.

8               MS. MYLES:  Your Honor, one --

9               THE COURT:  Yes.

10              MS. MYLES:  -- clarifying question.  With our

11   other ground, that is to say the ones we've been discussing

12   to this point, the existence of aiding and abetting, et

13   cetera, would we re-brief those grounds or just the issue of

14   whether assuming --

15              THE COURT:  No, just that issue, just the

16   pleading, yeah.  Because the other stuff that I have in

17   mind -- and this has been helpful to me, both

18   Mr. Collingsworth, you've been helpful and the defendants,

19   Ms. --

20              MS. MYLES:  Myles.

21              THE COURT:  Myles.  Didn't I know you as a

22   different --

23              MS. MYLES:  Yeah, Linsley.

24              THE COURT:  Your name was Linsley?

25              MS. MYLES:  Yeah, Kristin Linsley.  That's my
```

1    maiden name.

2              THE COURT:  Were you with the U.S. Attorney's

3    office at some time?

4              MS. MYLES:  No.

5              THE COURT:  You're with Monger Tolles, right?

6              MS. MYLES:  Monger Tolles.  And Marc Becker was at

7    our firm, too.  So, yeah.

8              THE COURT:  Don't worry about that.

9              MR. COLLINGSWORTH:  I'm not worried.

10             THE COURT:  I was mean to my mother, so.

11             MS. COLLINGSWORTH:  Your Honor, one point of

12   clarification.  So, they have ten days to respond.

13             THE COURT:  Yes.  Yes.

14             MR. COLLINGSWORTH:  Then I would presume we would

15   have ten days to respond.

16             THE COURT:  Yes, yes.  And then we'll set a

17   hearing.  And you figure it out.  Okay.

18                         ~ ~ ~

19             (Court adjourned.)

20                         ~ ~ ~

21

22

23

24

25

```
1                  C E R T I F I C A T E

2    I hereby certify that the foregoing is a true and correct

3    transcript of the stenographically recorded proceedings in

4    the above matter.

5    Fees charged for this transcript, less any circuit fee

6    reduction and/or deposit, are in conformance with the

7    regulations of the judicial conference of the united states.

8

9    _____        06/21/2009

10   Anne Kielwasser, CSR, RPR             Date
     Official Court Reporter
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**0**

05-5133SVW [1] - 1:10
06/21/2009 [1] - 49:9

**1**

1 [4] - 26:16, 26:22, 27:14, 30:25
10 [2] - 37:16, 47:3
100 [2] - 5:11, 35:7
12 [1] - 3:5
13 [1] - 37:16
13th [1] - 2:22
14 [1] - 32:19
174 [1] - 33:19
18th [1] - 12:3
1909 [1] - 2:11
1980 [1] - 21:22
19th [1] - 2:18
1:17 [1] - 3:1

**2**

2 [6] - 23:10, 23:12, 23:20, 26:5, 26:17
20 [6] - 8:17, 8:18, 15:24, 33:23, 34:2, 46:20
20003 [1] - 2:5
20004-1109 [1] - 2:23
20006 [1] - 2:11
2005 [1] - 35:22
2009 [2] - 1:17, 3:11
202-263-3000 [1] - 2:12
202-543-4001 [1] - 2:6
202-637-5694 [1] - 2:23
213 [1] - 1:25
23 [1] - 32:20
29 [1] - 6:18

**3**

300 [1] - 2:14
3000 [1] - 2:14
312 [1] - 1:24
33 [1] - 2:18
37 [1] - 35:19

**4**

40 [1] - 31:16
415-512-4000 [1] - 2:19

**5**

432 [1] - 1:24

**5**

50901 [1] - 1:23
542 [1] - 6:18
545 [1] - 31:16
555 [1] - 2:22
562 [1] - 33:18

**6**

6 [3] - 29:17, 34:23, 46:16
650-331-2037 [1] - 2:15

**7**

728 [1] - 6:18
731 [1] - 2:5
732 [1] - 8:18
739 [1] - 31:16
75 [1] - 33:19

**8**

8 [3] - 1:17, 3:1, 5:9
894-2969 [1] - 1:25
8th [1] - 2:5

**9**

9 [1] - 5:9
90012 [1] - 1:24
94105-9781 [1] - 2:19
94306 [1] - 2:15

**A**

AB [1] - 40:22
Abagninin [9] - 13:18, 13:24, 14:10, 15:3, 15:6, 17:17, 31:15, 32:12, 40:22
Abdullah [2] - 32:6, 33:15
abet [1] - 43:18
abets [1] - 38:6
abetted [1] - 45:8
abetting [77] - 4:14, 4:17, 5:6, 5:12, 5:20, 5:23, 6:1, 6:13, 7:3, 7:8, 7:12, 7:22, 7:23, 7:24, 8:8, 8:10, 9:18, 9:19, 9:20, 10:2,

11:20, 12:11, 12:23, 13:5, 13:15, 15:8, 15:14, 15:17, 15:23, 16:6, 16:12, 17:8, 17:16, 18:14, 18:16, 18:19, 18:23, 19:2, 20:5, 22:23, 23:4, 23:6, 23:22, 24:9, 24:15, 24:16, 24:17, 24:20, 25:1, 25:2, 25:6, 25:8, 25:11, 25:17, 26:2, 26:14, 27:2, 31:12, 31:13, 32:2, 32:7, 32:21, 33:14, 33:23, 37:20, 37:25, 38:5, 38:10, 38:24, 39:10, 39:13, 40:4, 40:9, 40:12, 44:9, 47:12
abettor [2] - 38:13, 43:17
absence [3] - 20:15, 25:7, 30:14
absolutely [2] - 29:11, 32:11
absorb [1] - 35:11
absorbed [1] - 20:24
academic [1] - 7:6
accept [1] - 44:3
accidentally [1] - 42:14
accompanies [1] - 40:11
acknowledged [1] - 10:23
acknowledgement [1] - 11:1
act [3] - 42:13, 45:17
action [16] - 4:14, 4:17, 5:20, 7:10, 11:18, 12:23, 13:5, 14:20, 21:3, 22:11, 22:14, 23:14, 23:16, 23:19, 25:12, 26:7
actionable [1] - 10:12
actively [1] - 36:6
actor [4] - 16:2, 16:3, 33:25, 38:7
actual [1] - 9:17
additional [1] - 28:6
address [6] - 19:16, 19:22, 20:1, 28:17, 39:15, 46:24
addressed [2] - 7:8, 17:5, 17:7, 17:16, 19:17, 19:18, 29:18
addresses [2] - 13:23, 16:24
addressing [2] - 14:11, 22:10

adhered [1] - 12:1
adjourned [1] - 48:19
adjudicated [1] - 30:15
advice [1] - 36:11
affirmatively [2] - 27:22, 42:12
Africa [2] - 31:21, 38:23
afternoon [4] - 3:9, 3:11, 3:13, 3:15
agree [7] - 7:19, 10:24, 12:23, 15:9, 15:19, 16:16, 18:25
agreed [1] - 11:21
agrees [1] - 41:9
agricultural [1] - 36:11
ahead [2] - 16:24, 39:25
aid [1] - 43:18
aided [1] - 45:8
aider [3] - 38:13, 40:4, 43:17
aiding [79] - 4:13, 4:17, 5:5, 5:12, 5:20, 5:22, 6:1, 6:13, 7:3, 7:8, 7:12, 7:22, 7:23, 7:24, 8:8, 8:9, 9:17, 9:19, 10:2, 11:20, 12:11, 12:23, 13:5, 13:14, 15:7, 15:14, 15:16, 15:23, 16:5, 16:11, 17:7, 17:16, 18:14, 18:16, 18:19, 18:22, 19:2, 20:4, 22:23, 23:3, 23:4, 23:6, 23:21, 24:9, 24:14, 24:16, 24:17, 24:20, 25:1, 25:6, 25:8, 25:10, 25:17, 26:2, 26:14, 27:2, 31:12, 31:13, 32:2, 32:7, 32:21, 33:14, 33:23, 37:3, 37:20, 37:25, 38:5, 38:10, 38:24, 39:10, 39:12, 40:4, 40:9, 40:11, 44:8, 47:12
aids [1] - 38:6
al [1] - 1:8, 1:12, 3:6
alien [2] - 5:7, 5:13
allegation [5] - 44:15, 44:21, 44:24, 45:2, 45:4
allegations [3] - 4:25, 5:4, 35:2
allege [5] - 4:20, 35:5, 35:17, 36:24, 45:7
alleged [3] - 42:24,

