1  PAUL L. HOFFMAN  (S.B.# 71244)
   CATHERINE SWEETSER (S.B. # 271142)
2  Schonbrun Seplow
   Harris & Hoffman, LLP
3  723 Ocean Front Walk
   Venice, California 90291
4  Tel: 310-396-0731 / Fax: 310-399-7040
   E-mail: hoffpaul@aol.com
5  Email: catherine.SDSHHH@gmail.com

6

7  TERRENCE COLLINGSWORTH
   (DC Bar # 471830)
8  International Rights Advocates
   621 Maryland Avenue NE
9  Washington, D.C. 20002
   Tel: 202-255-2198
10 E-mail: tc@iradvocates.org

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN DOE I, Individually and on behalf of Proposed Class Members; JOHN DOE II, Individually and on behalf of Proposed Class Members; JOHN DOE III, Individually and on behalf of Proposed Class Members; JOHN DOE IV, Individually and on behalf of Proposed Class Members; JOHN DOE V, Individually and on behalf of Proposed Class Members; and JOHN DOE VI, Individually and on behalf of Proposed Class Members, <br><br> Plaintiffs, <br><br> v. <br><br> NESTLÉ, S.A., NESTLÉ U.S.A., NESTLE Ivory Coast, ARCHER DANIELS MIDLAND CO., CARGILL INCORPORATED COMPANY, CARGILL COCOA, CARGILL WEST AFRICA, S.A. <br><br> Defendants. | **Case No. CV 05-5133-SVW-MRW** <br><br> **SECOND AMENDED COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES** <br><br> 1. **Forced labor (Alien Tort Statute, 28 U.S.C. § 1350)** <br> 2. **Cruel, inhuman, or Degrading Treatment (Alien Tort Statute, 28 U.S.C. § 1350)** <br> 3. **Torture (Alien Tort Statute, 28 U.S.C. § 1350)** <br><br> **DEMAND FOR JURY TRIAL** |

# I.    **NATURE OF THE ACTION**

1.    Plaintiffs John Doe I, John Doe II, John Doe III, John Doe IV, John Doe V, and John Doe VI (referred to herein as the "Former Child Slave" Plaintiffs) are all former child slaves of Malian origin who were trafficked and forced to work harvesting and/or cultivating cocoa beans on farms in Côte d'Ivoire, which supply cocoa beans to the Defendant companies named herein.  The Former Child Slave Plaintiffs bring this action on behalf of themselves and all other similarly situated former child slaves of Malian origin against Defendants: Nestlé, S.A., Nestlé, U.S.A., and Nestlé Côte d'Ivoire, S.A. (together as "Nestlé"); Cargill, Incorporated ("Cargill, Inc."), Cargill Cocoa, and Cargill West Africa, S.A. (together as "Cargill"); and Archer Daniels Midland Company ("ADM") (referred to collectively as the "Chocolate Importers" or Defendants) for the forced labor and torture they suffered as a result of the wrongful conduct either caused and/or aided and abetted by these corporate entities.  Specifically, the Former Child Slave Plaintiffs assert claims for child slavery/forced labor, cruel, inhumane or degrading treatment, and torture under the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350.

2.    The Former Child Slave Plaintiffs bring their ATS actions in the United States because such claims cannot be maintained in their home country of Mali as currently there is no law in Mali whereby such Plaintiffs can seek civil damages for their injuries against the major exporters of cocoa operating outside of Mali. Nor could claims be brought in Côte d'Ivoire as the judicial system is notoriously corrupt and would likely be unresponsive to the claims of foreign children against major cocoa corporations operating in and bringing significant revenue to Côte d'Ivoire. It is also likely that both Plaintiffs and their attorneys would be placed in danger following the civil unrest in Côte d'Ivoire and the general hostility by cocoa producers in the region where Plaintiffs were forced to work. Further, the Former Child Slave Plaintiffs bring their claims in the United

States as the United States has provided a forum for such human rights lawsuits with the passage of the ATS.

3.     The Former Child Slave Plaintiffs bring this action using pseudonyms due to fear of retaliation against themselves and their families by those persons who trafficked them into Côte d'Ivoire; the owners of farms on which they were enslaved; and by the local buyers, who are employees and/or agents of the Defendants. Plaintiffs' case not only threatens to expose criminalized elements within the cocoa sector but also to dismantle the source of its significant profits, cheap labor procured through forced child trafficking. For this reason, Plaintiffs' lives are in great danger as evidenced by the violence already wielded against other critics and investigators of corruption and child labor within the cocoa sector. For example, French-Canadian reporter Guy André Kieffer, who was investigating the criminal elements within the cocoa sector, disappeared and is presumed dead. Other journalists investigating cocoa and child labor have also received death threats.

## II.     <u>JURISDICTION AND VENUE</u>

4.     Pursuant to 28 U.S.C. § 1331, this Court has federal question jurisdiction over this dispute pursuant to the ATS, 28 U.S.C. § 1350 for the alleged violations of international human rights law.  The ATS provides federal jurisdiction for "any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States."

5.     Venue and Personal Jurisdiction over each Defendant is proper in this judicial district, and in the United States as a whole for the foreign Defendants, because, as more fully detailed below, Defendants either own, lease, export to, or otherwise   conduct business activities, including the sale of cocoa and cocoa derivative products, to chocolate retailers in the United States and/or in California

**SECOND AMENDED COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES**

such that they maintain a general course of business activity within the United States, including California, either directly through their own activities or by virtue of their parent entities acting as their alter ego and/or agent.

## III.   PARTIES

### A.  Former Child Slave Plaintiffs

6.     Plaintiff John Doe I is an adult citizen of Mali currently residing near the city of Sikasso. He brings this action on behalf of himself and all other former child slaves trafficked into Côte d'Ivoire from Mali for purposes of working and then forced to work on a farm and/or farmer cooperative that provided cocoa beans to any one and/or more of the Defendants named herein.

7.     Plaintiff John Doe II is an adult citizen of Mali currently residing near the city of Sikasso. He brings this action on behalf of himself and all other child slaves of Malian origin trafficked into Côte d'Ivoire from Mali for purposes of working and then forced to work on a farm and/or farmer cooperative that provided cocoa beans to any one and/or more of the Defendants named herein.

8.     Plaintiff John Doe III is an adult citizen of Mali currently residing near the city of Sikasso. He brings this action on behalf of himself and all other former child slaves of Malian origin trafficked into Côte d'Ivoire from Mali for purposes of working and then forced to work on a farm and/or farmer cooperative that provided cocoa beans to any one and/or more of the Defendants named herein.

9.     Plaintiff John Doe IV is an adult citizen of Mali currently residing near the city of Sikasso. He brings this action on behalf of himself and all other former child slaves trafficked into Côte d'Ivoire from Mali for purposes of working and then forced to work on a farm and/or farmer cooperative that provided cocoa beans to any one and/or more of the Defendants named herein.

**SECOND AMENDED COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES**

10.     Plaintiff John Doe V is an adult citizen of Mali currently residing near the city of Sikasso. He brings this action on behalf of himself and all other former child slaves of Malian origin trafficked into Côte d'Ivoire from Mali for purposes of working and then forced to work on a farm and/or farmer cooperative that provided cocoa beans to any one and/or more of the Defendants named herein.

11.     Plaintiff John Doe VI is an adult citizen of Mali currently residing near the city of Sikasso. He brings this action on behalf of himself and all other former child slaves of Malian origin forced to work on a farm and/or farmer cooperative that provided cocoa beans to any one and/or more of the Defendants named herein.

