THEODORE B. OLSON, SBN 38137
  tolson@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W., Washington, DC 20036-5306
Telephone: 202.955.8500
Facsimile: 202.530.9500

THEODORE J. BOUTROUS JR., SBN 132099
  tboutrous@gibsondunn.com
PERLETTE MICHELE JURA, SBN 242332
  pjura@gibsondunn.com
MATTHEW A. HOFFMAN, SBN 227351
  mhoffman@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue, Los Angeles, CA 90071-3197
Telephone: 213.229.7000
Facsimile: 213.229.7520

CRAIG A. HOOVER (SBN 113965)
  craig.hoover@hoganlovells.com
NEAL KUMAR KATYAL (*Pro hac vice*)
  neal.katyal@hoganlovells.com
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW, Washington, DC 20004
Telephone: 202.637.6400
Facsimile: 202.637.5910

*Attorneys for Defendant Nestlé USA*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN DOE I, Individually and on behalf of Proposed Class Members; JOHN DOE II, Individually and on behalf of Proposed Class Members; JOHN DOE III, Individually and on behalf of Proposed Class Members; JOHN DOE IV, Individually and on behalf of Proposed Class Members; JOHN DOE V, Individually and on behalf of Proposed Class Members; and JOHN DOE VI, Individually and on behalf of Proposed Class Members,<br><br>                    Plaintiffs,<br><br>          v.<br><br>NESTLÉ, S.A., NESTLÉ USA, NESTLÉ Ivory Coast, ARCHER DANIELS MIDLAND CO., CARGILL INCORPORATED COMPANY, CARGILL COCOA, CARGILL WEST AFRICA, S.A.,<br><br>                    Defendants. | CASE NO. 2:05-cv-05133-SVW-MRW<br><br>**DEFENDANT NESTLÉ USA, INC.'S NOTICE OF MOTION AND 12(B)(1) & 12(B)(6) MOTION TO DISMISS DOE PLAINTIFFS' SECOND AMENDED COMPLAINT**<br><br>[Proposed Order filed concurrently herewith]<br><br>Hearing:<br>Date:       January 9, 2017<br>Time:       1:30 p.m.<br>Place:      Courtroom 6, 312 N. Spring St.<br>Judge:      Honorable Stephen V. Wilson<br><br>Action Filed:     July 14, 2005<br>Trial Date:       TBD |

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

    **PLEASE TAKE NOTICE** that on January 9, 2017 at 1:30 p.m., or as soon thereafter as this matter may be heard in the courtroom of Judge Stephen V. Wilson, located at 312 N. Spring St., Los Angeles, California, Courtroom 6, Defendant Nestlé USA, Inc. ("Nestlé USA") will and hereby does move for an order dismissing Plaintiffs' Second Amended Complaint ("SAC") with prejudice.

    This Motion is made following a telephonic conference of counsel which took place, pursuant to Local Rule 7-3 and the Court's rules, on September 1, 2016.

    **NESTLÉ USA RESPECTFULLY REQUESTS** that the SAC be dismissed with prejudice pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). Nestlé USA bases this Motion on this Notice of Motion and Motion, the memorandum of points and authorities, the Court's files and rulings in this action, the arguments of counsel, and any other matter that the Court may properly consider.

Dated: September 15, 2016

THEODORE J. BOUTROUS JR.
GIBSON, DUNN & CRUTCHER LLP

By:  /s/     Theodore J. Boutrous Jr.
             Theodore J. Boutrous Jr.

Attorneys for Defendant
NESTLE USA, INC.

Gibson, Dunn &
Crutcher LLP

# TABLE OF CONTENTS

MEMORANDUM OF POINTS AND AUTHORITIES ...................................................... 1

I.     RELEVANT BACKGROUND .......................................................................... 3

       A.     Facts ......................................................................................................... 3

       B.     Procedural History ................................................................................... 4

              1.     District Court Proceedings ............................................................ 4

              2.     Plaintiffs' Appeal And Waiver ..................................................... 5

              3.     September 4, 2014 Ninth Circuit Decision ................................... 5

              4.     July 14, 2016 Second Amended Complaint ................................. 6

II.    ISSUES TO BE DECIDED .............................................................................. 7

III.   LEGAL STANDARDS .................................................................................... 7

IV.    ARGUMENT .................................................................................................... 8

       A.     Plaintiffs Seek An Extraterritorial Application Of The ATS ................. 8

              1.     Relevant Legal Principles ............................................................ 8

              2.     As To Nestlé USA, The SAC Does Nothing To Cure The
                     Extraterritorial Deficiencies Of The FAC ................................... 9

              3.     Because All Of The Relevant Conduct Occurred Overseas,
                     Plaintiffs Fail To State A Domestic Application Of The ATS ...... 10

              4.     The SAC Fails To Allege A Domestic Application Of The
                     ATS Under The Focus Test .......................................................... 10

       B.     Plaintiffs Have Not Alleged The Requisite *Actus Reus* .......................... 16

              1.     *Perisic* And *Taylor* Confirm The Propriety Of Using The
                     "Specific Direction" Standard ...................................................... 16

              2.     Plaintiffs' Allegations Fail To Satisfy Any *Actus Reus*
                     Standard ........................................................................................ 18

       C.     Plaintiffs Do Not Have Standing To Sue Nestlé USA ........................... 23

       D.     Plaintiffs' Claims Fail For Additional Reasons ..................................... 24

V.     CONCLUSION .............................................................................................. 25

# TABLE OF AUTHORITIES

## Cases

*Abecassis v. Wyatt*,
704 F. Supp. 2d 623 (S.D. Tex. 2010) ................................................................. 23, 24

*Airs Aromatics, LLC v. Opinion Victoria's Secret Stores Brand Mgmt., Inc.*, 744 F.3d 595 (9th Cir. 2014) ............................................................. 14

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........................................................................ 7, 12, 19

*Balintulo v. Ford Motor Co.*,
796 F.3d 160 (2d Cir. 2015) .................................................................. 13

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) ......................................................................... 7, 8, 24

*Cardona v. Chiquita Brands*,
760 F.3d 1185 (11th Cir. 2014) ............................................................. 13

*Citizens United v. Fed. Election Comm'n*,
558 U.S. 310 (2010) ............................................................................. 23

*Doe I v. Cisco Sys., Inc.*,
66 F. Supp. 3d 1239 (N.D. Cal. 2014) .................................................... 21

*Doe I v. Nestlé USA, Inc.*,
766 F.3d 1013 (9th Cir. 2014) ....................................................... *passim*

*Doe I v. Nestlé USA, Inc.*,
788 F.3d 946 (9th Cir. 2015) ............................................................. 6, 25

*Doe v. Drummond Co.*,
782 F.3d 576 (11th Cir. 2015), *cert. denied*, 136 S. Ct. 1168 (2016) ............... 11, 13

*Doe v. Exxon Mobil Corp.*,
2015 WL 5042118 (D.D.C. July 6, 2015) ................................................ 13

*Doe v. Nestlé, S.A.*,
748 F. Supp. 2d 1057 (C.D. Cal. 2010) ........................................... *passim*

*Gang v. Zhizhen*,
2016 WL 1275026 (D. Conn. Mar. 31, 2016) .......................................... 15

Gibson, Dunn & Crutcher LLP

*Kiobel v. Royal Dutch Petroleoum Co.*,
    133 S. Ct. 1659 (2013)............................................................................*passim*

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992)......................................................................................23

*Mastafa v. Chevron Corp.*,
    770 F.3d 170 (2d Cir. 2014) .........................................................................11

*Mazza v. Am. Honda Motor Co.*,
    666 F.3d 581 (9th Cir. 2012) ........................................................................23

*Mujica v. Airscan Inc.*,
    771 F.3d 580 (9th Cir. 2014) .................................................................*passim*

*N.Y. Times Co. v. Sullivan*,
    376 U.S. 254 (1964)......................................................................................23

*Presbyterian Church of Sudan v. Talisman Energy, Inc.*,
    582 F.3d 244 (2d Cir. 2009) .........................................................................25

*Prosecutor v. Perisic*,
    Case No. IT-04-81-A (ICTY Feb. 28, 2013)............................................ 6, 17

*Prosecutor v. Šainović*,
    Case No. IT-05-87-A, Appeal Judgment (ICTY Jan. 23, 2014) ..................17

*Prosecutor v. Taylor*,
    Case No. SCSL-03-01-A (SCSL Sept. 26, 2013)................................... 6, 17

*RJR Nabisco, Inc. v. European Comm.*,
    136 S. Ct. 2090 (2016)........................................................................*passim*