44:16, 46:13
allow [6] - 16:9, 25:3, 27:3, 38:20, 39:10, 39:11
allowed [1] - 7:13
alluded [1] - 23:25
alone [1] - 41:12
Alto [2] - 2:14, 2:15
amend [6] - 34:13, 46:11, 46:12, 46:19, 46:20, 46:23
amended [4] - 45:3, 45:5, 46:12, 46:24
Amended [1] - 47:2
amoral [1] - 38:25
analysis [19] - 5:10, 10:13, 13:2, 17:18, 18:13, 20:5, 20:8, 23:6, 23:20, 25:18, 27:4, 28:19, 28:23, 29:23, 30:13, 30:19, 32:20, 42:17, 42:19
analyze [1] - 29:22
analyzed [2] - 29:19, 29:20
Andrew [2] - 2:10, 3:11
Angeles [2] - 1:17, 1:24
Anne [2] - 1:23, 49:10
annekielwasser@aol.com [1] - 1:25
answer [10] - 12:21, 21:18, 22:12, 23:11, 24:7, 24:8, 26:12, 43:6, 44:10, 44:14
Answer [1] - 46:15
answered [1] - 40:22
answers [1] - 45:11
anticipating [1] - 47:1
apart [1] - 17:6
Apartheid [2] - 31:22, 38:23
appeals [1] - 31:23
appearances [1] - 3:7
applicable [2] - 12:5, 14:17
application [1] - 32:21
applied [1] - 37:18
applies [2] - 10:10, 33:23
apply [5] - 8:13, 31:8, 31:16, 31:25, 32:12
applying [1] - 33:13
approach [1] - 15:3
appropriate [1] - 26:20
approving [1] - 17:1
Archer [1] - 3:17
Archer-Daniels-

**Midland** [1] - 3:17
**area** [6] - 4:12, 10:16, 22:20, 26:9, 28:22, 29:16
**areas** [1] - 35:4
**argue** [2] - 5:21, 44:1
**argues** [3] - 8:4, 39:6, 39:25
**arguing** [1] - 13:2
**argument** [8] - 7:24, 13:4, 14:5, 15:5, 20:7, 39:4, 41:21, 42:20
**arguments** [4] - 6:22, 20:11, 27:5, 28:7
**articles** [1] - 22:3
**aside** [3] - 5:1, 16:17, 35:12
**aspect** [2] - 37:6, 38:15
**assist** [2] - 43:18, 45:25
**assistance** [8] - 7:5, 35:6, 35:7, 36:22, 37:18, 39:1, 44:16
**assisted** [1] - 45:19
**assume** [2] - 35:13, 39:9
**assumed** [1] - 34:2
**assuming** [12] - 4:20, 7:10, 11:19, 23:14, 27:1, 36:8, 36:9, 39:8, 40:4, 40:6, 43:25, 47:14
**ATF** [3] - 13:15, 24:5
**attach** [1] - 25:11
**attached** [1] - 32:18
**attaches** [1] - 32:18
**attempted** [1] - 43:19
**Attorney's** [1] - 48:2
**authorities** [2] - 20:3, 22:7
**authority** [8] - 5:5, 25:16, 25:18, 25:19, 31:21, 47:6
**authorize** [1] - 27:10
**aware** [2] - 5:15, 34:9

**B**

**Bank** [5] - 23:2, 23:3, 24:4, 25:7, 25:20
**based** [2] - 32:11, 32:23
**basis** [1] - 15:22
**beans** [1] - 35:8
**Becker** [1] - 48:6
**becomes** [1] - 41:14
**begin** [1] - 3:21

**BEHALF** [2] - 2:3, 2:9
**below** [1] - 28:17
**best** [2] - 18:7, 18:13
**better** [1] - 40:4
**between** [8] - 14:17, 19:9, 29:21, 31:9, 37:25, 38:25, 41:25, 42:25
**beyond** [2] - 27:6, 36:10
**big** [1] - 36:18
**biggest** [1] - 35:6
**bit** [3] - 21:6, 31:4, 34:17
**block** [1] - 46:9
**bought** [2] - 35:13, 44:4
**box** [1] - 36:18
**Breyer's** [1] - 8:19
**Brief** [1] - 32:19
**brief** [7] - 29:17, 32:18, 32:22, 33:17, 37:14, 47:13
**briefed** [1] - 47:7
**briefing** [6] - 27:18, 27:19, 28:6, 30:18, 30:25, 34:23
**briefly** [2] - 44:10, 44:14
**bring** [2] - 8:5, 34:3
**broke** [1] - 39:19
**brought** [1] - 33:25
**Brown** [2] - 2:10, 2:13
**builds** [1] - 29:13
**bunch** [1] - 29:18
**business** [1] - 26:9
**buyers** [1] - 36:4
**buying** [4] - 35:7, 35:12, 36:10, 45:8

**C**

**CA** [2] - 2:15, 2:19
**Cabranes** [1] - 28:1
**cahoover@hhlaw.com** [1] - 2:24
**CALIFORNIA** [1] - 1:2
**California** [2] - 1:17, 1:24
**Camino** [1] - 2:14
**candidly** [1] - 40:23
**cannot** [4] - 23:7, 23:21, 41:9, 41:12
**care** [1] - 39:5
**Cargill** [1] - 3:12
**carry** [1] - 42:12
**case** [42] - 4:8, 5:14, 5:25, 9:4, 9:5, 9:9, 12:15, 13:18, 13:21,

13:23, 14:10, 15:6, 15:13, 16:17, 17:10, 17:12, 17:13, 18:3, 19:20, 21:23, 22:13, 23:9, 24:3, 25:9, 27:13, 27:25, 28:5, 29:6, 29:9, 29:15, 30:3, 31:15, 31:20, 32:4, 32:6, 32:25, 33:5, 33:15, 34:3, 34:13, 47:6
**cases** [27] - 4:9, 4:11, 5:10, 5:15, 5:16, 6:7, 14:9, 16:18, 16:20, 17:20, 18:5, 18:6, 18:9, 20:25, 22:16, 25:11, 28:20, 28:24, 29:8, 29:12, 29:25, 30:2, 30:8, 33:25, 37:15, 37:19, 41:11
**CENTRAL** [1] - 1:2
**Central** [6] - 23:2, 23:3, 24:4, 24:11, 25:7, 25:20
**century** [1] - 12:3
**certain** [2] - 24:24, 38:8
**certainly** [7] - 12:19, 21:19, 33:12, 34:3, 35:2, 45:3, 46:11
**certify** [1] - 49:2
**cetera** [3] - 12:4, 22:3, 47:13
**chance** [1] - 46:18
**changed** [3] - 28:24, 28:25, 34:17
**charged** [2] - 37:20, 49:5
**child** [3] - 35:9, 35:14, 35:24
**choice** [2] - 7:15, 19:10
**circuit** [2] - 13:23, 49:5
**Circuit** [28] - 9:5, 12:19, 13:16, 13:17, 15:2, 15:6, 15:13, 16:17, 16:18, 17:5, 17:24, 17:25, 18:9, 21:22, 27:13, 27:18, 28:20, 30:5, 30:18, 31:15, 32:5, 32:11, 32:23, 33:17, 34:5, 34:7, 37:24
**Circuit's** [1] - 34:4
**circumstance** [2] - 7:6, 40:13
**circumstances** [5] - 24:13, 24:18, 24:24, 25:2, 37:4

**citable** [1] - 17:14
**cite** [7] - 5:9, 6:6, 6:18, 33:18, 33:22, 37:14
**cited** [7] - 13:18, 17:9, 17:11, 17:12, 33:17, 41:6, 47:6
**citing** [1] - 37:15
**civil** [33] - 5:5, 6:14, 7:16, 9:16, 9:19, 10:2, 20:15, 20:16, 20:21, 21:2, 21:16, 22:9, 22:14, 22:15, 22:22, 22:25, 23:4, 23:22, 24:2, 24:5, 24:10, 24:16, 24:20, 24:25, 25:6, 25:8, 25:11, 25:16, 26:2, 26:15, 32:20, 33:12
**claim** [2] - 18:19, 22:15
**clarification** [1] - 48:12
**clarifying** [1] - 47:10
**clarity** [2] - 12:2, 12:8
**clear** [2] - 6:21, 41:11
**clearly** [1] - 34:1
**CLERK** [2] - 3:5, 27:22
**clerks** [1] - 27:16
**clients** [1] - 44:1
**close** [1] - 40:22
**closed** [1] - 34:1
**closest** [1] - 17:17
**co** [2] - 4:6, 33:5
**co-counsel** [2] - 4:6, 33:5
**cocoa** [6] - 35:4, 35:8, 36:12, 36:18, 44:4, 44:5
**colleague** [1] - 39:16
**collection** [1] - 33:2
**COLLINGSWORTH** [28] - 3:9, 4:4, 4:7, 4:16, 4:21, 5:8, 5:24, 6:6, 6:17, 7:1, 31:2, 31:6, 31:13, 34:8, 34:15, 34:22, 35:17, 36:14, 37:1, 37:8, 37:14, 38:14, 38:22, 42:4, 46:14, 48:9, 48:11, 48:14
**Collingsworth** [11] - 2:4, 3:10, 4:5, 30:22, 30:24, 40:23, 41:19, 41:20, 45:7, 46:3, 47:18
**Collins** [2] - 2:17, 3:17
**Columbia** [1] - 2:22
**coming** [1] - 30:10
**commission** [4] - 43:18, 43:19, 43:20,