**B. Former Child Slave Plaintiffs' Class Action Allegations**

12.     The Former Child Slave Plaintiffs bring this action individually, and pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3), on behalf of the following class:

13.     All individuals during the period 1996 through the present who reside or did reside in the country of Mali, West Africa, and who were trafficked from Mali to any cocoa producing region of Côte d'Ivoire and forced to perform labor as children under the age of 18 on any farm and/or farmer cooperative within any cocoa producing  region of Côte d'Ivoire, including but not limited to the geographical regions of Bouake, Bouaflé, Man, Daloa, Odienne, Oume, Gagna, Soubre, Duekoue and San Pédro for the purpose of harvesting and/or cultivating cocoa beans that were supplied, either directly or indirectly, to any of the named Defendants herein.

14.     The class is so numerous that joinder of all members is impractical. The Former Child Slave Plaintiffs know that there are thousands of class members.

15.     There are questions of law and fact common to the class. Key common questions include, but are not limited to, the following:

> a) Whether Plaintiffs and Proposed Class Members were unlawfully trafficked for purposes of forced child labor, in violation of International Labor Conventions 138 and 182, so as to work on cocoa farms, which supplied cocoa beans to the named Defendants herein?

> b) Whether Defendants caused and/or aided and abetted the forced labor and torture imposed on Plaintiffs by either providing logistical support to the supplier farms and/or failing to provide sufficient logistical support and/or take adequate action to prevent and stop such forced child labor in violation of international law, federal law and California state law?

16.     The Former Child Slave Plaintiffs' claims are typical of the claims of the class. They seek redress for the same conduct that has affected all class members and press legal claims which are the same for all class members.

17.     The Former Child Slave Plaintiffs named herein will fairly and adequately represent the class.  These Plaintiffs do not have conflicts of interest with members of the class and have retained counsel who are experienced in complex litigation, including class actions and international litigation, who will vigorously prosecute this action.

18.     A class action is the superior method for adjudication of this controversy. In the absence of a class action, courts will be unnecessarily burdened with multiple, duplicative individual actions, particularly in the case of Mali where class claims are not recognized. Moreover, if a class is not certified, many meritorious claims will go un-redressed as the individual class members are not able to prosecute complex litigation against large defendant corporations.

**SECOND AMENDED COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES**

**C. Chocolate Importer Defendants**

19.    Defendant Nestlé, SA, is the world's largest food and beverage company involved primarily in the manufacture and sale of beverages, milk products, chocolate, confectionery and biscuits. Based in Switzerland, it employs around 253,000 people and has factories or operations in almost every country in the world. Its stock is traded in the United States in the form of American Depositary Receipts (ADR), which is a negotiable security representing ownership of publicly traded shares in a non-US corporation. Nestlé's ADRs are held through Citibank, N.A., a major U.S. banking institution, and together with its ADR receipts and the sale of Nestlé brand products in the forum constitute significant contacts with the United States, including the forum.

20.    Nestlé, USA is a wholly-owned subsidiary of Nestlé, SA. Headquartered in California, it is one of the largest food and beverage companies in the U.S. with 21,000 employees nationwide, 42 manufacturing facilities, 6 distribution centers, and 58 sales offices across the country, including California. It is one of the largest purchasers, manufacturers, and retail sellers of cocoa products in North America.

21.    Defendant Nestlé Côte d'Ivoire, SA (or Nestlé Ivory Coast) is a subsidiary of Nestlé, SA. Its purpose within the Nestlé enterprise is to process cocoa beans for export globally, including North America and California specifically.

22.    Defendant Archer-Daniels-Midland Company (ADM) is a publicly held Delaware corporation with its principal place of business in Decatur, Illinois. It is engaged in the business of procuring, transporting, storing, processing and merchandising agricultural commodities and products.  This includes specifically the processing of cocoa beans from Côte d'Ivoire and the production of cocoa liquor, cocoa butter, cocoa powder, chocolate and various cocoa compounds for

the food processing industry primarily in the United States market, including California. In addition to providing cocoa products to California manufacturers and processors, ADM owns and operates several processing plants in California which process rice, bakery mix and specialty ingredients.

23. Defendant Cargill, Incorporated Company ("Cargill, Inc.") is one of the largest privately held corporate providers of food and agricultural products and services worldwide with over 100,000 employees in 59 countries. Its activities include cultivating and processing grain, oilseeds and other agricultural commodities, including cocoa for distribution to food producers. Headquartered in Minneapolis, it is a family business that is tightly controlled and centrally managed. On information and belief, in 1992, the business was restructured to ensure that managers making decisions about buying and selling commodities had ties to Cargill Headquarters in Minneapolis and would receive instructions from there.

24. Cargill Cocoa is a subsidiary of Cargill, Inc. incorporated in Pennsylvania. It is a major cocoa bean originator and processor. It offers a wide range of high-quality cocoa powder, butter and liquor products under the Gerkens and Wilbur brands to leading manufacturers of food, chocolate and confectionery products worldwide, including processors and manufacturers of cocoa and cocoa products in California. Products are sold through an international network of offices, agents and distributors. Its facilities include a production facility in Côte d'Ivoire for the production of cocoa liquor, butter and powder and origination of cocoa beans. Cargill Cocoa & Chocolate North America is responsible for partnerships with farmers in the Ivory Coast, including a program to train farmers in crop protection.[1]

---

[1] 85 out of 101 farmer cooperatives in Cote d'Ivoire are involved in their crop protection initiative "Yiri".

**SECOND AMENDED COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES**

25.     Cargill West Africa, SA is a subsidiary of Cargill, Inc. and a member of the Cargill Group headed by Cargill, Inc. Formed in 1986, its purpose within the Cargill Group is to process and/or export cocoa beans supplied to it by farms and/or farmer cooperatives in Côte d'Ivoire.  Upon information and belief, Cargill West Africa, SA exports cocoa to the United States, including California, either directly or indirectly through other Cargill Group affiliates.

**D. Unknown Corporate Defendants**

26.     Plaintiffs are currently unaware of the true names and capacities of Defendants sued herein as Corporate DOES 1-10, and therefore sue these Defendants by using fictitious names.  Plaintiffs will amend this complaint to allege their true names and capacities when ascertained.  Upon information and belief each fictitiously named Defendant is responsible in some manner for the occurrences herein alleged and that the injuries to Plaintiffs herein alleged were proximately caused in relation to the conduct of the named Defendants, as well as Corporate Does 1-10.

## IV.   AGENCY

27.     Plaintiffs contend that each of the subsidiaries identified herein is and was, at all relevant times, the agent of the parent companies identified herein. Specifically, the parent entities control the subsidiaries' operations, particularly with respect to the sourcing, purchasing, manufacturing, distribution, and/or retailing of cocoa and cocoa derived products from the Côte d'Ivoire.

28.     Plaintiffs further contend that each of the parent entities identified herein control and/or have the ability to control their subsidiaries' actions with

---

http://www.cargillcocoachocolate.com/sustainability/cocoa-promise-in-action/yiri-plus-program/index.htm

**SECOND AMENDED COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES**

respect to labor practices on the farms and/or farmer cooperatives from which cocoa products are sourced.