*Rush v. Savchuk*,
    444 U.S. 320 (1980)......................................................................................25

*In re S. African Apartheid Litig.*,
    617 F. Supp. 2d 228 (S.D.N.Y. 2009) .........................................................20

*Saldana v. Occidental Petroleum Corp.*,
    774 F.3d 544 (9th Cir. 2014) ........................................................................12

*Sosa v. Alvarez-Machain*,
    542 U.S. 692 (2004)..........................................................................15, 16, 25

Gibson, Dunn &
Crutcher LLP

iii

*Sosa v. DIRECTV, Inc.*,
    437 F.3d 923 (9th Cir. 2006) ...................................................................... 12

*Spokeo, Inc. v. Robins*,
    136 S. Ct. 1540 (2016) .............................................................................. 23

*Taghadomi v. United States*,
    401 F.3d 1080 (9th Cir. 2005) .................................................................. 15

*Terenkian v. Republic of Iraq*,
    694 F.3d 1122 (9th Cir. 2012) .................................................................... 8

*Thornhill v. Alabama*,
    310 U.S. 88 (1940).................................................................................... 23

*Tietsworth v. Sears*,
    720 F. Supp. 2d 1123 (N.D. Cal. Mar. 31, 2010).................................... 22

*Top Rank, Inc. v. Haymon*,
    2015 WL 9948936 (C.D. Cal. Oct. 16, 2015) .................................... 7, 25

*United States v. Wallace*,
    531 F.3d 504 (7th Cir. 2008) .................................................................... 12

**Statutes, Rules, and Regulations**

28 U.S.C. § 1350................................................................................*passim*

Fed. R. Civ. Proc. 8............................................................................... 24

Fed. R. Civ. Proc. 12(b)(1) ................................................................... 23

Fed. R. Civ. Proc. 12(b)(6) .............................................................. 24, 25

Fed. R. Evid. 407 ................................................................................... 22

**Other Authorities**

Chocolate Mfrs. Ass'n, *Protocol for the Growing and Processing of
    Cocoa Beans and Their Derivative Products in a Manner that
    Complies with ILO Convention 182 Concerning the Prohibition and
    Immediate Action for the Elimination of the Worst Forms of Child
    Labor* (2001), *available at* http://tinyurl.com/pccd9w2 ......................... 13

H. Amend. 142, H.R. 2330 (2001) (in 147 Cong. Rec. H3781 (daily ed.

Gibson, Dunn &
Crutcher LLP

1

June 28, 2001) .......................................................................................... 13

William A. Schabas, *General Principles of Criminal Law in the ICC Statute*, 6 Eur. J. Crime Crim. L. Just. 400 (1998) ................................... 19

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Gibson, Dunn & Crutcher LLP

DEFENDANT NESTLÉ USA'S MOTION TO DISMISS DOE PLAINTIFFS' SECOND AMENDED COMPLAINT

## <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

Nestlé USA, Inc. ("Nestlé USA") respectfully moves this Court to dismiss Plaintiffs' Second Amended Complaint ("SAC") with prejudice.

Plaintiffs, all natives of Mali, allege that unidentified foreigners trafficked and forced them to work on cocoa farms in Côte d'Ivoire from 1994-2001.  They have not sued their alleged captors or the farmers that purportedly mistreated them.  Instead—through the Alien Tort Statute, 28 U.S.C. § 1350 ("ATS")—they seek to hold two cocoa suppliers ("Cargill" and "ADM") and a U.S. food and beverage company, Nestlé USA, responsible for aiding and abetting the purported crimes, based largely on Defendants' *efforts to help combat* the global social problem of forced child labor and their decision to purchase cocoa sourced from Côte d'Ivoire, which supplies 70% of the world's cocoa.  This implausible and unprecedented theory of liability—after more than eleven years and multiple opportunities to amend—still does not state a claim.  This failure is particularly acute with respect to Nestlé USA, which is not alleged to have owned farms, contracted with farmers, or conducted operations in Côte d'Ivoire, and is referenced in just three of the 101 paragraphs in Plaintiffs' complaint.

In 2014, the Ninth Circuit provided Plaintiffs with one final opportunity to amend.  It refrained from ruling on extraterritoriality or *actus reus* and instead directed Plaintiffs to: (1) allege facts to demonstrate that they did not seek an extraterritorial application of the ATS, noting that the pleadings "ma[d]e no attempt to explain what portion of the conduct underlying [their] claims took place within the United States"; and (2) describe what acts Defendants engaged in ("*actus reus*") to justify proceeding against them as aiders and abettors.  *Doe I v. Nestlé USA, Inc.*, 766 F.3d 1013, 1023, 1026-28 (9th Cir. 2014) ("*Doe I*").  But Plaintiffs' SAC brings them no closer to stating a claim than they were eleven years ago.  It does not identify any relevant domestic conduct or any injury to justify applying the ATS to Plaintiffs' fundamentally foreign claims.  And, even applying the most lenient *actus reus* standard, Plaintiffs still fail to

plead that Nestlé USA—or any other Defendant—engaged in acts that aided and abetted the alleged crimes perpetrated against them.

In fact, the SAC adds no new substantive allegations about Nestlé USA.  (*See* SAC ¶¶ 1, 20, 35).  Instead, it offers a handful of allegations about "Nestlé," a moniker used by Plaintiffs to refer collectively to Nestlé USA and two foreign affiliates, Nestlé, S.A. and Nestlé Ivory Coast, which, in more than a decade, have never been served.

Even these collective group allegations—which are improper on their face and largely duplicative of Plaintiffs' prior allegations—do not show how any of these entities aided and abetted the wrongs allegedly perpetrated against Plaintiffs.  Rather, the allegations focus in substantial part on "Nestlé" policies and cocoa supplier policies *opposing* forced labor.  Far from supporting Plaintiffs' claims, the policies confirm that "Nestlé" contributed to multiple projects to help combat the global social problem of forced child labor, and it required suppliers to comply with all applicable laws—including prohibitions against forced labor.  Plaintiffs cannot convert "Nestlé's" efforts to help bring about positive social change into wrongful conduct through their own say-so.  Not only does Plaintiffs' illogical and limitless theory of liability run contrary to the law, but their attempt to recast corporate social responsibility programs and public stances against forced labor as evidence of wrongdoing also threatens grave global trade implications and could dramatically chill corporate efforts to do social good.

The SAC fails in numerous additional respects as well.  It does not plead Article III standing.  It relies on improper group pleading to disregard corporate separateness and depends on agency and state-law claims that were rejected by this Court in 2010.  It also requires this Court to ignore the judicial restraint and caution that the Supreme Court has repeatedly called for in ATS cases.

Given Plaintiffs' repeated inability to state a claim, this action should be put to rest.  Nestlé USA should not be required to litigate a case indefinitely that never alleges *any* wrongdoing, turns on foreign claims, and attempts to punish the very entities that are trying to *help* address the global social problem of forced child labor.

# I.     RELEVANT BACKGROUND

## A.     Facts[1]

Plaintiffs are six unnamed adult citizens and residents of Mali.  (SAC ¶¶ 6–11).  They allege that, after being trafficked from Mali, they were forced to work, as minors, harvesting cocoa on specific "farm[s] and/or farmer cooperative[s]" in Côte d'Ivoire at various points from 1994 to 2000 or 2001.  (*Id.* ¶¶ 6–11, 70–75).[2]

Plaintiffs allege that they were victimized by criminals in Mali and Côte d'Ivoire, including farmers, "locators" who sold and trafficked them (*id.* ¶¶ 73-74), and "guards" and "overseers" who forced them to work on cocoa farms, prevented them from leaving at night, and beat them.  (*Id.* ¶¶ 70–75).  None of these wrongdoers are named as defendants or are alleged to have any relationship with Defendants.

Instead, Plaintiffs target companies that allegedly purchased products sourced from Côte d'Ivoire, including two cocoa suppliers: Archer Daniels Midland Company (ADM) and Cargill Incorporated Company (Cargill) (collectively, "Cocoa Suppliers"); and, Nestlé USA, a North American "food and beverage compan[y]."  (*Id.* ¶¶ 20, 35).

The SAC names four additional defendants that Plaintiffs never served, including two other supplier defendants (Cargill Cocoa and Cargill West Africa, S.A.) and two foreign Nestlé entities: Switzerland-based Nestlé S.A. and Nestlé Ivory Coast.  (*Id.* ¶ 1).  The SAC refers to all seven companies generally as "Defendants" and conclusorily alleges that all subsidiaries acted as agents and alter egos of their respective parent companies.  (*Id.* ¶¶ 27-31).