43:21
**common** [12] - 6:3, 6:16, 6:19, 7:4, 7:12, 7:21, 8:4, 8:5, 8:11, 11:5, 15:17, 37:9
**Company** [1] - 34:19
**company** [1] - 36:19
**compatible** [1] - 6:13
**complaining** [1] - 30:10
**Complaint** [18] - 34:13, 34:14, 34:16, 34:18, 35:20, 35:21, 35:22, 44:25, 45:3, 45:5, 46:4, 46:8, 46:19, 46:21, 46:22, 46:23, 47:2
**complete** [1] - 45:8
**complex** [1] - 21:7
**complicated** [1] - 30:2
**comports** [2] - 8:24, 15:2
**comprehensive** [4] - 20:5, 20:9, 27:4, 27:7
**concerned** [1] - 5:18
**conclude** [2] - 30:3, 38:22
**concluded** [3] - 4:13, 29:24
**concluding** [1] - 32:1
**conclusion** [2] - 29:17, 33:3
**concurring** [1] - 8:19
**conduct** [3] - 16:7, 16:8, 37:5
**conference** [1] - 49:7
**conference** [1] - 49:6
**confused** [1] - 25:15
**Congress** [1] - 36:2
**Conrad** [1] - 2:4
**consensus** [14] - 10:11, 13:12, 14:1, 14:19, 14:20, 18:18, 19:1, 26:1, 26:21, 30:8, 30:12, 30:16, 33:11, 40:19
**considered** [1] - 26:18
**consistent** [1] - 5:3
**conspiracy** [1] - 37:22
**contest** [1] - 4:22
**context** [3] - 24:4, 24:8, 24:10
**contrary** [1] - 42:11
**contrasted** [1] - 42:1
**conundrum** [1] - 35:25
**corporate** [20] - 6:14, 9:16, 16:21, 17:2,

17:19, 19:12, 19:13, 19:23, 27:3, 27:6, 27:11, 27:20, 27:23, 28:18, 31:11, 32:7, 33:14, 33:20, 39:11, 40:6

**corporation** [3] - 16:5, 34:1, 34:3

**corporations** [7] - 16:23, 17:20, 18:9, 28:21, 30:1, 30:9, 33:7

**correct** [11] - 4:15, 6:17, 9:13, 13:4, 19:14, 36:14, 38:14, 41:22, 42:3, 45:1, 49:2

**correctly** [1] - 41:22

**Cote** [4] - 29:22, 30:6, 35:4, 36:5

**Counsel** [1] - 3:7

**counsel** [3] - 4:6, 33:5

**counterpart** [2] - 21:2, 24:21

**countries** [1] - 33:11

**course** [2] - 31:6, 31:9

**COURT** [114] - 1:1, 3:5, 3:20, 3:25, 4:6, 4:11, 4:19, 4:23, 5:15, 6:5, 6:9, 6:20, 7:7, 7:17, 7:19, 8:3, 8:14, 9:1, 9:8, 9:15, 9:25, 10:4, 10:13, 10:17, 11:2, 11:14, 12:7, 12:9, 12:14, 12:19, 13:1, 13:8, 13:10, 13:16, 13:21, 15:4, 15:21, 16:10, 16:15, 16:17, 17:22, 18:7, 18:14, 19:11, 19:15, 19:21, 19:25, 20:3, 20:10, 20:17, 20:19, 21:8, 21:10, 23:8, 24:12, 24:16, 25:13, 25:22, 26:3, 26:8, 26:25, 27:12, 27:23, 28:4, 28:14, 28:22, 29:12, 30:21, 31:5, 31:11, 34:6, 34:9, 34:17, 35:10, 36:7, 36:25, 37:2, 37:12, 38:4, 38:20, 39:2, 39:5, 39:17, 39:21, 39:24, 40:3, 40:20, 40:23, 41:1, 41:3, 41:18, 42:6, 42:16, 43:5, 43:13, 43:22, 43:25, 44:13, 44:24, 45:3, 45:12, 46:2, 46:7, 46:18,

47:9, 47:15, 47:21, 47:24, 48:2, 48:5, 48:8, 48:10, 48:13, 48:16

**court** [21] - 7:11, 9:21, 10:6, 11:3, 11:4, 12:10, 12:16, 15:10, 17:23, 18:21, 22:6, 23:13, 23:17, 25:7, 26:9, 26:10, 26:24, 29:6, 31:23, 36:3

**Court** [40] - 1:23, 3:23, 6:18, 11:15, 12:4, 13:24, 13:25, 14:5, 14:6, 14:8, 14:10, 14:16, 14:19, 15:25, 16:24, 17:1, 17:3, 17:7, 17:13, 17:15, 21:22, 21:24, 23:2, 24:2, 24:25, 25:14, 25:15, 25:17, 25:19, 26:20, 26:21, 28:15, 31:1, 33:23, 38:24, 40:8, 48:19, 49:10

**Court's** [2] - 11:25, 23:6

**courtroom** [1] - 3:18

**courts** [4] - 4:13, 17:11, 22:7, 26:23

**cover** [1] - 3:24

**covers** [1] - 20:11

**Craig** [1] - 2:21

**craig** [1] - 3:13

**create** [2] - 18:20, 41:9

**created** [1] - 19:7

**creating** [1] - 41:13

**crime** [8] - 7:24, 14:3, 14:7, 15:12, 15:19, 43:19, 43:20

**criminal** [23] - 7:16, 9:19, 14:6, 20:22, 20:25, 21:4, 21:15, 22:5, 22:9, 22:18, 22:20, 23:6, 24:1, 24:6, 24:9, 24:17, 24:19, 25:1, 25:8, 32:21, 33:12, 38:9