29.    Plaintiffs are informed and believe that at all material times each of the parent defendants and their relevant subsidiaries were the agent or otherwise working in concert with each other and that each such subsidiary was acting within the course and scope of such agency or concerted activity.  To the extent that said conduct was perpetrated by certain subsidiary defendants, the parent defendant corporations confirmed and ratified the same.

## V.    **ALTER EGO**

30.    Plaintiffs contend that each of the subsidiaries identified herein is and was, at all relevant times, the alter-ego of the parent companies identified herein. Specifically, the parent entities control every aspect of the subsidiaries' operations, particularly with respect to the sourcing, purchasing, manufacturing, distribution, and/or retailing of cocoa and cocoa derived products, and have used them merely as conduits for the receipt or transfer of funds and/or products with respect to cocoa products derived from the Côte d'Ivoire.

31.    Upon information and belief, the subsidiary and parent corporations named herein have common ownership, common board of directors, are inadequately capitalized for the risks at hand, and have failed to observe corporate formalities with respect to their operations. The inherent and pervasive failure to maintain separate identities constitutes improper conduct and disrespects the privilege of using the corporate form to conduct business.

## VI.    **AIDING AND ABETTING**

32.    Côte d'Ivoire is a country struggling to recover from years of civil conflict.  Active hostilities ended in January 2003, leaving the country divided into three zones of control: the government-controlled south, the rebel-held north and

the Zone of Confidence, which was formally patrolled by international troops. Although several peace agreements have been signed, and the Zone of Confidence dismantled, acts of violence continue. Côte d'Ivoire's cocoa-producing regions, which lie mostly with the government controlled southern zone, are at the heart of the Ivorian conflict. In this conflict, the cocoa hierarchy has been described by the International Crisis Group as an "Enron-type structure" of front companies with secret bank accounts used to transfer funds with multiple layers of insulation between the criminal acts and their eventual beneficiaries.

33.   It is in this often lawless and clandestine backdrop that Cote d'Ivoire has emerged as the largest exporter of cocoa in the world, providing 70% of the world's supply.  A majority of this cocoa is imported to the US by the named Defendants herein. Indeed, journalist Carol Off explains in her 2006 book "*Bitter Chocolate: Investigating the Dark Side of the World's Most Seductive Sweet*" that the "dirty work" of buying and selling cocoa beans in this conflict ridden country has become the domains of large multinationals such as Defendants Nestlé, ADM, and Cargill and that since the 1990s, Côte d'Ivoire cocoa production has been controlled by these companies with the unilateral goal of finding the cheapest sources of cocoa.

34.   Defendants ADM and Cargill are headquartered in and have their main management operations in the U.S., and every major operational decision by both companies is made in or approved in the U.S. At all times relevant to the injuries to the Plaintiffs, Defendants ADM and Cargill had complete control over their cocoa production operations in Côte d'Ivoire, and they regularly had employees from their U.S. headquarters inspecting their operations in Côte d'Ivoire and reporting back to the U.S. headquarters so that the U.S.-based decision-makers had accurate facts on the ground. Defendants ADM and Cargill

**SECOND AMENDED COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES**

had the ability and control in the U.S. to take any necessary steps to eradicate the practice of using child slaves to harvest their cocoa in Côte d'Ivoire.

35.     Defendant Nestlé established a major operation in the U.S., which is a key market for Nestlé cocoa products. To promote, expand and protect this market, Nestlé established Nestlé, USA as a wholly-owned subsidiary of Nestlé, SA. This subsidiary is now one of the largest food and beverage companies in the U.S. with 21,000 employees nationwide, 42 manufacturing facilities, 6 distribution centers, and 58 sales offices across the country. It is one of the largest purchasers, manufacturers, and retail sellers of cocoa products in North America. Every major operational decision regarding Nestlé's U.S. market is made in or approved in the U.S. At all times relevant to the injuries to the Plaintiffs, Nestlé had complete control over its cocoa production operations in Côte D'Ivoire, and had the ability and control in the U.S. to take any necessary steps to eradicate the practice of using child slaves to harvest its cocoa in Côte D'Ivoire. Nestlé regularly had employees from their Swiss and U.S. headquarters inspecting their operations in Côte D'Ivoire and reporting back to these offices so that the U.S.-based decision-makers had accurate facts on the ground.

36.     The history and methodology of the exploitation of child slaves in Côte D'Ivoire by the Defendants and other multinationals is virtually undisputed. Defendants were able to obtain an ongoing, cheap supply of cocoa by maintaining exclusive supplier/buyer relationships with local farms and/or farmer cooperatives in Côte d'Ivoire.  Through these exclusive supplier/buyer relationships, maintained in the form of memorandums of understanding, agreements, and/or contracts, both written and oral, Defendants are able to dictate the terms by which such farms produce and supply cocoa to them, including specifically the labor conditions under which the beans are produced.

**SECOND AMENDED COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES**

37.    Defendants control such conditions by providing local farmers and/or farmer cooperatives with *inter alia* ongoing financial support, including advance payments and personal spending money to maintain the farmers' and/or the cooperatives' loyalty as exclusive suppliers; farming supplies, including fertilizers, tools and equipment; training and capacity building in particular growing and fermentation techniques and general farm maintenance, including appropriate labor practices, to grow the quality and quantity of cocoa beans they desire.  The training and quality control visits occur several times per year and require frequent and ongoing visits to the farms either by Defendants directly or via their contracted agents.

38.    Among other countries, Defendant Nestlé was directly involved in the purchasing and processing of cocoa beans from Côte d'Ivoire. Among its exclusive supplier/buyer relationships were agreements with suppliers Keita Ganda and Keita Baba from plantations in Daloa; Lassine Kone from plantations in Sitafa. Among other areas, Defendant Nestlé processed the cocoa near Odienne in Côte d'Ivoire.

39.    Defendant Cargill has a direct presence in Côte d'Ivoire cocoa farms. Carol Off notes that Cargill is possibly the largest privately owned corporation in the world and that its influence over the food we eat, in terms of where it comes from and how it is produced, is staggering.  Among its exclusive supplier/buyer relationships are Dôté Colibaly, Soro Fonipoho, Sarl Seki, Lenikpo Yéo (alias "the Big One") from which 19 Malian child slaves were rescued, Keita Ganda, and Keita Hippie, who produce the bulk of the cocoa in the Bouaflé region.

40.    Cargill's Côte d'Ivoire Country Webpage states that in 2000/01, Cargill opened two up-country buying stations in Daloa and Gagnoa in the western cocoa belt, and that Cargill's Micao cocoa processing plant has obtained ISO 9002 certification, which is a system of quality standards for food processing from

sourcing through processing that inherently requires detailed visits and monitoring of farms.

41.     Defendant ADM was also directly involved in the purchasing and processing of cocoa beans from Côte d'Ivoire. Among its exclusive suppliers is a farmer cooperative known as SIFCA. In a 2001 article found in *Biscuit World,* ADM explains that its acquisition of SIFCA in Côte d'Ivoire "gives ADM Cocoa an unprecedented degree of control over its raw material supply, quality and handling." In the same article, an ADM executive states that "ADM Cocoa can deliver consistent top quality products by control of its raw materials," and that "ADM is focused on having direct contact with farmers in order to advise and support them to produce higher quality beans for which they will receive a premium."