Plaintiffs concede that none of the Defendants trafficked or enslaved them or owned the farms on which Plaintiffs worked. *Doe I*, 766 F.3d at 1017.  They also admit that Defendants did not have the subjective motive to harm children (*id.* at 1025) and had policies against unlawful labor practices.  *See* I.B.4, *infra*.  Plaintiffs maintain

---

[1]  Nestlé USA assumes the truth of adequately pleaded facts and draws reasonable inferences in Plaintiffs' favor.  It does not admit the facts alleged in the SAC.

[2]  John Does I-V allege that they escaped their captors by or before 2000.  John Doe VI alleges that he worked three years during a four-year span from 1997 to 2001, without identifying which three-year period he worked.  (*See* SAC ¶ 75).

that Defendants should, nonetheless, be responsible because they provided agricultural

assistance to farmers, purchased substantial quantities of cocoa from Côte d'Ivoire, and

operated with the "unilateral goal of finding the cheapest sources of cocoa" despite

widespread knowledge of problems with forced labor and substantial power to control

Côte d'Ivoire's cocoa market.[3]  (SAC ¶ 33).  Plaintiffs also criticize Defendants for

lobbying and publicizing their stance against forced child labor, but failing to eradicate

it.  *Id.* ¶¶ 52-67.  Based on these allegations, Plaintiffs accuse Defendants of aiding and

abetting: (i) forced labor; (ii) cruel, inhuman or degrading treatment, and; (iii) torture.

**B.    Procedural History**

   **1.    District Court Proceedings**

   Plaintiffs filed their original complaint on July 14, 2005, asserting claims on be-

half of John Does I-III and seeking to act on behalf of a purported class of Malians.

(*See* Dkt. entry dated Jul. 14, 2005).[4]  They asserted causes of action for aiding and

abetting forced labor, violating the Torture Victim Protection Act, and various state

law torts (including, *inter alia*, agency and alter ego claims).  (*Id.* ¶¶ 26-33).

   After four years of litigation, this Court directed Plaintiffs to file an amended

complaint.  (Dkt. 106).  They filed an amended complaint ("FAC") on July 10, 2009,

proceeding under the same theories and including a handful of additional allegations.

(Dkt. 118).  This Court dismissed the FAC in a 161-page opinion on September 8,

2010, and concluded that an aider and abettor must (1) carry out acts specifically di-

rected to assist, encourage, or lend moral support to the perpetration of a specific

crime, which have a substantial effect on the perpetration of the crime (*actus reus*), and

(2) act with the specific intent of substantially assisting the commission of that crime

(*mens rea*).  *Doe v. Nestlé, S.A.*, 748 F. Supp. 2d 1057, 1080, 1087-88 (C.D. Cal.

---

[3]  Plaintiffs also allege that "Defendants"—not Nestlé USA—provided some general
financial assistance to some farmers, none of which are alleged to be Plaintiffs'
captors.  (SAC ¶ 37).

[4]  The earlier complaints also named human rights organization, Global Exchange, as
a Plaintiff.  Global Exchange was dismissed on jurisdictional grounds.

Gibson, Dunn &
Crutcher LLP

2010).  It concluded that Plaintiffs failed to allege either element with respect to De-fendants.  *Id.* at 1111.  It also concluded that corporations cannot be sued for aiding and abetting under the ATS and rejected Plaintiffs' agency theories, TVPA claim, and state-law claims.  *Id.* at 1113, 1120-24, 1143-45.

### 2.    Plaintiffs' Appeal And Waiver

Rather than amend again, Plaintiffs filed an appeal and explicitly waived all claims except their ATS forced labor claim.  (App. Op. Br. at 3 n.2, ECF No. 15).[5]

### 3.    September 4, 2014 Ninth Circuit Decision

The Ninth Circuit disagreed with this Court's *mens rea* holding.  *Doe I*, 766 F.3d at 1026.  It also held that corporations could be liable for aiding and abetting un-der the ATS.  *Id.* at 1023.  It did not conclude, however, that Plaintiffs stated a cog-nizable claim.  Instead, it directed them to amend on extraterritoriality and *actus reus*.

Specifically, during Plaintiffs' appeal, the Supreme Court decided *Kiobel v. Royal Dutch Petroleoum Co.*, which established that the presumption against extrater-ritoriality applies to ATS claims.  133 S. Ct. 1659, 1669 (2013).  The parties provided the Ninth Circuit with supplemental briefing on the issue, and although the court ulti-mately remanded and "decline[d] to resolve the extraterritoriality issue," it noted that the FAC "ma[de] no attempt to explain what portion of the conduct underlying the plaintiffs['] claims took place within the United States."  *Doe I*, 766 F.3d at 1027-28.

As for *actus reus*, the Ninth Circuit recognized that the alleged assistance must be "substantial," but declined to determine whether that assistance also must be "spe-cifically directed" toward the commission of a crime.  *Id.* at 1026.  It also noted the po-tential importance of demonstrating a "causal link" between the commission of the crime and defendants, and remanded with instructions to allow Plaintiffs to amend the FAC in light of two international decisions decided after Plaintiffs filed their FAC: *Prosecutor v. Perisic,* Case No. IT-04-81-A, (ICTY Feb. 28, 2013) ("*Perisic*") and *Prosecutor v. Taylor*, Case No. SCSL-03-01-A (SCSL Sept. 26, 2013) ("*Taylor*").  *Id.*

---

[5]  As such, only Count I of the SAC should be considered by this Court.

Gibson, Dunn &
Crutcher LLP

Defendants sought, but were unable to secure, *en banc* and Supreme Court review.  *But see Doe I v. Nestlé USA, Inc.,* 788 F.3d 946 (9th Cir. 2015) (Bea, J., dissenting).

### 4.    July 14, 2016 Second Amended Complaint

Eleven years after filing their original Complaint, and nearly two years after the Ninth Circuit's decision, Plaintiffs filed the SAC.  The SAC does not add a single new substantive allegation about Nestlé USA (SAC ¶¶ 1, 20, 35).  In fact, the *only* specific allegations about Nestlé USA are that it "is one of the largest food and beverage companies in the U.S." and "is one of the largest purchasers, manufacturers, and retail sellers of cocoa products in North America."  (SAC ¶¶ 20, 35).

The SAC contains 16 paragraphs in total that refer to any Nestlé corporate entity (SAC ¶¶ 1, 19, 20, 21, 33, 35, 38, 52-58, 67, 69).  Just a handful of these paragraphs contain new allegations.  (*Id.* ¶¶ 35, 38, 52-58, 67, 69).  Referring collectively to three different Nestlé corporate entities, without distinguishing among them, Plaintiffs make the following new allegations:

- *Paragraph 35* alleges in relevant part that "Nestlé" (presumably referring to Nestlé S.A.) established a major operation in the U.S. through Nestlé USA.  It claims that every major operational decision about "Nestlé's" U.S. market was made in or approved in the U.S., that "Nestlé" had complete control over its cocoa production operations in Côte d'Ivoire and the ability and control in the U.S. to take necessary steps to eradicate the practice of using forced child labor to harvest cocoa in Côte d'Ivoire.  It also alleges that "Nestlé" regularly had employees from their Swiss and U.S. headquarters inspecting their operations in Côte d'Ivoire and reporting back so that U.S.-based decision-makers had accurate facts on the ground.  (SAC ¶ 35).

- *Paragraph 38* adds that "Nestlé" (presumably referring to Nestlé Ivory Coast) processed cocoa near Odienne in Côte d'Ivoire.  (SAC ¶ 38).

- *Paragraphs 52-55* refer to four previously cited Nestlé S.A. publications that describe 2005-2006 efforts to help ensure that "Nestlé" supply chains are free from

1    forced child labor.  (SAC ¶¶ 52-55).  The new allegations state these were pub-

2    lished in English and accessible in the U.S.  (*Id.*)

3    • *Paragraph 56* refers to a Nestlé S.A. document from 2013, entitled "The Nestle

4      Commitment on Child Labour In Agricultural Supply Chains."  This document,

5      also available in English and online, states that the company is against all forms of

6      exploitation of children and is firmly committed to actions to eradicate child labor

7      from its agricultural supply chains.  (*See* SAC ¶ 56).

8    • *Paragraph 57* quotes from the 2013 Nestlé S.A. Supplier Code, which confirms

9      that it imposes non-negotiable minimum standards on suppliers and reflects the

10     company's stance against child labor.  (*See* SAC ¶ 57).

11   • *Finally*, Plaintiffs include new allegations suggesting that the above statements im-

12     plied to the U.S. market that "Nestlé" was combatting child labor, which Plaintiffs

13     claim merely protected "Nestlé's" ability to benefit from the alleged cost savings of

14     aiding and abetting child labor.  (SAC ¶¶ 58; 67 n.4, 69).