**critical** [2] - 20:14, 28:23

**crop** [1] - 45:8

**crops** [3] - 42:1, 44:5

**crumbling** [1] - 42:14

**crux** [1] - 42:19

**CSR** [1] - 49:10

**cultivation** [1] - 35:18

**current** [2] - 41:5

**customary** [1] - 31:25

**CV-05-5133SVW** [1] - 3:5

---

# D

**D'Ivoire** [2] - 35:4, 36:5

**Daniel** [2] - 2:17, 3:17

**Daniels** [1] - 3:17

**Date** [1] - 49:10

**days** [4] - 46:20, 47:3, 48:12, 48:15

**DC** [3] - 2:5, 2:11, 2:23

**deal** [3] - 16:18, 16:22, 44:12

**dealing** [3] - 15:7, 37:15, 39:22

**debate** [2] - 7:6, 22:3

**debating** [1] - 14:23

**decided** [5] - 18:5, 21:21, 28:5, 29:6, 30:8

**decision** [9] - 11:25, 21:25, 23:2, 28:12, 31:22, 32:9, 32:12, 37:23, 38:23

**decisions** [3] - 22:4, 22:24, 29:18

**defendant** [10] - 3:12, 3:14, 3:16, 16:2, 16:7, 16:8, 16:21, 28:9, 34:19, 38:21

**DEFENDANTS** [1] - 2:9

**defendants** [9] - 1:13, 4:21, 6:24, 17:21, 28:20, 33:22, 35:1, 44:22, 47:18

**definition** [1] - 12:6

**deposit** [1] - 49:6

**detail** [2] - 44:11, 45:22

**detailed** [1] - 32:20

**determinative** [1] - 5:17

**determine** [1] - 7:12

**developed** [1] - 22:21

**dictum** [1] - 18:4

**differ** [1] - 40:13

**difference** [3] - 12:5, 37:25, 38:4

**differences** [3] - 11:7, 20:13

**different** [8] - 14:24, 14:25, 20:19, 23:11, 27:24, 38:12, 39:19, 47:22

**differently** [1] - 25:10

**dilemma** [1] - 14:22

**directed** [1] - 14:11

**directly** [5] - 8:17, 12:10, 19:16, 23:19,

40:22

**disagreement** [2] - 14:17, 19:8

**disappeared** [1] - 32:10

**discriminating** [1] - 15:11

**discussed** [4] - 18:12, 27:25, 28:19, 41:7

**discussing** [1] - 47:11

**discussion** [2] - 9:17, 31:19

**discussions** [1] - 16:21

**dismiss** [1] - 46:10

**dispositive** [1] - 33:16

**dispute** [1] - 31:9

**dissent** [2] - 31:7, 32:9

**distinction** [6] - 37:24, 38:25, 41:25, 42:3, 42:7, 42:24

**DISTRICT** [2] - 1:1, 1:2

**district** [3] - 18:21, 18:22, 29:8

**divergent** [1] - 10:24

**divided** [1] - 39:4

**DOE** [1] - 1:8

**Doe** [1] - 3:6

**domestic** [7] - 5:23, 9:11, 13:11, 22:16, 23:8, 23:9, 25:24

**done** [3] - 3:23, 17:13, 17:18

**down** [2] - 35:10, 39:19

**drag** [1] - 28:10

---

# E

**easily** [1] - 43:7

**effect** [1] - 36:23

**either** [6] - 10:19, 12:24, 19:23, 22:8, 39:14, 45:18

**El** [1] - 2:14

**element** [2] - 15:7, 23:18

**Eleventh** [3] - 34:5, 34:6, 37:24

**Email** [4] - 2:6, 2:16, 2:20, 2:24

**end** [1] - 26:3

**ended** [1] - 32:1

**environmental** [1] - 28:11

**equivalent** [1] - 12:3

**essentially** [3] - 11:1, 19:7, 32:16

---

**establish** [1] - 6:10

**established** [9] - 7:9, 7:10, 8:10, 9:18, 20:23, 21:3, 24:20, 27:1, 39:13

**establishing** [1] - 20:20

**et** [7] - 1:8, 1:12, 3:6, 12:4, 22:3, 47:12

**event** [1] - 29:5

**evidence** [1] - 33:7

**exact** [1] - 32:22

**exactly** [4] - 10:3, 14:22, 26:23

**examination** [2] - 5:17, 15:16

**example** [1] - 17:12

**excuse** [1] - 29:24

**exercise** [1] - 23:18

**Exhibit** [2] - 31:21, 32:18

**existence** [8] - 14:16, 23:5, 26:2, 26:22, 29:24, 29:25, 41:15, 47:12

**exists** [1] - 41:15

**expertise** [1] - 33:1

**explain** [2] - 34:25, 39:19

**explicitly** [2] - 23:17, 41:17

**exploiting** [1] - 35:14

**extending** [1] - 16:1

**extends** [1] - 8:21

**extent** [1] - 10:19

---

# F

**F.3d** [2] - 31:16, 33:19

**facilitating** [2] - 43:20, 43:21

**facing** [1] - 14:22

**fact** [3] - 5:16, 33:13, 34:19

**factory** [1] - 36:17

**facts** [1] - 46:15

**failing** [1] - 36:1

**failure** [1] - 45:23

**fair** [1] - 10:7

**fairly** [1] - 27:7

**familiar** [1] - 29:7

**far** [4] - 10:4, 15:4, 29:21, 46:25

**farmers** [9] - 34:20, 35:5, 35:14, 35:16, 36:11, 44:6, 44:22, 45:9

**farms** [2] - 35:3, 44:6

**favor** [2] - 18:22,

19:23
**favorable** [1] - 10:1
**Federal** [1] - 1:23
**federal** [12] - 6:3, 6:16, 6:19, 7:4, 7:12, 7:21, 8:4, 8:5, 8:11, 15:17, 23:21, 37:9
**fee** [1] - 49:5
**fees** [1] - 49:5
**felt** [1] - 10:5
**fertilizer** [1] - 44:7
**fertilizers** [3] - 35:19, 36:12, 45:10
**few** [3] - 21:18, 29:21, 30:22
**field** [1] - 33:1
**figure** [2] - 27:17, 48:17
**file** [2] - 46:3, 47:3
**filed** [3] - 34:12, 35:21, 35:22
**filter** [1] - 25:17
**filtered** [1] - 25:23
**finally** [1] - 40:14
**financial** [1] - 44:16
**fine** [1] - 6:12
**fine-tuning** [1] - 6:12
**firm** [1] - 48:7
**first** [12] - 4:3, 4:17, 5:9, 5:14, 5:25, 8:9, 9:20, 18:12, 29:15, 33:18, 34:12, 40:18
**First** [1] - 31:6
**FI** [1] - 2:18
**flat** [1] - 23:3
**flawed** [1] - 29:23
**flip** [1] - 11:10
**floating** [2] - 27:14, 47:5
**follow** [2] - 24:18, 24:23
**follows** [1] - 24:3
**footnote** [3] - 8:17, 9:2, 33:21
**Footnote** [5] - 8:17, 8:18, 15:24, 33:23, 34:2
**forced** [1] - 44:19
**foregoing** [1] - 49:2
**foreign** [1] - 26:17
**forever** [1] - 28:14
**form** [1] - 35:6
**forth** [1] - 45:10
**foundation** [2] - 29:13, 29:15
**framework** [1] - 20:19
**Francisco** [1] - 2:19
**frankly** [6] - 4:11, 10:13, 25:14, 28:10,

29:2, 42:6
**frequently** [1] - 41:6
**furthering** [1] - 44:18

**G**

**general** [12] - 14:4, 15:18, 22:8, 22:23, 24:12, 24:18, 25:7, 25:10, 37:4, 38:13, 39:14, 41:25
**generally** [4] - 20:25, 38:5, 38:9, 40:10
**genocide** [3] - 14:2, 14:11, 15:19
**given** [5] - 8:22, 35:15, 44:18, 44:22, 45:22
**glean** [2] - 20:21, 21:15
**granted** [1] - 46:10
**ground** [3] - 10:22, 11:5, 47:11
**grounds** [1] - 47:13
**grow** [2] - 35:4, 42:1
**growing** [1] - 36:12
**guidance** [4] - 18:20, 19:3, 19:7, 31:23
**guide** [1] - 23:1

**H**

**Habana** [4] - 21:24, 32:24, 32:25, 37:23
**Hall** [6] - 9:10, 10:17, 13:8, 13:10, 19:17, 19:25
**hand** [2] - 10:25, 36:1
**handful** [1] - 22:18
**hard** [1] - 4:12
**harm** [2] - 11:23, 42:22
**harmonized** [1] - 11:7
**Hartson** [2] - 2:21, 3:14
**harvesting** [1] - 35:19
**head** [1] - 27:22
**hear** [1] - 7:14
**heard** [2] - 45:1, 45:2
**Hearing** [1] - 1:16
**hearing** [3] - 46:19, 47:4, 48:17
**held** [2] - 28:7, 32:6
**help** [1] - 21:10
**helpful** [2] - 47:17, 47:18
**hereby** [1] - 49:2
**higher** [4] - 14:15, 20:24, 20:25, 37:22

**history** [1] - 22:19
**Hoffman** [2] - 4:6, 33:5
**Hogan** [2] - 2:21, 3:14
**holding** [1] - 33:7
**Honor** [35] - 3:9, 3:11, 3:13, 3:15, 3:22, 4:5, 4:7, 4:16, 5:8, 5:25, 6:7, 6:17, 7:2, 7:14, 11:11, 14:9, 17:19, 21:14, 31:2, 31:14, 32:15, 33:21, 34:22, 35:18, 36:14, 37:1, 38:2, 39:3, 42:4, 42:22, 44:11, 45:25, 46:14, 47:8, 48:11
**Honor's** [4] - 8:24, 22:12, 23:10, 26:13
**HONORABLE** [1] - 1:4
**Hoover** [2] - 2:21, 3:14
**HOOVER** [1] - 3:13
**human** [1] - 45:25

**I**

**identical** [1] - 7:4
**identified** [1] - 42:21
**identifies** [1] - 12:4
**identify** [1] - 33:11
**immediate** [1] - 12:22
**immoral** [1] - 38:25
**impact** [1] - 42:17
**implications** [1] - 26:18
**implicitly** [3] - 11:22, 17:1, 17:24
**implied** [1] - 23:5
**imply** [4] - 23:22, 24:1, 26:6, 26:20
**implying** [3] - 26:7, 26:10, 26:21
**important** [1] - 38:2
**impossible** [1] - 14:18
**incidental** [1] - 38:19
**incidentally** [1] - 29:5
**including** [3] - 20:12, 38:18, 44:16
**increase** [2] - 44:7, 45:10
**independently** [1] - 21:3
**indicates** [1] - 30:1
**indicators** [1] - 33:13
**indirectly** [1] - 13:18
**individual** [3] - 33:25, 34:1
**infer** [2] - 24:5, 24:14
**information** [4] - 27:15, 31:1, 39:25,

46:17
**initial** [1] - 7:21
**inquiry** [2] - 13:25, 33:6
**insofar** [2] - 5:17, 20:4
**instance** [2] - 40:15, 43:25
**instead** [1] - 45:5
**instinct** [1] - 8:24, 9:1
**instruct** [1] - 43:8
**instructing** [1] - 45:9
**instruction** [1] - 35:18
**integrated** [2] - 36:6, 36:15
**intended** [1] - 37:21, 42:22
**intent** [24] - 14:3, 14:4, 14:13, 15:18, 31:10, 32:3, 37:4, 37:5, 37:11, 38:5, 38:12, 38:17, 39:14, 42:9, 42:10, 42:23, 43:2, 43:3, 43:23, 45:14, 45:17
**intention** [1] - 14:12
**interested** [8] - 8:9, 9:20, 10:18, 28:2, 39:7, 39:24, 40:16, 46:19
**interesting** [2] - 31:24, 32:10
**international** [70] - 4:15, 5:2, 5:21, 5:22, 6:11, 6:15, 7:3, 7:9, 7:11, 7:25, 8:5, 8:8, 8:10, 8:13, 8:18, 8:21, 9:13, 9:23, 10:2, 10:10, 10:11, 10:23, 11:17, 11:20, 12:11, 13:3, 13:14, 14:18, 15:11, 15:14, 16:1, 16:4, 16:9, 16:23, 17:2, 18:15, 18:18, 19:8, 20:4, 20:21, 20:22, 21:4, 21:15, 21:23, 25:5, 25:16, 25:23, 26:1, 26:15, 27:1, 30:7, 30:12, 30:16, 31:25, 32:1, 33:2, 33:10, 33:22, 37:7, 37:15, 39:10, 39:11, 39:13, 40:5, 40:6, 40:20, 41:5, 43:6, 43:11
**internationally** [3] - 20:15, 20:24, 32:21
**interpretation** [2] - 9:20, 25:4
**interpreting** [1] - 21:4
**interrupt** [1] - 30:21