42.     ADM's 2004 Cocoa Webpage openly states that ADM Cocoa has a "strong presence in origin regions," and in a section entitled "Farmers as Partners," ADM further states that "[t]he success of the thousands of small, family-owned farms on which cocoa is typically grown is vital to the cocoa industry. That is why ADM is working hard to help provide certain farmer organizations with the knowledge, tools, and support they need to grow quality cocoa responsibly and in a sustainable manner . . . ADM is providing much needed assistance to organizations representing thousands of farmers and farming communities. These efforts are making an impact at the farm level."

43.     The ADM Cocoa Brochure, states that "[t]hrough its support of the World Cocoa Foundation, the European Cocoa Association, the US Chocolate Manufacturers Association and other programs, ADM is actively involved in long-term efforts to ensure that cocoa is grown responsibly and sustainably. Such efforts include research into environmentally sound crop management practices, plant breeding work to develop disease-resistant varieties and farmer field schools to

**SECOND AMENDED COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES**

transfer the latest know-how into the hands of millions of cocoa farmers around the world. Starting from the cocoa growers through to the world's top food and beverage manufacturers, ADM Cocoa is committed to delivering the best in product quality and service at every stage."

44.     As part of their ongoing and continued presence on the cocoa farms in Côte d'Ivoire for purposes of quality control, pesticide eradication, cultivation assistance, harvesting, and packing and shipping, among other activities and assistance to the farmers, Defendants, through U.S.-based employees, had first-hand knowledge of the widespread use of child labor harvesting cocoa on the farms they were working with and purchasing from.

45.     In its 10-K securities filings, ADM explicitly stated that research on the cocoa industry and on development was based in Milwaukee, Wisconsin.

46.     ADM processed the cocoa in facilities in Massachusetts, New Jersey, and Wisconsin.

47.     Defendants also had knowledge of the widespread use of child labor harvesting cocoa on the farms they were working with and purchasing from based on the numerous, well-documented reports of child labor by both international and U.S. organizations.

48.     The U.S. State Department, the International Labor Organization (ILO), and UNICEF, among others, have confirmed since the late 1990s the existence of child slavery with documented reports and statistics.  Notable non-governmental organizations have also independently confirmed that many, if not most, of the children working on Ivorian cocoa plantations are being forced to work as slaves without any remuneration.

49.     In 1997, UNICEF reported that children from the neighboring countries of Mali and Burkina Faso are being trafficked to Côte d'Ivoire to harvest cocoa beans.  *See* Carol Bellamy, *The State of the World's Children 1997: Focus*

**SECOND AMENDED COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES**

*on Child Labour*, Oxford University Press for UNICEF (1996).  The ILO estimates there are 378,000 children working in Côte d'Ivoire in various sectors of the economy.  International Programme on the Elimination of Child Labour, ILO, *Combating Trafficking in Children for Labour Exploitation in West and Central Africa* (2001).  The U.S. State Department has also estimated that there were at least 15,000 child laborers working on cocoa, coffee, and cotton farms in 2004. Bureau of Democracy, Human Rights and Labor, U.S. Dep't of State, *Country Reports on Human Rights Practices, 2004: Cote d'Ivoire* (2004).

50.     Despite the well-documented use of child labor on cocoa farms in Côte d'Ivoire, Defendants not only purchased cocoa from farms and/or farmer cooperatives which they knew or should have known relied on forced child labor in the cultivating and harvesting of cocoa beans, but Defendants provided such farms with money, supplies, and training to do so with little or no restrictions from the government of Côte d'Ivoire.  Upon information and belief, several of the cocoa farms in Côte d'Ivoire from which Defendants source are owned by government officials, whether directly or indirectly, or are otherwise protected by government officials either through the provision of direct security services or through payments made to such officials that allow farms and/or farmer cooperatives to continue the use of child labor.

51.     Defendants, because of their economic leverage in the region and exclusive supplier/buyer agreements, each had the ability to control and/or limit the use of forced child labor by the supplier farms and/or farmer cooperatives from which they purchased their cocoa beans. The Defendants, based in the U.S., and focused on protecting their U.S. market share following increased negative campaigning in the U.S. against their use of child labor in harvesting cocoa in West Africa, decided in the U.S. to do little or nothing to stop the exploitation and abuse of child workers and instead merely issue promises and policy statements in

the U.S. to falsely assure the U.S. consumers that they were committed to putting an end to child slavery in their cocoa production. The three Defendants each made specific and false assertions in the U.S. to U.S. consumers to deny that they were aiding and abetting child slavery, which allowed each of them to continue aiding and abetting child slavery with no measurable loss of U.S. market share.

52.     Defendant Nestlé published in the U.S. in English and targeting the U.S. market its "Standards of Business Conduct," which state that "Nestlé is against all forms of exploitation of children. Nestlé does not provide employment to children before they have reached the age to have completed their compulsory education . . . and expects its suppliers to apply the same standards. Nestlé abides by national laws in all countries in which it has operations and complies with the International Labour Organisation (ILO) Convention 138 on Minimum Age for Employment and the ILO Convention 182 on the Worst Forms of Child Labour." Nestlé also informed U.S. consumers in the U.S. that it requires all of its subcontractors and Outsourcing Contractors to adhere to Nestlé's Corporate Business Principles, and chooses its Suppliers based on, *inter alia,* their "minimum corporate social responsibility standards."

53.     Nestlé's 2006 "Principles of Purchasing," published in the U.S. in English and targeting the U.S. market, states "purchasing should, wherever possible, be part of the Supply Chain . . . and that Strategic Buyers perform strategic activities such as market research or analysis [and] supplier profiling and selection." Under the section "Raw Materials," Nestlé states it "provides assistance in crop production." Under the section, "Traceability," Nestlé states "[t]raceability includes tracking inside our company supply chain, i.e. from the reception of raw and packaging materials, production of finished products to delivery to customers." Indeed, Nestlé states that "[t]raceability of incoming materials is of the utmost importance to Nestlé. In dealing with suppliers,

Purchasing must insist on knowing the origin of incoming materials and require suppliers to communicate the origin of their materials." Nestlé's Principles of Purchasing also states that it "actively participate[s] as the first link in an integrated supply chain;" that it "develop[s] supplier relationships;" and that it "continually monitor[s] the performance, reliability and viability of suppliers."

54.   Nestlé's 2005 Webpage on Suppliers Management also discusses the importance of the Nestlé Supply Chain for production operations. "The Nestlé Quality System covers all steps in the food supply chain, from the farm to the consumer of the final products. Quality assurance activities are not confined to production centers and head offices. They include working together with producers and suppliers of raw . . . materials."

55.   Nestlé's Commitment to Africa Brochure, published in the U.S. in English and targeting the U.S. market, further states that "[w]hile we do not own any farmland, we use our influence to help suppliers meet better standards in agriculture. . . . Working directly in our supply chain, we provide technical assistance to farmers." Nestlé goes on to state that the "[s]upport provided to farmers ranges from technical assistance on income generation to new strategies to deal with crop infestation, to specific interventions designed to address issues of child labour." "Specific programmes directed at farmers in West Africa include field schools to help farmers with supply chain issues, as well as a grassroots 'training of trainers' programme to help eliminate the worst forms of child labour."

56.   Defendant Nestlé published in the U.S. in English and targeting the U.S. market "*The Nestlé Commitment on Child Labour In Agricultural Supply Chains*" (http://www.nestle.com/assetlibrary/documents/library/documents/corporate_social _responsibility/nestle-commitment-child-labour.pdf) stating:

- "Nestlé is against all forms of exploitation of children, and is firmly committed to actions to eradicate child labour from its agricultural supply chains, in line with our commitments in the Nestlé Corporate Business Principles."