15        The SAC also adds three new John Does (IV-VI).  The new John Does ceased

16   working on cocoa farms in 1998, 1999, and 2000-2001, respectively.

## II.   ISSUES TO BE DECIDED

18       1.  Whether Plaintiffs' claims require extraterritorial application of U.S. law.

19       2.  Whether Plaintiffs allege that Nestlé USA performed the requisite *actus reus*.

20       3.  Whether Plaintiffs lack standing to sue Nestlé USA.

21       4.  Whether Plaintiffs' claims should be dismissed on other grounds.

## III.   LEGAL STANDARDS

23        Federal Rule of Civil Procedure 8(a) requires a plaintiff to plead each claim with

24   sufficient specificity to give each defendant fair notice of what the claim is and the

25   grounds upon which it rests.  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555

26   (2007).  A complaint must be dismissed under Rule 12(b)(6) unless it "contain[s] suffi-

27   cient factual matter, accepted as true, to state a claim to relief that is plausible on its

28   face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotations omitted).  Courts should

"strip" the complaint "of conclusory statements, legal conclusions disguised as factual allegations, and group pleading allegations." *Top Rank, Inc. v. Haymon*, 2015 WL 9948936, at 9, 13 (C.D. Cal. Oct. 16, 2015).  After doing so, the remaining factual allegations must do more than "create[] a suspicion [of] a legally cognizable right of action"; they must "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (quotations omitted).  Likewise, 12(b)(1) requires allegations with "sufficient factual matter" to "state a claim to relief that is plausible on its face. . ." *Terenkian v. Republic of Iraq*, 694 F.3d 1122, 1131 (9th Cir. 2012) (quotations omitted).

## IV.    ARGUMENT

The SAC neither provides a basis to apply U.S. law to Plaintiffs' fundamentally foreign claims nor alleges conduct that satisfies any *actus reus* standard.  It likewise fails to allege standing with respect to Nestlé USA, relies on improper group pleading, and runs contrary to *Sosa* and its progeny by asking this Court to create a new action with significant foreign policy and trade implications.

### A.    Plaintiffs Seek An Extraterritorial Application Of The ATS

The SAC fails to plead a domestic application of the ATS—and thus fails under *Kiobel* and *RJR*—for multiple reasons.  First, Plaintiffs have not added any new allegations about Nestlé USA and, therefore, still have not pleaded any facts linking Plaintiffs' claims to the U.S.  Second, Plaintiffs do not allege any *relevant* domestic conduct, which means that their claims should be dismissed.  Finally, applying the "focus" test, it is clear that the relevant conduct (and Plaintiffs' injuries themselves) all occurred in the Ivory Coast.  None of the U.S. conduct alleged by Plaintiffs comes close to justifying application of U.S. law to Plaintiffs' fundamentally foreign claims.

### 1.    Relevant Legal Principles

"United States law governs domestically but does not rule the world." *RJR Nabisco, Inc. v. European Comm.*, 136 S. Ct. 2090, 2100 (2016) (quotations omitted).  Hence, the presumption against extraterritoriality: absent clearly expressed congressional intent, when a statute gives no indication of an extraterritorial application, it has

none.  *Id.*  The presumption helps guard against international discord that can result
from applying U.S. law to foreign conduct.  *Id.*

To limit the possibility of these adverse effects, the Supreme Court established
in *Kiobel* and *RJR* a two-step inquiry to determine whether a U.S. statute can govern
conduct that occurs outside of the U.S.  First, courts must ask "whether the statute [au-
thorizing the civil action] gives a clear, affirmative indication that it applies extraterri-
torially." *Id.* at 2101.  The ATS does not.  *Id.*

Second, for non-extraterritorial statutes, like the ATS, courts then look to the
statute's "focus." *Id.*[6]  If the conduct relevant to the statute's focus occurred in the
U.S., then the case involves a permissible "domestic application" of the statute, even if
other conduct occurred abroad; "but if the conduct relevant to the focus occurred in a
foreign country, then the case involves an impermissible extraterritorial application *re-
gardless of any other conduct that occurred in U.S. territory*." *Id.* (emphasis added);
*see also Kiobel*, 133 S. Ct. at 1669; *accord Mujica v. Airscan Inc.*, 771 F.3d 580, 591-
92 (9th Cir. 2014) (applying touch and concern test to conclude that plaintiffs did not
state a domestic application of the ATS because the "basis of Plaintiffs' claims exclu-
sively concern conduct that occurred" overseas).

The Supreme Court clarified in *RJR* that where there is no relevant conduct al-
leged to have occurred in the United States, a case can be dismissed without the need
to engage in the focus test.  *RJR*, 136 S. Ct. at 2101.

## 2.   As To Nestlé USA, The SAC Does Nothing To Cure The Extraterritorial Deficiencies Of The FAC

In its 2014 decision, the Ninth Circuit did not make a ruling on extraterritorial-
ity.  Instead, it directed Plaintiffs to amend their complaint, noting that the pleadings
"ma[d]e no attempt to explain what portion of the conduct underlying [P]laintiffs'
claims took place within the United States." *Doe I*, 766 F.3d at 1028.  But a compari-
son of the First and Second Amended Complaints reveals that the allegations specific

---

[6]  *RJR* made clear that the "focus" test applies in the ATS context, resolving any am-
biguity created by the Ninth Circuit in this case.  *See Doe I*, 766 F.3d at 1028.

9

to Nestlé USA are substantively *identical* to the allegations in the FAC.  (*Compare* FAC ¶¶ 1, 19 *with* SAC ¶¶ 1, 20, 35 (¶ 35 repeats allegations about Nestlé USA from ¶ 20)).  Therefore, Plaintiffs still have not pleaded which conduct "took place within the United States." On this basis alone, this Court should dismiss Nestlé USA.

### 3. Because All Of The <u>Relevant</u> Conduct Occurred Overseas, Plaintiffs Fail To State A Domestic Application Of The ATS

Even if this Court considers the improper group pleading with regard to "Nestlé" and Defendants as relevant to Plaintiffs' claims against Nestlé USA, like *Kiobel*, all of the *relevant* conduct and Plaintiffs' injuries occurred outside of the U.S.  *See* 133 S. Ct. 1669.  Accordingly, the SAC can be dismissed as extraterritorial without resort to the focus test.  *RJR*, 136 S. Ct. at 2101 (explaining that it was unnecessary to engage in the "focus" test in *Kiobel* because "all the relevant conduct" took place outside the U.S.).

Put simply, Plaintiffs allege they were trafficked from Mali to Côte d'Ivoire, forced to work on farms in Côte d'Ivoire, and harmed in Côte d'Ivoire.  (SAC ¶¶ 13, 70–76).  None of that conduct, nor Plaintiffs' injuries, occurred in the U.S.  And none of their allegations regarding "Nestlé" and "Defendants"—old or new—suggest any *relevant* U.S. conduct.  *See infra* IV.B. (Plaintiffs' failure to allege *actus reus*).

### 4. The SAC Fails To Allege A Domestic Application Of The ATS Under The Focus Test

Even assuming *arguendo* that it is necessary to engage in the second step of the extraterritoriality inquiry by applying the focus test, it is clear that the relevant conduct occurred overseas, as did Plaintiffs' injuries, and this case therefore "involves an impermissible extraterritorial application[,] regardless of any other conduct that occurred in U.S. territory."  *RJR*, 136 S.Ct. at 2101.

#### a. Alleged Conduct

For purposes of the ATS, circuits applying the "focus" test since *Kiobel* have held "that the 'focus' of the ATS is on conduct and on the location of that conduct."

1    *See, e.g.*, *Mastafa v. Chevron Corp.*, 770 F.3d 170, 185 (2d Cir. 2014); *Doe v. Drum-*

2    *mond Co.*, 782 F.3d 576, 592 (11th Cir. 2015), *cert. denied*, 136 S. Ct. 1168 (2016).

3    *RJR* also places emphasis on the place of the injury.  *RJR*, 136 S. Ct. at 2106, 2111 (re-

4    quiring allegations of a "domestic injury" to apply RICO private right of action to con-

5    duct outside of the U.S.).  Here, all of the relevant conduct and Plaintiffs' injuries oc-

6    curred in Côte d'Ivoire and Mali.  Plaintiffs allege they were trafficked from Mali and

7    forced to work in Côte d'Ivoire on cocoa farms.  (SAC ¶¶ 6-11).  To the extent they al-

8    lege that Defendants offered training and supplies, or assistance to local farmers, that

9    also allegedly occurred in Côte d'Ivoire.