**intertwined** [1] - 16:12
**introduced** [1] - 13:15
**invite** [1] - 9:16
**involved** [1] - 37:19
**issue** [28] - 4:23, 7:3, 7:20, 10:5, 12:10, 13:18, 14:11, 14:23, 15:5, 15:23, 16:2, 16:22, 17:8, 17:19, 17:25, 18:2, 18:10, 18:12, 26:5, 27:6, 28:18, 29:20, 29:22, 30:3, 30:25, 33:20, 47:13, 47:15
**issues** [13] - 6:3, 6:21, 12:20, 17:5, 26:18, 29:19, 30:1, 30:2, 30:14, 33:24, 38:18, 38:19, 39:23
**Item** [2] - 3:5, 34:23
**itself** [3] - 6:2, 30:15, 41:9

**J**

**Jacobs** [1] - 28:1
**JOHN** [1] - 1:8
**John** [2] - 3:5, 3:6
**joined** [1] - 41:16
**joint** [1] - 36:23
**judge** [4] - 9:10, 10:9, 13:7, 31:9
**JUDGE** [1] - 1:4
**Judge** [17] - 10:10, 18:13, 18:24, 19:4, 19:18, 27:2, 28:11, 28:17, 29:22, 30:6, 31:3, 31:6, 32:9, 41:6, 41:7
**judges** [9] - 9:12, 12:25, 13:3, 13:4, 13:8, 13:13, 27:17, 27:24, 27:25, 29:9, 29:20
**judgment** [1] - 23:18
**judicial** [4] - 21:25, 22:4, 22:24, 49:7
**July** [1] - 47:4
**JUNE** [1] - 3:1
**June** [1] - 1:17
**juries** [1] - 43:8
**jurisdiction** [5] - 14:6, 24:1, 24:2, 24:6
**Justice** [2] - 8:19, 29:3

**K**

**Katy** [1] - 27:21
**Katzmann** [20] - 9:12,

9:22, 10:4, 10:7, 10:9, 10:19, 10:21, 11:8, 11:21, 12:9, 13:9, 14:23, 14:24, 18:24, 19:9, 19:15, 19:17, 19:25, 41:7
**keep** [1] - 39:20
**Khulumani** [7] - 9:7, 9:9, 18:11, 31:22, 32:8, 32:23, 38:3
**Kielwasser** [2] - 1:23, 49:10
**kind** [2] - 12:6, 32:10
**kinds** [1] - 43:8
**knowing** [3] - 7:5, 35:8, 39:1
**knowingly** [1] - 42:13
**knowledge** [17] - 14:2, 35:13, 36:8, 36:9, 37:5, 37:11, 37:13, 37:18, 38:1, 38:13, 41:25, 42:1, 42:8, 42:25, 43:2, 45:13
**known** [1] - 13:22
**knows** [2] - 22:4, 45:6
**Korman** [16] - 9:12, 9:22, 9:25, 10:5, 10:10, 10:20, 11:21, 14:23, 18:13, 18:15, 19:9, 19:18, 28:17, 31:3, 41:7
**Korman's** [5] - 20:5, 27:2, 27:4, 31:7, 32:9
**Kristin** [3] - 2:17, 3:15, 47:25
**kristin.myles@mto. com** [1] - 2:20

# L

**labor** [5] - 35:9, 35:14, 35:24, 44:18, 44:19
**lacking** [1] - 46:8
**landscape** [1] - 40:14
**language** [1] - 6:19
**last** [2] - 12:15, 25:23
**lately** [1] - 35:21
**law** [63] - 4:18, 5:11, 5:23, 6:2, 6:3, 6:16, 6:19, 7:3, 7:4, 7:12, 7:15, 7:21, 8:4, 8:5, 8:8, 8:11, 8:13, 8:21, 9:11, 9:13, 10:10, 10:11, 10:23, 11:17, 13:11, 13:14, 14:18, 15:17, 16:1, 16:4, 16:9, 18:18, 18:23, 18:25, 21:15, 21:23,

22:3, 22:21, 22:22, 22:24, 23:9, 25:5, 25:23, 25:24, 26:15, 27:16, 29:1, 29:13, 29:14, 30:4, 31:25, 33:2, 33:10, 33:23, 37:7, 37:9, 37:15, 38:9, 41:5, 42:11, 43:7, 43:11
**LAW** [1] - 27:22
**laws** [2] - 13:3, 22:20
**lead** [1] - 15:16
**least** [4] - 4:12, 5:3, 34:2, 38:9
**leave** [1] - 46:11
**leaving** [1] - 5:1
**lectern** [2] - 4:3, 30:23
**Lee** [2] - 2:13, 3:12
**left** [1] - 27:9
**legal** [1] - 39:22
**less** [2] - 10:6, 49:5
**Leva** [1] - 4:8
**Leval** [1] - 28:1
**level** [3] - 12:2, 29:6, 45:22
**liability** [31] - 5:5, 5:12, 6:4, 6:13, 6:14, 8:21, 9:16, 16:1, 16:13, 17:2, 19:12, 19:13, 19:24, 22:25, 23:23, 24:15, 24:19, 26:2, 27:3, 27:6, 27:11, 27:20, 27:23, 31:12, 32:8, 33:14, 33:20, 33:24, 38:18, 39:11, 40:6
**liable** [3] - 16:23, 33:8, 38:19
**line** [1] - 22:19
**Linsley** [4] - 2:17, 47:23, 47:24, 47:25
**listed** [1] - 45:25
**literally** [1] - 31:8
**Litigation** [1] - 31:22
**loaning** [1] - 45:9
**lobbying** [1] - 36:2
**logic** [1] - 24:10
**logistical** [4] - 34:20, 34:21, 44:17, 45:6
**lollipop** [1] - 15:21
**look** [24] - 5:22, 5:23, 6:3, 6:15, 7:11, 8:4, 9:10, 9:12, 9:23, 11:19, 15:11, 15:14, 16:4, 21:22, 22:25, 25:19, 28:10, 29:10, 33:1, 33:10, 34:12, 41:4, 43:12
**looked** [4] - 12:17, 21:24, 22:6, 22:8

**looking** [10] - 7:21, 11:4, 12:14, 13:25, 16:7, 22:20, 25:3, 28:8, 29:20, 33:24
**Los** [2] - 1:17, 1:24
**lower** [2] - 14:12, 17:23
**lrubin@ mayerbrownrowe. com** [1] - 2:16

# M

**maiden** [1] - 48:1
**main** [1] - 33:6
**majority** [1] - 44:5
**manner** [1] - 26:15
**Marc** [1] - 48:6
**market** [1] - 35:7
**material** [1] - 34:24
**materials** [1] - 41:6
**matter** [12] - 5:25, 7:8, 15:17, 17:16, 22:2, 24:13, 25:6, 26:15, 28:4, 29:4, 43:6, 49:4
**matters** [1] - 16:11
**Mayer** [2] - 2:10, 2:13
**mean** [17] - 7:20, 11:5, 11:14, 11:15, 21:1, 25:8, 28:14, 28:25, 34:20, 39:18, 43:7, 43:14, 44:3, 44:24, 46:21, 46:22, 48:10
**means** [5] - 5:12, 11:6, 12:24, 41:19, 42:10, 44:16, 44:17, 45:6
**meant** [1] - 30:4
**mens** [8] - 37:2, 37:6, 38:8, 39:8, 45:14, 45:16, 45:18, 45:23
**mental** [1] - 46:9
**mentioned** [2] - 32:5, 34:12
**mere** [1] - 32:13
**middle** [5] - 10:22, 11:13, 11:15, 15:1, 47:4
**Midland** [1] - 3:17
**might** [5] - 10:22, 26:18, 28:8, 28:9, 32:10
**mind** [17] - 6:21, 15:12, 15:18, 16:11, 21:9, 26:17, 37:3, 38:7, 38:10, 39:14, 40:11, 40:12, 40:13, 40:15, 40:19, 44:2, 47:17