- "Nestlé is committed to work with all relevant stakeholders . . . to address child labour."

- "Nestlé sources agricultural crops from over 5 million farmers, and is exposed to the potential for child labour and the worst forms of child labour across a range of commodities and countries."

- "The Commitment has . . . been prepared by Nestlé to specifically guide and align its efforts to tackle child labour in its agricultural supply chains."

57.    Defendant Nestlé published in the U.S. in English and targeting the U.S. market "*The Nestlé Supplier Code*," which states:

- The Nestlé Supplier Code "defines the **non-negotiable minimum standards** that we ask our suppliers and their sub-tier suppliers to respect and adhere to when conducting business with Nestlé."

- The supplier code "helps the continued implementation of our commitment to international standards such as the OECD Guidelines for Multinational Enterprises, the UN Guiding Principles on Business and Human Rights, the Core Conventions of the International Labour Organization (ILO) and the 10 Principles of the United Nations Global Compact . . . ."

- "The Standards of the Code set forth expectations for the Supplier for whom Nestlé does business, including their parent, subsidiary, or affiliate entities, as well as all others with whom they do business including all employees (including permanent, temporary, contract agency and migrant workers), upstream suppliers and third parties."

- The first "pillar" of the Nestlé Supplier Code is Human Rights. Included in this is a prohibition against child labor.

58.     Defendant Nestlé, by publishing in the U.S. in English and targeting the U.S. market the various statements discussed above, intended to demonstrate to the U.S. market that it had made a decision to prevent child labor harvested cocoa from reaching the U.S. market by using its control over its cocoa suppliers to prevent child slaves from harvesting Nestlé's cocoa. While Nestlé admitted its control and ability to achieve this, it failed to take the promised action so that it could protect its U.S. market while also continuing to benefit from the cost savings of aiding and abetting child slavery.

59.     Defendant Cargill's Position Paper on cocoa industry labor, published in the U.S. in English and targeting the U.S. market, explicitly states that "[a]busive treatment towards children in agriculture or in any other industry is not acceptable." Cargill's International Code of Conduct, also published in the U.S. in English and targeting the U.S. market, states that Cargill will "comply with the letter and spirit of all applicable . . . laws designed to accomplish equal and fair opportunities in employment." *Cargill Cocoa Promise*, *available at* at:http://www.cargillcocoachocolate.com/wcm/groups/public/@ccc/@all/documents/document/na31657361.pdf). The International Code of Conduct also promises:

- "We form close, supportive relationships with farmers and farmer organization, providing them with solutions that they can own, and giving them the skills and knowledge to implement programs that will make a positive and meaningful change." (p. 2)
- "Cocoa has always been a crop that offered economic opportunity. But now, with many farms at the end of their productive lifecycle, cocoa productivity is under pressure. The majority of smallholder cocoa farms, particularly in West Africa, were established 20–30 years ago. Cocoa is a tree crop and the

trees have aged and become less productive; soil nutrient levels have decreased and pests and diseases affect both cocoa pod and overall tree health. **How can we solve this together?[2] By working with farmers to dramatically improve knowledge and adoption of good agricultural practices – whether that is  with the appropriate use of weeding and pruning techniques or the development of safer harvesting practices. By improving farmers' incomes and providing better services for farmers, their families and their communities. And by providing farmers with the planting materials and other inputs they need to invest in their farms and prepare for a successful future.  It's all part of the Cargill Cocoa Promise, which we are rolling out in six origin countries according to local needs.**

- "We are all too aware of the unique challenges faced in each region, and although West Africa – and **in particular, Côte d'Ivoire** . . . ." (p. 5)

- "Increasingly, reporting needs to incorporate clear proof of tangible change. **That is why we are building  on the measurement systems we  have already established, developing comprehensive indicators to assess the impact of our actions and demonstrate the improvement generated by programs on the ground. This allows us to track both inputs** (such as  the number of farmers trained and volumes certified) **and outputs** (such as improved knowledge of pest and disease control management and solid entrepreneurial skills). **The next step is to consistently measure the impact of all of our activities on a broader scale, using impact assessment frameworks and the skills of our existing in-house research and consultancy team.** When combined with anecdotal material, this is the kind

---

[2] Emphasis added.

SECOND AMENDED COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

of information that cocoa and chocolate manufacturers can use to engage and activate consumer demand in a credible way. **It means consumers can understand the current situation in origin countries, as well as the difference that they can make by buying sustainable products** – creating a much more compelling proposition." (p. 10)

- Cargill claims they are "working to protect the rights of children." (graphic on p. 11)

- "Working to Promote and protect the rights of children:

  o . . . **[W]e need to raise awareness of child labor issues and children's rights in farming communities. The most effective way for us to do this is through farmer training.** That is why we have worked in partnership with the International Cocoa Initiative (ICI), a leading organization addressing child labor issues in West African cocoa-growing communities, to develop a specific training module."

  o "In Côte d'Ivoire, 425 extension agents received four days of intensive training from ICI on the issue of child labor and sensitization, equipping them with the skills to effectively train farmers. The project will reach more than 70,000 cocoa producers before 2016."

  o In partnership with the International Cocoa Initiative (ICI), 8,720 farmers were trained in 2013 to protect and improve the rights of children as an integrated part of our farmer training approach. In total 70,000 will be trained.

  o According to Nick Weatherill, Executive Director, International Cocoa Initiative (ICI): "Working with Cargill and ANADER[3], we've

---

[3] Agence nationale d'appui au développement rural, (http://www.anader.ci/#close).

**SECOND AMENDED COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES**

been able to ensure that thousands of farmers get specialist training on child labor issues to thousands of farmers. Cargill's Farmer Field Schools gives us, and the ANADER agents we train, unrivalled access to farmers in an established learning environment."

- "Supplying smallholders farmers with the knowledge, inputs, and finance they need to make good decisions and run a successful farm over the long term."

  o With the right investment, cocoa productivity can increase significantly. Already, in Côte d'Ivoire, we have  seen that yields of over 800–1,000 kilograms per hectare are achievable in a smallholder context. In many cases, this is a 100% increase of current yields. The appropriate use of inputs such  as fertilizers and crop protection help farmers to maximize current cocoa yields without compromising the future of their farms or local environments. **We help them to gain access to the inputs, as well as the financing, for fertilizers and crop protection, to invest in their farms and plan for the future. Cargill's extensive on-the-ground networks include not just partnerships with farmer organizations, but also buying stations in all the major cocoa- growing regions.** Together, these form an efficient delivery model to store and distribute and provide access to fertilizer, crop protection and planting materials  to farmers. (p. 22)

Cargill has numerous other releases that contain similar representations that it has complete control of its supply chain and boasts that it has been recognized in this area. All of these policies, as well as the actual decisions that resulted in Cargill continuing to obtain cocoa harvested by child laborers, were made in the U.S.  In addition, Cargill's recent announcement to close a plant in Lititz Pennsylvania stated that "the company's vast administrative, research and

development and marketing resources" are located in Minneapolis, where it maintains its corporate headquarters.