10          Even if this Court were to focus on the secondary conduct that Plaintiffs allege,

11   primarily about "Nestlé" and "Defendants," as part of their aiding and abetting theory,

12   Plaintiffs still cannot justify application of U.S. law to their claims.  Indeed, Plaintiffs

13   allege the following connections: (1) U.S. Corporate Citizenship; (2) Defendants' con-

14   trol of the Côte d'Ivoire cocoa market; (3) U.S. lobbying; (4) U.S. operational deci-

15   sions; (5) Inspections in Côte d'Ivoire by U.S. personnel; and (6) U.S. publications and

16   press.  These allegations fail basic pleading standards, are *irrelevant* to the question of

17   whether Nestlé USA—or any of the Defendants—aided and abetted the crimes against

18   Plaintiffs, and provide no basis to apply U.S. law to Plaintiffs' foreign claims.

19          ***1. U.S. Corporate Citizenship and U.S. Conduct by Non-Parties Nestlé S.A.***

20   ***and Nestlé Ivory Coast***.  As they did in the FAC, Plaintiffs continue to allege that

21   Nestlé USA is incorporated and operates in the U.S.; that its parent, Nestlé S.A., trades

22   stock and banks in the U.S.; and that Nestlé Ivory Coast exports cocoa to North Amer-

23   ica.  (SAC ¶¶ 19-21, 35).  First, corporate citizenship is not enough to overcome the

24   extraterritoriality hurdle.  *See Kiobel*, 133 S. Ct. at 1669; *Mujica*, 771 F.3d at 594.

25   Second, courts have routinely held that these kinds of generic allegations do not justify

26   extraterritorial application of the ATS.  *See Mastafa*, 770 F.3d at 184-85.  Finally, the

27   conduct of non-parties, Nestlé S.A. and Nestlé Ivory Coast, evidence extraterritorial

28   activity—not U.S. activity—and is irrelevant in any event, as neither Nestlé S.A. nor

Nestlé Ivory Coast have ever been served and Plaintiffs waived all agency theories after this Court ruled against them in its prior decision. *See supra* at I.B.2.

**2. Control Over Côte d'Ivoire Cocoa And Failure To Eradicate.** Plaintiffs again allege that "Nestlé" (and the other "Defendants") controlled cocoa operations from the U.S. and could have, but failed to, "take[] any necessary steps to eradicate" forced child labor. (SAC ¶ 35). These allegations fail for multiple reasons.

First, the Ninth Circuit remanded and cautioned that Plaintiffs needed to amend to address their extraterritoriality problems. *Doe I*, 766 F.3d at 1028. Second, as this Court previously explained, such an omission—i.e., a failure to act from the U.S.—is not relevant to Plaintiffs' aiding and abetting claim. *Doe*, 748 F. Supp. 2d at 1109. Finally, Plaintiffs have not satisfied basic pleading standards. As their own sources explain, countless suppliers and companies in the cocoa industry purchase cocoa from Côte d'Ivoire, which supplies 70% of the *world's* cocoa. (SAC ¶¶ 33, 52-58). Plaintiffs cannot plausibly allege that Nestlé USA or any "Nestlé" corporate entity (or even all three Defendants at issue here) controlled the market or had the power to eradicate forced child labor. *See Saldana v. Occidental Petroleum Corp.*, 774 F.3d 544, 553-54 (9th Cir. 2014) (rejecting as implausible claim that private company controlled the Colombian army). Indeed, this allegation is merely a "naked assertion[] devoid of further factual enhancement"—it says nothing about what "Nestlé" allegedly controlled and how that possibly relates to Plaintiffs' claims. *See Iqbal*, 556 U.S. at 678; *see also Mujica*, 771 F.3d at 592 (rejecting allegations that rely on "mere conjecture").

**3. U.S. Lobbying Efforts.** Plaintiffs also continue to point to alleged "lobbying efforts" by the "U.S. chocolate industry, including Defendants[,]" which do nothing to justify application of the ATS to the wrongs alleged here. (SAC ¶¶ 63–67). First, the "focus" of the ATS does not—and cannot—include lobbying efforts protected by the First Amendment. *See, e.g.*, *United States v. Wallace*, 531 F.3d 504, 506 (7th Cir. 2008) ("[T]he first amendment protects self-interested campaigning."); *Sosa v.*

1   *DIRECTV, Inc.*, 437 F.3d 923, 931 (9th Cir. 2006) (courts must "construe federal stat-

2   utes so as to avoid burdening conduct that implicates the protections afforded by the

3   Petition Clause unless the statute clearly provides otherwise").  Further, courts have

4   held that policy decisions in the U.S. are not enough to rebut the presumption against

5   extraterritoriality.  *Drummond*, 782 F.3d at 598.[7]

6   ***4. U.S. Operational Decisions.***  In an attempt to offer a new allegation, the SAC

7   tautologically claims that "[e]very major operational decision regarding Nestlé's U.S.

8   market is made in or approved in the U.S." (SAC ¶ 35).  But this does not justify appli-

9   cation of U.S. law either.  Plaintiffs' generic allegations do not explain how decisions

10   regarding the "U.S. market" are relevant to their claims.  For example, Plaintiffs do not

11   allege that these decisions concerned the working conditions on farms (farms that

12   "Nestlé" is not alleged to have owned, operated or contracted with).  Nor do Plaintiffs

13   allege that these "operational decisions" concerned Plaintiffs or their alleged captors.

14   Further, this "Court may not presume that conduct relevant to the ATS claims

15   occurred as part of these routine business practices."  *Doe v. Exxon Mobil Corp.*, 2015

16   WL 5042118, *13 (D.D.C. July 6, 2015); *see also Drummond*, 782 F.3d at 598-99 (re-

17   jecting suit where "Plaintiffs allege that generally, Defendants made funding and pol-

18   icy decisions in the United States"); *Mujica*, 771 F.3d at 592.  And courts have consist-

19   ently held that "[a]llegations of general corporate supervision are insufficient to rebut

20   the presumption against [extra]territoriality."  *Balintulo v. Ford Motor Co.*, 796 F.3d

21   160, 168 (2d Cir. 2015); *Cardona v. Chiquita Brands*, 760 F.3d 1185, 1189–90 (11th

22   Cir. 2014) (same); *Exxon Mobil Corp.*, 2015 WL 5042118 at *13.

23   This allegation also squarely contradicts Plaintiffs' assertions elsewhere in the

24   ---

[7]  The proposed legislation would have merely provided the FDA with $250,000 to develop an FDA label certifying chocolate as "slave free."  In contrast, the Harkin Engel Protocol proposed "credible, mutually-acceptable, voluntary, industry-wide standards of public certification . . . that cocoa beans . . . have been grown and/or processed without any of the worst forms of child labor."  *Compare* H. Amend. 142, H.R. 2330 (2001) (in 147 Cong. Rec. H3781 (daily ed. June 28, 2001)) *with* CMA *Protocol for the Growing and Processing of Cocoa Beans and Their Derivative Products in a Manner that Complies with ILO Convention 182 Concerning the Prohibition and Immediate Action for the Elimination of the Worst Forms of Child Labor* (2001).

SAC that Nestlé USA is a "wholly-owned subsidiary of Nestlé, SA," a parent company "[b]ased in Switzerland," and that "the parent entities control every aspect of the subsidiaries' operations, particularly with respect to the sourcing, purchasing, manufacturing, distribution, and/or retailing of cocoa and cocoa derived products." (SAC ¶¶ 19-20, 30). The Court should disregard allegations of U.S. based control for that reason alone. See *Airs Aromatics, LLC v. Opinion Victoria's Secret Stores Brand Mgmt., Inc.*, 744 F.3d 595, 600 (9th Cir. 2014) ("A party cannot amend pleadings to directly contradict an earlier assertion made in the same proceeding." (citation omitted)).

**5. Inspections In Côte d'Ivoire By U.S. Personnel.** Plaintiffs now allege that employees from "U.S. headquarters inspect[ed] [Nestlé Ivory Coast] operations in Côte D'Ivoire." (SAC ¶ 35). This allegation does not describe U.S. conduct; the inspections, after all, allegedly occurred "in Côte D'Ivoire." And the allegation that some of those who participated in those inspections were U.S. employees makes no difference. As the Ninth Circuit explained in *Mujica*, the fact that some of the "participants" in an overseas bombing were "employees" of a U.S. company does "not support a sweeping inference that [the U.S. company], *through actions in the United States*, took sufficient part in the bombing to be subject to ATS jurisdiction under *Kiobel*." 771 F.3d at 592 n.6 (emphasis in original).