**minimum** [1] - 22:4
**minute** [1] - 31:3
**minutes** [1] - 30:22
**missing** [1] - 31:19
**misstate** [1] - 11:12
**mixed** [1] - 14:9
**moment** [8] - 3:19, 5:1, 6:20, 8:7, 9:8, 11:11, 41:23, 46:2
**MONDAY** [1] - 3:1
**Monday** [1] - 1:17
**money** [2] - 36:21, 45:9
**Monger** [2] - 48:5, 48:6
**Montgomery** [1] - 2:18
**most** [5] - 8:16, 10:15, 38:2, 41:6, 43:16
**mother** [1] - 48:10
**motion** [2] - 46:10, 47:3
**Motion** [1] - 1:16
**MR** [29] - 3:9, 3:11, 3:13, 4:7, 4:16, 4:21, 5:8, 5:24, 6:6, 6:17, 7:1, 31:2, 31:6, 31:13, 34:8, 34:15, 34:22, 35:17, 36:14, 37:1, 37:8, 37:14, 38:14, 38:22, 39:16, 42:4, 46:14, 48:9, 48:14
**MS** [86] - 3:15, 3:22, 4:4, 7:14, 7:18, 8:2, 8:12, 8:16, 9:7, 9:14, 9:24, 10:3, 10:9, 10:15, 10:21, 11:10, 11:24, 12:8, 12:13, 12:18, 12:21, 13:3, 13:9, 13:12, 13:17, 13:22, 15:20, 15:22, 16:14, 16:16, 17:4, 18:2, 18:8, 18:17, 19:14, 19:17, 19:22, 20:1, 20:8, 20:11, 21:13, 23:9, 24:14, 25:5, 25:21, 25:25, 26:4, 26:12, 27:8, 28:3, 28:13, 28:16, 29:11, 29:16, 39:3, 39:18, 39:22, 40:1, 40:17, 40:21, 40:25, 41:2, 41:4, 42:5, 42:15, 42:19, 43:12, 43:16, 43:24, 44:10, 44:14, 45:1, 45:11, 45:16, 46:6, 47:8, 47:10, 47:20, 47:23, 47:25, 48:4, 48:6
**Myles** [4] - 2:17, 3:16, 4:3, 47:20
**mysterious** [1] - 27:16

# N

**name** [2] - 47:24, 48:1
**named** [1] - 18:10
**nations** [5] - 4:18, 6:2, 30:9, 30:14, 41:16
**natural** [2] - 16:5, 36:21
**nature** [1] - 22:8
**necessarily** [3] - 5:17, 24:23, 26:21
**necessary** [2] - 37:3, 38:7
**need** [4] - 6:4, 16:22, 41:2, 41:3
**needs** [1] - 40:19
**negligently** [1] - 42:13
**NESTLE** [1] - 1:12
**Nestle** [7] - 3:6, 3:14, 34:19, 35:2, 35:15, 44:4, 45:8

48:11
**Munger** [3] - 2:18, 3:16, 3:18
**must** [3] - 8:20, 28:21, 43:18
**myles** [1] - 47:21
**MYLES** [84] - 3:15, 3:22, 7:14, 7:18, 8:2, 8:12, 8:16, 9:7, 9:14, 9:24, 10:3, 10:9, 10:15, 10:21, 11:10, 11:24, 12:8, 12:13, 12:18, 12:21, 13:3, 13:9, 13:12, 13:17, 13:22, 15:20, 15:22, 16:14, 16:16, 17:4, 18:2, 18:8, 18:17, 19:14, 19:17, 19:22, 20:1, 20:8, 20:11, 20:18, 21:6, 21:9, 21:13, 23:9, 24:14, 25:5, 25:21, 25:25, 26:4, 26:12, 27:8, 28:3, 28:13, 28:16, 29:11, 29:16, 39:3, 39:18, 39:22, 40:1, 40:17, 40:21, 40:25, 41:2, 41:4, 42:5, 42:15, 42:19, 43:12, 43:16, 43:24, 44:10, 44:14, 45:1, 45:11, 45:16, 46:6, 47:8, 47:10, 47:20, 47:23, 47:25, 48:4, 48:6

**never** [2] - 45:2, 46:4
**New** [2] - 2:18, 4:9
**nicety** [1] - 7:23
**Ninth** [13] - 12:19, 13:16, 13:17, 15:2, 15:6, 15:13, 16:17, 16:18, 17:5, 17:24, 17:25, 31:15, 32:11
**nobody** [1] - 17:21
**none** [3] - 29:19, 29:25, 37:19
**norm** [35] - 4:18, 4:20, 5:2, 6:2, 7:2, 8:22, 9:17, 9:18, 9:23, 10:2, 10:12, 11:17, 12:1, 12:11, 15:12, 15:14, 17:2, 18:15, 20:21, 20:22, 21:4, 21:16, 23:14, 24:20, 25:16, 27:2, 32:2, 38:15, 38:16, 41:3, 41:9, 41:13, 41:15, 43:6
**norms** [20] - 4:15, 5:21, 5:22, 6:15, 7:9, 7:11, 7:25, 8:10, 11:20, 16:23, 20:4, 20:21, 21:4, 21:19, 39:10, 39:11, 39:13, 40:5, 40:7, 40:20
**North** [1] - 1:24
**note** [1] - 33:21
**notices** [1] - 25:7
**notion** [1] - 33:22
**notions** [1] - 22:23
**Nuremberg** [1] - 37:16
**NW** [2] - 2:11, 2:22

**O**

**obviously** [4] - 20:14, 22:5, 28:5, 28:18
**Occidental** [1] - 17:12
**occurring** [1] - 36:17
**OF** [3] - 1:2, 2:3, 2:9
**offense** [2] - 15:7, 38:8
**office** [1] - 48:3
**Official** [1] - 1:23
**official** [1] - 49:10
**old** [1] - 21:23
**Olson** [2] - 2:18, 3:16
**ON** [2] - 2:3, 2:9
**once** [4] - 4:4, 6:2, 6:10, 24:19
**one** [29] - 4:9, 4:24, 5:3, 6:20, 6:23, 9:8, 9:10, 10:25, 14:12, 18:25, 19:19, 19:22,

21:19, 23:1, 24:23, 25:9, 26:13, 28:19, 30:1, 31:3, 32:15, 33:9, 36:1, 36:17, 36:18, 38:6, 46:2, 47:8, 48:11
**ones** [2] - 39:19, 47:11
**online** [1] - 27:16
**open** [3] - 19:19, 19:20, 29:3
**operating** [1] - 36:20
**operation** [1] - 36:16
**opine** [1] - 19:10
**opines** [1] - 12:22
**opinion** [15] - 8:19, 10:16, 12:16, 13:6, 17:3, 17:9, 17:23, 19:1, 20:8, 28:17, 29:7, 30:19, 31:7, 32:6, 34:18
**Opinion** [1] - 11:11
**opinions** [3] - 9:9, 16:25, 29:21
**opposed** [1] - 42:12
**opposite** [1] - 30:11
**order** [2] - 21:19, 39:12
**original** [2] - 34:14, 34:15
**otherwise** [1] - 43:18
**ought** [2] - 9:12, 47:2
**out-of-pocket** [1] - 4:10
**output** [1] - 36:22
**outset** [1] - 32:16
**own** [1] - 10:17
**ownership** [1] - 36:23

**P**

**P.M** [1] - 3:1
**page** [4] - 8:17, 29:17, 32:19, 37:15
**pages** [2] - 5:9, 33:19
**Palo** [2] - 2:14, 2:15
**panel** [3] - 27:18, 27:24, 27:25
**Paquete** [5] - 21:23, 32:24, 32:25, 37:23
**paradigms** [1] - 12:3
**paragraph** [1] - 35:19
**part** [5] - 5:7, 7:23, 12:11, 40:17, 46:21
**particular** [5] - 7:6, 11:25, 16:2, 21:18, 42:21
**partly** [1] - 23:10
**parts** [1] - 23:11
**passage** [1] - 8:16

**past** [2] - 4:19, 9:3
**pending** [1] - 28:12
**people** [1] - 36:15
**perceive** [1] - 41:22
**percent** [2] - 5:11, 35:8
**perhaps** [4] - 9:18, 11:7, 25:2, 44:5
**perpetrator** [1] - 8:22
**person** [6] - 16:5, 37:20, 42:2, 42:9, 42:21, 42:22
**persuasive** [2] - 10:14, 10:15
**Pfizer** [2] - 32:6, 33:16
**Phone** [1] - 1:25
**phonetically** [1] - 4:8
**pick** [1] - 15:1
**pieces** [1] - 21:18
**pINCUS** [1] - 39:16
**Pincus** [3] - 2:10, 3:12, 44:12
**PINCUS** [1] - 3:11
**piracy** [1] - 12:4
**place** [3] - 3:20, 14:25, 15:16
**plaintiff** [3] - 8:20, 17:12, 28:9
**plaintiff's** [1] - 44:4
**plaintiffs** [3] - 1:10, 3:10, 8:3
**PLAINTIFFS** [1] - 2:3
**plant** [1] - 36:12
**platform** [1] - 5:2
**play** [1] - 41:5
**pleading** [2] - 44:4, 47:16
**plus** [1] - 37:18
**pocket** [1] - 4:10
**point** [15] - 6:23, 6:25, 7:16, 8:17, 8:20, 20:14, 23:12, 23:25, 24:3, 24:4, 26:9, 27:10, 44:3, 47:12, 48:11
**points** [1] - 34:5
**policy** [1] - 26:17
**popping** [1] - 39:20
**portion** [1] - 33:19
**position** [5] - 5:24, 8:12, 10:1, 13:2, 34:4
**possibility** [1] - 18:22
**possible** [1] - 21:15
**post** [6] - 12:17, 13:21, 13:22, 16:18, 28:24, 29:10
**posts** [1] - 23:1
**practice** [4] - 25:10, 33:7, 33:13