60.     Defendant ADM's Business Code of Conduct and Ethics, known as "The ADM Way," states with respect to Child Labor that "ADM will not condone the employment or exploitation of legally underage workers or forced labor and will not knowingly use suppliers who employ such workers or labor." ADM further states that its Code, including its Child Labor provision, is "a statement of the values to be recognized in the conduct of ADM's business by its employees, officers, directors and other agents . . . It is [also] the responsibility of all . . . its subsidiaries worldwide to comply with this Business Code of Conduct and Ethics . . . [and that] the values explained in this [Code] are to be consistently applied throughout the world in ADM's business, not only when it's convenient or consistent with other business objectives, but in all situations." ADM also asserts that it "will deal fairly with its customers, suppliers and business partners [and that] no ADM representative should take unfair advantage of anyone through . . . misrepresentation of material facts or any other unfair dealing practice."

61.     Defendants' assertions, published in the U.S. in English and targeting the U.S. market, make clear that Defendants were able to make decisions in the U.S. that would eradicate child labor and help the child laborers obtain education. However, they failed to implement these decisions after assuring the U.S. market that they would, allowing them to continue to benefit from child slavery without any measurable impact on their bottom line.

62.     Despite Defendants' admitted knowledge of the widespread use of forced child labor on the cocoa farms from which they source and their specific policies prohibiting child labor, Defendants not only continued to provide cocoa farms money, supplies, and training to grow cocoa beans for their exclusive use knowing that their assistance would necessarily facilitate child labor, but they

actively lobbied against all legal enforcement mechanisms that would have curbed forced child labor.

63.   In 2001, following news reports that child slavery was a key ingredient of American chocolate, U.S. Congressman Eliot Engel introduced a bill that would have forced U.S. chocolate importers and manufacturers to adhere to a certification and labeling system that their chocolate was "slave free." The bill passed the House of Representatives with a vote of 291 to 115 in favor of the measure.

64.   The U.S. chocolate industry, including Defendants, immediately moved to eradicate the bill (rather than child slavery) urging the legislatures, concerned non-governmental organizations, and the public at large that there was no need for concrete, enforceable legislation against child slavery because they would instead implement a private, voluntary mechanism to ensure child labor free chocolate.

65.   The U.S. chocolate industry, including Defendants, launched a multi-million dollar lobbying effort, which paid off by resulting in the Harkin-Engel Protocol, an entirely voluntary agreement whereby the chocolate industry would essentially police itself and in effect guarantee the continued use of the cheapest labor available to produce its product -- that of child slaves.

66.   By providing the logistical and financial assistance described herein across a period of years, Defendants knew that the farmers they were assisting were using and continued to use forced child labor, but nevertheless continued to provide such assistance. But for Defendants' knowing and substantial assistance and their efforts to derail enforceable legal mechanisms via the Harkin-Engel Protocol, the farmers would not have been able to operate their cocoa plantations using forced child labor.

**SECOND AMENDED COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES**

67.     The Defendants made decisions in the U.S. to respond to the Harkin-Engel Protocol passed by the U.S. Congress by adopting so-called monitoring systems that Defendants knew would serve as a tool to further mislead the U.S. market but that would not actually provide rigorous or accurate marketing. Defendants fought efforts in the U.S. to require enforceable standards that would effectively require Defendants to stop profiting from child slavery.[4]

68.     The three individual Plaintiffs, and the members of the class, all were forced to work as child slaves during the time that Defendants had decided in the U.S. not to address child slavery, but to instead misrepresent to the U.S. market that they were implementing effective programs to help stop the practice and rehabilitate the former slaves.

69.     More recent sources confirm the ongoing use of child slaves to harvest cocoa in Côte D'Ivoire by large multinationals, including Nestlé, ADM, and Cargill. *The Dark Side of Chocolate*, a film that focuses on the role of the multinational companies in perpetuating the use of child slaves, provides shocking details about the extent and the horrors of slavery on cocoa plantations in Côte D'Ivoire (https://www.youtube.com/watch?v=7Vfbv6hNeng). Further, the U.S. Department of Labor funded researchers at Tulane University, who published a 2015 study, *Survey Results on Child Labor in West African Cocoa Growing Areas*, which provides detailed and current facts of the large numbers of children still performing hazardous work in harvesting cocoa in Côte D'Ivoire. Defendants have continued to operate in the U.S. market based on their decision made in the U.S. to

---

[4] Reports in the past have shown the way that Nestlé profited through keeping labor costs low through these illegal practices.  Cocoa farmers receive only 3.2% of the retail price while the mark-up is 43%.  Oxfam, *Equality for women starts with chocolate: Mars, Mondelez and Nestle and the fight for Women's Rights* (2013), *available at* https://www.oxfam.org/sites/www.oxfam.org/files/equality-for-women-starts-with-chocolate-mb-260213.pdf

continue to aid and abet child slavery while implementing a public relations campaign in the U.S. to mislead the U.S. market about the ongoing use of child slavery.

## VII.   HARM TO THE INDIVIDUAL PLAINTIFFS

### A. Former Child Slave Plaintiffs

70.   Plaintiff John Doe I was trafficked into Côte d'Ivoire at age fourteen (14) to work on a large cocoa plantation located in Abobogou, near the town of Bouafle in Côte d'Ivoire. He was forced to work on the plantation until the age of nineteen (19), between the period of 1994 and 2000, when he finally escaped. During the four year period, he was forced to work harvesting and cultivating cocoa beans for up to twelve (12) hours a day and sometimes as many as fourteen (14) hours, six days a week.  This work included cutting, gathering, and drying the cocoa beans for processing.  Upon information and belief, the cocoa cultivated on this plantation is supplied to any one and/or more of the Defendants herein. He was not paid for his work and only given scraps of food to sustain him. He, along with the other children on the plantation, was heavily guarded at all times and at night kept in a locked room to prevent escape.  When the guards felt he was not working quickly enough, he was often beaten with tree branches.  He was beaten so hard that he suffered cuts on his hands and legs. Plaintiff John Doe I brings this action on behalf of himself and all other similarly situated former child slaves in Mali.

71.   Plaintiff John Doe II was trafficked into Côte d'Ivoire and forced to work as a child slave on a cocoa plantation for approximately 2 ½ years between the period of 1998-2000. During this time, he was between the age of 12-14 years old, below the legal working age in Côte d'Ivoire. The plantation was located in the Region de Man, Côte d'Ivoire. During the 2 ½ years, he was forced to work harvesting and cultivating cocoa beans for up to twelve (12) hours a day and

sometimes as many as fourteen (14) hours, six days a week.  This work included cutting, gathering, and drying the cocoa beans for processing.  Upon information and belief, the cocoa cultivated on this plantation is supplied to any one and/or more of the Defendants herein.  Once on the plantation, his movements were strictly controlled and he was not permitted to leave under the threat that he would be severely beaten and his feet cut open, as he had witnessed with the other children who attempted escape. At night, he, along with the other children working on the farm, were forced to sleep on the floor of a locked room until morning when they were again gathered for work. Plaintiff John Doe II was not paid, provided with only the bare minimum of food, and beaten with a whip when the guards felt he was not performing adequately. Plaintiff John Doe II brings this action on behalf of himself and all other similarly situated former child slaves in Mali.

72.     Plaintiff John Doe III was was trafficked into Côte d'Ivoire and forced into slavery at age 14 on a cocoa plantation located in the Bengalo Region de Man, Côte d'Ivoire. He was forced to work on the plantation for approximately four (4) years until he was 18 years old from 1996-2000. During this time, he worked between twelve (12) and fourteen (14) hours, six days a week cutting, gathering, and drying cocoa beans and was not paid for his work. Upon information and belief, the cocoa cultivated on this plantation is supplied to any one and/or more of the Defendants herein. John Doe III could not leave the plantation under fear that he would be severely beaten and forced to drink urine, as had been done with other the children who attempted escape. He was watched at gun point at all times and at night was forced to sleep in a small locked room with no windows and several other children on the floor. When he did not perform adequately, he was often whipped by the overseer. Plaintiff John Doe III brings this action on behalf of himself and all other similarly situated former child slaves in Mali.