Moreover, the "operations" of "Nestlé" in Côte d'Ivoire consisted only of processing, not farming, cocoa beans (SAC ¶ 21); thus, alleged inspections of those processing operations would not have related to abuses on cocoa farms.

**6. U.S. Publications And Press.** Plaintiffs added the words "published in the U.S. in English and targeting the U.S. market" at the beginning of a handful of paragraphs describing previously cited Nestlé S.A. policies and supplier standards that clearly stand *against* forced child labor. They also add new allegations about 2013 policies. (SAC ¶¶ 56-57). Plaintiffs contend that these policies evidence efforts in the U.S. to deny to U.S. consumers that they were aiding and abetting forced child labor.

1   (*Id.* ¶¶ 51, 58).  These allegations fail to establish a relevant U.S. link for several rea-

2   sons.

3         First, the publication timelines do not match Plaintiffs' allegations.  Plaintiffs re-

4   fer to (primarily Nestlé S.A.) publications from 2005-2013 (*see* SAC ¶¶ 52-57), but

5   Plaintiffs' alleged harm ended between 1998 and 2001 (*see* SAC ¶¶ 70–75).

6         Second, Plaintiffs' allege only that these publications "falsely assured" U.S.

7   consumers (SAC ¶¶ 51-52) or were part of a "public relations campaign" (SAC

8   ¶ 69)—they do not allege how these publications assisted forced child labor.  To the

9   contrary, these publications evidence a clear effort to combat unlawful practices, in-

10   cluding forced child labor; they do not seek to enable them.  At best, these allegations

11   appear to be remnants of theories brought by the long dismissed Plaintiff Global Ex-

12   change, which attempted to act on behalf of "American consumers."  (*See* FAC ¶ 17).

13         Third, the publications are far more benign than the *propaganda specifically di-*

14   *rected to the U.S.* that other courts have held insufficient to justify a domestic applica-

15   tion of law.  *See Gang v. Zhizhen*, 2016 WL 1275026, *3 (D. Conn. Mar. 31, 2016) (al-

16   legations that defendant "specifically directed" his propaganda campaign to the U.S.

17   through his website were insufficient to survive after *Kiobel*).

18         **b.   Alleged Injuries**

19         Finally, even if relevant conduct were deemed to have occurred in the U.S., the

20   SAC should still be dismissed because Plaintiffs' alleged injuries all occurred over-

21   seas.  In *RJR*, the Supreme Court held that RICO's private right of action reaches only

22   "*domestic* injury," no matter where the conduct underlying the substantive RICO vio-

23   lation occurred.  136 S. Ct. at 2106.  The same logic applies to the ATS.  *See id.*; *see*

24   *also Sosa v. Alvarez-Machain*, 542 U.S. 692, 705 (2004) (explaining that courts in

25   "tort cases" generally apply "the law of the place where the injury occurred");

26   *Taghadomi v. United States*, 401 F.3d 1080, 1084 (9th Cir. 2005) ("The locus of a tort

27   is the place where injury takes effect.").  In this case, all of Plaintiffs' alleged injuries

28   occurred abroad.  (SAC ¶¶ 6-11, 70-75).

**B.   Plaintiffs Have Not Alleged The Requisite *Actus Reus***

Plaintiffs also fail to allege *actus reus*.  To allege aiding and abetting, a plaintiff must adequately plead that the defendant had the requisite mental state (*mens rea*) and provided the requisite support in the commission of the crime (*actus reus*).  In interpreting the standard for *actus reus*, Plaintiffs argued that a showing of "substantial assistance" was sufficient.  Defendants argued—and this Court agreed—that international law also required that the substantial assistance be specifically directed toward the commission of a specific crime. *Doe*, 748 F. Supp. 2d at 1081.  On appeal, the Ninth Circuit "decline[d] to adopt an *actus reus* standard." *Doe I*, 766 F.3d at 1026. Instead, citing two international law opinions decided after Plaintiffs filed the FAC—*Perisic* and *Taylor*—the Ninth Circuit suggested the *actus reus* standard focused more on the existence of a causal link between the defendants and the commission of the crime. *Id*.  It then directed Plaintiffs to amend in light of these authorities. *Perisic* and *Taylor* confirm that this Court was correct—the "specifically directed" standard is the proper standard, and Plaintiffs' allegations do not satisfy that standard.  Even applying a substantial assistance or "causal link" standard, the SAC still fails to state a claim.

**1.   *Perisic* And *Taylor* Confirm The Propriety Of Using The "Specific Direction" Standard**

The authority of federal courts under the ATS is "limited . . . to recognizing causes of action only for alleged violations of international law norms that are 'specific, universal, and obligatory.'" *Kiobel*, 133 S. Ct. at 1665 (quoting *Sosa*, 542 U.S. at 732).  Therefore, this Court may only recognize an *actus reus* standard that is "universal[ly]" accepted in international law. *Perisic* and *Taylor*—cases involving some of the most heinous massacres and other war crimes of the last century—not only underscore how far afield it is to target efforts to combat forced labor as "aiding and abetting," but also demonstrate that *Perisic*'s "specific direction" formulation is the only standard with sufficient universal acceptance.

In *Perisic*, the International Criminal Tribunal for the Former Yugoslavia

("ICTY") addressed whether Perisic, the Chief of the Yugoslav Army General Staff, was liable for aiding and abetting atrocities committed in Sarajevo and Srebrenica by Army of the Republika Srpska ("VRS"). *Perisic*, ¶¶ 2, 3. The prosecution's theory was that Perisic was responsible for the atrocities because he "administered and facilitated the provision of large-scale military assistance to the VRS." *Id*. ¶ 64. The evidence showed that some of the assistance was sent to VRS units that Perisic knew to be committing crimes. *Id*. ¶¶ 66, 68-69. Even so, the tribunal held that Perisic was not liable for aiding and abetting. *Id*. ¶ 74. According to the tribunal, Perisic's aid "was directed towards the VRS's general war effort rather than VRS crimes." *Id*. ¶¶ 68-69. Since the aid was general, and not "specifically directed" toward the alleged crimes, the tribunal held that Perisic did not engage in the *actus reus* required for aiding and abetting liability. *Id*.[8] It explained that the "specifically directed" element was a necessary component of the aiding and abetting theory because the defendant was "remote" and not "physically present during the preparation or commission of crimes," such that his culpable involvement in the crimes would "be self-evident." *Id.* ¶¶ 38-39.

In *Taylor*, the Appeals Chamber of the Special Court for Sierra Leone considered whether Taylor, the notorious former Liberian President, could be liable for, *inter alia*, aiding and abetting 11 counts of crimes against humanity. *See Taylor*, ¶ 13. The court held *actus reus* is "established by assistance, encouragement or moral support that has a substantial effect on the crimes" and noted the significance of ensuring "that there is a sufficient causal link—a criminal link—between the accused and the commission of the crime before an accused's conduct may be adjudged criminal." *Id*. ¶¶ 368, 390. The tribunal thus held that there was a "causal link between Taylor's acts and conduct and the crimes" because he provided "extensive" and "sustained" operational support, as well as "arms and ammunition," to paramilitary forces that otherwise

---

[8] After *Perisic*, a different ICTY appellate panel held that the "specifically directed" standard is not part of the *actus reus* requirement. *Prosecutor v. Sainović*, Case No. IT-05-87-A, Appeal Judgment (ICTY Jan. 23, 2014). However, when the *Perisic* panel was asked to reconsider its opinion in light of *Sainović*, it declined. *Perisic*, IT-04-81-T, Decision on Motion for Reconsideration (ICTY Mar. 20, 2014).

1  would not have had the supplies needed to commit atrocities.  *Id.* ¶¶ 514-20.

2  This discussion clarifies that *Perisic*'s "specific direction" standard is the only

3  universally accepted *actus reus* standard.  Although *Taylor* expressly "[did] not agree

4  with the *Perisic* Appeals Chamber[]" on this issue, (*id.* ¶ 480), *Taylor* articulated a

5  broader understanding of conduct that could constitute aiding and abetting.  *Sosa* re-

6  quires this Court to apply the more demanding "specific direction" standard.  The SAC

7  makes no attempt to allege specific direction and therefore fails on this basis alone.

8  **2.   Plaintiffs' Allegations Fail To Satisfy Any *Actus Reus* Standard**

9  The SAC also fails to allege *actus reus* under the "substantial assistance" stand-

10  ard and fails to articulate any "causal link" between Defendants and the alleged crimes.