**pre** [4] - 28:24, 29:10, 29:25, 46:4
**precedent** [8] - 17:17, 18:3, 18:4, 20:15, 20:16, 22:19, 22:22, 23:24
**precedents** [1] - 24:10
**preempted** [1] - 4:25
**prepared** [1] - 3:23
**presentation** [1] - 30:21
**presented** [1] - 10:5
**PRESIDING** [1] - 1:4
**presume** [1] - 48:14
**pretty** [3] - 20:8, 40:21, 41:11
**primary** [3] - 16:6, 43:3, 43:4
**principal** [1] - 38:7
**principles** [1] - 43:10
**private** [1] - 16:3
**problem** [3] - 28:22, 30:7, 36:3
**procedural** [4] - 7:22, 15:8, 15:23, 16:10
**proceedings** [1] - 49:3
**Proceedings** [1] - 1:16
**procuring** [1] - 13:6
**produced** [1] - 35:8
**product** [2] - 36:11, 36:18
**productive** [1] - 36:12
**productivity** [2] - 44:7, 45:10
**products** [3] - 35:7, 35:12, 35:13
**professors** [1] - 22:3
**prohibitions** [1] - 21:16
**pronunciation** [1] - 13:19
**proof** [2] - 20:25, 21:1
**proper** [2] - 19:8, 22:23
**proposition** [2] - 13:13, 13:14
**protest** [1] - 30:14
**prove** [1] - 39:12
**proven** [2] - 14:3, 14:4
**provided** [3] - 34:24, 35:5, 44:22
**provides** [1] - 13:14
**providing** [4] - 36:20, 36:21, 45:21, 45:24
**provision** [1] - 44:12
**public** [1] - 36:1
**publicly** [1] - 35:23
**purchasing** [1] - 35:3

**pure** [2] - 6:1, 44:23
**purpose** [10] - 41:17, 41:18, 42:25, 43:1, 43:20, 43:21, 44:18, 44:23, 45:20, 45:24
**purposeful** [1] - 37:5
**put** [4] - 24:10, 46:15, 46:17, 46:21
**puts** [1] - 24:4

**Q**

**questions** [4] - 3:21, 4:2, 16:11, 26:16
**quickly** [1] - 39:18
**quip** [1] - 29:2
**quite** [2] - 31:4, 33:2
**quote** [4] - 8:20, 33:25, 34:1, 43:19

**R**

**raise** [2] - 27:12, 34:9
**raised** [7] - 18:2, 18:3, 18:5, 18:10, 30:1, 30:15, 30:25
**raises** [2] - 26:8, 30:3
**rather** [2] - 3:25, 16:21
**ratify** [3] - 31:18, 41:10, 41:12
**re** [2] - 31:21, 47:13
**re-brief** [1] - 47:13
**rea** [8] - 37:2, 37:6, 38:9, 39:8, 45:14, 45:16, 45:18, 45:23
**reach** [1] - 6:4
**reached** [1] - 10:22
**read** [1] - 9:1
**reading** [2] - 4:12, 24:3
**Real** [1] - 2:14
**really** [7] - 4:21, 7:20, 13:23, 18:12, 29:19, 35:22, 35:25
**realm** [1] - 38:11
**reason** [1] - 12:14
**received** [1] - 27:15
**recognition** [1] - 40:11
**recognize** [5] - 22:25, 23:13, 23:15, 40:5, 40:7
**recognized** [7] - 4:14, 6:11, 14:21, 22:14, 22:15, 40:10, 41:13
**recognizing** [1] - 25:6
**reconcile** [3] - 4:12, 11:4, 11:22

**record** [2] - 3:8, 33:5
**recorded** [1] - 49:3
**rectify** [1] - 41:21
**reduction** [1] - 49:6
**referred** [1] - 27:14
**reflect** [1] - 41:14
**reflected** [1] - 13:6
**reframing** [1] - 21:11
**regard** [3] - 26:25, 27:2, 40:15
**regarding** [2] - 4:23, 9:17
**regulations** [1] - 49:7
**rejected** [1] - 15:2
**relating** [1] - 44:19
**relevance** [1] - 33:9
**relevant** [4] - 23:19, 23:24, 27:5, 33:19
**relied** [2] - 17:13, 31:7
**rely** [1] - 18:1
**relying** [1] - 13:10
**remand** [4] - 31:20, 31:22, 38:2, 38:23
**rephrase** [1] - 21:13
**Reporter** [2] - 1:23, 49:10
**Reporter's** [1] - 1:16
**requested** [2] - 27:18, 27:19
**require** [2] - 32:2, 43:2
**required** [1] - 38:12
**requirement** [5] - 11:25, 15:12, 38:17, 45:15, 45:18
**requirements** [1] - 45:17
**requires** [1] - 41:16
**resources** [1] - 36:21
**respected** [1] - 12:16
**respond** [4] - 30:24, 39:6, 48:12, 48:15
**Response** [1] - 5:9
**response** [1] - 15:5
**rest** [1] - 46:22
**result** [2] - 8:6, 13:1
**rethink** [1] - 33:17
**rights** [1] - 46:1
**role** [1] - 11:14
**Rome** [16] - 14:11, 14:13, 19:6, 20:13, 31:7, 31:8, 31:16, 31:24, 32:12, 41:7, 41:8, 41:16, 43:13, 43:16, 44:8
**Room** [1] - 1:24
**rotate** [1] - 6:22
**RPR** [2] - 1:23, 49:10
**Rubin** [2] - 2:13, 3:12
**rule** [2] - 24:18, 47:1

**ruled** [1] - 18:4
**ruling** [1] - 20:2
**Rwanda** [3] - 10:25, 14:14, 20:14

# S

**S.A** [2] - 1:12, 3:6
**San** [1] - 2:19
**Sarei** [2] - 23:25, 24:11
**satisfied** [1] - 26:16
**satisfies** [1] - 41:9
**satisfy** [5] - 26:22, 44:8, 45:14, 45:16, 45:17
**Scheindlin** [1] - 19:4
**scherer** [1] - 2:4
**scholars** [2] - 33:1, 33:2
**Scholars'** [1] - 32:19
**scope** [1] - 8:21
**SE** [1] - 2:5
**Second** [13] - 9:5, 18:8, 18:9, 21:21, 27:13, 27:18, 28:20, 30:5, 30:18, 32:5, 32:23, 33:16, 34:4
**see** [3] - 13:25, 29:10, 42:18
**seem** [2] - 16:12, 42:17
**selectively** [1] - 11:16
**sense** [3] - 16:6, 23:15, 38:16
**set** [2] - 29:14, 48:16
**settled** [13] - 10:2, 11:4, 11:6, 11:17, 12:3, 26:11, 26:14, 30:12, 37:6, 37:10, 37:13
**shape** [1] - 6:3
**shorter** [1] - 24:8
**show** [2] - 8:20, 45:18
**showing** [2] - 45:20, 45:24
**side** [2] - 10:6, 10:20
**side-stepped** [2] - 10:6, 10:20
**similar** [2] - 4:9, 13:25
**simple** [2] - 22:12, 44:23
**simplify** [1] - 21:17
**simply** [2] - 37:11, 37:17
**single** [1] - 7:15
**site** [1] - 32:8
**situation** [2] - 25:3, 37:19

**slave** [1] - 42:17
**slavery** [10] - 4:20, 5:4, 6:12, 7:10, 8:1, 38:12, 44:9, 44:19, 45:13, 46:1
**slaves** [1] - 41:25
**slide** [1] - 26:4
**slow** [1] - 35:10
**Snip** [1] - 32:25
**so-called** [1] - 20:20
**solve** [1] - 36:3
**someone** [2] - 42:16, 42:21
**someplace** [2] - 11:12, 11:15
**sometime** [1] - 47:4
**sometimes** [1] - 29:13
**somewhat** [1] - 7:5
**sorry** [2] - 14:7, 14:9
**sort** [6] - 12:14, 20:19, 23:25, 28:18, 29:21, 30:11
**Sosa** [40] - 6:1, 6:5, 6:8, 6:18, 7:20, 8:12, 8:15, 8:16, 8:18, 11:25, 12:17, 13:21, 13:22, 13:23, 14:1, 14:19, 14:20, 15:2, 15:25, 16:18, 21:16, 23:10, 23:17, 25:18, 26:10, 28:24, 28:25, 29:1, 29:5, 29:6, 29:7, 29:10, 29:25, 30:11, 32:24, 33:21, 41:9, 41:13
**Sosa's** [2] - 26:16, 26:22
**Sotomayor's** [1] - 28:11
**sounds** [1] - 43:22
**source** [5] - 13:4, 18:25, 31:25, 32:14, 33:9
**sources** [4] - 18:23, 21:20, 21:23, 21:25
**Souter** [1] - 29:3
**South** [2] - 31:21, 38:23
**speaking** [3] - 20:25, 38:6, 38:9
**specific** [23] - 14:2, 14:13, 15:18, 31:10, 32:3, 35:2, 37:5, 37:11, 37:21, 37:22, 37:25, 38:5, 38:12, 39:14, 42:2, 42:8, 42:9, 42:10, 42:16, 43:17, 43:22, 45:14, 45:17
**specifically** [7] - 5:19,