**SECOND AMENDED COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES**

73.     Plaintiff John Doe IV was trafficked into Côte d'Ivoire when he was around the age of twelve (12) to work on a cocoa plantation in Côte d'Ivoire. He was recruited by a "locateur" who sold him into slavery. The plantation he was sold to was located in Kassangoro. He was forced to work on the plantation for approximately a year between 1998 and 1999, when he finally escaped.  During this time, he was forced to work harvesting and cultivating cocoa beans for twelve (12) hours to fourteen (14) hours a day.  This work included cutting, gathering, and drying the cocoa beans for processing.  Upon information and belief, the cocoa cultivated on this plantation is supplied to one or more of the Defendants herein. He was not paid for his work and only poor food to sustain him. He, along with the other children on the plantation, was heavily guarded at all times and at night kept in a locked room to prevent escape.  He tried to escape several times before he succeeded. Once time when he was caught the guards cut his feet at the bottoms and rubbed pepper in the wounds. Another time, he was tied to a papaya tree and was severely beaten. This damaged his left arm and left it permanently damaged. He finally escaped with a few other children by digging a hole under the wall of the hut where they slept with a dirt floor. He escaped to Baoule. The Malian Envoy helped him and other children to get home to their homes and then went back to rescue other Malian children working on the plantation. Plaintiff John Doe IV brings this action on behalf of himself and all other similarly situated former child slaves in Mali.

74.     Plaintiff John Doe V was sold into slavery and trafficked into Côte d'Ivoire when he was eleven years old by a "locator." He was forced to work as a child slave on a cocoa plantation for less than a year in approximately 1998. The plantation was located in Kassangoro. He was forced to work harvesting and cultivating cocoa beans for long hours. This was all he did. The work included cutting, gathering, and drying the cocoa beans for processing.  Upon information

and belief, the cocoa cultivated on this plantation is supplied to any one and/or more of the Defendants herein. He was guarded by men with guns. One of the guards was called "nyejugu" (sour face). He ran away once but was captured and severely beaten. He was rescued by the Malian Envoy because another child had escaped and told his family where he was. Plaintiff John Doe V brings this action on behalf of himself and all other similarly situated former child slaves in Mali.

75.     Plaintiff John Doe VI was trafficked into Côte d'Ivoire at age ten (10) to work on a large cocoa plantation located in Koussou in Côte d'Ivoire. A man took him from Mali to Côte d'Ivoire and sold him to a plantation for 20,000 CFA. He was forced to work on the plantation for three (3) years between 1997 and 2001, when he finally escaped.  During the three-year period, he was forced to work harvesting and cultivating cocoa beans for very long days,  sometimes as many as fourteen (14) hours, six days a week.  This work included cutting, gathering, and drying the cocoa beans for processing.  Upon information and belief, the cocoa cultivated on this plantation is supplied to one or more of the Defendants herein. He was not paid for his work and only given scraps of food to sustain him. He, along with the other children on the plantation, was heavily guarded at all times and at night kept in a locked room to prevent escape.  John Doe VI could not leave the plantation under fear that he would be severely punished. He was with around 75 other Malian children. He saw that children who tried to flee were caught and the bottom of their feet were cut and rubbed with salt. He was beaten for working too slow when he was sick. He has many scars from beatings and from cutting himself with a machete while working. He saw other children who died on the plantation. Plaintiff John Doe VI brings this action on behalf of himself and all other similarly situated former child slaves in Mali.

76.     The members of the class have been forced to harvest cocoa in the major cocoa regions of Côte d'Ivoire, including but not limited to the geographical

**SECOND AMENDED COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES**

regions of Bouake, Bouaflé, Man, Daloa, Odienne, Oume, Gagna, Soubre, Duekoue and San Pédro. All Defendants have sourcing relationships within one or more of those areas, and each Defendant has utilized substantial amounts of cocoa harvested with child laborers, including members of the class.

## VIII.  DEFENDANTS' VIOLATIONS OF LAW

77.   The causes of action maintained herein arise under and violate the following laws, agreements, conventions, resolutions and treaties:

(a)  Alien Tort Statute (ATS), 28 U.S.C. § 1350;

(b)  Protocol Amending the Slavery Convention, done Dec. 7, 1953, 7 U.S.T. 479 (entered into force Dec. 7, 1953);

(c)  Slavery Convention, concluded Sept. 1926, 46 Stat. 2183, T.S. No. 788.  60 I.N.T.S 253 (entered into force Mar. 9, 1927);

(d)  Supplementary Convention on the Abolition of Slavery, the Slave Trade, and Institutions and Practices Similar to Slavery;

(e)  International Labour Organisation Convention No. 29 Concerning Forced or Compulsory Labor (1930), 39 U.N.T.S. 55 (entered into force May 1, 1932);

(f) International Labour Organisation Convention No. 105 Concerning the Abolition of Forced Labour Convention;

(g) International Labour Organisation (ILO) Convention 138 on Minimum Age for Employment (1973) 1015 U.N.T.S. 297 (entered into force June 19, 1976);

(h) ILO Convention 182 on the Worst Forms of Child Labour (1999) 38 I.L.M. 1207(entered into force November 19, 2000);

(i)  United Nations Charter, 59 Stat. 1031, 3 Bevans 1153 (1945);

(j)  Universal Decl. of Human Rights, G.A. Res. 217A(iii), U.N. Doc. A/810 (1948);

**SECOND AMENDED COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES**

(k)    International Covenant on Civil and Political Rights, G.A. Res. 2220A(xxi), 21 U.N. Doc., GAOR Supp. (No. 16) at 52, U.N. Doc. A/6316 (1966);

(l)    Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, G.A. res. 39/46, 39 U.N. Doc., GAOR Supp. (No. 51) at 197, U.N. Doc. A/39/51 (1984);

(m)   Declaration on the Protection of All Persons From Being Subjected to Torture and Other Cruel, Inhuman or Degrading Treatment or        Punishment, G.A. Res. 3452, 30 U.N. Doc., GAOR Supp. (No. 34) at 91, U.N. Doc. A/10034 (1976);

(n)  Customary international law;

(o) Federal Common and Statutory Law.

## IX.    CLAIMS FOR RELIEF

### COUNT I
### FORCED LABOR BY ALL FORMER CHILD SLAVE PLAINTIFFS AGAINST ALL DEFENDANTS
### THE ALIEN TORT STATUTE, 28 U.S.C. § 1350

78.    The Former Child Slave Plaintiffs incorporate by reference paragraphs 1-77 of this Complaint as if fully set forth herein.

79.    The Former Child Slave Plaintiffs were placed in fear for their lives, were deprived of their freedom, separated from their families and forced to suffer severe physical and mental abuse.