11  **a.   Nestlé USA**

12  The SAC mentions Nestlé USA three times—once listing it as a Defendant

13  (SAC ¶ 1) and twice describing it as a "wholly-owned subsidiary of Nestlé, S.A." with

14  U.S. operations (SAC ¶¶ 20, 35).  Though Plaintiffs had eleven years to perfect these

15  allegations, they still fail to describe "substantial assistance," or a "causal link."  This

16  Court's analysis can, and should, end there.

17  **b.   "Nestlé" Entities And "Defendants"**

18  Even considering Plaintiffs' group allegations about "Nestlé" and "Defendants,"

19  the SAC fails to adequately allege any possible formulation of the *actus reus* standard.

20  ***Control and Failure to Eradicate Forced Child Labor in Côte d'Ivoire.***  Plain-

21  tiffs allege that "Nestlé," Defendants, and other multinational corporations had "com-

22  plete control" over cocoa operations in Côte d'Ivoire and the use of child labor on the

23  farms, and, from the U.S., could have "eradicate[d] the practice of using child slaves to

24  harvest its cocoa in Côte d'Ivoire" (SAC ¶¶ 33, 35, 38, 51, 56–58).  Specifically, as

25  they claimed in the FAC, Plaintiffs allege Defendants were "able to dictate . . . labor

26  conditions" through the exclusive supplier/buyer relationships which they used to en-

27  sure an "ongoing, cheap supply of cocoa" and that Nestlé processed cocoa near Odi-

28

enne in Côte d'Ivoire.  (SAC ¶¶ 36, 38).  These allegations are nothing more than naked assertions devoid of further factual enhancement.  *Iqbal*, 556 U.S. at 678.

As explained above, "judicial experience and common sense" make clear that it is implausible to suggest Nestlé USA, or even all three Defendants, control Côte d'Ivoire and could eradicate forced child labor on their own.  *See supra* IV.A.4(a)(2).

Plaintiffs also fail to allege either "substantial assistance" or a "causal link."  Here, Plaintiffs claim an omission—the failure to eradicate forced child labor—not an affirmative criminal act.  First, as this Court previously explained, "omissions, moral support, and tacit approval and encouragement" are "not sufficiently well-defined and universally accepted to constitute an actionable international law norm under *Sosa*."  *Doe I*, 748 F. Supp. 2d at 1102, 1109.  Second, "[t]o the extent this type of liability exists," which it does not, "an 'omission' or 'failure to act' only gives rise to aiding and abetting liability if 'there is a **legal duty** to act'" and "**all** of the . . . cases . . . involve defendants who held a position of formal authority."  *Id*. at 1104-05 (emphasis in original).  Otherwise, "there is no criminal liability . . . for mere failure to act."  William A. Schabas, *General Principles of Criminal Law in the ICC Statute*, 6 Eur. J. Crime Crim. L. Just. 400, 412 (1998).  Plaintiffs do not allege that any Defendant, much less Nestlé USA, had any legal duty to act in this case, and there is no plausible argument that any Defendant had a "position of formal authority."

Finally, Plaintiffs do not allege (nor can they) that "Nestlé" or "Defendants" dictated that forced labor be used in their supply chain or that any profits made by local farmers from poor labor practices would be passed up the supply chain to Defendants.  The sources cited by Plaintiffs suggest just the opposite.  For example, the first pillar of "Nestlé's" Supplier Code is a "prohibition against child labor."  (SAC ¶¶ 56-57).

***Employee Visits, Technical Assistance, and Training.***  In addition to their reprised allegations that "Defendants" provided some Ivorian farmers with certain financial and technical assistance and training, Plaintiffs also now allege that "Nestlé" sent unidentified Swiss and U.S. employees—at an unidentified point in time—to inspect

their operations in Côte d'Ivoire so that "U.S.-based decision-makers had accurate facts on the ground." (SAC ¶¶ 35, 37, 66). Plaintiffs' old allegations fail for the same reasons they did six years ago, and their new allegations about employee visits fail to allege substantial assistance or suggest any causal link to their alleged injuries.

First, as in their FAC, Plaintiffs still fail to show how any of "Defendants'" alleged assistance or training substantially assisted the crimes perpetrated against Plaintiffs. This Court already held that the same allegations regarding financial assistance reflected mere "commercial transactions" intended to facilitate the Defendants' access to cocoa. *Doe I*, 748 F. Supp. 2d at 1100. Likewise, Plaintiffs' allegations concerning "technical assistance" "establish, at most, that Defendants generally assisted the Ivorian farmers in the act of growing crops and managing their business—**not** that Defendants substantially assisted the farmers in the acts of committing human rights abuses." *Id.* at 1102 (emphasis in original). The law of nations "does not impose liability for declining to boycott a pariah state," and Plaintiffs cannot punish companies for "simply doing business" in Côte d'Ivoire. *See In re S. African Apartheid Litig.*, 617 F. Supp. 2d 228, 257 (S.D.N.Y. 2009). Nor do Plaintiffs allege that any Nestlé entity provided support to any of the farmers allegedly responsible for harming Plaintiffs.

Additionally, Plaintiffs' own sources suggest that Defendants' assistance would have helped improve the farming conditions and therefore, potentially helped minimize conditions that could incentivize farmers to use forced or child labor. For example, Plaintiffs cite "Nestlé's" Commitment to Africa Brochure which states that "Nestlé" provides technical assistance relating to "income generation[,] . . . new strategies to deal with crop infestation, [and] . . . specific interventions designed to address issues of child labour." (SAC ¶¶ 53-58). The only causal link suggested by Plaintiffs' allegations, is that the assistance provided by Defendants helped to *reduce*, not facilitate, the global social problem. At best, Plaintiffs' allegations are similar to those in *Doe I v. Cisco Sys., Inc.*, where plaintiffs alleged Cisco was liable for aiding and abetting human rights abuses because it created software that provided the means by which the

Gibson, Dunn & Crutcher LLP

Chinese Communist Party tracked, detained, and ultimately tortured them. 66 F. Supp. 3d 1239, 1241, 1248 (N.D. Cal. 2014). Applying the "substantial effect" standard, the court found that plaintiffs' allegations were conclusory and insufficient, in part because the Cisco product had many uses that were not tied to human rights abuses. *Id*. at 1248. Likewise, here, there is no doubt that the alleged assistance provided by Defendants has non-criminal purposes. Indeed, Plaintiffs have conceded as much.

Further, Plaintiffs' vague allegations that "Nestlé" employees inspected "Nestlé" operations in Côte d'Ivoire and reported back to the U.S. about those inspections do nothing to show substantial assistance to Plaintiffs' alleged assailants or a causal link between "Nestle" and Plaintiffs' harm. Indeed, Plaintiffs allege that Nestlé Ivory Coast had a processing plant – not a cocoa farm. And the absence of any specific allegation regarding these alleged "inspections" likewise speaks volumes: (1) Plaintiffs do not allege that any Nestlé entity owned or operated farms in Côte d'Ivoire—certainly none that Plaintiffs worked; (2) they do not allege that there was any enslavement or mistreatment at Nestlé Ivory Coast's facility; (3) they do not alleged that these "inspections" occurred prior to 2001—when Plaintiffs were allegedly injured; and (4) Plaintiffs do not identify a single instance of a "Nestlé" employee identifying harm and choosing to ignore it—instead, Plaintiffs' SAC underscores "Nestlé's" policy to report any such instances if they are observed. (SAC ¶¶ 52-55). As such, even assuming that Nestlé USA or other employees inspected the Nestlé Ivory Coast facility, which is not alleged to be the site of any wrongdoing, that does nothing to create a connection between such activity and the harm that allegedly befell Plaintiffs.

***Corporate Social Responsibility.*** Finally, Plaintiffs cite extensively from "Nestlé's" "Standards of Business Conduct," "Principles of Purchasing," "Webpage of Suppliers Management," "Commitment to Africa Brochure," "The Nestlé Commitment on Child Labour," and the "Nestlé Supplier Code." (SAC ¶¶ 52-57). They contend that these publications, which express "Nestlé's" opposition to forced child labor and describe its efforts to help address the global social problem, are part of "Nestlé's"

Gibson, Dunn & Crutcher LLP

effort "to continue aiding and abetting child slavery with no measureable loss of U.S. market share." (SAC ¶¶ 51–58). This appears to be a meritless consumer misrepresentation claim, not a claim for violation of international law.

Moreover, these allegations about statements and policies from 2005 onward, do not have a logical connection to Plaintiffs' alleged harm, which ended between 1998 and 2001. Thus, there simply is no "causal link" between these U.S. policies and Plaintiffs' alleged injuries in Côte d'Ivoire and Mali.[9]

More importantly, Plaintiffs' reliance on social responsibility policies highlights how surreal Plaintiffs' aiding and abetting theory has become. Their allegations show that "Nestlé" and the other Defendants have repeatedly and publicly engaged in efforts to help combat forced child labor. (*See* SAC ¶¶ 52-60). Stripping back Plaintiffs' unsupported conclusions, their allegations about "Nestlé's" policy statements and lobbying efforts amount to the following, "Nestlé": (a) "is against all forms of exploitation of children" (*id*. ¶¶ 52, 56); (b) sets supplier standards that prohibit forced labor (*id*. ¶¶ 53,54,57); (c) provides "'training of trainers' . . . to help eliminate the worst forms of child labor" (*id*. ¶¶ 53-55); and (d) voluntarily dedicated millions of dollars to help eradicate forced labor in Côte d'Ivoire (*id.* ¶¶ 63-65).

These goals are laudable, not criminal. Indeed, having failed to establish any link whatsoever between these statements and criminal conduct, these policies are protected speech regarding "matters of public concern." *See Thornhill v. Alabama*, 310 U.S. 88, 104 (1940). Thus, Plaintiffs' suit is not only baseless as a factual matter, but also is an unconstitutional effort "to exact a cost" from "Nestlé" for its protected noncommercial speech. *See Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 336, 337 (2010) (citing *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 267 (1964)).

The Ninth Circuit directed Plaintiffs to amend in light of two cases involving

---

[9] And, to the extent Plaintiffs' theory is even credited at all (which it should not be), it would still be improper because it attacks subsequent remedial measures. U.S. law reflects a deeply rooted policy of encouraging parties to engage in remedial measures. *See, e.g.*, Fed. R. Evid. 407; *Tietsworth v. Sears*, 720 F. Supp. 2d 1123, 1148 n.7 (N.D. Cal. Mar. 31, 2010) (explaining that allegations concerning "remedial action[s]" are "immaterial" at the motion to dismiss stage).

Gibson, Dunn & Crutcher LLP

heinous war crimes.  Instead, Plaintiffs strain to try to cast Defendants' laudable efforts to help address a global social problem as bad acts.  Regardless of the legal standard, Plaintiffs have entirely failed to state a claim.

## C.     Plaintiffs Do Not Have Standing To Sue Nestlé USA

For many of the same reasons that Plaintiffs fail to allege *actus reus*, they also lack standing to sue Nestlé USA, which deprives this Court of subject matter jurisdiction over the claims against Nestlé USA.  *See* Fed. R. Civ. P. 12(b)(1).  Article III standing requires "a causal connection between the injury and the conduct complained of—the injury has to be 'fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  This requirement is not lessened for a class action.  *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 594 (9th Cir. 2012).  Nor have Plaintiffs alleged a concrete or particularized injury attributable to Nestlé USA.  *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016).

Thus, in *Abecassis*, the court held that the plaintiffs—survivors of, and relatives of victims of, suicide bombings in Israel—lacked standing to bring aiding and abetting allegations against an oil and gas company because there was no direct relationship between the defendant and the principal tortfeasors, the suicide bombers.  *Abecassis v. Wyatt*, 704 F. Supp. 2d 623, 643 (S.D. Tex. 2010).  Plaintiffs' alleged that the company aided and abetted genocide and crimes against humanity by illegally purchasing oil from the Saddam Hussein regime, which in turn, independently used the funds to finance terrorism.  *Id*.  The court held that this was not enough because, ultimately, "the suicide bombers and the terrorist[s]" carried out the attacks, not the Hussein government or various third parties, and certainly not defendant.  *Id*.

Here, Plaintiffs merely allege that Nestlé USA is a Nestlé S.A. subsidiary (SAC ¶¶ 20, 35).  Plaintiffs make no effort to explain how Nestlé USA's operations connect to their injuries in Côte d'Ivoire; they do not allege that Nestlé USA (or any Nestlé entity) directly harmed Plaintiffs or has any relationship with the principal tortfeasors;

nor do they suggest that, had Nestlé USA ceased purchasing cocoa altogether, Plaintiffs might have suffered a different fate.  Plaintiffs thus provide no basis to conclude that Nestlé USA or any "Nestlé" conduct, for that matter, caused Plaintiffs' injuries.  *See Twombly*, 550 U.S. at 555.  Indeed, "Plaintiffs do not allege . . . that Defendants provided the guns and whips that were used to threaten and intimidate the Plaintiffs."  *Doe I*, 748 F. Supp. 2d at 1101.  Plaintiffs do not even allege that any "Defendant" purchased cocoa from any specific farm when Plaintiffs allegedly worked there.  To the contrary, they cite documents that confirm that "Nestlé" has policies against forced child labor, and supports several on-the-ground programs designed to help eradicate it.  (SAC ¶¶ 52-55).  This cannot be said to have caused Plaintiffs' harm and renders Plaintiffs' allegations implausible.[10]

## D.    Plaintiffs' Claims Fail For Numerous Additional Reasons

*First*, Plaintiffs' improper attempt to lump allegations about Nestlé USA with several other Defendants is an independent basis for dismissal.  *See* Fed. R. Civ. Proc. 8; 12(b)(6); *Twombly*, 550 U.S. at 555.  Plaintiffs' group pleading "draw[s] no meaningful distinctions between or among" the three defendants under the "Nestlé" label, or the seven defendants under the "Defendants" label and should be dismissed on this basis.  *Top Rank*, 2015 WL 9948966, at *9; *see also Rush v. Savchuk*, 444 U.S. 320, 331-32 (1980) (rejecting an "attempt[] to attribute [one defendant]'s contacts to [another defendant]").  This is particularly clear where, as here,  group pleading raises significant due process concerns, only three of the seven named defendants have been served, and Plaintiffs' agency allegations were long ago dismissed.

*Second*, Plaintiffs' theory of unlimited corporate liability predicated on global trade, corporate social responsibility programs and protected speech threatens grave trade implications and seeks to punish U.S. citizens for commercial activity that they

---

[10]  Plaintiffs' repeated reference to "Nestlé's" efforts to use suppliers that are committed to engaging in lawful labor practices means "the complaint itself gives reasons to believe that" Plaintiffs' allegations are implausible.  *See* B(2)(b), *supra*.

Gibson, Dunn & Crutcher LLP

had no notice would subject them to liability.  The Supreme Court has repeatedly cautioned against adopting novel or aggressive theories of ATS liability, not only for fear of foreign-policy consequences, but also to preserve the separation of powers.  *E.g.*, *Kiobel*, 133 S. Ct. at 1664 ("[T]he danger of unwarranted judicial interference in the conduct of foreign policy is magnified in the context of the ATS" because judge-made law in this area could "imping[e] on the discretion of the Legislative and Executive Branches in managing foreign affairs."); *Sosa*, 542 U.S. at 725-27; *see also Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 254-56 (2d Cir. 2009); *Doe I,* 788 F.3d at 947 (Bea, J., dissenting from the denial of rehearing en banc).

  *Finally*, Nestlé USA strongly disagrees with the Ninth Circuit's *mens rea* analysis and its conclusion that the FAC's allegations satisfied any *mens rea* standard.  *See Doe I*, 766 F.3d at 1023-26.  While that decision may preclude this Court from adopting a different rule of law, Nestlé USA preserves its prior *mens rea* arguments.  Further, the three paragraphs in the SAC about Nestlé USA do not purport to describe any mental state that can be attributed to Nestlé USA.  Accordingly, even under the Ninth Circuit's articulation of what is sufficient to survive a Rule 12(b)(6) challenge to *mens rea*, Plaintiffs have not pleaded that Nestlé USA acted with the requisite *mens rea*.[11]

## V.  CONCLUSION

  Nestlé USA respectfully requests dismissal with prejudice.  It would be fundamentally unfair and prejudicial to permit this action to proceed, given Plaintiffs' repeated failure to state a claim after more than a decade.

---

[11] Nestlé USA preserves its other challenges to the Ninth Circuit's rulings (including whether aiding and abetting and corporate liability are available under the ATS) and its right to challenge any other adverse rulings from these proceedings.

1  Dated: September 15, 2016

2

3                                     THEODORE J. BOUTROUS JR.
                                      GIBSON, DUNN & CRUTCHER LLP

4

5

6                                     By:  /s/      Theodore J. Boutrous Jr.
                                               Theodore J. Boutrous Jr.

7
                                      Attorneys for Defendant
8                                     NESTLÉ USA, INC.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANT NESTLÉ USA'S MOTION TO DISMISS DOE PLAINTIFFS' SECOND AMENDED COMPLAINT