22:9, 22:10, 22:14, 38:24, 43:14
**specificity** [1] - 12:2
**spelled** [1] - 4:8
**sphere** [1] - 10:18
**spoken** [2] - 12:20, 13:17
**spread** [1] - 35:3
**Spring** [1] - 1:24
**Sprizzo** [1] - 19:5
**Square** [2] - 2:14, 2:22
**squarely** [1] - 10:6
**St** [1] - 2:18
**standard** [21] - 7:4, 10:23, 14:2, 14:13, 14:15, 15:1, 19:6, 19:10, 20:24, 21:1, 26:23, 37:4, 37:9, 37:10, 37:13, 37:17, 37:23, 39:8, 43:1, 43:2, 44:1
**standards** [7] - 6:11, 11:17, 12:5, 14:17, 14:24, 14:25, 32:16
**standing** [2] - 19:9, 41:12
**stands** [1] - 28:5
**staring** [1] - 4:8
**start** [2] - 5:2, 47:2
**started** [1] - 5:14
**starting** [1] - 35:22
**state** [19] - 3:7, 15:12, 15:18, 16:2, 16:11, 33:6, 33:7, 37:2, 38:7, 38:10, 39:13, 40:11, 40:12, 40:15, 40:19, 41:5, 44:2, 45:4
**statement** [2] - 10:7, 17:24
**STATES** [1] - 1:1
**States** [5] - 22:16, 31:17, 41:10, 41:12, 43:7
**states** [1] - 49:7
**stating** [1] - 35:23
**statute** [25] - 5:1, 5:7, 5:13, 6:10, 6:14, 11:16, 14:12, 14:13, 14:14, 19:6, 25:8, 31:8, 31:17, 31:24, 32:13, 41:7, 41:8, 41:16, 43:14, 43:16, 44:8
**statutes** [7] - 20:13, 21:25, 22:4, 22:18, 23:22, 33:12
**stenographically** [1] - 49:3
**step** [11] - 4:18, 18:25,

23:10, 23:12, 23:20, 25:18, 26:5, 26:16, 26:17, 26:22
**STEPHEN** [1] - 1:4
**stepped** [3] - 3:18, 10:6, 10:20
**still** [7] - 4:6, 19:7, 19:19, 22:2, 25:17, 34:15, 45:23
**Street** [4] - 1:24, 2:5, 2:11, 2:22
**structurally** [1] - 11:5
**stuff** [2] - 27:17, 47:16
**subject** [2] - 12:16, 30:19
**submitted** [2] - 31:20, 32:23
**substantial** [3] - 7:5, 36:22, 39:1
**substantive** [3] - 7:23, 15:8, 38:16
**sudden** [1] - 29:14
**sued** [1] - 8:23
**sufficiently** [1] - 28:1
**Suite** [1] - 2:14
**Supplemental** [1] - 46:15
**supplemental** [2] - 31:21, 34:23
**support** [15] - 5:6, 5:16, 5:19, 8:8, 10:8, 10:19, 13:1, 18:19, 34:20, 34:21, 35:15, 37:12, 44:17, 44:22, 45:6
**supported** [5] - 5:21, 7:25, 10:19, 18:16, 21:20
**supposed** [3] - 21:24, 26:24, 33:1
**supreme** [1] - 11:3
**Supreme** [5] - 11:15, 11:24, 23:2, 24:25, 28:15
**surprised** [1] - 30:18
**switch** [1] - 9:5

# T

**talisman** [1] - 29:22
**Talisman** [5] - 27:14, 28:17, 30:25, 33:4, 47:6
**talks** [2] - 20:12, 20:14
**tc@conradscherer. com** [1] - 2:6
**technical** [2] - 35:6, 35:15
**ten** [2] - 48:12, 48:15

term [1] - 45:6
terms [10] - 5:5, 6:12, 6:13, 18:14, 20:3, 20:20, 36:20, 37:2, 37:24, 43:7
ternary [1] - 31:17
Terry [3] - 2:4, 3:10, 4:4
test [1] - 27:4
that'd [1] - 9:4
THE [114] - 2:3, 2:9, 3:20, 3:25, 4:6, 4:11, 4:19, 4:23, 5:15, 6:5, 6:9, 6:20, 7:7, 7:17, 7:19, 8:3, 8:14, 9:1, 9:8, 9:15, 9:25, 10:4, 10:13, 10:17, 11:2, 11:14, 12:7, 12:9, 12:14, 12:19, 13:1, 13:8, 13:10, 13:16, 13:21, 15:4, 15:21, 16:10, 16:15, 16:17, 17:22, 18:7, 18:14, 19:11, 19:15, 19:21, 19:25, 20:3, 20:10, 20:17, 20:19, 21:8, 21:10, 23:8, 24:12, 24:16, 25:13, 25:22, 26:3, 26:8, 26:25, 27:12, 27:23, 28:4, 28:14, 28:22, 29:12, 30:21, 31:5, 31:11, 34:6, 34:9, 34:17, 35:10, 36:7, 36:25, 37:2, 37:12, 38:4, 38:20, 39:2, 39:5, 39:17, 39:21, 39:24, 40:3, 40:20, 40:23, 41:1, 41:3, 41:18, 42:6, 42:16, 43:5, 43:13, 43:22, 43:25, 44:13, 44:24, 45:3, 45:12, 46:2, 46:7, 46:18, 47:9, 47:15, 47:21, 47:24, 48:2, 48:5, 48:8, 48:10, 48:13, 48:16
therefore [2] - 19:2, 28:21
they've [2] - 36:2, 36:15
three [5] - 9:9, 32:5, 32:9, 35:1, 40:17
three-to-O [1] - 32:9
three-to-zero [1] - 32:5
Tolles [5] - 2:18, 3:16, 3:18, 48:5, 48:6
took [2] - 9:25, 31:23
tort [2] - 5:7, 5:13

torture [2] - 4:24, 4:25
toward [1] - 12:14
train [1] - 35:23
training [1] - 35:6
Transcript [1] - 1:16
transcript [2] - 49:3, 49:5
treaties [1] - 22:5
treaty [2] - 32:13, 43:13
trial [2] - 4:8, 29:6
tribunals [3] - 10:25, 37:16, 37:17
tried [2] - 7:2, 11:12
true [3] - 5:11, 18:8, 49:2
try [2] - 21:13, 21:18
trying [7] - 3:20, 11:10, 11:22, 12:13, 27:8, 33:10, 35:23
tuning [1] - 6:12
turned [1] - 19:3
turns [1] - 42:14
TVPA [1] - 27:10
twisted [1] - 21:11
two [12] - 9:11, 12:25, 13:3, 13:4, 13:8, 13:13, 14:9, 17:5, 18:22, 19:7, 23:1, 45:11
Two [1] - 2:14
Twombly [7] - 34:18, 46:4, 46:6, 46:7, 46:8
type [3] - 17:3, 17:22, 35:14
types [1] - 16:25

# U

U.S [2] - 32:25, 48:2
under [33] - 4:14, 4:25, 7:11, 10:11, 10:23, 11:17, 14:1, 14:11, 14:13, 14:14, 14:17, 14:19, 14:20, 16:23, 17:2, 18:18, 19:8, 21:16, 21:23, 22:15, 23:10, 24:10, 25:8, 25:18, 26:14, 26:17, 27:3, 37:3, 37:6, 37:8, 41:13, 46:8
understood [2] - 24:22, 41:20
United [5] - 22:16, 31:17, 41:10, 41:12, 43:7
UNITED [1] - 1:1
united [1] - 49:7

universal [3] - 14:6, 24:1, 24:2
universally [1] - 12:1
unless [3] - 11:16, 28:10, 38:14
Unocal [1] - 17:10
up [4] - 3:22, 14:9, 32:1, 39:20
US [1] - 6:18
USA [1] - 3:14
uses [1] - 6:19

# V

vacated [1] - 17:9
variety [2] - 21:20, 21:25
versus [5] - 3:6, 7:16, 16:3, 32:6, 33:15
verus [1] - 32:25
via [1] - 15:18
victim [2] - 37:21, 37:22
view [14] - 5:16, 6:9, 6:24, 8:7, 9:22, 9:25, 10:8, 10:18, 16:25, 20:5, 21:2, 27:3, 37:6, 39:8
violates [1] - 11:24
violation [7] - 6:10, 8:22, 42:24, 43:3, 45:19, 45:21, 46:1
violations [2] - 44:18, 44:19
violator [1] - 43:4
votes [1] - 18:22
vS [1] - 1:11

# W

wait [3] - 28:12, 28:13, 28:14
wants [3] - 7:14, 30:18, 44:11
Washington [3] - 2:5, 2:11, 2:23
wavelength [1] - 39:7
weak [1] - 29:13
weigh [1] - 17:3
Westlaw [1] - 33:18
whatsoever [1] - 22:22
whole [2] - 10:16, 22:19
WILSON [1] - 1:4
wish [1] - 41:21
word [3] - 12:15, 38:21, 46:5

words [11] - 7:19, 7:21, 11:2, 15:10, 15:15, 20:23, 24:17, 24:22, 27:1, 39:9, 41:18
world [1] - 28:24
worried [1] - 48:9
worry [2] - 34:6, 48:8
worth [2] - 24:3, 28:17

# Y

York [1] - 4:9
Yugoslav [3] - 10:24, 14:14, 20:13

# Z

zero [1] - 32:5