80.    Defendants' use of forced labor under these conditions of torture violate the law of nations, customary international law, and worldwide industry standards and practices, including, but not limited to those identified in paragraph

81.    To the extent necessary, Defendants' actions occurred under color of

law and/or in conspiracy or on behalf of those acting under color of official authority, such that the injuries inflicted on these Plaintiffs as a result of the forced labor were inflicted deliberately and intentionally through the acts and/or omission of responsible state officials and/or their agents to act in preventing and/or limiting the trafficking or otherwise the use of child slaves. Upon information and belief, there are also several farms which are owned by government officials, whether directly or indirectly, or are otherwise protected by government officials either through the provision of security services or through payments made to such officials that allow farms and/or farmer cooperatives to continue the use of child labor.

82.     Defendants' conduct in violation of customary international law either directly caused these injuries, or Defendants are liable for these injuries because they provided knowing, substantial assistance to the direct perpetrators, or because the direct perpetrators were agents, and/or employees of Defendants or of companies that are the alter egos of Defendants.

83.     The conduct of Defendants was malicious, fraudulent and/or oppressive and done with a willful and conscious disregard for the Former Child Slave Plaintiffs' rights and for the deleterious consequences of Defendants' actions. As a result, the Former Child Slave Plaintiffs have sustained significant injuries and these Plaintiffs will continue to experience pain and suffering and extreme and severe mental anguish and emotional distress. The Former Child Slave Plaintiffs are thereby entitled to compensatory and punitive damages in amounts to be proven at trial.

//
//

**SECOND AMENDED COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES**

## COUNT II
### CRUEL, INHUMAN, OR DEGRADING TREATMENT
### BY ALL FORMER CHILD SLAVE PLAINTIFFS
### AGAINST ALL DEFENDANTS
### THE ALIEN TORT STATUTE, 28 U.S.C. § 1350

84.     The Former Child Slave Plaintiffs incorporate by reference paragraphs 1-81 of this Complaint as if fully set forth herein.

85.     The acts described herein had the intent and the effect of grossly humiliating and debasing the Former Child Slave Plaintiffs, forcing them to act against their will and conscience, inciting fear and anguish, and breaking their physical and/or moral resistance.

86.     Defendants' actions forced the Former Child Slave Plaintiffs against their will and under fear of harm, to labor for Defendants' economic benefit and in doing so the Former Child Slave Plaintiffs were placed in great fear for their lives and forced to suffer severe physical and psychological abuse and agony.

87.     In acting through the implicit sanction of the state, Defendants acted under color of law and/or in conspiracy or on behalf of those acting under color of official authority, and the injuries inflicted on the Former Child Slave Plaintiffs as a result of the cruel, inhuman and degrading treatment were inflicted deliberately and intentionally through the omission of responsible state officials and/or their agents to act in preventing and/or limiting the trafficking or otherwise the use of child slaves. Upon information and belief, there are also several farms which are owned by government officials, whether directly or indirectly, or are otherwise protected by government officials either through the provision of security services or through payments made to such officials that allow farms and/or farmer cooperatives to continue the use of child labor.

88.     The acts described herein constitute cruel, inhuman or degrading treatment in violation of the law of nations under the ATS and Defendants are

liable because they directly caused these injuries or they provided knowing, substantial assistance to the direct perpetrators, or because the direct perpetrators were agents, and/or employees of Defendants or of companies that are the alter egos of Defendants.

89.     Former Child Slave Plaintiffs are thereby entitled to compensatory and punitive damages in amounts to be proven at trial.

## COUNT III
### TORTURE BY ALL FORMER CHILD SLAVE PLAINTIFFS AGAINST ALL DEFENDANTS
### THE ALIEN TORT STATUTE, 28 U.S.C. § 1350

90.     The Former Child Slave Plaintiffs incorporate by reference paragraphs 1-89 of this Complaint as if fully set forth herein.

91.     Defendants' actions were undertaken under the color of foreign authority.  Specifically, Defendants acted under color of law, and/or in conspiracy or on behalf of those acting under color of official authority, by acting with the implicit sanction of the state and/or through the intentional omission of responsible state officials and/or their agents to act in preventing and/or limiting the trafficking or otherwise the use of child slaves into Côte d'Ivoire.  Upon information and belief, there are also several farms which are owned by government officials, whether directly or indirectly, or are otherwise protected by government officials, either through the provision of security services or through payments made to such officials that allow farms and/or farmer cooperatives to continue the use of child labor.

92.     Defendants' conduct either directly caused Plaintiffs' injuries, or they are liable for Plaintiffs' injuries because they provided knowing, substantial assistance to the direct perpetrators, or because the direct perpetrators were agents,

**SECOND AMENDED COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES**

and/or employees of Defendants or of companies that are the alter egos of Defendants.

93.     The acts described herein were inflicted deliberately and intentionally for purposes which included, among others, punishing the victim or intimidating the victim or third persons, and constitute torture in violation of the law of nations under the ATS.

94.     Defendants' tortious acts described herein placed all members of the Former Child Slave Plaintiffs in great fear for their lives and caused them to suffer severe physical and mental pain and suffering. The Former Child Slave Plaintiffs are thereby entitled to compensatory and punitive damages in amounts to be proven at trial.

## X.     LIABILITY

95.     The Plaintiffs incorporate by reference paragraphs 1-94 of this Complaint as if set forth herein.

96.     Defendants are directly liable for any actions that they aided and abetted by knowingly providing financial support, supplies, training, and/or other substantial assistance that contributed to the ability of their agents, employees and/or partners to use and/or facilitate the use of child slave labor, including but not limited to any farm and/or farmer cooperative that held any agreement, contract, and/or memorandum of understanding, written or oral, to supply cocoa beans.

97.     To the extent that Defendants can be said to have acted indirectly, Defendants are vicariously liable for the actions of their agents, employees, co-venturers and/or partners, including specifically any farm and/or farmer cooperative which held any agreement, contract, and/or memorandum of understanding, written or oral, to supply cocoa beans to such Defendants.

98.    To the extent that any such agent, employee, co-venturers and/or partner used and/or facilitated the use of child slave labor and/or made material misrepresentations and omissions, such entity was acting within the course and scope of such agency, enterprise, or venture and Defendants confirmed and ratified such conduct.

99.    Defendants are further liable for the acts of any and all corporations and/or entities found to be their alter ego.  Defendants' control over these entities' operations, particularly with respect to the sourcing, purchasing, manufacturing, distribution, and/or retailing of cocoa and cocoa derived products, renders them mere conduits for the receipt or transfer of funds and/or products with respect to cocoa products derived from the Côte d'Ivoire. Such inherent and pervasive failure to maintain separate identities constitutes improper conduct and disrespects the privilege of using the corporate form to conduct business.

## XI.    DEMAND FOR JURY TRIAL

100.   Plaintiffs demand a trial by jury on all issues so triable.

## XII.   PRAYER FOR RELIEF

101.   WHEREFORE, Plaintiffs respectfully request the Court to:

(a) enter judgment in favor of the Plaintiffs on all counts of the Complaint;

(b) award the Plaintiffs compensatory and punitive damages;

(c) grant the Plaintiffs equitable relief including, but not limited to, an injunction prohibiting further damage to their persons, remedying past damage, and protecting their rights under customary international law;

(d) award Plaintiffs the costs of suit including reasonable attorneys' fees; and

**SECOND AMENDED COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES**

1      (e) award Plaintiffs such other and further relief as the Court deems just

2 under the circumstances.

3

4

5 Dated: July 14, 2016

6                                                                 

7         Terry Collingsworth (DC Bar# 471830)

8         *Attorney for Plaintiffs*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**SECOND AMENDED COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES**